# IN THE UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

## CASE NO. 13-1799-CR

_____

**CHRISTIAN GEROLD TARANTINO,**

**Defendant/Appellant,**

**vs.**

**UNITED STATES OF AMERICA**

**Plaintiff/Appellee.**

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CENTRAL ISLIP)**
_____

_____

**BRIEF FOR DEFENDANT/APPELLANT**
_____

**TODD G. SCHER**
**FLORIDA BAR #0899641**
**LAW OFFICE OF TODD G. SCHER, P.L.**
**398 E. DANIA BEACH BLVD. #300**
**DANIA BEACH, FL 33004**
**TEL: 754-263-2349**
**FAX: 754-263-4147**
**COUNSEL FOR APPELLANT**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................v

**PRELIMINARY STATEMENT** ....................................................1

**STATEMENT OF JURISDICTION** .............................................1

**REQUEST FOR ORAL ARGUMENT** .........................................1

**STATEMENT OF THE CASE** ......................................................2

**ISSUES PRESENTED** ..................................................................3

**STATEMENT OF THE FACTS** ...................................................4

    **A. The First Trial** ...................................................................4

      **1. COUNT 1 - BAUMGARDT ROBBERY** .........................4

      **2. COUNT 2 – DORVAL HOMICIDE** .................................9

      **3. COUNTS 3 AND 4– GARGUILO HOMICIDE** ............18

    **B. THE SECOND TRIAL.** .....................................................27

**SUMMARY OF THE ARGUMENTS** ........................................39

**ARGUMENT** ..............................................................................44

**POINT I** ......................................................................................44

**COUNT 1 OF THE INDICTMENT MUST BE DISMISSED** .........44

    **A. The Indictment and Statutory Language** ......................45

    **B. The Indictment is Defective** ...........................................46

      **1. The Parallel Statutes** .....................................................51

      **2. The Legislative History** .................................................53

    **C. Conclusion** .......................................................................55

**POINT II** ...................................................................................56

**TARANTINO'S CONVICTION OF COUNT 2 MUST BE VACATED IN LIGHT OF *FOWLER V. UNITED STATES*** ...............................56

    **A.** *Fowler* Requires Dismissal of Count 2 due to Insufficient Evidence. ......59

    **B.  Erroneous Jury Instruction Under *Fowler*** ..............................65

**POINT III** ..................................................................................68

**TARANTINO WAS INVOLUNTARILY ABSENT FROM CRITICAL STAGES OF THE PROCEEDINGS AND A NEW TRIAL IS WARRANTED ON COUNTS 1 AND 2.** ...........................................68

    **A.  Introduction** ......................................................................68

    **B.  Tarantino had a right to be present at the pre-qualification of jurors.** ..70

    **C.  When is a defendant's right to be present violated?** ..................71

    **D.  What is an effective waiver of a defendant's right to be present?** ...........72

    **E.  Argument** ...........................................................................73

        **1. Tarantino's right to be present during the pre-qualification of jurors was violated.** ......................................................73

        **2. Tarantino did not waive his right to be present.** .......................74

**POINT IV** ..................................................................................76

**THE "GARGUILO TAPE" WAS IMPROPERLY ADMITTED INTO EVIDENCE AT BOTH TRIALS AND A NEW TRIAL IS WARRANTED.** ...........................................................................76

    **A.  Legal Overview** ...................................................................77

    **B.  Argument** ..........................................................................78

**POINT V** ...................................................................................83

**A NEW TRIAL IS REQUIRED ON COUNTS 1 AND 2 BECAUSE OF**

**AN ACTUAL CONFLICT OF INTEREST.**...................................83

   **A. Tarantino raised a conflict-of-interest issue in the district court and requested a hearing.**..................................................83

   **B. Froccaro labored under an actual conflict of interest and the district court failed to conduct a hearing.** ...............................86

**POINT VI**..............................................................................90

**TARANTINO'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO THE GOVERNMENT'S INCONSISTENT THEORIES PRESENTED AT BOTH TRIALS AS TO DORVAL'S MURDER. DISMISSAL WITH PREJUDICE ON ALL CHARGES OR A NEW TRIAL ON ALL CHARGES IS WARRANTED.** .............................90

   **A. Factual Background** ........................................................90

   **B. Legal Overview** ...............................................................94

     **1. Judicial Estoppel as acknowledged by the Supreme Court and other Circuits.**....................................................96

     **2. Three-Factor Test** ..........................................................99

   **C. Argument** ........................................................................100

     **1. The Government pursued factually contradictory theories against the Pistone brothers and Tarantino.** ...............100

     **2. The three-factor test applies to Tarantino's case.** ...............101

     **3. Tarantino may raise this issue for the first time on appeal.**..................102

     **4. Tarantino is entitled to relief.** ......................................103

**POINT VII** ............................................................................103

**COUNT THREE MUST BE VACATED** ...............................103

   **A. THE GOVERNMENT KNOWINGLY PRESENTED PERJURED TESTIMONY REGARDING A MURDER.**.........................103

     **1. Background** ...................................................................103

     **2. Legal Overview** .............................................................105

**3. Analysis** .............................................................................106

**4. Conclusion** .........................................................................107

**B. THE GOVERNMENT IMPROPERLY ARGUED FACTS NOT IN EVIDENCE AND BOLSTERED MULLIGAN'S TESTIMONY IN REBUTTAL SUMMATION** ....................................................107

**POINT VIII** .................................................................................112

**THE DISTRICT COURT'S DECISION TO REFUSE TO DISQUALIFY AUSA MISKIEWICZ WAS AN ABUSE OF DISCRETION** ...............................................................................112

**A. Background** ........................................................................112

**B. Legal Overview** ..................................................................114

**C. Analysis** .............................................................................115

**D. Conclusion** .........................................................................117

**CONCLUSION** ............................................................................117

**CERTIFICATE OF SERVICE** .....................................................118

**CERTIFICATE OF COMPLIANCE** .............................................118

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adler v. Pataki*, 185 F.3d 35 2d Cir. 1999)............................................................95

*Annunziato v. Manson*, 566 F.2d 410 (2d Cir.1977) ............................................106

*Bond v. United States*, 134 S.Ct. 2077 (2014) .......................................................55

*Bottaro v. Halton Associates*, 680 F.2d 895 (2d Cir. 1982) ........................ 115, 116

*Bradshaw v. Stumpf*, 545 U.S. 175 (2005).......................................................... 97, 98

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................................99

*Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010)......................................................78

*Cinema 5 Ltd. v. Cinerama, Ltd.*, 528 F.2d 1384 (2d Cir. 1976) .........................115

*Cohen v. Senkowski*, 290 F.3d 485 (2d Cir. 2002)................................ 70, 71, 72, 73

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)................................................................87

*Davis v. Wakelee*, 156 U.S. 680 (1895)..................................................................97

*DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99 (2d Cir. 2010)...............................100

*Diaz v. Herbert*, 317 F.Supp.2d 462 (S.D.N.Y. 2004) ...........................................70

*Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) ....................................................99

*Faretta v. California*, 422 U.S. 806 (1975) ...........................................................70

*Fowler v. United States,* 131 S.Ct. 2045 (2011) ............................................. passim

*Grayton v. Ercole*, 691 F.3d 165 (2d Cir. 2012)....................................................70

*Hagner v. United States*, 285 U.S. 427 (1932) .......................................................48

*Hamling v. United States*, 418 U.S. 87 (1974) .......................................................47

*In re Adelphia Recovery Trust*, 634 F.3d 678 (2d Cir. 2011)...............................100

*In re Double-Click, Inc. Privacy Litigation*, 154 F.Supp.2d 497 (S.D.N.Y. 2001)78, 82

*Lewis v. United States*, 146 U.S. 370 (1892) .................................................... 71, 74

*Lia v. Saporito*, 134 S.Ct. 2305 (2014) .......................................................... 95, 100

*Lia v. Saporito*, 541 F. App'x 71 (2d Cir. 2013)............................................ 95, 100

*Muro v. UBS Fin. Servs.*, Inc., 331 F. App'x 886 (2d Cir. 2009).........................102

*New Hampshire v. Maine*, 532 U.S. 742 2001) ............................... 97, 99, 100, 102

*Pegram v. Herdrich*, 530 U.S. 211 (2000)................................................................97

*Perkins v. LeFevre*, 691 F.2d 616 (2d Cir.1982) ..................................................106

*Polizzi v. United States*, 1990 WL 100891 (S.D.N.Y. 1990) ................................75

*Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154 2010) ...........................................95

*Rochin v. People of California*, 342 U.S. 165 (1952)....................................92, 101

*Rushen v. Spain*, 464 U.S. 114 (1983) ...................................................................70

*Scarano v. Central R. Co.*, 203 F.2d 510 3d Cir. 1953) ........................................97

*Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000).............................................. 98, 99

*Snyder v. Massachusetts*, 291 U.S. 97 (1934) .......................................................71

*Strickland v. Washington*, 466 U.S. 668 (1984) ..................................................86

*Stumpf v. Mitchell*, 367 F.3d 594 (6th Cir. 2004) ............................................ 97, 98

*Sussman v. ABC*, 186 F.3d 1200 (9th Cir.1999) ....................................................82

*Taylor v. United States*, 414 U.S. 17 (1973)..........................................................74

*Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997)................................. 99, 101

*Thompson v. Calderon*, 523 U.S. 538 (1998) .........................................................99

*United States v. Agurs*, 427 U.S. 97 (1976)..........................................................106

*United States v. Ahmed*, 472 F.3d 427 (6th Cir. 2006)...........................................44

*United States v. Bin Laden*, 91 F. Supp. 2d 600 (S.D.N.Y. 2000) ............... 115, 116

*United States v. Birdman*, 602 F.2d 547 (3d Cir. 1979) ......................................116

*United States v. Blau*, 159 F.3d 68 (2d Cir. 1988).................................................86

*United States v. Boyle*, 129 S.Ct. 2237 (2009) ......................................................94

*United States v. Boyle*, 283 F. App'x. 825 (2d Cir. 2007)......................................94

*United States v. Butler*, 496 Fed. App'x 158 (3d Cir. 2012) ..................................52

*United States v. Catalan-Roman,* 585 F.3d 453 (1st Cir. 2009)............................49

*United States v. Crutcher*, 405 F.2d 239 (2d Cir. 1968)..........................73

*United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982) .............................84

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010)...........96

*United States v. Daniels*, 948 F.2d 1033 (6th Cir. 1991).......................49

*United States v. Evans*, 352 F.3d 65 (2d Cir. 2003) ...............................70

*United States v. Gagnon,* 470 U.S. 522 (1985) ................................. 70, 73

*United States v. Ghavami*, 2014 WL 1979922 (S.D.N.Y. May 15, 2014) ...........101

*United States v. Goodwin*, 141 F.3d 394 (2d Cir. 1997) .........................47

*United States v. Harris*, 498 F.3d 278 (4th Cir. 2007) ............................67

*United States v. Heightland*, 678 F. Supp. 159 (E.D. Ky. 1987)...............53

*United States v. Heightland*, 865 F.2d 94 (6th Cir. 1989) ......................49

*United States v. Howard*, 692 F.3d 697 (7th Cir. 2012).........................52

*United States v. Jiau*, 734 F.3d 147 (2d Cir. 2013) ......................... 77, 78

*United States v. Jones*, 308 F.3d 748 (7th Cir. 2002)............................46

*United States v. Jones*, 381 F.3d 114 (2d Cir. 2004) ..............................74

*United States v. Kliti*, 156 F.3d 150 (2d Cir. 1998) ................................88

*United States v. Kurka*, 818 F.2d. 1427 (9th Cir. 1987) ..................... 50, 51, 53, 54

*United States v. Levy*, 25 F.3d 146 (2d Cir. 1994)..................................87

*United States v. Locascio*, 6 F.3d 924 (2d Cir. 1993)..............................89

*United States v. Lopez*, 372 F.3d 86 (2d Cir. 2004)................................67

*United States v. Lowe*, 65 F.3d 1137 (4th Cir. 1995) .............................49

*United States v. Malpiedi*, 62 F.3d 465 (2d Cir. 1995)..................... 87, 88

*United States v. McKinley*, 38 F.3d 428 (9th Cir. 1994) .........................49

*United States v. McTiernan*, 695 F.3d 882 (9th Cir. 2012) ...................... 78, 80, 83

*United States v. Norris*, 792 F.2d 956 (10th Cir. 1986)..........................49

*United States v. Perlmutter*, 637 F. Supp. 1134 (S.D.N.Y. 1986)............... 115, 116

*United States v. Pupo*, 841 F.2d 1235 (4th Cir. 1988)...................... 47, 48

*United States v. Regan*, 897 F. Supp. 748 (S.D.N.Y. 1995) ........................ 115, 116

*United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ......................................107

*United States v. Schwartzbaum*, 424 U.S. 942 (1976)...........................................114

*United States v. Schwartzbaum*, 527 F.2d 249 (2d Cir. 1975) .............................114

*United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002)..................................... 86, 87

*United States v. Stantini*, 85 F.3d 9 (2d Cir. 1996)......................................... 87, 88

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006)...........................................70

*United States v. Tyler*, 732 F.3d 241 (3d Cir. 2013)...................................... 59, 60

*United States v. Urso*, 369 F. Supp. 2d 254 E.D.N.Y. 2005) ................................96

*United States v. Wainwright,* 789 F.Supp.2d 699 (E.D.Va. 2011) .................. 66, 67

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)........................................105

*United States v. Watson*, 525 F.3d 583 (7th Cir. 2008).........................................49

*United States v. Wexler*, 621 F.2d 1218 (2d Cir. 1980)..........................................45

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ..............................................49

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 2d Cir. 2005) ..................... 95, 101

*Wood v. Georgia*, 450 U.S. 261 (1981) .......................................................... 86, 88

*Yarborough v. Keane*, 101 F.3d 894 (2d Cir. 1996)...............................................69

**Statutes**

18 U.S.C. § 1512 ....................................................................................................56

18 U.S.C. § 1512(a)(1)(C) .....................................................................................56

18 U.S.C. § 1512(a)(3)(A) ......................................................................................56

18 U.S.C. § 1951 ....................................................................................................49

18 U.S.C. § 1992 ....................................................................................................51

18 U.S.C. § 1992(a)(6)............................................................................................51

18 U.S.C. § 2510 ....................................................................................................77

18 U.S.C. § 2511(1)(d)............................................................................................77

18 U.S.C. § 2511(2)(d)..................................................... 77, 78

18 U.S.C. § 32 ...............................................................51

18 U.S.C. § 32(a)(5) .......................................................52

18 U.S.C. § 32(a)(6) .......................................................52

18 U.S.C. § 33 .......................................................... 45, 46

**Rules**

Fed. R. App. P. 10(c) ....................................................68

Fed. R. Crim. P. 43(b)(1) ...............................................72

## PRELIMINARY STATEMENT

References to the record in this brief are as follows: citations to the first trial testimony are designated as "T1" following by the page number. Citations to the retrial testimony are designated as "T2" followed by the page number. Entries in the district court docket are designated as "DE" followed by the entry and page number. References to Tarantino's appendix are designated as "A" followed by the page number.

## STATEMENT OF JURISDICTION

The judgment of conviction and sentence was docketed on May 7, 2013. Tarantino timely filed his Notice of Appeal on May 8, 2013 (A53). Jurisdiction lies pursuant to 28 U.S.C. § 1291 in this direct appeal from a criminal conviction arising from the United States District Court for the Eastern District of New York.

## REQUEST FOR ORAL ARGUMENT

Tarantino respectfully requests to present oral argument pursuant to Fed. R. App. P. 34(a). The issues presented in this appeal are complex, some are of first impression for this Court, and Tarantino submits that oral argument will be critical to the proper disposition of this appeal.

## <u>STATEMENT OF THE CASE</u>

On September 23, 2008, a 4-count indictment charged Tarantino as follows: Count 1 alleged that, on or about June 23, 1994, Tarantino willfully endangered the safety of a commercial motor vehicle operator resulting in the death of Julius Baumgardt, in violation of 18 U.S.C. §§ 33, 34, 2, and 3551 (A59-60). Count 2 alleged the obstruction-of-justice murder of Louis Dorval on or about August 12, 1994, in violation of 18 U.S.C. §§ 1512(a)(1)(C), 1512(a)(3)(A), and 3551 (A60-61). Count 3 alleged conspiracy to commit the obstruction-of-justice murder of Vincent Gargiulo in or about and between December 2002 and August 18, 2003, in violation of 18 U.S.C. §§ 1512(a)(1)(A), 1512(a)(1)(B), and 1512(a)(1)(C), which killing was a murder as defined in 18 U.S.C. § 1111 (a) (A61-62). Count 4 alleged the obstruction-of-justice murder of Gargiulo on or about August 18, 2003, in violation of 18 U.S.C. § 1512(a)(1)(A), 1512(a)(1)(B), 1512(a)(1)(C), 1512(a)(3)(A), 111, 2, and 3551 (A62-63).

Tarantino's trial commenced with jury selection in March, 2011. On May 14, 2011, he was convicted of Counts 1 and 2 but the jury deadlocked on Counts 3 and 4 (DE262). Retrial commenced on April 10, 2012 (DE361). On May 14, 2012, Tarantino was acquitted on Count 4 (obstruction-of-justice murder) but convicted on Count 3 (conspiracy to commit obstruction-of-justice murder) (DE381).

On April 24, 2013, Tarantino was sentenced to three terms of life

2

imprisonment on all counts to be served concurrently (A49). Judgment was docketed

on May 7, 2013, and Tarantino timely filed this appeal (A53).

## ISSUES PRESENTED

1.  Whether Count 1 of the indictment should be dismissed as a matter of law.

2.  Whether insufficient evidence warrants vacation of Tarantino's conviction on Count 2 and/or whether a new trial is warranted due to faulty jury instructions under *Fowler v. United States.*

3.  Whether Tarantino's involuntary absence from critical stages of trial warrants a new trial on Counts 1 and 2.

4.  Whether the improper admission of "Garguilo Tape" into evidence at both trials warrants a new trial on Counts 1, 2, and 3.

5.  Whether a new trial on Counts 1 and 2 must be ordered due to an actual conflict of interest.

6.  Whether Tarantino's due process rights were violated by the Government's inconsistent theories at both trials regarding Dorval's murder, and whether the violation warrants dismissal of the charges or a new trial.

7.  Whether a new trial is warranted on Count 3 because the Government knowingly presented perjured testimony and/or because it conducted improper summation.

8.  Whether AUSA James Miskiewicz should have been disqualified from the case because he was a crucial defense witness.

## STATEMENT OF THE FACTS

**A.    The First Trial**

The indictment in this case was returned on September 23, 2008, after a 14-year investigation of "two murders" that took place in the Eastern District of New York in the summer of 1994 (Julius Baumgardt and Louis Dorval), and a third, "related" murder of a "witness" in Manhattan on August 18, 2003 (Vincent Gargiulo).

**1.    Count I – Baumgardt Robbery**

Count 1 of the indictment charged that on June 23, 1994, Tarantino and two others, identified in the Indictment as Louis Dorval and "John Doe 2", who was later revealed to be Scott Mulligan[1], approached two check-cashing employees, carrying bags of payroll cash into a building, and robbed them. The indictment alleged that, during the course of the robbery, one of the guards, Julius Baumgardt, was shot and killed by Dorval.[2] While the check-cashing employees arrived in a van, the robbery and shooting occurred on the sidewalk after the van was parked and both men had exited and approached the building. No eyewitnesses testified to seeing anyone even

---

[1] After Tarantino's first trial, Mulligan was arrested on the Complaint of Agent Schelhorn and charged with the capital crime under 18 U.S.C. §33. It remains unexplained why, after nearly 20 years of investigation, and multiple, successive grand jury panels, the Government failed to indict Mulligan.

[2] Dorval allegedly killed Baumgardt when his gun accidentally fired during the robbery.

approach, let alone disable, damage, or destroy the vehicle in which the security guards had arrived. These facts are not in dispute.

Various eyewitness accounts described two or three men, one of which was wearing a suit and facial disguise carrying a gun, and another who was wearing a pig mask and carrying a shotgun. Brian Pattison, an investment banker at work that day, testified that the incident occurred right outside the building's entrance (T1-773-74). He was outside smoking with co-workers John Bosco and Jim Contacessa[3] when the incident occurred. Pattison described the robber holding the shotgun as being tall and heavy built, about 280 lbs. (T-787-789).

The Government's principal evidence at trial as to Tarantino's involvement in Count 1 consisted of (i) a suspicious tape recording that it claims to have received anonymously in the mail in 2004 that purports to contain an illicitly recorded

---

[3] Over the 17 year period between the robbery and Tarantino's trial, Contacessa, who was familiar with Tarantino from the local social scene, had been interviewed several times and gave the same account, asserting that he had no knowledge relating Tarantino to the robbery. However, just days before Tarantino's trial was set to begin in April 2011, the Government arrested Contacessa for allegedly making false statements to authorities by withholding information that would implicate Tarantino. Contacessa suddenly recalled that he had seen Tarantino at the building where he worked talking to a mutual friend two weeks before the robbery. Contacessa pled guilty to making false statements in connection with this case on April 6, 2011 (T1-1818; 1830-31). Of course, to account for the 17-year delay in changing his story, Contacessa, over defense objection, testified that, despite that Tarantino never approached him, he feared for his life. Nonetheless, Contacessa maintained that he was an eyewitness to the robbery and that he did not recognize the build or the voice of any robber to be that of Tarantino.

