# 13-1799

*To Be Argued By*:
JAMES M. MISKIEWICZ

# United States Court of Appeals

## For the Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

—against—

CHRISTIAN GEROLD TARANTINO,

*Defendant-Appellant.*

**On Appeal From The United States District Court
For The Eastern District of New York**

## BRIEF FOR THE UNITED STATES

LORETTA E. LYNCH,
*United States Attorney,*
*Eastern District of New York.*

PETER A. NORLING,
JAMES M. MISKIEWICZ,
CARRIE N. CAPWELL,
  *Assistant United States Attorneys,*
    *Of Counsel.*

i

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..........................................iv

PRELIMINARY STATEMENT...........................................1

STATEMENT OF FACTS..............................................3

    I.    Introduction.........................................3

    II.   The Crimes..........................................4

          A.    The Filene's Basement Burglary..................4

          B.    The Armored Car Robbery/Murder..................5

               1.    The Crime...............................5

               2.    The Investigation.......................7

                     a.    The Firearms.......................7

                     b.    The Gargiulo Tape..................9

          C.    The Murder of Louis Dorval.....................13

          D.    The Murder of Vincent Gargiulo.................18

               1.    The Demand for a Reward................18

               2.    The Threat to Disclose the Letter.........19

               3.    The Murder.............................20

ARGUMENT......................................................25

POINT ONE - COUNT ONE PROPERLY ALLEGES A
        SECTION 33 VIOLATION..............................25

    I.    The Legal Standard..................................25

    II.   Argument............................................26

          A.    Count One Properly Alleges the
               Requisite Mens Rea............................26

B.   The Indictment Need Not Allege an
     Intent To Damage a Motor Vehicle
     or to Incapacitate The Driver/Employee
     While Operating the Motor Vehicle...............31

POINT TWO - THE EVIDENCE WAS SUFFICIENT TO CONVICT
       TARANTINO FOR THE OBSTRUCTION-OF-JUSTICE
       MURDER OF DORVAL CHARGED IN COUNT TWO, THE
       JURY INSTRUCTIONS WERE CORRECT, AND THE RULE
       35 MOTION WAS CORRECTLY DENIED.....................36

I.    Fowler...............................................36

II.   Application of Fowler...............................38

      A.   The Evidence Supports the Verdict..............39

      B.   The Jury Instructions Were Proper..............45

      C.   The Court Properly Denied the Rule 33 Motion....52

POINT THREE - THE DISTRICT COURT DID NOT COMMIT PLAIN
        ERROR BY HOLDING TWO TELEPHONE CONFERENCES
        WITH COUNSEL, WITHOUT TARANTINO PRESENT,
        TO DISCUSS THE PARTIES' CHALLENGES FOR
        CAUSE BASED ON JUROR QUESTIONNAIRES..............54

I.    The Legal Standard..................................55

II.   Tarantino's Absence.................................57

      A.   Tarantino Had No Right To Be Present
           at the Telephone Conferences...................57

      B.   Tarantino Waived his Presence..................59

      C.   Any Error Does Not Warrant Reversal............63

POINT FOUR - THE DISTRICT COURT DID NOT ERR IN
       ADMITTING THE AUDIO RECORDING GARGIULO
       MADE OF HIS CONVERSATION WITH TARANTINO..........66

I.    The Legal Standard..................................66

II.   The Factual Background..............................69

    III. The Gargiulo Recording Was Properly Admitted........74

POINT FIVE - TARANTINO'S CLAIM THAT ONE OF HIS TRIAL
            COUNSEL AT THE FIRST TRIAL LABORED UNDER
            AN ACTUAL CONFLICT OF INTEREST IS
            UNSUPPORTED BY THE RECORD.........................89

    I.    The Factual Background..............................90

    II.   Discussion........................................94

          A.    The Legal Standard...........................94

          B.    Tarantino's Allegations of Conflict of
                Interest Are Not Supported by the Record.......97

          C.    The District Court Did Not Abuse Its
                Discretion in Denying Tarantino's Request
                for an Evidentiary Hearing.....................99

POINT SIX - THE GOVERNMENT DID NOT PURSUE INCONSISTENT
            THEORIES AND DID NOT VIOLATE TARANTINO'S DUE
            PROCESS RIGHTS..................................102

    I.    The Standard of Review............................103

    II.   Tarantino's Claim Has no Merit.....................104

POINT SEVEN - THE DISTRICT COURT PROPERLY REJECTED
            TARANTINO'S CLAIM THAT THE GOVERNMENT
            KNOWINGLY PRESENTED PERJURIOUS TESTIMONY........112

POINT EIGHT - THE DISTRICT COURT PROPERLY DENIED
            TARANTINO'S REQUEST THAT AUSA MISKIEWICZ
            BE DISQUALIFIED.................................123

    I.    The Factual Background............................123

    II.   Argument.........................................125

CONCLUSION.................................................128

TABLE OF AUTHORITIES

Page

CASES

Anderson v. Bessemer City,
  470 US 564 (1985)......................................... 87

Bradshaw v. Stumpf,
  545 U.S. 175 (2005).................................. 104, 106

Buitrago v. Scully,
  705 F. Supp. 952 (S.D.N.Y. 1989)......................... 113

Caro v. Weintraub,
  618 F.3d 94 (2d Cir. 2010)................................ 68

Cohen v. Senkowski,
  290 F.3d 485 (2d Cir. 2002)........................... 55, 56

Crawford v. Washington,
  541 U.S. 36 (2004).............................. 62, 82, 83

Cuyler v. Sullivan,
  446 U.S. 335 (1980)....................................... 95

Diaz v. Herbert,
  317 F. Supp. 2d 462 (S.D.N.Y. 2004)....................... 58

Fowler v. United States,
  131 S. Ct. 2045 (2011)............................... passim

Gully v. Nat'l Credit Union Admin. Bd.,
  341 F.3d 155 (2d Cir. 2003).............................. 33

Holloway v. Arkansas,
  435 U.S. 475 (1978)....................................... 99

In re DoubleClick, Inc. Privacy Litig.,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001)...................... 69

In re Grand Jury Subpoena Served upon Doe,
  781 F.2d 238 (2d Cir. 1986) ............................. 95

In re High Fructose Corn Syrup Antitrust Litig.,
  216 F.3d 621 (7th Cir. 2000)............................. 68

Johnson v. United States,
   520 U.S. 461 (1997) .................................. 51, 103

Lee v. United States,
   432 U.S. 23 (1977) ........................................ 35

McMann v. Richardson,
   397 U.S. 759 (1970) ....................................... 94

Moore v. Telfon Commications Corp.,
   589 F.2d 959 (9th Cir. 1978) .............................. 85

Norde v. Keane,
   294 F.3d 401 (2d Cir. 2002) ............................... 55

Ortega v. Duncan,
   333 F.3d 102 (2d Cir. 2003) .............................. 113

Reiter v. Sonotone Corp.,
   442 U.S. 330 (1979) ....................................... 28

Riascos-Prado v. United States,
   66 F.3d 30 (2d Cir. 1995) ............................. 98, 99

Salinas v. United States,
   522 U.S. 52 (1997) ........................................ 46

Snyder v. Massachusetts,
   291 U.S. 97 (1934) ................................ 56, 59, 60

Sparman v. Edwards,
   154 F.3d 51 (2d Cir. 1998) ................................ 95

Strickland v. Washington,
   466 U.S. 668 (1984) ................................... 95, 96

Stumpf v. Mitchell,
   367 F.3d 594 (6th Cir. 2004) ......................... 105, 106

Tankleff v. Senkowski,
   135 F.3d 235 (2d Cir. 1999) ........................... 56, 61

Thompson v. Calderon,
   120 F.3d 1045 (9th Cir. 1997),
   rev'd on other grounds, 523 U.S. 538 (1998) .............. 105

United States v. Bin Laden,
  91 F. Supp. 2d 600 (S.D.N.Y. 2000)......................... 125

United States v. Botti,
  711 F.3d 299 (2d Cir. 2013)................................ 46

United States v. Boyle,
  283 Fed. Appx. 825 (2d Cir. 2007)........... 104 n.45, 105 n.45

United States v. Brown,
  352 F.3d 654 (2d Cir. 2003)............................ 62, 104

United States v. Brown,
  623 F.3d 104 (2d Cir. 2010)............................ 96, 100

United States v. Cassiere,
  4 F.3d 1006 (1st Cir. 1993)............................. 69, 84

United States v. Coplan,
  703 F.3d 46 (2d Cir. 2012)................................ 43

United States v. Cotton,
  535 U.S. 625 (2002)....................................... 51

United States v. Dale,
  991 F.2d 819 (D.C. Cir. 1993)................... 68, 84, 87, 88

United States v. Danielson,
  199 F.3d at 671...................................... 54, 122

United States v. Davila,
  461 F.3d 298 (2d Cir. 2006)............................... 31

United States v. Doe,
  365 F.3d 150 (2d Cir. 2004)............................ 96, 98

United States v. Drummond,
  481 F.2d 62 (2d Cir. 1973)............................... 126

United States v. Feliciano,
  223 F.3d 102 (2d Cir. 2000)............................... 55

United States v. Ferguson,
  653 F.3d 61 (2d Cir. 2011),
  amended and superseded, 676 F.3d 260 (2d Cir. 2011)... 113 n.47

United States v. Ferrarini,
  219 F.3d 145 (2d Cir. 2000)............................. 56, 58

United States v. Fleurimont,
  401 Fed. Appx. 580 (2d Cir. 2010)......................... 100

United States v. Frias,
  521 F.3d 229 (2d Cir. 2008)................................ 26

United States v. Gagnon,
  470 U.S. 522(1985)..................................... 55, 61

United States v. Gallego,
  191 F.3d 156 (2d Cir. 1999)................................ 62

United States v. Gambino,
  59 F.3d 353 (2d Cir. 1995)................................ 117

United States v. Getto,
  729 F.3d 221 (2d Cir. 2013)........................ 69, 72, 81

United States v. Gonzalez,
  686 F.3d 122 (2d Cir. 2012)................................ 26

United States v. Gotti,
  459 F.3d 296 (2d Cir. 2006)........................ 26, 27, 28

United States v. Greer,
  285 F.3d 158 (2d Cir. 2002)............................ 56, 58

United States v. Imran,
  964 F.2d 1313 (2d Cir. 1992)............................... 52

United States v. Jiau,
  734 F.3d 147 (2d Cir. 2013),
  cert. denied, 135 S.Ct. 311 (2014).................. 66, 67, 68

United States v. James,
  712 F.3d 79 (2d Cir. 2013)....................... 52 n.23, 112

United States v. Jones,
  308 F.3d 748 (7th Cir. 2002)........................... 30, 31

United States v. Joyner,
  313 F.3d 40 (2d Cir. 2002)................................. 51

United States v. Khedr,
  343 F.3d 96 (2d Cir. 2003) ............................. 96, 98

United States v. Kliti,
  156 F.3d 150 (2d Cir. 1998) ............................... 96

United States v. Kurka,
  818 F.2d 1427 (9th Cir. 1987) ............................. 32

United States v. Lin Guang,
  511 F.3d 110 (2d Cir. 2007) ........................... 52 n.23

United States v. Luciano,
  158 F.3d 655 (2d Cir. 1998) ............................... 95

United States v. Matos,
  905 F.2d 30 (2d Cir. 1990) ............................. 96, 98

United States v. McKeon,
  738 F.2d 26 (2d Cir. 1984) ............................... 127

United States v. McTiernan,
  695 F.3d 882 (9th Cir. 2012),
  cert. denied, 133 S. Ct. 964 (2013) ....................... 69

United States v. Naiman,
  211 F.3d 40 (2d Cir. 2000) ............................... 45

United States v. Nersesian,
  824 F.2d 1294 (2d Cir. 1987) ............................ 126

United States v. Newman,
  773 F.3d 438 (2d Cir. 2014) ........................... 39, 43

United States v. Olano,
  507 U.S. 725 (1993) .................................. passim

United States v. Orena,
  32 F.3d 704 (2d Cir. 1994) ......................... 106, 108

United States v. Park,
  421 U.S. 658 (1975) ...................................... 52

United States v. Perez,
  575 F.3d 164 (2d Cir. 2009) ............................... 54

United States v. Regan,
  103 F.3d 1072 (2d Cir. 1997) ............................... 125

United States v. Resendiz-Ponce,
  549 U.S. 102 (2007) ........................................ 26

United States v. Reyes,
  49 F.3d 63 (2d Cir. 1995) ................................. 120

United States v. Romero,
  54 F.3d 56 (2d Cir. 1995) .............................. <u>passim</u>

United States v. Salerno,
  937 F.2d 797(2d Cir. 1991), ................ 106, 107, 108, 112

United States v. Schwartzbaum,
  527 F.2d 249 (2d Cir. 1975) ............................... 125

United States v. Stewart,
  433 F.3d 273 (2d Cir. 2006) ................................ 46

United States v. Thomas,
  274 F.3d 655 (2d Cir. 2001) ............................... 103

United States v. Torres,
  128 F.3d 38 (2d Cir. 1999) ................................ 113

United States v. Torres,
  503 F.2d 1120 (2d Cir. 1974) .............................. 125

United States v. Tyree,
  279 Fed. Appx. 31 (2d Cir. 2008) .......................... 114

United States v. Underhill,
  813 F.2d 105 (6th Cir. 1987) ........................... 68, 84

United States v. Urso,
  369 F. Supp. 2d 254 (E.D.N.Y. 2005) ...................... 104

United States v. Vasquez,
  389 F.3d 65 (2d Cir. 2004) ................................ 67

United States v. Viola,
  35 F.3d 37 (2d Cir. 1990) ................................. 50

United States v. Wallach,
  788 F. Supp. 739 (S.D.N.Y. 1992) ......................... 125

x

United States v. Wallach,
  935 F.2d 445 (2d Cir. 1991)........................... 113 n.47

United States v. Whab,
  355 F.3d 155 (2d Cir. 2004)............................... 104

United States v. Williams,
  927 F.2d 95 (2d Cir. 1991)................................ 56

United States v. Wong,
  78 F.3d 73 (2d Cir. 1996)............................. 119, 120

United States v. Young,
  470 U.S. 1 (1985)..................................... _passim_

United States v. Zichettello,
  208 F.3d 72 (2d Cir. 2000)........................... 113, 120

Wood v. Georgia,
  450 U.S. 261 (1981)....................................... 95

Yarborough v. Keane,
  101 F.3d 894 (2d Cir. 1996)............................... 55

## STATUTES

18 U.S.C. § 32............................................ 34

18 U.S.C. § 33................................... 25, 27, 33

18 U.S.C. § 33(a).................................. _passim_

18 U.S.C. § 35(b).......................................... 30

18 U.S.C. § 1512(a)(1)(C).................................. 36

18 U.S.C. § 1515(a)(1)(C).................................. 37

18 U.S.C. § 1992.......................................... 34

18 U.S.C. § 1992(a)(6).................................... 34

18 U.S.C. § 2511.................................... 66, 67

## RULES

Fed. R. Crim. P. 29.................................. 39, 43

Fed. R. Crim. P. 33.............................. 36, 52, 96, 112

Fed. R. Crim. P. 43(a)(2).................................... 55

Fed. R. Crim. P. 45(b)(1)(B)................................. 94

Fed. R. Crim. P. 52(b).................................. 54, 103

OTHER AUTHORITIES

Webster's New Collegiate Dictionary (8th ed.)............ 29 n.12

Webster's New International Dictionary, Second Edition....... 29

Webster's Third International Dictionary................. 29 n.12

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 13-1799

UNITED STATES OF AMERICA,

<u>Appellee</u>,

-against-

CHRISTIAN GEROLD TARANTINO,

<u>Defendant-Appellant</u>.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

<u>PRELIMINARY STATEMENT</u>

Defendant-Appellant Christian Gerold Tarantino appeals from a judgment entered May 7, 2013, in the United States District Court for the Eastern District of New York (Seybert, J.), convicting him, after two jury trials, of willfully endangering the safety of a commercial motor vehicle operator resulting in the death of a person (Julius Baumgardt) employed in the operation of the vehicle, in violation of 18 U.S.C. §§ 33, 34 (first trial), obstruction of justice murder

(Louis Dorval), in violation of 18 U.S.C. §§ 1512(a)(1)(C), (a)(3)(A) (first trial), and conspiracy to commit obstruction of justice murder (Vincent Gargiulo), in violation of 18 U.S.C. §§ 1512(k), (a)(3)(A), and sentencing him principally to life terms of imprisonment on all counts. He is currently serving his sentence.

Tarantino seeks reversal on eight separate grounds: (1) Count One of the indictment (charging endangering the safety of a commercial motor vehicle, resulting in death) must be dismissed because it fails to allege conduct falling within the ambit of the statute, (2) Tarantino's conviction under Count Two (obstruction of justice murder) must be vacated, (3) Tarantino was involuntarily absent from critical stages of the proceedings, (4) an incriminating tape recording was improperly admitted, (5) trial counsel suffered under a conflict of interest, (6) the government's allegedly inconsistent theories violated Tarantino's due process rights, (7) the government presented perjured testimony concerning Count Three, and (8) one of the Assistant U.S. Attorneys should have been disqualified.

For the reasons set forth below, each of these claims is without merit.

STATEMENT OF FACTS

I.    Introduction

        Tarantino's convictions arose from his criminal activities, over close to two decades, with various associates, two of whom he murdered in order to silence them.  The evidence at the two trials[1] showed that Tarantino and accomplices Louis Dorval and Scott Mulligan committed a burglary in which they stole furs from a department store, Filene's Basement, and attempted to sell them, leading to Dorval's indictment in the District of New Jersey.  This burglary was followed by an armored car robbery by Tarantino, Dorval, Mulligan, and an unindicted coconspirator in which one of the guards, Julius Baumgardt, while lying on the ground, was shot in the head by Dorval.  (Count One).  Certain indiscrete comments concerning the robbery that Dorval made to his friend and criminal associate Gaetano Fatato, together with Dorval's indictment in New Jersey and his statements that he would flee rather than

_____

        [1]    At the first trial, Tarantino was charged in four counts and convicted of two: Count One, charging an armored car robbery causing death, and Count Two, charging the murder of accomplice Louis Dorval in order to silence him; the jury was unable to reach a verdict as to Counts Three and Four, charging conspiracy to murder and murder, respectively, of a witness with respect to the first two murders, Vincent Gargiulo.  At the second trial, Tarantino was convicted of the Gargiulo murder conspiracy and acquitted of the murder.  We identify differences in the testimony only where it is material and otherwise consider the evidence as it was adduced at both trials.

4

return to jail, led Tarantino to conclude that he presented a
risk and therefore to murder him. (Count Two).

A close friend and criminal associate of Tarantino's,
Gargiulo, in order to secure evidence of his innocence of the
Baumgardt and Dorval murders should the authorities approach
him, surreptitiously made a recording of a conversation with
Tarantino in which the latter made admissions with respect to
the armored car robbery/murder and the murder of Dorval. More
than two years after making the recording and after a falling-
out with Tarantino and Mulligan, Gargiulo demanded $500,000 from
the two with the threat that otherwise he would provide the
recording to law enforcement officials. A few months later,
Gargiulo was murdered by a Tarantino accomplice (Counts Three
and Four), leading to the receipt of the tape by the New York
City Police Department and ultimately to its use as evidence at
trial.

## II. The Crimes

### A.   The Filene's Basement Burglary

As early as 1989, Tarantino had become a member of a
group that committed a series of commercial burglaries and
trafficked in stolen merchandise. (T 1474-88).[2] By December

---

[2]     "T" refers to the transcript of in the first trial,
"T2" to the transcript of the second trial, "A" to the appendix,
"GA" to the government's appendix, and "DE" to docket entries in
the district court (08-CR-655 (JS)).

1993, Tarantino's group included Dorval (known as "Louie") as well as Fatato and Mulligan. (T 1124, 1132-50).

On December 3, 1993, Tarantino, Dorval and Mulligan stole over 200 fur and leather coats in the burglary of a store in Manhasset, New York (the "Filene's Basement burglary"). (T 1150, 1156, 1162, 1169, 1173). Dorval and Fatato thereafter tried to sell the stolen merchandise to an individual who was in fact a federal informant in a racketeering investigation being conducted in the District of New Jersey. Dorval's and Fatato's meetings and phone calls with that informant were under surveillance by federal law enforcement officers, leading to their indictment on August 10, 1994. Fears that Dorval might cooperate led to his murder. (A 55-64).

B.   The Armored Car Robbery/Murder

1.   The Crime

In the months between the Filene's Basement burglary and Dorval's indictment in the District of New Jersey in United States v. Giampa, et al., Tarantino, Dorval, Mulligan and others committed a series of other crimes, principally among them the June 23, 1994 armed robbery of an armored check-cashing van that resulted in the murder of one of the van's operators, Baumgardt. (T 836).

At approximately 11 a.m., Baumgardt and his partner, Walter Tully, pulled their Mid-Island Check Cashing ("Mid-

Island") armored vehicle into a parking lot for a one-story office building at 6851 Jericho Turnpike in Syosset, New York, the address of Volt Information Systems, Inc., a Mid-Island client. (T 620, 715, 751-52). Mid-Island operated a fleet of armored vehicles in the New York metropolitan area and New Jersey (T 807-08), delivering cash to clients, including Airborne Express and the Port of Newark. (T 808-09). Although Mid-Island operators normally remained inside their vehicle and cashed payroll checks through a slot in a bulletproof teller's window built into the side of the van, the layout and practice at Volt required Baumgardt and Tully to exit the van and carry bags of cash into Volt's offices. (T 723-24, 757-58, 810).