5

September 2000 conversation between Tarantino and his longtime friend, Vincent Gargiulo[4]; (ii) testimony regarding a storage unit that contained a shotgun and a gun registered to Dorval,[5] neither of which were tied by forensics to the Baumgardt robbery; (iii) a notepad found in Dorval's apartment with one page containing a handwritten calculation, which the Government alleged was Tarantino's handwriting and represented the "split" of the proceeds stolen in the Baumgardt robbery[6]; (iv) a hair found in the Chevy Blazer allegedly used in the commission of the crime which reportedly had a mitochondrial DNA sequence that could not exclude Tarantino as the source;[7] and (v) the testimony of Guy Fatato, a highly paid government informant who testified to a host of hearsay statements he claims Dorval

---

[4] In which Tarantino is allegedly discussing the use of the Blazer in connection with the 1994 robbery and the recent taking of his DNA.

[5] The first several witnesses presented by the Government testified about a storage unit that was under surveillance in connection with an unrelated investigation regarding stolen cars. When the storage unit was seized, a shotgun was found as well as a gun that was registered to Dorval. There was no forensic evidence that tied the weapons found in the storage unit to the Baumgardt robbery and Tarantino was never seen at the storage unit nor were his fingerprints found anywhere in the storage unit or on any of the items found within it.

[6] Despite that the handwriting analysis was "inconclusive" and that, after 17 years, the exact amount stolen in the robbery was still undetermined.

[7] But could not definitively be attributed to him as the source either, as the difference between MtDNA and nuclear DNA is "huge" and thousands of other individuals, including Tarantino's brother Steven, share the same MtDNA (T1-1085; T2-737-38).

6

made to him that tie Tarantino to the Baumgardt robbery.[8]

At trial, the Government called Frank Fede, the owner of Mid-Island Check Cashing Corp. in June 1994. Fede testified that he owned and operated 17 armored vans to deliver company payrolls in Long Island and Queens, New York. Fede testified that in June 1994 his company did *not* service any companies outside of New York State (T1-807-08).[9]

After the robbery, Nassau County Detective Robert Giovannettone processed a red Chevrolet Blazer abandoned about 500 yards from the scene (T1-873-74). In 1994, microscopic examination of the tape lifts of the Blazer were examined by Nassau County Detective Vito Schiraldi and revealed the presence of four hairs which were mounted onto slides and became known as Q28, Q29, Q30, and Q31 (which was an animal hair). Tape lifts identified as items Q34 and Q35 were also examined. Schiraldi did not take a picture of the single Caucasian hair fragment found (T1-957-84). These materials were sent to the FBI laboratory *on June 20, 2001*, almost seven years after-the-fact. On November 27, 2001, a second mailing

---

[8] *See* Point II, *infra*.

[9] The Government then asked Fede if his company "ever" serviced companies in the "Port of Newark" to which Fede replied "yes." However there was no evidence submitted by the Government suggesting that Mid-Island was servicing any companies outside of New York in June 1994, or that the van in question had ever been used interstate.

was sent to the FBI containing buccal cell samples obtained from Tarantino pursuant to a grand jury subpoena issued on July 20, 2000.[10] The buccal swabs and hair samples of numerous other individuals, including Scott Mulligan, collected during the investigation were also eventually turned over to the FBI (T985-91).[11]

The three human hairs were thereafter submitted to the FBI mitochondrial DNA unit in 2001 and processed. Fram found that none of the hairs exhibited the same microscopic characteristics as the head hair samples received. However, the MtDNA tests purportedly matched sample Q30 with Tarantino's MtDNA.

Sandra Koch, a forensic examiner in the trace evidence unit of FBI lab, testified that the tape lifts were "resubmitted" to her in 2010 to identify additional hairs to be sent for MtDNA analysis in this case. Koch reviewed Q34 and removed

---

[10] Prior to July 2000, law enforcement had never requested a DNA or any other biological sample from Tarantino (T1-992).

[11] Dr. Constance Fisher, a forensic examiner from the FBI mitochondrial DNA laboratory, conducted analysis in 2002. She testified that a hair sample lifted from the Blazer left at the scene (Q30) matched the buccal swab sample from Tarantino (K17). According to Fisher, the same mitochondrial DNA sequence would be observed 17 times within a Caucasian population of 1,815 individuals. While she testified that Tarantino could not be excluded as the source of the hair recovered from the Blazer as the mitochondrial DNA sequence had been determined to be the same, she acknowledged that "mitochondrial DNA is incapable of attributing a particular sample to a single individual" (T1-1107). In other words, Fisher could not tell the jury "that the Q30 hair is Mr. Tarantino's" (*Id*.). Moreover, Fisher acknowledged that Tarantino's siblings from the same mother would have the same MtDNA (T1-1085). *See also* T2-737-38.

a hair that was previously missed, mounted it on a slide designated Q34.1, and sent to the MtDNA unit for further analysis (T1-1068-1076). Not only was the Q34.1 hair non-existent until it was "found" in 2010 and tested in November of 2010 (right before Tarantino's trial and 16 years after the alleged crime), it came back as a match to the MtDNA of Dorval. Not surprisingly, the Q34.1 hair was completely used up in testing, thus precluding independent testing by the defense.

### 2. Count 2 – Dorval Homicide

Count 2 of the indictment charged that on or about August 12, 1994, "Tarantino, together with others, killed Dorval" after Tarantino learned that Dorval had implicated Tarantino in the Baumgardt murder in a discussion with John Doe 3, who was later revealed to be Gaetano "Guy" Fatato, a paid Government informant and admitted serial perjurer.

Incredibly, in 1999, almost a decade *before* Tarantino's indictment and arrest, the same Federal Prosecutor (James Miskiewicz), Federal Case Agent (Robert Schelhorn), and Nassau County Police Detective (Anthony Zacarese) were involved in the investigation, indictment, prosecution *and conviction* of two brothers named Peter and Joseph Pistone for the murder of Louis Dorval before the same Federal District Court Judge (Hon. Joanna Seybert).[12] Joseph Pistone pled guilty to the

---

[12] *See* Point VI, *infra*.

9

murder of Dorval before Judge Spatt and admitted that he personally shot Dorval in the head, killing him. Peter Pistone pled guilty before Judge Seybert to being an "accessory-after-the-fact" to the Dorval homicide, giving sworn detailed testimony before Judge Seybert in support of his guilty plea, including the fact that, on August 14, 1994, he and Robert Misseri were present when Joseph Pistone shot Dorval in the head in Pistone's girlfriend's car. Peter Pistone then helped his brother dispose of the corpse by loading it onto the family boat in a tuff-tin toolbox and dumping it in the Atlantic Ocean off the coast of Fire Island after shooting holes in the box.

Peter Pistone made no mention or reference to Tarantino at any point before, during or after his plea. There was no allegation made or evidence presented that Tarantino had ever even met the Pistone brothers, let alone committed a murder with them. Agent Schelhorn testified in 2000 before a grand jury investigating the participation of others in the Dorval murder, including Joseph Pistone and Robert Misseri, and gave a detailed account of why Pistone and Misseri should be indicted, yet his testimony does not even mention Tarantino's name (DE422). The Government has continuously refused to explain the various—and mutually exclusive—fact patterns relied on to support the multiple, contradicting convictions of various men *who never even met* for the same murder.

AUSA Miskiewicz refused to acknowledge any of the information from the

prosecution of the Pistone brothers and Misseri[13] qualified as *Brady* material in the Tarantino case. Disturbingly, AUSA Miskiewicz took the position that the multiple convictions of different people for the same murder, under different circumstances, for different motives, taking place in different places on different dates, were somehow consistent:

> In sum, having prosecuted Pistone in the earlier case, I know of no evidence developed in that prosecution that would tend to do anything but inculpate - not exculpate – Tarantino in the murder of Louis Dorval. Accordingly, the government declines to provide notes, witness statements, grand jury minutes and the like because, under the circumstances of this case, they are not <u>Brady</u> material, nor discoverable pursuant to Rule 16. Insofar as the earlier phase of this prosecution generated statements of witnesses who will be called in the government's case-in-chief here, that material will be provided in accordance with the provisions of 18 U.S.C. 3500.

(DE 24). *See also* DE 30 (denying that Pistone pleas are *Brady.*)

Tarantino made numerous demands for *Brady* material, but the Government refused to cooperate (DE28, DE57). The Government relied on a vague, overly broad description of the 20-year-old murder of *one organized crime associate*, Dorval, as a "lengthy, on-going, multi-phased investigation" as an excuse to account

---

[13] AUSA Miskiewicz did not even acknowledge that his prosecution of Misseri was inconsistent with the charges against Tarantino, complaining that because of Peter Pistone's "varying stories" "the government, in November 2000, is ***forced***, in essence, to grant – consent to bail on one of the witnesses – one of the defendants in that case, the Galasso case, Robert Misseri, who had been charged with the murder" (T1-2692) (emphasis added). Misseri was incarcerated without bail for approximately 8 months in 2000 as a result of being charged with the Dorval murder (A85-95).

for changing government theories.[14] While the district court eventually directed the Government to turn over some materials from the Pistone/Misseri file, the Government did not produce nearly all.

The Government also refused to fully comply with Tarantino's demands for discovery related to DNA analysis (DE30) despite taking the position that the Government collected the DNA samples pursuant to July 2000 grand jury subpoenas "as part of the continuing investigations into the murders of Julius Baumgardt and Louis Dorval." As set forth more fully herein, the Government withheld significant *Brady* material from Tarantino with respect to DNA evidence as well.

On February 4, 2000, Peter Pistone pled guilty before Judge Seybert to being an accessory-after-the-fact to the murder of Dorval (T1-2545). Pistone testified that he was present during Dorval's murder and helped to dispose of his body at sea (T1-2547-48). At his plea hearing in 2000, Pistone was placed under oath and told the Government and Judge Seybert who was present when Dorval's body was disposed of at sea and the reasons why Dorval had been murdered (T1-2550). When he confessed to Judge Seybert under oath, he never mentioned Tarantino (*Id*.).

---

[14] Judge Seybert turned a blind eye to the Government's inconsistent prosecutions and allowed AUSA Miskiewicz to impeach Peter Pistone for testifying consistent with his grand jury testimony when he was the Government's witness and consistent with the plea Judge Seybert accepted from him. (T1-2692-2697). Judge Seybert even commented "I still don't know what the government's theory was in terms of Misseri or for anybody else in this case." (T1-2697).

12

After pleading guilty in 2000, Pistone was called to testify before a grand jury in February, 2001 (T1-2550-51). He described the murder of Dorval in detail and it did not include Tarantino (T1-2561-65). When he pled guilty before Judge Seybert, Pistone also told the court that Dorval was killed because he was part of organized crime and was selling drugs but not kicking back any profits to certain people (T1-2568).

Pistone told the jury that, at the time of the robbery that resulted in Baumgardt's death in 1994, his brother had a black shotgun, and a wig that he used "to do robberies" (T1-2573). Two days after Baumgardt's death, Joseph left New York for Florida around the same time as Dorval (T1-2574-75). Pistone admitted that there had been "discrepancies" about his version of events regarding Dorval's murder, and he explained those reasons (i.e. his family was being threatened) to the satisfaction of the court (T1-2575-78). Despite his inconsistencies, none of his stories included Tarantino, who he does not know (T1-2579).

The defense also called Agent Schelhorn, who acknowledged that he personally corroborated most of the information provided by Peter Pistone (T1-2741-43, 2749). To the contrary, there was no forensic evidence tying Tarantino to the murder of Dorval.

Dr. Charles Dawson, the retired Deputy Chief Medical Examiner for Suffolk County estimated that when his body was found, Dorval had been dead 3 to 4 days.

At the time of his death, Dorval had active warrants from New York State Probation and Parole, and the Nassau County Police, as well as from US Customs in Newark, New Jersey related to the newly indicted *Giampa* case. When Dorval's body was cound, FBI Agent Greco contacted Detective Daly of the Nassau County Police Department, who was investigating Baumgardt's homicide ("*That was his investigation*") (T1-1434).

Tiffany Fury, Dorval's sister, testified that Dorval contacted her about five days before his death[15] and asked her to dye his hair, which she did a reddish color (T1-1064-65). When she asked him why, Dorval said "he was in trouble and he was leaving" and that "[h]e wouldn't be in contact and he would be leaving" (T1-1065).

Gaetano "Guy" Fatato, the Government's star witness,[16] testified that he met

---

[15] Fury initially recalled that Dorval came to see her on the late in the day on the Thursday or Friday before his body was found, but acknowledged informing the FBI that it was on Friday (T1-1064).

[16] In a post-trial motion, Tarantino characterized Fatato as "among the most unreliable witnesses ever produced by the Office of the United States Attorney in an attempt to prove a count charged [in] an indictment" (DE278). Fatato's testimony confirms this characterization. At trial, Fatato acknowledged the staggering volume of his perjury, lies, false accusations, and state and federal crimes. (T1-1302-35). Among his many crimes and acts of perjury, he admitted to defrauding federal prosecutors and a judge; lying under oath about his friends' roles in certain crimes; falsely blaming his criminal conduct on others; lying to a grand jury in 1994 that was investigating the Baumgdardt and Dorval deaths (T1-1324); and lying when he was a cooperating witness for the Nassau County District Attorney's Office in 1996, (T1-1326-27).

Dorval in 1993 after Dorval returned from prison. They became friends and sold drugs together. (T1-1131-33).

Fatato testified that in 1993-1994, Dorval called him in search of a buyer for fur coats, which he claims *Dorval said* he and Tarantino had stolen from Filene´s Basement (T1-1150). Fatato had no direct dealings with Tarantino regarding the fur coat deal (T1-1154), and Tarantino was never charged in connection with this crime – while Fatato and Dorval were.[17] Indeed, on August 10, 1994, a federal grand jury for the District of New Jersey returned a sealed indictment in *United States v. Giampa* charging nine individuals, including Fatato and Dorval,[18] with federal racketeering including the interstate sale of the furs stolen at Filenes (T1-1166).[19]

Fatato testified that after hearing about the Baumgardt robbery on the news, he spoke to Dorval and met up with him at Dorval's apartment in Queens. According to Fatato, Dorval was "scared and confused" and, after Fatato asked what happened, *Dorval said* "I put the gun to the guy's head, and it was an accident" (T1-1191).

---

[17] Yet Fatato was permitted to testify to these hearsay statements as a result of Judge Seybert's ruling following a Mastrangelo Hearing, where she found by a preponderance of the evidence that Tarantino killed Dorval and that, therefore, Fatato would be permitted to testify as to a host of damaging statements that would otherwise be inadmissible hearsay. (DE185).

[18] But not Tarantino, who was not involved with organized crime.

[19] The Government conceded that there is no mention of Tarantino in the thousands of hours of recordings made in connection with the *Giampa* case.

According to Fatato, *Dorval said* "[t]he armored car pulled up, and as the guard got out, he approached him, pulled [a gun] out and put it to the guy's head, told him: On the floor. As he was on the floor, the gun went off and killed the guy" (T1-1192). Fatato also claimed that *Dorval said* Tarantino was present, wearing a "face mask" (T1-1192-93).

Fatato testified that Dorval was "nervous" and "said he was going to Florida" to "lay low" (T1-1193). He had a fake ID made for him and his girlfriend because when he had been arrested with Nassau County authorities "he didn't want to go back to jail" so he "made some IDs up" and was "looking to go to Florida to open a video store" and planned to fly back and forth with his fake ID and "spend most of his time down in Florida" (*Id*.).

Fatato also testified that after he returned from Florida, *Dorval said* that Tarantino and Mulligan were interested in purchasing a large quantity of marijuana (T1-1196). Dorval obtained the drugs and Fatato met Dorval, Mulligan, and Tarantino at a pizzeria to deliver it (*Id*.). Because he was "curious," Fatato asked Tarantino "what the fuck happened with the armored car" and Tarantino gave him a "cold kill stare, like, I don´t know what you´re talking about" (T1-1198). Fatato never mentioned the subject again (T1-1199). Later that evening, Dorval met Fatato to pay him for the drugs, and, Fatato claims, Dorval demanded to know why Fatato said something to Tarantino because "[w]e have a pact: We don't tell our friends,

16

girlfriends, nothing" (T1-1200). Dorval was "upset" and Fatato apologized (*Id.*).

Fatato testified that on August 13, 1994, Fatato learned from his sister that a newspaper article indicated he, Dorval "and a bunch of Lucchese guys" had been named in the *Giampa* indictment and charged with RICO violations (T1-1206; 1208; 1220). Fatato immediately called Dorval and told him "we got trouble" and they met up (T1-1207). Fatato told Dorval he was going to see his attorney and, *Dorval said*, "fine. I'm not going back to jail. I got my IDs. I'm going to take off." (*Id.*). Fatato testified that he met with his attorney,[20] who advised him to go to Fire Island while the attorney worked with the prosecutor to arrange a self-surrender on the following Monday (*Id.*).

Fatato testified that when he last spoke to Dorval he told Dorval he was on Fire Island and *Dorval said* he was with Tarantino (T1-1213). According to Fatato, *Dorval said* that Tarantino did not think Fatato was safe on Fire Island, so *Dorval offered* to pick Fatato up by boat (T1-1214). Fatato claimed he declined (*Id.*). Fatato beeped Dorval later that night and on Saturday but Dorval did not respond (T1-1214-15).[21] Fatato claims he was incarcerated when he subsequently learned that Dorval's

---

[20] His attorney, Sidney Friedler, was later arrested. (T1-1303).

[21] On cross-examination, Fatato admitted giving inconsistent stories about his last contact with Dorval. During one of his first interviews with the FBI, Fatato said that he last spoke with Dorval by phone when Dorval was at his apartment and *not* with Tarantino (T1-1335-37).

body had been found (T1-1219).

On August 16, 1994, the Coast Guard received a call to retrieve a body floating at sea inside of a cooler (T1393-1401). Dr. Charles Dawson, a Suffolk County medical examiner, performed the autopsy on Dorval and determined that Dorval died as the result of a single gunshot to the head. Dr. Dawson estimated that Dorval was dead for 3-4 days before being found. He submitted hair, blood and other bodily material taken from Dorval´s body to the Suffolk crime lab (T1-1402-26).

### 3. Counts 3 and 4– Gargiulo Homicide

Counts Three and Four of the indictment charged Tarantino with conspiracy to obstruct justice as well as aiding and abetting in the obstruction of justice murder of Vincent Gargiulo. The indictment alleged that Gargiulo illicitly recorded a conversation of Tarantino incriminating himself in the Baumgardt and Dorval "murders" and was in the process of providing that evidence to the Government when he was killed.[22] On August 18, 2003, Gargiulo was murdered on a Manhattan street in broad daylight by two drug addicts, Justin Bressman and Pablo Amador, in need of money during a week-long drug binge of crack, cocaine and heroin. While

---

[22] However, at trial, the Government's expert witness admitted that the tape of the conversation could not be authenticated in totality and that Gargiulo actually refused to provide the tape to the Government unless they paid him $500,000.00. The Government declined, and Gargiulo never provided the alleged tape to the Government.

one of the alleged killers, Justin Bressman, was known to both Gargiulo and Tarantino (as he had worked as a personal trainer for gyms associated with both of them), Bressman was also dealing drugs to Garguilo, who had heroin and opiates in his blood when he died, according to toxicology reports provided by the Government. There was no evidence that anyone, including Gargiulo's own friends and family, let alone Tarantino, knew he was communicating with S.A. Schelhorn. Despite that, the indictment charged that Tarantino hired Bressman (John Doe 4) to kill Gargiulo to prevent him from providing the tape to the Government. No evidence was presented by the Government at trial to indicate that any money or other form of payment had been made to the killers. The jury was unable to reach a verdict on either Gargiulo count, and the hung jury resulted in a mistrial.[23]

Robert Gerrato testified that he was a longtime friend of Gargiulo and remained so until Gargiulo's death (T1-1505) and that Gargiulo suffered from mental problems and was delusional and paranoid at times (T1-1534-35). Gerrato and Gargiulo were partners in a gym in 1997, but it closed about 4 years later because business was bad and Gargiulo opened another gym also called Body Sculpt (T1-1509). Gerrato met Justin Bressman through the gyms in the mid-1990's (T1-1510). In the late 1990's, Gargiulo mentioned that he had a tape recording with

---

[23] Upon re-trial of those two counts, a second jury acquitted Tarantino of aiding and abetting in the murder of Gargiulo, but convicted him of conspiracy.

19

"incriminating evidence against Chris" (T1-1511).

In 2001 or 2002, Gerrato bumped into Tarantino at a pet food store, and Tarantino asked what was up with Gargiulo because he was sick and "acting fucked up" (T1-1513). Tarantino said that Gargiulo was trying to "dry rat him" meaning that he was trying to get him to say things "where other people were listening" (T1-1513). In 2003, several months before Garguilo's murder, the two attended a concert together, and Gargiulo told him that he and someone named Larry wrote a letter and sent it to Scott Mulligan's wife "and he was going to blackmail Chris" by asking for $500,000 (T1-1514). Garguilo said he was going to go to the FBI if his demand was not met (T1-1515). Gerrato told Gargiulo that was crazy, and Gargiulo responded "Oh, what are they going to do, get Justin to kill me?" (*Id*.). It was Gerrato's "understanding" that Gargiulo had made Tarantino aware of the tape (*Id*.).[24] He saw Gargiulo for the last time about a week before his murder (*Id*.).