As Baumgardt and Tully approached the building's entrance, eyewitnesses saw a man in a business suit -- Dorval -- wearing what appeared to be a fake moustache and a wig, run up to Baumgardt and Tully pointing a Glock semi-automatic pistol and order the men to the ground. (T 730, 759, 779-81, 1805-06). As Dorval rushed Baumgardt and Tully, Tarantino and an un-indicted coconspirator pulled up to the scene in a red Chevy Blazer that had been stolen about six months earlier. (T 1389-90). Either Tarantino or the other occupant in the Blazer, both of whom were wearing masks, jumped out pointing a pump-action shotgun with a pistol grip. (T 26, 721-22, 762, 782-83).

After forcing the Mid-Island operators down on the ground, one of the assailants handcuffed Tully. (T 729, 734-36, 784-85, 812-13). Moments later, Dorval fired his gun once into the back of Baumgardt's head as he lay face-down on the pavement, killing him instantly. (T 760-61). As Baumgardt lay dead, Tully struggled to get up and call for help, still handcuffed. (T 735-36, 1813). The attackers grabbed a briefcase of cash and fled in the Blazer, which they abandoned in a nearby parking lot, from which they continued to flee in a second getaway car. (T 71-72, 871-72).

2. The Investigation

The ensuing investigation revealed evidence connecting Tarantino and Dorval to the attack.

a. The Firearms

Evidence of Tarantino's guilt in the Baumgardt killing came from the testimony of those who operated within his sphere of influence in his Bellmore-Merrick neighborhood of Long Island, coupled with physical evidence recovered at the time of the murder. For instance, Tarantino and Mulligan regularly used teenagers from the neighborhood to run errands necessary to advance their burglary and stolen merchandise trafficking scheme. Among those was one Carl Vahldieck. (T 622-23). On June 20, 1994, Vahldieck appeared at the home of another Bellmore-Merrick teen, Scott Rosenberg. (T 624). Saying he was

on a "mission" for Tarantino, Vahldieck pressured Rosenberg into driving to a nearby gun store, where Rosenberg was used as a straw buyer of a Mossberg, pump-action 12-gauge shotgun, fitted with a pistol grip. (T 625-28). Once outside the store, Rosenberg gave the shotgun to Vahldieck.

On that same day -- June 20, 1994 -- Vahldieck also borrowed the driver's license of a third teenager within the ambit of the Tarantino-Mulligan group. Vahldieck used that license to rent a storage unit designated B-54, at a self-storage facility in Farmingdale, New York. (T 885, 891-98). The transaction was observed by Detective Jack Kennedy of the Nassau County Police Department ("NCPD"), who was present in connection with an unrelated auto-theft investigation. (T 892-94).

On the morning of June 24, 1994, the day after the Baumgardt murder, the manager of the storage facility called NCPD Detective Raymond Gene to alert him that someone was in the vicinity of unit B-54. (T 899). As Detective Gene drove to the storage facility, Detective Kennedy obtained a search warrant for unit B-54, among others, as part of their investigation. (T 886). As Kennedy arrived at the storage facility, he passed a sedan driven by Mulligan, whom he knew personally. (T 902-06). From unit B-54, Kennedy recovered a black canvas bag (T 907; GX JK-2) inside of which was the Mossberg shotgun

purchased for Tarantino days earlier by Rosenberg, who was
eventually told by Vahldieck to lie about the gun purchase.
(T 638-39; GX-JK4, JK-9,-10). The detectives also recovered
four walkie-talkies (GX JK-5), two police scanners (GX JK-6),
and a Glock semi-automatic pistol, which was subsequently
determined by agents of the Bureau of Alcohol, Tobacco and
Firearms to have been purchased by Dorval in Florida in February
1994. (T 907, 918, 921-23; GX JK-3, ATF-1).[3]

> b.   The Gargiulo Tape

The Gargiulo tape recording of his conversation with
Tarantino provided incriminating evidence of Tarantino's
participation in the Baumgardt and Dorval murders.[4] (See
generally GA 256-87).

---

[3]   The government did not argue that the Glock was the
one used to kill Baumgardt. Bullet fragments recovered from
Baumgardt's head made ballistics comparison all but impossible.
Moreover, as Mulligan testified in the second trial, he and
Tarantino took the murder weapon from Dorval after the robbery
and dismantled and discarded it within hours of the killing.
(T2 1470-71, 1480-84).

[4]   The identification of both Tarantino and Gargiulo's
voices on the tape was made by Gargiulo's brother, William.
(T 1998). Additionally, at one point on the tape, Tarantino
referred to himself in the third person, saying, "I, Chris
Tarantino. . . ." (GA 276-77). Tarantino's references during
the recording as to how many weeks had elapsed since a Federal
Bureau of Investigation ("FBI") special agent and NCPD
detectives had taken his DNA (July 2000) (GA 211, 216-17, 221,
258) made it possible to date the making of the recording to
September 2000, which Tarantino concedes. (Br. 76).

The tape begins, in pertinent part, with Tarantino's discussing the FBI and NCPD's collection of samples of his DNA and his fear that it would lead to his arrest for the Baumgardt murder:

> CT [Tarantino]: So the cops come upstate, you know. . . So listen, so I go, ah -- I get a call from [attorney Melvyn K. Roth]. . . So Mel goes, "Chris, listen, fuckin' U.S. Attorney wants to take DNA from you. You fuckin' botched the armored car up," . . . .
>
> VG [Garguilo]: They didn't take it, did they?
>
> CT: Listen. So I go, holy fuck; and I ain't giving it to them, you know? He says this. I ain't giving to them. I go, it's gonna come back, you know?

(GA 256).

As Tarantino had feared, as he tried to understand why federal and state agents had recently taken his DNA samples "six, coming up on seven" years after the Baumgardt and Dorval murders (GA 260), "[T]he car we pulled up in . . . they [i.e., the FBI and NCPD] have it." (GA 257).[5]

---

[5] The Blazer was abandoned by Tarantino and Dorval at an adjacent parking lot but located by law enforcement almost immediately. (T 763-66, 868-974). After it was impounded, an NCPD forensic examiner recovered Caucasian head hairs from within the Blazer. (T 960-69).

Moments later, Tarantino offered a defense in the event his DNA were found in the Blazer, although his rationalization only tended to incriminate him further.

> CT: I was thinking about the other thing, but who's to say, the car we pulled up in, did someone take our license plate down? How do they know that was the car that was found down there? Just 'cause it's a *red stolen vehicle*, it could have been there for a month, you know, but – you know.
>
> You know what I'm saying, like --
>
> VG: Right.

(GA 259)(emphasis added).

The mtDNA[6] samples taken from Tarantino in July 2000, as well as those from Mulligan and Dorval, among others, were compared with the mtDNA of human hairs recovered from the abandoned Blazer. In sum, the evidence established that Tarantino's and Dorval's mtDNA were the same as those in two human hairs recovered from the Blazer; therefore neither man

---

[6]    Mitochondrial DNA (mtDNA), which is inherited maternally, exists in cells even in the absence of blood or tissue, as in the case of hair shafts. (T 1083-85). While it cannot provide a precise match, as with nuclear DNA comparisons, it can be used to determine whether or not a particular individual can be excluded as the source of forensic evidence left at the scene of a crime. (T 1086-92). Tarantino's mtDNA was identical to that of one of the Caucasian hairs recovered from the Blazer one day after the Baumgardt killing. That particular sequence of DNA appeared in 1.38 percent of the Caucasion population. (T 1093-95). A second hair displayed an mtDNA sequence identical to Dorval's. (T 1097-1100). That DNA appeared in only 0.16 percent of the Caucasion population. (T 1099-1100).

could be excluded as having been present within the vehicle at some point prior to Baumgardt's murder. (T 1093-1101).

Moreover, on the tape, Tarantino commented that he recognized one of the eyewitnesses standing at the entrance of 6851 Jericho Turnpike during the killing.

> And I mean, like, I was so nervous with [UI] a kid that I know was right there when this whole fucking thing went down, you know? Like right there. And, ahh, to make a long story short, I said, you know, like Jenn[ifer Tarantino, the defendant's wife], go get Jimmy's fuckin phone number, 'cause I know that Jenn [UI] – Jimmy's phone number cause I was gonna get in touch with him to get a fuckin' statement.

(GA 282-83).

The "Jimmy" to whom Tarantino referred was James Contacessa, a stock broker who worked at a firm also located at 6851 Jericho Turnpike. Contacessa, who was standing by the entrance of the building at the time of the robbery/murder (T 1799-1804, 1809-10), dove to the ground as the gunmen rushed and heard the rack of the shotgun, the click of handcuffs on Tully and the gunshot that killed Baumgardt. (T 1812-13). As with other eyewitnesses, Contacessa told police immediately after the murder that he was unable to identify any of the assailants. However, Contacessa personally knew Tarantino, Mulligan and others through Tarantino's wife, Jennifer (T 1822-29). Moreover, weeks before the Baumgardt murder, he saw

Tarantino walking inside the lobby of 6851 Jericho Turnpike in an apparent act of reconnaissance in advance of the robbery, a fact Contacessa failed to tell investigators responding to the robbery/murder. (T 1830-34, 1839-41).[7]  The juxtaposition of Contacessa's testimony and Tarantino's statement on the Gargiulo tape about seeing Contacessa "right there when this whole fucking thing went down" (GA 283) confirmed Tarantino's participation in the murder.

>C. The Murder of Louis Dorval

In late 1993 and early 1994, Fatato, Dorval and Tarantino were involved in the attempted sale in New Jersey of the fur coats stolen from Filene's Basement.  (T 1150, 1156, 1162, 1169, 1173).  Fatato learned from Dorval that Dorval and Tarantino had stolen the fur coats.  (T 1150).  Recorded conversations of the conspirators in the District of New Jersey investigation ultimately led to Dorval and Fatato's indictment in Giampa on August 10, 1994.  Although Tarantino was not captured on or mentioned by name in the recordings, he was referenced by Fatato and Dorval on some of the recordings.  In one telephone call Fatato referred to Tarantino as one of the

---

[7]     In the years following, Contacessa attempted to let Tarantino know that he never disclosed this information to law enforcement officials.  (T 1844-45).  During a second attempt, Contacessa was assaulted by Tarantino's brother and subsequently told to keep his "mouth shut."  (T 1851).

14

"hot-headed guys" with whom Fatato was dealing in negotiating the sale of the fur coats. (T 1374; GX GF-12).

The killing of Baumgardt in July 1994 generated considerable publicity in the local media, and shortly after the killing, Dorval confided in Fatato that he and Tarantino were responsible. (T 1192-93). Dorval admitted that he accidentally shot Baumgardt as he was restraining him on the ground with a gun to his head. (T 1191-92). At a meeting of Dorval, Tarantino, Mulligan, and Fatato at a pizzeria in New Hyde Park, New York, in connection with a marijuana sale, Mulligan and Dorval left the table at one point, and Fatato asked Tarantino, "What the fuck happened with the armored car? What happened?" (T 1197-98). Tarantino looked at him with a "cold kill stare" and responded, "I don't know what you are talking about." (Id.).

Later that night, Dorval chastised Fatato for having mentioned Baumgardt's killing to Tarantino, telling him, "Why did you say something to Chris? We have a pact: we don't tell our friends, girlfriends, nothing. Why the fuck did you say something?" (T 1200).

On August 10, 1994, Dorval, Fatato and others -- members of the Lucchese organized crime family -- were indicted on racketeering charges that included the sale of the stolen fur coats. (GA 178-79, 289). On August 12, the indictment was

reported in the press, which mentioned that Fatato and Dorval
were wanted but still at large. (GA 180-81, 290-92). Fatato
immediately called Dorval to meet to consider their options.
(GA 180).

Dorval told Fatato that he was not going back to
prison and planned to flee rather than surrender. (GA 180).
To raise money for his defense, Fatato told Dorval to call
Tarantino to sell the more than ten kilograms of cocaine in
Dorval's possession, which Fatato had received on credit from
one of his drug suppliers. (Id.). Later that afternoon, Fatato
rushed to Fire Island and waited for his attorney to negotiate
the terms of his surrender and possible release on bail. While
there, Fatato received a call from Dorval, who was with
Tarantino; when Tarantino learned that Fatato was on Fire
Island, Tarantino opined that Fatato should not remain and asked
to pick him up by private boat, an offer Fatato declined. As
for the cocaine, Dorval indicated that Tarantino would attempt
to sell it. Fatato attempted to contact Dorval several times
over the weekend but never received a return call, which was
unusual. (T 1212-15, 1218).

On August 16, 1994, Dorval's body was found -- with a
gunshot wound to the back of the head -- stuffed inside a
plastic tool box floating in the Atlantic Ocean, approximately
20 to 30 miles off the coast of Long Island. (T 1396-97, 1414,

1421).  An autopsy indicated that Dorval most likely had been killed three to four days prior to the recovery of his body, placing the time of death between Friday and Saturday, about the time of Fatato's last contact with him.  (T 1424-25).

Again, Tarantino's admissions on the Gargiulo tape left no doubt of his guilt.  (GA 256-87, T 1720-21).  He stated that Dorval had been taken to the location "by boat" and his body dumped "in the middle of the Atlantic Ocean."  (GA 276, 282).  Tarantino and Gargiulo briefly discussed the fact that Tarantino had either cut or "squished" his finger in the process of dumping Dorval's body into the ocean.  (GA 276).  However, Tarantino doubted that this might have been the reason why the FBI and NCPD had collected his DNA.  As Tarantino explained, Dorval's body had been found floating in "saltwater" and had been adrift for "two days" or "better" when it was discovered. (Id.).  He speculated that any skin or other tissue from which DNA might have been retrieved would have washed away or been destroyed.  (Id.).[8]

---

[8]      This portion of the tape became even clearer during the second trial, when Mulligan, then a cooperating witness, testified that as he and Tarantino tried to weigh down the tool chest containing Dorval's body, he accidentally crushed Tarantino's right thumb with a piece of concrete, or cinderblock, which he also described as a "boulder."  (T2 1524-25).  The injury was severe enough for Tarantino to require hospital treatment, on August 13, 1994.  (GA 248-49; GX MED 1-13).

One of the last admissions on the Gargiulo tape made clear that Tarantino had killed both Baumgardt and Dorval.

> VG: [UI] their interest, in Louie –
>
> CT: Yeah.
>
> VG: Him, they don't give a fuck about. That's what I mean. They don't care about him.
>
> CT: Not anymore.
>
> VG: No . . . It's more the security guard. That's really bad, buddy.
>
> CT: I know.

(GA 262).

In the days after the recovery of Dorval's body, an FBI agent and detectives of the NCPD located and searched his Queens apartment. (T 1436-38, 1450-51). They noted that it appeared to have been cleared of Dorval's personal effects. (T 877, 879). However, they did recover a legal pad with notes unevenly dividing $91,600 four ways. (GX JRS-2). This sum corresponded to the approximate amount that remained in the armored van at the time of the robbery. (T 23-24). A handwriting expert gave a qualified opinion that the notes had been written by Tarantino. (T 1991-93, 1996-97, 2002-03).

D.   The Murder of Vincent Gargiulo

1.   The Demand for a Reward

In May 2003, the FBI in New York received a letter signed "Chucky," who claimed to have "information and audiotapes" regarding "Scott Mulligan, Chris Tarantino and others" and their involvement in a "1994 armored car robbery where a guard was shot dead and the death of one of the robbers named Louie was also shot dead and found floating off Long Island." (T 2372; T2 104; GA 294).   At the bottom of the letter, "Chucky" wrote, "PS.  I was not involved in these crimes and I don't want a deal.  I just want money!  Further, Chris T told me someone was wrongly convicted of the armored car robbery." (T 2375; GA 294).

Accordingly, on May 29, 2003, Special Agent Robert Schelhorn met "Chucky," who turned out to be Vincent Gargiulo, on a street corner in Manhattan.  (T 2371, 2373-74; T2 105-07, 186).   He asked Gargiulo for the tape, but Gargiulo demanded a reward of $500,000.  (T 2376; T2 110).  Gargiulo claimed that he had personally made the tape recording as "an insurance against Chris Tarantino."   (T 2375).   Gargiulo also claimed that Tarantino was recorded on the tape speaking about his role in the robbery in which the security guard was shot and killed. (T 2378; T2 109-10).

Agent Schelhorn indicated that he would need to hear the contents of the tape and be able to determine if it was authentic before any payment was made, and the meeting ended without agreement. (T2 111-12). Gargiulo advised Schelhorn that Tarantino knew about the tape and that if Gargiulo "couldn't get the . . . money from . . . [the government,] that he would get it from Tarantino." (T 2379-80; T2 112-13).

Gargiulo had in fact already revealed the existence of the recording to Tarantino and, indirectly, to others. In approximately December 2002, Scott Mulligan and his wife, Manon, returned home one evening to find a telephone voicemail from an angry and threatening Gargiulo, who warned Mulligan to stop talking about him (T2 1575) and said, "[W]hen you see what I have on you, you'll be sorry" (T2 1575). Notably, Mulligan replayed the message for Tarantino, who confirmed that it was Gargiulo speaking. (T2 1180).

2. <u>The Threat to Disclose the Letter</u>

On January 3, 2003, Mulligan entered prison on unrelated charges. (T2 1575). Soon thereafter, an anonymous one-page letter addressed to Mulligan arrived at the Mulligan house by mail. Manon immediately recognized Gargiulo to be the letter's author, given his recent threatening voicemail. (T2 1326). The letter demanded that Mulligan pay $500,000 or else Gargiulo would turn over to the FBI a "tape" that he had

made purportedly containing information about various crimes Mulligan and Tarantino had committed together. (T2 1325-26).

One or two days later, Tarantino stopped by Manon's house. (T2 1327). Tarantino said that he had received a similar letter and confirmed that Gargiulo was the author. (T2 1329). Tarantino advised Manon not to mention the letter to her husband and told her not to worry about Gargiulo because Tarantino would "take care of it." (T2 1329-30, 1338-39).

In the summer of 2003, only weeks before his murder, Gargiulo told his best friend, Robert Gerrato, that he had made a recording of Tarantino and had threatened to reveal the recording to law enforcement officers if Tarantino or Mulligan did not pay him $500,000. (T 1514-15).

3. The Murder

On August 18, 2003, Justin Bressman, an employee of Tarantino's at one of the Synergy Gyms, shot and killed Gargiulo in midtown Manhattan as Gargiulo walked to work. Earlier that month, Bressman appeared at the Lower East Side apartment of a close friend, Pablo Amador. (T2 886-87, 895). Bressman brought with him a Ruger semi-automatic .22 caliber pistol along with a two-piece silencer. (T2 895-96, 98). Noting the quality of the gun and the silencer, Amador asked Bressman what he was doing with such a weapon. Bressman responded that he had "a job" to do for his "boss" at Synergy, a man whom Bressman identified as

"Mattie Roth." (T2 890, 906-07). "Mattie Roth" was an invented name, a pseudonym for Tarantino. (T2 1110-12, 1122, 1596).

The day before, Amador and Bressman spent much of the day and night together. (T2 940-41). During that evening and into the early morning hours of Monday, August 18, Bressman told Amador that the "job" for "Mattie Roth" was to kill an individual named Vinny. The reason given for the killing was vague, but Bressman stated that Vinny and "Mattie" had a dispute and that "Mattie" wanted to keep "Vinny" from going to court. Bressman was to receive $35,000 for the murder. (T2 943). Bressman offered Amador $3,500 to act as his look-out during the shooting. (T2 945-46).

Amador and Bressman arrived at the intersection of West 30th Street and Broadway early in the morning. Minutes later, as Amador watched, Gargiulo approached Bressman, who was standing a short distance away on the sidewalk on Broadway. The two men clasped hands and shoulders in a friendly gesture. Gargiulo bent down to place his lunch cooler and hardhat on the sidewalk; as he straightened up, Bressman fired a single shot into the bridge of Gargiulo's nose, killing him. Bressman and Amador fled the scene. (T2 945-57).

Tarantino's cellphone received a series of calls minutes after the murder, the first came from a Synergy Gym a short distance from the murder scene, followed thereafter by

incoming calls from payphones located on West 16th Street and then further south on Varick Street within the hour after the killing; there was then one uncompleted outgoing call from Tarantino's cellphone. (T2 1210-12).

On August 21, 2003, New York Police Department homicide detectives asked Bressman if he would accompany them for questioning about the Gargiulo murder. (T2 249-50, 1108). Bressman first asked to place a call from the gym and then accompanied the detectives to their station house. (T2 251-52, 1109). Within minutes, the station received a call from attorney Melvyn K. Roth, the same attorney who had represented Tarantino since 1989, and whom Tarantino referenced on the Gargiulo tape as purportedly warning him that "you botched the armored car up." (T2 1110-11). Roth identified himself, claimed that he represented Bressman, and demanded that questioning stop. Bressman, however, said that Roth was not his attorney. Roth insisted that he had been retained to represent Bressman by a "concerned party" and reiterated his demand that questioning stop. (T2 1112). At trial, Roth testified that it was Tarantino who had asked him to intercede. (T2 1126-27).

On April 8, 2004, the lieutenant who was then supervising the Gargiulo murder investigation received an anonymously-mailed package. Inside was the Gargiulo micro-cassette tape. (T2 305-15). The tape was submitted for

forensic analysis to the FBI, and, as noted above, deemed to be authentic and original.  (T2 130, 315).  The tape was played at both trials.