NYPD Lieutenant James West testified that he was working on the Gargiulo murder case and, on April 8, 2004, he received an envelope containing a cassette tape (identified as KM-1) addressed to him with no return address. West did not

---

[24] Gerrato never told police anything about this purported conversation when he was first interviewed after Gargiulo's murder (T1-1526-27). He did, however, tell police that Gargiulo was having problems with "numerous people" including co-workers, a man named Julio, and a man named Andy, who Gargiulo felt had stolen money from him (T1-1530).

know who made the tape, when it was made, what machine was used to make it, or where it had been prior to its receipt. The police never determined who sent the tape in 2004, and West had no knowledge if the tape or the box it came in were tested for fingerprints (T1-1544-73).

The Government called Pablo Amador, who testified he was close with Bressman in the past but they had lost contact for a while until July, 2003 (T1-2126-29). The two engaged in severe and heavy drug use together, including smoking crack and heroine. One day in August 2003, Bressman complained that a weapon he had was causing problems because it would only shoot one round at a time and he had a "job to do" for "Mattie Roth" (T1-2140-44); Amador helped unjam the gun (T1-2140-41). Amador testified that "Mattie Roth" was Bressman's boss at Synergy (T1-2144).[25]

On August 13 or 14, 2003, Amador went to visit friends in New Jersey (T1-2149). He returned later that evening, and the following day Bressman came to his apartment and both began drinking and getting high (T1-2150-51). Bressman asked Amador if he wanted to go swimming so they went to a nearby hotel (T1-2152). As they were leaving the hotel, Bressman told Amador he knew a way of getting some

---

[25] Near the end of its case the Government presented evidence that there were no records related to the Synergy gyms reflecting that a Matthew or Mattie Roth was an owner, employee, or manager of the business (T1-2332-36). Moreover, financial records revealed that Tarantino did not owe Gargiulo any money (T1-2336).

21

money by getting and then selling guns (T1-2154). They went to the Synergy Gym on W. 23d Street and went to the locker room where Bressman opened a locker and took out a bag of ammunition and guns (T1-2159-60). Bressman took the bag and they headed to a downtown pizzeria (T1-2161). Bressman ordered pizza and told Amador to call Miguel Pena, a friend who also stayed with Bressman from time to time (T1-2162). Pena came to the pizzeria, and Bressman told him he had some guns for sale, which Pena took into the bathroom to examine (T1-2163). Pena agreed to buy the guns in exchange for cocaine and cash (T1-2164). Bressman had another gun with him that Pena wished to purchase, but Bressman said he would keep it (T1-2165). After this meeting, Amador left with Pena and went back to their apartment; Bressman went off to get high (T1-2166). The following day, Amador was in the apartment when Bressman came over, and the two spent the weekend drinking and getting high (T1-2169).

In the early morning hours of Monday, Amador testified that Bressman was "impatient" and "talking to me about something he had to take care of" (T1-2171). Bressman was cleaning the gun that Amador had helped unjam the week before (*Id.*). According to Amador, Bressman said the job he had to do was kill an individual named Vinnie (T1-2171). Bressman said that his boss "Mattie Roth" got sick, like he had a nervous breakdown, and he let Vinnie have power of attorney over the gym and that Vinnie sold the equipment behind his back. An equipment lien had been

22

placed on his house, and "Justin had to kill him because Vinnie wanted him to appear in court" (T1-2172). Bressman said he was being paid $35,000 by Mattie to kill Vinnie (T1-2173). After Bressman put the gun into a pillowcase, he and Amador left and as they walked they discussed the possibility of Amador helping Bressman as lookout (T1-2177). Bressman said he would give Amador $3500 just to look out and Amador agreed (T1-2177-78).

Amador and Bressman took the subway and went to 30th Street and Broadway (T1-2181). Amador took position at a telephone booth while Bressman kept looking up and down the block, saying he hoped he did not miss him (T1-2183). Eventually Bressman spotted Gargiulo walking down the sidewalk toward them and Bressman said that was him; as Gargiulo approached Bressman, Gargiulo looked and was surprised to see Bressman (T1-2190). Amador heard Gargiluo exchange a greeting, and Gargiulo put the cooler and hardhat he was holding down; as Gargiulo did that, Bressman shot him in the face (T1-2191; 2213-16). He saw Gargiulo fall down, and Bressman looked at him for a second and ran toward Amador (T1-2191). Amador was frozen by what he witnessed, and Bressman ran off (*Id.*). Amador took a cab back to his apartment, and told his friend LeShawn Campbell what happened (T1-2193). He testified that the following day Bressman came by his apartment unannounced and Amador asked about the money (T1-2234). Bressman said that "Mattie" had taken him out to eat and was happy but he could not be paid in a lump

sum because "Mattie" was going to be under scrutiny after Gargiulo's murder (T1-2235). Bressman spoke with Amador again later that week and was upset because Amador had left a bottle of beer in the phone booth that could be used to identify him (T1-2236-37). Amador eventually carried a gun because he was fearful of Bressman, who called him a "loose end" (T1-2238). He last saw Bressman on the Thursday after the murder when he came back to Amador's apartment (T1-2238). Bressman told him that detectives picked him up at the gym and questioned him, and that "Mattie" had gotten him a lawyer (T1-2239). Amador has never laid eyes on Tarantino (T1-2240).

Amador was arrested on September 16, 2003, for possession of a handgun and pled guilty to that charge (T1-2196). He also pled guilty to first-degree manslaughter for his involvement in Gargiulo's murder and as part of his plea agreed to cooperate with the New York State authorities in exchange for a reduced sentence on the manslaughter charge (T1-2198).

NYPD Detective Jeff Salta testified that he was assigned to the Gargiulo case, and one of his duties was to go to the Synergy Gym on 23rd Street to speak with Bressman (T1-2295). Bressman agreed to go to the police station to be questioned but had to ask his boss for permission to leave work (T1-2296). Salta saw Bressman on the phone and heard him tell his boss he was going to the police station (T1-2298). When they arrived at the station, Salta had a phone call from a man

identifying himself as Mel Roth, an attorney who said he represented Bressman and who demanded that questioning cease (T1-2300). Salta asked how or why Roth believed he was representing Bressman, and Roth said "he was called and contacted by a concerned party" (*Id*.). He gave Bressman the phone, questioning ceased, and he brought Bressman back to the gym (*Id*.).

Attorney Melvyn Roth testified that on August 21, 2003, he contacted the NYPD regarding an imminent interview of Justin Bressman (T1-2305). Roth told the officer he spoke with that he was going to represent Bressman and demanded that questioning cease (*Id*.). Tarantino had notified Roth that Bressman was being interviewed and asked him to contact the police (*Id*.). Roth explained that this was not the first time he had been asked to intervene with police on behalf of an employee of Tarantino's gyms (T1-2306). After this one phone call, he never represented Bressman further, and was not paid for his services (*Id.*).

The Government's final witness was FBI Agent Robert Schelhorn (T1-2337). At the end of 1999, he was assigned to the Dorval homicide investigation, and he began working the case with Nassau County agents who were working on the Baumgardt case. The FBI's investigation in the Dorval case began when his body was found, and the Baumgardt case became a federal one in October or November, 1999 (T1-2340; 2406). Schelhorn identified newspaper articles from the New York Times, Newsday, and the Daily News all dated Friday, August 12, 1994, publicizing

the *Giampa* indictment and naming Fatato and Dorval (T1-2334). He also testified that an American Express statement reflecting a hotel bill and a bill for purchases made at a store in Fire Island on August 12-13, 1994 (T1-2355-56). He also identified Gov. Ex. KM-5, the Gargiulo tape, which he took possession of in April, 2004 (T1-2356). Schelhorn listened to a copy of the tape and prepared a transcript of its contents (T1-2359). The tape was then played to the jury with Schelhorn interspersing testimony about its contents.

Schelhorn testified that the FBI received a letter postmarked May 21, 2003, from someone named Chucky; according to the letter, Chucky claimed he had information on tape that incriminated Tarantino, Scott Mulligan and others in Baumgardt's murder as well as Dorval's murder and he wanted a reward in exchange for the tape (T1-2370). The letter had instructions on how to contact Chucky on Craigslist, which Schelhorn did (*Id.*). Chucky subsequently agreed to meet Schelhorn on May 29 (T1-2371).[26] Chucky turned out to be Vincent Gargiulo (T1-2374). Gargiulo said he made the tape shortly after Tarantino got out of prison as "insurance" against Tarantino and wanted $500,000 for the tape (T1-2377). Schelhorn told him that the Government would not pay that sum and that he could

---

[26] This meeting was not memorialized by video or audio (T1-2421-22). He did prepare a written report of the meeting but did not have it typed up until weeks after Gargiulo's death (T1-2423).

not just accept Gargiulo's word that he had a tape and that it was not bogus (T1-2377). Schelhorn asked for the tape but Gargiulo was still stuck on the reward and said that if he did not get the money from the Government he would get it from Tarantino (T1-2378). Schelhorn asked Gargiulo if Tarantino knew about the tape's existence, and he sarcastically said "he knows, he knows" (T1-2380). They agreed to speak again at a later date (T1-2379; 2382). Schelhorn and Gargiulo never met again in person but Gargiulo called him several times between in the following days and left a voice message on August 11 (T-1-2380-87). The last contact from Gargiulo took place on August 15, and Shelhorn asked again about meeting him the following week; Gargiulo was "open-minded" about meeting again (T1-2391).

### B.    The Second Trial

With some important exceptions, the Government's testimony at the second trial largely tracked the evidence and testimony from the first trial albeit in a more condensed fashion. The main difference was the addition of Scott Mulligan, Tarantino's longtime best friend, and his wife Manon, to the Government's roster of cooperating witnesses.

In March 2002, the Government conducted MtDNA analysis on samples taken from various people in connection with its investigation, including Dorval, Tarantino, and Mulligan and compared the results to hairs retrieved from the Blazer connected to the Baumgardt robbery. According to Government testimony,

27

Mulligan's MtDNA was **excluded** as a possible source of any of the hairs. On February 16, 2011, at the pre-trial Mastrangelo hearing presided over by Judge Seybert in connection with Tarantino's first trial, Schelhorn, at the direct examination conducted by AUSA Miskiewicz, testified:[27]

> Q. Did you in addition to taking the defendant's DNA in mid-2000, also eventually take Scott Mulligan's DNA?
>
> A. We did.
>
> Q. So today he has been excluded. Correct?
>
> A. That's correct.
>
> Q. And by the way, did Detective Kennedy serve that subpoena on Scott Mulligan to take DNA?
>
> A. That's correct.
>
> Q. At your request or in conjunction with you?
>
> A. Correct.

(DE441 at 363).

Yet, incredibly, on November 22, 2011, a few weeks before Tarantino's retrial was set to begin, the Government alleged that it suddenly made a match between Mulligan's MtDNA and Q29, one of the original hairs recovered from the Blazer in

---

[27]Agent Schelhorn previously testified that Mulligan's DNA had been excluded when he testified before the indicting grand jury on August 5, 2008 ("Q. Okay. Did you take a DNA sample from Scott Mulligan? A. I did. Q. Okay. At or about the same period of time? A.Correct. Q. No matches to Mulligan? A. No.") (DE388-1).

1994, ***almost 20 years earlier*** (DE 305-1).

Craig Miller, who did not testify at Tarantino's first trial, testified that, in the summer of 1994, Mulligan contacted Miller about doing him a favor and helping him get rid of burglary tools by taking him out to the ocean in his boat so that Mulligan could throw them overboard. (T2-793-94). After a series of calls where the boat trip was cancelled, Miller spoke with Mulligan again around 5:00 PM one day and Mulligan said he would call Miller in the morning (T2-798). After Tarantino arrived, he observed him and Mulligan carrying a box and some crowbars and tools which they put on the boat (T2-809-10). The box did not appear to be heavy, and Miller could not see what was in the box (T2-810-12). No one else was on the boat apart from Miller, Mulligan, and Tarantino (T2-813).

Miller looked into the water and saw the lid of the box was open, and he saw some broken rock or concrete and a black sneaker with a grayish sock (T2-820). Miller became physically ill because he thought there might have been a person in the box, so Mulligan piloted the boat home (T2-822). He later read a news article about a body found off the coast of Fire Island in a black trunk, and on that day Mulligan called to see if he was OK (T2-826).

Miller did not see or speak with Tarantino from 1994 until around 1999 when Tarantino came to his house (T2-831). Tarantino asked if everything was OK and if anyone was bothering him (T2-832). The conversation lasted 5 minutes (*Id*.). He

next saw Tarantino in 2002 or 2003 when Tarantino came to Miller's mother's house; Tarantino again asked if anyone had questioned him and that he might have mentioned Miller's name in a conversation that someone might have taped (T2-835). Tarantino handed him the business card of an attorney (*Id.*).[28]

The Government also presented Pablo Amador, who testified essentially in the same manner as he did at the first trial regarding his involvement with Justin Bressman in the murder of Garguilo (T2-884-910; 927-1105).[29]

In 2002, Manon Mulligan became aware that Garguilo was having drug, alcohol, and mental problems and he was later admitted to a mental health facility (T2-1314). Toward the end of 2002, Manon received a threatening voice message at her home left by Gargiulo; he was screaming "like a crazy person" and saying "stop talking about me or I'll kill you" (T2-1315-16). Her husband, Scott, who was heading to federal prison on January 3, 2003, heard the message and was upset (*Id.*).

---

[28] On cross-examination, the Government objected when Tarantino asked Miller whether he had been arrested for any crimes relating to Dorval's murder (T2-849). At sidebar, the Government contended that the statute-of-limitations had run on Miller's activities because he was not involved in the killing or disposal of the body (T2-851). Tarantino contended Miller could be charged as an accessory-after-the-fact but the Government disagreed (T2-851-52).

[29] Except that Amador was forced to change his timeline he had previously testified to on numerous occasions when he was confronted, for the first time, with evidence that the subway line he testified he took from place to place on August 15th was not running because of the citywide blackout.

After Scott reported to prison, Manon went to Canada to visit family, and upon her return on January 22, 2003, opened her mail and discovered an envelope addressed to Scott (T2-1324). The letter was typed and unsigned and related that its writer had an incriminating tape about "criminal" things and demanded $500,000 by a date certain or else the tape would be given to the FBI (T2-1325). Manon believed the letter was sent by Garguilo because of his earlier phone call (T2-1326).

In August, 2003, Manon learned that Garguilo had been murdered when her friend Keith Pellegrino told her (T2-1339).

Manon testified that shortly after Gargiulo's wake, which they both attended, Tarantino visited her at home to discuss business issues and that Tarantino told her to tell Scott "to stop asking questions about Vinnie" (T2-1347). Since that time she had no further contact with Tarantino (T2-1348). She did visit Scott in prison shortly after Tarantino's visit and related to him what Tarantino said to her about Garguilo (T2-1352).

Scott Mulligan testified[30] that he and Tarantino grew up together and had been like brothers (T2-1408-09). In 1989 and into the 1990s they both committed crimes

---

[30] Prior to his testimony, the court instructed the jury that it would be hearing testimony about other murders, but that evidence was not admissible for showing any criminal propensity on Tarantino's part but rather testimony about the Baumgardt and Dorval murders was only relevant to "what, if any, motivation there was for the defendant to commit this third murder that is alleged" (T2-1406).

31

together, along with Dorval, Rob Smyth, and others (T2-1409 *et seq.*). One of these criminal activities included stealing a red Blazer in January of 1994, which they kept housed at a warehouse owned by Craig Miller (T2-1432-34). Mulligan also grew up with Garguilo, who also knew Tarantino (T2-1445).

Just prior to Tarantino's second trial, Mulligan was charged with participating in the Baumgardt robbery and within days he entered a guilty plea on January 3, 2012, in exchange for a cooperation agreement with the Government (T2-1446-47). Mulligan was hoping that the judge would give him a lighter sentence due to his cooperation (T2-1448).[31]

Mulligan testified that he participated in the robbery that led to the death of Julius Baumgardt (T2-1446-50), but, despite the fact that he physically matched the description given by eyewitnesses as one of the people in front of the armored car at the time of the murder, Mulligan insisted he was just the lookout (T2-1617). In fact, the criminal complaint filed by Schelhorn charging Mulligan in the Baumgardt case stated that Mulligan was one of three people at the scene of the murder (T2-1618). Predictably, after he decided to cooperate, Mulligan admitted that "everything changed as far as [him] and Mr. Schelhorn were concerned" because he told

---

[31] On cross-examination, Mulligan was confronted with the fact that he had been recorded in the jail, just days before testifying, and he said to a friend, Joe Angelone, that he hoped to get "like five or ten years" (T2-1615).

Schelhorn all the witnesses were wrong (*Id*.). He knew he would get less time if he said he was just the lookout (T2-1622).

Significantly, Mulligan, as the Government's witness, testified that he, Tarantino and Dorval, specifically decided to rob the guards themselves and *not* try to disable the armored vehicle in any way, because they realized that the guards took the money with them when they left the van (T2-1463).[32] Mulligan claimed he wanted to back out of the plan at that time because he did not want to be involved with anything having to do with guns (T2-1463); other names to replace him had been discussed, including Guy Fatato, Richie Maldoon, and Garguilo (T2-1464). But Mulligan ultimately agreed to help as a lookout because they talked him into it and for the money (*Id*.).

Mulligan testified that he, of course, was not present at the Baumgardt robbery, but that he later heard Tarantino and Dorval arguing about the accidental shooting of Baungardt; Tarantino kept asking Dorval "how it happened" and Dorval said it was a mistake (T2-1480).

Mulligan testified that Dorval had said several times that "he was never going back to jail" (T2-1490). Mulligan saw Dorval that summer and noticed he had dyed his hair a blondish color and he had moved to Queens to avoid capture (*Id*.).

---

[32] *See* Point I, *infra*.

Mulligan testified that during the summer of 1994 a plan was formulated to kill Dorval (T2-1492). "We all discussed it" but Tarantino ultimately made the decision (*Id*.). Tarantino purportedly said to both Mulligan and Garguilo that "it is my mess, and I'll clean it up." (T2-1493). According to Mulligan, the plan to kill Dorval had been formulated days before it was carried out but had been cancelled a two or three times because "it didn't work out as expected" (T2-1497).[33]

Mulligan testified that he mistakenly dropped a "boulder" on top of Tarantino's right hand and it "split his hand in half" and he began bleeding (T2-1524). They then slid the box off the boat into the water (T2-1525). Mulligan held the lid open while the box went into the water so they could shoot holes into it so it would sink (T2-1526). After Tarantino "shot holes in the bottom of the box," they closed the lid and it sank (T2-1527). Mulligan "guessed" that Tarantino was able to hold the gun despite his injury due to adrenaline (T2-1528). Tarantino threw the gun into the water and they returned to Miller's house (*Id*.). When they returned, Tarantino said he was going to deal with his hand, and Mulligan believed he sought treatment at the Nassau County Medical Center (T2-1531).[34] Miller testified that he

---

[33] Ironically, this testimony would mean that the decision to murder Dorval was made *prior* to the *Giampa* Indictment and would thus further contradict the Government's case on Count 2. *See* Point II, *infra*.

[34] Medical records were introduced into evidence dated August 13, 1994 (T2-1533).

never saw any blood or an injury to Tarantino's hand, contradicting Mulligan's account, which is also disproved by Tarantinos's medical records. *See* Point VII, *infra*.

Mulligan further testified that during this same period of time he and others were involved in the gym and fitness business (T2-1538). In 1995-96, Garguilo took on Mulligan and Tarantino as partners in an establishment called Body Sculpt (T2-1544). After 6 or 8 months that venture failed due to disputes with Garguilo over the gym's management (T2-1545). Mulligan and Tarantino broke the partnership with Garguilo and moved on but neither of them took back any money they had fronted to Garguilo for the business (*Id.*). Body Sculpt remained open for a short time before it went out of business (T2-1547).

Toward the end of the 90s and into the 2000s, he and Tarantino acquired ownership in a number of fitness centers named Synergy (T2-1547). One location was at E. 23rd Street and Third Avenue in Manhattan (T2-1548)

In December, 1999, Garguilo approached Mulligan and Tarantino about becoming partners in a new Body Sculpt location but Garguilo did not have enough credit to sign the lease; they agreed to help Garguilo and took on an ownership interest in January, 2000 (T2-1552). Mulligan signed a guarantee to be responsible for any late payments or any breach of the lease (T2-1557). However, a rift with Garguilo again occurred and "it was becoming uncomfortable again with him" (T2-

1559). After a few months, he and Tarantino walked away from the business again and dissolved the partnership with Garguilo (T2-15670). However, Mulligan and Tarantino never removed their name off the lease guarantee or the credit card machine guarantee they had signed (T2-1560). They never attempted to recover the $50,000 they had put into the business (T2-1561).