At the retrial of the Gargiulo murder charges, Scott Mulligan testified that Gargiulo was present during Tarantino and Mulligan's planning to kill Dorval.  (T2 1493-94).[9]  Garguilo was also present on the night of August 12, 1994, when Tarantino joined Mulligan at a local bar and announced that Dorval was dead.  (T2 1498-99).  The following day, using a boat belonging to the family of a mutual acquaintance, Mulligan and Tarantino disposed of Dorval's body off the shore of Long Island. (T2 1520-29).[10]  Although Gargiulo's relationship with Mulligan

---

[9]    The FBI arrested Mulligan in December 2011, after the first trial, for his role in the armored car robbery/murder. Mulligan agreed to cooperate.

[10]    Mulligan testified that he was not present during the actual killing but only took part in the disposal of Dorval's body on the following day.  (T2 1498-1510).  He testified that he, Tarantino, and boat operator Craig Miller were on the boat that day.  (T2 1505-31).  This contradicted the 2006 claim of Tarantino coconspirator Joseph Pistone's (at times, "Joseph," to distinguish him from his brother, Peter Pistone (or "Peter") to FBI agents that Pistone was present on the boat with Tarantino at the time of the killing and disposal of Dorval's body.  The two accounts cannot be reconciled, but, as discussed further below, they do not support the inconsistent theory argument advanced by Tarantino.  Mulligan's account was corroborated by Miller (T2 809, 813, 819-21) as well as medical records regarding the injury Tarantino sustained as they tried to weigh down the tool box containing Dorval's body.  The government did not rely on Pistone's testimony with respect to any of the counts of conviction.

and Tarantino deteriorated by late 2002 following the collapse of one of their gym partnerships, in September 2000, at the time of the making of the tape, no such antagonism existed among these men. Two months prior to Gargiulo's making of the recording, the FBI and local authorities began collecting DNA from a number of suspects, including Tarantino and Mulligan.

After Mulligan's release from prison in August 2004, Tarantino told Mulligan about Gargiulo's January 2003 letter. Tarantino further told Mulligan not to discuss the letter with his wife (Manon) and warned, "Leave it be. It is done. It is over with." (T2 1610).

ARGUMENT

POINT ONE

COUNT ONE PROPERLY
ALLEGES A SECTION 33 VIOLATION

Tarantino argues that Count One of the indictment must be dismissed because it fails to allege all of the essential elements of a violation of 18 U.S.C. § 33. (Br. 44-56). Count One states:

> On or about June 23, 1994, within the Eastern District of New York, the defendant CHRISTIAN GEROLD TARANTINO, together with others, willfully and with a reckless disregard for the safety of human life, disabled and incapacitated Julius Baumgardt and John Doe 1, who were drivers and persons employed in connection with the operation of a motor vehicle used, operated and employed in interstate commerce, to wit: a Mid-Island armored van . . . , which offense resulted in the death of Julius Baumgardt.

(A 59-60 (emphasis added)). Tarantino asserts that the count is defective in failing to allege that Tarantino acted (1) "with intent to endanger the safety of any person on board" the vehicle in interstate commerce and (2) with intent either to damage a motor vehicle or to incapacitate its driver or an employee while "on board" or "while operating" the vehicle. Tarantino is wrong.

I. The Legal Standard

An indictment must satisfy two constitutional requirements, that it (1) contain the elements of the offense

charged and "fairly inform[] a defendant of the charge against which he must defend" and (2) enable the defendant to "plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Resendiz-Ponce, 549 U.S. 102, 108 (2007). If an indictment fails to set out all of the essential elements of the charged offense, it is defective. See United States v. Gonzalez, 686 F.3d 122, 127 (2d Cir. 2012). To state an offense, an indictment typically "need only track the language of the statute and, if necessary to apprise the defendant of the nature of the accusation against him, state time and place in approximate terms." United States v. Frias, 521 F.3d 229, 235 (2d Cir. 2008) (citation and internal quotation marks omitted). A claim that the indictment does not properly charge the violation is reviewed de novo. United States v. Gotti, 459 F.3d 296, 320 (2d Cir. 2006).

II.  Argument

    A.  Count One Properly Alleges the Requisite Mens Rea

Tarantino asserts that Count One fails to allege that he acted "with intent to endanger the safety of any person on board" a motor vehicle used in interstate commerce. (Br. 46). However, Section 33(a) sets out two forms of mens rea: acting with "intent to endanger" or "with a reckless disregard for the safety of human life." 18 U.S.C. § 33(a). Here the indictment charged the latter. (A 59).

Count One charges Tarantino with the murder of Julius Baumgardt, in violation of 18 U.S.C. §§ 33 and 34. (A 59-60). The first paragraph of Section 33(a) states, in relevant part:

> Whoever willfully, with intent to endanger the safety of any person on board or anyone who he believes will board the same, <u>or</u> with a reckless disregard for the safety of human life, damages, disables, destroys, tampers with, or places or causes to be placed any explosive or other destructive substance in, . . . any motor vehicle which is used, operated, or employed in interstate or foreign commerce, or its cargo or material used or intended to be used in connection with its operation; . . .

18 U.S.C. § 33(a) (emphasis added). This language makes clear that the statute applies to a defendant who has acted *either* "with intent to endanger the safety of any person on board or anyone who he believes will board the same" *or* "with a reckless disregard for the safety of human life." <u>Id.</u> The third paragraph -- the provision with which Tarantino is charged -- provides:

> Whoever, <u>with like intent</u>, willfully disables or incapacitates any driver or person employed in connection with the operation or maintenance of the motor vehicle, or in any way lessens the ability of such person to perform his duties as such; . . .

Id. (emphasis added).[11]  The phrase "with like intent" in the third paragraph of Section 33(a) clearly refers back to the first paragraph of the statute and incorporates *both* forms of mens rea from the first paragraph: "with intent to endanger the safety of any person on board or anyone who he believes will board the same, or with a reckless disregard for the safety of human life."  18 U.S.C. § 33(a).

Tarantino asserts that the "with like intent" phrase initiating Paragraph Three (and Paragraph Two) refers solely to the "intent to endanger" mens rea in Paragraph One rather than to the "reckless disregard" mens rea found in that paragraph as well.  (Br. 46-47).  This interpretation, however, is illogical both linguistically and as a matter of legislative intent.

---

[11]  The second paragraph of Section 33(a) also contains the phrase "with like intent," referring back to the first paragraph of Section 33(a).  18 U.S.C. § 33(a).  The second paragraph of Section 33(a) makes it a violation to damage "any garage," "structure," or "facility" used in connection with "motor vehicles engaged in interstate or foreign commerce."  Id. Each paragraph in Section 33(a) is separated by a disjunctive "or," making clear that the statute intends to prohibit each of the acts enumerated in the separate paragraphs.  See Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise.").  Section 34 of Title 18 provides that, "[w]hoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life."

First, the term "intent" can include not only purposefulness but also generally the state of mind with which an action is taken. <u>See</u> Webster's New International Dictionary, Second Edition, 1934 ("Frame of mind, understanding.").[12] Thus, the "like" intent in Paragraph Three (and Two) can refer to acting with "the same frame of mind" as that described in Paragraph One, meaning acting not only intentionally but also acting with reckless disregard, another state of mind.

Moreover, one can act recklessly with respect to the conduct set forth in Paragraph Two and Three as much as one can with that defined in Paragraph One. Tarantino, however, offers no reason why Congress would chose to punish the conduct prohibited in Paragraphs Two and Three only where done with intent to endanger the safety of persons yet punish that conduct described in Paragraph One where committed with either intent to endanger or reckless disregard for the safety of human life.

---

[12] This dictionary was the current version of the Webster's Dictionary at the time of the enactment of this legislation in 1956, over 20 years later. While this dictionary terms this usage of "intent" obsolete, by 1965, it was back in currency ("the state of mind or mental attitude with which an act is done: VOLITION") (Webster's Third New Int'l Dictionary (unabridged)), as it was in 1979, when Webster's New Collegiate Dictionary (8th ed.) was published, in which "the state of mind with which an act is done" was an accepted definition for "intent." In all, as of the time of the passage of the legislation at issue, "a state of mind" was an accepted definition for intent.

Tarantino's reliance on <u>United States v. Jones</u>, 308 F.3d 748 (7th Cir. 2002), (Br. 46) is misplaced. There, the defendant was charged with 18 U.S.C. § 35(b), known as the Bomb Hoax Act. 308 F.3d at 750. The Seventh Circuit summarized the defendant's argument as follows:

> His second objection [to the indictment] is substantive, but incorrect. The indictment does not allege that Jones intended to endanger anyone's safety. Such intent is required for a violation of § 33(a), and without a violation of § 33(a) (or some other predicate offense) there can be no violation of § 35(b) either, <u>Jones insists</u>.[13]

<u>Id.</u> at 750 (emphasis added).

Thus, a careful reading of the language in <u>Jones</u> suggests that the statement "such intent is required for a violation of § 33(a)" was part of Jones's argument, not the Seventh Circuit's finding. Moreover, any statement by the Seventh Circuit regarding the <u>mens</u> <u>rea</u> requirement of Section 33(a) was <u>dicta</u>, as the court's focus in <u>Jones</u> was the <u>mens</u> <u>rea</u> element of Section 35(b), the statute charged in <u>Jones</u>. In fact, the Seventh Circuit concluded that the <u>mens</u> <u>rea</u> requirement of Section 33(a) was irrelevant because "Section 35(b) has its own mental-state requirement" and "[i]t would make no sense to borrow a mental-state rule from elsewhere, because

---

[13]     Section 33 was later redesignated 33(a).

the point of § 35(b) is to penalize <u>hoaxes</u>, and hoaxers do not intend people to be harmed." <u>Id.</u>

Because the indictment properly alleged intent in Count One, Tarantino's claim should be rejected.

B. **The Indictment Need Not Allege an Intent To Damage a Motor Vehicle or to Incapacitate The Driver/Employee While Operating the Motor Vehicle**

Tarantino further claims that Count One is defective because it fails to allege that Tarantino "willful[ly] inten[ded] to damage, destroy, or tamper with any interstate motor vehicle" or that he intended "to incapacitate its driver while the driver was operating the vehicle." (Br. 46-47, 48).[14] A plain reading of Section 33(a), however, reveals that neither of those two elements is required by the statute when the indictment alleges a violation of Paragraph Three of Section 33.

As noted above, unlike Paragraph One of Section 33, which addresses willful damage to a motor vehicle, Paragraph Three focuses on the "disabl[ing]" or "incapacitat[ion]" of "any

---

[14] Unlike his first attack on Count One of the indictment, Tarantino did not raise the instant argument until more than a year after his first trial. (<u>See</u> DE 402, D.'s Mot. to Dismiss Count One, filed 11/3/12). Because Tarantino raised this claim well after the first (and second) trial, this Court should construe the indictment more liberally in support of a finding of sufficiency. <u>See</u> <u>United States v. Davila</u>, 461 F.3d 298, 308 (2d Cir. 2006) (citing Fourth Circuit case that based this rule on "interest in judicial efficiency [concerning] tardily challenged indictments.") (citation and internal quotation omitted).

driver or person employed in connection with the operation or maintenance of the motor vehicle." 18 U.S.C. § 33(a). This paragraph requires no damage to the motor vehicle, and Tarantino provides no valid support for a contrary position.

Rather, Tarantino offers a strained interpretation of United States v. Kurka, 818 F.2d 1427, 1428 (9th Cir. 1987). (See Br. 49-50 ("Under Kurka, the excision of the 'specific intent' language in Tarantino's indictment fatally decapitated the statute because the essential element of willful vehicular damage was improperly excluded.")). In Kurka, the Ninth Circuit held that the indictment (which alleged a violation of Section 33's first paragraph, as Tarantino acknowledges (see Br. 49)) was defective because it failed to allege that the damage to the motor vehicle was "willful" and thus failed to allege an essential element of the crime. 818 F.2d at 1430-31. The Ninth Circuit reasoned that the first paragraph of Section 33 requires willful damage to the vehicle plus the prescribed intent of intentionally or recklessly endangering human life. Id. at 1430.

The indictment in the instant case properly alleges intent and tracks the language in the third paragraph of Section 33(a), as it states, in relevant part, that Tarantino "willfully and with a reckless disregard for the safety of human life, disabled and incapacitated Julius Baumgardt and John Doe 1."

(A 59-60 (emphasis added)). Had the indictment in this case not included the word "willfully," then it would have suffered from the defect at issue in Kurka. Contrary to Tarantino's contention, Kurka does not stand for the proposition that every count charging a violation of Section 33 must allege a willful intent to damage a motor vehicle. The plain language of the third paragraph of Section 33(a), while it refers back to the first paragraph, does not require willfulness with respect to the acts upon the motor vehicle. Rather, the plain language of the third paragraph applies the mens rea of willfulness to the actus reus of "disables or incapacitates any driver or person employed in connection with the operation or maintenance of the motor vehicle, or in any way lessens the ability of such person to perform his duties as such." 18 U.S.C. § 33.

Tarantino's related argument that Count One is flawed because it fails to allege that either Baumgardt or his co-worker was disabled or incapacitated while "on board" the commercial motor vehicle or "while operating the vehicle" (Br. 48), is also belied by the plain language of the statute.[15]

---

[15] While Tarantino urges this Court to rely on the legislative history of Section 33, this Court should decline to do so. Where the statutory language is unambiguous, the Court's inquiry need not, and should not, involve an investigation into legislative history. See Gully v. Nat'l Credit Union Admin. Bd., 341 F.3d 155, 164 (2d Cir. 2003) ("Given the plain, unambiguous language of the text, it is well settled that we

Tarantino points to the language of 18 U.S.C. § 1992 for support.  Section 1992 prohibits certain acts against a driver or similarly-situated person "while the person is employed in dispatching, operating, controlling, or maintaining railroad on-track equipment or a mass transportation vehicle."  18 U.S.C. § 1992(a)(6).  However, the phase "while the person is employed in" in Section 1992 undermines Tarantino's argument.  If the legislature intended Section 33 to prohibit acts against a driver or other person only while that person was physically operating or working on the vehicle, it would have used the same terminology as it did in Section 1992.  Instead, the legislature used broader language, which protects "any driver or person employed in connection with the operation or maintenance of the motor vehicle." 18 U.S.C. § 33(a) (emphasis added).  The "in connection with" language in the third paragraph of Section 33(a) casts a broader net and includes drivers and persons whose work relates to the "operation or maintenance."  It does not require the driver or person to be "on board" the vehicle or operating the vehicle at the time of the attack.[16]

---

cannot resort to legislative history to glean a statute's meaning.")

[16]  The same argument applies to Tarantino's reliance on 18 U.S.C. § 32, which criminalizes the destruction of aircraft or aircraft facilities.  Tarantino points to language in Section 32(a)(5)("interferes with or disables . . . anyone engaged in the authorized operation of such aircraft or any air navigation

Because Count One properly sets out the essential elements of Section 33, Tarantino's attack on the indictment should be rejected.[17]

---

facility . . .") and Section 32(a)(6) ("performs an act of violence against or incapacitates any individual <u>on any such aircraft</u> . . . .") in arguing that Section 33(a) similarly requires that the victim be disabled or incapacitated while "on board" or "while operating" the vehicle. (Br. 51-52). Tarantino also points out that Sections 32 and 33 were enacted together in 1956. <u>Id.</u> at 51. This further shows that, if Congress had intended to limit the application of Section 33(a) to individuals who were attacked while they were "on board" or "while operating" the motor vehicle, it could have used terminology similar to that in Section 32 to accomplish that goal.

[17]  If this Court determines that Count One is defective, contrary to Tarantino's request (Br. 48), it should dismiss without prejudice. <u>See</u> <u>Lee v. United States</u>, 432 U.S. 23, 33-34 (1977). Moreover, a dismissal of Count One would not require a retrial (or dismissal) of Count Two, as all of the evidence would have been admissible as probative of Tarantino's motive to murder Dorval.

POINT TWO

THE EVIDENCE WAS SUFFICIENT TO CONVICT TARANTINO
FOR THE OBSTRUCTION-OF-JUSTICE MURDER OF DORVAL CHARGED
IN COUNT TWO, THE JURY INSTRUCTIONS WERE CORRECT,
AND THE RULE 35 MOTION WAS CORRECTLY DENIED

Tarantino contends that, in light of the Supreme Court's decision in Fowler v. United States, 131 S. Ct. 2045 (2011), issued three days after the jury found Tarantino guilty of Dorval's murder to obstruct justice under 18 U.S.C. § 1512(a)(1)(C), the evidence must be deemed insufficient to support his conviction for Dorval's murder, the jury instructions were erroneous, and the district court erred in denying his motion for a new trial under Fed. R. Crim. P. 33. (Br. 56-68). As we show below, Tarantino's conviction accords with the holding later set forth in Fowler.

I.   Fowler

The witness tampering statute -- Title 18, United States Code, § 1512(a)(1)(C) -- punishes one who "kills or attempts to kill another person, with intent to . . . (C) prevent the communication by any person to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense[.]" Section 1512(f) (the provision then in effect; currently at Section 1512(g)(2)) stated, "In a prosecution for an offense under this section, no state of mind need be proved with respect

to the circumstance that . . . the law enforcement officer is an officer or employee of the Federal Government . . . ."

In <u>Fowler</u>, the Supreme Court considered the circumstances in which "a defendant kill[s] a person with an intent to prevent that person from communicating with law enforcement officers in general but where the defendant did not have federal law enforcement officers (or any specific individuals) particularly in mind." <u>Id.</u> at 2048. Under these circumstances, the government must show that "there was a <u>reasonable</u> <u>likelihood</u> that a relevant communication would have been made to a federal officer." <u>Id.</u>

Prior to <u>Fowler</u>, this Circuit, in <u>United States v. Romero</u>, 54 F.3d 56 (2d Cir. 1995), addressed the issue of what the government must show regarding the victim's intent to cooperate with law enforcement officials:

> [T]he government did not need to offer proof that [the victim] was willing to cooperate or that an investigation was underway. Rather, the statute is directed at the "intent to prevent . . . communication" with federal authorities. <u>See</u> 18 U.S.C. § 1515(a)(1)(C). The government need prove only an intent to kill for the purpose of interfering with communication with federal law enforcement officials. The victim need not have agreed to cooperate with any federal authority or even to have evinced an intention or desire to so cooperate. There need not be an ongoing investigation or even any intent to investigate. Rather, the killing of an individual with the intent to frustrate the

> individual's possible cooperation with
> federal authorities is implicated by the
> statute.

Id. at 62 (ellipsis in original).

Under Romero, then, a violation of Section 1515(a)(1)(C) can be sustained if there is intent to kill for the purpose of interfering with communication with federal law enforcement officials; under Fowler, if the defendant intends simply to prevent communication with law enforcement officers -- not necessarily federal -- there must be a reasonable likelihood that communication would have been made to a federal official.

## II. Application of Fowler

As we show below, because the proof established an intent to interfere with communication with federal officials, the conviction can be sustained under Romero because of Tarantino's intent to interfere with communication to officials of the United States Customs Service, the original investigating agency; for similar reasons, there was a reasonable likelihood that the communication would in fact have been to federal officials. Either is sufficient to sustain the conviction. Federal agents had secured an arrest warrant for Dorval and Fatato in the Giampa case, and Tarantino was aware of that fact and would have understood that, should Dorval chose to cooperate, it would have been with federal authorities. In any event, even if Tarantino did not hold this specific

apprehension, there was a reasonable likelihood that it would have been a federal officer to whom Dorval would have communicated.

A.    The Evidence Supports the Verdict

Tarantino argues that, under Fowler, the government presented insufficient evidence to support his conviction for Dorval's obstruction-of-justice murder. According to Tarantino, "there has to be a 'reasonable likelihood' that a relevant communication would have been made to a federal officer." (Br. 59). Tarantino argues that "Fowler requires more than just a 'remote' or 'hypothetical' possibility that Tarantino might have killed Dorval to prevent him from communicating with federal authorities." (Id.). Tarantino further argues that "the principal testimony on Count 2 came from . . . Fatato" and attacks Fatato's credibility. (Id. at 60-61). However, because the evidence was sufficient, the district court correctly denied Tarantino's motion under Fed. R. Crim. P. 29.[18]

The evidence established that, just days before Dorval's murder, Dorval was indicted in a federal case in the

---

[18]    A defendant challenging the sufficiency of the evidence "bears a heavy burden, as the standard of review is exceedingly deferential." United States v. Newman, 773 F.3d 438, 451 (2d Cir. 2014). Although this Court's sufficiency review is de novo, the conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Newman, 773 F.3d at 451 (citation omitted).

District of New Jersey and was wanted by federal authorities, who had arrested several of Dorval's co-defendants. The parties stipulated to the testimony of Lawrence Hardie, supervisor for what was at the relevant time known as the United States Customs Service, that in 1993-94, his agency was conducting an investigation of members and associates of the Lucchese crime family and that as part of the investigation, agents used a confidential informant, Richard Sabol, who recorded telephone conversations and a face-to-face meeting, all taking place in January 1994, and that the Giampa indictment was returned on August 10, 1994 by a federal grand jury in the District of New Jersey, which charged nine individuals, including Fatato and Dorval, with federal crimes, among them those related to the interstate sale of fur and leather coats stolen from Filene's Basement. (GA 178-79, 288-89).