At some point after these events, Garguilo called Mulligan to tell him he was in a mental hospital, that the fitness club was in dire straits, and he asked if they could help salvage the business (T2-1562-64). Mulligan and Tarantino again became involved with Body Sculpt to help their friend and because their name was still on the lease (T2-1564). After hiring a new manager they were able to get the business to succeed (T2-1565). At some point Garguilo was released from the mental hospital but problems again arose because Garguilo became upset that they had taken money out of the gym's profits to pay bills; Garguilo expected that they would pay the bills out of their own pockets (T2-1566-67). He and Tarantino were insulted by Garguilo's accusations and they decided to pull out of the business again, at which point Garguilo had people come and take out the equipment in the middle of the night so he could sell it (T2-1567; 1570). Members of the gym became angry and stopped payments on their memberships; Garguilo and the business were evicted in February, 2002 (T2-1568-69). Mulligan and Tarantino were affected because creditors began taking money out of other companies (T2-1571). Tarantino and

Mulligan agreed to pay off the outstanding bills and both were able to salvage their credit (T2-1571-72). After this occurred, their friendship with Garguilo ended (T2-1572).

Around this time, Mulligan pled guilty to conspiracy to distribute marijuana stemming from a 2001 arrest (T2-1572). He reported to serve his sentence on January 3, 2003 (T2-1574-75). Prior to this time, but after the 2002 breakup of Body Sculpt, Mulligan came home and he and his wife discovered a message from Garguilo "raging, cursing me out" and saying that if his name ever came out of his mouth again "he would have to kill me" (T2-1575). The message also said "When you see what I have on you, you will be sorry" (*Id.*). Mulligan testified that he had been "bad mouthing" Garguilo, calling him a rat and scum bag due to sticking him with the bill from Body Sculpt (T2-1580). The following day, Tarantino heard the message from Garguilo (T2-1581). Tarantino never said he was going to have Garguilo killed (T2-1665).

Mulligan testified that prior to reporting to prison in January, 2003, he met Justin Bressman several times at Synergy Fitness on 23rd Street (T2-1595). Bressman and Tarantino worked out together and Bressman worked at several different locations (T2-1596). He believed that Bressman also knew Garguilo, having seen

37

them at strip clubs together (T2-1599).[35] Mulligan was in prison when he learned about Garguilo's murder, and he asked his wife Manon to ask Tarantino and Keith Pellegrino what happened (T2-1600). In September, 2003, Manon visited him in prison, and she told him that Tarantino told him to stop worrying about the gym and to let him run it (T2-1603). Mulligan was upset because he thought Tarantino was trying to discredit everything he had built (T2-1605). Manon also told him that Tarantino had said to stop asking questions about Garguilo (*Id.*). Mulligan did not know what that meant (*Id.*). Manon never told him about receiving a threatening letter from Garguilo in January (T2-1606).

Mulligan was released from prison in August, 2004, and during the time he had before having to fly to Florida to report to his halfway house to complete his sentence he went to have breakfast with friends, including Tarantino and Pellegrino (T2-1607-08). They all then accompanied Mulligan to the Boston airport, and just before Mulligan entered the gate Tarantino pulled him aside and explained that they had received a letter from Garguilo demanding $500,000 or else he would give the cops a tape he had made (T2-1610). He said after that "it was done" and told Mulligan not to say anything to Manon (T2-1610).

---

[35] On cross-examination, Mulligan's reticence to disclose the actual relationship between Bressman and Garguilo was explored, and Mulligan ultimately admitted that Bressman and Garguilo were both junkies who used, bought and sold cocaine together (T2-1662).

## SUMMARY OF THE ARGUMENTS

**Point I**: In Count 1 of the indictment, Tarantino was charged with a violation of 18 U.S.C. § 33, a provision encaptioned "Destruction of Motor Vehicles or Motor Vehicle Facilities," in connection with a sidewalk robbery of Julius Baumgardt, an employee of a check-cashing company. The "motor vehicle" involved had nothing to do with the actual crimes alleged. The robbery and subsequent killing of Baumgardt occurred after he had exited his vehicle on the sidewalk in front of an office building. The indictment failed to allege specific essential elements of an offense under § 33. There was no incapacitation of the driver of the vehicle while operating the vehicle. The conduct alleged in Count 1 amounted to a sidewalk robbery, not a violation of § 33. Count 1 must be dismissed as a matter and Tarantino's conviction vacated with prejudice.

**Point II:** Under *Fowler v. United States*, there is insufficient evidence as a matter of law to uphold Tarantino's conviction on Count 2 (the obstruction-of-justice murder of Louis Dorval. *Fowler* mandates that the Government present more than just a "remote" or "hypothetical" possibility that Tarantino might have killed Dorval to prevent him from communicating with federal authorities. There has to be a "reasonable likelihood" that a relevant communication would have been made to a federal officer. The Government's principal evidence on Count 2 came from Gaetano Fatato, a prolific liar, perjurer, and criminal who, armed with a cooperation

agreement from the Government, provided the sole testimony relating to Tarantino and Dorval. Even crediting Fatato's testimony, the Government merely proved that Dorval was anything but reasonably likely to make a relevant communication to federal authorities about Tarantino's alleged involvement in the Baumgardt murder; Dorval's testimony, in connection with that of lead case agent Schelhorn, established that Dorval was on the run from state and federal authorities, had skipped bail on pending state charges, had his hair dyed by his sister shortly before his disappearance, had a fake ID prepared, and fled to Florida to hide. Moreover, in 1994, the Baumgardt investigation was a purely state investigation, contradicting the Government's hypothetical supposition that he was reasonably likely to make a relevant communication to *federal* authorities. Under *Fowler*, Tarantino's conviction on Count 2 cannot stand. Furthermore, the jury was improperly instructed when it was told merely that the Government must establish only that Tarantino believed that Dorval "might communicate with law enforcement authorities" and that Dorval "could have" provided a relevant communication to law enforcement. Under *Fowler* the instruction was fatally flawed and a new trial must be ordered.

**Point III**: At two proceedings at which potential jurors were prescreened for service at Tarantino's first trial, Tarantino was involuntarily absent. His presence was never waived. He had a constitutional right to be present at the prequalification of potential jurors. Tarantino did not have a meaningful opportunity to participate in

the proceedings and his involuntary absence from the two proceedings in question violated his constitutional right to be present, and a new trial is warranted.

**Point IV**: At both of Tarantino's trials, he moved for suppression of a tape of a conversation between Tarantino and Vincent Garguilo that Garguilo illegally taped. The tape was a critical piece of evidence for the Government at both trials, and its suppression was warranted because Tarantino established by at least a preponderance of the evidence that Garguilo's primary or determinative factor in intercepting the conversation was for a criminal or tortious purpose, that is, to blackmail and/or extort Tarantino. Tarantino supplied the district court with more than sufficient information to warrant the tape's suppression, including details of Garguilo's dire financial straits in the period of time leading to the tape's creation. Even if part of Garguilo's motivation in making the tape was for a criminal purpose, its suppression was required. The district court erred in not even affording Tarantino an evidentiary hearing to make a full record as to his allegations. A new trial on all counts is required; at a minimum, an evidentiary hearing is warranted.

**Point V:** During Tarantino's second trial, information came to light that established that Tarantino's counsel at his first trial, Peter Froccaro, had jointly represented both Tarantino and Scott Mulligan, the Government's cooperating witness at the second trial and who was also directly involved in the Baumgardt and Dorval murders, prior to and during Tarantino's first trial. The Government

41

acknowledged that it knew this information "all along" but never disclosed it to the court prior to Tarantino's first trial. Moreover, Tarantino's retrial counsel informed the court that, based on the information he had, Mulligan had paid Froccaro $150,000 to appear for Tarantino. The district court refused to entertain the issue at Tarantino's retrial, refused to grant a hearing, and told the attorneys to "stay away" from the issue because Tarantino could vindicate his rights on appeal if he so chose. Tarantino submits that Frocarro's conflict adversely affected his representation of Tarantino at the first trial and a new trial must be ordered; at a minimum, an evidentiary hearing is warranted.

**Point VI:** Tarantino's due process rights were violated due to the Government's intentional use of wholly inconsistent theories of Dorval's murder. Eight years before Tarantino was indicted, the same prosecution team that prosecuted him also indicted Joseph and Peter Pistone, along with Robert Misseri, for Dorval's murder. According to the indictment in *United States v. Galasso*, the Pistones and Misseri killed Dorval in an entirely different way for an entirely different reason in an entirely different location than the Government alleged that Tarantino killed Dorval. The Pistone brothers, years before Tarantino's indictment, pled guilty to their roles in Dorval's death, and the Government in open court affirmed the factual basis for their guilty pleas, which were accepted by the court. Yet at both of Tarantino's trials, the Government presented an entirely new—and

42

wholly inconsistent—theory of Dorval's murder. Under the doctrine of judicial estoppel, the Government should have been estopped from engaging in this outrageous conduct, which shocks the conscious, violates due process, and requires the vacation of all charges due to gross Government misconduct. At a minimum a new trial on all counts should be ordered.

**Point VII:** Tarantino's conviction on Count 3 should be dismissed or a new trial ordered due to a combination factors. First, the Government knowingly presented perjured testimony through Scott Mulligan, a cooperating witness. Knowing but intentionally ignoring the fact that it had already vouched for the plea deals for Joseph and Peter Pistone, who allocated to their roles in Dorval's murder, the Government nonetheless presented Mulligan to testify to the circumstances, manner, and place of Dorval's death which cannot be reconciled with the Pistone version. Moreover, in its summation at Tarantino's retrial, the Government knowingly and improperly obfuscated the record and the truth in order to obtain a conviction against Tarantino. Mulligan's false testimony, coupled with the Government's fabricated summation and improper bolstering of Mulligan, warrants a new trial on Count 3.

**Point VIII:** Prior to his retrial, Tarantino moved to disqualify AUSA Miskiewicz as a prosecutor because he was the only witness who could testify to the Government's belief in the accuracy and veracity of the facts and circumstances of

Dorval's death as set forth in the plea deals accepted by the court for Joseph Pistone. In light of the fact that the Government intended to present the testimony of Scott Mulligan to establish that Tarantino actually shot Dorval to death, Miskiewicz possessed clearly exculpatory evidence because he vouched for the Government's case when it allowed Joseph Pistone to plead guilty as the actual shooter of Dorval. Miskiewicz should have been disqualified so that Tarantino could have presented this exculpatory evidence. A new trial, without the participation of Miskiewicz, is warranted.

## ARGUMENT

## POINT I

### COUNT 1 OF THE INDICTMENT MUST BE DISMISSED

Before his first trial, Tarantino moved, pursuant to Fed. R. Crim. P. 12(b), to dismiss Count 1 of the indictment for failure to allege intent, an essential element of the offense (DE75). That motion was denied (A96). After his second trial, but before sentencing, Tarantino again moved to dismiss Count 1, pursuant to Fed. R. Crim. P. 12(b)(3)(B), because the indictment failed to plead an essential jurisdictional element of the statute under which Tarantino was charged (DE402). This motion, too, was denied (A122). This Court reviews the sufficiency of an indictment *de novo*, *United States v. Ahmed*, 472 F.3d 427, 431 (6th Cir. 2006), and should dismiss Count 1 because the "prosecutor, judge and defense counsel acting in concert may not

create a crime where none exists." *United States v. Wexler*, 621 F.2d 1218, 1223 (2d Cir. 1980).

### A.    The Indictment and Statutory Language

Count 1 alleged that Tarantino and others "willfully and with reckless disregard for the safety of human life, disabled and incapacitated Julius Baumgardt and John Doe 1," persons employed in connection with the operation of a motor vehicle used in interstate commerce—an armored van—and "lessened the ability of such person to perform their duties," which offense resulted in the death of Baumgardt, in violation of 18 U.S.C. § 33 (A59-60). The indictment alleged that on June 23 1994, Baumgardt and a co-worker "jointly operated an armored van" and were assigned to deliver U.S. currency to Volt Information Sciences, Inc., a company located in Syosset, New York (A55-56). As the men "approached" the Volt premises, three individuals, including Tarantino, "approached" them (A56). "Baumgardt and [his co-worker] were ordered to lay on the ground and, while [his co-worker] was being handcuffed, [Louis] Dorval shot and killed Baumgardt. At that time, [the three alleged robbers] seized two briefcases carried by Baumgardt". *Id*.

18 U.S.C. § 33 ("Destruction of Motor Vehicles or Motor Vehicle Facilities") provides in relevant part:

> (a) Whoever *willfully*, *with intent to endanger the safety of any person on board or anyone who he believes will board the same, or with a reckless disregard for the safety of human life*, damages, disables, destroys, tampers with, or

45

> places or causes to be placed any explosive or other
> destructive substance in, upon, or in proximity to, any
> motor vehicle which is used, operated, or employed in
> interstate or foreign commerce . . . ; or
>
> * * *
>
> …Whoever, *with like intent, willfully* disables or
> incapacitates any driver or person employed in connection
> with the operation or maintenance of the motor vehicle, or
> in any way lessens the ability of such person to perform
> his duties as such; or...

*Id.* (emphasis added).

## B.    The Indictment is Defective

Tarantino challenged Count 1 on two interrelated grounds. First, he sought

dismissal because, although the indictment presumably charged him under § 33(a)—

*i.e.* disabling a person (third paragraph) rather than a vehicle (first paragraph) or

structure (second paragraph)—it did not allege that he disabled Baumgardt "with

intent to endanger the safety of any person on board" a vehicle used in interstate

commerce, as required by the "with like intent" phrase in the third paragraph. *United

States v. Jones*, 308 F.3d 748, 750 (7th Cir. 2002) ("the indictment does not allege

that Jones intended to endanger anyone's safety. Such intent is required for a

violation of § 33(a)"). Tarantino also sought dismissal of Count 1 because the

indictment failed to allege willful intent to damage, destroy, or tamper with any

interstate motor vehicle. The robbery and Baumgardt's killing occurred on the

sidewalk after the guard had already exited the vehicle; there was no allegation of

intent to damage an interstate commercial vehicle or to incapacitate its driver while the driver was operating the vehicle. Therefore, no violation of § 33 occurred. For either or both reasons, Count 1 must be dismissed.

An indictment must contain the elements of the offense charged. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Goodwin*, 141 F.3d 394, 401 (2d Cir. 1997). "An indictment that must rely on a statutory citation does not 'fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir. 1988). Despite acknowledging that § 33's third paragraph "could be considered ambiguous," the district court rejected Tarantino's first pretrial motion, speculating that the phrase "with like intent" found in the third paragraph refers back to both the "intent to danger the safety of any person" clause in the first paragraph *and* the "reckless disregard" clause of that same paragraph (A105). Tarantino disagrees.

"It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" *Hamling*, 418 U.S. at 117. The district court found § 33's third paragraph "ambiguous" and, in doing so, essentially acknowledged that Count 1 neither alleged intent nor set forth the words of § 33

47

"fully, directly, and expressly" as *Hamling* requires. *Accord Pupo*, 841 F.2d at 1239 (citing *Hagner v. United States*, 285 U.S. 427 (1932)) ("It is well established that an indictment is defective if it fails to allege elements of scienter that are expressly contained in the statute that describes the offense").

Moreover, the indictment failed to charge specific intent to damage a vehicle, and the district court failed to instruct the jury that the government carried the burden of proving the defendant possessed that specific *mens rea. See* T1-3128-3131. It is undisputed that, at the time of the offense, Baumgardt and his co-worker were not "*on board*" the vehicle. Indeed, the indictment alleges that the robbery occurred only *after* Baumgardt and his co-worker had exited their vehicle and were "*on the ground*" before the entranceway to the office building premises (A56). No allegation of intent to damage an interstate commercial vehicle or incapacitate its driver *while operating the vehicle* appears in Count 1.[36] Because the indictment failed to state an offense proscribed by § 33, Count 1 must be dismissed with prejudice.

The Government artificially engineered a prosecution under an inapposite "destruction of motor vehicles" statute by excising essential statutory language from

---

[36] The Government's closing argument misleadingly repeated the phrase "armored car robbery" (T1-2881, 2883-85, 2887-88, 2894, 2895, 2898-99, 2900, 2903-05, 2907). Tarantino was not charged with, nor was there an inference of, any robbery of—let alone an intent to damage—the van. This was a sidewalk robbery, not an "armored car robbery."

the indictment.[37] There is scant precedent interpreting § 33,[38] and thus parallel statutes and legislative history must also be analyzed to provide further support for Tarantino's argument.[39]

In *United States v. Kurka*, the Court addressed § 33's first paragraph and noted "if 'willful' damage to the vehicle is an essential element of the crime, then it was essential that both the indictment and the jury instructions included that element."

---

[37] The robbery underlying Count 1 *may have* supported a Hobbs Act charge under 18 U.S.C. § 1951. *See, e.g. United States v. Catalan-Roman,* 585 F.3d 453 (1st Cir. 2009); *United States v. Watson*, 525 F.3d 583 (7th Cir. 2008); *United States v. Norris*, 792 F.2d 956 (10th Cir. 1986). In fact, Tarantino's prosecutor referred to the actions on June 23, 1994, as "a felony murder, a Hobbs Act robbery, and in this act the hijacking of this interstate motor vehicle" (T1-618). But the Government failed to bring Hobbs Act charges within the statute-of-limitations period and, rather than let it remain a state case, created an offense under a federal statute charging conduct divorced from the actual facts.

[38] None of the cases analyzing § 33 involved a sidewalk robbery, a void that speaks volumes. *See United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) (rental van destroyed by bomb exploded in terrorist plot against World Trade Center); *United States v. Lowe*, 65 F.3d 1137 (4th Cir. 1995) (driver shot *while operating truck* ambushed during labor dispute); *United States v. McKinley*, 38 F.3d 428 (9th Cir. 1994) (defendants charged with placing explosives in vehicle employed in interstate commerce); *United States v. Daniels*, 948 F.2d 1033 (6th Cir. 1991) (shots fired at Greyhound bus en route during labor strike); *United States v. Heightland*, 865 F.2d 94 (6th Cir. 1989) (coal trucks ambushed with high-powered guns during labor dispute resulting in death of driver *while operating truck*).

[39] In rejecting Tarantino's second motion to dismiss, the district court refused to engage the legislative intent asserting "the statutory language is unambiguous" (A127). Yet, when addressing Tarantino's first dismissal motion, the very same judge concluded that § 33's third paragraph "could be considered ambiguous" (A105). The court made no attempt to reconcile these contradicting views.

818 F.2d. 1427, 1428 (9th Cir. 1987).[40] The Ninth Circuit examined the "symmetry" of § 33 and stated "[i]f the first paragraph did not require willful damage to the vehicle plus the prescribed intent of intentionally or recklessly endangering human life, then the phrase 'with like intent' in the two succeeding paragraphs would have no reference point and would be meaningless." *Id*. at 1429-30. The majority found the indictment "fatally defective" because "it failed to charge an essential element of the crime," emphasizing that "the erroneous interpretation [of § 33] persisted throughout the trial and in the instructions to the jury." *Id*. at 1431. Under *Kurka*, the excision of the "specific intent" language in Tarantino's indictment fatally decapitated the statute because the essential element of willful vehicular damage was improperly excluded. To make matters worse, the active verb employed in "driver or person employed in connection with the operation … of the motor vehicle" was distorted to connote mere employee status.

§ 33 prohibits impairing a driver *while employed in the operation of the vehicle* in order to be consistent with the legislative purpose of the federal statute, *i.e.* to punish criminals who commit acts of sabotage against interstate commercial motor vehicles, thereby endangering human life. The Government overreached by

---

[40] *Kurka* involved two defendants who followed a bus carrying passengers in interstate commerce. Kurka was the driver and Combs the passenger. Combs took a rifle from the gun rack of the truck and fired at the bus, hitting it twice. *Kurka*, 818 F.2d at 1428.

using a federal statute designed to punish acts of sabotage and terrorism to punish robbery conduct.

### 1. The Parallel Statutes

Because of the scarcity of case authority interpreting § 33, it is instructive to review parallel statutes. *Kurka*, 818 F.2d at 1430. The statutory purpose is best understood by analogizing § 33 to its related provisions found within 18 U.S.C. §§ 32 and 1992. § 33, enacted with § 32 in 1956, adopted the jurisdictional language "used, operated, or employed" in commerce from its model statute ( § 1992), which authorizes the prosecution of anyone who "willfully derails, disables, or wrecks any train, engine, motor unit, or car used, operated, or employed in interstate or foreign commerce by any railroad." *Kurka*, 818 F.2d at 1430. Congress was concerned with protecting certain transport channels and instrumentalities of interstate commerce, *i.e.*, trains and aircraft. § 33 merely extended the federal protection to "motor vehicles … used, operated, or employed in interstate or foreign commerce." Here, the Government transmogrified the statutory structure of § 33 and warped its language to concoct Count 1.

To illustrate the correlation between the incapacitation clauses in §§ 32 and 33 and their model language in § 1992, Tarantino juxtaposes the provisions for comparison. *Compare* 18 U.S.C. § 33(a), *supra*, *with* 18 U.S.C. § 1992(a)(6):

> Whoever… [with] intent to endanger the safety of any person, or with a reckless disregard for the safety of human

life, interferes with, disables, or incapacitates any
dispatcher, driver, captain, locomotive engineer, railroad
conductor, or other person while the person is employed
in dispatching, operating, controlling, or maintaining
railroad on-track equipment or a mass transportation
vehicle...[.]