Moreover, on Friday, August 12, 1994, three New York City and Long Island newspapers reported that members of organized crime -- including Fatato and Dorval -- had been indicted or arrested in a federal investigation in New Jersey. (GA 214-15, 290-92). Indeed, the New York Times article specifically mentioned that Fatato and Dorval were charged in the Giampa case. (Id.). After reading a newspaper article, Fatato called Dorval and told him, "[W]e got trouble," and, in a meeting shortly thereafter, Dorval told Fatato, in no uncertain

terms, that he was not going back to prison and planned to leave New York. (GA 180-81). Fatato advised Dorval that he planned to see his attorney. (Id.). As noted above, Dorval was killed on or about August 12, 1994, the day of the news accounts.

Thus, the evidence established that, at the time of his murder, Dorval was wanted by United States Customs Service agents for his participation in the attempted interstate sale of stolen property and that this information became public in the New York City and Long Island areas on August 12, 1994. Moreover, Tarantino knew that Dorval was wanted by federal authorities and had reason to want to prevent Dorval from communicating with them. Given the widespread news accounts, Tarantino -- then living on Long Island (T 1185) -- would have learned that Dorval was wanted by federal authorities. Moreover, after Fatato and Dorval met, on August 12, to discuss the situation, Fatato told Dorval to contact Tarantino to attempt quickly to sell cocaine that Fatato and Dorval were holding. (GA 180-81). Furthermore, when Fatato spoke to Dorval later that afternoon from Fire Island, Dorval told Fatato that he was with Tarantino and relayed Tarantino's desire to pick up Fatato on Fire Island in a private boat because Tarantino did not think Fatato was safe there. (T 1212-14).

There was substantial evidence that Tarantino had participated in the subsequent attempt to sell the stolen

merchandise. Dorval told Fatato that he and Tarantino had stolen 200 fur coats from Filene's Basement and asked if Fatato knew of any potential purchasers, asking $100,000 for the coats. (T 1150-52; GX GF 4). Later, a potential buyer -- Sabol, the informant -- wanted to see samples. (T 1151-53; GA 178-79, 288). Dorval provided Fatato with four samples, but ultimately Tarantino sought their return. (T 1154-56, 1169; GX GF-11)). After a meeting with Sabol, Dorval returned two of the fur coats to Tarantino. (T 1162).

Given the relationship between Dorval and Tarantino and the evidence that Tarantino had participated in the theft of the fur coats and the subsequent attempt to sell them, it was reasonable for the jury to conclude that Dorval would have confided in Tarantino that Dorval was wanted by federal authorities in connection with the stolen fur coats, and given Tarantino's attempts to spirit Fatato away from Fire Island, a rational juror could have reasonably inferred that Dorval had advised Tarantino that Dorval and Fatato were wanted by federal authorities.

The evidence thus proved that Tarantino's motivation for killing Dorval was to prevent him from communicating with federal law enforcement officers regarding crimes Tarantino had committed with Dorval. The most serious of those crimes was the armored car robbery and murder of Baumgardt, which had taken

place less than two months earlier.[19]   Tarantino had reason to
worry that Dorval would talk to the federal authorities
concerning this if apprehended, not only because Dorval had
expressed his clear intention, after learning of the Giampa
indictment, not to return to prison but also because Tarantino
had learned that Dorval had "loose lips": Dorval's chastising
Fatato for raising the topic of the armored car robbery after
Fatato had revealed to Tarantino that he was aware of the crime
suggested that Tarantino had reprimanded Dorval for having told
Fatato about their involvement in the armored robbery/murder and
from this a jury could infer that Tarantino was concerned that
Dorval would tell the federal authorities about crimes they had
committed with one another.[20]

---

[19]   Tarantino admitted on the Gargiulo recording that he
was a suspect in the armored car robbery and Baumgardt's murder
from "day one."   (GA 273).

[20]   While Tarantino devotes two pages of his argument to
attacking the credibility of Fatato, upon whose testimony this
proof in large part relied, in reviewing a denial of a Rule 29
motion, the appellate court "'must view the evidence in the
light most favorable to the Government, crediting every
inference that could have been drawn in the Government's favor,
and deferring to the jury's assessment of witness credibility
and its assessment of the weight of the evidence.'"   Newman, 773
F.3d at 451 (quoting United States v. Coplan, 703 F.3d 46, 62
(2d Cir. 2012)).

In any event, Fatato's testimony was corroborated by, among
other things, audio recordings (including Tarantino's admissions
on the Gargiulo Tape, in which Tarantino admitted to his
participation in the Baumgardt and Dorval murders) (T 1165-80,
1726-27; GX GF 9-17; GA 256-83); newspaper articles (GA 214-15,

Moreover, the <u>Fowler</u> "reasonable likelihood" test is met here. The evidence was overwhelming that, had Dorval communicated with law enforcement, at least one relevant communication would have been made to a federal officer. 131 S. Ct. at 2052. The government's evidence easily showed that "the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." <u>Id.</u> There was an official federal proceeding pending against Dorval in the District of New Jersey, Dorval was wanted by federal authorities at the time of his murder, and he had information about Tarantino's involvement in several federal crimes that he could have shared with federal law enforcement in the hopes of receiving a cooperation agreement or leniency from the district court at sentencing.

Tarantino observes that Dorval, who had stated his intention not to return to jail, was "committed to life on the lam" (Br. 62; <u>see also</u> Br. 64), and would flee rather than surrender and provide information to law enforcement officers.

---

290-92); surveillance and crime scene photographs (T 1160-62, 1457-69; GX GF 5-7, TH 1-8); the testimony of Dr. Dawson (T 1421, 1424-25), Dorval's sister (T 1063-65), and Fatato's former fiancée, Tara Martino (T 2034-40); and documents, including a handwritten list itemizing the fur coats (T 1150-52; GX GF 4), a credit card receipt signed by Fatato to pay for a hotel on Fire Island, for August 13-15, 1994 (T 1215-17; GX GF-8), and a credit card statement in the name of Fatato's relative showing purchases on Fire Island on Friday, August 12, 1994 (T 2355-56; GX 27).

This ignores, however, that there was always the possibility that he would be apprehended, in which his only realistic opportunity of avoiding prison would be to cooperate. The jury was free to infer that Tarantino recognized this possibility and saw no disadvantage to killing Dorval so that it would not come about.

Tarantino's sufficiency claim therefore must be rejected.

B.    The Jury Instructions Were Proper

Tarantino did not object to the district court's instructions on Count Two. (T 2807-46, 3095). Thus, his claim that the instructions were erroneous due to the Supreme Court's subsequent decision in Fowler is subject to plain error review.[21] Tarantino cannot establish plain error.

---

[21] Generally, this Court reviews challenged jury instructions de novo but will reverse a conviction only if all of the instructions, taken as a whole, caused the defendant prejudice. See United States v. Naiman, 211 F.3d 40, 51 (2d Cir. 2000). A jury instruction is erroneous if it either misleads the jury regarding the correct legal standard or fails to inform the jury of the law. Id. In the absence of an objection at trial, jury instructions are reviewed on appeal for plain error. See Fed. R. Crim. P. 52(b); Johnson v. United States, 520 U.S. 461, 466-67 (1997). "Under this deferential standard, we will vacate a judgment only if we find that the District Court made a mistake that is clear and obvious, affected substantial rights, and seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Danielson, 199 F.3d 666, 671 (2d Cir. 1991) (internal quotation marks omitted).

First, for the reasons set forth above, the district court did not err in its instructions.  The court instructed the jury in pertinent part as follows:

> In order to prove the Defendant guilty of Count Two of the Indictment, the Government must prove each of the following elements beyond a reasonable doubt:
>
> .    .    .
>
> <u>Fourth</u>, that the Defendant acted with the intent to prevent Louis Dorval from communicating to law enforcement authorities information relating to the commission or possible commission of federal offenses.

(A 136 (emphasis added)).  In its explanation of the fourth element, the court stated, in relevant part:

> The <u>fourth</u> element that the Government must prove beyond a reasonable doubt is that the Defendant acted with the specific intent to prevent Louis Dorval from communicating to law enforcement authorities <u>of the United States</u> information relating to the

---

In <u>United States v. Viola</u>, 35 F.3d 37, 42-43 (2d Cir. 1994), <u>abrogated on other grounds by</u> <u>Salinas v. United States</u>, 522 U.S. 52 (1997), this Court established a "modified" plain error rule for claims based upon a "superseding decision" that "alters settled law."  In those situations, this Court held, the government must show that the error did not affect the defendant's substantial rights.  <u>Id.</u>  However, more recently, this Court has noted that the Supreme Court's subsequent decision in <u>Johnson</u> "has called into doubt the continuing viability of the modified plain-error approach."  <u>United States v. Stewart</u>, 433 F.3d 273, 294 n.5 (2d Cir. 2006); <u>see also</u> <u>United States v. Botti</u>, 711 F.3d 299, 308 (2d Cir. 2013) (<u>Johnson</u> "called into question the modified plain error standard of review that this Court established in <u>Viola</u>.").  As is argued below in more detail, regardless of which side bears the burden, the defendant's substantial rights were not affected.

commission or possible commission of a
federal offense.  By specific intent, I mean
that <u>the Defendant must have acted knowingly</u>
<u>and with the unlawful intent to prevent</u>
<u>Louis Dorval from communicating information</u>
<u>relating to the commission or possible</u>
<u>commission of a federal offense to a law</u>
<u>enforcement officer of the United</u>
<u>States</u>. . . .

* * *

In order to satisfy this fourth
element, it is not necessary for the
Government to prove that the Defendant knew
that the law enforcement authorities were
federal law enforcement authorities.
However, the Government must establish,
beyond a reasonable doubt[,] that the
offense or offenses which Dorval could have
provided information about were federal
offenses.

Finally, while the Government need not
prove that a proceeding was actually pending
or about to be instituted at the time of
Dorval's murder, the Government must
establish that the Defendant believed Dorval
might communicate with law enforcement
authorities.

(A 138-39) (emphasis added).

Tarantino takes issue with the last clause of the

instructions, that "the Government must establish that the

Defendant believed Dorval might communicate with law enforcement

authorities."  However, as noted above, contrary to Tarantino's

claim that <u>Fowler</u> makes clear that the use of the word "might"

in the jury instructions was incorrect, the Supreme Court said

in <u>Fowler</u> that "[w]hen the defendant has in mind a particular

individual or a particular set of individuals with whom he fears the victim <u>might</u> communicate, the application of the statute is relatively clear," and that whether there was a reasonable likelihood that a relevant communication would have been made to a federal officer, 131 S. Ct. at 2049, is irrelevant. Here, the district court made clear to the jury that the government had to prove each element set forth in Count Two, which included that "the Defendant acted with the intent to prevent Louis Dorval from communicating to law enforcement authorities information relating to the commission or possible commission of federal offenses." (A 136).

Even assuming, <u>arguendo</u>, that the district court erred and the error was plain, Tarantino cannot meet his burden of showing that the error affected his "substantial rights."[22] An error affects substantial rights if it was "prejudicial," meaning that it "affected the outcome of the district court proceedings." <u>United States v. Olano</u>, 507 U.S. 725, 734 (1993). Because there was overwhelming evidence of Tarantino's guilt, he cannot satisfy his burden. Under <u>Fowler</u>, the government would have had to show "a <u>reasonable</u> <u>likelihood</u> that, had, <u>e.g.</u>, the victim communicated with law enforcement officers, at least one

---

[22] Even if this Court applies a modified plain error analysis, the government can establish that the alleged instructional error did not affect Tarantino's substantial rights.

relevant communication would have been made to a federal law enforcement officer." 131 S. Ct. at 2052. Stated another way, "the Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." Id. Given that Dorval was under federal indictment and was wanted by federal agents, who had just a day or two before arrested a number of Dorval's co-defendants, there was a very strong likelihood -- if not a certainty -- that, had Dorval communicated with law enforcement officials, it would have been with the federal agents working on the Giampa investigation and prosecution. Contrary to Tarantino's contention, Dorval's intent or lack of intent to cooperate with federal authorities is irrelevant. See Fowler, 131 S. Ct. at 2051 ("[T]o require the Government to prove [the victim's intent] would prevent the statute from applying where it is plain that federal officers would have been involved in investigating and prosecuting the offense . . . but where the defendant killed the victim before the victim had decided to communicate to law enforcement officers. Congress, however, intended the statute to apply in these last-mentioned circumstances."). Rather, the focus is on the defendant's intent -- whether Tarantino killed Dorval because Tarantino believed Dorval might provide information to federal authorities. The Fowler Court was concerned with the

federalization of state crimes. 131 S. Ct. at 2051-52. Here, the federal nexus was clear: there was an official federal proceeding underway in the District of New Jersey, and Dorval was wanted by federal authorities in connection with that proceeding.

If Dorval were to have cooperated with any law enforcement agents, it was certainly going to begin with the United States Customs Service agents in charge of investigating and prosecuting the Giampa case, who would want to know, at the very least, how Dorval had obtained the more than 200 fur coats and who his accomplices were.

Thus, because the evidence presented at trial easily satisfied the Fowler "reasonable likelihood" standard, Tarantino cannot show that the outcome of his first trial would have been different if the district judge had instructed the jury on the Fowler standard. Should this Court apply the modified plain error standard, the government has met its burden of showing that the alleged error did not affect the defendant's substantial rights. United States v. Viola, 35 F.3d 37, 42 (2d Cir. 1990).

Last, the alleged error did not "seriously affect the fairness, integrity or public reputation" of Tarantino's trial. Olano, 507 U.S. at 736. The Supreme Court has explained that a court of appeals should exercise its discretion to correct an

error "in those circumstances in which a miscarriage of justice
would otherwise result." United States v. Young, 470 U.S. 1, 15
(1985). The Supreme Court has found that an error in failing to
instruct the jury on an element of the offense did not justify
correction under the fourth part of the plain error test when
the proof of the element was 'overwhelming' and 'essentially
uncontroverted' at trial." See United States v. Cotton, 535
U.S. 625, 635 (2002); Johnson v. United States, 520 U.S. 461,
470 (1997); United States v. Joyner, 313 F.3d 40, 46 (2d Cir.
2002).

    In the instant case, as detailed above, the government
presented overwhelming evidence at trial that it was "reasonably
likely under the circumstances that (in the absence of the
killing) at least one of the relevant communications would have
been made to a federal officer." Fowler, 131 S. Ct. at 2052.
The evidence overwhelmingly established that Tarantino killed
Dorval because Dorval had been indicted in the District of New
Jersey, federal agents were looking for Dorval, and Tarantino
could no longer trust Dorval to keep quiet regarding crimes they
had committed together, including the armored car
robbery/murder. (T 536, 2919). The evidence overwhelmingly
supported the government's theory. Thus, even if the district
court erred in not instructing the jury on the Fowler
"reasonable likelihood" standard, the error did not "seriously

52

affect the fairness, integrity or public reputation" of Tarantino's trial. Tarantino's conviction on Count Two should be affirmed.

> C. <u>The Court Properly Denied the Rule 33 Motion</u>

The district court did not abuse its discretion in denying the Rule 33 motion.[23] The court correctly found that <u>Fowler</u> does not apply to the facts of the instant case and that, even if <u>Fowler</u>'s "reasonable likelihood" standard did apply, Tarantino did not suffer any harm, as the district court's instructions fairly apprised the jury of the government's burden. (<u>See</u> Sealed Mem. & Order, dated 11/09/11, at 32-33 (submitted to this Court under seal)). The court's instructions, read as a whole, made clear to the jury that it had to find, beyond a reasonable doubt, that Tarantino "acted with the specific intent to prevent Louis Dorval from communicating to law enforcement authorities of the United States information relating to the commission or possible commission of a federal offense." (A 138, <u>see generally</u> A 136-

---

[23] A motion for a new trial under Fed. R. Crim. P. 33 is committed to the discretion of the district court, and its decision will be reversed only for abuse of discretion. <u>See</u> <u>United States v. James</u>, 712 F.3d 79, 107 (2d Cir. 2013), <u>cert.</u> <u>denied</u>, 134 S. Ct. 2660 (2014). The court's factual findings are reviewed for clear error. <u>See</u> <u>United States v. Imran</u>, 964 F.2d 1313, 1318 (2d Cir. 1992). "In deciding a Rule 33 motion, '[t]he test is whether it would be a manifest injustice to let the guilty verdict stand.'" <u>James</u>, 712 F.3d at 107 (quoting <u>United States v. Lin Guang</u>, 511 F.3d 110, 119 (2d Cir. 2007)).

39); see also United States v. Park, 421 U.S. 658, 674 (1975) (jury instructions are adequate when they fairly advise jurors of the government's burden)).  The court correctly found that "[t]he jury was not left with the misimpression that it was enough for the Government to prove that Tarantino killed Dorval to prevent his communications to law enforcement generally and that there was a mere possibility that one of those communications would be to a federal officer."  (Sealed Mem. & Order at 35).

POINT THREE

THE DISTRICT COURT DID NOT COMMIT PLAIN ERROR
BY HOLDING TWO TELEPHONE CONFERENCES WITH COUNSEL,
WITHOUT TARANTINO PRESENT, TO DISCUSS THE PARTIES'
CHALLENGES FOR CAUSE BASED ON JUROR QUESTIONNAIRES

Tarantino claims he is entitled to a new trial on Counts One and Two because, before the first trial, he was involuntarily absent from the telephone conferences with the district court[24] during which counsel requested that certain potential jurors be excused for cause based on a review of juror questionnaires. (Br. 68-76). He is wrong.

Because Tarantino did not object to the district court's jury selection process below, his claim is subject to plain-error review. See Fed. R. Crim. P. 52(b); United States v. Perez, 575 F.3d 164, 169 (2d Cir. 2009). As noted above, under this deferential standard of review, this Court "will vacate a judgment only if [it] find[s] that the District Court made a mistake that is clear and obvious, affected substantial rights, and seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Danielson, 199 F.3d at 671 (internal quotation marks omitted). Because the district court did not err -- much less commit plain

---

[24] The district court judge presided over the March 17, 2011 telephone conference, which was continued to March 21, 2011. (See GA 21). A magistrate judge presided over the March 21, 2011 telephone conference. (See GA 79).

error -- in holding two telephone conferences to address for-cause challenges without Tarantino present, his claim fails.[25]

I.   The Legal Standard

Generally, a defendant has the right to be present at all material stages of his trial under the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth Amendment.  See United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam).  The empaneling of a jury is a material stage of a trial that requires the defendant's presence.  See Norde v. Keane, 294 F.3d 401, 411 (2d Cir. 2002); Cohen v. Senkowski, 290 F.3d 485, 489 (2d Cir. 2002) (holding that pre-screening of prospective jurors in chambers regarding pretrial publicity was material stage of trial at which defendant had constitutional right to be present); see also Fed. R. Crim. P. 43(a)(2).

This right, however, is not absolute.  Rather, it arises only when the defendant's presence "has a relation,

---

[25] Tarantino incorrectly argues that the alleged error was of structural dimension. (See Br. 69 n. 55).  In United States v. Feliciano, 223 F.3d 102, 111-12 (2d Cir. 2000), this Court held that exclusion of the defendants from bench conferences during voir dire was not structural error but, rather, harmless error beyond a reasonable doubt.  This Court has defined structural errors as follows: "Errors are properly categorized as structural only if they so fundamentally undermine the fairness or the validity of the trial that they require voiding its result regardless of identifiable prejudice."  Yarborough v. Keane, 101 F.3d 894, 897 (2d Cir. 1996).

reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934). In other words, "[t]he constitutional right to be present at trial, . . . [applies] only to the extent that a fair and just hearing would be thwarted by [the defendant's] absence." United States v. Ferrarini, 219 F.3d 145, 152 (2d Cir. 2000). This Court has held that a defendant does not have the right to be present when prospective jurors are being questioned about hardship excuses and other routine administrative matters because such questioning is not truly part of the voir dire. See United States v. Greer, 285 F.3d 158, 168 (2d Cir. 2002) (in camera questioning of prospective jurors, without the parties or counsel present, for hardship excuses was not error); United States v. Williams, 927 F.2d 95, 96-97 (2d Cir. 1991) (jury clerk may excuse jurors on hardship grounds before the voir dire). Furthermore, a defendant can waive his right to be present at stages of jury selection, and this waiver can be inferred. See Tankleff v. Senkowski, 135 F.3d 235, 247 (2d Cir. 1999); Cohen, 290 F.3d at 491-92.

II.  Tarantino's Absence

    A.  Tarantino Had No Right To Be
        Present at the Telephone Conferences

      Tarantino's right to be present at all material stages of his trial was not violated by his absence during the two telephone conferences. Prior to the conferences, the parties had independently reviewed the juror questionnaires and provided the district court with a list of potential jurors, identified by juror number, that they wanted excused for cause. (See GA 22). In many instances, the parties agreed on which potential jurors should be excused for cause prior to voir dire. (See, e.g., 22, 25, 40, 90, 105-06, 114-15). The purpose of the telephone conferences was for the district court to resolve disputes between the parties concerning whether a potential juror should be excused before voir dire. (See GA 4-11; see generally GA 21-125). Notably, no potential jurors participated in the telephone conferences. (See GA 21-125). During the two conferences, several potential jurors were excused due to hardship. (See, e.g., GA 27-28, 39-40, 56-57, 90-91, 99-100, 114-15).[26] Pursuant to Greer and Williams, Tarantino did not

---

[26] Only one of the potential jurors excused due to a hardship, Juror No. 27, was excused based on a government challenge that was not joined by defense counsel. (See DE 479-1 (Tr. of 3/17/11 Hr'g), at 12-13). Juror No. 27 reported that s/he was a "graduating senior" who could not miss class and exams. (Id. at 13).

have the right to be present for discussions regarding excusing potential jurors based on hardship. 285 F.3d at 168; 972 F.2d at 96-97.