*and with* 18 U.S.C. § 32(a)(5) ("interferes with or disables, with intent to endanger
the safety of any person or with a reckless disregard for the safety of human life,
anyone engaged in the authorized operation of such aircraft or any air navigation
facility aiding in the navigation of any such aircraft"); § 32(a)(6) ("performs an act
of violence against or incapacitates any individual on any such aircraft, if such act
of violence or incapacitation is likely to endanger the safety of such aircraft").

The related counterpart statutory provisions found in § 1992 and § 32 confirm
that the incapacitation conduct proscribed under § 33 must occur while the driver is
operating an interstate commercial vehicle, thereby endangering the safety of human
life aboard. *United States v. Howard*, 692 F.3d 697 (7th Cir. 2012) (affirming § 1992
conviction for interfering with the engineer of a passenger train, while engineer was
operating a passenger train); *United States v. Butler*, 496 Fed. App'x 158, 161 (3d
Cir. 2012) ("least culpable conduct that may satisfy 18 U.S.C. § 32(a)(5) involves
willfully interfering, with a reckless disregard for the safety of human life, with
anyone *engaged in* the authorized *operation of* an aircraft or air navigation facility").

## 2.    The Legislative History[41]

The primary thrust of § 33 is to punish the sabotage of interstate commercial motor vehicles and, if death results, to enhance punishment under § 34. The incapacitation of the "commercial motor vehicle operator" must be construed in conformity with the clear legislative intent. *United States v. Heightland*, 678 F. Supp. 159, 163 (E.D. Ky. 1987) ("[T]he statute is construed in relation to its statutory purposes. In the absence of case law interpretation of 18 U.S.C. § 33, the only guidance that can be provided is the legislative history").

Review of the 1956 Congressional Record confirms Tarantino's position. Edwin Willis, Chairman of the relevant judiciary committee, explained: "[t]he purpose of this legislation is to supplement the federal criminal laws so as to provide more effective deterrents to the commission of acts of destruction and sabotage with respect to aircraft and motor vehicles" (DE402-1 at 3) (cited in *Kurka*, 818 F.2d at 1430) . The statute's protection of interstate commercial vehicles from acts of sabotage was brought as a companion to the destruction of aircraft statute promulgated in response to an airborne disaster in Colorado (DE402-1 at 3). The proposed legislation was advanced because commercial motor vehicles were "as vulnerable as aircraft to the type of sabotage or other criminal action which could

---

[41] The legislative history of § 33 was appended to Tarantino's motion below (DE402-1; 402-2; 402-3) but the judge ignored it (A127).

result in great loss of life and destruction of property." *Id.* at 4.

Proceedings held on the Congressional floor in 1956 also shed light on the legislative intent (DE402-2). Rep. Willis stated "As to the motor vehicle provision, the gist of the offense is *'intent to endanger the lives of the persons on board'*" (DE402-2 at 4-5). The resulting bill was amended to include "provisions covering motor vehicles" because, as another congressional report had found, *"it is clear that willful damage to or destruction of motor vehicles used in the transportation of passengers and property . . . could seriously jeopardize the safety of a great many persons, as well as passengers.*

At the 1956 Congressional hearings, the language for incapacitation was understood as that which could cause damage to or destruction of the interstate commercial conveyance (DE402-3 at 24-25). Incapacitation of the driver or operator must occur while the driver or operator is operating a protected interstate commercial vehicle (*i.e.*, while "employed in connection with the operation…of the motor vehicle"). For any transgression to fall within the scope of the motor vehicle destruction statute, a specific intent to damage, disable, destroy or tamper with an interstate commercial motor vehicle must be alleged in the indictment. Count 1 failed to allege this requisite intent, as it was conceded that the robbery did not involve any damage or destruction to any motor vehicle.

The 1984 legislative history that the incapacitation proscribed by § 33 must

54

take place while the driver is operating the vehicle (DE402 at 22). The definition of "motor vehicle" in § 31 was amended "to include a vehicle used for commercial purposes on the highways in the transportation of 'passengers, passengers and property, or property or cargo.'" *Id*. The Senate Report made clear that a person who destroys or damages a truck with intent to endanger the safety of the driver or any other person on board could be prosecuted under 18 U.S.C. § 33." *Id*. The legislative history shows Congress' sensitivity to preemption and federalism. *Id.* ("However, the Committee does not intend that federal prosecution be the sole means of dealing with such a crime. Damaging a truck with the intent of injuring the driver would violate any of a number of state laws, and the Committee intends that state authorities continue to play a major role in this area.").[42]

## C.    Conclusion

The sidewalk robbery resulting in Baumgardt's death cannot be transformed into a § 33 offense by overzealous prosecutors. The robbery may have supported a Hobbs Act charge, but the Government did not file such charge within statute of limitations. Rather than referring the case to state prosecutors, the Government authored an indictment charging a non-offense to sidestep the time-bar. Count 1

---

[42] *See Bond v. United States*, 134 S.Ct. 2077, 2090 (2014) (there must be a "clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States.").

must be dismissed.

## POINT II

### TARANTINO'S CONVICTION OF COUNT 2 MUST BE VACATED IN LIGHT OF *FOWLER V. UNITED STATES*

In Count 2 Tarantino was charged with the August 12, 1994, obstruction-of-justice murder of Louis Dorval, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and 1512(a)(3)(A). § 1512 makes it a federal crime to kill or attempt to kill

> another person, with intent to . . . (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings . . . .

The indictment alleged that Tarantino participated in Dorval's murder in order to obstruct ongoing federal and state investigations involving the interstate sale of stolen merchandise in 1993, specifically fur and leather coats from Filene's Basement (A60). It further alleged that between June 23 and August 9, 1994, Tarantino learned that Dorval had implicated him in the Baumgardt's murder in a discussion with John Doe 3, and that on August 10, 1994, Dorval and others (but not Tarantino) were federally indicted in New Jersey in *United States v. Giampa,* 94-CR-403, on various federal crimes (A57-58).

At the close of the evidence, Tarantino sought dismissal of Count 2 pursuant to Fed. R. Crim. P. 29 due to insufficiency of evidence that Tarantino killed Dorval

specifically to prevent him from communicating with a federal officer, arguing "[t]here has been no evidence whatsoever from anybody that there was an alleged concern on Mr. Tarantino's part that [Dorval] was going to become a cooperating witness or provide information about him, not even one word," and that there is "[n]othing about a concern of him cooperating, nothing . . . It has to all come out of thin air" (T1-2794, 2800. Denying the motion, the court "thought" the evidence "can somewhat be inferred that there was a concern" that Dorval would be apprehended and "he was attempting to leave, and with the possibility that upon arrest if he didn't want to go to jail, he would then cooperate" (T1-2799).

Subsequently, the jury was instructed that, in order to find that Tarantino acted with the requisite intent, the Government must establish he believed Dorval "might communicate with law enforcement authorities" and that Dorval "could have" provided a relevant communication to law enforcement (A138). It was also instructed that the Government must prove beyond a reasonable doubt that "the offense or offenses which Dorval could have provided information about were federal offenses" (A139).

Three days after the verdict, the Supreme Court decided *Fowler v. United States,* 131 S.Ct. 2045 (2011). In *Fowler*[43], the Eleventh Circuit held that a showing

---

[43] Like Tarantino, Fowler was charged with a violation of 18 U.S.C. § 1512.

of possible or potential communication to federal authorities was sufficient. The Supreme Court granted review to address the question of "what, if anything the Government must show beyond this broad in-definite intent in order to show that the defendant more particularly intended to prevent communication with *federal* officers" as opposed to "law enforcement officers in general." *Id*. at 2048. The Supreme Court held, "the Government must show that there was a *reasonable likelihood* that a relevant communication would have been made to a federal officer." *Id*. The Court wrote, "where a federal crime is at issue, communication with federal law enforcement officers is almost always a *possibility*" and therefore "to allow the Government to show only a mere possibility that a communication would have been with federal officials is to permit the Government to show little more than the possible commission of a federal offense." *Id*. at 2051. The Government must show that "the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* at 2052.[44]

Shortly after *Fowler* issued, Tarantino moved for relief pursuant to Fed. R. Crim. P. 33 because (1) there was insufficient evidence to convict him of the

---

[44] *Fowler*'s holding should be compared with the court's ruling that it "thought" the evidence "can somewhat be inferred that there was a concern" that Dorval would be apprehended and "he was attempting to leave, and with the possibility that upon arrest if he didn't want to go to jail, he would then cooperate" (T1-2799). This ruling reflects the epitome of a "remote" or "simply hypothetical" possibility condemned in *Fowler*.

58

obstruction-of-justice murder of Dorval, and (2) the jury instruction on Count 2 was erroneous (DE267). The district court denied Tarantino's motion.[45]

### A. *Fowler* Requires Dismissal of Count 2 due to Insufficient Evidence.

The Government's evidence was legally insufficient to sustain Tarantino's conviction on Count 2. *Fowler* requires more than just a "remote" or "hypothetical" possibility that Tarantino might have killed Dorval to prevent him from communicating with federal authorities. Moreover, there has to be a "reasonable likelihood" that a relevant communication would have been made to a federal officer. *Fowler* requires "that the jury find that if [Tarantino] did not have a particular law enforcement officer in mind, then the Government must establish a 'reasonable likelihood' that had [Dorval] 'communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer.'" *United States v. Tyler*, 732 F.3d 241, 251 (3d Cir. 2013) (citing *Fowler*, 131 S.Ct. at 2052).[46] Post-*Fowler*, the requirement that the Government merely prove that the defendant believe the witness "might" communicate with federal law

---

[45] This order was sealed; Tarantino will submit it to the Court in a supplemental sealed appendix.

[46] The "use of the term 'might' permitted a mere possibility rather than a reasonable likelihood, which fails to comport" with *Fowler*. *Tyler, 732 F.3d at 251-52.* "Worse," an inference of the element further violates *Fowler* by "transform[ing] a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature." *Id*.

enforcement is obsolete. *Tyler*, 732 F.3d at 251.[47]

The principal testimony on Count 2 came from Gaetano Fatato, who the Government essentially conceded was a pathological liar in a filing below, where it noted another judge's ruling that Fatato's "veracity is so slender as to suggest the court wouldn't believe him" (DE171). The Government also paid Fatato almost $200,000 for his "cooperation" (*Id.*). Nevertheless, the Government presented Fatato as its only witness that Dorval was with Tarantino when he was last heard from before he died, and that they were, conveniently, about to board a boat (T1-1211-14).

Fatato ranks "among the most unreliable witnesses ever produced by the Office of the United States Attorney in an attempt to prove a count charged [in] an indictment" (DE278 at 6). At trial, Fatato acknowledged the staggering volume of his perjury, lies, false accusations, and state and federal crimes:

- Lied on numerous occasions to various federal law enforcement officers and federal and state probation officers about the criminal conduct he was committing (T1-1267-68; 1273;1308; 1314; 1338-44),

- Filed false police reports with state law enforcement to perpetrate insurance fraud (T1-1334);

---

[47] Even the district court, in its sealed order, acknowledged that "[i]f Tarantino did not have federal agents specifically in mind and the Government showed only a possibility of Dorval's communicating with federal authorities, then [Tarantino's] conviction on Count Two would be invalid in light of *Fowler*."

- Filed false federal tax returns and lied about it (T1-1355-56);

- Attempted to bribe a federal prosecutor and judge while he was a cooperating witness and implicating Tarantino (T1-1293-96);

- Committed and/or charged with numerous felonies (T1-1291-93) and lying to the Government about it (T1-1280-81); failing to honor an existing cooperation agreement he had with New Jersey authorities (1281-88).

Fatato was awaiting sentencing on a 2003 federal charge for conspiracy to distribute crystal methamphetamine for which he hoped to receive a reduced sentence for testifying against Tarantino (T1-1117-18). He admitted lying to a grand jury in 1994 that was investigating the Baumgardt and Dorval deaths and lying when he was a cooperating witness for the Nassau County authorities in 1996, when he swore that Dorval never told him who was involved with the sidewalk robbery (T1-1324-27). Fatato provided the Government with "different versions" of what purportedly occurred during his last phone conversation with Dorval and of Tarantino's alleged presence with Dorval during that conversation (T1-1335). For example, Fatato admitted that on September 13, 1994, shortly after Dorval's body was found, he told the FBI that the last time he spoke with Dorval was when Dorval was at his apartment in Queens and Dorval *was not with Tarantino*. *Id.*

Even giving Fatato more credence than merited, Count 2 still must fall on the elements of intent and reasonable likelihood of communication to a federal officer.

Nowhere in Fatato's testimony—or any other testimony—is there any evidence that Dorval had cooperated with any authorities or had ever indicated to anyone that he intended to communicate with any authorities, much less federal authorities. Rather, the Government's theory at trial was that "if [Dorval] had been arrested and [if he had cooperated, [he] could have spoken to the authorities about Mr. Tarantino" (T1-1116). This is precisely the "remote" and "hypothetical" type of evidence that proved fatal in *Fowler*.

The only reasonable evidentiary inference was that Dorval was *not* cooperating nor was he *about to* cooperate and provide information to *federal* authorities about Tarantino's involvement in the charges resulting in the *Giampa* indictment (in which Tarantino was never charged), or even about the Baumgardt robbery, which was a state investigation when Dorval was killed. In fact, Fatato and lead agent Schelhorn provided the best evidence to *negate* any notion that Dorval was about to cooperate with *federal* authorities about *federal* offenses.

Fatato testified that Dorval was committed to life on the lam to avoid incarceration on a *state* case even before Baumgardt's death on June 23, 1994. At the time Dorval's body was retrieved, Dorval had skipped bail in a Nassau County, New York, stolen vehicle case, and was wanted by state authorities (T1-1190). Dorval "was on the run from the law" and obtained a new ID and moved apartments because "he didn't want to go back to jail" (*Id*.). Dorval also admitted to Fatato that

he accidentally shot Baumgardt and was "nervous" and going to "lay low" in Florida (T1-1193). In August, 1994, Fatato learned that he and Dorval had been indicted in New Jersey in the *Giampa* matter and he called Dorval, who said "[h]e wasn't going back to fucking jail. . . I got my IDs. I'm going to take off" (T1-1207).

Agent Schelhorn's testimony furthers the insufficiency of the evidence on Count 2. Schelhorn testified that in 1999 he was assigned to the Dorval murder investigation and *at that time* he began working with Nassau County detectives, who had been investigating the sidewalk robbery resulting in Baumgardt's death (T1-2339-40). It was then (late 1999) that the Dorval and Baumgardt cases "blended together" and they were "worked as a federal case". *Id*. Prior to that time, the FBI was only investigating the Dorval homicide (T1-2340). In other words, the Baumgardt case was a state investigation in 1994 when Dorval was killed, and did not become a federal investigation until late 1999. This important fact is further support for the absence of any evidence that Tarantino was involved in the obstruction-of-justice killing of Dorval in August, 1994, out of fear that Dorval would provide information to the *federal authorities* about Tarantino's alleged involvement in the Baumgardt case. *Fowler*, 131 S.Ct. at 2048.

The record in this case lacks legally sufficient factual support to establish a § 1512 offense under *Fowler*. Even crediting the Government's case—and Fatato's testimony—there is an absence of any evidence that Tarantino participated in the

killing of Dorval because there was a reasonable likelihood that a relevant communication would have been made by Dorval to a federal officer about Tarantino's alleged involvement in the Baumgardt case. In 1994, the Baumgardt case was being investigated solely by state law enforcement, and did not become a federal investigation until late 1999, over five years after Dorval was killed. *See Fowler*, 131 S.Ct. at 2051. [48]

At best, the Government showed Dorval was a co-defendant/co-conspirator of Fatato in a New Jersey federal indictment who was on the lam. Dorval sought to evade state and federal authorities by fleeing to Florida with a fake ID. Dorval also contacted his sister, Tiffany Fury, about five days before his death, and asked her to dye his hair because "he was in trouble and he was leaving" and "wouldn't be in contact" (T1-1064-65). These actions undermine a reasonable likelihood that Dorval would have made a communication to a federal officer. And finally, the Government did not present one scintilla of evidence that Tarantino even knew that Dorval was wanted by federal officers.

---

[48] Justice Scalia, concurring in the judgment in *Fowler*, agreed that the Government failed to present sufficient evidence for a § 1512 offense, observing that "a suspect who commits a murder with the general intent of preventing law enforcement from learning about activities that violate both state and federal law would not be guilty, because the Government would be unable to prove that the communication he sought to prevent necessarily would have been to a federal official." *Fowler*, 131 S.Ct. at 2053-54 (Scalia, J., concurring).

To permit Tarantino's conviction to stand *Fowler* and means that any murder would fall under § 1512's reach as long as the victim was a co-conspirator in an actual or potential federal case because of the mere possibility that he might get arrested at some point and might cooperate by making a statement to federal authorities. As *Fowler* clarified, this is a "remote, outlandish, or simply hypothetical" situation forbidden by the statute. The district court observed that "[i]f Tarantino did not have federal agents specifically in mind and the Government showed only a possibility of Dorval's communicating with federal authorities, then his conviction on Count Two would be invalid in light of *Fowler* (Sealed Order at 34). Tarantino agrees. Count 2 must be vacated.

### B.    Erroneous Jury Instruction Under *Fowler*

Tarantino's jury was instructed that in order to find that he acted with the intent to prevent Dorval from communicating to law enforcement authorities information relating to the "commission or possible commission of federal offenses," the Government must establish that Tarantino believed that Dorval "might communicate with law enforcement authorities" and that Doval "could have" provided a relevant communication to law enforcement (A138-39). Under *Fowler*, the instruction is fatally flawed because it held the government to a lesser and improper standard of proof.

In *Fowler*, the Supreme Court held "the Government must show that there

was a *reasonable likelihood* that a relevant communication would have been made to a federal officer." *Fowler*, 131 S.Ct. at 2048. As the Court wrote, "where a federal crime is at issue, communication with federal law enforcement officers is almost always a *possibility*" and therefore "to allow the Government to show only a mere possibility that a communication would have been with federal officials is to permit the Government to show little more than the possible commission of a federal offense." *Id*. at 2051. The Government must show that "the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* at 2052. [49]

In *United States v. Wainwright,* 789 F.Supp.2d 699 (E.D.Va. 2011), the defendant, like Tarantino, was convicted of a violation of § 1512(a)(1)(C). After *Fowler* issued, the court entered an order that *Fowler* "resolved a split among the circuits as to the elements required to be proven to sustain a conviction for killing a witness under Section 1512" by holding that "where the defendant kills a person with an intent to prevent communication with law enforcement officers generally, that intent includes an intent to prevent communications with federal law enforcement officers only if it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications would have

---

[49] The jury charge at Tarantino's second trial more closely tracked *Fowler*'s language and highlights the error at the first trial (A145).

been made to a federal officer." *Id.* at 700. The judge further noted that *Fowler* overruled Fourth Circuit precedent holding that "no showing was necessary concerning whether the witness would actually communicate with a federal law enforcement official"; rather, "the federal nexus" was satisfied upon a showing that "the information the defendant [sought] to suppress actually relate[d] to the commission or possible commission of a federal offense...." *Id.* (citing *United States v. Harris*, 498 F.3d 278, 286 (4th Cir. 2007)). The judge concluded, and the Government ultimately agreed, that the faulty instruction warranted vacation of Wainwright's conviction. *Wainwright*, 789 F.Supp.2d at 700-01.

In Tarantino's case, the jury was instructed—in accordance with Second Circuit precedent—that the Government's burden was merely to show Tarantino "believed Dorval *might* communicate with law enforcement authorities" (T1-3136) (emphasis added). This instruction, while accordant with *United States v. Lopez*, 372 F.3d 86 (2d Cir. 2004), was fatally flawed under *Fowler* in holding the Government to a lesser and improper standard of proof. Just as *Fowler* cited and overruled the Fourth Circuit's *Harris* case, it similarly cited and overruled *Lopez*.[50] In fact, *Fowler* addressed *Harris* and *Lopez* in the very same sentence, first quoting *Harris* and then *Lopez*. *Fowler*, 131 S.Ct. at 2048-49. *Fowler* rejected the *Lopez* standard, ruling that

---

[50] Tarantino's research has uncovered no case where this Court has yet addressed *Fowler*.

a merely "possible" or "likely" communication with federal officers could not be reconciled with the language or purpose of the statute. *Fowler*, 131 S.Ct. at 2051-52. Tarantino submits that the Court's adoption of the "reasonable likelihood" standard overruled *Lopez*, along with *Harris* and other circuit decisions approving the lesser standard of proof. A new trial before a properly-instructed jury must be ordered.

## POINT III

### TARANTINO WAS INVOLUNTARILY ABSENT FROM CRITICAL STAGES OF THE PROCEEDINGS AND A NEW TRIAL IS WARRANTED ON COUNTS 1 AND 2.