Tarantino's right to a "fair and just hearing" was not "thwarted by [his] absence" at the telephone conferences. Ferrarini, 219 F.3d at 152; see also Diaz v. Herbert, 317 F. Supp. 2d 462, 474-75 (S.D.N.Y. 2004) (quoting Snyder and concluding that defendant's presence at sidebar conferences where venire members were excused because of an expressed bias against defendant based on ties to law enforcement would have been "useless, or the benefit but a shadow"). Only two potential jurors were excused during the March 21, 2011 telephone conference for cause, based on a government challenge that Tarantino had opposed. (See GA 79-125).[27] All of the other potential jurors who were excused during the telephone conferences were let go on consent of both parties or based on defense challenges for cause that the government had opposed. (See GA 21-125). Those who were not excused were instructed to

---

[27] Juror No. 238 was excused due to a reported bias against law enforcement and cooperating witnesses as well as a financial hardship. (See GA 111-13). Juror No. 257 was excused due to a reported bias against cooperating witnesses and an inability to follow the court's instruction to avoid and ignore any statements made by the media about the case. (GA 118-20). No jurors were excused during the March 17, 2011 telephone conference based on a contested government challenge (aside from Juror No. 27 for hardship, as discussed above at n.26). (See GA 21-78).

report to the courthouse the following week for voir dire. (See GA 5-6). Tarantino was present for voir dire, which took place on March 22, 23 and 28, and he does not complain about any other aspect of the jury selection process. (See Br. 68-76). Given that no potential jurors participated in the two telephone conferences, that both of Tarantino's trial counsel participated in the telephone conferences, and that the parties were simply making arguments based on their earlier review of the questionnaires, Tarantino's presence at the telephone conferences did not have "a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Snyder, 291 U.S. at 105-06. Unlike the facts in Cohen, on which Tarantino strongly relies, no jurors participated in the proceedings from which Tarantino was absent, and Tarantino was present for the subsequent, lengthy voir dire of every juror who ultimately was seated on his jury.

B.    Tarantino Waived his Presence

Moreover, Tarantino's waiver of his appearance at the two telephone conferences can be inferred from his conduct and that of his attorneys and their failure to object to Tarantino's absence from the telephone conferences. On March 15, 2011, the district court held a Curcio hearing. (See GA 1-20). After argument on the Curcio issue, one of Tarantino's counsel requested permission to raise "some housekeeping" issues with

the district court. (GA 2). Counsel waived Tarantino's
appearance, and Tarantino left the courtroom with Curcio
counsel. (GA 2) Thereafter, the court and the parties
discussed the process for copying and reviewing the
questionnaires, which potential jurors were in the process of
filling out that very day (March 15, 2011). (GA 4-11). The
court advised the parties, "I need to know from you Thursday
[March 17, 2011] whatever the choices will be. We have to
resolve that." (GA 5). In response to a question from the
government, the court explained, "There's three piles. Pile
number one, don't want, can't have them, totally unable to
consent. Pile number 2, we agree those folks are good to go,
and then you sometimes have four or five that you can't agree
on. That's what you need me for." (GA 5). The court further
stated that it wanted to advise potential jurors by Friday,
March 18, if they needed to report to the courthouse on Monday,
March 21 for jury selection. (Id.).

After Tarantino re-entered the courtroom (GA 12) and
at the conclusion of the March 15, 2011 hearing, the following
exchange took place between the district court and defense
counsel pertaining to the jury questionnaires:

> THE COURT: I'll see you folks. I'll
> certainly hear from you, you'll be able to
> visit with Mr. Tarantino and go through the
> jury selection questionnaires.

> MR. FROCCARO [defense counsel]: I don't
> know if we'll have time to do that.
>
> THE COURT: So you're definitely going
> to do that beforehand and see what his
> desires would be in terms of the type of
> jury he'd like to be seated.
>
> MR. FROCCARO: Yes, your Honor.

(GA 19 (emphasis added)). In response to defense counsel's question regarding when the parties were due "physically back" in court, the district court responded, "[P]hysically back here with the defendant dressed for trial in civilian clothes . . . on March 22, next week." (GA 20).

At no point during the March 15 hearing or thereafter, including the March 17 and 21 telephone conferences, did Tarantino or his trial counsel complain about the jury selection process outlined by the court, request that Tarantino participate in any discussions with the court that would occur prior to March 22, 2011, or object to Tarantino's absence from the telephone conferences. Thus, it was not error for the district court to infer that Tarantino, through his actions (or lack thereof) and those of his counsel, had waived his presence at the telephone conferences. See Gagnon, 470 U.S. at 528 (holding that the "failure by a criminal defendant to invoke his right to be present under [Rule 43] at a conference which he knows is taking place . . . constitutes a valid waiver of that right"); cf. Tankleff, 135 F.3d at 247 ("The far more likely

explanation for his absence is that he and his lawyers did not think it was important for him to be present at this tedious, routine screening designed to eliminate jurors who had been prejudiced by pre-trial publicity. Under the circumstances, we think waiver may properly be inferred from the conduct of the defendant and his attorneys.").[28] The district court did not commit error, and certainly not a plain error. See United States v. Brown, 352 F.3d 654, 664-65 (2d Cir. 2003) (explaining that an error is "plain" if the mistake is apparent at the time of appellate review and "is so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object").

---

[28]     In fact, during voir dire, Tarantino did not object to being excluded from sidebar conferences, at which (1) the district court and counsel discussed matters privately with potential jurors, (2) counsel challenged potential jurors for cause, and (3) counsel exercised peremptory challenges. (GA 171-73 (court explains procedure, including sidebars and peremptory challenges), GA 175-76 (peremptory strikes at bench)). The fact that Tarantino did not object to his absence from sidebar discussions calls into question how genuine his instant claim is that he did not have "a meaningful opportunity to participate" (Br. 76) in jury selection due to his absence from the two telephone conferences and supports the government's argument that he waived his right to be present at the two telephone conferences. Also, Tarantino could have objected during voir dire to the earlier telephone conferences, but did not, further undermining his current claim. See United States v. Gallego, 191 F.3d 156, 172-73 n.9 (2d Cir. 1999), abrogated on other grounds by Crawford v. Washington, 541 U.S. 36 (2004). Such an objection would have given the district court an opportunity to address the claim and attempt to remedy it, if appropriate.

C.    Any Error Does Not Warrant Reversal

Moreover, even assuming, arguendo, that the district court committed an error that was plain, in holding the March 17 and 21, 2011 conferences without Tarantino, Tarantino cannot meet his burden of showing that the error affected his "substantial rights."  An error affects substantial rights if it was "prejudicial," meaning that it "affected the outcome of the district court proceedings."  Olano, 507 U.S. at 734.  Tarantino provides no evidence or examples of how his absence from the two telephone conferences affected the outcome of his trial.  (See Br. 68-76).

Of the more than fifty potential jurors excused as a result of the March 17, 2011 and March 21, 2011 telephone conferences, only two potential jurors were excused based on a government challenge for cause (other than hardship) that the defense opposed.  (See GA 21-125; see also, nn.26 & 27 above).  Aside from those two potential jurors, all of the potential jurors that the district court excused during the two telephone conferences were excused either on consent of both parties or based on a defense request.  Tarantino cannot establish that he was prejudiced by being absent from the two telephone conferences because (1) almost all of the potential jurors who were excused were defense challenges and (2) to the extent Tarantino lost any of his challenges for cause at the telephone

hearings, those potential jurors were instructed to report for voir dire, which Tarantino attended. Thus, Tarantino had an opportunity to observe and listen to all the jurors who ultimately were selected to sit on his jury. And, during voir dire, Tarantino had an opportunity to advise his counsel which jurors he wanted removed. Tarantino's absence at the two telephone conferences in no way affected the outcome of his trial.

Even if Tarantino could satisfy his burden of proving that the district court committed error, this Court has the discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation" of the trial. Olano, 507 U.S. at 736. The Supreme Court has stated that a court of appeals should exercise its discretion to correct an error "in those circumstances in which a miscarriage of justice would otherwise result." United States v. Young, 470 U.S. 1, 15 (1985). This Court should decline to exercise that discretion here. Tarantino participated in the voir dire of all jurors who ultimately were selected to serve on his jury and raises no objection to the voir dire that took place on March 22, 2011, March 23, 2011 and March 28, 2011. That the district court excused a number of potential jurors based on hardship and other for-cause challenges during two telephone conferences, prior to voir dire, based almost entirely on defense counsel's objections

to the potential jurors, does not result in a miscarriage of justice.

For all of these reasons, Tarantino's claim should be rejected and his convictions on Counts One and Two affirmed.

POINT FOUR

THE DISTRICT COURT DID NOT ERR IN
ADMITTING THE AUDIO RECORDING GARGIULO
MADE OF HIS CONVERSATION WITH TARANTINO

Tarantino argues that the district court erred in admitting -- at both of his trials -- the audio recording Gargiulo made of a conversation he had with Tarantino, claiming that it should be suppressed under Title 18, United States Code, Section 2511(2)(d) because he made the recording for the purpose of blackmailing Tarantino. (Br. 76-77). Tarantino's claim fails because Tarantino cannot meet his burden of proving that Gargiulo's primary motivation or a determinative factor in his motivation for making the recording was to blackmail Tarantino. Moreover, the district court did not abuse its discretion in denying Tarantino's request for an evidentiary hearing.

I.   The Legal Standard

This Court "review[s] a district court's ruling on a motion to suppress for clear error as to the facts and de novo on questions of law, and pay[s] special deference to the district court's factual determinations going to witness credibility." United States v. Jiau, 734 F.3d 147, 151 (2d Cir. 2013) (internal citations omitted), cert. denied, 135 S.Ct. 311 (2014) (holding that, because there was no indication that the recordings were made with an intent to harm the defendant, there was no Title III violation and recordings were not inadmissible

67

under 18 U.S.C. § 2511(2)(d)).  Where the issue presents mixed questions of fact and law, and the inquiry is "essentially factual," as is the case here, this Court applies a clearly erroneous standard.  See United States v. Vasquez, 389 F.3d 65, 75 (2d Cir. 2004).

Title III generally prohibits the interception or wiretapping of electronic communications not authorized by a court of law or permitted by one of the statute's exceptions. 18 U.S.C. § 2511.  One of the statutory exceptions permits a party to the communication, who is not acting under the color of law, to make the recording himself or to consent to the recording.  18 U.S.C. § 2511(2)(d).  This exception does not apply, however, if the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."  Id.  As this Court stated in Jiau, "[t]he carve-out within § 2511(2)(d), which renders inadmissible consented recordings made for the purpose of perpetrating 'criminal' or 'tortious' acts, is to be construed narrowly.  It is confined to instances where the recording party intends to use the recording to harm or injure a recorded party, such as to blackmail, threaten, or publicly embarrass the recorded party."  734 F.3d at 152.

The intent of the recording party at the time he made the recording is critical. See id.; Caro v. Weintraub, 618 F.3d 94, 100 (2d Cir. 2010); see also In re High Fructose Corn Syrup Antitrust Litig., 216 F.3d 621, 623 (7th Cir. 2000).  A Title III violation exists "if, at the time of the recording, the [recording party] plans to use the recording to harm the other party to the conversation." Caro, 618 F.3d at 100.  However, "[i]f, at the moment he hits 'record,' the offender does not intend to use the recording for criminal or tortious purposes [against the other party], there is no violation." Id.; see also United States v. Underhill, 813 F.2d 105, 110 (6th Cir. 1987) ("the legality of an interception is determined by the purpose for which the interception is made, not by the subject of the communications intercepted").

Tarantino bears the burden of proving, by a preponderance of the evidence, that Gargiulo's "primary motivation" for intercepting the conversation or that a "determinative factor" in his motivation was to commit a criminal or tortious act. United States v. Dale, 991 F.2d 819, 841 (D.C. Cir. 1993) (defendants failed to meet their burden to prove that the recording parties made the tapes for criminal or tortious purposes; "[t]aping phone calls to make an accurate record of a conversation 'in order to prevent future distortions by a participant' is not illegal" (quoting Underhill, 813 F.2d

at 110)); United States v. Cassiere, 4 F.3d 1006, 1021 (1st Cir. 1993) (applying same standard); In re DoubleClick, Inc. Privacy Litig., 154 F. Supp. 2d 497, 514-15 (S.D.N.Y. 2001) (same); see also United States v. McTiernan, 695 F.3d 882, 888 (9th Cir. 2012) (joining other Circuits and holding that the defendant bears the burden to prove by a preponderance of the evidence that the recording at issue was made for a criminal or tortious purpose), cert. denied, 133 S. Ct. 964 (2013). Tarantino concedes that he bears this burden. (Br. 78).

This Court reviews the denial of a motion for an evidentiary hearing for abuse of discretion. United States v. Getto, 729 F.3d 221, 227 n.6 (2d Cir. 2013). "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." Id.

II.  The Factual Background

The district court denied Tarantino's pretrial motion to suppress the Gargiulo recording, in which Tarantino argued that the recording was made in violation of Title III. (A 96-112). In his motion, Tarantino did not request an evidentiary hearing. (DE 75 at 1-17). The court found that Tarantino had not met his burden of proving that Gargiulo possessed "the

70

requisite contemporary intent to commit a crime or tort through the use of the interception." (A 103). The court noted that Gargiulo's statement to FBI agents, in May 2003, that the recording was his "insurance" against Tarantino "is somewhat equivocal." (A 101). Gargiulo may have wanted the recording for "personal protection" against Tarantino, who Gargiulo knew was violent (A 101-02), or he might have been referring to "financial insurance" through blackmail, which would be illegal, or by selling the recording to law enforcement officers, which would not be illegal. (A 102). The court concluded that the three-year lapse between the making of the recording and Gargiulo's attempts to obtain money for it "render[ed] [the attempts] less probative of Gargiulo's specific intent at the time of creation." (A 102-03). The court also noted that, even if Gargiulo made the recording "as a type of insurance against a rainy day, by definition he did not have a contemporary intention to commit a crime or tort." (A 103).

After Robert Gerrato testified at the first trial, Tarantino renewed his motion to suppress the Gargiulo recording, arguing that Gerrato's testimony proved that Gargiulo had made the recording with the intent to extort Tarantino. (GA 196). The government countered, in sum, that Gerrato's testimony offered no new evidence regarding Gargiulo's intent at the time he made the recording in September 2000 and that the recording

itself makes clear that Gargiulo made the recording to obtain evidence to exculpate him from any involvement in the armored car robbery/murder. (GA 197-98, 206). During the argument that followed, the court asked Tarantino to provide the court with witness's names and "specific" evidence they would offer if the district court were to hold an evidentiary hearing regarding Gargiulo's intent at the time he made the recording. (See GA 200-03, 207-09). Tarantino identified the following individuals as those he would question at a hearing: Gerrato (who also testified at a pre-trial <u>Mastrangelo</u> hearing),[29] Larry Kyatt, Suzette Snider and Jordan Gitterman. (GA 201, 204). Based on Tarantino's arguments and vague factual allegations at oral argument, the court found that Tarantino was not entitled to a hearing. (GA 207). However, the court made clear that it would reconsider if Tarantino could provide the court with evidence that witnesses could provide "specific" information "to lead [it] to believe that the person ha[d] knowledge" of Gargiulo's motivation at the time he made the recording. (GA 202, 207). Tarantino responded that he would provide the court with witness names and "specific" information by the close of business.

---

[29] Tarantino conceded that he did not question Gerrato at the pretrial <u>Mastrangelo</u> hearing regarding when Gerrato first became aware of the Gargiulo recording and what, if anything, Gargiulo told Gerrato about why Gargiulo made the recording. (T 1611).

(GA 208). Two days later, the court denied Tarantino's renewed motion to suppress the recording and his request for an evidentiary hearing. (See DE dated 4/8/11 (no docket number)). The docket entry noted, "The Defendant has not indicated, using 3500 material, witness affidavits, or otherwise, that a hearing on this issue is warranted." (Id.).

　　　　The district court issued a written decision on April 19, 2011. The court concluded that Tarantino had failed to meet his burden of proving, by a preponderance of the evidence, that Gargiulo's primary motivation or a "determinative factor" in his motivation for recording the conversation was to blackmail Tarantino. (A 116, 121). As the court noted, it was undisputed that "Gargiulo eventually tried to blackmail Tarantino" but that "it is not at all clear that blackmail was Gargiulo's primary goal at the time the [recording] was made." (A 116-17 (emphasis added)). The court concluded that Gargiulo's motive for making the tape was "mixed, at best." (A 117). The court based its conclusion on three main factors: (1) the significant lapse of time between Gargiulo's making of the recording in September 2000 and his attempts to blackmail Tarantino in the spring or summer of 2003; (2) that the failure of Gargiulo's gym occurred in 2001 or 2002; and (3) Gargiulo's statement to the Federal Bureau of Investigation ("FBI") case agent that the tape was "insurance against" Tarantino was subject to more than one

interpretation, including that the tape was a means by which Gargiulo could exonerate himself should Tarantino or Mulligan claim that he had participated in the murders of Baumgardt or Dorval. (A 117-19).

The district court denied Tarantino's renwed request for a hearing, which Tarantino claimed would allow him to probe what Gargiulo may have told certain witnesses about what his motivation was to record Tarantino. (A 119). The court noted that, although it had invited Tarantino to submit evidence suggesting that Gerrato, Kyatt, Snider, Gitterman or anyone else might have knowledge of Gargiulo's intent in making the tape, Tarantino did not submit any evidence. (A 119). Based on the court's review of the 3500 material the government had provided for Gerrato, Kyatt, Snider and Gitterman, it concluded that there was no basis to believe that any of those witnesses had information helpful to Tarantino's argument. (A 120).[30] In fact, as the court found, Gitterman's testimony before the grand jury undermined Tarantino's theory that Gargiulo had created the tape with the intent to blackmail Tarantino. (A 120 (emphasis added)). As the court explained:

> Although [Gitterman] initially testified to
> the grand jury that he did not remember

---

[30] Although the government provided 3500 material for the four witnesses identified by Tarantino, only Gerrato testified at trial.

whether Gargiulo ever explained why he made the Tape, he later testified (during the same session) that Gargiulo said that <u>he made the Tape in case Tarantino and Scott Mulligan tried to "flip" the blame for the armored car robbery onto Gargiulo</u>.

(A 120 (emphasis added)).

Days before the retrial, Tarantino again moved to suppress the Gargiulo recording. (DE 356, 4/19/12 Mot. to Suppress). Tarantino argued that "court documents reveal that Gargiulo had a financial motive to extort Tarantino <u>one month before the taping</u>." (<u>Id.</u> at 1). The district court denied the motion, finding that Tarantino had not satisfied his burden of proving, by a preponderance of the evidence, that Gargiulo had made the recording for a tortious purpose -- that is, to blackmail Tarantino -- at the time Gargiulo recorded the conversation. (GA 227). The court also found that a hearing was not warranted. (GA 228).

III. <u>The Gargiulo Recording Was Properly Admitted</u>

The district court correctly denied Tarantino's motions to suppress, finding that Tarantino had failed to meet his burden of proving, by a preponderance of the evidence, that Gargiulo's primary motivation or a "determinative factor" in his motivation for recording his conversation with Tarantino in September 2000 was to blackmail Tarantino. Because the timing of the relevant events is critical to a determination of

Gargiulo's motive in making the recording, we set forth these events in some detail below.

As the district court found, there was a significant lapse between Gargiulo's making the recording and his attempts to blackmail Tarantino (see A 117), from which it can be concluded that he acted without a criminal purpose. Tarantino concedes that Gargiulo made the recording in approximately September 2000 (Br. 76), a concession supported by several statements made on the recording, including Tarantino's statement that it had been about two months since the FBI had collected his DNA samples. (GA 217, 221, 258 ("Two months and change.")). Law enforcement officers collected the samples -- as well as those of others in connection with the investigation into the Baumgardt and Dorval murders -- in and around July 2000 (GA 211, 216-20, 250-51). However, as shown below, Gargiulo did not demand money from Tarantino or Mulligan in exchange for his agreement to refrain from providing the recording to authorities until January 2003, more than two years after he had made the recording.

The record established that the earliest attempts by Gargiulo to blackmail Tarantino and Mulligan with threats of providing the recording to law enforcement officers took place in January 2003, when Gargiulo sent Mulligan and Tarantino demand letters. (T2 1323-27). Tarantino points to no evidence

showing that Gargiulo attempted to blackmail Tarantino or Mulligan any earlier than that. The more than two-year lapse between Gargiulo's making the recording, in September 2000, and his earliest attempts to blackmail Tarantino and Mulligan, in January 2003, undercuts Tarantino's argument that Gargiulo's primary motive, or a determinative factor in his motivation, for making the recording was to blackmail Tarantino. If blackmail had been Gargiulo's primary motivation (or a determinative factor) for making the recording and, even assuming Gargiulo was having financial difficulties before he made the recording of Tarantino, as Tarantino claims, then Gargiulo would have begun to blackmail Tarantino shortly after making the recording, not 28 months later.[31]

The district court's finding that it is "likely" that Gargiulo decided to extort Tarantino only after the failure of the 79th Street Body Sculpt gym in late 2001/early 2002 (see A 118) is well supported by the evidence. The court's findings were based in large part on Gerrato's testimony at the pretrial Mastrangelo hearing and at the first trial. (See A 118).

---

[31]  This also demonstrates that the district court did not abuse its discretion in denying Tarantino's request for an evidentiary hearing on the eve of the retrial. (See DE 356). Even accepting as true Tarantino's argument that Gargiulo was having financial difficulties prior to making the recording, this did not change the fact that Gargiulo waited 28 months after making the recording before attempting to blackmail Tarantino and Mulligan.