#### A.    Introduction

On March 17, 2011, a telephonic hearing was conducted to prescreen prospective jurors to serve on Tarantino's jury at which the court, the Government's counsel, and Tarantino's counsel were present (DE 486-6). Tarantino was not present.[51] In fact, the minutes from that proceeding confirm his absence (DE194). At the conclusion of the March 17 hearing, the court noted that because the

---

[51] During the pendency of this appeal, Tarantino served the Government with a statement of evidence pursuant to Fed. R. App. P. 10(c). The Government never objected or submitted any proposed amendments and Tarantino submitted the statements to the court for mandatory settlement and approval (DE463, 477). The Government opposed Tarantino's request and Tarantino filed a Reply (DE478, 479). The court refused the requested "mandatory" settlement and approval but acknowledged that the March 17, 2011 proceeding was conducted "without Defendant" being present (DE481 at 2-3).

prescreening was not completed, it would contact Magistrate Judge Tomlinson to complete it "on Monday" (DE486-6 at 58). On Monday March 21, another telephonic hearing occurred before Magistrate Judge Tomlinson; counsel for the Government and Tarantino were present (DE483).[52] Tarantino, however, was again not present at this proceeding.[53] At both the March 17 and March 21, 2011 proceedings, prequalification of jurors took place; challenges were exercised for those jurors who expressed medical issues, vacations/planned trips, difficulty understanding the English language, financial hardships, bias and/or other additional hardships.[54] Under any standard of review,[55] Tarantino's involuntary absence from

[52] The district court characterized this proceeding as "completing" the prequalification carried over from March 17 (DE481 at 3). Neither the court nor the Government disputed that Tarantino was not present.

[53] There is no docket entry or clerk minutes reflecting *any* proceeding on March 21, 2011. Tarantino discovered that a proceeding did take place when reviewing the transcript from March 17 where the court referred to further proceeding to take place "on Monday." The transcript of the March 21 proceeding, which confirms Tarantino's absence, was later ordered and docketed (DE483).

[54] The jury selection in the first trial should be contrasted with the second trial, where Tarantino *was* present in court for the entire jury selection process (including the prescreening and cause challenges for which he was *not* present at the first trial) (DE474, 474-1).

[55] Because Tarantino was involuntarily absent from the proceedings, he was not afforded the opportunity to object. Courts have employed various standards of review for involuntary absence claims. Tarantino submits that the error is structural because it "so fundamentally undermine[d] the fairness or validity of the trial that [it] require[s] voiding its result regardless of identifiable prejudice." *Yarborough v. Keane*, 101 F.3d 894, 897 (2d Cir. 1996). Harmless error also has been used when evaluating a defendant's absence from a critical stage of trial. *Diaz v. Herbert*, 317

these critical stages violated the Sixth Amendment, and a new trial is warranted on Counts 1 and 2.

### B. Tarantino had a right to be present at the pre-qualification of jurors.

Tarantino had a constitutional right to be present during all "critical" stages of trial including jury selection. *Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) ("It is a well-settled principle of constitutional law that a criminal defendant has the right 'to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings,' and jury selection is certainly among these stages") (quoting *Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975)). While a defendant's right to be present is not absolute—and his attendance is not required when his participation would be meaningless[56]—this Court has held that "pre-screening of prospective jurors is a material stage of trial at which the defendant has a constitutional right to be present. *Cohen*, 290 F.3d at 489. Indeed, "the defendant's

---

F.Supp.2d 462 (S.D.N.Y. 2004) ("Even if Diaz's absence from the sidebar conferences in question somehow implicated a federal right, the error would be, at best, harmless") (citing *Rushen v. Spain*, 464 U.S. 114, 117-19 (1983); *United States v. Evans*, 352 F.3d 65, 68-69 (2d Cir. 2003)). For issues not preserved at trial, a plain error analysis is the standard of review. *United States v. Stewart*, 433 F.3d 273, 290-91 (2d Cir. 2006). Tarantino submits that even under plain error analysis, his involuntary absence from critical stages of trial "seriously affect[ed] the fairness, integrity, or public reputation of the judicial proceedings." *Id*. at 291.

[56] *See United States v. Gagnon,* 470 U.S. 522, 526-27 (1985); *Grayton v. Ercole*, 691 F.3d 165, 170 (2d Cir. 2012).

"life or liberty may depend upon the aid which, by his personal presence, he may give to counsel and to the court and triers, in the selection of jurors." *Id.* (citing *Lewis v. United States*, 146 U.S. 370, 373 (1892)).

## C.    When is a defendant's right to be present violated?

This Court has noted that "[t]he right of a defendant to be present is not absolute . . . and instead is triggered only when the defendant's presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Cohen,* 290 F.3d at 489 (internal quotation marks omitted) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)). *Cohen* is undeniably applicable to a defendant's right to be present during the pre-qualification of jurors.

"[I]f a defendant is given an opportunity to register his opinions with counsel after juror questioning and is present when the exercise of strikes is given formal effect, then his constitutional right to be present is satisfied." *Cohen*, 290 F.3d at 490 (citations omitted) . In *Cohen*, the presiding judge invited counsel in to chambers to exercise challenges during voir dire. *Id*. at 487. Although the defendant was not present for each in-chambers discussion with counsel regarding challenges, he did have an opportunity to discuss and provide input to his counsel prior to each meeting. *Id.* The court noted, "district courts within our Circuit have consistently held that a defendant's absence during the exercise of challenges does not violate his constitutional rights *provided he is present for juror questioning and the formal*

71

*reading of challenges in open court.*" *Id.* (citations omitted) (emphasis added).

### D. What is an effective waiver of a defendant's right to be present?

A defendant has a right to be present at all critical stages of trial. Fed. R. Crim. P. 43 affords a defendant that right and it addresses waiver of this right. In pertinent part, Rule 43(b)(1) provides "the defendant shall be considered to have waived his right to be present whenever a defendant, initially present, voluntarily absents himself after the trial has commenced (whether or not he has been informed by the court of his obligation to remain during the trial)."

This Court also observed that "[a]lthough trial courts must vigorously safeguard a criminal defendant's right to be present, a defendant may expressly or effectively waive the right . . . the waiver of this constitutional right must be both knowing and voluntary." *Cohen*, 290 F.3d at 491 (citations omitted) (internal quotations omitted). In *Cohen*, the trial judge, in the presence of the defendant, advised that he would conduct certain pre-screening questioning of jurors in chambers. *Id.* at 487. Certain peremptory and for cause challenges were also conducted in chambers, outside the presence of Cohen. *Id.* The court acknowledged that Cohen did not expressly waive his right to be present at the pre-screening procedure during voir dire. *Id.* Based on this acknowledgement, the court had to determine whether he "knowingly and voluntarily made an implied waiver through his conduct." *Id.* In making its determination, the court stated, "the trial judge did

announce in open court his intention to conduct the pre-screening, and the record indicates that he noted at that time that he had had an opportunity to speak with counsel about the pre-screening procedure. The trial judge also described the nature of the procedure in open court on several occasions." *Id.* at 491. The court held, "when a defendant is fully apprised of the nature of the pre-screening procedure, makes no objection to the procedure, and has counsel present for the duration of the pre-screening, a knowing waiver of the right to be present occurs." *Id*. at 493. "[M]inimal knowledge" by the defendant of the nature and purpose of the prescreening procedure is required when the defendant is absent and waiver is implied. *Id*. at 491. This Court has inferred that a valid waiver is unobtainable from a defendant in custody. *See United States v. Crutcher*, 405 F.2d 239, 243 (2d Cir. 1968).

### E.     Argument

### 1.     Tarantino's right to be present during the pre-qualification of jurors was violated.

Based on *Cohen,* Tarantino had a right to be present at all stages of trial "where his absence might frustrate the fairness of the proceedings." His participation would not have been meaningless, nor was it a proceeding at which he would not "have gained anything by attending." *United States v. Gagnon*, 470 U.S. 522, 526-27 (1985). Rather, Tarantino's life and liberty depended on the aid he would have given to his counsel and the court in the selection of jurors. *See Lewis v. United*

73

*States*, 146 U.S. 370, 373 (1892).

Tarantino did not have an opportunity to confer with his counsel prior to the telephone conferences wherein jurors from the venire were excused for cause and thus his absence frustrated the fairness of the proceedings and caused severe prejudice. Each juror challenged during the prescreening was excused outside of Tarantino's presence. Tarantino had no opportunity to view and/or discuss the first round of jurors with his counsel which supports Tarantino's argument that his Constitutional right to be present was not satisfied.

### 2. Tarantino did not waive his right to be present.

Tarantino did not waive his right to be present at the pre-screening of the jurors conducted via telephone conferences in March 2011. That Tarantino did not have an opportunity to review the questionnaires given to the prospective jurors in conjunction with the fact that he did not have an opportunity to review same with his counsel prior to the exercise of for-cause challenges by counsel establishes that he did not knowingly nor voluntarily waive his right to be present at the pre-screening of those jurors distinguishes this case from others. *Cf. Taylor v. United States*, 414 U.S. 17, 20 (1973) (per curiam) (defendant's failure to return to court after lunch recess implied waiver of right to be present); *United States v. Jones*, 381 F.3d 114, 122 (2d Cir. 2004) (defendant waived his right to be present when he never objected to his absence from the in-chambers hearing, even though he was present

during the subsequent hearing in open court when the court made its ruling); *Polizzi v. United States*, 1990 WL 100891 at *9 (S.D.N.Y. 1990) ("Polizzi understood that he had the right to be present, and understood exactly what he was electing to miss, but that he chose to absent himself because he wished to tend to his commercial business interests.").

Because Tarantino was not fully apprised of the nature of the pre-screening procedure, he had no opportunity to object to it and as a result, under *Cohen*, no knowing waiver existed. It is irrelevant that counsel did not object to Tarantino's presence at the telephone conferences because Tarantino was completely unaware that pre-screening conferences were being conducted. Neither Judge Seybert nor Magistrate Judge Tomlinson inquired with defense counsel whether Tarantino had an opportunity to review the questionnaires with counsel and if he had lodged any objections or made any comments thereto. Furthermore, Judge Seybert specifically instructed defense counsel to meet with Tarantino to review the juror questionnaires prior to the telephone conferences. Even under the "minimal knowledge" standard, a waiver by Tarantino could not have been implied as he had no knowledge of any of the proceedings relevant to this claim. Tarantino was in custody and lacked the power to waive his right to be present. And Tarantino was in custody, unable to give a valid, knowing and voluntary waiver.

### 3.     Tarantino is entitled to relief.

Tarantino's right to be present was violated when he was involuntarily excluded from the pre-screening of the venire. Tarantino did not waive his right to be present while he was in custody as there was no knowing and voluntary waiver as required by this Circuit; nor did counsel effectively waive his right by participating in the teleconferences. As a result, Tarantino did not have a meaningful opportunity to participate in the proceedings. A new trial on Counts 1 and 2 is warranted.

## POINT IV

## THE "GARGUILO TAPE" WAS IMPROPERLY ADMITTED INTO EVIDENCE AT BOTH TRIALS AND A NEW TRIAL IS WARRANTED.

Around September 2000, Garguilo illegally intercepted a conversation he had with Tarantino for the criminal purpose of blackmail and/or extortion. Prior to his first trial, Tarantino moved to suppress the tape because its interception violated 18 U.S.C. § 2511(1) and requested a hearing (DE75; 86). Tarantino requested an evidentiary hearing to further develop the facts surrounding the interception but the court denied both the motion and the request for a hearing (DE 116). After Robert Gerrato testified at trial, Tarantino renewed his motion because Gerrato testified that Garguilo intercepted the conversation with the criminal intent to blackmail Tarantino (T1-1596-98). The court denied these requests (A96-112; 113-21). Prior to his second trial, Tarantino again requested the tape's suppression, appending extensive

documentation of Gargiulo's dire financial straits in the months leading up to the tape's creation, and arguing his entitlement to a hearing to establish that Gargiulo's primary motivation, or that a determinative factor in Gargiulo's original motivation for intercepting the conversation, was to commit a criminal or tortious act (DE356). The court denied Tarantino's requests on the record (T2-5). The "Garguilo tape" was improperly presented as evidence at both trials, the district court erred in refusing to suppress it at both trials, and a new trial is required on all counts due the improper admission of the "Garguilo tape."

### A.    Legal Overview[57]

The federal wiretap law governs when intercepts of oral communications may be used at trial. *See* 18 U.S.C. § 2510 *et seq.* § 2511(2)(d) provides that an individual may intercept a communication if that person is a party to it or if one of the parties to the conversation gives prior consent, unless the communication is intercepted "for the purpose of committing any criminal or tortious act . . . " Use at trial of the contents of an illegally intercepted wire or oral communication, or evidence derived therefrom, is forbidden under 18 U.S.C. § 2515.

An interception is unlawful under § 2511(1)(d) when either the "primary motivation" or a "determinative factor in the actor's motivation" in intercepting the

---

[57] This Court reviews for "clear error as to the facts and *de novo* on questions of law." *United States v. Jiau*, 734 F.3d 147, 151 (2d Cir. 2013).

communication was to commit a criminal or tortious act. *In re Double-Click, Inc. Privacy Litigation*, 154 F.Supp.2d 497, 514-15 (S.D.N.Y. 2001). A defendant must prove by a preponderance of evidence that the recording was made for an unlawful purpose. *United States v. McTiernan*, 695 F.3d 882, 888 (9th Cir. 2012).

§ 2511(2)(d)'s exception "is confined to instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party." *United States v. Jiau*, 734 F.3d 147, 151 (2d Cir. 2013); *accord Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010) ("Where the taping is legal, but is done for the purpose of facilitating some further impropriety, such as blackmail, § 2511 [of Title XVIII] applies . . . ."). The "criminal" or "tortious" requirement covers "only acts accompanied by a specific contemporary intention to commit a crime or tort." *In re Double-Click, Inc.,* 154 F.Supp.2d at 515; *accord Caro,* 618 F.3d at 99-100 ("There is a temporal thread that runs through the fabric of the statute and the case law. At the time of the recording the offender must intend to use the recording to commit a criminal or tortious act . . . If, at the moment he hits 'record', the offender does not intend to use the recording for criminal or tortious purposes, there is no violation.").

## B.   Argument

In its first order denying suppression, the court wrote there were "a number of clues*"* bearing on Garguilo's purpose in creating the recording, one being that the

tape was "insurance" against Tarantino or that Garguilo may have "intended to use the recording for personal protection against the risk that Tarantino would come after him" (A102). Concluding that Garguilo's purpose was either to blackmail Tarantino OR sell the tape to law enforcement, the court acknowledged that blackmail would be a criminal purpose but the events were "close in time" and it was "difficult to say which event furnishes a clearer view of Garguilo's motive at the time the tape was created. Anyway, both events probably occurred three years after the recording of [the] tape, rendering them less probative of Garguilo's specific intent at the time of creation." (A102-03).

In denying Tarantino's renewed request to suppress the tape during the first trial, the court concluded that neither Gerrato's nor Schelhorn's testimony shed any more light on Garguilo's motives, and that while it was "undisputed" that Garguilo "eventually tried to blackmail Tarantino" it was "not at all clear that blackmail was Garguilo's primary goal at the time the tape was made" (A116-17). The court found Garguilo's motive was "mixed, at best": first, it found that a "significant time lapse" between the interception of the conversation and Garguilo's attempt to blackmail Tarantino undermined the idea that Garguilo's primary or determining motivation was blackmail; second, the failure of Garguilo's gyms as a financial reason for blackmail arose "only after the tape was made"; and third, "Garguilo's statement to the FBI that the tape was 'insurance against' Tarantino is susceptible to more than

one meaning" (A116-19).

In denying Tarantino's renewed request prior to retrial, the court again concluded, "the defendant has not established by a preponderance of the evidence that Mr. Garguilo made the tape for a criminal or tortious – and/or tortious act, to wit, to blackmail the defendant at the time the tape was made. It is at least a 51 percent of preponderance" (T2-5).

While acknowledging that Garguilo did in fact attempt to blackmail Tarantino, the court erred in failing to conclude that Garguilo's primary motivation to record the conversation was to blackmail Tarantino. Garguilo was not "acting out of a legitimate desire to protect himself." *McTiernan*, 695 F.3d at 889. And although noting that Garguilo's intention was to either blackmail Tarantino *or* to sell the tape to law enforcement, the court erred in acknowledging that this constitutes a determinative factor for Garguilo's motivation under *In re Double-Click.* Based on the lower court's own analysis, Tarantino proved by a preponderance of the evidence that blackmail, was at the very least, a determining factor for intercepting the conversation.

In further support of his argument, Tarantino provided evidence that proved *more likely than not* that the failure of Garguilo's gyms arose prior to the interception. For example, prior to the second trial, Tarantino argued that "the material factual dispute between the prosecution and the defense is dating the genesis

of [Garguilo's] ill-intent," and provided documentation of Garguilo's financial meltdown (DE 356 at 3). Tarantino invited the court to compare the Indictment (alleging that threatening took place "[i]n or about and between December 2002 and August 2003") with an annexed exhibit compiling court actions and judgments against Garguilo entered even a month before he made the tape (DE356 at 8-10).

Tarantino further argued that Garguilo and Tarantino's relationship had "already deteriorated by the time the tape was created, and therefore the contention that an event worthy of motivating Garguilo only arose after his gym closed in early 2002 is a 'red herring' argument" (DE356 at 7). In support of this argument, Tarantino set forth the testimony of Agent Schelhorn's testimony before the grand jury that Garguilo stated he had taped his conversation because he was "very bitter" that his relationship with Tarantino and Mulligan had "gone sour," which is also suggested within the dialogue of the tape made in late 2000 (*Id.*).

Testimony provided at trial further supported Tarantino's argument that Garguilo had a contemporary intent to commit a crime, to wit, blackmail, when he intercepted the conversation with Tarantino. For example, Schelhorn testified that Garguilo "stated that he made the tape as an insurance, an insurance against Christian Tarantino" (T1-2375). Tarantino further quoted Schelhorn's testimony to the grand jury, where he reflects on a meeting with Garguilo: "He [Gargiulo] thought that was his insurance policy. He stated to me that he would not provide me with the actual

81

tape because that was his ace in the hole, and if he had provided it to me, the federal government wouldn't need him, and he wanted to hold on to the tape" (DE356 at 10). Testimony at trial also revealed that Garguilo had been dry-ratting[58] Tarantino—information Tarantino provided to two mutual acquaintances, Gerrato and Nicholas Pisciotti (DE356 at 5).

The quantum of evidence supplemented by Tarantino the defense surpasses the preponderance standard and he has made a sufficient showing that it is *more likely true than not true* that Gargiulo made the tape with the intent to extort given (1) Gargiulo had begun to suffer financial pains shortly before the taping; (2) Tarantino complained to associates that Gargiulo was "dry ratting" him; and (3) Gargiulo kept possession of the tape as his "insurance" to collect in attempts to collect from Tarantino and even from government agents after Tarantino did not pay a price. That Gargiulo may have harbored "mixed" motivations, as the lower court determined, "the mere existence of [a] lawful purpose alone does not 'sanitize a[n interception] that was also made for an illegitimate purpose.'" *In re DoubleClick, supra,* at 515 (*quoting Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir.1999)).

The court erred in permitting the introduction of the "Garguilo tape" at both

---

[58] It is clear that the term ***"dry ratting"*** meant blackmail or extortion for the personal illicit gain of a predisposed Gargiulo within the context of this case.

trials, and a new trial must be ordered on all counts.[59]

## POINT V

## A NEW TRIAL IS REQUIRED ON COUNTS 1 AND 2 BECAUSE OF AN ACTUAL CONFLICT OF INTEREST.

### A.  Tarantino raised a conflict-of-interest issue in the district court and requested a hearing.

Opening statements and testimony at Tarantino's second trial on Counts 3 and 4 began on April 23, 2012. Two days before opening statements at Tarantino's retrial, the Government moved for an order permitting it to offer testimony from Manon Mulligan, the wife of Scott Mulligan, "concerning the contents of a threatening letter sent by Vincent Gargiulo to Scott Mulligan, which she received and read on January 23, 2003" (DE357 at 1). The Government argued that the extortion letter was "lost" and therefore Manon's oral testimony concerning the letter's "threatening contents" should be admitted as "secondary evidence" pursuant to Fed. R. Evid. 1004. *Id*. According to the Government, after Manon read the letter, she called Keith Pellegrino, a mutual friend of both the Mulligans and Tarantino, who came over and retrieved the letter. *Id*. at 3. According to Manon, Pellegrino told her that he intended to deliver the letter to Scott Mulligan's attorney, Peter Froccaro.

---

[59] At a minimum, an evidentiary hearing is warranted to explore this issue. In refusing to grant Tarantino's repeated requests for an evidentiary hearing, the lower court abused its discretion. *McTiernan*, 695 F.3d at 891.

*Id.* Further, according to the Government, Scott Mulligan, since becoming a cooperating witness against Tarantino, executed a waiver of attorney-client privilege and permitted Frocarro to respond to a Government subpoena for the letter, but Froccaro denied receiving the letter. *Id.*

When trial commenced, the court addressed the Government's request to present Manon testimony but Tarantino alerted the court to a "very difficult" conflict-of-interest caused by the recent discovery that Froccaro represented Mulligan and Tarantino "during the [first] trial, and all through 2008" (T2-7). Counsel further noted that Froccaro had failed to disclose to the court that he represented Mulligan while simultaneously representing Tarantino, arguing "we can prove that if Mr. Froccaro is brought in, we have a very difficult conflict that we may have to go over." *Id.* The Government admitted it "knew that all along" about this and acknowledged that Froccaro's representation of Mulligan and Tarantino had not been part of the *Curcio*[60] hearing held before Tarantino's first trial, which addressed Froccaro's simultaneous representation of another individual implicated in Dorval's murder. *Id.* at 12. At that point, the court said nothing further about the issue.