Mulligan's testimony at the second trial shed light on the dispute over the 79th Street Body Sculpt gym, supporting the district court's findings. He testified that he and Tarantino helped Gargiulo with two business ventures that failed but that it was the failure of the Body Sculpt gym on 79th Street in Manhattan in late 2001/early 2002 that resulted in the permanent dissolution of their friendship and the animus between the former friends. (See generally T2 1542-72).

Disagreements had arisen regarding the management of a predecessor gym after which Tarantino and Mulligan "broke off [their] partnership with [Gargiulo] and . . . moved on" although Tarantino and Mulligan's departure was amicable and they remained friends with Gargiulo. (T2 1545-46). (The gym eventually went out of business.) (T2 1547).

Mulligan testified that, in late 1999, Gargiulo asked Tarantino, Mulligan and Eric Holzer to assist him in establishing another gym in Manhattan (the 79th Street Body Sculpt gym), and the four formed a partnership. (T2 1550-52, 1555-56). Tarantino, Mulligan and Holzer together invested $50,000. (T2 1561). Because Gargiulo did not have good credit, Mulligan signed the guarantee on the lease for the building, and Tarantino signed the guarantee for a credit card machine to be used at the gym. (T2 1552, 1556-57). The lease for the building was dated January 4, 2000. (T2 1555). After

approximately four months, disagreements arose regarding the operation of the gym and Tarantino and Mulligan "walked away from it" (T2 1559-60); however, they did not remove their names from the guarantees or demand a return of funds from Gargiulo and the three remained friends.  (T2 1560-62).

More than a year later, Gargiulo called Mulligan because he was in the hospital for drug rehabilitation and needed help to save the gym, which was in debt; Mulligan and Tarantino agreed to take over operation of the gym in exchange for a percentage of the profits.  (T2 1562-64).  With a new manager, Tarantino and Mulligan were able to pay down many of the debts, but when Gargiulo returned to the gym in approximately November 2001, he was upset that Tarantino and Mulligan had used money from the gym to pay down the bills rather than paying the bills out of their own pockets.  (T2 1565-67, 1569).  This resulted in arguments leading to Tarantino and Mulligan's pulling out.  (T2 1567-69).

Thereupon, in approximately December 2001 or January 2002, Gargiulo surreptitiously removed the equipment from the gym in the middle of the night so that he could sell it and withdrew the funds in the gym's checking accounts.  (T2 1567-70).  Gym members demanded their money back from the credit card companies, who attempted to withdraw money from Body Sculpt's bank account, but the account was empty.  This led to an adverse

effect on Tarantino's credit, as he was the guarantor on the credit card machine, and the companies' withdrawal of funds from other companies owned by Tarantino and Mulligan and their entering into a payment plan with their creditors. (T2 1507-71). Tarantino and Mulligan ceased all contact with Gargiulo and no longer considered him a friend. (T2 1572).

As this chronology demonstrates, the rift between Tarantino and Mulligan, on one side, and Gargiulo, on the other, occurred in late 2001 into early 2002 and arose from the operation of the 79th Street Body Sculpt gym. While Tarantino and Mulligan had disagreed with Gargiulo's management style in the past, the men had always remained friends and parted ways amicably. However, after this dispute -- in late 2001 and early 2002 -- the relationship soured. The timing of this dispute and the ensuing bitterness between the men further shows that Gargiulo's intent to blackmail Tarantino and Mulligan arose after this dispute and did not exist when he made the recording in September 2000.[32]

---

[32] The recording itself provides powerful evidence that Tarantino and Gargiulo were close friends at the time of the recording, in September 2000. During the more than 90-minute conversation (see T 1679), Tarantino and Gargiulo can be heard laughing together. (GA 267, 275, 278, 280, 282, 285). It is clear that Tarantino wholeheartedly trusted Gargiulo, with whom he spoke openly about his role in the armored car robbery/murder, Dorval's murder and other crimes. (See generally GA 256-87). At times, Gargiulo greets and speaks to

At Tarantino's second trial, Mulligan testified that approximately one month before he reported to federal prison (on January 3, 2003),[33] he received a voicemail message at his home in which the caller was "raging" and "cursing" and warned Mulligan to stop talking about him. The individual said, "[W]hen you see what I have on you, you will be sorry." (T2 1575). Mulligan was not certain who had left the message; however, after Tarantino listened to the voicemail message with Mulligan, Tarantino confirmed that it was Gargiulo. (T2 1580-81). Mulligan testified that he (Mulligan) had been speaking ill of Gargiulo to others because he was angry at Gargiulo after their falling out over the 79th Street Body Sculpt gym (see above). (T2 1580). Manon corroborated her husband's testimony and said that Tarantino as well had heard the message. (T2 1315-27).

---

Tarantino's wife "Jenn" on the recording and even discusses with Tarantino the fact that Jenn is pregnant. (GA 258, 266).

[33] Because Mulligan was arrested for Baumgardt's murder in December 2011, after the first trial, the district court did not have available his or Manon's testimony when it ruled on the motion. However, their testimony supports the court's finding of a significant lapse of time between Gargiulo's making of the recording and his attempts to blackmail Tarantino and Mulligan. The fact that the Mulligans' testimony moves the timing of Gargiulo's blackmail attempts up by approximately four months (so that the time lapse was closer to 28 months than 32 months) does not materially alter the court's findings or analysis.

When Manon returned home from a trip abroad on January 22, 2003, she found an anonymous letter addressed to her husband, who was in prison. (T2 1317, 1323-24). She believed the author to be Gargiulo because of the voicemail message. (T2 1326). The letter demanded that Mulligan pay $500,000 by a specified date in January, which date had just passed, or else Gargiulo would turn over a "tape" that contained evidence of criminal activity to the FBI. (T2 1325-26). One or two days later, Tarantino came over to the Mulligans' home to speak to Manon. (T2 1327). Tarantino told her that he, too, had received a letter from Gargiulo that was nearly identical to the one addressed to Mulligan. (T2 1329-30). Tarantino instructed Manon not to tell her husband about the letter and said that he would "take care of it." (T2 1329-30, 1338-39). Manon abided by Tarantino's request. (T2 1338.) Shortly after Gargiulo's murder, Tarantino instructed Manon to tell her husband "to stop asking questions about Vinnie." (T2 1347, 1605). Mulligan testified that Tarantino told him about Gargiulo's January 2003 letter in August 2004, after Gargiulo's murder and after Mulligan was released from prison. (T2 1610). Tarantino also told Mulligan not to discuss the letter with Mulligan's wife and warned, "Leave it be. It is done. It is over with." (Id.).

Gerrato, who considered himself Gargiulo's best friend (T 1505), testified that Gargiulo first told him he had a tape

recording of Tarantino no later than 2000 and that the recording had incriminating evidence against Tarantino.[34] (T 1511; 2/22/11 Hr'g. T 1018; T2 360-61.) In the summer of 2003, Gargiulo told Gerrato that he planned to blackmail Tarantino and that he and his friend "Larry" (Kyatt) had written a letter to Manon in which he stated that he was going to blackmail Tarantino and that he wanted "a half million dollars." (T 1513-14). Gargiulo further told Gerrato that he told Tarantino about the existence of the tape recording and that it contained statements regarding a "car heist where somebody was murdered." (T 1514-15). Gargiulo further told Gerrato that if he were not given a half million dollars, he would reach out to the FBI. (T 1514).[35] Gerrato responded that Gargiulo would be "crazy" to do so. (T 1515).[36]

---

[34] Gerrato testified at a pretrial <u>Mastrangelo</u> hearing on February 22, 2011 as well as at both trials. (2/22/11 Hr'g. T 1012-51; T 1505-44; T2 367-451).

[35] Gerrato testified that Tarantino complained to him of Gargiulo's odd behavior in approximately December 2002. (T 1512, 1533; T2 363 ("Approximately Christmastime, 2002"). Tarantino asked Gerrato about Gargiulo's unusual behavior. (T 1512). Tarantino further told Gerrato that Gargiulo was "trying to dry rat him" (<u>id.</u>), which Gerrato understood to mean that "[Gargiulo] was trying to get Chris to say things, conversation where other people are listening" (<u>id.</u>). Approximately one year earlier, during Christmastime 2001, Gargiulo was in a psychiatric facility in Manhattan. (T2 365-66).

[36] While Tarantino references one Nicholas Pisciotti in his brief and in an earlier motion for suppression (<u>see</u> Br. 82;

Moreover, the evidence suggests that Gargiulo may have made the recording to insure against later allegations by Tarantino or Mulligan that he had been involved in the armored car robbery/murder. The district court found that this motive "is at least as likely as a contemporaneous intent to commit blackmail." (A 118).[37]

---

DE 356 at 5), Pisciotti's information to law enforcement officers further shows that Gargiulo did not attempt to blackmail Tarantino until after their falling out over the 79th Street Body Sculpt gym in late 2001/early 2002. Pisciotti, a cooperating defendant who was also a business partner of Tarantino's in the gym business, told FBI agents that, approximately one month before Gargiulo was murdered, Tarantino asked Pisciotti for advice. (See 3500-RS-30 at 49, 51 (grand jury testimony of SA Schelhorn)). Pisciotti reported that Tarantino told him that, after Gargiulo's gym on 79th Street failed, Gargiulo threatened to inform the police about the murder of a security guard if Tarantino did not pay Gargiulo a large sum of money. (Id. at 51). Pisciotti told Tarantino to "leave Gargiulo alone since Gargiulo had an alcohol problem" and that Tarantino might have to pay Gargiulo. (Id.). Thus, Pisciotti in no way helps Tarantino's position; rather, his information places Gargiulo's blackmail attempts close in time to his murder.

[37]    The district court reasonably noted that "Gargiulo's statement to the FBI that the tape was 'insurance against' Tarantino is susceptible to more than one meaning," including that Gargiulo created the tape to "guarantee his physical safety," to "protect himself" from Tarantino's falsely implicating him in crimes discussed on the recording, or to "hedge against" Tarantino's accusing Gargiulo of unrelated crimes not discussed on the recording, in the event that Tarantino was considering cooperating with the authorities. (A 118-19; see also A 101-02 (noting that Gargiulo also could have been referring to future "financial insurance" -- either by blackmailing Tarantino, which would be illegal, or selling the tape to the authorities, which would not be illegal).

Gitterman's testimony before the grand jury provided the clearest evidence of Gargiulo's intent in making the recording. One day in 2000, Gargiulo unexpectedly appeared at the door of Gitterman, a friend of Gargiulo's who lived in the same apartment building as Tarantino, stated that he had just tape-recorded Tarantino, and displayed what looked like a tape to Gitterman. Gargiulo told Gitterman that the tape contained Tarantino's admissions regarding an armored car robbery involving a killing and that he had made the recording in case Tarantino and Mulligan tried to "flip" the blame for the armored car robbery onto Gargiulo. As the district court pointed out, Gitterman's testimony before the grand jury undermined Tarantino's theory that Gargiulo had created the tape with the intent to blackmail Tarantino. (A 120). Recording a conversation to obtain evidence of one's innocence for future use is not a violation of Title III. Cf. Dale 991 F.2d at 841 (holding that taping phone calls to make an accurate record of a conversation in order to prevent future distortions by a participant is not illegal); Cassiere, 4 F.3d at 1021-22 (affirming district court's finding that party made tape recording for the lawful purpose of preventing future distortions by a co-conspirator); Underhill, 813 F.2d at 110 ("Generally, when the purpose of an interception is to make or preserve an accurate record of a conversation in order to

prevent future distortions by a participant, the interception is legal."); Moore v. Telfon Commications Corp., 589 F.2d 959, 966 (9th Cir. 1978) (holding that in enacting § 2511, "Congress . . . intended to permit one party to record [a] conversation with another when the recorder is acting 'out of a legitimate desire to protect himself.'").

Gitterman's testimony that Gargiulo stated that he had made the recording in the event that Tarantino or Mulligan tried to implicate him in the armored car robbery/murder is supported by events occurring shortly before Gargiulo made the recording in September 2000, as well as Gargiulo's statements on the recording. In June and July 2000, local and federal law enforcement officers served grand jury subpoenas on various individuals, including Tarantino and Mulligan, for DNA samples. (See GA 211, 219-21, 256, 260-61, 279; see p. 75 above). During the recorded conversation, Gargiulo indicated that he also drove the car that Tarantino and his associates had used during the armored car robbery, which was stolen and which Tarantino had used "all winter." (T 1389-90; GX STP-2 (stipulation that a red 1994 Chevrolet S-10 Blazer was reported stolen on January 28, 1994 from Robert's Chevrolet in Hicksville, New York); GA 257). After Tarantino stated, "The car we drove up there with Louie," Gargiulo replied, "Yeah, I know. I know. I had the car." (GA 257). The fact that Gargiulo had used the car and that law

enforcement officers were taking DNA samples from "dozens of witnesses," presumably to match DNA found in the car, could explain Gargiulo's concern with being implicated in the armored car robbery/murder. (GA 260).[38] Moreover, Gargiulo seemed concerned that, after Mulligan provided his DNA samples to the authorities, he went "on the lam." (GA 273-74, 279). In Gargiulo's opinion, Mulligan's flight would only arouse further suspicion. He told Tarantino, "But you know what the bad thing is SCOTT going on the run. He makes you guys look so bad though . . . ." and "[N]ow they see what SCOTT did, they must feel pretty confident they are on the right track." (GA 273, 275).

Even more telling is Gargiulo's statement on the recording that he had nothing to do with the armored car robbery. During their conversation about the investigation into the armored car robbery/murder, Gargiulo stated, "I don't mean to sound fucked up, but I'm so glad I'm not involved in this one." (GA 268). Gargiulo further disassociated himself from the armored car robbery in making the following statements: "They know he's [Scott Mulligan] running scared. What do you think – now this is between me and you. What do you think? You don't think he's going to tell on you?" (GA 274) and "All you

---

[38] Mulligan testified that Tarantino had solicited Gargiulo to take part in the armored car robbery (T2 1498-99), a fact that might have heightened Gargiulo's concern with being falsely linked to the crime.

have to worry about is you and S[cott]" (GA 278). Given that
(1) Gargiulo had committed crimes with Tarantino in the past
(see GA 183-95), (2) Gargiulo had used the car that Tarantino
and his associates used during the robbery, (3) law enforcement
officers were collecting DNA from various individuals, and
(4) Gargiulo appeared to be concerned about whether Mulligan
would cooperate with law enforcement officers, it was certainly
reasonable for the district court to find that it "is at least
as likely" that Gargiulo's motive was to protect himself from a
false accusation by Tarantino and Mulligan as a blackmail
motive. (A 118).

    The district court's findings of fact thus were not
clearly erroneous.  Moreover, the conclusion that Tarantino did
not meet his burden of proving, by a preponderance of the
evidence, that Gargiulo's "primary motivation" or a
"determinative factor" in Gargiulo's motivation for recording
the conversation was to blackmail Tarantino was, likewise, not
clearly erroneous.  Cf. Dale, 991 F.2d at 841 ("[S]imply because
the factual record could reasonably lead a factfinder to
conclude that [those making the recording] did have an illegal
or tortious purpose in taping does not mean that the district
court's contrary, and at least equally permissible, view of the
facts is clearly erroneous.") (citing Anderson v. Bessemer City,

470 US 564, 574 (1985)).[39]  Even if this Court reviews the district court's decision de novo, the evidence weighs strongly in favor of affirming the district court's decision denying Tarantino's suppression motion.  Furthermore, the district court did not abuse its discretion in denying Tarantino's request for a hearing, as Tarantino failed to provide the district court -- despite the district court's requests -- with specific and non-speculative information from which the district court could determine that contested issues of fact were in question.

For all of these reasons, the district court's orders denying Tarantino's motions to suppress should be affirmed.

---

[39]  To the extent Tarantino is arguing that the district court erred in holding him to the higher "primary motivation" standard and failing to consider whether blackmail was a "determinative factor" in Gargiulo's motivation (see Br. 80), Tarantino would be wrong.  The district court cited In re DoubleClick and recognized that Tarantino was required to prove "either (1) that the primary motivation, or (2) that a determinative factor in [Gargiulo's] motivation for intercepting the conversation was to commit a criminal [or] tortious act." (A 116); see also Dale, 991 F.2d at 842.  The district court found that Tarantino failed to prove either by a preponderance of the evidence.

<u>POINT FIVE</u>

<u>TARANTINO'S CLAIM THAT ONE OF HIS TRIAL
COUNSEL AT THE FIRST TRIAL LABORED UNDER AN ACTUAL
CONFLICT OF INTEREST IS UNSUPPORTED BY THE RECORD</u>

Tarantino argues that he is entitled to a new trial on Counts One and Two because one of his trial counsel, James R. Froccaro, Esq., rendered ineffective assistance of counsel. (Br. 83-90).[40] Tarantino contends, without support in the record, that Mr. Froccaro labored under an actual conflict because he represented Scott Mulligan, who became a cooperating witness against Tarantino in December 2011, while he was also representing Tarantino in the instant case and accepted a $150,000 payment from Mulligan to represent Tarantino. (Br. 85-86). Tarantino further claims the district court erred by failing to hold an evidentiary hearing during the retrial or prior to sentencing. (Br. 88). Because Tarantino's factual allegations are unsupported by the record, his claim should be denied. Furthermore, the district court did not abuse its discretion by denying Tarantino's request for an evidentiary hearing.

---

[40] Tarantino incorrectly refers to Mr. Froccaro as Peter Froccaro. (Br. 83). In addition to Froccaro, Tarantino was represented by Michael Rosen, Esq. at his first trial, and his pretrial defense team also consisted of John Wallenstein, Esq., David A. Ruhnke, Esq., and Diarmuid White, Esq. (A 1-2). (Ruhnke and Wallenstein were death penalty counsel; their representation ended on July 30, 2010.)

I.   The Factual Background

Tarantino was arrested in the instant case on September 24, 2008. (A 4). Mr. Froccaro represented Tarantino at his arraignment and remained his attorney until August 17, 2011, three months after the conclusion of the first trial. (A 2, 4 (DE 8), 23 (DE 270)). On August 17, 2011, Froccaro and co-counsel Michael Rosen, Esq. were relieved as counsel and replaced by Tarantino's newly retained counsel, Stephen H. Rosen, Esq., and Frank A. Doddato, Esq. (A 23 (DE 270, 277, 273, 275, 276)).

Prior to his representation of Tarantino, Mr. Froccaro had represented Mulligan in two cases in the Eastern District of New York, between May 22, 2001 and November 2002. See United States v. Aparo, et al., 01 CR 416 (ILG); United States v. Albin, et al., 02 CR 139 (ILG).[41] In those cases, which are unrelated to the instant case, Mulligan was charged with conspiring to distribute marijuana.[42] (See id.; see also T2 1572). Mulligan began serving his sentence in January 2003 and was released in August 2004. (T2 1573-74, 1606-07). Mulligan

---

[41] Mulligan pleaded guilty in the 2002 case; the charges in the 2001 case were dismissed. See 02 CR 139 (ILG) at DE 25; 01 CR 416 (ILG) at 11/08/02.

[42] The Assistant U.S. Attorneys handling Mulligan's 2001 and 2002 prosecutions were not involved in Tarantino's instant prosecution. (See Docket Sheets in 01 CR 416 (ILG), 02 CR 139 (ILG)).

was charged in connection with the Baumgardt murder in December 2011. (T2 1613). He retained counsel in Florida, where he was arrested. (T2 1638).

In advance of the retrial on the Gargiulo charges, the government filed a motion requesting that, pursuant to Federal Rule of Evidence 1004, Manon Mulligan be permitted to testify about the contents of an anonymous and threatening letter she received in January 2003, which was addressed to her husband (who earlier that month began serving his sentence on the marijuana conspiracy case), demanded $500,000 and threatened that a tape would be turned over to the FBI if the demand was not met. (A 29 (DE No. 357 at 4-10)). The government alerted the district court that it expected Manon would testify that she discussed the letter with Tarantino, who confirmed it was written by Gargiulo and stated that he had received an almost identical letter. (DE No. 357 at 3-4). The government further advised the court that it expected Manon to testify that, immediately after she read the letter, she called Keith Pellegrino, a mutual friend of Mulligan and Tarantino. (Id. at 3). Pellegrino came to Manon's home, retrieved the letter, and told Manon he intended to deliver the letter to Mr. Froccaro. (Id. at 3 & n.1). The government further reported to the court that Mulligan had executed a waiver of his attorney-client privilege, permitting Mr. Froccaro to respond to the

government's request, by means of a trial subpoena, for production of the Gargiulo letter. (Id. at 3 n.1). However, Froccaro advised the government that he had never received such a letter. (Id.). Thus, the government sought to introduce Manon's testimony regarding the contents of the letter as "secondary evidence." (Id. at 1).