The issue again arose when the court brought up the Government's request to

---

[60] *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982).

present Manon's testimony (T2-915). Defense counsel again alerted the court to the conflict-of-interest issue and again requested a hearing, noting that there were also issues in regards to "fees and other things" that necessitated Frocarro's testimony at a hearing (T2-919). The court responded "right now I'm trying this case, and whatever other issues you have in terms of conflict of interest—and Mr. Froccaro can be well vetted on appeal." *Id*. at 920.

Shortly into a proffer of Manon's testimony, Tarantino objected, arguing "I don't know the purpose of any of this based upon the fact that we are supposed to be dealing with Mr. Froccaro, Mr. Pellegrino" (T2-1165). The court stated that it was "not dealing with any of these people" and "maybe on appeal" but not now. *Id*. After ruling admissible Manon's testimony, Tarantino objected and again argued that the defense wanted Keith Pellegrino to testify, but the court said

> [T]hat is not happening: You will have whatever rights on appeal in terms of Curcio, and the government's failure to advise the Court in the first trial that Mr. Froccaro had represented Scott Mulligan, and what if any impact there should have been and whether there should have been a hearing is something for later on.

(T2- 1332). The court directed counsel to "stay away from the attorney issue". *Id*. at 1336.

Tarantino "stayed away" from the issue but did file a post-trial motion reasserting his entitlement to a new trial on Counts 1 and 2 due to the conflict-of-interest and again requested the hearing he was deprived of because of (1) the

Government's affirmative non-disclosure prior to the first trial of Froccaro's representation of Mulligan, and (2) because Mulligan paid Froccaro approximately $150,000 to appear for Tarantino (DE388 at 7-12). The Government responded (DE393), and the court denied the motion on timeliness grounds only, concluding that "the proper avenue to pursue this argument is on appeal . . ." (DE404 at 14).

### B. Froccaro labored under an actual conflict of interest and the district court failed to conduct a hearing.

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *See United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1988); *see also Wood v. Georgia*, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest"). "Whether a defendant's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed de novo." *United States v. Schwarz*, 283 F.3d 76, 90-91 (2d Cir. 2002).

Although a defendant is generally required to demonstrate prejudice to prevail on an ineffective assistance of counsel claim, *see Strickland v. Washington*, 466 U.S. 668 (1984), a "fairly rigid" presumption of prejudice applies when counsel is burdened by an actual conflict of interest. Under these circumstances, a defendant "need not establish a reasonable probability that, but for the conflict or a deficiency in counsel's performance caused by the conflict, the outcome of the trial could have

been different. Rather, he need only establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance." *Schwarz*, 283 F.3d at 91 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). "To prove a lapse in representation, a defendant must 'demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir. 1995) (quoting *United States v. Levy*, 25 F.3d 146, 157 (2d Cir. 1994)). "[T]he applicable standard requires only the demonstration of a conflict inconsistent with a plausible trial strategy or tactic." *Malpiedi*, 62 F.3d at 470.

A court "has an obligation to inquire into the facts and circumstances of an attorney's interests either in response to a timely conflict of interest objection" or when it "knows or reasonably should know of the possibility of a conflict of interest." *United States v. Stantini*, 85 F.3d 9, 13 (2d Cir. 1996). "[T]he government can protect itself by informing the district judge of potential conflicts at the earliest possible moment," and the court can then secure a waiver or disqualify counsel due to the conflict. *Malpiedi*, 62 F.3d at 470 (citing *Levy,* 25 F.3d at 157). However, when apprised of the possibility of a conflict or reasonably should know of such a possibility, a court has a "*threshold obligation* to determine whether the attorney has an actual conflict, a potential conflict, or no conflict." *United States v. Kliti*, 156 F.3d

150, 153 (2d Cir. 1998) (emphasis added). "Failure to engage in such an inquiry, when it is required, results in an automatic reversal." *Stantini*, 85 F.3d at 13 (citing *Wood v. Georgia*, 450 U.S. 261, 272 n.18 (1981); *accord Kliti*, 156 F.3d at 153 ("If a district court ignores a possible conflict and does not conduct this initial inquiry, reversal of a defendant's conviction is automatic").

The error in the manner in which this issue was addressed is as manifest as it is troubling. Despite acknowledging that it knew "all along" that Froccaro represented both Tarantino and Mulligan during the first trial and all though 2008, the Government failed to alert the district court of the issue prior to Tarantino's first trial, thus "gain[ing] a tactical advantage from that conflict." *Malpiedi*, 62 F.3d at 470 n.3. Second, when alerted to the issue, the district court failed in any manner to address it, directed counsel to "stay away" from the issue, and transferred its responsibility to determine the issue to this Court (T2-920). There was not even an "initial inquiry." *Kliti*, 156 F.3d at 153 & n.2. Third, the court failed to afford Tarantino a hearing to a complete record. The district court erred.

Tarantino has established an actual conflict of interest; at a minimum, he has established error in the court's failure to even conduct a hearing. Tarantino alleged that Froccaro jointly represented him and Mulligan during the time leading up to and during the first trial. He also alleged that Froccaro operated under an actual "benefactor" conflict because Mulligan paid Froccaro approximately $150,000 to

appear for Tarantino. *See generally United States v. Locascio*, 6 F.3d 924, 932 (2d Cir. 1993) ("Ethical considerations warn against an attorney accepting fees from someone other than the client. As we stated in a different context, the acceptance of such benefactor payments may subject an attorney to an undesirable outside influence and raises an ethical question as to whether the attorney's loyalties are with the client or the payor").

The actual "benefactor" conflict adversely affected Froccaro's performance at Tarantino's first trial because (1) the armed robber alleged to be Tarantino actually matched Mulligan's description but Froccaro failed to argue that it could have been Mulligan instead of Tarantino, (2) Froccaro could have cross-examined the case agent and experts as to why Mulligan's DNA had not been tested, but he elected not to cast any suspicion on his "benefactor," (3) Froccaro could have suggested that Mulligan, a Synergy co-owner, was the gym owner known by the alias "Matty Roth" who ordered Gargiulo's murder, and (4) Froccaro could have presented a theory of defense that Mulligan actually killed Dorval and that Tarantino was, at most, an accessory after-the-fact who did no more than assist in the disposal of Dorval's body. But for Froccaro's divided loyalties, Tarantino could have been acquitted of the Dorval murder (Count 2). Finally, an unwaiveable conflict of interest would have been presented if Froccaro had withheld, mishandled, or destroyed the extortion letter ostensibly authored by Gargiulo and purportedly received by Manon

89

Mullingan in January, 2003, in order to protect Scott Mulligan, his client for more years than Tarantino. All of these points establish more than "plausible" trial strategies or tactics that were unavailable to Tarantino due to Froccaro's conflict that the Government knew about "all along" but elected not to inform the district court about.

A new trial is warranted as to Counts 1 and 2 due to the conflict-of-interest described above and the concomitant failure by the district court, when apprised of the conflict, to address it or hold a hearing. At a minimum, the Court should remand for a hearing.

## POINT VI

**TARANTINO'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO THE GOVERNMENT'S INCONSISTENT THEORIES PRESENTED AT BOTH TRIALS AS TO DORVAL'S MURDER. DISMISSAL WITH PREJUDICE ON ALL CHARGES OR A NEW TRIAL ON ALL CHARGES IS WARRANTED.**

### A.    Factual Background

Eight years before Tarantino was indicted, the same prosecution team that prosecuted him (principally FBI Agent Schelhorn and AUSA Miskiewicz) also indicted Joseph Pistone, Peter Pistone and Robert Misseri for the murder of Louis Dorval in the case entitled *United States v. Galasso III et al*, docket # 9:00-cr-00122-ADS (A85-95).

90

Three Superseding Indictments in *Galasso* all included the same allegations regarding Dorval's death. In Count One, a racketeering charge, the Government alleged as predicate acts, that Joseph Pistone and Misseri "together with others, did knowingly and intentionally murder Louis Dorval" and "conspired to murder Louis Dorval" in violation of New York law (A85-95). The overt act in support of the murder conspiracy alleged that "in or about August, 1994, Misseri and Joseph Pistone together with *another*, traveled in a passenger vehicle with Louis Dorval; (b) ...defendant JOSEPH PISTONE shot and killed Louis Dorval *in the passenger vehicle*; (c) defendants *PISTONE and MISSERI* loaded Dorval's body into a "Tuff Bin" tool box, and (d) Pistone together with *another*, dumped the tool box with Dorval's body "into the Atlantic Ocean south of Long Island" (A94-95).[61]

The "another" mentioned in the indictment was Peter Pistone, who pled guilty in 2000 for his role in Dorval's murder and who testified as a defense witness at Tarantino's first trial. Evidence at the first trial confirmed that the Government corroborated and verified Peter Pistone's information surrounding the circumstances of Dorval's murder by Joseph Pistone;[62] given that the Government allowed and the

---

[61] According to Peter Pistone's testimony at Tarantino's trial, Dorval's murder was a "hit" ordered by organized crime bosses because Dorval was not making kickbacks from his criminal earnings and he had a big mouth (T1-2568).

[62] *See* T1-2741-49 (Testimony of Agent Schelhorn).

91

court accepted Peter Pistone's plea in open court, the Government assuredly satisfied itself as to the truth of the most significant details surrounding the Dorval murder, *i.e.* that Joseph Pistone murdered Dorval with a single gunshot wound to the head in a vehicle in the presence of Peter Pistone and Robert Misseri, then, together with Peter, stuffed Dorval's body into a tool box and travelled by boat to the Atlantic Ocean where they disposed of it. Both Pistones brothers pled guilty and were imprisoned for their roles in Dorval's murder. Peter served approximately 8 years, while Joseph is currently serving a 20-year sentence.

Despite interviewing the Pistones and dozens (if not hundreds) of witnesses since Dorval's body was found, there was not a shred of evidence introduced at any of the numerous proceedings in the *Galasso* case or in Tarantino's case that in any way demonstrated a relationship between Pistone and Tarantino or suggested that they even knew each other.[63] Indeed, the Government's opening statement at Tarantino's trial on the Dorval homicide did not mention either of the Pistone brothers or Robert Misseri. Despite the 14 years during which the same case agents

---

[63] Tarantino is not mentioned in the *Galasso* indictment and the Pistones and Misseri are not mentioned in Tarantino's indictment. In other words, two indictments were secured by the Government for the murder of the same person on the same day, yet both allege entirely different—and mutually exclusive—manners and locations of Dorval's death and motives for his murder. The Pistones *and* Tarantino stand convicted of murdering Dorval in entirely different ways at entirely different locations for entirely different reasons. The Government's conduct "shocks the conscious." *Rochin v. People of California*, 342 U.S. 165, 173 (1952).

and detectives investigated the Dorval homicide and the massive resources spent by the Government, the Government was unable to present a shred of evidence that Pistone and Tarantino **had ever even met.**

The Government has readily admitted it held "consecutive grand juries" from 1996 to 2008 with respect to the Dorval murder (DE422), and failed to return an indictment against Tarantino until 2008, 14 years after the alleged crime. So, while the Government convicted the Pistones for murdering Dorval *in a vehicle* after being ordered to do so by organized crime bosses for failing to make payoffs, Tarantino, according to the Government, murdered Dorval *on a boat* because he was angry that Dorval had spoken to Guy Fatato about the Muttentown robbery and was afraid he would talk to law enforcement. There was no evidence admitted at Tarantino's trial other than the testimony of Guy Fatato regarding this alleged conversation that supposedly served as a motive for Tarantino to murder Dorval. There was no evidence admitted at trial to suggest that Tarantino actually suspected that Dorval was cooperating with federal law enforcement or that he was going to cooperate with federal law enforcement. Nor was there evidence that Tarantino had any actual knowledge that Dorval had just been indicted in the *Giampa* case. Indeed, all evidence at trial pointed to only one inference — that Dorval was going on the lam in order to avoid being apprehended by law enforcement at all costs, and that he would die in a gunfight before being apprehended. *See* Point II, *supra*.

93

During Tarantino's retrial, the Government offered *yet another* inconsistent theory as to facts surrounding the murder of Louis Dorval. Tarantino filed a post-verdict motion for a new trial "due to the perjured testimony elicited by the Government through Scott Mulligan" (DE388 at 2). Mulligan, a cooperating witness, testified at the second trial to a version of events entirely inconsistent to the version vouched for by the Government in the *Galasso* matter. This time, it had Mulligan testify that Tarantino shot Dorval in the head in Craig Miller's warehouse and that he (Mulligan) along with Tarantino and Miller took out Miller's boat, dumped the tool box containing Dorval's dead body into the water, and Tarantino shot holes in the bottom of the box so that it would sink (T2-1492-1500). The names Joe Pistone, Peter Pistone, and/or Robert Misseri, the individuals indicted in *Galasso* (two of whom pled guilty to their role in Dorval's murder) were mentioned not one time at Tarantino's second trial.

### B.    Legal Overview

This Court has yet addressed the issue of whether a defendant's due process rights are violated when the government advances a theory of criminal liability that is factually inconsistent with one pursued by the government in a previous action because it has not been "present[ed] [with] the opportunity to consider the issue." *United States v. Boyle*, 283 F. App'x. 825, 826 (2d Cir. 2007), *aff'd* 129 S.Ct. 2237 (2009). Tarantino's case presents the Court with that opportunity.

94

While the Court has yet found the proper case to address a *criminal* defendant's right to assert judicial estoppel as a due process violation, it has stated, "the relevant question is whether a 'party has succeeded in persuading a court to *accept that party's earlier position,* so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.'" *Lia v. Saporito*, 541 F. App'x 71, 74 (2d Cir. 2013) (summary order) (emphasis in original), *cert. denied*, 134 S.Ct. 2305 (2014) (quoting *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 170 (2010)); *accord Adler v. Pataki*, 185 F.3d 35, 41 n. 3 (2d Cir. 1999) ("judicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision"). As this Court has explained:

> Our circuit has consistently limited the application of judicial estoppel to 'situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced. Moreover, we limit the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain.

*Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005) (citations omitted) (internal quotations omitted) (internal brackets omitted).

New York federal courts have likewise failed to fully analyze whether a criminal defendant is entitled to relief under the doctrine of judicial estoppel. However, they have acknowledged divergent views. In *Urso*, the court stated,

95

> There is no clear consensus in the federal courts on
> whether a prosecutor may be precluded from raising an
> argument at a criminal trial because the government has
> asserted a factually incompatible argument in pursuing a
> conviction against another defendant at another trial . . .
> However, there is a clear consensus that among the courts
> that have applied the doctrine of judicial estoppel to
> criminal proceedings that prosecutors should be barred
> from arguing a different theory of liability in a second
> prosecution only where the government's trial theories are
> "inherently factually contradictory" and thus are
> "irreconcilable."

*United States v. Urso*, 369 F. Supp. 2d 254, 263-64 (E.D.N.Y. 2005) ("judicial

estoppel may be applied to prevent a due process violation, if ever, only where there

is a ***clear and categorical repugnance*** between the government's two theories of the

case."); *accord United States v. D'Amico*, 734 F. Supp. 2d 321, 351-52 (S.D.N.Y.

2010) (collecting cases) (while several courts of appeals have found due process

violations when prosecutors have used inconsistent theories against different

defendants to obtain a conviction, other courts have found that a prosecutor may

make an inconsistent argument without violating the due process clause).

1. **Judicial Estoppel as acknowledged by the Supreme Court and other Circuits.**

Similar to this Circuit, the Supreme Court has stated, "Although we have not

had occasion to discuss the doctrine elaborately, other courts have uniformly

recognized that its purpose is 'to protect the integrity of the judicial process' by

'prohibiting parties from deliberately changing positions according to the exigencies

of the moment.'" *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (citations omitted). The Court cited to several cases in support of this assertion. *See Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953) ("judicial estoppel prevents the parties from playing fast and loose with the courts'"). However, the Court maintained "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire,* 532 U.S. at 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). The Court adopted the rule of "judicial estoppel" and explained that it "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire*, 532 U.S. at 749 (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000)).

The Sixth Circuit joined other circuits in holding that "the use of inconsistent, irreconcilable theories to convict two defendants for the same crime is a due process violation." *Stumpf v. Mitchell*, 367 F.3d 594, 611 (6th Cir. 2004), *rev'd in part on other grounds*, *Bradshaw v. Stumpf*, 545 U.S. 175 (2005).[64] The court noted that "the

---

[64] In *Stumpf*, two men entered a home in furtherance of their plan to commit a robbery. *Id.* at 596. During the commission of the robbery, one of the homeowners was shot and killed. *Id.* at 597. In two separate proceedings, the same prosecutor

due process challenge to the use of inconsistent theories is based on the notion of fundamental fairness. Because inconsistent theories renders convictions unreliable, they constitute a violation of the due process rights of any defendant in whose trial they are used." *Id.* The court further noted, "Logically, both defendants' due process rights were prejudiced by the prosecutor's actions or neither's were." *Id.*

The Eighth Circuit overturned a 13-year-old conviction due to "the State's use of inconsistent prosecutorial theories [which] violated [the defendant's] due process rights in a way that rendered his convictions fundamentally unfair." *Smith v. Groose*, 205 F.3d 1045, 1046 (8th Cir. 2000).[65] In evaluating the prosecutor's actions, the court stated, "In short, what the State claimed to be true in Smith's case, it rejected in Cunningham's case, and vice versa." *Id.* at 1050. The court held, "the use of inherently factually contradictory theories violates the principles of due process." *Id.* at 1051. In support of its reasoning, the court stated, "To violate due process, an inconsistency must exist at the ***core*** of the prosecutor's cases against defendants for the same crime. In the present case, the State's zeal to obtain multiple murder convictions on diametrically opposed testimony renders [the defendant's]

---

alleged that each defendant "had been the one to pull the trigger, resulting in the fatal shots". *Id.* at 613.

[65] The prosecutor used a statement from a co-defendant to convict one defendant of murder, then used an alternate, conflicting statement from the same co-defendant to convict another defendant of the same crime. *Id.* at 1047-48.

convictions infirm." *Id.* at 1046 (emphasis added) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.")).

The Ninth Circuit found a due process violation where "[t]he prosecutor manipulated evidence and witnesses, argued inconsistent motives and [at the second] trial essentially ridiculed the theory he had used to obtain a conviction and death sentence at [the first] trial." *Thompson v. Calderon*, 120 F.3d 1045, 1057-58 (9th Cir. 1997), *rev'd on other grounds*, 523 U.S. 538 (1998). The Ninth Circuit cited an Eleventh Circuit case with similar facts: two defendants were tried by a prosecutor utilizing inconsistent theories. *Id.* (citing *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (en banc) (finding due process violation and writing "The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for the truth.").

## 2. Three-Factor Test

While judicial estoppel is "not reducible to any general formulation of principle," *New Hampshire*, 532 U.S. at 750, the Court developed a three-factor test to determine its applicability:

> *First*, a party's later position must be clearly inconsistent with its earlier position. *Second*, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial

99

acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second was misled.[66] A ***third*** consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.[67]

*New Hampshire*, 532 U.S. at 750-51 (citations omitted) (internal quotations omitted) (emphasis added). This Circuit has adopted this test. *See Lia v. Saporito*, 541 F. App'x 71, 73 (2d Cir. 2013) (summary order), *cert. denied*, 134 S.Ct. 2305 (2014); *DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 103 (2d Cir. 2010).

## C.   Argument

### 1.   The Government pursued factually contradictory theories against the Pistone brothers and Tarantino.

Tarantino's due process rights were violated because "the prosecution pursued, to its advantage, factually contradictory theories against different

---

[66] In reference to the second factor the Supreme Court stated, "Absent success in a prior proceeding, a party's later inconsistent statement introduces no risk of inconsistent court determinations." *New Hampshire*, 532 U.S. at 750-51 (citations omitted) (internal quotations omitted).

[67] In reference to the third factor, the Second Circuit, quoting its earlier opinions and the opinion of the United States Supreme Court, has reiterated "[it] is sometimes couched in terms of unfair detriment [to] the opposing party rather than advantage to the party to be estopped. In this circuit, moreover, [w]e further limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain. This latter requirement means that judicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements." *In re Adelphia Recovery Trust*, 634 F.3d 678, 696 (2d Cir. 2011) (citations omitted) (internal quotation marks omitted).

defendants." *See United States v. Ghavami*, 2014 WL 1979922, at \*13 (S.D.N.Y. May 15, 2014). The facts of Tarantino's case clearly demonstrate that the Government took a position inconsistent with one taken in a prior proceeding: based on the circumstances surrounding Tarantino's indictment and his conviction of Dorval's murder, it could not be clearer that the Government's position when indicting Tarantino was inconsistent with the one taken when it also indicted the Pistone brothers and Robert Misseri in the *Galasso* case. The "risk of inconsistent results with the impact on judicial integrity is certain" is evident in this case, *Uzdavines,* 418 F.3d at 148, and the judicial was severely compromised as the same detectives, prosecutors ***and judge*** took part in the indictments, plea agreements and/or trial of the Pistone brothers and Tarantino, wherein different factual scenarios were utilized to secure pleas or convictions. As in *Thompson v. Calderon*, Tarantino's prosecutors "manipulated evidence and witnesses" and "argued inconsistent motives" which violates due process and "shocks the conscious." *Rochin*, 342 U.S. at 173. Here, "little remain[s] consistent other than the prosecutor's desire to win at any cost." *Calderon,* 120 F.3d at 1057-58.