On the first day of the retrial, Tarantino's counsel claimed they had just become aware of a potential conflict of interest involving Mr. Froccaro's representation of Tarantino in the instant case. (T2 7 ("Because when [Mr. Froccaro] was representing Mr. Tarantino last year during the trial, and all through 2008, and if he was also jointly representing Mr. Mulligan -- and I think we can prove that if Mr. Froccaro is brought in, we have a very difficult conflict that we may have to go over.") (emphasis added)). Tarantino's counsel conceded, "I don't know how far out that conflict goes. . . . So it predates his representation of about three years of Mr. Tarantino." (Id.). Tarantino's counsel suggested that the court "may need testimony" from Mr. Froccaro and Mr. Pellegrino[43] to resolve the government's motion for admission of the January 2003 letter received by Manon. (Id. at 7, 10 ("If [Pellegrino]

---

[43] The government advised the district court that Mr. Pellegrino intended to assert his Fifth Amendment right if called to testify at trial. (T2 9).

testifies he gave [the letter] to Mr. Froccaro, we have to bring in Mr. Froccaro. If he testifies he never got a letter from Manon Mulligan, that would obviously be Brady material, and to indicate that she has lied and she is acting in bad faith. . . . It gets into the heart of the question of admissibility and whether or not there is bad faith.")). In response to the district court's inquiry, the government acknowledged that it was aware of Mr. Froccaro's prior representation of Mulligan (id. at 12 ("We knew that all along.")) and that this issue was not raised during the March 15, 2011 Curcio hearing (id.).

A few days later, the court addressed the pending issue concerning the admissibility of the January 2003 letter and suggested that Manon testify outside the jury's presence. (T2 915). Tarantino's counsel argued that Mr. Froccaro and Mr. Pellegrino "may be essential witnesses" as "[t]hey have material and relevant information concerning that letter . . . ." (GA 230). Tarantino's counsel added that "[t]his also brings up issues from the first trial concerning conflicts of interest between Mr. Froccaro and Scott Mulligan. . . . There are also issues that may come up in regards to fees and other things which would cause us to necessitate to bring Mr. Froccaro forward and find out what this is all about." (GA 234). The court noted that it currently was presiding over Tarantino's retrial on the Gargiulo charges, and Tarantino could raise the

conflict of interest issue concerning Mr. Froccaro and the first trial on appeal. (GA 235; see also GA 242-46 (district court reiterated that there was no reason to elicit from Manon that Pellegrino told her he would give the letter to Froccaro; to the extent there was an issue regarding Froccaro's prior representation of Mulligan, Tarantino could pursue that claim on appeal)).

After his conviction on Count Three, for conspiring to murder Gargiulo to obstruct justice, Tarantino moved for a new trial on Counts One and Two based on Mr. Froccaro's alleged conflict of interest during the first trial. (DE 388 at 7-12). In the alternative, Tarantino requested an evidentiary hearing to explore Froccaro's conflict during the first trial. (Id. at 12). The district court considered whether Tarantino had shown "excusable neglect" pursuant to Fed. R. Crim. P. 45(b)(1)(B), but concluded that he failed to do so, as Tarantino "had new counsel for over a year at the time he filed the current motion." (GA 157). The district court reiterated its view that "the proper avenue to pursue this argument is on appeal, not through a time-barred motion for a new trial." (Id.).

## II. Discussion

### A. The Legal Standard

A defendant's Sixth Amendment right to counsel "is the right to the effective assistance of counsel," McMann v.

Richardson, 397 U.S. 759, 771 n.14 (1970), and includes "a correlative right to representation that is free from conflicts of interest," Wood v. Georgia, 450 U.S. 261, 271 (1981). In order to have a conviction reversed for ineffective assistance of counsel, the defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that the poor performance prejudiced the outcome of the proceeding. See Strickland v. Washington, 466 U.S. 668, 68-88 (1984). A court considering an ineffectiveness claim generally should "offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs." Sparman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998).

An actual conflict occurs when the interests of counsel and the defendant "diverge with respect to a material factual or legal issue or to a course of action." Cuyler v. Sullivan, 446 U.S. 335, 356 n.3 (1980). Prejudice to the defendant flowing from this actual conflict is presumed, see id. at 349-50, but the presumption is subject to rebuttal, see United States v. Luciano, 158 F.3d 655, 661 (2d Cir. 1998). Where a defendant is represented by lawyers paid for by an alleged co-conspirator, these "benefactor payments" raise concerns regarding the attorneys' loyalties. In re Grand Jury Subpoena Served upon Doe, 781 F.2d 238, 248 n.6 (2d Cir. 1986)

(en banc). Where no actual conflict is present, there may still be a potential conflict of interest "if the interests of the defendant may place the attorney under inconsistent duties at some time in the future." United States v. Kliti, 156 F.3d 150, 153 n.3 (2d Cir. 1998). To prove that a potential conflict violated Sixth Amendment rights, the defendant must prove prejudice. Id.; see also Strickland, 466 U.S. at 688.

This Court will only decide an ineffective assistance claim raised for the first time on appeal when its resolution is "beyond any doubt" or in the interest of justice. United States v. Matos, 905 F.2d 30, 32 (2d Cir. 1990). This Court prefers to hear ineffective assistance of counsel claims on collateral review. See United States v. Doe, 365 F.3d 150, 152 (2d Cir. 2004); United States v. Khedr, 343 F.3d 96, 99-100 (2d Cir. 2003); but see United States v. Brown, 623 F.3d 104, 113-14 (2d Cir. 2010) (finding, as a matter of first impression, that district court abused its discretion in not considering defendant's claim of ineffective assistance of counsel claim prior to sentencing as a Rule 33 motion where pro se defendant raised facially plausible claim that his previous attorney had not conveyed the government's plea offer, which resulted in a disparate sentence for the defendant).

B.   Tarantino's Allegations of Conflict of
     Interest Are Not Supported by the Record

Although Tarantino claims that "Froccaro represented both Tarantino and Mulligan during the first trial and all through 2008" (Br. 88), Tarantino offers no factual support for that assertion.   Moreover, he mischaracterizes the facts in claiming that the government "acknowledg[ed] that it knew [this] 'all along'." (Br. 88).  Because Mulligan's 2001 and 2002 cases in the Eastern District of New York were a matter of public record, the government knew that Mr. Froccaro had represented Mulligan in those earlier and unrelated narcotics prosecutions. (T2 12; GA 142-43).    However, that acknowledgment is significantly different from what Tarantino incorrectly claims, that the government had known all along that Froccaro represented both Mulligan and Tarantino during the September 2008 through June 2011 time period.   There is no evidence in the record to support Tarantino's claim that Froccaro still represented Mulligan between September 2008 and June 2011 or that the government had any knowledge of this supposed joint representation by Froccaro.

Furthermore, Tarantino claims, without citation to any sources, that Mulligan paid Mr. Froccaro $150,000 to assist in Tarantino's legal defense during the instant prosecution. (Br. 88-89; see also DE 388 (Def.'s 6/8/12 Rule 33 Mot.) at 7-

9). Tarantino argues that Froccaro thus labored under an actual conflict of interest and, therefore, failed to shift the blame for Baumgardt and Dorval's murders to Mulligan. Tarantino also claims, again with no support, that the government deliberately did not disclose to Tarantino that Froccaro was allegedly simultaneously representing Mulligan, prior to the March 15, 2011 Curcio hearing. (Br. 89-90; DE 388 at 11). Not only do Tarantino's accusations lack any support in the record, but it is more likely that, if Mulligan had contributed to Tarantino's defense fund, it was at Tarantino's request and that Tarantino knew about this prior to his first trial.

Given that Tarantino's allegations that Mr. Froccaro labored under an actual conflict of interest are merely allegations, with no support in the record, this Court should reject Tarantino's request for a new trial on Counts One and Two. There is no basis in the record for a finding that Froccaro provided ineffective assistance "beyond any doubt." Matos, 905 F.2d at 32. Tarantino can avail himself of collateral review to develop a factually-supported theory of ineffective assistance, which he raised for the first time during the retrial on the Gargiulo obstruction-of-justice murder. Doe, 365 F.3d at 152; see also Khedr, 343 F.3d at 99-100; Riascos-Prado v. United States, 66 F.3d 30, 35 (2d Cir. 1995).

C.    The District Court Did Not Abuse
      Its Discretion in Denying Tarantino's
      Request for an Evidentiary Hearing

In denying Tarantino's belated Rule 33 motion based on ineffective assistance due to Mr. Froccaro's alleged conflict, the district court considered whether Tarantino had failed to file a timely Rule 33 motion due to "excusable neglect." (GA 155). The district court considered four factors: (1) the danger of prejudice to the non-moving party; (2) the length of delay and possible impact on proceedings; (3) the reason for delay; and (4) the good faith of the moving party. (Id.). The court noted that the jury returned a verdict on Counts One and Two on May 23, 2011, Mr. Froccaro's representation ceased on August 17, 2011, and Tarantino had new counsel for over a year at the time he filed the Rule 33 motion claiming ineffective assistance. (GA 156-57). (While Tarantino's counsel actually filed the Rule 33 motion approximately nine months (not over a year) after taking over Tarantino's defense, this three-month difference is not material and does not diminish the district court's rationale for rejecting Tarantino's motion as untimely.)

Unlike in Brown, where this Court remanded the ineffective assistance claim to the district court for fact-finding and a decision, Tarantino was not proceeding pro se, the alleged conduct of Mr. Froccaro is not per se unreasonable (see Holloway v. Arkansas, 435 U.S. 475, 482-83 (1978) (stating that

"joint representation[] is not <u>per</u> <u>se</u> violative of constitutional guarantees of effective assistance of counsel")), and Tarantino was almost certainly aware <u>prior to his first trial</u> that Froccaro previously represented Mulligan in the Eastern District of New York and that Mulligan contributed to Tarantino's defense fund (assuming that Mulligan made any such payments).[44]  623 F.3d at 113-14 & n.5.

As this Court noted in <u>Brown</u>, "when a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding." <u>Id.</u> at 112-13. However, "Brown does not require as a categorical matter that district courts grant a full-blown testimonial hearing in response to all such claims." <u>United States v. Fleurimont</u>, 401 Fed. Appx. 580, 582 (2d Cir. 2010). "To the contrary, we expressly noted that 'district courts face competing considerations in deciding whether it is appropriate to inquire into the merits of such claims prior to judgment' . . . ." <u>Id.</u> (quoting <u>Brown</u>, 623 F.3d at 112-13).

---

[44]    The record from the retrial reflects that Tarantino and Mulligan were friends and business associates during the period of 2000-2004. (<u>See</u> Point Four above (summary of Mulligan's trial testimony)).  In fact, Tarantino met with Mulligan in Boston, in August 2004, when Mulligan was released from prison on the Eastern District of New York marijuana conspiracy charge. (T2 1607-09).

The district court did not abuse its discretion in finding that Tarantino had not shown "excusable neglect" warranting the district court's examination of the merits of Tarantino's ineffective assistance claim prior to Tarantino's sentencing for the 1994 murders of Baumgardt and Dorval, and the 2003 conspiracy to murder Gargiulo.

POINT SIX

THE GOVERNMENT DID NOT PURSUE INCONSISTENT THEORIES
AND DID NOT VIOLATE TARANTINO'S DUE PROCESS RIGHTS

Tarantino argues that the government violated his due process rights by pursuing inconsistent theories with respect to the murder conspiracy of Louis Dorval in successive prosecutions. (Br. 90-103). He is wrong.

This claim, and the two that follow in Tarantino's brief (Points VII and VIII), pose attacks upon the judgment arising from what Tarantino characterizes as inconsistent positions taken by the government at different times with respect to the facts surrounding the Dorval murder. Tarantino and Joseph Pistone were both investigated in the same, multi-year proceeding that led first to Joseph's indictment and conviction by guilty plea to conspiring to kill Dorval (in United States v. Galasso, 00-CR-0122(ADS)(EDNY)) and ultimately to Tarantino's conviction at trial for also participating, together with others, including Joseph, in that same murder. The unequivocal admissions of guilt by both -- one by guilty plea allocution and the other through acquisition of the Gargiulo recording and statements to witnesses who were not eye-witnesses to the killing -- differed in details, and an early cooperator proved unreliable. However, the government throughout its investigation pursued evidence that both men were

involved in Dorval's murder, assembled evidence of each individual's guilt, and provided Tarantino full discovery from which he presented inconsistencies for the jury to consider as part of his defense. In short, Tarantino was not deprived of his due process rights.

I.    The Standard of Review

First, Tarantino did not raise his due process claim before the district court. (See Br. 102-03). At best, Tarantino argued after his conviction on the Dorval obstruction-of-justice murder charge, and prior to the re-trial of the Gargiulo obstruction of justice murder charges, that Assistant U.S. Attorney ("AUSA") James Miskiewicz should have been disqualified and called as a defense witness due to his prior prosecution of Joseph Pistone. (Br. 102 n. 68). His due process claim now may only be reviewed for plain error. See Fed. R. Crim. P. 52(b); Johnson, 520 U.S. at 466-67. The forfeiture rule applies to bar appellate review of constitutional claims. See Olano, 507 U.S. at 731. He cannot meet this standard.

An error is "plain" if "it is so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today." United States v. Thomas, 274 F.3d 655, 667 (2d Cir. 2001) (internal quotation marks omitted). This Court has not found plain error "where the

operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court." United States v. Whab, 355 F.3d 155, 158 (2d Cir. 2004).

Even assuming that the claim was preserved, it is without merit.

II.  Tarantino's Claim Has no Merit

As Tarantino concedes, there is no clear consensus among the courts that have addressed the issue that the use of inconsistent theories in successive prosecutions violates due process.  (Br. 94-99).  The Supreme Court has "never hinted, much less held, that the Due Process Clause prevents . . . prosecuting defendants based on inconsistent theories." Bradshaw v. Stumpf, 545 U.S. 175, 190 (2005) (Thomas, J. concurring); United States v. Urso, 369 F. Supp. 2d 254, 263 (E.D.N.Y. 2005) ("no clear consensus" on incompatible theories). Accordingly, because the complained-of conduct did not contravene clearly established precedent, it is not plain error. United States v. Brown, 352 F.3d 654, 665 n.10 (2d Cir. 2003) (error is "plain" only when it contravenes clearly established precedent); see also Olano, 507 U.S. at 734 (a "court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law.").[45]

_____

[45]  In United States v. Boyle, 283 Fed. Appx. 825 (2d Cir. 2007), where the defendant arguably preserved the claim for

105

In Thompson v. Calderon, 120 F.3d 1045 (9th Cir. 1997)(en banc), rev'd on other grounds, 523 U.S. 538 (1998), prosecutors first convicted one defendant of single-handedly raping and murdering a victim and then, in a second trial, convicted a co-defendant on a murder conspiracy theory, arguing that he was "the only one with any motive for [the victim's] death." Id. at 1056. A plurality of the Ninth Circuit found that the prosecutor had "manipulated evidence and witnesses, argued inconsistent motives, and at [the second] trial essentially ridiculed the theory he had used to obtain a conviction and death sentence at [the first] trial." Id. at 1057. Four judges dissented, finding, among other things, that the use of inconsistent arguments did not violate the defendant's due process rights because the inconsistency was irrelevant to the conviction. Id. at 1066. Without addressing the inconsistent theory claim, the Supreme Court reversed. See Calderon v. Thompson, 523 U.S. at 549-50.

In Stumpf v. Mitchell, 367 F.3d 594 (6th Cir. 2004), the state argued in separate trials that the defendant and his accomplice fired the shot that killed the victim. Despite the

appellate review, this Court declined to reach the issue after concluding that the prosecution of a single crime in successive indictments, where the defendants were alleged to have acted "together with others" in separate enterprises are not "factually contradictory." Id. at 826.

fact that the inconsistency arose as a result of new evidence, the court announced a blanket rule that "[b]ecause inconsistent theories render convictions unreliable, they constitute a violation of due process rights of any defendant in whose trial they are used." Id. at 613. The Supreme Court reversed, finding that the use of inconsistent theories was immaterial to the defendant's conviction. Stumpf, 545 U.S. at 187.

This Court has examined the government's alleged use of inconsistent theories in a number of cases. Instead of categorically barring the prosecution from pursuing inconsistent theories in successive prosecutions, the Court has determined, on a case-by-case basis, whether evidence of the government's inconsistency should be admissible at trial. See United States v. Orena, 32 F.3d 704, 715-16 (2d Cir. 1994); United States v. Salerno, 937 F.2d 797, 810-12 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 317 (1992).

In Orena, for example, the defendant argued that the prosecution proffered one theory of a victim's murder at a trial that was inconsistent with a theory advanced by the government at a prior trial of an associate charged with the same murder. Id. at 715-16. The defendant sought to introduce the government's opening statement from the prior trial, but the district court did not permit it. This Court affirmed, holding that "[t]he defense is allowed to introduce a prosecutor's

statement from a prior trial when: (1) the prosecution offered an inconsistent assertion of fact at the prior trial; and (2) the prosecution can offer no 'innocent' explanation for the contradiction." Id. at 716 (citations omitted).

In Salerno, the defendant argued that "the district court abused its discretion by precluding him from establishing that the government had prosecuted the commission case [an earlier prosecution] under the theory that [the defendant] . . . was a victim of extortion by the members of the commission, a theory that was inconsistent with the government's position in this case." Salerno, 937 F.2d at 810. In dicta, this Court found that because the government, at different times, had urged that the defendant was both a victim and, inconsistently, a culpable bid-rigger, the jury had the right to know the inconsistencies. See id. at 811-12.

Where defendants have demonstrated that the government has pursued theories that were in fact inconsistent, this Court has found that such evidence has been admissible against the government at trial because the jury was entitled to know of the inconsistencies. While they did not specifically involve due process concerns, those cases suggest no concern with the constitutionality of the government's use of inconsistent theories, with the Court addressing the government's use of inconsistent theories in successive trials by proscribing rigid

requirements for the admissibility of evidence showing those inconsistencies. See Orena, 32 F.3d at 716; Salerno, 937 F.2d at 811.

Here, consistent with Orena and Salerno, the district court held prior to the first trial that Tarantino would be permitted to introduce the statement of an AUSA (Joseph Conway) made during Peter Pistone's guilty plea allocution that was deemed to be inconsistent with Tarantino's guilt. (T 2717). Indeed, at the first trial, the defense called Peter Pistone as a defense witness. (T 2543-86). That the jury found no reasonable doubt regarding Tarantino's responsibility in the murder of Dorval despite the testimony of alleged inconsistencies evidenced the jury's obvious rejection of Pistone's veracity.[46] It did not violate due process.

The government manipulated no evidence or witnesses to its unfair advantage and made no contradictory arguments in the prosecution of Joseph Pistone or subsequent prosecution of Tarantino for the murder of Dorval. In both the Pistone and the Tarantino indictments, each defendant was alleged to have acted "together with others" in the murder of Dorval. (A 60, 94). The overt acts alleged in the Pistone indictment concerning

---

[46] Near the conclusion of his cross-examination, the district court observed that Peter Pistone's testimony was so objectively incredible that he faced a possibility of being charged with perjury. (T 2694).

Dorval's murder (A 94-95), were, as Tarantino clearly
acknowledged by calling him as a defense witness, derived from
information provided by Peter Pistone in 1999 and 2000.
However, Peter proved to be an unreliable government witness
long before the indictment in this case, recanting his
allegations regarding his brother's (and another codefendant's)
involvement in the Dorval murder. (A 73-74; DE 199 (00CR0122)).
The recantation required that the government agree to release on
bail for Robert Misseri, a defendant in Galasso, soon thereafter
(T 2692; DE 230 (00CR0122)), the disposition of his case
pursuant to a guilty plea on other charges (DE 345 (00CR0122)),
and dismissal of the Dorval murder charges against Misseri
(DE 493 (00CR0122)). Incredibly, despite his recantation
regarding Misseri in 2000, at trial in 2011, Peter once again
put Misseri back into the events that he once before admitted
were lies. (T 2559-64). As the government argued at the first
trial, Peter's November 2000 recantation rendered him no longer
a viable cooperating witness with respect to the Dorval murder
prosecution still pending against his brother. (T 2693).
Though the government continued to interview him and even placed
him in the grand jury after his recantation, it did so to
"ascertain whether there was some sort of obstruction of
justice" causing Peter falsely to exculpate certain subjects of
the investigation. (T 2693).

Joseph Pistone's decision to plead guilty to a RICO conspiracy, predicated in part on his conspiring to kill Dorval, meant that the government did not, unlike in <u>Thompson</u>, have to argue or misuse evidence based on a failed cooperator's testimony. However, the suggestion that the government ever viewed Tarantino as anything but one of several co-conspirators responsible for Dorval's murder is false. As made clear through the discovery provided Tarantino and the evidence adduced at trial, Tarantino had been a suspect in both the Baumgardt and Dorval murders within days of the recovery of Dorval's body in August 1994 and remained so even through the Joseph Pistone prosecution. The government collected DNA from both Joseph Pistone and Tarantino in 2000 as part of that single investigation, and, as evidenced on the Gargiulo tape, Tarantino knew that the collection of his DNA grew out of the <u>Galasso</u> case and prosecution of the Pistone brothers. That negates any claim that the government at some point viewed Tarantino as un-involved in the crimes charges. Lastly, the government disclosed to Tarantino in May 2009 the statements of Peter and Joseph Pistone, which included a post-conviction identification of Tarantino as a co-conspirator. That the Pistone brothers made numerous, inconsistent claims about how Dorval was killed, by whom, and where, while repeatedly maintaining their own guilt over many years for crimes to which they pleaded guilty, does

not constitute manipulation of witnesses or evidence by the
government or the assertion of mutually exclusive theories to
obtain Tarantino's conviction.

The district court made no error and, consistent with
precedent, permitted Tarantino fully to pursue factual
inconsistencies arguably raised by the successive prosecutions.
That the jury found Tarantino guilty of Dorval's murder despite
hearing this evidence was no doubt a function of the
government's overwhelming evidence of Tarantino's guilt,
especially his repeated admissions on the Gargiulo tape to
killing Dorval while ridiculing the government's reliance on
Peter Pistone in September 2000. Tarantino can show no due
process violation in this record.