### 2. The three-factor test applies to Tarantino's case.

In applying the three-factor test to Tarantino's case: 1) the prosecutors' Government's later position (against Tarantino) is clearly inconsistent with its earlier position (against the Pistone brothers); 2) the prosecutors were successful in

persuading Judge Seybert of their his position with respect to the Pistone brothers; therefore, judicial acceptance of the later position against Tarantino created the perception that either the first position or the later position was misled; 3) it is **<u>clear</u>** that by asserting inconsistent positions, the prosecution derived an unfair advantage, as multiple men are serving time in prison for the same crime. *New Hampshire,* 532 U.S. at 750-51.

### 3. Tarantino may raise this issue for the first time on appeal.

From what this Court has written regarding whether this issue may be raised for the first time on appeal,[68] Tarantino must establish that the issue should be heard "to avoid manifest injustice". *Muro v. UBS Fin. Servs.*, Inc., 331 F. App'x 886, 887 (2d Cir. 2009). It is obvious that an injustice has been done as three men were punished for the murder of Louis Dorval under inconsistent prosecutorial theories. The fact that three men have and/or are serving time in prison under factually inconsistent theories screams injustice. This argument presents a question of law and

---

[68] Tarantino does not concede that this issue was not raised below. Although the exact term "judicial estoppel" was not utilized, Tarantino twice moved to disqualify AUSA Miskiewicz based on his inconsistent positions (DE285; 320). The record also reveals that that Tarantino, on multiple occasions, noted the varying positions of the government to the court with respect to the murder of Louis Dorval. Moreover, an argument was raised by Tarantino in which he contended that the Government presented perjured testimony from both Guy Fatato and Scott Mulligan during their testimony, which was inconsistent with the theory utilized by the government during the Pistone cases (DE 388). The lower court was aware of Tarantino's concern of the Government's dual theories but refused to question the Government's tactics.

there is no need for fact-finding. *Id.* The Court can very easily read the Government's factually inconsistent arguments by reviewing both the Indictments of Tarantino and the Pistone brothers (A55-65; 85-95).

### 4. Tarantino is entitled to relief.

The use of inconsistent theories by the Government to indict both the Pistone brothers and Tarantino is a violation of due process under the doctrine of judicial estoppel. The Government's use of inconsistent theories at *both* of Tarantino's trials violates due process, "shocks the conscious," and warrants dismissal with prejudice of all counts for which Tarantino was indicted. At a minimum, a new trial on all charges is warranted.

<div align="center">

**POINT VII**

**COUNT THREE MUST BE VACATED**

</div>

### A. THE GOVERNMENT KNOWINGLY PRESENTED PERJURED TESTIMONY REGARDING A MURDER.

### 1. Background

During the retrial, the Government called Scott Mulligan in part to provide his version of the 1994 murder of Louis Dorval. The Government, fully knowing that it previously investigated and prosecuted Joseph and Peter Pistone, who entered guilty pleas accepting responsibility for the murder of Dorval and the disposal of his corpse at sea, as well as previously indicted and prosecuted Robert Misseri, presented the testimony of Mulligan who furnished an irreconcilably different version of the same

<div align="center">103</div>

murder.

Mulligan identified the warehouse of Craig Miller as the location of the Dorval murder (T2-1437). But the factual basis offered by the Pistone brothers and accepted as true by the district court and the Government during their plea colloquies and sentencing hearings, *Joseph Pistone shot Dorval in the head inside of a truck in the presence of his brother Peter who assisted in the disposal of the dead corpse at sea. Tarantino´s name was never even mentioned in that version of the murder. See* DE388 at 4-5.

The Government knew or should have known that the testimony of Mulligan was perjured. Unlike the acceptance of responsibility by the Pistone brothers for Dorval's murder, *which was supported by forensic corroboration obtained by law enforcement*, Mulligan's newly-minted version lacked any scientific corroboration. Moreover Mulligan implicated Tarantino as the actual triggerman (T2-1499) but never mentioned (nor did the Government) the Pistones during his retrial narrative of the murder. And while Mulligan pinned the murder on Tarantino and its location at Miller´s warehouse, the same case agent (Schelhorn) previously testified that the Dorval murder had been committed by Joseph Pistone in a vehicle (DE388).

Mulligan testified that he assisted Tarantino in disposing of Dorval's body. According to Mulligan, Miller drove his boat a few miles into the ocean, Mulligan and Tarantino slid the toolbox containing the body of Dorval into the water, and

104

Tarantino shot holes in the bottom of the box so that it would sink (T2-1499-1531). On the other hand, the same case agent had previously testified that the same body was placed into a toolbox by Joseph Pistone and Robert Misseri and later taken by the Pistone brothers to their family boat (DE388-1 at 21 *et seq.).* They loaded the box onto the back of the Pistone family boat from where it was dumped overboard hours later when the Pistone brothers reached the high seas. Peter Pistone shot the toolbox under his brother´s command (*Id*.)

The Pistone version was corroborated by the same case agent, who testified before the grand jury that the description of a revolver as the murder weapon matched ballistic findings, the holes examined in the toolbox containing the corpse were consistent with shots described by Peter Pistone, and an expert who examined the truck confirmed that the tailgate had been broken in the way that Peter described[69] (DE388-1 at 36-39). No such forensic corroboration was offered by the Government in support of Mulligan´s "mutually exclusive" version of the Dorval murder.

### 2. Legal Overview

In *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991), this Court held:

> [w]hether the introduction of perjured testimony requires
> a new trial depends on the materiality of the perjury to the

---

[69] The district court discussed the disparate nature of the Pistone version in a pretrial order (DE205).

jury's verdict and the extent to which the prosecution was aware of the perjury. … Where the prosecution knew or should have known of the perjury, the conviction must be set aside "'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"

(citing *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir.1982) and quoting *United States v. Agurs*, 427 U.S. 97, 103, (1976)). *See also Annunziato v. Manson*, 566 F.2d 410, 414 (2d Cir.1977) ("Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.'").

### 3.    Analysis

In order to accept the guilty pleas entered by the Pistone brothers, the Government and the court had to establish factual bases for the guilty pleas during the plea colloquies with the Pistones under Fed. R. Crim. P. 11. The entirely inconsistent account of the Dorval murder portrayed by Mulligan and Miller must also be discounted because they were neither charged for nor faced penal consequences for the murder, unlike both Pistone brothers, who were sentenced to many years in prison.

Here, the "mutually exclusive" version of the murder offered by Mulligan without the scientific corroboration that supported the Pistone version established, under *Wallach*, that the government knowingly permitted the introduction of false testimony in Tarantino's case. The conviction must be reversed because the perjured testimony falsely implicating Tarantino as the triggerman in the murder of Dorval

raises a "reasonable likelihood that the false testimony could have affected the judgment of the jury." This case presents "the rare instance where it can be shown that the prosecution knowingly used false testimony" and where the Court applies a "less stringent test and permit[s] the granting of new trial where the jury 'might' have acquitted absent the perjury." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). Here, the history of verdicts supports a conclusion that the retrial jury "might" have acquitted absent the perjury, as the first trial jury deadlocked on the Gargiulo counts and the retrial jury actually acquitted Tarantino of the substantive Gargiulo murder charge.

### 4.    Conclusion

The Government capitalized on Mulligan's perjured testimony knowing it to be false because Joseph Pistone had accepted responsibility for fatally shooting Dorval. Peter Pistone, before the same district court judge that presided over Tarantino's case, accepted responsibility as an "accessory after-the-fact" in the disposal of the corpse during properly conducted plea and sentencing hearings. A new trial is warranted.

### B.    THE GOVERNMENT IMPROPERLY ARGUED FACTS NOT IN EVIDENCE AND BOLSTERED MULLIGAN'S TESTIMONY IN REBUTTAL SUMMATION

During its summation at Tarantino's retrial, the Government argued that submitted that Mulligan's account of the body disposal was also corroborated by

medical records from the Nassau University Medical Center showing that Tarantino sustained a severe injury to his thumb, as Mulligan testified, on the same day of the disposal (T2-1892-93). However, Mulligan tailored his false testimony based upon a misreading of the contents of the records. As explained below, careful review of Tarantino's medical records would have established that the severe injury to Tarantino's "thumb" requiring a cast did not take place until the month after the body disposal instead of "on the same day of the disposal." Mulligan testified that he dropped a "boulder" on Tarantino's hand during the disposal, ***splitting his right thumb in half*** (T2-1524-25).

The Government displayed 13 exhibits of medical records on the courtroom screen. (MED-1 to MED-13); *see* T2-1532. Mulligan testified that the date reflected on the MED-3 records (August 13, 1994) comported with his memory of the date when the body was dumped (T2-1533). Mulligan also testified that the time reflected on the record (5:35 p.m.) comported with the time of their return. *Id*. Mulligan claimed that he "crushed" Tarantino's right hand on August 13, 1994 with a "cinderblock" and a cast was fitted for Tarantino's arm as a result of the injury inflicted (T2-1534-35). He identified Tarantino in a surveillance photo (dated September 28, 1994) wearing the cast that he received as a result of that injury (T2-1535-36).

The "grand finale" of the Government´s case before resting was the

*uncorroborated* trial testimony of Scott Mulligan (T2-1671) (Mulligan stating Tarantino hired Justin Bressman to murder Garguilo). Juror assessment of Mulligan's credibility was therefore of paramount importance to a conviction, but the Government allowed his false testimony on the Dorval murder to remain *uncorrected* in order to capitalize with the jury. Even worse, Government counsel vouched for Mulligan´s credibility and "corroborated" his perjured testimony by misrepresenting medical records and misstating "facts" not in evidence. In closing, the Government misread the medical records to corroborate Mulligan's account of the injury (T2-1892-93).

In summation, Tarantino correctly underscored that the records actually proved that Mulligan fabricated his testimony because the records show two unrelated hospital visits – the August 13, 1994 visit for the right hand "little finger" and the September 6, 1994 visit for "the first metacarpal" (thumb) requiring the "right hand" to be "in cast" (T2-1902-07). Mulligan's false testimony, that the injury to Tarantino´s *thumb* occurred during the disposal of Dorval's body on August 13, 1994 and resulted in a cast, was tailored to fit a misreading of the medical records and falsely corroborate Mulligan's version of events. An accurate reading of the records reveals that the right thumb ("the first metacarpal") fracture that resulted in Tarantino´s right hand being placed "in cast" did not occur until early September 1994. *See* Exhibit C (medical records); T2-1907 (defense counsel imploring jurors

to "[p]lease read the medical records.").

However, in its rebuttal summation, the Government compounded the due process violation embodied in presenting Mulligan's perjured testimony by misrepresenting to the jury that "there is no record here of two incidents." (T2-1935) ("You know, records, business records, they are a gold mine. And in this case they are a disaster to this claim that Scott Mulligan is a liar [b]ecause there is no record here of two incidents."). The Government intentionally mislead the jury when he offered false rebuttal fabricating out of whole cloth that Tarantino was issued the "medical record number … 771466" for the treatment of the same finger that was injured in August, which he argued was injured while dumping the Dorval body. *Id.* (emphasizing that "numbers don´t lie."). Government counsel misled the jurors by misrepresenting that the number had been assigned *to the injury* and that the second event was *follow-up treatment* on the same injury. *Id.* ("…this reference to a second event, it is not a second event. It is a follow-up to the same injury, 771466."). However, the "MR" number "771466" was assigned to Tarantino since the 1980s, and the medical records clearly show that his August and September visits were related to *separate injuries* to *different fingers* and that the right thumb placed in a cast was fractured *in September as a result of a barroom brawl*. Not only is the cause of the fractured thumb noted on the medical record as a "bar brawl," but the Government knowingly lied to the jury as Tarantino was arrested as a result of the

bar fight and it was acknowledged on his PSR.

In the district court's order denying Tarantino's motion, the court noted that the parties disagreed about the appropriate standard applicable to Tarantino's claim (DE404). But rather than resolving the dispute the court district court simply found that the Government did not present perjured testimony, concluding that while Mulligan's testimony was "arguably inconsistent with Pistone's admission, there is nothing to suggest that Mulligan deliberately gave false or misleading testimony." *Id.* The court failed to reconcile the conflicting testimony and evidence. The district court further ignored that the Government capitalized with the jury by leaving the trial record uncorrected as to Mulligan's false testimony and misrepresented medical records. Instead, the court reprimanded Tarantino for failing to call Pistone as a witness to highlight the inconsistencies for the jury.

In light of the hung jury with respect to Counts 3 and 4 at the first trial and the acquittal of Tarantino of Count 4 at the retrial, the Government's case was tenuous at best, and the effect of Mulligan's false testimony coupled with the Government's fabricated corroboration and improper bolstering of such testimony, should not have been ignored. The district court erred in denying defendant's motion, and a new trial must be granted.

## POINT VIII

## THE DISTRICT COURT'S DECISION TO REFUSE TO DISQUALIFY AUSA MISKIEWICZ WAS AN ABUSE OF DISCRETION

### A.    Background

Prior to Tarantino's second trial, he moved to disqualify AUSA Miskiewicz as a prosecutor under the witness-advocate rule and the attorney-as-unsworn witness rule because Tarantino wanted to call him to testify (DE285). The genesis of Tarantino's request originated prior to the first trial but, in light of the retrial on Counts 3 and 4, Tarantino made his request to disqualify Miskiewicz prior to the second trial.

Prior to Tarantino's first trial, he filed a notice of intent to introduce statements made by Peter Pistone and former Assistant United States Attorney Joseph Conway during Pistone's plea proceeding before Judge Seybert in February 2000, in which Pistone pled guilty to involvement in the murder of Louis Dorval (DE205). Pistone had been prosecuted by the same United States Attorney's Office that was prosecuting Tarantino, and during his plea proceeding (also before Judge Seybert), Pistone stated that he, his brother Joseph Pistone, and Robert Misseri were present when Joseph Pistone shot and killed Dorval in the back seat of a truck. They then placed Dorval's body in a tool box and dumped the box in the water. Peter Pistone further stated at the plea proceeding that, later on, he learned from his brother that

"[t]he reason that [Dorval] was killed for is part of an organized crime thing where he was selling drugs and not kicking back to certain people" (DE205 at 3). When Pistone's allocution was finished, then-AUSA Conway told the Court: "Just so the record is clear, the Government's evidence would show as Mr. Pistone stated, he was in the car at the time that the murder occurred, although he had no knowledge that it was going to happen. Once it did happen [sic], he helped dispose of the body and then subsequently learned as to the reasons why Mr. Dorval was actually killed." *Id*.

Based on the position taken by the Government when it allowed Pistone to enter a plea to the Dorval murder eight years before Tarantino was indicted, Tarantino moved, prior to his first trial, to introduce then-AUSA Conway's statements during Pistone's plea hearing to establish that the Government believed Pistone was truthful and that it had evidence supporting his allocution (DE205 at 2). The court ruled Conway's statement admissible to show "that the Government believed Pistone was truthful at the time of his plea proceeding and that the Government's evidence was in accord with Pistone's version of the Dorval murder" (DE205 at 4).

During Joseph Pistone's plea allocution, he stated that "[Dorval] was shot and killed. When asked by presiding Judge Spatt, "Who did that?" Pistone responded, "I did." AUSA Miskiewicz was the prosecutor assigned to Joseph Pistone's case and

113

represented the Government at the proceeding. In light of this history, Tarantino, prior to the retrial, moved for Miskiewicz's disqualification because "just as this Court found with regard to Mr. Conway as the prosecutor of Peter Pistone, Mr. Miskiewicz, as the prosecutor of Joseph Pistone and representative of the Government, thought Pistone was credible and that its evidence supported Pistone's view of the Dorval murder" (DE285 at 1). He also argued that there was no equivalent alternative testimony (*Id*. at 4). The court denied Tarantino's motion, ruling that her prior ruling regarding Conway did not "compel" the conclusion that Tarantino could call Miskiewicz as a witness. Moreover the court concluded that the Government has never claimed that Tarantino "actually fired the fatal bullet" (DE291).

Tarantino renewed his motion, the court to consider the Government's intention to present Mulligan's testimony that Tarantino killed Dorval (DE320). The court again denied Tarantino's request, baldly deferring to the Government's incorrect explanation that it "never theorized who has fired the shot that killed Dorval."

### B.    Legal Overview

In order to call a government witness at trial, a defendant must show a "compelling and legitimate need." *United States v. Schwartzbaum*, 527 F.2d 249 (2d Cir. 1975), *cert. denied*, 424 U.S. 942 (1976). No compelling need exists "[w]here

witnesses other than the prosecutor can testify to the same matters in question". *See United States v. Regan*, 897 F. Supp. 748, 758 (S.D.N.Y. 1995); *accord United States v. Bin Laden*, 91 F. Supp. 2d 600, 622-23 (S.D.N.Y. 2000) ("A court may only permit a prosecutor to testify if the offering party has exhausted all other available sources for that testimony.").

In order to determine whether the disqualification of an attorney is the appropriate remedy, this Court has adopted a "restrained approach". *See United States v. Perlmutter*, 637 F. Supp. 1134, 1137 (S.D.N.Y. 1986) (citing *Bottaro v. Halton Associates*, 680 F.2d 895 (2d Cir. 1982)). A In "restrained approach" is defined as that "which calls for disqualification only upon a finding that the presence of a particular counsel will ***taint the trial by affecting his or her presentation of a case***." *Bottario*, 680 F.2d at 896 (citations omitted) (emphasis added). Notwithstanding any findings by a court, the "[d]isqualification of an attorney [] remains in the sound discretion of the trial court." *United States v. Perlmutter*, 637 F. Supp. 1134, 1137 (S.D.N.Y. 1986) (citing *Cinema 5 Ltd. v. Cinerama, Ltd.*, 528 F.2d 1384, 1385 (2d Cir. 1976)).

## C.    Analysis

Tarantino established a compelling and legitimate need for testimony at the second trial. Miskiewicz was the *only witness* who could testify as to the Government's belief that Joseph Pistone's recitation of the facts surrounding Louis

115

Dorval's murder was credible and that evidence supported Pistone's view of the murder. *See United States v. Regan*, 897 F. Supp. 748, 758 (S.D.N.Y. 1995); *United States v. Bin Laden*, 91 F. Supp. 2d 600, 622-23 (S.D.N.Y. 2000) ; *contra United States v. Perlmutter*, 637 F. Supp. 1134, 1138 (S.D.N.Y. 1986) (Defendant did not establish that the AUSA "ha[d] any information which [was] essential to her defense and which [could not] be obtained through means other than calling him as a trial witness.").

The court improperly denied Tarantino's request to disqualify Miskiewicz. As Miskiewicz was the prosecutor who collected evidence and negotiated Joseph Pistone's plea agreement for Dorval's murder, Miskiewicz's presence tainted Tarantino's trial as his former prosecutions of Pistone affected his presentation of Tarantino's case. *See Bottaro v. Halton Associates*, 680 F.2d 895 (2d Cir. 1982). It was an abuse of discretion on the trial judge's part to deny Tarantino's request.

Moreover, Miskiewicz should have known that his former prosecution of Joseph Pistone would have a bearing on the evidence presented in Tarantino's case, and he was obligated to recuse himself from Tarantino's case. Due to his participation in the Pistone prosecution, he was unable to objectively argue the facts surrounding Tarantino's case. S*ee United States v. Birdman*, 602 F.2d 547, 551 (3d Cir. 1979).

### D. Conclusion

The district court's failure to disqualify AUSA Miskiewicz was erroneous. Miskiewicz was a critical and necessary witness to the defense. Had Miskiewicz been disqualified and testified at Tarantino's retrial, the jury would have returned a verdict of not guilty on all counts because his testimony was exculpatory. A new trial is warranted.

### CONCLUSION

For the foregoing reasons, this Court should reverse the judgments of conviction and sentence against Tarantino, remand the case with instructions to enter an acquittal, a new trial, and/or an evidentiary hearing as discussed herein.

Respectfully submitted,

/s/ Todd G. Scher
Law Office of Todd G. Scher, P.L.
Fla. Bar No. 0899641
398 E. Dania Beach Blvd. #300
Dania Beach, FL 33004
(Tel) 754-263-2349
(Fax) 754-263-4147
TScher@msn.com
Counsel for Appellant

117

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of November, 2014, I filed the above pleading with the Clerk via CM/ECF, which will serve all opposing counsel of record in this case.

/s/ Todd G. Scher

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that, as measured by the word processing system used to prepare this brief, that there are 28,907 words herein. This Court gave leave to file an oversized brief of no more than 30,000 words.

/s/ Todd G. Scher