POINT SEVEN

THE DISTRICT COURT PROPERLY REJECTED
TARANTINO'S CLAIM THAT THE GOVERNMENT
KNOWINGLY PRESENTED PERJURIOUS TESTIMONY

Tarantino argues that he is entitled to a new trial on Count Three, the conspiracy to murder Vincent Gargiulo, because the government knowingly presented, at the retrial, perjured testimony from cooperating defendant Scott Mulligan regarding Dorval's murder, a crime of which Tarantino was convicted at the first trial. (Br. 103). Tarantino claims the government must have known that Mulligan's testimony was perjurious, because the government previously charged and convicted other individuals in connection with Dorval's murder, and Mulligan's account of Dorval's murder is "irreconcilably different." (Id.). Tarantino's claim is meritless.

As noted above (p. 52 n.23), a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure is committed to the discretion of the district court, and its decision will be reversed only for abuse of discretion; "[i]n deciding a Rule 33 motion, '[t]he test is whether it would be a manifest injustice to let the guilty verdict stand.'" James, 712 F.3d at 107. The defendant must establish the following to succeed on a motion for a new trial based on perjury: (1) the witness actually committed perjury; (2) the alleged perjury was material; (3) the government knew or should have known of the

alleged perjury at the time of trial; and (4) the perjured testimony remained undisclosed during trial. See United States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000).[47] "Reversal of a conviction based on allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." Id. The defendant bears the burden of establishing that a witness actually committed perjury. See United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1999). In determining whether perjury occurred, a district court must "weigh all the evidence of perjury before it." Ortega v. Duncan, 333 F.3d 102, 107 (2d Cir. 2003).

Because Tarantino failed to demonstrate, as a threshold matter, that Mulligan's testimony at trial was actually false, the district court's ruling should be affirmed. Tarantino offers no "hard evidence" of perjury. See Buitrago v. Scully, 705 F. Supp. 952, 957 (S.D.N.Y. 1989) (noting that the

---

[47] In United States v. Ferguson, 653 F.3d 61, 82-83 (2d Cir. 2011), amended and superseded, 676 F.3d 260 (2d Cir. 2011), this Court noted that the two-part test in United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (requiring that the perjury be material to the jury's verdict and that the prosecution knew or should have known the testimony was perjurious), "is in tension with the four-part test" from Zichettello, "which supplements the Wallach factors" based on circuit precedent. In Wallach, however, the government conceded that a witness had lied on the stand. Here, no such concession exists. Thus, Tarantino must establish all four elements summarized by Zichettello and its supporting authority.

114

only evidence of perjury was a conflict between the testimony of two witnesses). The only so-called evidence of perjury offered by Tarantino is that the Pistone brothers had previously provided the government with different versions of Dorval's murder and the disposal of his body and that they pleaded guilty, in 2000 and 2001, respectively, to offenses relating to their roles in the murder.[48] (Br. 103-05; T 2545; DE 388-2). This is insufficient to establish perjury by Mulligan. See United States v. Tyree, 279 Fed. Appx. 31, 34 (2d Cir. 2008) (noting that other witness may have been lying, or purportedly perjured testimony could have been due to mistake).

Mulligan provided a credible and well-corroborated account of what he knew regarding Dorval's murder. Mulligan testified that he was not present during Dorval's actual killing. (T2 1498). Rather, Mulligan testified that, in the days prior to Dorval's murder, he helped Tarantino look for large toolbox for Dorval's body and contacted Craig Miller to

---

[48] Tarantino argues that the Pistones' account of Dorval's murder was supported by "forensic corroboration" and the case agent's testimony in the grand jury. (Br. 104-05 (citing DE 388-1)). The case agent testified before the grand jury, on April 6, 2000, that (1) Peter Pistone's description of the murder weapon as a revolver was supported by a ballistics expert's examination of fragments of the bullet removed from Dorval's body and (2) Peter's information that the tailgate of the truck snapped when the Pistone brothers moved Dorval's body from the rear compartment of the truck was supported by an expert's finding that there had been damage, since repaired, to the hinges of the truck's tailgate. (DE 388-1 at 12-13, 18-23).

ask whether he could borrow Miller's boat. (T2 1495). On the evening of August 12, 1994, Tarantino told Mulligan, in Gargiulo's presence, that he had shot Dorval in the head in Miller's warehouse in Farmingdale, that the murder was "done," and that Dorval did not "bleed much." (T2 1498-99). Tarantino, Mulligan and an unindicted co-conspirator went to Dorval's apartment in Queens, removed most of Dorval's personal belongings to make it appear as though Dorval had fled, and took two kilograms of cocaine that Dorval had stored in his apartment. (T2 1499-1501). Mulligan took Dorval's dog to an animal shelter and tied the dog to the front door. (T2 1501).

Mulligan further testified that, the following morning (August 13, 1994), he contacted Miller and arranged to use Miller's boat. (T2 1502). Tarantino arrived at Miller's home in a Jeep Cherokee, and Mulligan helped carry the black toolbox containing Dorval's body onto Miller's boat. (T2 1506). Miller drove the boat through the Jones Beach Inlet and a couple of miles out into the Atlantic Ocean. (T2 1520). While Tarantino and Mulligan placed large rocks into the black toolbox, where Dorval's body was "squished inside," Mulligan accidently dropped one of the large rocks on Tarantino's right hand, splitting open the skin on Tarantino's thumb. (T2 1522, 1524). Once Tarantino and Mulligan lowered the toolbox into the

water, Tarantino shot holes in the bottom of the toolbox.
(T2 1527). Miller became "panic stricken" and "nauseous."
(T2 1529). While Mulligan helped Tarantino dispose of Dorval's
body, Tarantino told him that the above-mentioned unindicted co-
conspirator was cleaning and painting a portion of the warehouse
where Dorval was shot and killed, to cover up any blood.
(T2 1507-08).

Mulligan's testimony was corroborated by other
evidence including (1) Tarantino's own words on the Gargiulo
recording, in which he implicates himself in Dorval's murder and
regales Gargiulo with a "twisted" story about how "this guy
named [Peter] Pistone" was "running around telling everybody he
bumped Louie" (see GA 260, 276-82),[49] (2) Miller's testimony
regarding Tarantino and Mulligan's use of his family boat and
warehouse (T2 794-800, 807-24)[50] (3) hospital records showing

---

[49]    More specifically, Tarantino told Gargiulo, "I was in
the middle of the fuckin' Atlantic Ocean and the body was found
floating two days later or better. There was one piece of skin
on a fuckin' rock, can't believe it's been floating in the
ocean. . . . it would just float away . . . it wouldn't stay
jammed on a rock?" (GA 275-76). In response to Tarantino's
statements that Peter Pistone took credit for Dorval's murder,
Gargiulo remarked, "Unbelievable." (GA 260). Gargiulo further
remarked, "[S]o you know they are way off" when Tarantino told
him that law enforcement "supposedly" had a "picture at night"
of "these guys . . . rolling [Dorval] right off the bridge."
(GA 281).

[50]    Miller further testified that he saw Tarantino and
Mulligan bring onto Miller's boat and throw overboard a large
toolbox and several pieces of broken sheet rock. (T2 811-17,

Tarantino obtained medical treatment to his right hand on August 13, 1994 (see GA 248-49; GX MED-1-13); (4) a surveillance photograph taken on September 28, 1994, showing Tarantino wearing a half-cast on his right hand (see T2 1535-36; GX JK-11), and (5) the black toolbox with bullet holes (see T2 1507; GX CW-4, SLD-12).

That Mulligan's testimony about the Dorval murder did not agree with the inconsistent versions of the event that the Pistone brothers had previously provided is not proof of perjury. Cf. United States v. Gambino, 59 F.3d 353, 365 (2d Cir. 1995) (noting that "even a direct conflict in testimony does not in itself constitute perjury"). Prior to the retrial, Joseph Pistone was transported, in custody, to the Eastern District of New York as a potential defense witness. (T2 24, 156, 161; see also DE 393-1 (Ltr. from J. Pistone to the Hon. Joanna Seybert, rec'd 5/7/12, asking to be sent back to his designated prison)). However, Tarantino did not call him as a witness. In its order denying Tarantino's motion for a new trial, the district court noted that it was "troubled" by the fact that Tarantino made the strategic decision not to call

---

877). Miller saw a leg sticking out of the toolbox. (T2 820-21). When Miller visited his family's warehouse a couple of weeks later, he noticed that a section of sheet rock in the interior had been cut away and that other portions had been poorly painted over. (T2 828-29).

Joseph Pistone as a witness and highlight any inconsistencies in Mulligan's testimony yet argued in his post-trial motion that Mulligan gave perjured testimony. (GA 152).

In chronological order, Joseph Pistone has claimed that (1) Dorval admitted killing a guard during an armored car robbery with Tarantino and Mulligan, and Joseph subsequently heard "on the street" that Tarantino killed Dorval (see Bates No. 000000425 (12/3/99 debriefing)); (2) Dorval's body was transported in an SUV truck in which Dorval's blood would be found (id. at 000000427 (1/13/00 debriefing)); (3) Joseph shot Dorval in the head as part of a racketeering conspiracy with other un-named co-conspirators (see 7/19/01 Tr. of J. Pistone Change of Plea Hr'g at 52 (DE 388-2)); (4) Joseph shot Dorval in the head on a boat as part of a conspiracy with Tarantino, among others (see Bates No. 000000484 (2/7/06)); (5) Joseph had nothing to do with Dorval's murder, but he somehow learned that Fatato killed Dorval because Dorval "slapped around" his own girlfriend (see id. at 000000489 (8/18/08); and (6) a repeat of version (4), admitting that Joseph killed Dorval with Tarantino (see GA 142). Calling Joseph as a defense witness was certainly risky for Tarantino, as he had incriminated Tarantino in Dorval's murder in the past.

Tarantino's counsel cross-examined Mulligan and highlighted some of the alleged inconsistencies in Mulligan's

testimony. (T2 1614-19, 1654). However, counsel asked Mulligan no questions regarding Dorval's murder (T2 1613-69, 1671-72) but, on summation, questioned Mulligan's credibility (T2 1903-10, 1914-16).[51] Thus, the jury had the opportunity carefully to consider and scrutinize Mulligan's testimony. Tarantino's counsel may have been able to point out more inconsistencies in Mulligan's testimony had Tarantino called Joseph Pistone to testify, but he chose not to do so. Possible impeachment is not a basis for granting a new trial. See United States v. Wong, 78 F.3d 73, 82 (2d Cir. 1996) (noting that cumulative impeachment information "is routinely held insufficient to warrant a new trial because it does not undermine the confidence in the verdict").

Even assuming, arguendo, that Mulligan deliberately testified falsely about Dorval's murder and the disposal of his body -- and that the government was aware the testimony was perjurious -- it would be immaterial to Tarantino's conviction on Count Three, for conspiring to obstruct justice by murdering Gargiulo. Mulligan's testimony about Tarantino's participation in the murders of Baumgardt and Dorval was admitted as probative of Tarantino's motive to kill Gargiulo. (T2 1406 (court's

---

[51] During summation, Tarantino's counsel told the jury, "What I'm going to discuss with you now has nothing to do [with] whether or not my client is guilty of the Dorval homicide or not . . . he is not on trial for the Dorval homicide." (T2 1902).

instruction to the jury before Mulligan testified)). Moreover, defense counsel told the jury, in summation, that Tarantino was not on trial for Dorval's murder. (T2 1902). Thus, inconsistent testimony regarding Dorval's murder would neither negate the elements required for a conviction under Count Three nor affect the overwhelming evidence linking Tarantino to the conspiracy to murder Gargiulo. See Wong, 78 F.3d at 82 (noting that "[t]he circumstances do not suggest that the undisclosed evidence of [the witness's] perjury would have affected the result" because "[a]mple evidence supports [petitioner's] conviction . . . . The additional evidence concerns a collateral issue."); cf. United States v. Reyes, 49 F.3d 63, 68 (2d Cir. 1995) (holding that a government agent's possible perjury in other cases did not warrant a new trial where the "testimony was of marginal significance" and the "core of the evidence" came from a different witness).

In any event, Tarantino cannot show that he was unaware of the alleged falsity of Mulligan's testimony during trial. See Zichettello, 208 F.3d at 102. In May 2009, almost two years before Tarantino's first trial, the government disclosed to Tarantino the Pistone brothers' various and inconsistent accounts of Dorval's murder. (See GA 295-96 (3/24/14 Ltr. from goverment to Todd Scher, Esq., memorializing earlier disclosures by the government and providing a copy

set)).[52]  Tarantino's defense team even made preparations to call Joseph Pistone as a defense witness at the April 2012 retrial, specifically to attack Mulligan's credibility.  (T2 1284-87). Accordingly, even if the inconsistencies between Mulligan and the Pistones' accounts of Dorval's murder were material, Tarantino cannot credibly claim that he was unaware of this potential evidence or its utility to attempt to attack Mulligan's credibility.

Tarantino's new argument that the government improperly bolstered Mulligan's allegedly perjurious testimony in its rebuttal summation by giving an inaccurate description of the medical records (Br. 107-11) is unavailing.  Tarantino did not object to the government's description of the records during rebuttal summation (GA 253-55), nor did he raise this argument in his Rule 33 motion (see DE 388 at 2-6).

Furthermore, Tarantino's counsel's argument in summation that the medical records undermined Mulligan's testimony (T2 1903-07) was premised on factual allegations that had no support in the record.  In rebuttal, the government noted the absence of evidence to support counsel's allegations and urged the jury carefully to examine the medical records (GA 248-49), which were admitted in evidence as MED-1 through MED-13

---

[52]    Moreover, Peter testified as a defense witness at Tarantino's first trial.  (T 2544-2680, 2687-2737).

(GA 248-49). The district court instructed the jury at various times that arguments and statements of counsel are not evidence and that it is the jury's role to weigh the evidence. (T2 1845, 1907, 1933, 1948, 1958-60). Thus, even assuming, <u>arguendo</u>, that the government inadvertently erred in its description of the medical records, it did not affect Tarantino's substantial rights or seriously affect the fairness, integrity or reputation of his trial. <u>See</u> <u>Danielson</u>, 199 F.3d at 671 (discussing plain error review). "It is a rare case in which improper comments . . . are so prejudicial that a new trial is required." <u>Ferguson</u>, 653 F.3d at 83 (rejecting defendants' claims of prosecutorial misconduct based on the government's comments at opening statement, in summation and on rebuttal) (internal quotations omitted).

      For all of these reasons, there was no miscarriage of justice, and Tarantino's attack on the order denying Tarantino's motion for a new trial should be rejected.

## POINT EIGHT

### THE DISTRICT COURT PROPERLY DENIED TARANTINO'S REQUEST THAT AUSA MISKIEWICZ BE DISQUALIFIED

Tarantino argues that the district court abused its discretion in denying Tarantino's motion to disqualify AUSA James Miskiewicz before the retrial, because Tarantino planned to call AUSA Miskiewicz as a witness. (Br. 112-14). He is wrong.

## I.   The Factual Background

Tarantino's motion was based upon his assertion that the government had taken inconsistent positions concerning the details of Dorval's murder, including the roles played by the conspirators. At his guilty plea allocution to being an accessory after the fact to the murder of Dorval, Peter Pistone made no reference to Tarantino and his description of the events was otherwise at odds with evidence later adduced at Tarantino's trial, including with respect to the motive. Then-AUSA Joseph Conway stated at the proceeding that Peter Pistone had disposed of the body. At the first trial, the district court permitted Conway's comments as an admission of a party-opponent. (GA 132).

Following the first trial, Tarantino moved to disqualify Conway's successor, AUSA Miskiewicz, on similar grounds. Miskiewicz was present at the plea of Joseph Pistone,

124

who allocuted to having shot Dorval; the FBI case agent, Robert Schelhorn, was present as well.[53]   (T2 153).   Tarantino urged that disqualification of Miskiewicz was required so that Tarantino could call him to establish that it was the government's belief at one point that it was Joseph Pistone who killed Dorval, a position it had not espoused at Tarantino's trial.  (GA 126-30).

The district court denied the motion (and a renewed motion), finding that Joseph Pistone's account was not inconsistent with the government's position because the government at his plea proceeding had not asserted that it was Tarantino (as opposed to Joseph Pistone) who had shot Dorval. (See GA 133, 138-39).

---

[53] At the retrial, Tarantino's counsel questioned the FBI case agent about Joseph Pistone's guilty plea proceeding:

> Q: And you and Mr. Miskiewicz stood in front of this judge when Mr. Pistone took a plea in this case; is that correct?
>
> A: That's correct.
>
> Q: And Mr. Miskiewicz made Mr. Pistone tell the judge exactly how he killed Louis Dorval, did he not?
>
> A: That's correct.

(T2 153).

125

II.  Argument

        The district court properly found that Tarantino did

not show "compelling and legitimate reasons" to call AUSA

Miskiewicz as a witness.  This Court has held that "[a]

defendant who wishes to call a prosecutor as a witness must

demonstrate a compelling and legitimate reason to do so."

United States v. Regan, 103 F.3d 1072, 1083 (2d Cir. 1997); see

also United States v. Schwartzbaum, 527 F.2d 249, 253 (2d Cir.

1975); United States v. Torres, 503 F.2d 1120, 1126 (2d Cir.

1974) ("A Government prosecutor should not take the stand to

impeach the testimony of Government witnesses unless it is

unavoidably necessary.").  Furthermore, "[where] witnesses other

than the prosecutor can testify to the same matters or

conversations, no compelling need exists."  United States v.

Wallach, 788 F. Supp. 739, 744 (S.D.N.Y. 1992); see also United

States v. Bin Laden, 91 F. Supp. 2d 600, 622-23 (S.D.N.Y. 2000)

("A court may only permit a prosecutor to testify if the

offering party has exhausted all other available sources for

that testimony.").

        Tarantino claims that he established a compelling and

legitimate need for AUSA Miskiewicz's testimony at the retrial,

because, according to Tarantino, "Miskiewicz was the only

witness who could testify as to the Government's belief that

Joseph Pistone's recitation of the facts surrounding Louis

Dorval's murder was credible and that evidence supported
Pistone's view of the murder." (Br. 115-16 (emphasis in
original)).

This claim must be rejected. Tarantino offers no
support for the proposition that an AUSA can testify as to his
beliefs with respect to the evidence. Indeed, a statement of
personal belief may constitute professional misconduct under the
various standards of professional responsibility. See, e.g.,
United States v. Young, 470 U.S. 1, 7-8 & n.3 (1985), citing ABA
Model Code of Professional Responsibility DR 7-106(C) (1980)
("In appearing in his professional capacity before a tribunal, a
lawyer shall not . . . [a]ssert his personal opinion as to the
justness of a cause, as to the credibility of a witness, as to
the culpability of a civil litigant, or as to the guilt or
innocence of an accused. . . ."). Indeed, this Court has held
improper statements by AUSAs in summation that have vouched for
the credibility of their witnesses. See, e.g., United States v.
Drummond, 481 F.2d 62, 63-64 (2d Cir. 1973) ("I think, I submit
to you, that the testimony of [government witnesses] is
certainly worthy of the highest credibility."); United States v.
Nersesian, 824 F.2d 1294, 1328 (2d Cir. 1987) ("It is obligatory
for prosecutors to find careful ways of inviting jurors to
consider drawing argued inferences and conclusions and yet to
avoid giving the impression that they are conveying their

personal views to the jurors."). Indeed, had AUSA Miskiewicz on summation offered his personal beliefs as to the credibility of witnesses against Tarantino or the inferences to be drawn from the evidence, such remarks would no doubt have brought a proper objection by the defense and a curative instruction by the court. Notably, none of the cases Tarantino cites involves defense attempts to call an AUSA as a witness in order to testify concerning his beliefs.

That is not to say, however, that the government –– not simply a particular AUSA –– may not be bound by the AUSA's representations, see United States v. McKeon, 738 F.2d 26, 30 (2d Cir. 1984), and AUSA Miskiewicz's statements at an earlier proceeding might have been admissible on this basis. However, this did not require AUSA Miskiewicz to testify, as the statement at issue was made on the record and Tarantino offers no reason why the fact of AUSA Miskiewicz's making of the statement, as opposed to his underlying beliefs, required his disqualification.[54]

---

[54] Moreover, given that defense counsel elicited from the case agent at the retrial that he and AUSA Miskiewicz had been present at Joseph Pistone's guilty plea allocution, Tarantino cannot establish that he had "compelling and legitimate reasons" to call AUSA Miskiewicz as a witness.

128

<u>CONCLUSION</u>

For the reasons set forth above, the judgment should

be affirmed.

Dated:  Brooklyn, New York
        February 9, 2015

                              Respectfully submitted,

                              LORETTA E. LYNCH,
                              <u>United States Attorney</u>,
                              <u>Eastern District of New York</u>.

                    By:  _____/s/_____
                         Carrie Capwell
                         Assistant U.S. Attorney

PETER A. NORLING,
JAMES MISKIEWICZ,
CARRIE CAPWELL,
<u>Assistant United States Attorneys</u>,
    (<u>Of Counsel</u>).

<u>CERTIFICATE OF COMPLIANCE WITH RESPECT TO TYPE-VOLUME
LIMITATION,TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.   This brief contains 28,541 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). Although this does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), an order of this Court dated January 12, 2015 permits our filing of a brief of up to 30,000 words.

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated:  Brooklyn, New York
        February 9, 2015

                    /s/
        _____
        PETER A. NORLING
        Assistant U.S. Attorney