# 13-1799

---

# United States Court of Appeals

### For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

CHRISTIAN GEROLD TARANTINO,

*Defendant-Appellant.*

---

**On Appeal From The United States District Court
For The Eastern District of New York**

---

## THE GOVERNMENT'S APPENDIX

---

LORETTA E. LYNCH,
*United States Attorney,*
*Eastern District of New York.*

TABLE OF CONTENTS

Page

Excerpt from Transcript of _Curcio_ Hearing,
 March 15, 2011..............................................GA 1

Transcript of Jury Selection Conference Call
 Before the District Court,
 March 17, 2011.............................................GA 21

Transcript of Jury Selection Conference Call
 Before Magistrate Judge Tomlinson,
 March 21, 2011.............................................GA 79

Defense Letter Seeking to Disqualify AUSA Miskiewicz
 Dated Nov. 7, 2011........................................GA 126

Memorandum and Order,
 Denying Defense Request to Disqualify AUSA Miskiewicz,
 Dated Nov. 22, 2011.......................................GA 131

Excerpt from Transcript of Proceedings,
 Feb. 15, 2012.............................................GA 134

Excerpt from Gov't Memorandum of Law
 In Opposition to Defendant's Rule 33 Motion,
 Dated June 22, 2012.......................................GA 140

Memorandum and Order
 Denying Defendant's Rule 33 Motion,
 Dated Nov. 7, 2012........................................GA 144

Excerpt from Transcript of _Voir Dire_,
 March 22, 2011............................................GA 170

Excerpt from Transcript of _Voir Dire_,
 March 23, 2011............................................GA 174

Excerpts from Transcript of Trial,
 April 2011................................................GA 177

Excerpts from Transcript of Retrial,
 April-May 2012............................................GA 226

GX RS-39
 Transcript of Gargiulo Tape...............................GA 256

GX STP5
 Stipulation as to Testimony of Lawrence Hardie............GA 288

GX RS-29
 Newspaper Coverage of Giampa Indictments on
 August 12, 1994.........................................GA 290

GX RS-6
 Gargiulo letter to FBI,
 Undated.................................................GA 293

Gov't Letter to Defense Counsel,
 Memorializing Prior Discovery Disclosures
 And Providing Copies,
 Dated March 25, 2014....................................GA 295

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA

                                    08-CR-00655

                                    TRANSCRIPT OF PROCEEDINGS
        -against-           :
                              United States Courthouse
                              Central Islip, New York

CHRISTIAN TARANTINO,
                              March 15, 2011
        Defendant.         :  10:30 a.m.

- - - - - - - - - - - - - - X

        BEFORE THE HONORABLE JOANNA SEYBERT
           UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:     LORETTA E. LYNCH
                        United States Attorney
                        100 Federal Plaza
                        Central Islip, New York 11722
                        BY:  CARRIE CAPWELL
                             JAMES MISKIEWICZ
                        Assistant United States Attorneys

For the Defendant:      JAMES FROCCARO, ESQ.
                        MICHAEL ROSEN, ESQ.


Also present as advisor:  EDWARD JENKS, ESQ.


Court Reporter:         Perry Auerbach
                        100 Federal Plaza
                        Central Islip, New York 11722
                        (631) 712-6103


        Proceedings recorded by mechanical stenography.
           Transcript produced by computer.

7

1   take up some housekeeping rules with your Honor.

2             THE COURT:  I think that the phrase housekeeping

3   rules.

4             MR. ROSEN:  All right.  I won't use it again.

5             THE COURT:  The other phrase I don't like is

6   honestly.

7             MR. FROCCARO:  I never said that again, I don't

8   think, Judge, I learned that the first time.  And I'll

9   never say again I have one thing to say.

10            MR. ROSEN:  How about ground rules?

11            THE COURT:  Whatever.  You want to call it

12   housekeeping let's call it housekeeping.

13            MR. ROSEN:  They can go ahead, I don't want to

14   delay --

15            THE COURT:  All right.  Do you want to bring

16   Mr. Tarantino -- are you waiving Mr. Tarantino's

17   appearance for purposes of this additional what would you

18   call it?

19            MR. ROSEN:  I'm afraid to call it anything.

20   Whatever it is, I waive it.

21            THE COURT:  All right.

22            (Whereupon the defendant leaves the courtroom

23   with Mr. Jenks.)

24            MR. ROSEN:  Judge Seybert, you had asked a while

25   back about certain religious days or certain holidays

8

1    coming up next month in April, and I learned and have sort

2    of confirmed, yes, as my calendar indicates, that Passover

3    begins at sundown on Monday, April 18th, the first two

4    days of Passover which I believe are the most observed or

5    most sacred or some may say all days are, but

6    traditionally what I've been led to understand is that the

7    first two days, the 19th and 20th are the first two days

8    of Passover, which are the most observed.  And of course

9    at the end of that week, it was told that we don't work on

10   that Friday the 22nd, but in any event, it's Good Friday,

11   and then at the very end of the week or you may want to

12   say it's the beginning of the next week, Sunday the 24th

13   is Easter.

14          Now, I've also been told and I did some

15   inquiries, that the schools in Nassau and Suffolk County I

16   believe are closed and again that's subject to I guess

17   case agent Schelhorn verifying.  Schools are closed that

18   week.

19          THE COURT:  I'm not going to pick any elementary

20   people to serve on the jury.  No students.  All right?  So

21   they're closed.

22          MR. ROSEN:  No, I understand that.  No, I'm

23   saying parents who have children that normally would be in

24   school if the schools are closed down --

25          THE COURT:  It may be a problem, we'll have to

9

1    see.

2         MR. ROSEN:  I just wanted to let your Honor know

3    what my religious research has turned up.  And that's what

4    I have to say.

5         THE COURT:  Okay.  Anything else?  The

6    questionnaires have been distributed?

7         MS. CAPWELL:  I believe so, your Honor.

8         MR. MISKIEWICZ:  Yes, your Honor.  They did go

9    down yesterday evening and they're down there with the

10   clerk's office, I think there's a session in the morning

11   and there's one coming in at 1:30.  We should have enough

12   questionnaires.

13        THE COURT:  You're beginning to start reviewing

14   them and giving me all the information so by Thursday I'll

15   have your selections, because I'm not going to be

16   available Friday morning.

17        MR. MISKIEWICZ:  Okay.  We hadn't gotten to that

18   pat of whether or not it's going to be feasible for both

19   sides to agree.

20        THE COURT:  I thought that you were going to

21   scan them and e-mail.

22        MR. MISKIEWICZ:  Yes, that we're going to do

23   starting this afternoon, I imagine by tomorrow Mr. Rosen

24   and Mr. Froccaro can pick up a CD with all the copied,

25   filled out questionnaires, there'll be hard copied for

10

1  your Honor, and we'll print out our own copy from whatever

2  we scan.

3          So that will be done by tomorrow.  But in terms

4  of both parties agreeing upon a --

5          THE COURT:  I want these people to know Friday

6  afternoon whether or not they're going to be coming in.

7          MR. MISKIEWICZ:  You need to know from us first

8  thing --

9          THE COURT:  I need to know from you Thursday

10 whatever the choices will be.  We have to resolve that.

11         MR. MISKIEWICZ:  You mean in terms of people who

12 we are agreeing for whatever reason shouldn't be serving.

13         THE COURT:  There's three piles.  Pile number

14 one, don't want, can't have them, totally unable to

15 consent.  Pile number 2, we agree those folks are good to

16 go, and then you sometimes have four or five that you

17 can't agree on.  That's what you need me for.

18         MR. MISKIEWICZ:  You need it by Thursday we'll

19 get it to you by Thursday.  We'll get it to counsel and

20 we'll be on the phone and try to work out an agreed

21 possible list of people that we both suggest should not be

22 on.

23         THE COURT:  You all have about 10 items that you

24 can go through pretty quickly, the questionnaires I'm

25 talking about.

PERRY AUERBACH, RPR, CSR
Official Court Reporter

11

1          MR. ROSEN:  Judge, as I understand it there's

2    usually three divisions as your Honor indicated.

3          THE COURT:  Right.

4          MR. ROSEN:  One is where we agree that there's

5    challenges for cause.

6          THE COURT:  Right.

7          MR. ROSEN:  Two, I always maintained was the

8    Court may want to do further inquiry, see that's my

9    understanding there may be X number.

10         THE COURT:  You want those people to come back

11   in.

12         MR. ROSEN:  Come back in for your Honor.

13         THE COURT:  And there's five or six knock down

14   drag out brawl you can't agree on, both sides are adamant

15   on it.  Unless you're telling me you're the type of

16   attorneys that can divide this up into two groups, you

17   have to --

18         MR. ROSEN:  No, Judge.

19         THE COURT:  You should come in with at least 75

20   to 100 people to show up.

21         MR. MISKIEWICZ:  We'll do that by Thursday.

22         MR. ROSEN:  And that would facilitate things in

23   the interest of justice if you're downloading all these

24   things that we'll come out and pick up a downloaded

25   version and get those disks that takes me three hours to

12

 1   figure out how to put into the machine, downloaded for us,

 2   a paper copy so we come out, we can start.

 3            THE COURT:  No.  That's not what they're doing.

 4   They're putting it out on a disk so you can take it back

 5   and print it out, which is possibly more efficient.

 6            MR. FROCCARO:  Judge, it's not more efficient if

 7   we pick it up, if they have it done for us.

 8            MR. MISKIEWICZ:  It will get to them faster than

 9   if they have to wait around.

10            THE COURT:  You can e-mail them.

11            MR. MISKIEWICZ:  We could e-mail.  The problem

12   we've been advised it would be many, many e-mails and the

13   files are going to be so big it may jam up their e-mail

14   system and not get through.  Once we scan all the 250

15   completed questionnaires we load that on to a disk, they

16   can pick it up, I'm sure by tomorrow morning, that will be

17   the fastest thing, it's going to still take us, it took us

18   all day yesterday to print out these 250, because it's not

19   like making 250 copies, we had to print out 250 unique

20   sets of questionnaires, they're all unique numbers and

21   sequentially numbered.  It took us all day to do that.

22   It's going to take them a while, it will take us a while

23   to print out and them.  If we print out the disk.

24            THE COURT:  Will you have it today?

25            MR. MISKIEWICZ:  It depends upon how fast we get

13

 1   it from the clerk's office.  We'll scan it and it will be

 2   ready by the end of the day or tomorrow morning, if not, I

 3   assume it will be ready by 9:00 tomorrow.

 4            MR. FROCCARO:  That's going to take us all day.

 5   Where are we going to find the time to read them.

 6            THE COURT:  I can make myself available on

 7   Friday afternoon.  But I'm not going to have the copies

 8   with me.

 9            MR. MISKIEWICZ:  We'll get chambers your hard

10   copies.

11            THE COURT:  I can't carry hard copies on a

12   plane.  I don't want 500 copies of questionnaires.  A lot

13   of things I don't mind traveling with, but 500 copies of

14   questionnaires I'm not doing.

15            MR. FROCCARO:  You have the Friday?

16            THE COURT:  I'm not going to physically have

17   them, that's my point, to discuss with you.  And usually

18   that's what I need.  You can do it, depending upon how

19   available Perry is, you can certainly do it after five

20   o'clock, within reason.  So let's get the schedule down,

21   the last group of jurors will be done today in the

22   afternoon.

23            MR. MISKIEWICZ:  They come in at 1:30, figure by

24   2:30 they'll be done.

25            THE COURT:  And then how many are you expecting

14

1    this afternoon?

2            MR. MISKIEWICZ:  I think what the clerk's office

3    said they were going to bring in 150 in the morning and

4    150 in the afternoon, and that's assuming everybody shows.

5            THE COURT:  Usually it's around 250, right?

6            MR. MISKIEWICZ:  So whenever we get the first

7    batch, for instance, if they're finished now, we can start

8    scanning them now.  We will start scanning them now.

9    Maybe we can get at least that first batch on the disk

10   before the end of the day to counsel.

11           THE COURT:  Then they're going to have to

12   photocopy them also.

13           MR. MISKIEWICZ:  Print them out.

14           THE COURT:  The other alternatives is I can ask

15   the magistrate judge to do it.

16           MR. ROSEN:  May we just have a photocopy

17   machine, nothing elaborate.

18           THE COURT:  You may have to take it to a

19   service.

20           MR. ROSEN:  Like Kinkos or something.

21           THE COURT:  Absolutely.  You're not going to be

22   able to do it.

23           MR. MISKIEWICZ:  We could print it all out as

24   well for counsel, it's just that it's going to take us a

25   while to print out our own set.  I'm trying to get them

15

1   something as soon as possible.

2          THE COURT:  You print them here.

3          MR. MISKIEWICZ:  Yes.  In case we have, we

4   ultimately decided rather than sending them to First

5   Choice, because of the possibility that the collating

6   would get messed up.  We're doing it all in-house.  And

7   also First Choice didn't think they can get back copies by

8   nine o'clock tomorrow morning.  They were telling us that

9   they could not guaranty that.  So this seemed to be the

10  faster way.

11         MR. FROCCARO:  We may have the same problems.

12  If you can do it, it honestly would be a big help.  If we

13  go to Kinkos they can tell us they can't get it tomorrow

14  morning.

15         MR. MISKIEWICZ:  Then --

16         THE COURT:  It's the clerk's office that's doing

17  the photocopying.

18         MR. MISKIEWICZ:  No, we're doing it, we're doing

19  everything.  We just handed them the material.  And

20  they're handing us the completed copies.  I just wanted to

21  say they have what we have as soon as possible.  If

22  counsel is okay with it, it will just take longer to print

23  out, print everything out.  I don't know how long it's

24  going to take to print out.

25         MR. FROCCARO:  It will take the same amount of

16

1    time but we're going to have the same amount of time

2    anyway.

3              MR. MISKIEWICZ:  We'll work it out.

4              THE COURT:  If it has to be, I'll have a

5    magistrate judge do it.  I would prefer doing it Thursday

6    afternoon.  Okay.

7              MR. ROSEN:  Thank you, Judge.

8              THE COURT:  I'll see you in about a half hour.

9              MR. ROSEN:  Judge, while you are here, I don't

10   mean to infringe on your time, there are a couple of

11   things that I would like to bring to the Court's attention

12   in the nature of reargument.

13              I know your Honor ruled about these computers,

14   but -- that were taken from Mr. Garguilo, from Mr. Kyatt,

15   and there's a third computer somewhere I saw in the 3500

16   material.  These computers were seized -- again if you

17   don't want to hear the comment, I respect that.

18              THE COURT:  Is there something new that's come

19   up in the last few days?

20              MR. ROSEN:  No.

21              THE COURT:  On this issue?

22              MR. ROSEN:  No.  Something new that I've gone

23   back over the 3500 material and the detectives who did

24   seize these computers made it pretty clear in their DD-5s,

25   I think, that Mr. Schelhorn's selected 302s, that they

33

1              THE COURT:  I don't expect you'll be getting

2   that.

3              MR. MISKIEWICZ:  Right.

4              THE COURT:  You're not going to concede

5   authenticity.

6              MR. ROSEN:  No.

7              MR. MISKIEWICZ:  Right.  And I respect that.

8   It's incumbent on them to attack authenticity throughout.

9   That's why we're having this issue, it's not because we

10  want the jury to hear these epithets.  Frankly we don't

11  care.  We wish there was a way to redact them.

12             THE COURT:  I'll handle it in instructions to

13  the jury.  The other issue though is the uncharged murders

14  which you're going to be playing those portions, presents

15  a real dilemma.  But I'll handle it.  Let's take 10

16  minutes if you would.  I'll see you once Mr. Tarantino

17  comes back.

18             MR. ROSEN:  Thanks, Judge.

19             (Recess taken at this point.)

20             (After recess.)

21             (Whereupon, Mr. Jenks and the defendant entered

22  the courtroom.)

23             THE COURT:  All right.  Mr. Jenks, have you had

24  an opportunity to speak to Mr. Tarantino.

25             MR. JENKS:  I have, your Honor.

34

 1          THE COURT:  And is there any particular inquiry

 2    the Court should make of Mr. Tarantino?

 3          MR. JENKS:  I think that you can just go over

 4    the general Curcio rules and bounds.  I think he

 5    understands the nature of the potential conflict and he's

 6    prepared to waive it.

 7          THE COURT:  I guess it's best to swear in

 8    Mr. Tarantino.  Have him rise and swear him in.

 9          (Defendant sworn.)

10          THE COURT:  You can just push the microphone

11    over to Mr. Tarantino so that he can respond and we can

12    all hear him.

13          Mr. Tarantino, how are you today, sir.

14          THE DEFENDANT:  Good.

15          THE COURT:  I'm going to ask you a series of

16    questions.  You're under oath.  You have to tell the

17    truth.  If you don't want to answer me, let me know, if

18    you want to talk to your attorneys at any time before

19    responding let me know that and I'll give you an

20    opportunity to speak to them in private.  Do you

21    understand that?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Do you understand that you have an

24    absolute right under the Sixth Amendment to be represented

25    by counsel of your choosing and a counsel that is free

35

1   from any conflicts of interest.

2           Do you understand that?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Have you had an opportunity to

5   discuss with Mr. Rosen and Mr. Froccaro the issues

6   involving their representation of the Katia, Sal and

7   Danny?

8           THE DEFENDANT:  Yes, I have.

9           THE COURT:  And have you seen the material that

10  the government has supplied back in November of 2010 which

11  indicates that Sal Katia was involved in the murder of

12  Louis Dorval?

13          THE DEFENDANT:  Yes, I have.

14          THE COURT:  According to a confidential source,

15  and additionally, his father Danny or Dominico was

16  bragging, made representations that Sal did a very nice

17  piece of work by killing Mr. Louis Dorval.  You've seen

18  that?

19          THE DEFENDANT:  Yes, I have.

20          THE COURT:  You understand that currently both

21  Mr. Rosen and Mr. Froccaro are representing individuals

22  who have been implicated, at least according to one

23  confidential source, to have been involved in the murder

24  of Louis Dorval for which you were charged in this case.

25          THE DEFENDANT:  Yes.

                                                                    36

1          THE COURT:  And that's a conflict.  That's an

2    actual conflict in that you would have to waive any claim

3    of prejudice or bias on the part of your attorneys.

4          Do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you understand that you're

7    entitled to have new attorneys that do not have any

8    conflict and the Court would afford you an opportunity to

9    do that?

10         THE DEFENDANT:  Yeah, I understand.

11         THE COURT:  All right.  And do you understand

12   that if there's any issue with respect to the payment of

13   Mr. Rosen and Mr. Froccaro from the Katias, that their

14   loyalty may be divided, I'm not saying that it is, but it

15   may be divided.

16         THE DEFENDANT:  I understand.

17         THE COURT:  You understand, and you've spoken

18   with Mr. Jenks and he has he outlined for you some of the

19   potential problems where you have an attorney that has a

20   potential conflict?

21         THE DEFENDANT:  Yes.

22         THE COURT:  How do you feel that?

23         THE DEFENDANT:  I'm okay.

24         THE COURT:  You're okay?

25         You understand that you can't later claim by way

37

1    of, if you are convicted, by way of a habeas proceeding

2    that Mr. Rosen and Mr. Froccaro were really aligned more

3    with the Katias contingent and didn't worry about your

4    representation, that they'll give you 100 percent

5    representation.

6              THE DEFENDANT:  How am I supposed to answer

7    that, ma'am?

8              THE COURT:  If you're giving up that right you

9    can't claim it later on.

10             THE DEFENDANT:  Yeah, I get that.

11             THE COURT:  You get it, okay.  In other words, I

12   assume that you're also getting paid, Mr. Froccaro and

13   Mr. Rosen, by the Katias; is that correct?

14             MR. FROCCARO:  Of course.

15             THE COURT:  You too, Mr. Rosen.

16             MR. ROSEN:  Yes, Judge.

17             THE COURT:  And --

18             MR. ROSEN:  Hopefully.

19             THE COURT:  Whatever it is.  But you have a

20   monetary interest.

21             MR. ROSEN:  Yes.

22             THE COURT:  In both cases.

23             MR. FROCCARO:  Yes, your Honor.

24             THE COURT:  That's my only point.

25             MR. ROSEN:  Yes, your Honor.

PERRY AUERBACH, RPR, CSR
Official Court Reporter

38

1              THE COURT:  Is there anything that counsel feels
2     would impinge upon their representation of Mr. Tarantino?
3              MR. FROCCARO:  No, your Honor.
4              MR. ROSEN:  No, your Honor.
5              THE COURT:  Do you have any questions,
6     Mr. Tarantino?
7              THE DEFENDANT:  No.
8              THE COURT:  Have you had enough time to talk to
9     Mr. Jenks about this?
10             THE DEFENDANT:  He did a good job outlining it
11    for me.
12             THE COURT:  He usually does a good job.  That's
13    why I assigned him.  Okay.  So he outlined it for you.
14    You don't have any questions?
15             THE DEFENDANT:  No.
16             THE COURT:  Do you need any more time to think
17    about your decision here?
18             THE DEFENDANT:  No.
19             THE COURT:  And so you're going to waive any
20    conflict that counsel might have?
21             THE DEFENDANT:  Yes.
22             THE COURT:  Are you currently taking any
23    medication?
24             THE DEFENDANT:  Yes.
25             THE COURT:  What are you taking,

39

1    medication-wise.

2           THE DEFENDANT:  Selegiline, Sinemet, and

3    something else.

4           THE COURT:  Does that affect your ability to

5    understand anything?

6           THE DEFENDANT:  No.

7           THE COURT:  You seem to be smiling, okay.

8           THE COURT:  Mr. Jenks, you are rising.

9           MR. JENKS:  I want to say something, Judge, I

10   noticed it, and I can relate to this somewhat,

11   Mr. Tarantino has a noticeable tremor.

12          THE COURT:  Yes.  I noticed when he raised his

13   hand.

14          MR. JENKS:  He has Parkinson's and takes

15   Sinemet, which I take also, mine is early onset stage, his

16   is mid-level stage.  He is concerned, I'm going to address

17   it with his lawyers and the government, the noticeable

18   tremor may make the jury think of something and that

19   should be maybe something in jury selection that should be

20   addressed with the Court.  When I saw him I knew

21   immediately he had Parkinson's.  I asked him and he was

22   comfortable speaking to me about it and he asked me to

23   address it with his lawyers, the government and the Court

24   before you get to jury selection.

25          THE COURT:  It's my intention that there's a

40

1   question in the questionnaire related to Parkinson's and

2   the jury will be advised of that, and they'll also be

3   instructed that if they notice any tremor it has nothing

4   to do with your being nervous or uncomfortable in court.

5   It's simply a condition that you have.  All right.

6   Anything else?

7          MR. ROSEN:  No, Judge.

8          THE COURT:  I deem the conflict waived, unless

9   the government has any questions that you'd like the Court

10  to ask.

11         MS. CAPWELL:  No, your Honor.  Thank you very

12  much.

13         THE COURT:  I'll see you folks, I'll certainly

14  hear from you, you'll be able to visit with Mr. Tarantino

15  and go through the jury selection questionnaires.

16         MR. FROCCARO:  I don't know if we'll have time

17  to do that.

18         THE COURT:  So you're definitely going to do

19  that beforehand and see what his desires would be in terms

20  of the type of jury he'd like to be seated.

21         MR. FROCCARO:  Yes, your Honor.

22         THE COURT:  Have a good day.

23         MR. ROSEN:  Judge, we're due back here, just so

24  I make sure that I don't miss it, when does your Honor

25  expect us physically back here?

PERRY AUERBACH, RPR, CSR
Official Court Reporter

41

1          THE COURT:  Physically back here with the
2    defendant dressed for trial in civilian clothes
3    appropriately attired on March the 22nd, next week.
4          MS. CAPWELL:  Tuesday.
5          THE COURT:  Tuesday.
6          MR. ROSEN:  Thank you, Judge.
7          THE COURT:  In terms of the time you should be
8    here, let me check with the deputies.  Generally the
9    defendant has been brought over sometime around 10.
10          THE MARSHAL:  Yes, Judge, usually about 10:30 we
11   get here.
12          THE COURT:  All right.  The jury selection I'd
13   like to get started by 10 o'clock, is it going to be a
14   problem with that?
15          THE MARSHAL:  No, I don't think so.
16          THE COURT:  He'll be dressed and ready to go at
17   10 o'clock.
18          MR. ROSEN:  His wife will bring the clothes
19   before, that's what the MDC requires.
20          THE COURT:  They'll bring it to MDC and he can
21   change there.  Great.  Thank you.
22          (Matter concluded.)
23
24
25

1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - X
3                             :
   UNITED STATES OF AMERICA
4                                      08-CR-655

5
           -against-            :
6                                      United States Courthouse
                                       Central Islip, New York
7  CHRISTIAN TARANTINO,
                                       March 17, 2011
8          Defendant.         :       4:25 p.m.

9  - - - - - - - - - - - - - - X

10          TRANSCRIPT OF TELEPHONE CONFERENCE
           BEFORE THE HONORABLE JOANNA SEYBERT
11             UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Government:      LORETTA E. LYNCH
                            United States Attorney
14                          100 Federal Plaza
                            Central Islip, New York 11722
15                          BY:  JAMES MISKIEWICZ
                               CARRIE CAPWELL
16                          Assistant United States Attorneys

17

18  For the Defendant:      MICHAEL ROSEN, ESQ.
                           JAMES FROCCARO, ESQ.
19

20

21
   Court Reporter:          Perry Auerbach
22                          Harry Rapaport
                            100 Federal Plaza
23                          Central Islip, New York 11722
                            (631) 712-6103
24
           Proceedings recorded by mechanical stenography.
25              Transcript produced by computer.

                Perry Auerbach, CSR, RPR
                 Official Court Reporter

2

1           (TELEPHONE CONFERENCE IN CHAMBERS.)

2           THE COURT:  Hello, this is Judge Seybert.  Can

3   you please identify yourselves.

4           MS. CAPWELL:  Your Honor, for the government,

5   Carrie Capwell and Jim Miskiewicz.

6           MR. MISKIEWICZ:  James Miskiewicz for the

7   government.

8           MR. FROCCARO:  Judge, James Froccaro and Michael

9   Rosen is sitting beside me.

10          THE COURT:  We've got the list out.  Of the 154

11  potential jurors, there's an indication that you disagree

12  on 65.

13          MR. FROCCARO:  Yes.

14          THE COURT:  Are those for cause challenges?

15          MR. FROCCARO:  Yes.  These are for cause

16  challenges.  Included in that, Judge, there were certain

17  people that we thought had hardships, but obviously we

18  don't make that determination.

19          THE COURT:  I'll take a look at the hardships

20  later on, but I'm not going to drag in people if they

21  really have a hardship.

22          MR. FROCCARO:  I didn't even include them within

23  mine.

24          THE CLERK:  I think the government did.

25          THE COURT:  Let's go with number five.  I'd like

Perry Auerbach, CSR, RPR
Official Court Reporter

3

1     to be done with this by about 5:30 if that's at all

2     possible.  So let's be concise and get that organized.

3              Do you have a list that the government supplied?

4              MR. FROCCARO:  Just waiting for Mr. Rosen.

5              MR. ROSEN:  Number five, is that our first one

6     that you want to talk about?

7              THE CLERK:  Right.

8              THE COURT:  What's the basis for the for cause

9     challenge?

10             MR. ROSEN:  Paragraph 47, that the juror is

11    biased because Tarantino is in jail, and paragraph 56

12    which is a hardship.

13             THE COURT:  So it's 47, question 47.  All right.

14             MR. ROSEN:  Caused him to be biased and he

15    checked yes.

16             THE COURT:  What was the next question.  You

17    have 47.  I've read that.

18             MR. ROSEN:  And 66 which is just hardship

19    questions it's up to your Honor.

20             THE COURT:  Sounds like a very selfish person.

21    What's the government's position on this?

22             MS. CAPWELL:  Your Honor, they did note in

23    looking at number 49 which applies to whether they can

24    fairly and impartially evaluate all the evidence in this

25    case without fear or favor toward either side.  They said

4

 1    they would be able to follow their oath and not risk that.

 2          THE COURT:  I know, but 47 knocks him out.

 3    That's cause as far as I'm concerned.  Next is number 8.

 4          MR. ROSEN:  Number 8, your Honor, the reason I

 5    have indicated that is purely on the hardship question.

 6          THE COURT:  I thought you weren't doing

 7    hardships.  Tell me what the for cause challenge is.

 8          MR. ROSEN:  You see, when we gave the government

 9    the list, we indicated that the reason that I put that was

10    because it was a hardship.  But if you don't want me to do

11    that, I'll just do for cause.

12          THE COURT:  I'd like to work off the list here.

13    It says it's a hardship, he's got vacation booked March

14    20th to the 23rd.  I don't think that's such a big deal.

15    I'm not excluding him on that basis.  Any other basis?

16          MR. ROSEN:  No, your Honor.

17          THE COURT:  Okay.  March 10 -- juror number 10.

18    Tell me what's the objection, what particular question?

19          MR. ROSEN:  Juror number 10 question 32 that he

20    can't evaluate the evidence fairly.  Number 46.

21          THE COURT:  Okay.  Just one moment.  Let me look

22    at 32, then we'll go to 46.  And you had 32 and 46 was the

23    other one.

24          MR. ROSEN:  Yes, 32.  I also had, Judge Seybert,

25    23 D, I'm going to try to take them in order from now on

5

 1    in.

 2              THE COURT:  So now you have 32 D as in David?

 3              MR. ROSEN:  Yes.

 4              THE COURT:  That's related to the same

 5    situation.

 6              MR. ROSEN:  Yes.

 7              THE COURT:  What's the government's position on

 8    this?

 9              MS. CAPWELL:  Your Honor, are you on which

10    number?

11              THE COURT:  Number 10.

12              MS. CAPWELL:  10, okay.  Mr. Miskiewicz is

13    looking, I think they had airline tickets.

14              THE COURT:  No.  This is about a juror whose

15    family witnessed a horrific murder, people jumping off

16    into train tracks, et cetera.

17              MR. MISKIEWICZ:  That's why we believe that

18    person should be struck.

19              THE COURT:  But -- Mr. Miskiewicz, is that you

20    speaking?

21              MR. MISKIEWICZ:  Yes.

22              THE COURT:  I agree with you.  That person is

23    out.  I didn't have what the government's position was.

24    So that person is out.  Next is juror number 11.

25              MR. ROSEN:  Juror number 11.

6

 1          THE COURT:  Tell me what your objections are on

 2     juror number 11.

 3          MR. ROSEN:  Number 24.

 4          THE COURT:  Okay.  Let me get to 24 and then

 5     we'll go to the next one.

 6          MR. ROSEN:  Okay.

 7          THE COURT:  24:  Have you or a family member or

 8     close friend attended law school or been a lawyer.  The

 9     answer is yes.

10          What's the next one?

11          MR. ROSEN:  I think perhaps the next one that I

12     have I thought we should follow up on lawyers and law

13     firms.  The next I have is 32.

14          THE COURT:  What's the government's position on

15     this?

16          MR. MISKIEWICZ:  Unlike the last one, this seems

17     to be a close friend in high school, it was years ago.

18          THE COURT:  Is that the only basis that you have

19     for your objection?

20          MR. ROSEN:  No, your Honor.  47 again on

21     friends, 47.

22          THE COURT:  Okay.  That one is more troublesome.

23     What's the government's position on that?

24          MR. MISKIEWICZ:  Basically we -- if there were

25     many questions where people indicated that they had a

7

1    bias, but when they got to the questions about following

2    the Court's instructions about reasonable doubt and not

3    holding it against the defendant if he didn't testify,

4    this person, if you look at question 53, he pretty much

5    answered as you expect somebody to answer it.  So --

6            THE COURT:  You're saying it's a more general

7    feeling than a specific bias?

8            MR. MISKIEWICZ:  Yes.  He didn't say he can't be

9    fair or wouldn't to the Court's instructions.

10           THE COURT:  If you both talk at the same time

11   Perry is not putting any of it down.

12           MR. ROSEN:  Sorry, Perry, sorry, your Honor.

13   Look at 49, please, please.

14           THE COURT:  He indicates in the question whether

15   or not he can fairly and impartially evaluate all the

16   evidence in the case without fear or favor toward either

17   the government or the defendant, is there any reason why

18   you will be not able to follow, he said yes, he's on trial

19   for murder.  That's 3 questions that seems to be

20   indicative of more than a light bias.  Next one is 14.

21           MR. ROSEN:  Okay, then Judge, number 14, besides

22   the hardship, your Honor, there's number 32, please.

23           THE COURT:  Number 32.  By what incident is he

24   talking about?  I see.  Hold on.  Let me take a look at

25   the hardship.  What's the government's position on the

8

1    hardship with this person serving as an aid to a child

2    who's autistic.

3              MR. MISKIEWICZ:  It's a severe problem.  We'll

4    concede that he be struck.

5              THE COURT:  Okay.  He's gone or she's gone.

6              MR. ROSEN:  Judge, can I just say something.

7              THE COURT:  Yes.

8              MR. ROSEN:  I have never been in a jury

9    selection process where two questionnaires back to back 13

10   and 14 which we just discussed --

11             THE COURT:  No.  We did 11 and the next one is

12   14.

13             MR. ROSEN:  I know, but I've never seen two

14   questionnaires, 13 and 14 --

15             THE COURT:  I don't have 13 on the list.

16             MR. ROSEN:  I just wanted to tell you something.

17             THE COURT:  Okay.

18             MR. ROSEN:  Most respectfully.

19             THE COURT:  All right.

20             MR. ROSEN:  They're almost identical.  That's

21   why I didn't say anything until we finished this one.

22   It's the same imprint, it's as if they copied each other.

23   Maybe it's illegal.  I'm not suggesting that.  I've never

24   seen anything like that.  I was wondering if the

25   government noticed that because even both of these people

9

1    go to Knockouts, that bar, not that we know the bar.

2              THE COURT:  I haven't been spending a lot of

3    time there frankly.

4              MR. ROSEN:  No, but Knockouts, but both of them

5    go to Knockouts and they had the virtual incident, Judge.

6              THE COURT:  Maybe they knew each other.

7              MR. ROSEN:  Maybe.  I've never seen it.  Let's

8    move on.

9              THE COURT:  They --

10             MR. ROSEN:  The same language, it's troubling.

11   But since 13 is going to be one that you're raising now.

12             MR. ROSEN:  But 13 we agreed on.

13             MS. CAPWELL:  We can strike 13 for cause.

14             MR. FROCCARO:  We agreed.  And 14 is coming in.

15             THE COURT:  So 13 is also out.  Now we've got to

16   add 13.

17             MR. FROCCARO:  13 by agreement is out.

18             MR. ROSEN:  Okay.  Next one.

19             MR. FROCCARO:  I think it's 17, your Honor.

20             THE COURT:  The next one is 17.  Just give me

21   the number.

22             MR. ROSEN:  42 D and F.

23             MS. CAPWELL:  And they have a hardship.

24             MR. ROSEN:  Plus there's a hardship there.

25             THE COURT:  And the hardship?

10

1          MR. ROSEN:  I'm sorry, the hardship.

2          MS. CAPWELL:  They'll be leaving April for

3     family reasons, they don't state for how long.  I have

4     testing going on around these times.

5          THE COURT:  Why don't we get the reasons for

6     that.

7          MR. ROSEN:  42-F.

8          THE COURT:  E is also a problem.  They know

9     anything about the case, this person killed a guard.  All

10    right.  In view of that, we'll exclude number 17.

11         MS. CAPWELL:  Okay.  So 17 is out.

12         THE COURT:  He's out, too.  Number 18.

13         MR. ROSEN:  18 is next.

14         THE COURT:  You want to tell me what the

15    objection is on 18?

16         MR. ROSEN:  18 I have 39 A --

17         THE COURT:  Just one second.

18         MR. ROSEN:  Okay.

19         THE COURT:  They're not sure if they've ever had

20    a relative that's been a target of a case, or

21    investigation.

22         MR. ROSEN:  Right.  39 A.  The normal one that

23    most defense lawyers like to argue strenuously is the

24    person served as a grand jurors.

25         THE COURT:  Juror.

11

 1          THE COURT:  That's admissible but that's not a

 2    basis for cause.

 3          MR. ROSEN:  I understand that.

 4          THE COURT:  So any other thing that would keep

 5    them out?

 6          MR. ROSEN:  A hardship, that he needs a job and

 7    is out looking for a job.  That needs further inquiry by

 8    the court.

 9          THE COURT:  Absolutely.  Let me see what his

10    hardship is.  I don't think at this point I'm doing to

11    exclude him on the basis of that as a hardship.  So he can

12    come in.

13          21.

14          MR. ROSEN:  All right.  21, your Honor.  31 D.

15          THE COURT:  Were you or your friend or family

16    member called to testify in any legal proceeding arising

17    out of the incident, nothing is checked.  What's the

18    problem with that?

19          MR. ROSEN:  Go into 53.

20          THE COURT:  So there's no answer, we'll bring

21    him in.  And 53, one second, let me look at 53 with the

22    nature of that question.  It's a question as to whether or

23    not he believes or she believes in the rule of law, in

24    other words, that the person has to be proven guilty

25    beyond a reasonable doubt unanimously based upon the

12

1    evidence, et cetera.  In response to that he puts N/A.

2    We'll bring in and see what his problem is, maybe he just

3    didn't understand the question.  What else do you have?

4              MS. CAPWELL:  Your Honor, I'll just add for

5    number 21, 31 --

6              THE COURT:  One second, let me get to 21.

7              MS. CAPWELL:  I'm sorry, 31 D like David.  He

8    does state I can only understand easy words and listen to

9    easy words.  So makes part of the issue we would need to

10   explore with him.

11             THE COURT:  If he's not up for the task we'll

12   release him.  He stays or she stays.  Next we have 24.

13             MR. MISKIEWICZ:  Your Honor, just to move things

14   along, I'm reading his or her hardship, I think the person

15   that has a parent in hospice care and he's declining

16   rapidly.  I think we can both agree this is a severe

17   enough hardship to let the person go.

18             THE COURT:  Everyone agreed, so is the Court.

19             MR. ROSEN:  24, out.

20             MR. FROCCARO:  The next one, I believe,

21   your Honor is 28.

22             THE COURT:  27 is the next juror we have.  27

23   and what's your objection on 27?

24             MS. CAPWELL:  Let me turn to it.  I think it may

25   have been -- a large part of it was the hardship,

13

1   graduating senior, I can't miss class, I go to school

2   Mondays through Fridays, I will miss mid material exams

3   and papers due before spring break which is April.

4          THE COURT:  She or she is probably going to

5   become a teacher and will tell me they can't leave their

6   students but I'll allow this person not to return.  She

7   also has I would say on 34 B my family member was taken

8   into custody for no reason.

9          Next is 27.

10          MR. FROCCARO:  We just did 27.

11          THE COURT:  I'm sorry, we have 32.

12          MR. FROCCARO:  No, 28 is next.

13          THE COURT:  I don't have it on my list.

14          MR. FROCCARO:  I don't know, the government, we

15   have it on ours as a cause and the government doesn't on

16   their list.

17          THE COURT:  Okay.  But I thought that I was

18   getting a whole list of ones here.  28, let's see what

19   you've got on that one.

20          MR. ROSEN:  26, 32.

21          THE COURT:  First you have to give me a chance

22   to get it obviously.  All right, 26 which one on 26?  He's

23   got an ADA Manhattan around 10 years ago, this person

24   works in the Manhattan district attorneys Queens District

25   Attorney's office.  I don't know whether it was the person

14

1    or some relative.

2            MR. ROSEN:  We'll make it easier, Judge, 46.

3            THE COURT:  46 extremely uncomfortable with any

4    violent subjects and disruptions.

5            I don't necessarily think that is a reason to be

6    off a jury.  The other ones 49, victim of domestic for

7    domestic violence for over 20 years.  I'm not sure of my

8    ability to evaluate without fear.  They also have some

9    nonjudgment thing going on.

10           MR. ROSEN:  There's also 53 and 59 most

11   respectfully.

12           THE COURT:  That's unanswered.

13           MR. ROSEN:  53, there are unanswered questions,

14   equivocal yes at the very end of the line, I'll do the I'm

15   able.

16           THE COURT:  I can't ask any more than that.

17   What's the government's position on this?

18           MR. MISKIEWICZ:  I don't think she says anything

19   that automatically disqualifies her.  I just would put her

20   in a category of there may be further questions to be

21   asked follow up.  But I didn't think she deserved to just

22   be excused.

23           THE COURT:  All right.  I agree.  We're on to

24   the next one, which is 32.

25           MR. ROSEN:  I'm sorry, before you leave number

15

1   60, Judge, she doesn't think she can follow the rules of

2   law as you have outlined in 60.

3           THE COURT:  I'm certainly going to have a

4   discussion with her if she doesn't think, and she

5   continues not to think that she can follow it.  Then

6   she'll be released, but she's coming in.  All right.  Next

7   we have 32.

8           MR. ROSEN:  I have too many police officers in

9   the family and daughter's graduation.

10          THE COURT:  The daughter's graduation is when?

11          MR. ROSEN:  May.

12          MS. CAPWELL:  Not sure much date but the

13  graduation I mean --

14          THE COURT:  It might be local.  I don't know

15  where it is.  But just having multiple law enforcement

16  folks in the family or having multiple convicted

17  defendants in the family isn't a basis to exclude.  All

18  right.  If there's nothing else,.

19          MR. ROSEN:  Maybe you can inquire, your Honor,

20  of the date of the graduation.

21          THE COURT:  I will.  But the person can come in.

22  All right.  Next we have 33 -- that's the government's?

23          MS. CAPWELL:  No.

24          MR. ROSEN:  Village clerk and court clerk in a

25  local court and I think that maybe your Honor would be

16

1   able to, without revealing who she is, obviously, she's a

2   court clerk, and I don't know which court, where.

3          THE COURT:  We can check on that and make sure

4   that it's not a federal court.

5          MS. CAPWELL:  It's for a village.

6          THE COURT:  Okay.  So what difference does it

7   make?

8          MR. ROSEN:  I don't know if it does make a

9   difference.

10          THE COURT:  I'll ask these questions obviously,

11   I'm going to go through these questionnaires and ask these

12   questions.  Was there any other basis to have this person

13   excluded.

14          MR. ROSEN:  I just thought most respectfully

15   that being a grand juror, testifying in the grand jury and

16   at trial for the DA, just made it too much on the side of

17   the prosecution.

18          THE COURT:  All right.  It's something I'm

19   certainly going to explore, it's important to explore it.

20   But at this point I'm not going to have the person

21   excluded for cause.  All right.  Next we have juror number

22   34.

23          MR. ROSEN:  34.  I have that.  Let me see why I

24   did that.

25          THE COURT:  They indicate that they have a

17

1    difficulty reading or understanding English.

2         MR. ROSEN:  That's the reason that I put that

3    down, your Honor.

4         THE COURT:  It seems that they were born out of

5    the country, Lima, Peru, any other basis to exclude them?

6         MR. ROSEN:  No.  If they can't read or write I

7    think that's the sufficient argument that I can make four.

8         THE COURT:  All right.  Let's bring them in and

9    see just what their level is.  All right.  Next we have

10   35.

11        MR. ROSEN:  35, your Honor, I think question

12   number 3 I didn't understand.  This person is a patient or

13   treats patients.  So I'm just not sure.  And you have a

14   vacation hardship.

15        THE COURT:  Let me see what the vacation

16   hardship is.

17        MR. MISKIEWICZ:  May 25th.

18        THE COURT:  May 25th.

19        MR. ROSEN:  And you also have --

20        THE COURT:  Let me ask you, Mr. Miskiewicz, do

21   you still believe this case is going to be on -- in May,

22   on May 25th?  And let me ask defense counsel the same

23   question.

24        MR. FROCCARO:  No.

25        MR. MISKIEWICZ:  No, I think the trial will go

18

1    into the first and possibly the second week in May.  We

2    have some downtime in between.  We certainly should be

3    done by the end of May.

4            THE COURT:  Even with the days we're going to be

5    out?

6            MR. MISKIEWICZ:  Yes.  Because that would still

7    give us six solid weeks of trial time, and wouldn't get us

8    to May 25th.

9            THE COURT:  All right.

10           MR. MISKIEWICZ:  Having looking at the calendar

11   and when we're going to be down, and I would as I said I

12   think that we're going to be -- because of the weeks off,

13   we're going to be probably into May, the first three

14   weeks, but the end of May I just find it hard to believe

15   we'll be going on then.

16           THE COURT:  Mr. Rosen, Mr. Froccaro.

17           MR. FROCCARO:  Judge, I kind of reevaluated my

18   opinion, I think we may go to the end of May.  Since we've

19   gotten the rest of the 3500 and know who the witnesses

20   are, we could potentially stretch out to a 6 to 8 week

21   trial including all the experts.

22           THE COURT:  Just as an aside, has there been,

23   your expert hasn't had an opportunity to get involved in

24   any additional tests, right.

25           MR. FROCCARO:  He's not back yet, Judge.

```
                                                                  19
 1              THE COURT:  He's not back until Monday.

 2              MR. FROCCARO:  The 20th.

 3              THE COURT:  I tend to agree, Mr. Froccaro.  I

 4    don't see this being done on the 25th, but apparently

 5    there's air fare that's been booked, they fly on

 6    Wednesday, May 25th.  I think there is a potential.  Then

 7    attorneys always underestimate the length of their

 8    summations.  So I'm going to exclude this person.

 9              MR. ROSEN:  Okay, Judge.

10              THE COURT:  Okay.  Next is juror number 38.

11              MS. CAPWELL:  Yes, your Honor, I think the

12    government's basis for putting them in the for cause

13    challenge is the hardship, number 66, I am a language

14    teacher, my teacher who is replacing me is not qualified

15    to teach the subject.  Their regents preparation begins in

16    late April, if I'm not there I may be laid off in June.

17    That was our basis for this one.

18              THE COURT:  What's the defendant's position on

19    this?  38?

20              MR. ROSEN:  Judge, my notes on 38 just reflected

21    medical.

22              THE COURT:  Medical?

23              MR. ROSEN:  Yes.

24              THE COURT:  This is a person that's a school

25    teacher.
```

20

1           MS. CAPWELL:  Has cerebral palsy, more than 90

2    minute commute one way.

3           MR. ROSEN:  I'll consent, your Honor.

4           THE COURT:  Okay.  Let's have this person

5    released then.  38 is out.  Next we have, next juror is

6    40.

7           MR. ROSEN:  I think 53.

8           THE COURT:  All right.  Let me get 53, please.

9           MR. ROSEN:  The juror initially wanted --

10          THE COURT:  He's on page what of this 40 page

11   questionnaire.  I guess they get tired after a while.

12   What else do you have on this juror?

13          MR. ROSEN:  I have a hardship request.

14          THE COURT:  I don't have any hardship.  I have

15   NA.

16          MR. ROSEN:  I'm sorry, you're talking about

17   juror number.

18          THE COURT:  4-0.  40.

19          MR. ROSEN:  You're right.

20          THE COURT:  That's okay.  So that juror is

21   remaining on?

22          MR. ROSEN:  Yes.

23          THE COURT:  Good.  Next we have juror number 41.

24          MR. ROSEN:  So 40 is coming in.

25          THE COURT:  40 is coming in.

21

1           MR. ROSEN:  Okay, your Honor.  41 if you look at

2    number 40 et seq. that might do it.

3           THE COURT:  I'm sorry, 40 F?

4           MR. ROSEN:  No, number 40 and all of --

5           THE COURT:  I'm sorry, it's garbled the way it's

6    coming over.  Do you want me to look at 4-O?  Correct?

7           MR. ROSEN:  Yes, number 40 and --

8           THE COURT:  The questions here, this is juror

9    number 41, question 46.

10          MR. ROSEN:  I guess the last, 39 F.

11          THE COURT:  39 F.  So forget 40.  Now we're on

12   question 39 F.  No experience has been in every case with

13   US federal prosecutors that defendant was guilty and so I

14   may have a predisposition in this area.  I may.  Anything

15   else on this juror?

16          MR. ROSEN:  Yes, 43.

17          MR. MISKIEWICZ:  Judge, I think that we can

18   concede on this.

19          THE COURT:  The US Attorney's Office has always

20   been correct, I doubt that.  All right.  This juror is

21   gone.  Next one is 43.

22          MR. ROSEN:  Okay, I have 43 here and 43 where

23   this juror can't be fair and can't be impartial, I'm going

24   to put that down.

25          THE COURT:  Give me the number.

22

1        MR. ROSEN:  I know, Judge.  We'll do 59.  I'm

2    going backwards.

3        THE COURT:  Do you hold any beliefs or opinions

4    that would affect your ability to evaluate such testimony

5    blah-blah-blah fair and impartially, I might.  We'll find

6    out about it.  So that's --

7        MR. ROSEN:  Also, Judge, if you look at 64, I'm

8    very sorry, I'm a little disorganized with this one.  64.

9        THE COURT:  It would be difficult for them to

10   follow and put aside their emotions and prejudice.  What's

11   the government's position on this one?

12       MR. MISKIEWICZ:  It seems like it's a follow-up.

13   I don't know what that meant, it will be just that

14   difficult.  Doesn't say they can't.  But I understand.

15       THE COURT:  This is an interesting one.  I

16   cannot survive on spending nearly $25 to $40 to travel

17   leaving the house at approximately 6:30 daily for

18   part-time wages.  I'm on vacation the end of May, my

19   birthday, I'm planning a cruise.  A little inconsistent

20   with the impoverished state that they relate.  I think we

21   should call this person in and see what's going on.

22       MR. ROSEN:  Okay.

23       THE COURT:  Next we have number 54.

24       MS. CAPWELL:  Your Honor it was a typo, it

25   should be 45.

23

1          THE COURT:  45.  We have to get that one.

2          MR. ROSEN:  Might save a lot of time, Judge.

3          THE COURT:  Okay.  Before you get started on

4    that, we're going to switch court reporters.  You've tired

5    out Perry and now Harry Rapaport is here.

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

2          THE COURT:  Before you get into juror number 46,

3     I want the government to know they have to prepare blank

4     questionnaires that need to be copied for tomorrow.

5          MR. MISKIEWICZ:  We have a number of them

6     already.

7          THE CLERK:  150.

8          THE COURT:  We called up 150 people for

9     tomorrow.

10          MR. ROSEN: Nobody told Mr. Foccaro and I.

11          THE COURT:  I just found out two seconding ago.

12     I'm looking at the number of objections you have, the

13     number of people who showed up, and I'm also cognizant of

14     the fact that there will be additional jury selections on

15     Monday.  So, I figured we may as well get these folks

16     lined up and get some people to work with.

17          MR. MISKIEWICZ: Are they coming up in the

18     morning or is the going to be on two waves?

19          THE COURT:  I will figure it out later.  I

20     assume they are coming in two waves.

21          MR. MISKIEWICZ: We have enough if there are

22     about 100 people coming in the morning.  We have enough

23     ready to go.

24          THE COURT:  All right.

25          Shall we get back to juror number 45?

25

1          What are the objections on that?

2          MR. ROSEN: Number two.

3          MR. MISKIEWICZ:  One second.

4          MR. ROSEN: Number two.

5          MR. MISKIEWICZ:  What are you on, Michael?

6          THE COURT:  Number two for juror number 45.

7          MS. CAPWELL:  Thank you.

8          THE COURT:  About 60 percent loss of hearing on

9     the left ear.  We have to place the juror so their right

10    ear is facing us.

11         Anything else?

12         MR. ROSEN: We will just cross-examine from one

13    side.

14         THE COURT:  All right.

15         MR. ROSEN: Let me look at number 20 for a

16    moment.

17         The juror checked off on 20 A that she worked as

18    a consultant for somebody in the government.

19         THE COURT:  Department of Finance, I think.  We

20    will explore that.

21         MR. ROSEN: All right.

22         THE COURT:  Next.

23         MR. MISKIEWICZ:  45 stays in?

24         THE COURT:  45 stays in.

25         MR. MISKIEWICZ:  47 is next.

26

1          THE COURT:  47?  Yes, that comes next.

2          MR. ROSEN: 47, I have a prison bias, and I think

3   that is probably 47.

4          THE COURT:  Question 47?

5          MR. ROSEN: I'm pretty sure.  Yes, 47.

6          THE COURT:  Something I can explore with that.

7   They indicate they might be bias.  So, I will examine that

8   in some detail.

9          What else do you have?

10          MR. ROSEN: The other thing I have here is I

11   notice there is also a hardship, and it involves money.

12   And if they know about Filene's Basement.  I haven't

13   checked on the other stuff.

14          THE COURT:  Other people know about Filene's

15   Basement.

16          MR. ROSEN: There is a hardship, Judge.

17          THE COURT:  Let them explain.  Usually when you

18   tell them the travel will be paid for and a variety of

19   other things they make it here.

20          Just give me one second.

21          MR. ROSEN: Okay.

22          (Whereupon, at this time there was a pause in

23   the proceedings.)

24          THE COURT:  Mr. Miskiewicz, Mr. Baran relates

25   that all the jurors are coming in at the same time

27

1    tomorrow morning.  So you need to make additional copies

2    tonight.

3              MR. MISKIEWICZ:  All right.  We are on it.

4              THE COURT:  We did 47.  And 48 is the next one.

5              MR. ROSEN: Again, number 47 comes up, once again

6    about prison.

7              THE COURT:  He says he feels people should be

8    given a second chance.  So we can explore that with him.

9    What else?

10             MR. ROSEN: The only other thing I have again is

11   a hardship related to a job and vacation as I have it

12   noted.

13             THE COURT:  One second.

14             The company may suffer detriment, guidance --

15   inadequate guidance by my delegate -- additionally I

16   booked a vacation with my family and cannot cancel without

17   large losses in May.

18             Let's find out when he booked it.

19             Anything else you objected to?

20             MR. ROSEN: That was it.

21             THE COURT:  This person stays in.

22             Next we have 49.

23             MR. ROSEN: Sorry?

24             THE COURT:  49.

25             MR. ROSEN: I have 49.

28

1          Number 33.

2          THE COURT:  Favors law enforcement testimony.

3          What else do you have?

4          MR. ROSEN: I have 33, and I have 26.

5          THE COURT:  26, we are going now the other way,

6    right?

7          MR. ROSEN: Sorry.  At my stage -- a sheriff,

8    opens his lock, has been in law enforcement for 38 years

9    and favors police officers.

10          THE COURT:  The government's position on this?

11          MR. MISKIEWICZ: We concede.

12          THE COURT:  Kind of thought you might.  This

13   person is out.

14          MR. ROSEN: 49?

15          THE COURT:  49 is out.

16          Next I have 52.

17          MR. ROSEN: 52 is in my next pile.  I got it.

18          52.  I think there is an immediate difficulty

19   reading.  Yes, number one.

20          THE COURT:  Let me just see this here.

21          This person was born in China, cannot read, a

22   little bit English.

23          That may be a problem communicating with fellow

24   jurors during deliberations.

25          MR. ROSEN: I agree.

29

1          THE COURT:  Anything else the person lists?  I

2     tend to agree on this person.

3          MR. MISKIEWICZ:  52 is out?

4          THE COURT:  Out.

5          MR. MISKIEWICZ:  All right.

6          THE COURT:  Next we have number 53.

7          MR. ROSEN: One of the things I noted besides the

8     hardship is that this person thinks they have to Synergy.

9     Under attachment B the juror circled Synergy, and that has

10    a bit of a role in this case.

11         THE COURT:  It did, but not to the point where

12    the offenses were committed at that location.

13         MR. ROSEN: Just a couple of other --

14         THE COURT:  Apparently they also have some bias

15    against law enforcement.  They think they get paid too

16    much money.   But there is someone in their family in the

17    Nassau County Department of Corrections, and the

18    government may argue on something about that.

19         I don't think it is enough to keep the person

20    out at this stage, so I will let them come in and tell us

21    about why their work, and so forth, would be negatively

22    impacted to such a person that it is a hardship.

23         That person stays in.

24         And 54 is the next juror.

25         MR. MISKIEWICZ:  I think we might agree with

30

1    them on this one actually.

2            THE COURT:  Just tell me what it is, please.

3            MR. ROSEN: I have a personal observation, I may

4    have represented -- this juror says his father was an

5    elected attorney, and I handled a pretty significant case

6    in State Court in Nassau County many, many years ago.  It

7    was the first indictment I believe that Mr. Dillon, may he

8    rest, got a car dealership for turning down the odometer.

9    I don't know.  He didn't recognize my name, but I'm just a

10   little hesitant.

11           And the other thing that I noticed, 43(b), if

12   your Honor wants --

13           THE COURT:  Just one second.

14           It is somewhat colorful, if you have a basis to

15   believe that you represented that person's father?

16           MR. ROSEN: I got that case.

17           MR. FROCCARO:  If the government agrees, your

18   Honor --

19           THE COURT:  That may not be enough on this

20   situation.  The government is agreeing based on what.

21           MR. MISKIEWICZ:  Your Honor, we are just looking

22   at 33 A, and it might be in a particular situation.

23           THE COURT:  It is about a speeding ticket.

24           MR. MISKIEWICZ:  All right.  We can bring this

25   person back and explore it a little more.

31

1          THE COURT:  You can explore it, and then you

2     would be able to represent if you did represent a relative

3     of the person.

4          MR. ROSEN: First I need the fellow's name.

5          THE COURT:  Maybe the sight will gel it.

6          Number 58, five eight.  That is next.

7          MR. ROSEN: If we start with 33 C.

8          THE COURT:  Not certain if they can follow the

9     Court's instruction.  That alone is not going to get him

10    out of coming back.

11         And then we have also 34 C.

12         MR. ROSEN: That is my next one.

13         THE COURT:  Okay.  That is getting a little bit

14    closer.

15         Anything else?

16         MR. ROSEN: Yes, Judge.

17         I don't know, maybe your Honor -- being married

18    to a police officer would slant my views.

19         THE COURT:  You also have 43(a), which says my

20    sympathy is on the side of law enforcement.

21         MR. ROSEN: Yeah, yeah, yeah.

22         THE COURT:  They indicate they can be fair and

23    put that aside.

24         And then 59, I'm on the side of law enforcement.

25         They are getting really close now.

32

1          What else do we have here?

2          MR. ROSEN: We have F, 42 F, which says that the

3  case doesn't get this far without good evidence.

4          I don't mean to laugh, but --

5          MR. MISKIEWICZ: What number is that?

6          MR. ROSEN: It looks like 42 F to me.

7          THE COURT:  Have you formed an opinion as to the

8  defendant or about this case based on anything you have

9  seen or heard?

10         Answer:  Yes, question mark.

11         If, yes, what is that opinion?

12         Case doesn't get this far without good evidence.

13          I think he has enough here, or she has enough

14  to be excluded.  That person is out.

15         MR. ROSEN: Thank you.

16         THE COURT:  Next we have juror number 60.

17         MR. ROSEN: The only thing I have for that, if

18  your Honor please, is the doctor visit for medications

19  that this potential juror indicates.

20         THE COURT:  What number is that?

21         MR. ROSEN: Number three I believe.

22         THE COURT:  Visit to one doctor every three

23  months, visits with another for my knees.

24         Question number four he has here, medications,

25  would it affect his ability to serve?

33

1          Some of my medications induces tiredness and

2    sleepiness at random.

3          That will be a change because sometimes the

4    testimony induces sleepiness.

5          Why don't we get the person in to get more of a

6    clarification.  If they look like they are in bad shape

7    and can't hold up I will certainly exclude them.  All

8    right?

9          MR. MISKIEWICZ:  Okay.

10          THE COURT:  That person remains in.

11          Next we have juror number 61.

12          MR. ROSEN: If you look at number 47 --

13          MR. MISKIEWICZ: If I can short circuit this, the

14    person indicated they will be on travel and not return

15    until the evening of March 22nd, the 1st day of jury

16    selection.  And I don't know if that would ordinarily

17    disqualify them right there.  Not that I want to

18    disqualify that person.

19          THE COURT:  They are travelling to Charleston

20    the evening of the 21st and returning the evening of the

21    22nd.

22          We may pull this person in on the 23rd.  It

23    doesn't necessarily exclude them.

24          What else do you have on this person?

25          MR. ROSEN: 27.

34

1      THE COURT:  37, hold on.

2      MR. ROSEN: 27.

3      THE COURT:  Two seven, hold on.

4      MR. ROSEN: And 49.

5      THE COURT:  Have you ever filed a complaint with

6  the police against anyone?

7      Answer:  Yes.  In 2001 we had a break-in of our

8  apartment in New York City.  At the time I lived with

9  three roommates.

10      Were you satisfied?

11      Answer:  Yes.

12      MR. ROSEN: We have the wrong one.

13      THE COURT:  Juror number 61.

14      MR. ROSEN:  47 and 49.

15      THE COURT:  Not 27, all right.

16      You may hear testimony that the defendant has

17  previously spent time in prison.  Would that fact alone

18  cause you to be biassed against the defendant?

19      Answer:  Yes.  This fact could possibly sway my

20  opinion as to the type of person the defendant is.

21      That is not necessarily going to keep him out.

22      49, the question is the oath you take to fairly

23  and impartially evaluate evidence.  Is there any reason

24  why you will be unable to follow this oath?

25      Answer:  Yes, I could.  I think it is, possibly

35

1    fear retribution from defendant if I participated in a

2    guilty verdict.

3            It shows some indication that he may not be a

4    suitable juror, but maybe he or she can be re-educated.

5            Is there anything else?

6            MR. ROSEN: No.

7            THE COURT:  Okay.

8            Next, 63.

9            MR. ROSEN: I hate for them to mention it to

10   other jurors that they are afraid.  That can spread like a

11   virus.

12           The next one is what?

13           THE COURT:  63.

14           MR. ROSEN: Difficulty with English is the first

15   thing there, number one.

16           THE COURT:  Okay.

17           Difficulty with English.

18           Anything else?

19           MR. ROSEN: No, Judge.

20           THE COURT:  100 percent.

21           I'm a little nervous.

22           I will have this person come in.

23           Now that I think of it, 61 is probably not

24   someone that we really need in here at this point in time.

25   So I will change my mind on 61 and they will be excluded.

36

1          MR. ROSEN: Okay.

2          Now, 63 you are bringing in?

3          THE COURT:  63 comes in.  And 64 is next.

4          MR. ROSEN: I will be right there, Judge, one

5     second.

6          Again, 47 and a hardship.

7          THE COURT:  Concern about previous charges.  The

8     person spent time in jail.

9          At this point it is not enough.  Let me lock at

10    the hardship.

11         MR. FROCCARO: If this is a case they are

12    introducing evidence with Mr. Gargiulo, and with

13    Mr. Dorval, and there are jail cases now.

14         Anyone who is a close call on this, most

15    respectfully they should be excused.

16         MR. ROSEN: Maybe the close call can be avoided

17    on Angelo, because he is going to Italy April 29th for two

18    weeks.  And that may be enough right there.

19         THE COURT:  All right.  I'll exclude this

20    person.

21         Next we have 69.

22         MR. ROSEN: 69?

23         THE COURT:  Yes, six nine.

24         MR. MISKIEWICZ:  I just noticed they also have

25    something about a vacation on the back of 66, from May

37

1   23rd through June 11th.  We didn't think it would be a

2   problem, but it sounds like maybe now it is.

3          THE COURT:  All right.  So number 69.

4          MR. ROSEN: 56 is out, all right.

5          THE COURT:  The last one I looked at was 63, and

6   64 is out.  Now we are on 69.

7          MR. MISKIEWICZ:  Correct.

8          And they said they had a $10,000 trip, which is

9   non-refundable to Greece from May 23rd to June 5.

10          MR. FROCCARO:  You are talking about juror

11   number 69?

12          THE COURT:  69.

13          MR. MISKIEWICZ:  Question number 66 at the back.

14          MR. ROSEN: Going to Greece.

15          THE COURT:  All right.  Let him go to Greece.

16          MR. ROSEN: Judge, this has been a very efficient

17   way of doing this.

18          THE COURT:  Yes.

19          MR. ROSEN: What is next?

20          THE COURT:  70, seven 0.

21          MR. ROSEN: 46 and 49.

22          THE COURT:  Okay, just one moment.

23          Takes care of grandchildren.  And

24   daughter-in-law at work.  That person is gone.

25          Next we have 71.

*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

38

1          MR. ROSEN: 23 C and 33.

2          THE COURT:  Always on the side of law

3    enforcement.  Maybe in terms of being impartial and having

4    an open mind.

5          I will bring that person in and they can

6    explain --

7          MR. ROSEN:  Sorry, Judge?

8          THE COURT:  I will bring that person in unless

9    there is another reason to excuse him.

10          MR. ROSEN:  Judge, I didn't even look at the

11    hardship.  Once I hit the --

12          MR. MISKIEWICZ:  They don't have any.

13          MR. ROSEN: No hardship, good.

14          THE COURT:  It is maybe, in response can you put

15    aside the opinions of the police.  Let's find out whether

16    they can put it aside.

17          MR. ROSEN: The background here is NYPD and there

18    will be a lot of NYPD here.

19          THE COURT:  We will get a little more specific

20    here and see what the issues are.

21          MR. ROSEN: Yes, Judge.

22          THE COURT:  Okay.  That person remains.

23          Next is number 73.

24          MR. ROSEN: 44.

25          THE COURT:  That is in response Parkinson's

39

1    disease.

2          That depends on what kind of crime this person

3    with Parkinson's disease committed, and if the answer is

4    yes, it should be explored further.

5          MR. ROSEN: And I think number 53.  Let me take a

6    quick look, Judge.

7          THE COURT:  Seems a little bit confused, and I

8    think that is okay.

9          MR. ROSEN:  And you see, can't agree on the law,

10   53 B.

11         THE COURT:  I don't think he understands the

12   basic question.

13         MR. ROSEN: Okay, Judge.

14         THE COURT:  Any hardship on this person?

15         MR. ROSEN: I neglected to do that sometimes.  I

16   was so confident you would kick them off.

17         THE COURT:  No.  He doesn't have any hardship,

18   he stays on.

19         Next one is number 79.

20         MR. ROSEN: I have 79.  It looks like a language

21   objection.  It is number one.

22         Do you have any difficulty reading and

23   understanding English?

24         THE COURT:  The person is from the Ukraine.

25   They learned English at 24 and they are now 39.

40

1          Anything else?

2          MR. ROSEN: I don't believe so, Judge.

3          THE COURT:  They work as a security guard,

4    supervisor branch manager.

5          Let's bring him in unless there is some other

6    objection.

7          MR. ROSEN: Judge, it is probably my fault.  Once

8    I thought I had a winner I didn't go further.  And I'm

9    just looking at 64 on juror 79.  And I just noticed it and

10   apologize for that and I bring it to your attention.

11         THE COURT:  They indicate that they think that

12   if the case made it this far that they are probably

13   guilty.

14         That combined with the language, the person is

15   excluded.  79 is out.

16         Next is number 80.

17         MR. ROSEN: 33 is the number I have.

18         THE COURT:  They believe that law enforcement is

19   extrinsically sexist and homophobic. Their credibility

20   must always be examined.

21         I don't know how applicable that necessarily is.

22         MR. ROSEN: Thank you for that.  I just thought

23   it was very offensive.

24         To be candid, the reason I did that is I felt it

25   was terribly offensive.

41

1          I don't have any other reason.

2          He was on a grand jury, and he might be

3    affected.  I have it somewhere and I don't know where.

4    Again I apologize.  This was hard to prepare.

5          THE COURT:  I'm sure it is.

6          I don't see anything else.  He scheduled some

7    business trip in May, and that is for the 5th of May.

8          If there is nothing else I'm bringing the person

9    in and we will see.

10          Next is 81.

11          MR. ROSEN: Again, the English, item number one.

12          THE COURT:  The question here is -- he explains

13    it as how can I say little, something or another.  I don't

14    know why he is -- what he is saying here.  I'm not good in

15    English.  I try my best.

16          The person is from China.

17          Any other base?

18          MR. ROSEN: No, Judge.

19          THE COURT:  Let's get the person in and see what

20    the level of their ability to speak English is, and to

21    understand.

22          Next we have juror number 82.

23          MR. ROSEN: Number 47.

24          THE COURT:  47, with respect to prison time.

25          Knowing of previous wrongdoing would affect

42

1    something -- it looks like prior probability.

2            It doesn't make a whole lot of sense.  But I

3    guess they are indicating they are biased on that issue.

4            Is there anything else with this juror?

5            MR. ROSEN: No, Judge.

6            THE COURT:  It looks like he or she is

7    determined to stay with his position, if it does, then

8    obviously I will get rid of them pretty quickly.

9            MR. ROSEN: Judge, I apologize again.  66, the

10   hardship.  Passover holiday.

11           Let me look at that.

12           I have two very young children who I take daily

13   to daycare by work, not near home or court.  Obstruction

14   to sensitive research and publishing.

15           MR. MISKIEWICZ:  That is for Mr. Rosen as well,

16   the publishing disruption.

17           MR. ROSEN: The publishing?  I haven't published

18   lately.  I still think this is tough, whatever this person

19   is.

20           THE COURT:  This person is a mathematician.

21           MR. MISKIEWICZ:  And a biologist.

22           I just think the person didn't give enough to be

23   excluded automatically.

24           THE COURT:  I will bring the person in.

25           Next we have number 83.

43

1          MR. ROSEN: I'm getting here.

2          Health issue I have on the front page.

3          THE COURT:  They have anxiety attacks.  When I

4    get panicked or nervous I pass out.  The idea of being on

5    a murder case would be very difficult for my anxiety

6    level, especially the defendant could be in a bigger crime

7    gang or organized operation.  I would be very, something

8    concerned about being followed or for my family's safety,

9    especially since it is an Italian name, and the names on

10   the list are mostly Italian.

11          I consider that pretty offensive, but I will

12   excuse the person because of the anxiety attacks.

13          MR. ROSEN: That is 83.

14          THE COURT:  83 is out.  Next we have 86.

15          MR. ROSEN:  Let me have the young guy take over.

16          THE COURT:  A family member that works for

17   Suffolk County Police, Suffolk County Correction Officer.

18   They don't have a hardship.

19          MR. ROSEN: I don't see anything right now.  I'm

20   sorry.  I don't know why I put down four -- yes, number

21   two, yes.  I stopped at that.

22          THE COURT:  Can't see out of my left eye.  Has

23   cataract, need operation.

24          Frankly, I don't think it is enough to knock him

25   out.  Cataract operation, you go in in the morning, and

44

1   remove the cataract, and it takes less than ten minutes to

2   be done, and you are certainly available the next day.

3              Hopefully we can straighten that out.

4              If there is anything on that that makes it so

5   severe we will know.  Bring him in.

6              MR. ROSEN:  Okay.

7              THE COURT:  That person remains.

8              MR. ROSEN:  The next file is for Mr. Froccaro.

9              THE COURT:  We should be starting with number

10  87, Mr. Froccaro?

11             MR. FROCCARO:  One second, your Honor.  I was

12  responsible for this.

13             THE COURT:  Hopefully he will reciprocate.

14             MR. FROCCARO:  He doesn't have to.

15             MR. MISKIEWICZ:  This person had open heart

16  surgery and has to visit the doctor every two months.

17             MR. FROCCARO:  Number 87, that was the judge who

18  said this person had open heart, etcetera.

19             THE COURT:  The government, is this your

20  objection?  I don't have a hardship?

21             MR. MISKIEWICZ:  No.  We didn't object to this

22  person.

23             That is one of the ones you guys did right at

24  the end.

25             THE COURT:  Okay.

45

1          So, they are in.

2          The next one is 93.

3          MR. FROCCARO:  This person said they don't

4     understand English.

5          MR. MISKIEWICZ:  It looks like they might have

6     left a lot of questions.

7          THE COURT:  They have to go to the doctor twice

8     a week, back pain, and promised comprehending.

9          Gentlemen, number 93.  It is the English

10    inability.  It looks like pretty severe.  They don't

11    understand the question.  They answered a number of times,

12    this person is out.

13         Next.

14         MR. FROCCARO:  Next is 95.  My objections are

15    47, 59 and 64.

16         THE COURT:  Not sure if they can deal with

17    someone previously being in jail.  That might be overcome.

18    And the next one is 49?

19         MR. FROCCARO:  47, 59 --

20         THE COURT:  59, one second.

21         Want to know if a person like that can be

22    trusted.

23         That would be the cooperating witnesses.  I'm

24    not so sure that that might be to the defendant's

25    detriment.

46

1          MR. FROCCARO: But there are other things I don't

2     like.

3          THE COURT:  What is that?

4          MR. FROCCARO:  64.

5          THE COURT:  Not sure they can put aside their

6     feelings, and so forth.

7          MR. FROCCARO:  And we also had the travel

8     hardship, Judge.

9          THE COURT:  A seasonal business.

10         Let's have the person come in and see if we can

11    straighten it out.

12         Next is number 104.

13         MR. FROCCARO:  104.

14         I'm surprised the government didn't object, this

15    person knows Chris's son, Ray.

16         MR. MISKIEWICZ:  I don't know that it really

17    indicates that he knew him.  He knew that the kid was --

18         THE COURT:  In the school that he had worked.

19         MR. FROCCARO:  If we are concerned about

20    anonymity in all respects --

21         THE COURT:  This person is excluded, 104.

22         We have five minutes more because the court

23    reporter has to leave.  If we don't get done Judge

24    Tomlinson will handle these tomorrow.

25         109.

47

1          MR. FROCCARO:  I have 47 and 52, your Honor.

2          THE COURT:  That sounds like they are somewhat

3    equivocating on whether or not they can put aside their

4    bias.  So, I will let that person come in.

5          The next one was 49.

6          MR. FROCCARO:  47 and 62.

7          THE COURT:  Just one second.

8          It would be difficult for the person to ignore

9    the media.  That certainly would require examination.

10          Other than that I don't really see that much of

11    an issue.  So the person remains.

12          109 is in.

13          Next we have 115.

14          MR. FROCCARO:  47, your Honor.

15          THE COURT:  The person may be a repeat offender,

16    and they indicate yes.  And we can explore that.

17          MR. FROCCARO:  How can we explore it?  There is

18    so much on him in prison.  Everything is going to be in

19    prison.

20          THE COURT:  All right.  You have a point.

21          Is there anything else on 115?

22          MR. FROCCARO:  No, Judge.

23          There is a planned vacation.  That is another

24    reason.

25          THE COURT:  He is out.

48

1          Next.

2          MR. FROCCARO:  The next one, 117 is number 43

3    and number 46.

4          THE COURT:  It says:  Do you have any bias,

5    sympathy or prejudice toward law enforcement?

6          I wouldn't say bias, but it says he wants to see

7    criminals prosecuted to the fullest extent, only if found

8    guilty of a violent crime.

9          That doesn't concern me.

10          Now, 47.

11          You may hear testimony that the defendant has

12    previously spent time in prison --

13          MR. FROCCARO:  I thought I said 46, your Honor.

14          THE COURT:  46 is crossed out.

15          The defendant is charged with three counts of

16    murder and with conspiracy to commit murder.

17          Is there anything about the nature of these

18    charges in and of themselves that would interfere with

19    your ability to decide the case?

20          The answer is no.  And then he has crossed out,

21    as long as the safety of my family is guarantied.

22          I think that is probably close enough once they

23    start with that.  Okay.

24          MR. FROCCARO:  I'm sorry.  Is 117 out?

25          THE COURT:  He is out.

49

1          MR. FROCCARO: The next one I think is the

2     government's, Judge, 123.

3          MR. MISKIEWICZ:  It looks like the basis is

4     33 B, speaking about law enforcement being bigoted.

5          THE COURT:  Individuals who act on their

6     prejudice based on the fact of the case, and they exist in

7     all levels of law enforcement to varying degrees.

8          MR. MISKIEWICZ:  They say in the next one they

9     can put it aside.  We can bring him back in and explore

10    it.

11         THE COURT:  Let's do that.  Anything else with

12    this person?

13         MR. MISKIEWICZ:  No.

14         THE COURT:  This person remains.

15         Next, we have 127.

16         MR. FROCCARO:  Judge, 33 C.

17         This person also has a hardship, I think you

18    ought to look at that first.

19         THE COURT:  No reason why, let's go.

20         How many more?

21         MR. FROCCARO: About eight to go.

22         The next one is the physical condition and the

23    hardship.

24         THE COURT:  Let's look at the hardship.

25         MR. FROCCARO: Are we off all that week?

50

1          MR. MISKIEWICZ:  Off the prior week.

2          MR. ROSEN:  They want 4/19 to 4/26 for religious

3     reasons.  That is way too much.

4          MR. MISKIEWICZ:  We will concede on this, your

5     Honor.

6          THE COURT:  This person is gone.

7          MR. FROCCARO:  144, Judge?

8          THE COURT:  Yes.

9          MR. FROCCARO:  Number 47, this person has a

10    hardship as well.

11         MR. MISKIEWICZ:  We agree.

12         THE COURT:  The person is gone.

13         MR. FROCCARO: 146, there is a host of it, Judge.

14         33 --

15         THE COURT:  About the Italians?

16         MR. FROCCARO:  Yes, the Italians in the

17    neighborhood.

18         And the word "murder" may cause her to be biased

19    toward the defendant.

20         MR. MISKIEWICZ:  We would agree there.

21         THE COURT:  Out.

22         MR. FROCCARO:  146 is out.

23         THE COURT:  147 next.

24         MR. FROCCARO:  Again, there is a hardship to

25    start with.  I don't know if you want to start there, and

51

1    there is plenty others.

2              42 -- should I talk or just shut up?

3              THE COURT:  A full time student; the absence may

4    drop me from my courses.

5              MR. FROCCARO:  And just hearing charges caused

6    an opinion about the defendant.

7              THE COURT:  That person doesn't want to sit.

8    That person is out.

9              What is next?

10             MR. FROCCARO: 150, your Honor.

11             I have again a hardship.

12             Someone coming home to be married.

13             THE COURT:  What else?

14             MR. FROCCARO:  The fact alone that he was in

15   prison would affect and cause a bias.

16             THE COURT:  This is going to be a constant theme

17   in this case.  But there is nothing else you can do.

18             MR. MISKIEWICZ:  It also says it depends on the

19   crime.

20             MR. FROCCARO:  How do we know the crime ahead of

21   time?

22             THE COURT:  I would think if there was a crime

23   involving murder and obstruction of justice, similar to

24   the charges here, that might have an impact.

25             MR. FROCCARO:  That might be what you think and

52

1    not what the juror thinks.

2            THE COURT:  Well we can ask the juror.

3            Let me see the hardship for a moment.

4            MR. FROCCARO: While we are on the subject what

5    about the 404(b), when is your Honor going to rule on it?

6            THE COURT:  As soon as I get a good handle on

7    it.

8            We will give him time for his son, and also the

9    wedding.

10           Next.

11           That person stays.

12           MR. FROCCARO:  153.

13           MR. MISKIEWICZ:  We agree on getting rid of him.

14           THE COURT:  All right.

15           MR. FROCCARO:  154, Judge, this one, 43, has

16   sympathy toward law enforcement.

17           Also, there is a hardship on this person as

18   well, Judge.

19           THE COURT:  The person is a supervisor.  He has

20   a staff he is not able to supervise.

21           It doesn't sound certainly that he is that

22   indispensable.

23           47 also?

24           MR. FROCCARO:  43(a) says he has a bias in favor

25   of law enforcement.

53

1           THE COURT:  All right.  He is out.

2           MR. FROCCARO:  You have next 157, your Honor.

3           THE COURT:  Just a moment.

4           What is the deal there?

5           MR. FROCCARO:  47, the fact that the prior

6    prison alone causes him to be biased.

7           49 --

8           THE COURT:  Just a second.  I want to look at

9    what he has in there.

10          MR. FROCCARO: Sorry.

11          THE COURT:  On 47 the answer is it depends on

12   what for and the nature of the crime.

13          He is in jail for stealing, all right?

14          MR. FROCCARO:  I don't know.  For example, if

15   your Honor ruled on robbing an undercover police officer

16   with a weapon.  That is why I'm --

17          THE COURT:  I have to render a decision on the

18   403.  But at this point in time I have not.

19          And then 49 --

20          MR. FROCCARO:  49 says he will not be able to

21   follow the oath.

22          THE COURT:  He says he is unsure.

23          MR. FROCCARO:  That concerns us.

24          THE COURT:  What else do you have?

25          MR. FROCCARO:  That's all I have.

54

1          MR. MISKIEWICZ:  He has a hardship --

2          MR. FROCCARO:  I'm sorry --

3          THE COURT:  58 also.  16 credits.  150 miles.

4    It is an extreme hardship.  He has the trifecta on the

5    hardship.

6          Next we have 158.

7          MR. FROCCARO:  This one has a hardship, he says:

8    Will only be paid from his job for two weeks and can't

9    afford it.

10          THE COURT:  That is usually enough for me.  158

11    is out.

12          MR. MISKIEWICZ:  Okay.

13          MR. FROCCARO:  160.

14          MR. MISKIEWICZ:  Yes.

15          MR. FROCCARO:  This guy lost his hearing in one

16    ear.  The same as Mr. Rosen had.  It is number two, your

17    Honor.

18          THE COURT:  I completely lost hearing ability on

19    my left ear.  At times I have difficulty understanding

20    what is being said, especially if the sound comes from the

21    left side.

22          He also is from Albania, but understands

23    English.

24          Anything else on him?

25          MR. FROCCARO:  That was it on him, Judge.

55

1          THE COURT:  In view of the acoustics we have in

2     the courtroom it is going to be difficult.

3          We have one other one.

4          And I'll release him.

5          Listen to me for a moment.

6          Number eight, take a look at juror number eight.

7          MR. FROCCARO: I don't have it.

8          I have 87 in front of me now.  And on 87 it says

9     the person has a bias in favor of the government in 43(a).

10         THE COURT:  Juror number 87?

11         MR. FROCCARO:  Yes.

12         THE COURT:  And we have juror number eight that

13    was going to be in.  But that juror indicate they already

14    booked a vacation, and that was during the days of jury

15    selection.  It is at least one day, so he can come in the

16    second day.

17         Number eight remains.

18         Now, it was juror 87 you wanted me to look at;

19    is that right?

20         MR. FROCCARO:  Yes, Judge.

21         THE COURT:  Yes.  And that is --

22         MR. FROCCARO:  43(a), Judge.

23         He has a bias in favor of the government.

24         THE COURT:  Didn't we go over this guy once

25    before?

56

1          MR. MISKIEWICZ: We went over him.

2          MR. FROCCARO:  We didn't.  That was the one I

3    didn't have.

4          MR. MISKIEWICZ:  He has the open heart surgery.

5          MR. FROCCARO:  We didn't go over 87.

6          THE COURT:  We did.

7          MR. FROCCARO:  We couldn't find it.

8          THE COURT:  You didn't go over it.  I went over

9    it.

10         MR. FROCCARO:  You did it without us?

11         A bias in favor of the government?

12         MR. MISKIEWICZ: It is a little unclear what he

13   means.  He checked off yes and no.

14         THE COURT:  I looked at this.  He goes back and

15   forth.

16         MR. FROCCARO:  He circled the fact of the oath

17   that he couldn't be fair as well.

18         THE COURT:  Then he writes I obey, I think it is

19   the rules, and I believe.

20         MR. FROCCARO:  He says he can't fairly -- is

21   there a reason?

22         He says there isn't a reason.  He can't fairly

23   follow it.

24         MR. MISKIEWICZ: It sounds like he has an

25   understanding.

57

1        MR. FROCCARO:  Also if you go to 53 B, he says

2   he doesn't agree if the client doesn't testify, that he

3   would hold it against the client.  And he doesn't follow

4   the rules of law.

5        THE COURT:  In terms of 53 B about the

6   testifying, do you agree with this rule?

7        No.

8        Will you accept it?

9        No.

10       And then he explains:  Evidence -- is must and

11  correct.

12       MR. FROCCARO:  Truthfully, Judge, I don't think

13  this guy understands.

14       THE COURT:  Let's pull him out.  87 is gone.

15       MR. FROCCARO:  Judge, I know you should have us

16  done -- I have other things .

17       THE COURT:  That has us done.  You can bring it

18  up when we bring people in.

19       MR. ROSEN: Can I raise something else today?

20       THE COURT:  Not today.  You can do it on

21  Tuesday, and it is concluded.

22       MR. ROSEN: It has something to do with the case.

23       THE COURT:  I'm sure it has to do with the case,

24  if you want a record it is not done today.

25       MR. MISKIEWICZ:  You want to do this process

58

1   again on Monday?

2           THE COURT:  The magistrate judge has to do it on

3   Monday.

4           MR. MISKIEWICZ:  Okay.

5           THE COURT:  We have probably no more than 60

6   questionnaires completed.  So I doubt very much we will

7   start on Tuesday.

8           MR. MISKIEWICZ:  Thank you, Judge.

9           THE COURT:  So, get the new batch of

10  questionnaires.  Probably it is going to work out that I

11  won't be able to call in and do it, and I will advise

12  Magistrate Judge Tomlinson.  And if that doesn't go

13  forward then we have to do it on Tuesday.

14          We also have jurors who have not filled out the

15  questionnaires coming in on Monday for other selections.

16  So they may be available.

17          That completes the conference.

18          Anything else you want to discuss you can put in

19  writing and I'll review it.

20          All right, have a good day, gentlemen.

21          MR. MISKIEWICZ:  Good-bye.

22          MR. ROSEN: Thank you.

23          THE COURT:  You're welcome.

24              (End of the proceedings.)

25

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------------x
     UNITED STATES OF AMERICA,
 3
                                   Docket No.:
 4                                 08 cr 655(JS)
            versus
 5                                 U.S. Courthouse
     CHRISTIAN TARANTINO,                     100 Federal Plaza
 6                Defendant.      Central Islip, New York
     ------------------------------------x
 7                                 March 21, 2011

 8      Transcript of Criminal Cause for Telephone Conference

 9         Before the HONORABLE KATHLEEN TOMLINSON,

10              UNITED STATES MAGISTRATE JUDGE

11

12                         APPEARANCES

13   For the Government:        Loretta E. Lynch, ESQ.
                                United States Attorney
14                              Eastern District of New York
                                600 Federal Plaza
15                              Central Islip, New York 11722
                                BY:  Carrie M. Capwell, ESQ.
16                              Assistant U.S. Attorney

17   For the Defendant:         MICHAEL ROSEN, ESQ.
                                JAMES FROCCARO, ESQ.
18

19

20

21   Court Reporter:           LISA SCHMID, CCR, RMR
                                Official Court Reporter
22                              225 Cadman Plaza East
                                Brooklyn, New York 11201
23                              Phone:  718-613-2644
                                Fax:  718-613-2379
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

GA080

```
 1              THE COURT:  Good afternoon.  This is Judge

 2    Tomlinson.  Who is on the line, please?

 3              MS. CAPWELL:  For the government, Carrie Capwell.

 4    Good afternoon.

 5              THE COURT:  Good afternoon.

 6              MR. ROSEN:  Good afternoon, Judge Tomlinson.  This

 7    is Michael Rosen and James Froccaro.  We represent the

 8    defendant, Mr. Tarrantino.

 9              MR. FROCARRO:  Good afternoon, Your Honor.

10              THE COURT:  Good afternoon.

11              My first concern here is I'm looking at this box.

12    We just realized now these are not in numerical order, which

13    is -- you're going to have to bear with me as we're going

14    through this, all right.?

15              MS. CAPWELL:  Sure.  Sorry about that, Judge.

16              THE COURT:  All right.  I also learn from a mentor

17    many years ago that you should never pretend to know more than

18    you know.

19              So as many juries as I have selected both in

20    practice and on the bench, I've not been through this process

21    before.  So my understanding of this is, that these have all

22    been gone through, then essentially, you compare your list and

23    what you have been able to agree to, you have agreed to, and

24    what you can't agree to is what I'm supposed to be looking at

25    now.  Is that correct?
```

GA081

```
 1              MR. ROSEN:  Correct, Your Honor.

 2              MS. CAPWELL:  That's correct, Your Honor.  And I

 3    will also add just as I've been preparing for this telephone

 4    conference and I've looked at some of these questionnaires

 5    that I obviously had my colleagues help me, there are some

 6    that I'm going to agree to anyway.  So there's going to be

 7    even a little bit less of a dispute on some of these.

 8              THE COURT:  Okay.  So the first one we're trying to

 9    find is 136, and I don't have my fingers on it yet.

10              MR. ROSEN:  Stop.  Those were in agreement, 136.

11              THE COURT:  Hold on.  There is a court reporter here

12    taking everything down.  So especially when the gentlemen

13    speak, you're going to have identify who you are so she has

14    the record down.

15              MR. FROCARRO:  Yes, Judge.  James Frocarro for Mr.

16    Tarrantino.

17              THE COURT:  Yes?

18              MR. FROCARRO:  Judge, just so you're aware, it's

19    going to be out of order.  136 through 140 are going to be

20    before Your Honor, and then it's going to skip from there

21    essentially to 160, so that you don't think you're missing

22    something.

23              THE COURT:  All right.  So the list I have, it says

24    136 is an issue.  Are you telling me it's no longer an issue?

25              MR. FROCARRO:  No, it's not an issue.  It's both
```

 1  checked off on our list, Your Honor.

 2          THE COURT:  Okay.

 3          MR. FROCARRO:  Do you have the other list?

 4          THE COURT:  All I was given to me this morning,

 5  so -- and then I have a yellow marker on 136.  The government

 6  has an X.  There is nothing in the defense box.

 7          MS. CAPWELL:  Your Honor, I did -- I resent your

 8  deputy.  She might have been in court with you and may not

 9  have received it.  The defense counsel has sent me some

10  additional strikes, so that we created a revised list, so that

11  Your Honor may be looking at the one from earlier this

12  morning.

13          THE COURT:  All right.  Well, how did you send it to

14  us?

15          MS. CAPWELL:  I sent it by email as a PDF.

16          THE COURT:  All right.  Hold on for just a moment.

17  Hold on.  Is this the revised list?  There is a check for both

18  the government and defense, so you both are agreeing to strike

19  this person?

20          MS. CAPWELL:  Yes, Your Honor, yes, number 136.

21          THE COURT:  Very good.  All right.  Where do we go

22  from there?

23          MS. CAPWELL:  Then the first dispute was going to be

24  number 161, but I actually concede on that, so I believe our

25  first dispute is 163.

```
 1                 MR. FROCARRO:  It is.

 2                 THE COURT:  All right.  So 161 is excused as well,

 3     correct?

 4                 MS. CAPWELL:  Yes.

 5                 THE COURT:  All right.  So that brings to us to 163?

 6                 MR. ROSEN:  Yes, Judge.  Mike Rosen.

 7                 THE COURT:  Yes.  Let me just get this.

 8            Go ahead.

 9            MR. ROSEN:  I have some paragraphs on this that

10     might assist Your Honor in getting to the areas that we

11     think -- that the defense thinks is troublesome.  If you'd

12     like to proceed that way, I can.

13                 THE COURT:  Yeah.  That's fine.

14                 MR. ROSEN:  If we take a look, most respectfully, at

15     the first -- at 32, paragraph or question, 32, it begins

16     there.  And --

17                 THE COURT:  Well --

18                 MR. ROSEN:  Tell me how you want me to proceed.  You

19     want to take at look it first?

20                 THE COURT:  Yes.  Give me a moment and I'll tell you

21     when you can go ahead.

22                 MR. ROSEN:  Okay.  Thanks.

23                 THE COURT:  (Perusing.)

24            All right.  Go ahead, Mr. Rosen.

25                 MR. ROSEN:  What troubles me at the beginning --
```

```
 1    it's just the question -- is that the children were involved

 2    in Arnold Friedman case.  I'm not sure I know what that is,

 3    but I don't know if it's that homicide case that took place

 4    in -- locally here in Great Neck or nearby in Great Neck --

 5    and I want to know about that -- but going to the challenges

 6    for cause, 42E, the juror has heard about the case.

 7              THE COURT:  Hold on one moment.

 8              MR. ROSEN:  Okay.  Okay.

 9              THE COURT:  First of all, if I recall the Friedman

10    case -- and Ms. Capwell, you can certainly correct me here --

11    wasn't there an allegation in that case of child molestation?

12              MS. CAPWELL:  Your Honor, unfortunately, that case

13    does not ring a bell to me at all.

14              MR. FROCARRO:  This is James Ficcaro.  You're right.

15    It is not a molestation case.  Great Neck, it was a father and

16    son.

17              MR. ROSEN:  Oh, okay.

18              THE COURT:  Which one are you on after that?

19              MR. ROSEN:  After that is 42E, which the juror has

20    heard about the case.  My notes, middle of the page, then 42P.

21              THE COURT:  All right.  Juror remembers something

22    about the owner at something or other.  I can't make out the

23    --

24              MS. CAPWELL:  That should be Synergy.  Synergy is a

25    chain of gyms, workout gyms that the defendant and others own.
```

GA085

```
 1              THE COURT:  Uh-huh.  (Affirmative response.)

 2              MR. ROSEN:  And after that, I have 43, Your Honor,

 3    where I capsulize it as saying just what the juror says, "My

 4    sympathy is towards all officers prosecuting, because they're

 5    my representative in the legal system," and if we -- I'll wait

 6    for Your Honor.

 7              THE COURT:  All right.  It's all right.  I've got

 8    it.

 9              Ms. Capwell, is there anything that you want to

10    respond?

11              MS. CAPWELL:  Your Honor, on that point, 43A, I

12    think that juror should be called back and just further

13    questioned, you know, if you're instructed by the Court that

14    you have weigh everybody's testimony in the same manner, you

15    can't give extra weight to anybody.  Are you going to be able

16    to follow that?  If at that point, no, I really can't, then

17    she or he should be excluded.  I just don't know if we're at

18    that point just based on this one answer.

19              MR. ROSEN:  Well, there's a little more, with all

20    due respect, if you go to 60 -- 6-0, that might add some fuel

21    to the -- hard to read.  I understand that.

22              THE COURT:  All right.  Let me take a look.

23              MR. ROSEN:  Okay, Judge.

24              THE COURT:  Okay.  It's -- what I see is here is, "I

25    believe I can follow this, as long as what the judge explains
```

1    does not go against what I believe is fair or just."

2              MR. ROSEN:  Right.  And the final comment that I

3    have on this, respectfully, is I think it's 66, where the

4    juror, I think, articulates a hardship.

5              THE COURT:  I see.

6              MR. ROSEN:  So for all these reasons, I would say

7    that this juror should be excused for cause.

8              THE COURT:  And I to have say, Ms. Capwell, taking

9    into account the totality here, when I see things all

10   together, like held up at gunpoint while taking a deposit to

11   the bank, and two children involved in the Arnold Friedman

12   case, along with --

13             MS. CAPWELL:  I understand, Your Honor.  I'm not

14   going to oppose it.

15             THE COURT:  Yeah.  There are too many possibilities

16   here.  The thing that also concerns me as much as being told

17   that, you know, I'll go along with this, with what the judge

18   tells me as long as I agree with it is -- I think it's fair is

19   troublesome, so.

20             MS. CAPWELL:  That's fine, Your Honor.  We'll

21   concede on this one.

22             THE COURT:  All right.

23             MR. ROSEN:  The next one that I have in my pack --

24             MS. CAPWELL:  Actually, you know, is it 180?

25   Because I'll concede on 180.

```
1              MR. ROSEN:  Carrie, give me a moment.

2              MR. FROCARRO:  Yeah.

3              THE COURT:  180 is the next one on my list.

4              MS. CAPWELL:  Okay.  I concede.

5              MR. ROSEN:  Okay.  Just give us one second.

6         What's next, Carrie?

7              THE COURT:  I have 185.  Is that next?

8              MS. CAPWELL:  Yeah.

9              MR. ROSEN:  That's correct.

10             MR. FROCARRO:  That's correct 185.

11             MR. ROSEN:  Okay, Judge.  What I have here merely --

12        not merely, it's a hardship.  I think it's number 66, that,

13        "The juror is the sole support of myself and my home."  He's a

14        bus driver.

15             THE COURT:  Uh-hum (affirmative response).

16             MR. ROSEN:  And I'm not sure, but Mr. Ficcaro

17        reminds me that Judge Seybert was sensitive to financial

18        hardships, I would think most of the ones that came before or

19        last week with the first phase of this --

20             MS. CAPWELL:  My only issue is that hardship is,

21        is -- I don't see -- I don't know that they're supporting.  I

22        don't know that they're saying they're supporting children or

23        other family members.  Maybe it's something we could explore

24        more, if that's the only basis.

25             THE COURT:  Yeah.  I wouldn't be inclined to excuse
```

```
 1    just on that single statement, and if you want to bring the

 2    juror back to further probe into that, I have no problem with

 3    that.

 4            MR. ROSEN:  All right, Judge.

 5            The next that I think I have -- Jimmy, if you help

 6    me -- is 189.  Okay?  I think it's 189, if Your Honor, please.

 7            THE COURT:  Okay.

 8            MR. ROSEN:  And the only indication I have on my

 9    notes is for you to consider is answer number two.

10            THE COURT:  All right.  Let me just get to it.

11    We're still searching for it.

12            MR. ROSEN:  Okay.  I'm sorry.  We spent the better

13    part of four days.

14            THE COURT:  No doubt.  You probably know them by

15    heart at this point.

16            MR. ROSEN:  Not really, but it's a very arduous

17    task.

18            THE CLERK:  You need help?

19            THE COURT:  Yes. (Perusing.)

20            MS. CAPWELL:  Then after this one for us, I agree to

21    190 and 191.

22            MR. ROSEN:  All right.  So we can get rid of that.

23    And we could get rid of that.  And we've got the Gross, Julie

24    that's also -- that's going to come up.  We're still on 189,

25    right?
```

```
 1              THE COURT:  I'm just trying to find it.  Just bear
 2   with us.
 3              MR. ROSEN:  Okay.  We're bearing, Your Honor.  Like
 4   a vacation, we're bearing.
 5              THE COURT:  Okay.  We have got 189.
 6              MR. ROSEN:  And number two, which is a question
 7   about the health, this particular juror checked yes, that it
 8   would interfere, and gives a reason that he has Crohn's
 9   disease.  You know, and I think some of us may be familiar.
10   When it does flair it up, it's pretty --
11              THE COURT:  Yeah.  I'm familiar with Crohn's
12   disease.  It's not pleasant.
13              MR. ROSEN:  No, it is not.
14              MS. CAPWELL:  What I see that he wrote under number
15   two is that he or she -- "Flair-ups occur infrequently,
16   usually stress-related and last one to two days."
17              THE COURT:  Yes.
18              MR. ROSEN:  I would most respectfully suggest that
19   once the government opens, they'll be some stress.
20              MS. CAPWELL:  Of course, they'll be alternates
21   selected.  So the alternates, you know, that's their purpose,
22   if one of the jurors that is selected for some reason can't
23   serve, then the alternate steps in.
24              Do you have anything else on this one?
25              MR. ROSEN:  I don't.  I just -- that's the reason I
```

```
 1   put that number on the list, because of the her health, his

 2   health.

 3           MS. CAPWELL:  Your Honor, I would argue he could

 4   come back and we could explore it a little more.  If they

 5   really think that the trial is going to be stressful event to

 6   them that could cause flare-ups, then at that point, they

 7   could be excused.

 8           THE COURT:  That's fine and that's reasonable.

 9           MR. ROSEN:  Calling back.

10           MS. CAPWELL:  Your Honor, I advised defense counsel

11   that I conceded -- I agreed on the next two, 190 and 191, and

12   I'll agree that they should be excused for cause.

13           THE COURT:  All right.  So that brings us up to 192,

14   correct?

15           MR. ROSEN:  Yes, Your Honor.  And I, again, I refer

16   to I think it's paragraph, question 66, where the juror has a

17   trip scheduled to New Orleans from April 28th to May 7, which

18   is during period I have no doubt we will still be on trial.

19           MS. CAPWELL:  Yes.  I'll actually agree.  That's a

20   problem and that's consistent with Judge Seybert.  She did

21   excuse people who had planned trips.

22           THE COURT:  Yes.  That's fine.  All right.  So 192

23   is out also, then.

24           MR. ROSEN:  Yes, Judge.  And 195, I think is next.

25   Carrie, do you agree?
```

```
 1                MS. CAPWELL:  Yes.

 2                MR. ROSEN:  Okay.  Again, we go to 66, question 66,

 3   I believe a little bit more equivocal.  It's -- I'm sorry,

 4   about the schedule.  Right?

 5                THE COURT:  Which one are we on now?

 6                MR. ROSEN:  195, Your Honor.

 7                THE COURT:  All right.  Just bear with us a minute.

 8                MR. ROSEN:  All right.  Number 66.

 9                THE COURT:  You mean 195 and 197?  All right.  I

10   have 195.

11                MR. ROSEN:  Okay.  Number 66, right near the end.

12                THE COURT:   "I had plane reservations for Florida

13   at the end of April, much anticipated vacation."

14                MR. ROSEN:  Yes, Judge.  I don't really see on that

15   --

16                THE COURT:  From the one before.

17                MS. CAPWELL:  I guess the only issue is, I wish they

18   had specified what date.  If it's a long weekend, Judge

19   Seybert isn't I sitting on Friday.  So it really wouldn't be a

20   problem.  They didn't tell us if it was a week or how long it

21   is.

22                THE COURT:  Yeah.  It says, "A much anticipated

23   vacation."  I would draw from that that it's probably more

24   than just a weekend, but that's my stretch, so --

25                MR. ROSEN:  Well, for the sake of consistency --
```

```
 1              THE COURT:  I think we should let this one this go.

 2              MS. CAPWELL:  Okay.

 3              MR. ROSEN:  Carrie, I have next one, 197.

 4              And again, all these people who I envy who are

 5    getting out of this area for a little while, I think there is

 6    --

 7              THE COURT:  Especially on this first day of spring.

 8              MR. ROSEN:  Yes.  Yes.  I had found my snow --

 9    Number 66 on 197, Your Honor.

10              THE COURT:  They're still looking for it.  Hang on.

11              THE CLERK:  Right there.

12              THE COURT:  Then we're up to 205 and 206.  I'm just

13    trying to get a little head start here.

14              161.  Go ahead.

15              MR. ROSEN:  It's 197, the question 66, again, is

16    travel.

17              THE COURT:  I'm sorry, 197.  Hold on.  (Perusing.)

18              "Travel already arranged for work and personal.

19    Family wedding."  It doesn't tell me a whole lot.

20              MR. ROSEN:  For the doctrine of consistency, I would

21    ask Your Honor to consider that like the other two.

22              THE COURT:  This one, frankly, I would rather get

23    some more information from, unless Ms.Capwell has some other

24    thought here.

25              MS. CAPWELL:  No, I think that would be wise, Your
```

1    Honor.  We don't want to cut it too short so that we don't

2    have enough people to choose from.

3              THE COURT:  Yeah.  So this is a bring back.  All

4    right?

5              MR. ROSEN:  Next one I have on my list is 205.  I

6    hope that's correct.

7              MS. CAPWELL:  It is correct.

8              THE COURT:  Okay.

9              MR. ROSEN:  And again, referring to question 66.

10             THE COURT:  Ms. Capwell, you want to be heard?

11             MS. CAPWELL:  I guess if we take them at their word,

12   it sounds like they believe that the length of time we're

13   asking for is just too long for them with this project.

14             THE COURT:  Yeah.  I would agree with you, in

15   addition to which, I'm not sure you want somebody sitting

16   there who's agitated the entire time --

17             MS. CAPWELL:  Right.

18             THE COURT:  -- worrying about this.  Okay.

19             MS. CAPWELL:  That's fine.  So 205 is out, Your

20   Honor?

21             THE COURT:  Yes.

22             MR. ROSEN:  Next one is 206 and I'll wait.

23             THE COURT:  All right.  I have 206.

24             MR. ROSEN:  Question number three, if Your Honor,

25   please.  It's a health question, and it's not easy to discern

1    it.

2         THE COURT:  "I'm a diabetic.  In order to be ready

3    to serve as a juror, all doctor visits were canceled."

4         I'm not sure and what that means.

5         MR. ROSEN:  I'm not either, Judge.  I guess I don't

6    know.

7         THE COURT:  Well, let me look at 66 on this one.

8    Certainly, we have lots of jurors who serve who are diabetic.

9    When she says, is there mere inconvenience or financial

10   hardship, she says no, so I'm inclined to leave this.

11        MS. CAPWELL:  All right, Your Honor.  So 206 is in?

12        THE COURT:  Yeah.

13        MR. ROSEN:  Fine.  Okay.  And next one that I have

14   is ready appears to be 208.

15        THE COURT:  Yeah.  I go right through 213.

16        MS. CAPWELL:  208, Your Honor.  There is a whole

17   series, 208 through 213 are in dispute.

18        THE COURT:  Okay.  Fine.  So we can drag those out

19   while we're looking.  All right?  And I have 208.

20        MR. ROSEN:  Okay.  And number 33 is really not a

21   defense normal challenge, but I think that the juror is

22   indicating that minorities, which apparently she may be, you

23   know, are just not treated fairly, I mean.  Something that

24   would inure to the government's favor, but I don't practice

25   law that way.  If the person has some prejudice as to either

1    side, I don't think they should sit.

2            And on question 53, if Your Honor please, you will

3    see that the juror -- that the juror -- and it's confusing.

4    When the juror indicates she doesn't agree with the

5    presumption of innocence and then burden of proof --

6            THE COURT:  Yeah, that's pretty definitive.

7            MR. ROSEN:  Yeah.  You know, I think that's strong

8    enough for the Court to consider a challenge for cause.

9            THE COURT:  Ms. Capwell?

10           MS. CAPWELL:  Yes, Your Honor.  If we assume that

11   they understood the question and checked the right box, that

12   does not sound good.  So I guess they should be excused.  I

13   don't know if there is any indication of a language issue.

14           MR. ROSEN:  No.

15           THE COURT:  Didn't seem to be, and certainly, the

16   statement under number 33 is clear.

17           MR. ROSEN:  Yes.

18           MS. CAPWELL:  Okay.  That's fine.

19           MR. ROSEN:  Thank you.

20           THE COURT:  All right.

21           MR. ROSEN:  208 now, Jimmy.

22           209, when the Court and counsel are ready.

23           MS. CAPWELL:  Yes.

24           THE COURT:  Okay.  Go ahead.

25           MR. ROSEN:  Okay.  Beside a hardship indicated on

```
 1   our friend, question number 66, if you go to -- if you go to

 2   53, question 53, we could begin --

 3          THE COURT:  Well, I'm looking at 66, and they say,

 4   "Is it such a serious hardship that you would need to bring it

 5   to the attention of the Court?"  They checked off no.  And

 6   says, "Nothing but the financial hardship," which would

 7   effectively be true of virtually any juror here, so --

 8          MR. ROSEN:  Yes, I understand that.

 9          THE COURT:  Okay.  So what else are you looking at

10   on this one?

11          MR. ROSEN:  I'm looking at 53, if Your Honor please.

12          THE COURT:  Okay.

13          MR. ROSEN:  And I'm just not sure again, as Ms.

14   Capwell indicated.  The person may or may not have understood,

15   because we have got several boxes checked off yes and no.

16          THE COURT:  Yeah.

17          MR. ROSEN:  And then the word "because" started and

18   sort of ends there.

19          THE COURT:  Well, if that's the basis of the

20   challenge, then I would say this is somebody you need to bring

21   back and question further.

22          MR. ROSEN:  Well, Judge, I have two other bases.

23          THE COURT:  Go ahead.

24          MR. ROSEN:  Fifty-nine -- let me see why I have 58.

25   There's a question mark, I have for 58.  Excuse me for a
```

```
 1   moment, while I --

 2              THE COURT:  Go head.

 3              MR. ROSEN:  -- check that, 58.  It's tough.  Hard to

 4   read, but --

 5              THE COURT:  Yes.  Okay.  "Do you believe -- do you

 6   hold any beliefs or opinions that would affect your ability to

 7   evaluate the testimony of a law enforcement officer fairly and

 8   impartially?"  She says or he says, "Yes."  And the

 9   explanation is, "Because they may work to get just like a

10   group of people stick together at the words across -- or stick

11   together words across.  I'm sorry.  "Because they may work to

12   get -- just like a group of people stick to get their words

13   across."

14              MR. ROSEN:  You might think, if Your Honor please,

15   that the government should have some problem with that, but

16   based on my 46 years of being privileged to be in the Eastern

17   District, I believe that if either side has somebody who

18   doesn't like it, they should not be a juror.

19              And then I would end with 59, if Your Honor please,

20   which --

21              THE COURT:  Well, I do have a -- before we get to

22   59, I do have a concern with 58.  Anybody who tells me that

23   they hold beliefs that would affect their ability to evaluate

24   the testimony of a law enforcement officer fairly and

25   impartially and she checks yes or he checks yes, that raises a
```

```
 1    concern to me.

 2             MR. ROSEN:  Okay.

 3             THE COURT:  Ms. Capwell, do you want to be heard?

 4             MS. CAPWELL:  Your Honor, to the extent I can

 5    decipher what they're trying to say, I guess they might be

 6    saying that the law enforcement officers might get their

 7    testimony together --

 8             THE COURT:  Yeah.

 9             MS. CAPWELL:  -- and to have the same words come

10    across, so that would be a concern to the government.

11             THE COURT:  All right.

12             MS. CAPWELL:  And I think a reason to strike this

13    person.

14             THE COURT:  All right.  So we're going to strike

15    209.

16             MR. ROSEN:  Thank you.

17             Jimmy?  All right, 209 is gone.  The next one I have

18    is 210, Judge.

19             THE COURT:  Yes?

20             MR. ROSEN:  And the only notation I have on this is

21    the health question number three.  Just -- I think this was

22    done at two o'clock the morning.  Let me just make sure.  Yes.

23    It's a question mark as to number three.

24             THE COURT:  All right.  I'm not sure.  It says,

25    "Every three months, I see my heart doctor, also my doctor
```

```
 1    regulating my sugar."

 2              Sounds like somebody who is also diabetic.

 3         MR. ROSEN:  Yes.

 4         THE COURT:  This is every three months.  I guess the

 5    question would become whether or not they're seeing the

 6    physician while the trial its going on.

 7         MR. ROSEN:  Yes.

 8         THE COURT:  And I'd be -- frankly, I'm not so

 9    concerned about that because if an adjustment had to be made,

10    it certainly could be.

11         MS. CAPWELL:  That's true, Your Honor, and I

12    think -- and Judge Seybert is not holding trial on Friday, so

13    to the extent people can schedule appointments with their

14    doctors on Friday, that would work, too.

15         THE COURT:  My inclination is to leave this.

16         MR. ROSEN:  That's in.  Okay.

17              The next one I have is -- and I'm almost through

18    with my pile.  I'll turn it over to Jimmy soon -- 211,  I

19    believe is next.

20         THE COURT:  Yes?

21         MR. ROSEN:  Okay.  There is also a hardship claim on

22    number 66 -- not 66.

23         THE COURT:  "Recently started a new job.  Missing

24    the next one and-a-half to two months could potentially

25    negatively impact my relationship with my clients."
```

1              Ms. Capwell?

2              MS. CAPWELL:  Yes, Your Honor.  Unfortunately, I

3      don't have it in front of me, but that does sound like a

4      hardship.

5              THE COURT:  Yeah.  I would be inclined to let this

6      person go.

7              MS. CAPWELL:  Okay.

8              MR. ROSEN:  Thank you.  Next that I have, Your

9      Honor, Ms. Capwell is 212.

10             THE COURT:  Right.

11             MR. ROSEN:  Again, referring to number 66, question

12     66.  Yes, 66.

13             THE COURT:  Ms. Capwell, you want to be heard?

14             MS. CAPWELL:  Your Honor, I'm looking at 212.  "I

15     work in a medical practice with more than ten doctors.  Every

16     day, we're seeing more than one hundred patients, in cancer

17     and yearly checkup or cosmetic procedures or treatment.  I

18     don't have vacation or personal days available.  Each doctor

19     has to have two medical assistants."

20             THE COURT:  This could be true of a lot of potential

21     jurors.

22             MS. CAPWELL:  That's the problem I have.  I don't

23     doubt that it will, you know, I won't be convenient.  I just

24     don't know -- I mean, I feel like everybody who works, it's

25     going to be hard on them when they're on the jury, but that's

1    just part of civic service.

2              THE COURT:  Yeah.  I'm not inclined to let this one

3    go.  Just to let --

4              MR. ROSEN:  I'm sorry to interrupt, but if you could

5    backtrack a bit to number 48.  It's causing me some problems

6    and the reason I didn't do it chronologically is, I figured

7    we'd take a look at the hardships first.  But if you would

8    look at 48, I have a problem with that, even though this is

9    not any longer a death penalty eligible prosecution.

10             THE COURT:  You see that, Ms. Capwell?

11             MS. CAPWELL:  I do.  That is, if he is proven

12   guilty, she is against the death penalty, but life in prison

13   without parole.  I'm not sure if she's saying life in prison

14   without parole is okay.

15             THE COURT:  Yeah.

16             MR. ROSEN:  Looking at it, that terrifies me.

17             MS. CAPWELL:  Well --

18             MR. ROSEN:  That there was an assumption that people

19   are going to be found guilty.

20             MS. CAPWELL:  Well, it sounds like what her issue

21   would be is if she thought that the death penalty was an

22   option, she would have a problem.  It sounds like to me she's

23   saying other than that, she doesn't have any religious,

24   philosophical or moral issues with a guilty verdict.  I mean,

25   I think it's something that should be explored further, and I

```
 1   guess it's an issue we'll have to raise with the judge,

 2   because I've seen a number of these questionnaires where

 3   people have mentioned the death penalty.

 4           MR. ROSEN:  Right.

 5           MS. CAPWELL:  I have to -- I don't know, deal with

 6   that issue, so that --

 7           THE COURT:  All right.  Then why don't we put this

 8   in the category of further questioning?

 9           MR. ROSEN:  And my last assignment here is 213, I

10   believe.

11           THE COURT:  Okay.

12           MR. ROSEN:  And if you want to start with the

13   hardship, we will.  If not, I have other questions.

14           THE COURT:  All right.  Let me just see.

15           MR. ROSEN:  66 is the hardship question, Judge,

16   scheduling thing.

17           THE COURT:  It says, "My compensation affects other

18   employees that I work with.  My absence would result in a

19   financial loss for others."

20           All right.  What else are you looking at?

21           MR. ROSEN:  I'm looking at 43A.

22           THE COURT:  I see.  "Do you have any bias, sympathy

23   or prejudice towards law enforcement, prosecutor or the United

24   States Attorney's Office?"  Answer:  "Yes.  I would tend to

25   believe that the above would be truthful."
```

```
 1              MR. ROSEN:  And if we look at 47, that would be my

 2    presentation.

 3              THE COURT:  "You may hear testimony that the

 4    defendant has previously spent time in prison.  Would that

 5    fact alone cause you to be biased against the defendant?"

 6    Answer:  "Yes, it might come into play."

 7              MR. ROSEN:  And there will be several instances

 8    perhaps of prior prison service --

 9              THE COURT:  Right.

10              MR. ROSEN:  -- by the defendant.

11              THE COURT:  In the totality of this, I'm inclined to

12    let this person go, Ms. Capwell.

13              MS. CAPWELL:  That's fine, Your Honor.

14              THE COURT:  All right.

15              MR. ROSEN:  Now, with Your Honor's permission, Mr.

16    Frocarro will take the other pile.

17              THE COURT:  Okay.

18              MR. ROSEN:  Thank you, Judge.

19              THE COURT:  Okay.

20              MR. FROCARRO:  Judge, I think the next one is 219.

21              THE COURT:  219?

22              MS. CAPWELL:  Yes.

23              MR. FROCARRO:  Judge, on the front page, I put the

24    numbers.  Start off with 33B.

25              THE COURT:  Okay.  All right.  "Do you believe that
```

1   any particular group does not receive fair treatment from law

2   enforcement?"  Answer:  "Yes.  I believe our system of

3   jurisprudence favors those with the financial means to afford

4   better representation.  In effect, it's" -- looks like -- I

5   suspect it might have been penalizes, but it looks like

6   penalty.

7            MR. FROCARRO:  It should be penalizes.

8            THE COURT:  "Penalizes the poor white -- I don't

9   know what that word is.

10           MS. CAPWELL:  I think it's, "While the head of the"

11   --

12           THE COURT:  I see.  I gotcha.  You're correct.  "In

13   effect, it penalizes the poor while the head of the AIG" --

14           MR. FROCARRO:  Before, Judge, even maybe spend more

15   time on this, just could we go to the next one, too, 42F?  I

16   think that will solve it quickly.

17           THE COURT:  42F?  Hold on.  (Perusing.)

18           "Have you formed an opinion as to the defendant or

19   read about this case based on anything you have seen or heard

20   or read?"

21           "Yes.  It sounds as if this is part of the organized

22   crime sweep that occurred a few weeks -- a month ago.  I must

23   admit this is" -- something.  I'm not sure what word is.  "My

24   ideas about the case.  It sounds like something out of Good

25   Fellas, except real and thus horrific."

```
 1              Well, I would say on the basis of those two answers,

 2    I would be inclined to let this person go.

 3              MS. CAPWELL:  Okay.  We won't oppose.

 4              THE COURT:  Okay.

 5              MR. FROCARRO:  The next one, Judge, I believe is

 6    221.  I guess we'll start with the hardship, Your Honor.  I'll

 7    start with the hardship.

 8              THE COURT:  Okay.

 9              MR. FROCARRO:  Number 66.

10              THE COURT:  All right.  Let me take a look.

11    (Perusing.)

12              All right.  "Explain the hardship."

13              "I have clients and deadlines already lined up for

14    the next two months.  Six to eight weeks would cost my family

15    thousands of dollars and loss of clients to my business.

16    Would suffer further" -- I'm sorry -- "Would further harm our

17    family income in the future.  I'm also scheduled for two

18    business-related conferences in April, 21st and 22, and

19    May 16th through the 20.

20              Ms. Capwell?

21              MS. CAPWELL:  Yes, Your Honor.  That second business

22    conference concerns me the most, just because it pears to be a

23    whole week.

24              THE COURT:  Yeah.

25              MS. CAPWELL:  Monday through Friday, and we could
```

```
 1    still be going or that might be the deliberations at that
 2    point.
 3              THE COURT:  Yeah.
 4              MS. CAPWELL:  But I think that is a real issue.
 5              THE COURT:  All right.
 6              MR. FROCARRO:  With regard to 221?
 7              THE COURT:  I'm sorry?
 8              MR. FROCARRO:  221 is out, Your Honor?
 9              THE COURT:  Yeah.  I think that's what Ms. Capwell
10    is consenting to.
11              MS. CAPWELL:  That's fine.
12              MR. FROCARRO:  Okay.  Great.  Next, Your Honor, I
13    believe was --
14              THE COURT:  223.
15              MR. FROCARRO:  223, Your Honor.  Yeah.  I have
16    again, a hardship to start with, Your Honor, and if we need
17    others --
18              THE COURT:  Let's take a look.  "My job will not pay
19    me that long."
20              Well, this may not be the only juror, I'm sure, who
21    is in that boat.
22              MR. FROCARRO:  Judge, the other thing is number 47,
23    which is really a cause for more concern.
24              THE COURT:  "You may hear testimony that the
25    defendant has previously spent time in prison.  Would that
```

```
 1    fact alone cause you to be based against the defendant?"

 2              "Yes.  I feel if the defendant has already been in

 3    jail, then he had done something wrong in the past."

 4              MS. CAPWELL:  Your Honor, he should be out.

 5              THE COURT:  Okay.  Good.

 6              MR. FROCARRO:  Okay.

 7              MS. CAPWELL:  Next one is actually a government one.

 8              MR. ROSEN:  Yes.  You have no.  Yes, it is.  You're

 9    right.

10              MS. CAPWELL:  Number 226, Your Honor.  It do have

11    another one.

12              MR. FROCARRO:  226.

13              THE COURT:  Hold on.  I don't have that one.  Just

14    bear with me a minute, all right?  (Perusing.)

15              All right, 226.

16              MS. CAPWELL:  Yes, Your Honor.  Focusing on

17    questions 54 through 56 on the questionnaire.

18              THE COURT:  Okay.  Fifty-four.

19              MS. CAPWELL:  The person expresses concerns with

20    surveillance and obtaining audio recordings and using

21    cooperating sources to obtain audio recordings and basically,

22    they state for all those questions that they would have a

23    problem considering that type of evidence.

24              MR. FROCARRO:  I'll agree with that one.  You don't

25    have to go on.
```

GA108

```
 1                    THE COURT:  All right.  Good.  226 is out.

 2                    MR. FROCARRO:  228, I believe, is next, Your Honor.

 3                    THE COURT:  Okay.

 4                    MR. FROCARRO:  That was a hardship alone, Judge.

 5                    THE COURT:  All right.  Let me take a look.

 6   (Perusing.)

 7                    "I'm new with the company I work for, started about

 8   eight months ago."

 9                    MR. FROCARRO:  Admittedly, it may require

10   follow-ups, Judge.

11                    THE COURT:  I think that definitely needs a

12   follow-up.

13                    MR. FROCARRO:  All right.  229, your Honor.  A

14   hardship to start with, again.

15                    THE COURT:  Hold up.  "My job, there are no others

16   that would be able to cover me at this time.  One of my

17   coworkers is serving on grand jury until April the 18th."

18                     Do you know what this person does?

19                    MR. FROCARRO:  Yeah.  I think -- one second, Judge.

20                    THE COURT:  Okay.

21                    MS. CAPWELL:  Is this the Department of Utilities?

22                    THE COURT:  I'm sorry, what department?

23                    MR. FROCARRO:  Utility Collection Department.

24                    THE COURT:  Well, I'm not overly impressed by that,

25   but, I mean, one of two things.  You want to call this person
```

1    in and get some more information?

2            MR. FROCARRO:  Judge, there is more, if I could.

3            THE COURT:  All right.  Go ahead.

4            MR. FROCARRO:  One second -- 32E, I have down.

5            THE COURT:  32E?  Hold on.  (Perusing.)

6            Well, a couple things on this page, not with --

7            MR. FROCARRO:  33, too, 33A, I get that.

8            THE COURT:  Given to the totality here, I'm inclined

9    to let this person go.

10            Ms. Capwell, do you have any issue with that?

11            MS. CAPWELL:  No, Your Honor.

12            THE COURT:  Okay.

13            MR. FROCARRO:  Judge, next is 230.  That one is just

14    a hardship alone.

15            THE COURT:  Okay.  Let me look.  (Perusing.)

16            Says, "Was planning a vacation during the first week

17    in May."

18            Doesn't indicate that there's -- I mean, other than

19    inconvenience here, it doesn't indicate anybody has bought

20    tickets or made reservations or anything like that.  Frankly,

21    this is somebody I would get more information from.

22            MR. FROCARRO:  Okay, Judge.

23            Number 231.  What I have down is he's an NYPD police

24    officer, number 26.

25            THE COURT:

```
 1              MR. FROCARRO:  This is going to be a case where it's

 2   all NYPD involved, one of the murders.

 3              THE COURT:  Okay.

 4              MR. FROCARRO:  And also number 62, as well, Your

 5   Honor.

 6              THE COURT:  Let me take a look.  (Perusing.)

 7              "This case may receive attention in the media.  I

 8   instruct you that you are not to read or listen to such media.

 9   The media is not always accurate.  Under the law, you are to

10   base your decision on the evidence presented at trial, not on

11   what is reported in the media.  Will you have any difficulty

12   accepting the proposition that the only evidence you should

13   consider is the evidence received in this courtroom, and that

14   you are to avoid and ignore any statements made by the media?"

15   And he's checked off yes.

16              I will say that concerns me, Ms. Capwell.

17              MS. CAPWELL:  Yes, Your Honor.  That's fine, and

18   taken with the fact that this person is still employed by

19   NYPD.

20              THE COURT:  Yeah.

21              MS. CAPWELL:  That's fine.

22              THE COURT:  Okay.

23              MR. FROCARRO:  Judge, next I believe is 233.

24              THE COURT:  Yes.

25              MR. FROCARRO:  It's still -- again, start with the
```

```
 1   hardship, Your Honor.

 2             THE COURT:  Okay.

 3             MR. FROCARRO:  I have another one, if you get past

 4   that.

 5             THE COURT:  "I have to travel for work May 7th to

 6   11, roughly.  I don't have my phone, so I don't know the exact

 7   dates."

 8             All right.  What else?

 9             MR. FROCARRO:  And then number 47, Your Honor.

10   Prior prison would affect his ability to be fair and --

11             THE COURT:  "You may hear testimony that the

12   defendant has previously spent time in prison.  Would that

13   fact alone cause you to be biased against the defendant?"

14             Checks off yes.  "If yes, please explain."

15             "It would depend on testimony, because it might be

16   hard not to weigh prior acts in decision making."

17             Well, that's not comforting.

18             MS. CAPWELL:  I won't object if Your Honor wanted to

19   dismiss the person based on the combination of the May 7th

20   through 11 and the act of prison, that's fine.

21             THE COURT:  I think those two taken in conjunction

22   are enough.

23             MR. FROCARRO:  Next, I think is the government's,

24   Carrie, am I right?

25             MS. CAPWELL:  Yes.  I believe number 238.
```

```
 1              MR. FROCARRO:  Okay.

 2              MS. CAPWELL:  Your Honor, do you have that one?

 3              THE COURT:  Not yet.  Just bear with me.  It's

 4     because it's the government.  That's why you can't tell.  It's

 5     the gray shaded one.  (Perusing.)

 6              Okay.  I have 238.

 7              MS. CAPWELL:  Okay, Your Honor, just directing your

 8     attention to number 57 and number 58.

 9              THE COURT:  Hold on.

10              MS. CAPWELL:  "Their evidence could be planted,"

11     meaning by law enforcement, and also, "That the law

12     enforcement officers could be lying."

13              MR. FROCARRO:  Judge the only problem I have with

14     that is look at 58B.  Says, "It's not to be given any less or

15     more weight," and they check -- they agree with it and they

16     accept it.

17              MS. CAPWELL:  But early on, in 57, when asked if you

18     have feelings on searches conducted by law enforcement

19     officers that would make it difficult for you to consider such

20     evidence fairly?"

21              "Yes, the evidence could be planted."

22              Then 58, "Do you hold any beliefs or opinions that

23     would affect your ability to evaluate the testimony of a law

24     enforcement officer fairly and impartially?"

25              "Yes.  Could be lying."
```

```
1              And it just sounds like they have a strong bias
2   against law enforcement and feel that they are not trustworthy
3   and they plant evidence.
4              Also, in hardship, number 66, the person states, "I
5   have been out of work for six months.  I am due to go back to
6   soon."  Doesn't say exactly when.  This is a financial
7   hardship.
8              THE COURT:  Well, I'm also looking at the answer to
9   56, which is not terribly helpful either.
10             MS. CAPWELL:  Yes, regarding cooperating witnesses
11  --
12             THE COURT:  Yes.
13             MS. CAPWELL:  -- and audio recordings.
14             THE COURT:  Yeah.  I think given the totality here,
15  I'm inclined to let this person out.
16             MR. FROCARRO:  Next, 240, Your Honor, for defense.
17             THE COURT:  Yes.
18             MR. FROCARRO:  All I have is a hardship on that one,
19  Your Honor.
20             THE COURT:  Let me take a look.  (Perusing.)
21             "This will be a great hardship to my house finances.
22  Employer only pays on week, and $40 a day will not pay my rent
23  and feed my son.  I simply can't afford the time spent.  I
24  will not be able to sit for a period of time without taking my
25  blood pressure medicine.  I will need to be excused from
```

```
 1    courtroom for periods of time.  My son has severe asthma and I

 2    need to be reachable to him, as my job is flexible to allow me

 3    to pick him up from school for treatments and return to work."

 4              Well, that's not helpful.

 5              MS. CAPWELL:  That's fine, Your Honor.  That's fine.

 6    The government will agree that the juror should be struck.

 7              THE COURT:  All right.

 8              MR. FROCARRO:  Next one, Your Honor, is 241, a

 9    hardship again.

10              THE COURT:  Okay.  "Family vacation March 26th to

11    April 3rd, and June 3rd to June 11th."

12              MS. CAPWELL:  And that's problematic.

13              THE COURT:  Okay.

14              MS. CAPWELL:  So -- the March 27th, April 3rd one.

15              THE COURT:  Yeah.  All right.  So we agree?

16              MR. FROCARRO:  Yes.

17              THE COURT:  Okay.

18              MR. FROCARRO:  Judge, I believe next is 242.  Again,

19    that's a hardship.

20              THE COURT:  Okay.  "Worked only five months in 2010,

21    nine months in 2009.  Do not get paid if not at work.  Two

22    children in college.  Only with this employer six months."

23              Well --

24              MR. FROCARRO:  Judge, I have two kids in college, so

25    I can relate.
```

```
1              THE COURT:  Yeah, I understand.

2              MS. CAPWELL:  Your Honor -- and Your Honor, if

3     brought back or selected, is not going to be a happy juror.

4              THE COURT:  No.  For sure.

5              MS. CAPWELL:  That's fine.  We agree.

6              THE COURT:  All things considered, I think should be

7     excused.

8              MR. FROCARRO:  I believe the next one, Your Honor,

9     is 245 and that one, I have number 47.

10             THE COURT:  Okay.  Hold on.  Okay.  (Perusing.)

11             "You may hear testimony that they defendant has

12    previously spent time in prison.  Would that fact alone cause

13    you to be biased against the defendant?"

14             Answer:  "Yes.  Wouldn't have gone to jail if he

15    didn't do the crime."

16             That's seems pretty blatant.

17             MS. CAPWELL:  Yes, Your Honor.  We'll agree.

18             THE COURT:  Okay.

19             MR. FROCARRO:  Next one, Your Honor, is 248.

20             Is that right, Carrie?

21             MS. CAPWELL:  Yes.

22             MR. ROSEN:  248, and I have hardship.

23             THE COURT:  All right.  Hold on. (Perusing.)

24             Okay.  "I have just started my position 11 months

25    ago.  My job is very demanding and six to eight weeks of being
```

```
 1   out of the office would mean I would have to go to work on the
 2   weekends, just to keep up with my daily responsibilities."
 3          Well, that's not all that unusual from some of the
 4   other ones we heard.  This is somebody I would bring back for
 5   further questioning.
 6          MS. CAPWELL:  I agree, Your Honor.
 7          MR. FROCARRO:  Okay.  Next one, Your Honor, is 251.
 8   Is that right?
 9          THE COURT:  Okay.
10          MR. FROCARRO:  And for that one, I have 33A and 43A,
11   in conjunction with the fact that her husband works for the
12   NYPD.
13          THE COURT:  Okay.  33A?
14          MR. FROCARRO:  33A.
15          THE COURT:  Uh-hum (affirmative response).  Hold on.
16   (Perusing.)
17          She does have an opinion, and it would affect her
18   ability to evaluate the evidence in this case fairly and
19   impartially.  Respect law enforcement individuals and believe
20   that many of them are honest in their efforts to prevent crime
21   and protect."  I don't see any other word, so I don't know
22   what protect follows up on.
23          MS. CAPWELL:  Your Honor, the government will
24   concede that 43A is troubling.
25          MR. FROCARRO:  So I guess --
```

```
1              THE COURT:  Yes?

2              MR. FROCARRO:  251 is out?

3              THE COURT:  Yes.

4              MR. FROCARRO:  Okay, Your Honor.  The next one is --

5              MS. CAPWELL:  The government's --

6              THE COURT:  252?

7              MS. CAPWELL:  Yes, Your Honor.

8              THE COURT:  Okay.

9              MS. CAPWELL:  And they state in --

10             THE COURT:  Hang on.

11             MS. CAPWELL:  -- 39A.

12             THE COURT:  I just to have get that one.

13             MS. CAPWELL:  Okay.

14             THE COURT:  Okay.  Go ahead.

15             MS. CAPWELL:  39A, "Have you or have a family member

16   or close friend involved in or been the target of a criminal

17   investigation?"

18             They say, "My brother-in-law, Anthony Colombo, Chris

19   Colombo" --

20             MR. FROCARRO:  Judge, I agree.  That goes to

21   unanimity?

22             THE COURT:  All right.  Very good.

23             MS. CAPWELL:  252.

24             MR. FROCARRO:  Next is 253 and it's a hardship

25   again, Your Honor.
```

```
1                THE COURT:  All right.  Let me look.  (Perusing.)

2                "I have a commitment to be a speaker at a women's

3    retreat on April 29 and 30.  If I'm called to serve on this

4    case, I will not be able to fulfill this responsibility either

5    in completing my preparations or in actually being able to be

6    there.

7                MS. CAPWELL:  Actually, being there should not be a

8    problem because April 29th and 30th are a Friday and Saturday.

9    That should not be a problem.

10               THE COURT:  All right.

11               MS. CAPWELL:  In terms of preparing, I think

12   unfortunately, she'll have to make sacrifices like the rest of

13   the jurors.

14               THE COURT:  Yeah.  I agree.

15               MS. CAPWELL:  I believe the next one might be the

16   government's.

17               MR. FROCARRO:  Right.

18               THE COURT:  257?

19               MS. CAPWELL:  Yes, Your Honor, and let me locate

20   exactly where.  I've believe it's related to cooperating

21   witnesses.  (Perusing.)

22               THE COURT:  Yeah.  I see that.  It's 59.

23               MS. CAPWELL:  Okay.  Thank you, Your Honor.

24               THE COURT:  Actually, 59 and all the subparts.

25               MS. CAPWELL:  "Suspect of such a witness' motives
```

1    and ability to be a hundred percent honest."

2              And then in terms of follow-up --

3              MR. FROCARRO:  What I have on that is, Your Honor,

4    the standard charge, that is what the judge is going to tell

5    them, that a cooperating witness testimony suspect, you've got

6    to treat with special care, standard charge.

7              MS. CAPWELL:  And then I believe this juror might

8    have indicated they would have a problem ignoring the media.

9    I just have to find that answer.

10             MR. ROSEN:  It would be 65?

11             MS. CAPWELL:  Maybe 62, too.  Let me see what the

12   answer is.  "Will you have any difficulty accepting the

13   proposition that the only evidence you should consider the

14   evidence received in this courtroom and that you are to avoid

15   and ignore any statements made by the media.  The person

16   checked yes.

17             THE COURT:  Okay.

18             MS. CAPWELL:  They would have difficulty accepting

19   that proposition.

20             THE COURT:  I'm still back on 59C, where it says, it

21   "It is the law that the testimony of a single witness, even a

22   cooperating witness, can be sufficient to convict a defendant

23   of a charged crime, if the jury finds that the testimony of

24   that witness establishes proof beyond a reasonable doubt.  Do

25   you have any opinion or belief about cooperating witnesses

```
 1    that would prevent you from applying the rule of law?"

 2              And the answer here is yes, as noted in 59B.  So I

 3    think this person's out.

 4              MR. FROCARRO:  Next one, Your Honor, is 259.  I

 5    mean, still on the hardship.  There's a host of others, but on

 6    the hardship, Your Honor.

 7              THE COURT:  Okay.  Now, I understand she's a

 8    physical therapist or he's a physical therapist, and

 9    everybody's got patients to cover, I mean, or other

10    responsibilities.  So that in and of itself doesn't convince

11    me, but what else do you want me to look at?

12              MR. FROCARRO:  It's 43B, 47.  53B and 62 and 64.

13              THE COURT:  43B, okay.  Okay.  (Perusing.)

14              43B says, "Do you have any bias, sympathy or

15    prejudice toward the defendant, Christian Gerald Tarrantino?"

16              She says -- looks like she checked both here and

17    then scratched out no and left yes.  And then says, "Sounds

18    like a mob case.  Not a supporter of the Mafia."

19              Okay.  And what's the other one?

20              MR. FROCARRO:  Forty-seven, Your Honor.

21              MS. CAPWELL:  Actually, even number 44 is also

22    problematic.  They say they may have sympathy towards

23    Parkinson's disease.

24              THE COURT:  Okay.  I think that's out.

25              MS. CAPWELL:  We'll agree, Your Honor.
```

```
 1              THE COURT:  Okay.

 2              MR. FROCARRO:  Next is 260, Your Honor, start with I

 3   guess number 46, Your Honor.

 4              THE COURT:  Okay.  46. (Perusing.)

 5              MR. FROCARRO:  And 47.  They put question marks.

 6   That's just what I didn't understand, Judge.

 7              THE COURT:  Says no with a question mark.  I mean,

 8   frankly, if that's it, I would bring this person back for

 9   further questioning.

10              MR. FROCARRO:  There's more, Judge.  53, again, I

11   don't know what's going on there.

12              THE COURT:  Okay.  Yes.  He has them both crossed.

13   All right.

14              MR. FROCARRO:  Okay.  And if you go to 58B, Your

15   Honor, as well.  They don't believe in law enforcement's

16   testimony.

17              THE COURT:  Could they get these X's any smaller?

18              MR. FROCARRO:  Yeah.

19              THE COURT:  "Do you hold any beliefs or opinions

20   that would affect your ability to evaluate the testimony of a

21   law enforcement officer fairly and impartially?"

22              She says no.

23              MR. FROCARRO:  58B says, "Do you agree with this

24   rule of law?"  It says no.  "Will you accept this rule of

25   law?"  No.
```

```
 1                THE COURT:  I'm sorry.  Okay.

 2                MS. CAPWELL:  That's fine, Your Honor.  With this

 3     one, it's hard to know whether they're understanding the

 4     question --

 5                THE COURT:  Yeah.

 6                MS. CAPWELL:  -- and/or they're guessing.

 7                THE COURT:  I would be inclined to let this person

 8     go on the totality of these responses.

 9                MS. CAPWELL:  Okay.  That's fine.

10                MR. FROCARRO:  Okay.  Next one I think is the

11     government's, Your Honor.

12                THE COURT:  264.

13                MR. FROCARRO:  Am I right, Carrie?

14                MS. CAPWELL:  You're right, 264, let me see if I can

15     decipher a note.  (Perusing.)

16                Okay.  The person believes that their brother was

17     arrested for marijuana and treated unfairly.  Thinks poor

18     people in the inner city are treated unfairly by the cops.

19                THE COURT:  What number is that?  I'm sorry.

20                MS. CAPWELL:  Those are notations on the front to

21     myself, Your Honor.  Let me see if I can find - okay.

22     (Perusing.)

23                Might start on 39, on the second page, 39B.  Just

24     says that his brother was placed on probation for marijuana.

25     Let's see.
```

```
 1              THE COURT:  Then I like the one there.  "I think
 2    It's a poor law and thus a bogus crime."
 3              MS. CAPWELL:  Yes.  So they just thought the family
 4    member was treated unfairly.
 5              MR. FROCARRO:  Judge, if you look at 33C, for
 6    example, says if could you put such opinions aside.
 7              THE COURT:  Uh-hum (affirmative response).
 8              MR. FROCARRO:  Yeah.
 9              MS. CAPWELL:  And moving forward, Your Honor, to
10    number 63, towards the back.  It's the question about
11    punishment.  It's for the judge alone to decide.  Would you
12    have any difficulty following this rule?  The person says yes,
13    they will.
14              THE COURT:  All right.  Hold on a second.  What
15    number is this, 63?
16              MS. CAPWELL:  Sixty-three, yeah.
17              MR. FROCARRO:  I agree with this one, Judge.
18              THE COURT:  Okay.
19              MR. FROCARRO:  I agree with the government.
20              THE COURT:  Very good.
21              MS. CAPWELL:  One more.
22              THE COURT:  Okay.
23              MR. FROCARRO:  One more, 269.  That's it.
24              MS. CAPWELL:  Yep.
25              MR. FROCARRO:  Okay.  Judge, 43A, 47 and 53A and B.
```

```
 1                    THE COURT:  Okay.  Hold on.  (Perusing.)

 2              "Do you have any bias, sympathy or prejudice towards

 3  law enforcement, prosecutors or the U. S. Attorney's Office?"

 4              Answer:  "Yes.  As stated earlier, I see what law

 5  enforcement go through on a daily basis."

 6              Okay.  What's the next one?

 7              MR. FROCARRO:  Forty-seven, Your Honor.

 8              THE COURT:  "You may hear testimony that the

 9  defendant's previously spent time in prison.  Would that fact

10  alone cause you to biased?"

11              "Yes.  Maybe depending on what the prior time was

12  for."

13              Yeah.  I think this is an out.

14              MR. FROCARRO:  There's more, Judge.

15              THE COURT:  Ms. Capwell?

16              MR. FROCARRO:  That's it, right?

17              THE COURT:  Ms. Capwell?

18              MS. CAPWELL:  Yes, that's it, Your Honor.

19              THE COURT:  Any objection to that one?

20              MR. FROCARRO:  That's it, right?

21              THE COURT:  I'm just asking her if he has any

22  comment or objection to 269.

23              MS. CAPWELL:  No, Your Honor.  We would agree they

24  should struck for cause.

25              THE COURT:  Okay.  All right.  That takes care of
```

```
 1   it?

 2             MS. CAPWELL:  It does.

 3             THE COURT:  Terrific.

 4             MR. FROCARRO:  Thank you very much, Your Honor.

 5   Have a great day.

 6             THE COURT:  You're welcome.  Have a great day.

 7             MS. CAPWELL:  Your Honor, what I will do, Judge

 8   Seybert deputy just asked me to send -- to email him the list

 9   of agreed upon or the people who should be struck from this

10   group.  So I will do so that and I will copy the defense

11   counsel on my email.

12             THE COURT:  Very good.  Okay.  Sounds good.

13             MS. CAPWELL:  Thank you, Your Honor.

14             THE COURT:  Thank you all.

15             (Proceedings concluded.)

16

17

18

19

20

21

22

23

24

25
```

LAW OFFICES OF
STEPHEN H. ROSEN, P.A.
100 ALMERIA AVENUE, SUITE 205
CORAL GABLES, FLORIDA 33134

STEPHEN H. ROSEN, ESQUIRE                                TELEPHONE: (305) 448-9900
EMAIL: attnyrosen@aol.com                                FAX: (305) 448-9337

November 07, 2011

**BY ECF**

The Honorable Joanna Seybert
U.S. District Court
P.O. Box 9014
Central Islip, New York 11722-9014

          Re:     *U.S. v. Christian Gerold Tarantino*
                  Case No. 08-CR-655(JS)

Dear Judge Seybert:

By this Letter, the defendant seeks to disqualify Assistant United States Attorney James M. Miskiewicz as a prosecutor in this case.

In its Memorandum and Order dated March 27, 2011 (DE 205), the Court addressed the defendant's notice of intent to introduce statements made by Peter Pistone and former Assistant United States Attorney Joseph Conway during the former's February 4, 2000 plea proceeding before this Court. This Court granted the defendant's request "... insofar as he may introduce these statements for the limited purposes of showing that the Government believed [Peter] Pistone was truthful at the time of his plea and that it had evidence supporting Pistone's allocution." (DE 205 at 2).

Tarantino's former trial counsel called Peter Pistone to the witness stand but did not call Mr. Conway. Tarantino intends to call Mr. Miskiewicz as a witness. The testimony of Mr. Miskiewicz is admissible for the same reasons this Court held admissible the statement of Mr. Conway. Indeed, the testimony of Mr. Miskiewicz is even more essential to the defense than that of Mr. Conway.

The Court's resolution of the issue concerning Mr. Conway is determinative in favor of the admissibility of Mr. Miskiewicz's testimony. The issue arose prior to trial, when Tarantino was facing trial upon three related murders, including the obstruction-of-justice murder of Louis Dorval. Peter Pistone had been previously prosecuted by the same Office of the United States Attorney in connection with the Dorval murder and pled guilty before this Court on February 4, 2000. During that proceeding, Peter Pistone stated that he, his brother Joseph Pistone, and Robert Misseri were

Page -1-

present when Joseph Pistone shot and killed Dorval in the back seat of a truck. The men placed Dorval's body in a tool box and dumped the box in the water. Peter Pistone further stated that, later on, he learned from Joseph Pistone that "[t]he reason that [Dorval] was killed for is a part of an organized crime thing where he was selling drugs and not kicking back to certain people." (DE 205 at 3). When Pistone's allocution was finished, then-AUSA Conway told the Court: "Just so the record is clear, the Government's evidence would show as Mr. Pistone stated, he was in the car at the time that the murder occurred, although he had no knowledge that it was going to happen. Once it did happened [sic], he helped dispose of the body and then subsequently learned as to the reasons why Mr. Dorval was actually killed." (DE 205 at 3).

This Court ruled that Mr. Conway's statement was admissible as an admission by a party-opponent under Federal Rule of Evidence 801(d)(2)(D) to show that the Government believed Peter Pistone was truthful at the time of his plea proceeding and that the Government's evidence was in accord with Peter Pistone's version of the Dorval murder. Noting that the Government conceded, in accordance with Second Circuit precedent, that a Government lawyer's statement may be used against the Government as a party (DE 205 at 4), this Court reasoned that Mr. Conway's statement "appears to the Court as an endorsement of Pistone's version of events, which made no mention of Tarantino and cited Dorval's failure to kick back a portion of his drug proceeds as the motive for the killing." (DE 205 at 4-5). This Court went on to rule:

> The probative value of Mr. Conway's statement outweighs its potential to delay the trial, confuse the jury, or prejudice the Government because Pistone's credibility is clearly a major issue in this case. See FED. R. EVID. 403. The Government's theory now is that, contrary to Pistone's plea allocution, Tarantino and others killed Dorval to prevent him from becoming a cooperating witness. The Government will likely attempt to discredit Pistone, as it did at the Mastrangelo hearing, with evidence that prosecutors eventually came to believe Pistone was untrustworthy. (See Mastrangelo Hrg. Tr. 464-465). **The Defendant, then, ought to be able to show that, at least at one point, the Government thought Pistone was credible and that its evidence supported Pistone's view of the Dorval murder**.

(DE 205 at 5).

The Government had urged the Court to apply the analysis set forth in *United States v. McKeon*, 738 F.2d 26 (2d Cir. 1984), a decision addressing whether a defense attorney's jury argument in a prior trial of the same defendant could be used against that defendant in a retrial. This Court did not believe that the *McKeon* test was the proper framework for determining whether Mr. Conway's statement could be used against the Government, noting the distinctions that here, it was a representation to the Court during a plea proceeding, not an argument to the jury, and further, it was Tarantino, not the Government, who was offering the statement. Regardless, this Court reasoned, even if *McKeon* applied, Mr. Conway's statement was still admissible for the following reasons:

First, **Mr. Conway's statement amounts to an admission that the Government believed Pistone was credible, which is inconsistent with the Government's**

**position at the Mastrangelo hearing and likely at trial that Pistone is patently incredible. Second, the statement was testimonial because it was a representation to this Court what the Government's evidence would prove. Third, the inference that Tarantino may draw from the inconsistency--that the Government once thought Pistone was telling the truth about the Dorval murder--is fair.**

*McKeon* also instructs the Court to determine by a preponderance of the evidence whether there is an innocent explanation for the inconsistency. The Court understands the Government's position that the inconsistency was caused by information discrediting Pistone that the Government learned after the plea proceeding. This very well may be an innocent explanation. In its discretion, however, and **in light of how critical Pistone's credibility is to the Defense, the Court thinks the better approach is to let the jury evaluate the Government's reasons for its switch.**

(DE 205 at 8). The same reasoning applies to Mr. Miskiewicz, but with greater force. Mr. Miskiewicz stood in the same shoes as Mr. Conway, except that Mr. Miskiewicz did so as to Joseph Pistone, the person Mr. Miskiewicz successfully prosecuted as the person who shot and killed Dorval.

On July 19, 2001, Joseph Pistone pled guilty to shooting Dorval. The transcript of the proceeding is filed along with this letter as Exhibit A.[1] Mr. Miskiewicz stood next to Joseph Pistone during the proceeding. Judge Spatt, the presiding judge, asked Joseph Pistone to describe what he did with regard to the murder charge. Joseph Pistone explained that he "conspired to murder Louis Dorval." (Ex. A at 50-1).

Judge Spatt then asked whether Dorval was murdered. Joseph Pistone responded in the affirmative whereupon Judge Spatt asked how Dorval was murdered. Joseph Pistone responded: "He was shot and killed." *Id*. at 51. Judge Spatt then asked Mr. Miskiewicz whether Joseph Pistone's response was "satisfactory for that particular act." *Id*. Mr. Miskiewicz responded that it was not because Joseph Pistone did not detail his overt acts regarding the murder. *Id*. Thereupon, Mr. Pistone stated that he attempted to dispose of Dorval's body by loading it into a large plastic Tuff Bin toolbox which was dumped into the Atlantic Ocean at Fire Island. *Id*. at 51-2. Judge Spatt asked whether there was "anything else on that." *Id*. at 52. Mr. Miskiewicz stated that Joseph Pistone's account was still insufficient and offered in a "passive" voice and that the Court should require him to state what the

---

[1] The issue presented in this letter was only recently ascertained by Tarantino's present counsel during the review of nearly 10 boxes of discovery (turned over by Tarantino's previous trial counsel), which revealed the attached transcript, along with the review of more than 3000 pages of transcripts from the first trial.

Government implicitly believed and would prove at trial, namely, that Joseph Pistone was the murderer of Dorval. Accordingly, Judge Spatt asked: "Well, how was he killed then?" Pistone answered: "He was shot and killed." Judge Spatt asked: "Who did that?" Pistone answered: "I did." At that point, Mr. Miskiewicz was satisfied and stated: "Nothing further." *Id*.

Obviously, just as this Court found with regard to Mr. Conway as the prosecutor of Peter Pistone, Mr. Miskiewicz, as the prosecutor of Joseph Pistone and representative of the Government, "... thought Pistone was credible and that its evidence supported Pistone's view of the Dorval murder." (DE at 5). Accordingly, Tarantino has the right to present Mr. Miskiewicz's testimony as a party opponent and in support of his defense. There is no equivalent alternative testimony because Mr. Miskiewicz was the sole prosecutor of Joseph Pistone as the murderer of Dorval and the sole representative of the Government who advocated in Court the Government's position that Joseph Pistone shot and killed Dorval and participated in the disposal of the body.[2] Thus, Tarantino has made the required showing of a compelling and legitimate need to call Mr. Miskiewicz as a witness. *United States v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975).

It necessarily follows that Mr. Miskiewicz must be disqualified under the advocate-witness rule and under the attorney-as-unsworn- witness rule. The ethical rules adopted by the American Bar Association have long recognized that "[t]he roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively." American Bar Association, Code of Professional Responsibility EC 5–9 (1978); *see United States v. Birdman*, 602 F.2d 547, 553 nn. 14–16 (3d Cir.1979) (collecting cases in which courts have condemned an attorney's simultaneous service as advocate and as witness). "Permitting an advocate to testify as a witness also creates a risk that jurors will be unable to distinguish the lawyer's argument from his testimony and might therefore erroneously 'accord testimonial credit to the [lawyer]'s ... argument[s].'" *United States v. Bin Laden*, 91 F.Supp.2d 600, 622 (S.D.N.Y. 2000) (citations omitted). "If a litigant's lawyer must be a witness, therefore, he can not be permitted to serve as an advocate at trial." *Id*.

Additionally, 22 N.Y.C.R.R. § 1200.21 (DR5-102) provides as follows:

> (a) A lawyer shall not act, or accept employment that contemplates the lawyer's acting, as an advocate on issues of fact before any tribunal if the lawyer knows or it

---

[2] Mr. Miskiewicz apparently made similar statements which found their way into paragraphs 10, 11 and 12 of the presentence report of Joseph Pistone which were disclosed by the Government to Tarantino's previous trial counsel with a cover letter dated February 14, 2011. The letter and presentence report excerpts do not appear on the docket. Tarantino will therefore file paragraphs 10, 11 and 12 under seal. In short, those paragraphs, which are adopted herein, provide in even greater detail the evidence (apparently endorsed by Mr. Miskiewicz and consequently adopted in the presentence report) that Joseph Pistone murdered Dorval.

is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client, except that the lawyer may act as an advocate and also testify:

(1) If the testimony will relate solely to an uncontested issue.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the lawyer's firm to the client.

(4) As to any matter, if disqualification as an advocate would work a substantial hardship on the client because of the distinctive value of the lawyer as counsel in the particular case.

"An additional problem arises when the lawyer in question is a prosecutor in a criminal case. When a prosecutor testifies, in addition to all of the concerns specified above, there is a danger that the prestige associated with the prosecutor's office might induce a jury to grant too much weight to his testimony." *Bin Laden*, 91 F.Supp. 2d at 622. "A court may only permit a prosecutor to testify if the offering party has exhausted all other available sources for that testimony." *Id*. at 622-23. As noted: "In recognition of the fact that a move to disqualify trial counsel has inherent tactical advantages particularly when it occurs after the culmination of extensive trial preparation, the Second Circuit has required a showing of necessity from the movant." *United States v. Perlmutter*, 637 F.Supp. 1134, 1137 (S.D.N.Y.1986) (*citing  Schwartzbaum, supra)*.

"Even if he is not a necessary witness, however, a different problem can arise from an attorney's personal involvement in events that are at issue in a trial. If a witness testifies about events in which the attorney was involved, there is a danger that the jury will view that attorney as an unsworn witness, vouching for the accuracy of any testimony he elicits about events in which he was involved." *Bin Laden*, 91 F.Supp.2d at 624 (*citing United States v. Gotti*, 771 F.Supp. 552, 561–67 (E.D.N.Y.1991), *aff'd sub nom., United States v. Locascio*, 6 F.3d 924, 933–35 (2d Cir.1993)).

Mr. Miskiewicz is a critical witness for the defense. Upon application of the above-cited decisional authorities and ethical requirements concerning the advocate-witness rule or the unsworn-witness rule, Mr. Miskiewicz cannot prosecute the case against Tarantino and at the same time be a witness. Tarantino's Sixth Amendment right to compulsory process trumps any inconvenience to the government.

Very truly yours,

S/STEPHEN H. ROSEN

SHR/mr

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

       -against-              <u>MEMORANDUM & ORDER</u>
                                   08-CR-0655 (JS)

CHRISTIAN GEROLD TARANTINO,

                Defendant.
----------------------------------X
APPEARANCES:
For the Government: Carrie Nicole Capwell, Esq.
                  James M. Miskiewicz, Esq.
                  Sean C. Flynn, Esq.
                  United States Attorney's Office
                  610 Federal Plaza
                  Central Islip, NY 11722

For Defendant:     Diarmuid White, Esq.
                  White & White
                  148 East 78th Street
                  New York, NY 10021

                  Frank Anthony Doddato, Esq.
                  Law Offices of Frank A. Doddato, PC
                  666 Old Country Road, Suite 501
                  Garden City, NY 11530

                  Stephen Rosen, Esq.
                  Stephen H. Rosen, P.A.
                  100 Almeria Avenue, Suite 205
                  Coral Gables, FL 33134

SEYBERT, District Judge:

        Christian Gerold Tarantino ("Tarantino" or the "Defendant") moves to disqualify Assistant United States Attorney James M. Miskiewicz ("AUSA Miskiewicz") from prosecuting this case because Tarantino intends to call AUSA Miskiewicz as a witness. (Def. Br. 1.) Tarantino argues that AUSA Miskiewicz's testimony is admissible under the same

rationale that the Court used in concluding earlier that
Tarantino could offer statements made by then-Assistant United
States Attorney James Conway. (Id.) Familiarity with the facts
of this case and the Court's earlier ruling (the "Conway
Ruling") is presumed.

DISCUSSION

Contrary to Defendant's position, the Conway Ruling
does not compel the conclusion that Defendant may call AUSA
Miskiewicz to testify about Joseph Pistone's plea allocution.
The thrust of the Conway Ruling was that Defendant could present
evidence that the Government once believed someone whose account
of the Dorval murder was inconsistent with its theory in this
prosecution, including that Dorval was killed for reasons
unrelated to fears that he would cooperate with federal
authorities. Unlike his brother's account of the Dorval murder,
Joseph Pistone's account is not inconsistent with the
Government's position in this case; although Joseph Pistone
allocuted to shooting Dorval, the Government has never claimed
that Defendant actually fired the fatal bullet. (See
Indictment, Docket Entry 1 (charging Defendant with the Dorval
murder under, among others, the aiding and abetting statute).)

Moreover, if Defendant thinks that either Joseph or
Peter Pistone can exculpate Defendant, he may call them to
testify (subject to further rulings on Defendant's or the

2

Government's ability to re-litigate the Dorval murder).    In short, Defendant has not presented a legitimate or compelling reason to call AUSA Miskiewicz as a witness.    See, e.g., United States v. Bin Laden, 91 F. Supp. 2d 600, 622-23 (S.D.N.Y. 2000).

<u>CONCLUSION</u>

The Court orders the following: Defendant's motion to disqualify AUSA Miskiewicz (Docket Entries 284 & 285) is DENIED; the Government's request to preclude Defendant from offering the minutes from Joseph Pistone's plea proceeding (Docket Entry 289) is DENIED WITHOUT PREJUDICE; and if either party intends to move in limine concerning Defendant's ability to re-litigate the Baumgardt or Dorval murders, it shall do so by December 1, 2011.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    November   22  , 2011
          Central Islip, New York

3

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,         :    CR 08 655

     v.                          :    U.S. Courthouse
                              Central Islip, N.Y.

CHRISTIAN TARANTINO,              :
                              TRANSCRIPT OF PROCEEDINGS
         Defendant.    :
                              February 15, 2012
-------------------------------X    2:30 p.m.

BEFORE:

     HONORABLE JOANNA SEYBERT, U.S.D.J.


APPEARANCES:

For the Government:  LORETTA E. LYNCH
                   United States Attorney
                   100 Federal Plaza
                   Central Islip, New York 11722
                   By:  JAMES M. MISKIEWICZ, ESQ.
                       SEAN C. FLYNN, ESQ.
                       Assistants, U.S. Attorney

For the Defendant:   FRANK A. DODDATO, ESQ. ESQ.
                   666 Old Country Road
                   Garden City, New York 11530


Court Reporter:      HARRY RAPAPORT, C.S.R.
                   United States District Court
                   100 Federal Plaza
                   Central Islip, New York 11722
                   (631) 712-6105




Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.


*HARRY RAPAPORT, CERTIFIED REALTIME REPORTER*
*OFFICIAL COURT REPORTER*

2

1          THE CLERK:  For status, United States versus

2    Christian Tarantino.

3          Appearances please.

4          MR. MISKIEWICZ:  Good afternoon, your Honor.

5          James Miskiewicz and Sean Flynn for the United

6    States.

7          MR. DODDATO:  Good afternoon, your Honor.

8          Frank A. Doddato for the defendant Chris

9    Tarantino.

10         THE COURT:  Mr. Dodato, I received information

11   this morning that although the defendant was given an

12   opportunity to come to court today, he declined because he

13   did not have his legal papers.

14         MR. DODDATO:  I understand that as well.  I

15   received an email from chambers to that extent.

16         THE COURT:  I don't know why he would need his

17   legal papers necessarily to come in and talk with counsel

18   about these pending motions.

19         MR. DODDATO:  I'm ready to proceed without him.

20         THE COURT:  You are waiving his appearance, in

21   addition to his not coming here?

22         MR. DODDATO:  That's correct.

23         THE COURT:  Mr. Rosen is not participating in

24   this today?

25         MR. DODDATO:  That is also correct, your Honor.

3

1          THE COURT:  Please have a seat.

2          There are two outstanding mosts.  One is a

3   motion by the defendant requesting the Court to reconsider

4   its earlier ruling denying the defendant's request to

5   disqualify Mr. Miskiewicz from the case.

6          The second motion by the defendant is requesting

7   access to the FBI lab in Virginia.

8          I have reviewed your papers, and in terms of the

9   reconsideration of the disqualification ruling, I think I

10   went through this very clearly the last time in my ruling,

11   that the Conway ruling with regard to the trial testimony

12   that the Court permitted to come in, and that being that

13   Peter Pistone's position was that Dorval was killed for

14   not kicking back drug money to organized crime, which is

15   contrary to the government's position in the case before

16   the Court today, and the last case for trial that

17   Tarantino killed Dorval to prevent his cooperation.

18          Peter Pistone listed the people present at the

19   Dorval murder, but did not name Tarantino; and at that

20   time then AUSA Conway appeared to vouch for Peter

21   Pistone's credibility by telling the Court that the

22   government's evidence, quote, would show as Peter Pistone

23   stated, end quote.

24          In denying the motion to disqualify

25   Mr. Miskiewicz, I rejected any similarity between the

4

1    Conway-Peter Pistone facts, and the Miskiewicz and the

2    Joseph Pistone situation.  It is very different as to the

3    proffered testimony of Mr. Pistone.

4          Contrary to the defendant's position, the Conway

5    ruling does not compel the conclusion that the defendant

6    may call AUSA Miskiewicz to testify about Joseph Pistone's

7    plea allocution.  The thrust of the Conway ruling was that

8    the defendant could present evidence that the government

9    once believed someone whose accounts of the Dorval murder

10   was inconsistent with the theory in this prosecution

11   including that Dorval was killed for reasons unrelated to

12   fears that he would cooperate with federal authorities.

13         Unlike his brother's account of the Dorval

14   murder, Joseph Pistone's account is not inconsistent with

15   the government's position in this case; although Joseph

16   Pistone allocuted to shooting Dorval, the government has

17   never claimed that defendant actually fired the fatal

18   bullet.

19         Now, your reconsideration motion to disqualify

20   Mr. Miskiewicz.  The defendant points out that the

21   government's application for medical records in which the

22   prosecutors wrote that, among other matters, Scott

23   Mulligan will testify that after the defendant killed

24   Dorval in August 1994, Mulligan assisted Tarantino in

25   dumping Dorval's body.

5

1          Defendant suggests that in light of this

2     statement the government is now claiming that Tarantino

3     actually pulled the trigger, and that Joseph Pistone's

4     plea allocution, and by extension Mr. Miskiewicz's

5     observations of the plea proceeding, are relevant.

6     Therefore, the defendant argues Mr. Miskiewicz should be

7     disqualified.

8          This motion is denied for several reasons.

9          First, defendant appears to take one line from

10    the government's letter out of context.  As the government

11    explained it has never theorized who fired the shot that

12    killed Dorval.  And because the jury found Tarantino

13    guilty of the Dorval murder by virtue of Section

14    1512(a)(1) and the aiding and abetting statute, Section 2,

15    the government's recent letter which the Court credits was

16    accurate in that a jury having properly found the

17    defendant had killed Dorval either directly or by an

18    aiding and abetting theory.

19          Second, as I have explained with this

20    Pistone/Miskiewicz situation, it is distinguishable from

21    the facts that surrounded the Conway ruling in a number of

22    ways, perhaps most importantly because Peter Pistone

23    supplied the motive for the Dorval murder that is

24    inconsistent with the government's present theory.

25          Third, the defendant has not shown compelling

6

1    and legitimate reasons to call Mr. Miskiewicz as a

2    witness, and thus he need not be disqualified.

3              Now, on to the reciprocal discovery motion.

4              The defendant also moves for reciprocal

5    discovery, specifically, that he be allowed access to the

6    FIB's audio testing equipment. He argues because he

7    provided the FBI agent access to Tom Owen's and to Norm

8    Dotti's computer, he should have the same access to Agent

9    Marr's computers.

10             The defendant cites no authority whatsoever in

11   its motion, but is presumable founded on Federal Rules of

12   Criminal Procedure 16.

13             Rule 16, however, obligates the defense to

14   provide reciprocal discovery in certain instances.  But as

15   the government argues it does not allow successive rounds

16   of discovery followed by infinite rounds of reciprocity.

17             I'm denying this motion because the defendant

18   has not made a colorable legal argument that he is

19   entitled to access to the government's computers.  I have

20   also -- I also cite to you Federal Rules of Criminal

21   procedure 16(d)(1), which provides that at any time the

22   Court may, for good cause, deny, restrict, or defer

23   discovery or inspection, or grant other appropriate

24   relief.

25             Here the Court has denied the defendant's

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -               08-CR-0655(JS)

CHRISTIAN GEROLD TARANTINO,

                Defendant.

- - - - - - - - - - - - - - - -X


GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S RULE 33 MOTION FOR NEW TRIAL

                    LORETTA E. LYNCH
                    United States Attorney
                    Eastern District of New York
                    610 Federal Plaza
                    Central Islip, New York 11722-4454

Carrie N. Capwell
Sean C. Flynn
James M. Miskiewicz
Assistant U.S. Attorneys
    (Of Counsel)

a government witness, inconsistencies between his and Mulligan's
testimony would not establish perjury by Mulligan.  <u>United States
v. Gambino</u>, 59 F.3d 353, 365 (2d Cir. 1995)(Inconsistencies among
witnesses do not establish perjury).  Of course, Joseph Pistone
was never a government witness and the defense did not call him
although it claimed it would and made arrangements to have him
transported to the district during the re-trial.  To be sure,
Joseph Pistone contradicted himself most of all in his accounts
of the Dorval murder.  In chronological order, Pistone claimed
that: (1) Dorval admitted killing a guard during an armored car
robbery with Tarantino and Mulligan, and that he subsequently
"heard on the street" that Tarantino killed Dorval, Bates No.
000000425[2]; (2) Dorval's body was transported in an SUV truck in
which Dorval's blood would be found (it wasn't), <u>id</u>. 000000427;
(3) he shot Dorval in the head as part of a racketeering
conspiracy with others un-named, J. Pistone Guilty Plea T. at 52;
(4) he shot Dorval in the head on a boat as part of a conspiracy
with Tarantino, among others, Bates No. 000000484; (5) he had
nothing to do with Dorval's murder but learned somehow that
Gaetano Fatato killed Dorval because Dorval "slapped around" his
own girlfriend, Janice Traister, <u>id</u>. 000000489; (6) repeat
version (4) above, admitting that he killed Dorval with

---

[2] The Bates Numbers refer to documents disclosed to the
defense pursuant to the Court's protective order of May 10, 2009.

-6-

> review typically provides a far better
> opportunity for an evaluation of an
> ineffective-assistance claim than direct
> review, because a factual record focused on
> the defendant's claim can be developed in the
> district court, including by "tak[ing]
> testimony from witnesses for the defendant
> and the prosecution and from the counsel
> alleged to have rendered the deficient
> performance."

United States v. Oladimeji, 463 F.3d 152, 154 (2d Cir. 2006)

(quoting Massaro v. United States, 538 U.S. 500, 504-05 (2003)).

Assuming the conflict claim raised by the defendant has

any substantive merit, "joint representation, *is not per se*

*violative of constitutional guarantees of effective assistance of*

*counsel*." Holloway v. Arkansas, 435 U.S. 475, 482-83 (1978)

(emphasis added). Thus, although this Court has the discretion

to hear prior to sentencing ineffective assistance claims

regarding per se violations, Brown does not require such an

inquiry here.

B.   The Conflict of Interest Claim Is Meritless

Were the Court inclined to apply Brown here, the

defendant still fails to establish that any conflict existed or

that it prejudiced the defendant. Between 2001 and 2003,

criminal defense attorney James Froccaro represented Mulligan in

an unrelated federal narcotics prosecution that ended with

Mulligan pleading guilty and receiving a 37-month prison

sentence. United States v. Mulligan et al., 01-CR-0139(ILG);

Doc. No. 59. Being a matter of public record in which the United

-14-

States was a party, of course government counsel acknowledged that the government was aware of its own prosecution of Mulligan in another matter and of Mr. Froccaro's representation.  T. at 12.  Absent charges against Mulligan until December 2011, no joint representation or a basis to seek judicial intervention existed.  See F.R.Cr.P. 44(c)(1)("Joint representation occurs when: (A) two or more defendants have been charged jointly. . .; and; (B) the defendants are represented by the same counsel. . ..").

A defendant suffers an ineffective assistance of counsel violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance.  Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993) (citing Strickland v. Washington, 466 U.S 668 (1994)); United States v. Fulton, 5 F.3d 605, 609 (2d Cir. 1993).  Even where defendants are jointly represented by the same attorneys such representation, "is not per se violative of constitutional guarantees of effective assistance of counsel." Holloway, 435 U.S. at 482-83; Cuyler v. Sullivan, 446 U.S. 335, 337-38 (1980)(finding no Sixth Amendment violation where two privately retained lawyers represented three defendants charged with the same murders, each of whom was tried separately).

> An attorney has an actual, as opposed to a
> potential, conflict of interest when, during

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
UNITED STATES OF AMERICA,

                                  <u>MEMORANDUM & ORDER</u>

        -against-                    08-CR-0655(JS)

CHRISTIAN TARANTINO,

                    Defendant.
-----------------------------------X
APPEARANCES
For the Government:  Loretta E. Lynch, Esq.
                  Carrie N. Capwell, Esq.
                  Sean C. Flynn, Esq.
                  James M. Miskiewicz, Esq.
                  Assistant United States Attorneys
                  Eastern District of New York
                  610 Federal Plaza
                  Central Islip, NY 11722

For Tarantino:      Stephen H. Rosen, Esq.
                  Law Offices of Stephen H. Rosen, P.A.
                  100 Almeria Avenue, Suite 205
                  Coral Gables, Florida 33134

                  Frank A. Doddato, Esq.
                  Law Offices of Frank A. Doddato, P.C.
                  666 Old Country Road, Suite 501
                  Garden City, NY 11530

SEYBERT, District Judge:

        Presently pending before the Court is Defendant Christian Gerold Tarantino's ("Defendant" or "Tarantino") motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. For the following reasons, Defendant's motion is DENIED.

BACKGROUND

On September 23, 2008, a four count Indictment charged Tarantino with: (1) the 1994 murder of armored car guard Julius Baumgardt ("Baumgardt"); (2) the 1994 murder of Louis Dorval ("Dorval"); (3) Conspiracy to Commit the Obstruction-of-Justice Murder of Vincent Garguilo ("Garguilo"); and (4) the 2003 murder of Vincent Gargiulo.

A jury trial commenced before this Court on March 28, 2011. At trial, evidence was presented that on June 23, 1994, two individuals--Baumgardt and his partner--were armored car guards working for Mid-Island Check Cashing Company ("Mid-Island"). As the two men exited the armored car and attempted to begin their work day, Defendant and Dorval, armed with a shotgun and a pistol respectively, approached. Nearby, Scott Mulligan ("Mulligan") sat as the look-out. Defendant and Dorval ordered Baumgardt and his partner to the ground. Though Baumgardt complied, Dorval shot and killed him.

After the murder, Defendant, Dorval, and Mulligan fled and dumped the pistol and other materials in a self-storage facility. The pistol had been registered in Dorval's name and had been recovered by Nassau County Police shortly after Baumgardt's death. According to the prosecution, Defendant became concerned that Dorval might eventually cooperate with police and implicate Defendant in the Baumgardt murder. As a

result, Defendant confided in Mulligan and Gargiulo that he would "take care of the problem."

In the summer of 1994, Defendant told Mulligan that Dorval had been killed and that he needed to dispose of the body. Mulligan contacted an acquaintance whom they knew to have a boat. The next day, Mulligan and Defendant took Dorval's body, which had been stuffed into a tool bin, and threw it into the Atlantic Ocean off of the shore of Long Island.

For years the state of affairs remained unchanged. Then, in the fall of 2000, Gargiulo secretly taped Defendant. During this conversation, Defendant admitted to his involvement in the Baumgardt and Dorval murders. Following the downfall of Gargiulo's gym business, Gargiulo threatened Defendant, claiming that if Defendant did not pay Gargiulo, then Gargiulo would turn the secret tape over to the police. Defendant refused Gargiulo's demand and instead hired his business associate, Justin Bressman, to kill Gargiulo. On August 18, 2003, Mr. Bressman shot and killed Gargiulo.

On May 23, 2011, a jury convicted Defendant of the Baumgardt and Dorval murders. The jury, however, did not reach a verdict on Counts Three and Four of the Indictment, which charged Defendant with Conspiracy to Commit the Obstruction-of-Justice Murder of Vincent Gargiulo and the Obstruction-of-Justice Murder of Vincent Gargiulo, respectively.

3

A re-trial was held on Counts Three and Four of the Indictment before this Court beginning on April 23, 2012. A jury subsequently convicted Defendant of Conspiracy to Commit the Obstruction of Justice Murder of Vincent Gargiulo and acquitted Defendant on the Obstruction-of-Justice Murder of Vincent Gargiulo.

Defendant now seeks a new trial on several grounds. First, he asserts that perjurious testimony was presented at the re-trial. Second, he seeks a new trial on Counts One and Two due to a conflict of interest of trial counsel. Third, he contends that the Court erroneously allowed the admission of secondary evidence during the re-trial. Fourth, he contends that the Government withheld <u>Brady</u> material, thus impacting the re-trial. Finally, Defendant asserts that specific evidence should have been suppressed at the re-trial.

<u>DISCUSSION</u>

The Court will first discuss the standard governing Rule 33 motions. It will then address the merits of Tarantino's motion.

I.   <u>Standard for Granting Motion for a New Trial under Rule 33</u>

"The burden of proving the need for a new trial lies with the defendant." <u>United States v. Ferguson</u>, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (citing <u>United States v. Soblen</u>, 203 F. Supp. 542 (S.D.N.Y. 1961)), <u>aff'd</u>, 301 F.2d 236 (2d Cir. 1962);

4

see also United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995).  The decision whether to grant or deny a motion for a new trial is firmly within the discretion of the trial judge.  See Sasso, 59 F.3d at 350; see also Ferguson, 49 F. Supp. 2d at 323 (citing United States v. Rodriguez, 738 F.2d 13, 17 (1st Cir. 1984)); United States v. Zane, 507 F.2d 346, 347 (2d Cir. 1974) (reviewing a trial court's denial of a Rule 33 motion for abuse of discretion); United States v. Madeoy, 912 F.2d 1486, 1490 (D.C. Cir. 1990) (decision to grant post-trial relief is within trial court's sound discretion).   "[I]n deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses." Ferguson, 49 F. Supp. 2d at 323 (citing United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)).  Moreover, on a Rule 33 motion, "[t]he Court is not required to view the evidence in the light most favorable to the Government." Id. (citing United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).   Nevertheless, the Court's discretion is limited to the extent that Rule 33 motions for a new trial are "not favored and should be granted only with great caution." United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975) (internal quotation marks and citation omitted).

II.  Perjured Testimony

During Defendant's re-trial, the Government presented the testimony of Scott Mulligan.  Mulligan testified that

5

Defendant indicated during several conversations that Dorval was Defendant's "mess" and that Defendant would "clean it up." (Re-Trial 1492-93.)[1]  Thereafter, Defendant approached Mulligan and stated that he shot Dorval in the head, the murder "was done", and that Dorval "didn't bleed much." (Re-Trial 1498-99.) The two men then took Dorval's body, by now in a tool bin, out to sea via a friend's boat. (Re-Trial 1508-10.) As they attempted to fill the tool box with debris to help it sink, Mulligan dropped a bolder onto Defendant's right hand. (Re-Trial 1524.) Defendant attempted to further aid the sinking by shooting holes into the bottom of the bin. (Re-Trial 1525.) Defendant and Mulligan were eventually successful in getting the tool bin into the water and they fled the scene. (Re-Trial 1530.)

Defendant now asserts that this testimony was perjured. As proof of the alleged perjury, Defendant cites to the April 6, 2000 grand jury testimony of FBI Agent Schelhorn and AUSA Miskiewicz. (Def. Br. 3.) At that time, the Government had indicted Joseph Pistone ("Pistone"). Pistone provided an account of the Dorval murder in which Pistone admitted to being the shooter and having disposed of the body with the help of his brother, Peter Pistone. The Government

---

[1] Citations to the April 23, 2012 et seq. trial on Counts Three and Four of the Indictment shall hereinafter be referred to as "Re-Trial". Citations to the March 29, 2012 et seq. trial on Counts One and Two of the Indictment shall hereinafter be referred to as "Trial".

apparently does not dispute that it investigated Pistone's account of events and, for at least a period of time, believed Pistone to have shot and killed Dorval. Because this account, placing Pistone as the shooter, is inconsistent with the trial testimony of Mulligan placing Defendant as the gunman, Defendant argues that Mulligan's testimony was perjurious.

A.   <u>Standard for New Trial Based on Perjury</u>

The parties disagree as to the appropriate standard applicable to a motion for a new trial based upon the presentation of perjurious trial testimony. Both parties agree that the materiality of the perjured testimony and the extent to which the prosecution was aware of the perjury are two factors. <u>See</u> <u>United States v. Wallach</u>, 935 F.2d 445, 456 (2d Cir. 1991). The Government, however, also cites to <u>United States v. Zichettello</u>, 208 F.3d 72 (2d Cir. 2000). In <u>Zichettello</u>, the Second Circuit delineated a four-part test: "(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at the time of trial; and (iv) the perjured testimony remained undisclosed during trial." 208 F.3d at 102 (internal citations omitted). In a relatively recent opinion, the Second Circuit in <u>United States v. Ferguson</u> acknowledged that the two tests appear to be "in tension", though it did not

7

ultimately address the appropriate test.  676 F.3d 250, 282 (2d Cir. 2011).

As in <u>Ferguson</u>, the Court need not decide whether <u>Wallach</u> or <u>Zichettello</u> governs this inquiry because Defendant's argument fails as a threshold matter.  No matter the applicable standard, the first consideration in this inquiry is whether a party in fact presented perjured testimony, <u>see United States v. Haouari</u>, No. 00-CR-0015, 2001 WL 1586676, *4 (S.D.N.Y. Dec. 11, 2001), a requirement Defendant does not meet.

B.   <u>Testimony of Scott Mulligan</u>

Defendant has not shown that Mulligan's testimony was perjurious.  "Perjury" is when a witness deliberately makes a "material false or misleading statement[] while under oath." <u>Black's Law Dictionary</u> 1254 (9th ed. 2009).  Although Mulligan's testimony is arguably inconsistent with Pistone's admission, there is nothing to suggest that Mulligan deliberately gave false or misleading testimony.  Mulligan did not testify that he saw who shot Dorval.  Rather, he testified that Defendant told Mulligan that Defendant committed the murder.  (Re-Trial 1498-99.)  With respect to the discarding of Dorval's body, Mulligan testified that he was present and watched Defendant place the tub containing Dorval's body into the Atlantic Ocean and subsequently shoot holes into the tub in an attempt to cause it to sink.  (Re-Trial 1508-30.)

8

Defendant offers no proof of perjury other than the confession of Pistone.  This is woefully insufficient.  See Buitrago v. Scully, 705 F. Supp. 952, 957 (S.D.N.Y. 1989) (finding that there was no "hard evidence" of perjury).  That one witness gives a differing version of events from another is not uncommon in litigation and does not alone establish perjury.  See United States v. Tyree, 279 F. App'x 31 (2d Cir. 2008).  Courts have offered a myriad of reasons for differing accounts.  See id. at 34 (other witness may have been lying, or purportedly perjured testimony could have been due to mistake); see also Ocasio v. United States, No. 08-CV-1305, 2012 WL 3245419, *2 (S.D.N.Y. Aug. 9, 2012) (incorrect testimony may be the result of confusion, mistake, or a faulty memory).  As in the aforementioned precedent, the Court is left with little more than two arguably divergent accounts of the Dorval murder.  This simply does not constitute perjury.

Furthermore, even if this were perjury, the Court is troubled by the fact that Defendant apparently made a strategic decision not to call Pistone and highlight any inconsistencies, yet now claims that the lack of such disclosure merits a new trial.  Defendant was aware of Pistone's account of events at the time Mulligan testified at the re-trial, and the Court permitted Defendant to introduce Pistone's plea allocution if he so chose.  (Docket Entry 205.)

9

Defendant decided not to call Pistone. Rather, defense counsel highlighted inconsistencies in Mulligan's testimony and questioned Mulligan's credibility as a witness during summation. (Def. Reply Br. 5.) Specifically, defense counsel argued that medical evidence offered by the Government to corroborate Mulligan's testimony demonstrated Mulligan's "fabrication." (Def. Reply Br. 5.) The Government had offered medical evidence to show that Defendant had indeed sought medical treatment for a crushed right thumb, consistent with Mulligan's testimony that he had accidentally injured Defendant's thumb during their attempt to dispose of Dorval's corpse. The Government argued that the records indicated that Defendant sought treatment for his right thumb on the same day and around the same time that Mulligan had testified that he and Defendant returned from dumping Dorval's body. (Re-Trial 1892-93.) Defense counsel argued that the records showed two visits, and that the visit for Defendant's right thumb came only well after they disposed of the body. (Re-Trial 1902-07.)

Thus, Defendant did highlight some of the potential inconsistences in Mulligan's testimony. To the extent that he did not do so, this could only have been a deliberate choice given Defendant's knowledge of Pistone's admission. Accordingly, this state of affairs would give the Court great pause in granting a new trial even if Mulligan's testimony was

in fact perjured.  See United States v. Blair, 958 F.2d 26, 29 (2d Cir. 1992) ("We have always assumed, though never expressly held, that perjured testimony must have remained undisclosed during trial in order to require reversal of a conviction."); Conteh v. United States, 226 F. Supp. 2d 514, 520 (S.D.N.Y. 2002) ("[A] defendant seeking relief on the ground of the government's use of perjured testimony must demonstrate that he was unaware, and with due diligence would have remained unaware, of the falsity of the testimony.").

III. Conflict of Interest

       In addition to his claims for a new trial regarding the re-trial, Defendant also asserts that counsel during the first trial, James Froccaro, had an actual conflict, thus necessitating a new trial on Counts One and Two.  Defendant makes this argument on two related, but independent, grounds: (1) that Mr. Froccaro, at least for a period of time, simultaneously represented Mulligan and Defendant; and (2) Mr. Froccaro operated under an actual "benefactor" conflict of interest because Mulligan paid Mr. Froccaro approximately $150,000 to represent Defendant.  As a result, Defendant says, Mr. Froccaro did not pursue the argument that Mulligan shot Dorval, and that Defendant was actually an accessory-after-the-fact.

11

A.   <u>Timeliness</u>

Federal Rules of Criminal Procedure Rule 33 provides that motions for a new trial premised on grounds other than newly discovered evidence "must be filed within 14 days after the verdict or finding of guilty."[2] FED. R. CRIM. PRO. 33.  The Advisory Committee notes for the 2005 amendment to Rule 33 explain that there are some exceptions, however.  Under Federal Rules of Criminal Procedure Rule 45(b)(1), "[w]hen an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made . . . (B) after the time expires if the party failed to act because of excusable neglect."  FED. R. CRIM. PRO. 45 (b)(1)(B).

In determining whether excusable neglect exists, the Court considers four factors: (1) the danger of prejudice to the non-moving party; (2) the length of delay and possible impact on proceedings; (3) the reason for delay; and (4) the good faith of the moving party.  <u>United States v. Frederick</u>, No. 09-258, 2012 WL 2050909 (E.D.N.Y. June 5, 2012); <u>United States v. Sabir</u>, 628 F. Supp. 2d 414 (S.D.N.Y. 2007).

---

[2] Claims of ineffective assistance of counsel are not "newly discovered evidence".  <u>See</u> <u>United States v. Cammacho</u>, 462 F. App'x 81, 83 (2d Cir. 2012).

B.   <u>Application</u>

          Taking the factors out of order, the Court will first
consider the length and reason for the delay in seeking a new
trial.   Defendant asserts that Mr. Froccaro represented
Defendant during all relevant times.   Thus, even though
Defendant properly sought an extension of time to move for a new
trial, and subsequently did move for a new trial on Counts One
and Two, the issue of Mr. Froccaro's conflict of interest was
never raised because Mr. Froccaro was still counsel for
Defendant.   Accordingly, Defendant argues that Mr. Froccaro
could not have been expected to raise his own conflict.

          Defendant's argument is not a novel one.   For example,
in <u>United States v. Frederick</u>, the defendant argued excusable
neglect because counsel that he claimed was ineffective remained
his counsel until after the time to file for new trial expired.
2012 WL 2050909, at *9.   The District Court for the Eastern
District of New York held that this reason did not excuse
defendant's delay in waiting over a year and a half after
obtaining new counsel and less than one month before his
sentencing.   <u>Id.</u>

          Likewise here, Defendant's explanation of Mr.
Froccaro's conflict does not excuse his delay.   The jury
returned a verdict on Counts One and Two on May 23, 2011.   Mr.
Froccaro's representation of Defendant terminated on August 17,

13

2011, and Defendant had new counsel for over a year at the time he filed the current motion.   In fact, defense counsel at the re-trial explicitly acknowledged Mr. Froccaro's potential conflict and twice raised the issue to the Court.   (Re-Trial 7, 919.)   As was true at the re-trial, the proper avenue to pursue this argument is on appeal, not through a time-barred motion for a new trial.   (Re-Trial 919) (COURT: "[W]hatever other issues you have in terms of a conflict of interest--and Mr. Froccaro can be well vetted on appeal.").

IV.   <u>Secondary Evidence</u>

Defendant also seeks a new trial on the grounds that the Court erred in allowing the admission of secondary evidence without the proper proof that the original had been lost, thus contravening the best evidence rule.

During interviews with the Government, Scott Mulligan's wife, Manon Mulligan, discussed a letter she believed to have been written by Vincent Gargiulo (the "Gargiulo letter").   According to her testimony, Scott Mulligan went to prison on marijuana charges on January 3, 2003.   (Re-Trial 1316.)   Thereafter, Mrs. Mulligan visited family in Canada. (Re-Trial 1321.)   When she returned to her home in Bellmore on January 22, 2003, Mrs. Mulligan found a one-page anonymous, type-written letter addressed to Scott Mulligan.   (Re-Trial

14

1323-26.)   She deduced that Gargiulo was the author of the letter.  (Re-Trial 1324-27.)

        The Gargiulo letter demanded $500,000 and threatened that, if the money was not paid by a certain date, Gargiulo would deliver to the Federal Bureau of Investigation ("FBI") an audio-tape in which both Defendant and Mulligan were implicated in various crimes.  (Re-Trial 1325-27.)

        During an evidentiary hearing, Mrs. Mulligan further testified that, upon receiving the Gargiulo letter, she called her friend Keith Pellegrino ("Pellegrino").  (Re-Trial 1174.) That same day, on January 22, 2003, Pellegrino went to the Mulligan home.   (Re-Trial 1174-75.)   Pellegrino took the Gargiulo letter, stating that he would deliver it to Mr. Froccaro.  (Re-Trial 1174-76.)

        At the re-trial, the Court permitted Mrs. Mulligan to testify regarding the contents of the Gargiulo letter as secondary evidence, finding that the Government had sufficiently established that the original Gargiulo letter was lost. Defendant now claims that this ruling was erroneous because the Court should have first elicited testimony from Mr. Froccaro that he indeed did not have the letter.

    A.   Best Evidence Rule

        Under Federal Rules of Evidence Rule 1002, generally "[a]n original writing, recording, or photograph is required in

15

order to prove its content . . . "  If, however, the original is not available, Federal Rule of Evidence 1004 governs.  Rule 1004 provides:

> An original is not required and other evidence of the content of a writing . . . is admissible if --
> (a) all the originals are lost or destroyed, and not by the proponent acting in bad faith . . . .

FED. R. EVID. 1004.  "The admissibility of secondary evidence is within the broad discretion of the trial judge."  United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988); accord United States v. Covello, 410 F.2d 536, 543 (2d Cir. 1969).

B.   Application

The Court made a thorough inquiry into the potential whereabouts of the original Gargiulo letter, and the Government conducted an ample search.  On April 20, 2012, the Government filed its response to Defendant's motion to suppress particular evidence.  (Docket Entry 357.)  In it, the Government clearly delineated why Mrs. Mulligan's testimony as secondary evidence was necessary in this case.  The memorandum explained what Mrs. Mulligan was expected to, and indeed did, testify to. Furthermore, the first footnote of the brief explained that Scott Mulligan executed an attorney-client privilege waiver and permitted Mr. Froccaro to respond to the Government's request. Mr. Froccaro orally responded to the Government that he did not

16

have the letter and had never received it.  In addition, the Government issued a trial subpoena to Pellegrino.  Pellegrino invoked his Fifth Amendment right and thus was effectively unavailable for trial.

It is hard to imagine what additional proof the Court could have required in this regard.  Defendant offers no reason as to why calling Mr. Froccaro would have been any more effective nor does he even speculate that Mr. Froccaro would have waivered from his unequivocal statement that he never received the letter.  The Government's search, along with the hearing in which Mrs. Mulligan testified, satisfies the best evidence rule.

V.   Scott.Doc Letter

Defendant next contends that the Government withheld evidence favorable to the defense in violation of Brady v. Maryland, 373 U.S. 83, 835 S. Ct. 1194 (1963).  Specifically, he challenges that the Government failed to disclose a draft extortion letter ("Scott.doc") and the results of the forensic inspection of documents found on computers seized during the investigation into Gargiulo's murder.  According to Defendant, the Scott.doc letter demonstrates that Gargiulo had intended to extort Defendant, a showing that would have led to the

17

suppression of some of the Government's evidence.[3]  The Defendant takes this contention one step further, also arguing that there may have been other exculpatory material on the computers, thus necessitating in camera review or full access to the defense in order to conduct a forensic examination.

    A.   Standard

      "Brady requires the prosecution to disclose any 'evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'"  Ranta v. Bennett, No. 97-CV-2169, 2000 WL 1100082, *13 (E.D.N.Y. May 23, 2000) (quoting Brady, 373 U.S. at 87).  "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999).  The prosecution must disclose Brady material "in time for its effective use at trial."  United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001).

    B.  "Brady" Material

      Assuming, arguendo, that Scott.doc is Brady material, Defendant has not established that the Government withheld this

---

[3] See Section VI infra.

18

evidence.   In fact, the existence of Scott.doc became apparent
during a hearing in which Mrs. Mulligan testified.  (Re-Trial
1188.)  After the hearing, defense counsel asked for the letter,
the Court told the Government to turn over the letter, and the
Government did so.  (Re-Trial 1208-09.)

All of this took place and defense counsel received
Scott.doc before Scott and Mrs. Mulligan testified.   Thus there
was no Brady violation here because the defense received the
letter with more than enough time to make effective use of the
evidence.   See United States v. Douglas, 525 F.3d 225, 245-46
(2d Cir. 2008) (disclosure of 290 pages one business day before
trial did not constitute suppression where documents were
grouped and easily recognizable); Singh v. Greene, No. 10-CV-
4444, 2011 WL 2009309, *22 (E.D.N.Y. May 20, 2011) ("[I]f the
defense receives the information from the government in time for
its effective use at trial by the defense, then the information
has not been 'suppressed' within the meaning of Brady . . . . ")
(citation omitted).   Indeed, this Court has held that even
disclosure during the relevant witness' cross-examination, while
adding to the collective materiality inquiry, does not
necessarily mean that there has been a Brady violation.  Ranta,
2000 WL 1100082, at *25 ("[P]etitioner's generalized grievance
concerning the late disclosure of Bloom's plea allocution

19

minutes provides no indication that defense counsel was unable to make effective use of the minutes after he received them.").

    C.   <u>Additional Examination of Computer Documents</u>

Defendant also requests that any other documents on the computer be disclosed for <u>in camera</u> review or inspection by the defense. However, "[t]he government's obligation to search for <u>Brady</u> material and to turn it over at the appropriate time is the sole responsibility of the prosecutor." <u>United States v. Vinieris</u>, 595 F. Supp. 88, 91 (S.D.N.Y. 1984).

Defendant's generalized assertion that, in essence, there could be other potential <u>Brady</u> material does not warrant a ruling that the Government turn over the documents Defendant suggests. Defendant may not independently determine materiality. As the United States Supreme Court has held, and as the <u>Brady</u> case law makes clear, "where a defendant makes only a general request for exculpatory material under <u>Brady</u> . . ., it is the State that decides which information must be disclosed." <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59, 107 S. Ct. 989, 1002 (1987).

Likewise, Defendant's assertion does not merit an <u>in camera</u> review. An <u>in camera</u> review is appropriate where the defendant makes a particularized showing of materiality and usefulness of the sought after information. <u>United States v. James</u>, No. 02-CV-0778, 2007 WL 914242 (E.D.N.Y. 2007).

20

Defendant has failed to do so.  Defendant cannot make any specific showing of materiality and offers only speculation that there could be other documents on the computer.  The Court will not engage in a search of an indefinite number of documents on the basis that there may or may not be Brady material.  See Bruno v. Conn. Comm'r of Correction, No. 04-CV-0101, 2006 WL 2839232 (D. Conn. Sept. 29, 2006).

VI.  Gargiulo Tape

Finally, Defendant asserts that the Court erred in failing to suppress the Gargiulo Tape (the "Tape").  By way of background, the Tape refers to an audio-recording of a conversation between Gargiulo and Defendant.  The context of the Tape indicates that it was made some time around September of 2000.  In it, Defendant made several incriminating statements, including acknowledging his involvement in the Baumgardt and Dorval murders.

Defendant first moved to suppress the Tape on April 5, 2010 in connection with the first trial.  (Docket Entry 75.)  At that time, Defendant principally argued that the Tape was made for the purposes of committing a criminal or tortious act, rendering it illegal under Title III and inadmissible at trial. In its December 15, 2010 Order, the Court rejected that argument because, although it was clear that Gargiulo eventually tried to use the Tape to blackmail Defendant, the Court was not convinced

21

that Gargiulo intended to blackmail Defendant at the time he recorded their conversation in September 2000. (Docket Entry 116.)

During the course of the first trial, Defendant renewed his motion to suppress the Tape. (Trial 1555.) This renewed motion was the result of trial testimony from Robert Gerrato, Gargiulo's best friend. Mr. Gerrato testified that Gargiulo told him in the summer of 2003 that Gargiulo was using the Tape to extort Defendant. (Trial 1514-15.) This was consistent with what Gargiulo told Special Agent Robert Schelhorn at a May 2003 meeting. Agent Schelhorn testified at the <u>Mastrangelo</u> hearing before the first trial that Gargiulo said that if the FBI would not buy the Tape, he would get money from Defendant. (Hr'g. Tr. 296-97.)[4]

The Court again rejected Defendant's arguments and denied his request for a hearing on the matter. (Docket Entry 223.) The Court delineated several reasons for its decision, including that neither Mr. Gerrato's nor Agent Schelhorn's testimony shed any additional light on Gargiulo's motive for making the Tape beyond the evidence available to the Court in December 2010. Essentially, Gargiulo's motive in making the Tape was mixed. The Court also held that the failure of

---

[4] "Hr'g Tr." refers to the February 14, 2011 et seq. <u>Mastrangelo</u> hearing.

Gargiulo's gym business presented a financial motive for extortion that arose only after the Tape was created. Finally, the Court reiterated its findings in the December Order that Gargiulo's statements to FBI Agent Schelhorn that the Tape was "insurance" is ambiguous. Gargiulo may have made the Tape to guarantee his physical safety, protect against Defendant implicating Gargiulo, or for a host of other reasons. Ultimately, Defendant could not show by a preponderance of the evidence that Gargiulo made the Tape for a criminal or tortious purpose.

Once more, and just days prior to the re-trial, Defendant again moved to suppress the Tape. (Docket Entry 356.) In that motion, Defendant attached exhibits and argued that new evidence revealed that Gargiulo's gym business was failing and that Gargiulo had a financial motive to extort Defendant in the month before making the Tape. Defendant also claimed that grand jury testimony from Agent Schelhorn demonstrated inconsistencies from his trial testimony and demonstrated that Gargiulo's motivation for making the Tape was extortion. It is this motion that now forms one of the bases for Defendant's current motion for a new trial. Defendant claims that the Court ignored the aforementioned arguments, and that if considered, they would have created a preponderance of the evidence demonstrating Gargiulo's criminal intent. According to Defendant, the Court

23

summarily denied Defendant's motion and failed to suppress the
Tape despite this evidence.

A.   Standard

The federal wiretap law, commonly known as "Title
III," governs the circumstances under which intercepts of oral
communications may be used at trial.   See 18 U.S.C. § 2510 et
seq.   As is relevant here, Section 2511(2)(d) provides that an
individual may intercept a communication if that person is a
party to the communication or if one of the parties to the
conversation has given his prior consent, "unless such
communication is intercepted for the purpose of committing any
criminal or tortious act . . . ."   Intercepts made in accordance
with Section 2511 may be used at trial, subject to the
application of the Federal Rules of Evidence.   See 18 U.S.C.
§ 2515.

To show an intercept violated Title III, Defendant
must show by a preponderance of the evidence "either (1) that
the primary motivation, or (2) that a determinative factor in
[Gargiulo's] motivation for intercepting the conversation was to
commit a criminal [or] tortious act."   In re DoubleClick, Inc.
Privacy Litig., 154 F. Supp. 2d 497, 514-15 (S.D.N.Y. 2001).
The "legislative history and caselaw make clear that the
'criminal' or 'tortious' purpose requirement is to be construed

24

narrowly, covering only acts accompanied by a specific contemporary intention to commit a crime or tort." Id. at 515.

    B.  <u>Application</u>

      Contrary to Defendant's assertion, the Court did consider Defendant's motion, yet simply rejected it. As the Court stated at the beginning of the re-trial, the Court did not feel that there was enough evidence to present a 51 percent preponderance of the evidence of a criminal motive in making the Tape. (Re-Trial 5-6.) Defendant's claims of a financial motive in the month before the Tape was made, even if true, do not necessarily weigh in favor of a criminal motive, as Defendant suggests. Gargiulo was a long-time friend of Defendant and knew that Defendant had been involved in at least two murders. Certainly the risk involved in extorting such an individual was high. If this indeed was Gargiulo's motive, there is a break in the chain of logic--namely why Gargiulo would have undertaken such an exorbitant risk without seeking any payout until years later. Evidence regarding Gargiulo's failed gym business adds to the mystery, but does not add anything to the inquiry of Gargiulo's contemporaneous motive in creating the Tape. The Court properly suppressed the Tape and Defendant is not entitled to a new trial on this ground.

25

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion is DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    November 7, 2012
          Central Islip, New York

GA170

1

1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF NEW YORK
2

                ------------------------------X
3

         UNITED STATES OF AMERICA,      :    CR 08 655
4

                   v.                   :    U.S. Courthouse
5                                            Central Islip, N.Y.
         CHRISTIAN TARANTINO,           :
6                                             TRANSCRIPT OF VOIR DIRE
                        Defendant.      :
7                                            March 22, 2011
                ------------------------------X    9:40 a.m.
8

         BEFORE:
9
                 HONORABLE JOANNA SEYBERT, U.S.D.J.
10

11       APPEARANCES:

12       For the Government:  LORETTA E. LYNCH
                              United States Attorney
13                            100 Federal Plaza
                              Central Islip, New York 11722
14                            By:  JAMES M. MISKIEWICZ, ESQ.
                                   CARRIE N. CAPWELL, ESQ.
15                                 SEAN C. FLYNN, ESQ.
                                   Assistants, U.S. Attorney
16

         For the Defendant:  JAMES R. FROCCARO, JR., ESQ.
17                           20 Vanderventer Avenue, Suite 103W
                             Port Washington, New York 11050
18                                and
                             MICHAEL ROSEN, ESQ.
19                           61 Broadway, Suite 2602
                             New York, New York 10006
20

         Court Reporter:     HARRY RAPAPORT, C.S.R.
21                           United States District Court
                             100 Federal Plaza
22                           Central Islip, New York 11722
                             (631) 712-6105
23

24       Proceedings recorded by mechanical stenography.

25       Transcript produced by computer-assisted transcription.

1    have made sure that no one comes in here with any kind of

2    electronic devices.

3              The audience will be made aware of that fact.

4              The jurors are permitted to bring their cell

5    phones.  But I will clearly instruct them that they are

6    not permitted to send emails on anything to do with this

7    case.  If they do so, it will be a violation of their

8    oath, and they can face potential penalties.  And I will

9    not get into what the penalties would be.

10             And I will let everyone know they are not to

11   discuss the case or get involved with any aspects of the

12   media, just to make that known.

13             Just to review Rule 24, my general procedure is

14   I examine the individual jurors based on their

15   questionnaire.  I will review with them some trouble spots

16   perhaps.

17             Then, when I think we have 12 jurors who for

18   which there are no for-cause challenges, I will call up

19   counsel and ask you to make your challenges.

20             Generally what happens is we go to sidebar.  And

21   counsel may say this particular juror should be excused

22   for cause, or these are the reasons, or I have some

23   questions as to a particular juror.

24             You tell me what the questions are.  And if I

25   feel they are legitimate and I feel it is important to

GA172

10

1  make further inquiry, I will have the juror come up and I

2  will question the juror, and we will send the particular

3  juror back or excuse the particular juror.

4          My basic method of operation is to engage the

5  juror in a dialogue, not in a rote yes/no, yes/no, so you

6  get an opportunity to examine them.

7          After we are done with the first 12, if you have

8  additional questions let me know and I will do those.

9          Once we have the 12 in place, as you know the

10 defendant gets ten peremptory challenges and the

11 government gets six.

12         Charley has a little chart.  We go back and

13 forth, back and forth, and the government, you go first.

14 And then you work it out so it turns out that you are all

15 set to go.

16         Essentially, you can't stack up your challenges,

17 the peremptories.  If you don't use them on the round in

18 which you are directed to use them, you lose them.  You

19 can't back them up and use them for jurors who are

20 alternates.

21         I'm going to select alternates, and you each

22 have six challenges on the alternates.

23         That is basically it.

24         It is an open box system.  You can go back and

25 forth, whoever you want to challenge.

GA173

11

1          Any questions?

2          MR. FROCCARO:  No, your Honor.

3          MR. ROSEN:  Judge, I just have one.

4          THE COURT:  Yes.

5          MR. ROSEN:  One of the things I forgot to

6   perhaps include in the request is that jurors are to keep

7   an open mind until the very, very end of the case.

8          THE COURT:  Right.

9          MR. ROSEN:  Until your Honor's instructions, of

10  course.  And I'm not sure if I saw that specifically in

11  the questionnaire.  But jurors should be told that it is

12  going to be a bit of a while, this trial, and not to make

13  up their minds about anything until they hear from your

14  Honor at the end of the case.

15         THE COURT:  I generally do all that.

16         MR. ROSEN:  Yes, but I didn't see it in the

17  questionnaire.

18         MR. MISKIEWICZ:  Your Honor, we would just also

19  ask -- we noticed in a lot of the answers in the jury

20  questionnaires, there were individuals who indicated that

21  they had ethical or moral problems with the death penalty.

22  And we would just ask at some point to be advised that

23  this is not a death penalty case.  That might eliminate a

24  lot of questions or requests to come the sidebar.

25         THE COURT:  All right.

GA174

226

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

      ------------------------------X
 3
      UNITED STATES OF AMERICA,       :    CR 08 655
 4
             v.                       :    U.S. Courthouse
 5                                         Central Islip, N.Y.
      CHRISTIAN TARANTINO,            :
 6                                         TRANSCRIPT OF VOIR DIRE
                      Defendant.      :
 7                                         March 23, 2011
      ------------------------------X    10:20 a.m.
 8

      BEFORE:
 9
              HONORABLE JOANNA SEYBERT, U.S.D.J.
10


11    APPEARANCES:

12    For the Government:  LORETTA E. LYNCH
                           United States Attorney
13                         100 Federal Plaza
                           Central Islip, New York 11722
14                         By:  JAMES M. MISKIEWICZ, ESQ.
                                CARRIE N. CAPWELL, ESQ.
15                                SEAN C. FLYNN, ESQ.
                                Assistants, U.S. Attorney
16
      For the Defendant:   JAMES R. FROCCARO, JR., ESQ.
17                         20 Vanderventer Avenue, Suite 103W
                           Port Washington, New York 11050
18                              and
                           MICHAEL ROSEN, ESQ.
19                         61 Broadway, Suite 2602
                           New York, New York 10006
20
      Court Reporter:      HARRY RAPAPORT, C.S.R.
21                         United States District Court
                           100 Federal Plaza
22                         Central Islip, New York 11722
                           (631) 712-6105
23

24    Proceedings recorded by mechanical stenography.

25    Transcript produced by computer-assisted transcription.
```

GA175

325

1          THE PROSPECTIVE JUROR:  Not at all.

2          THE COURT:  That is a practice you have to keep

3    up.

4          If you saw anything in the media about the case,

5    you are obviously to disregard it.

6          Can you do all that?

7          THE PROSPECTIVE JUROR:  Yes, I can.

8          THE COURT:  Do you have any questions you wish

9    to ask me?

10          THE PROSPECTIVE JUROR:  No.

11          THE COURT:  Okay.

12          Thank you.

13          Counsel, when you have made your selections,

14    please come up.

15

16          (Whereupon, at this time the following took

17    place at the sidebar.)

18          THE COURT:  Did you want to review the chart

19    with Charley?

20          MR. ROSEN:  We did over the lunch hour.

21          THE COURT:  All right.

22          THE CLERK:  First round, government goes first.

23          MS. CAPWELL:  We go first, Jim.

24          MR. MISKIEWICZ:  Juror number 20, seat 11.

25          THE CLERK:  The first round, defendants get two.

1          THE COURT:  Mr. Rosen, you get two and they only

2     get one because you have ten challenges.

3          MR. FROCCARO:  We will take 5 and 10.

4          MS. CAPWELL:  You are using the seat numbers?

5          MR. FROCCARO:  The seat numbers, yes.  I think

6     it is easier.

7          If you want me to do both, I'm prepared.

8          Seat number 5, which is juror number 32.

9          Seat number 10, juror number 89.

10          MR. ROSEN:  Seat number 10 was 89.

11          MR. FROCCARO:  Yes.

12          THE CLERK:  Second round, defendants go first.

13     Two more challenges.

14          MR. FROCCARO:  Seat number 27, your Honor, juror

15     number 155.  And --

16          THE COURT:  Wait a moment.

17          (Whereupon, at this time there was a pause in

18     the proceedings.)

19          THE COURT:  All right.

20          MR. FROCCARO:  Seat number 6, your Honor, juror

21     number 113.

22          THE CLERK:  Still on the second round.  The

23     government gets one challenge.

24          MR. MISKIEWICZ:  Juror number 123 in seat 7.

25          THE CLERK:  The third round, the government goes

1

1                                                          1002

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

3       - - - - - - - - - - - - - - X
4                                   :
        UNITED STATES OF AMERICA
5                                          CR-08-655

6            -against-            :
                                           United States Courthouse
7                                          Central Islip, New York
        CHRISTIAN TARANTINO,
8
             Defendant.           :
9                                          April 4, 2011
        - - - - - - - - - - - - - - X  10:00 a.m.
10
                         TRANSCRIPT OF TRIAL
11             BEFORE THE HONORABLE JOANNA SEYBERT
              UNITED STATES DISTRICT JUDGE , and a jury.
12
        APPEARANCES:
13
        For the Government:       LORETTA E. LYNCH
14                                United States Attorney
                                  100 Federal Plaza
15                                Central Islip, New York 11722
                                  BY:  JAMES MISKIEWICZ, ESQ.
16                                     CARRIE CAPWELL, ESQ.
                                       SEAN FLYNN, ESQ.
17                                Assistants United States Attorney

18
        For the Defendant:       MICHAEL ROSEN, ESQ.
19                               JAMES FROCCARO, ESQ.

20
        Court Reporter(s):       Mary Ann Steiger
21                               Stephanie Picozzi
                                 Owen Wicker
22                               100 Federal Plaza
                                 Central Islip, New York 11722
23                               (631) 712-6101

24      Proceedings recorded by mechanical stenography, transcript
        produced by computer.
25
                         Mary Ann Steiger, CSR

GA178

164

1165

1   Q     Were the transcripts you reviewed fair and accurate

2   transcriptions of the recordings?

3   A     Yes, ma'am.

4         MS. CAPWELL:  Your Honor, at this time I would

5   like to read a stipulation in evidence, signed by the

6   Government and by the defense, with respect to these

7   recordings.

8         THE COURT:  All right.

9         MS. CAPWELL:  It is hereby stipulated by and

10  between Assistant U.S. Attorneys James M. Miskiewicz,

11  Carrie N. Capwell and Sean C. Flynn, on behalf of the

12  United States, and James R. Froccaro, Esq., and Michael

13  Rosen, Esq., on behalf of the defendant Christian Gerald

14  Tarantino, that:

15        1)  If called to testify, Lawrence Hardie would

16  testify that:

17        A)  Between March 1993 and September 1994, he

18  was a group supervisor in Newark, New Jersey, for the

19  United States Customs Service, now known as the Department

20  of Homeland Security, Immigration and Customs Enforcement.

21        B)  During that time period, his group was

22  conducting an investigation of members and associates of

23  the Lucchese crime family.  As part of that investigation,

24  the U.S. Customs Service used a confidential informant

25  named Richard Sabol.

OWEN WICKER, RPR

OFFICIAL COURT REPORTER

GA179

165

1166

1    C)  During the investigation, Sabol recorded

2    telephone conversations and face-to-face meetings with

3    several individuals under the supervision and direction of

4    special agents of the U.S. Customs Service.

5    D)  The recorded conversations made by Sabol

6    include the audio recordings contained on the compact

7    discs marked as Government's Exhibit GF-9, GF-11, GF-12,

8    GF-13, GF-14, GF-15, GF-16 and GF-17.

9    The above listed Government exhibits contain

10   true and accurate recordings of seven telephone

11   conversations that took place between January 5, 1994, and

12   January 12, 1994, and one face-to-face meeting that took

13   place on January 13, 1994.

14   Part E.  On August 10, 1994, a federal grand

15   jury sitting in the district of New Jersey returned an

16   indictment entitled United States versus Joseph Giampa, et

17   al., 94 CR 403 (AJL), charging nine individuals, including

18   Gaetano Fatato and Louis Dorval, with federal crimes,

19   including crimes related to the interstate sale of furs

20   and interstate stolen furs by the Filene store.

21   Number 2.  This stipulation and Government's

22   Exhibits GF-9, -11, -12, -13, -14, -15, -16 and -17 are

23   admissible in evidence.

24   The stipulation is dated April 24, 2011, Central

25   Islip, New York, signed on behalf of Loretta Lynch, and

OWEN WICKER, RPR

OFFICIAL COURT REPORTER

GA180

206

1207

1    A    Yes, ma'am.

2    Q    And after reading the newspaper, what did you do?

3    A    Called Louie.

4    Q    All right.  And what, in sum and substance, did you

5    say to him?

6    A    I told him, we got trouble.  I'm down in Great Neck.

7    Come down and meet me.

8    Q    Did you in fact see him a little later that day?

9    A    Yeah, pretty quick.  I went down there about 8:30,

10   9 o'clock.  I got the phone call, and then Louie rushed

11   down to meet me.

12   Q    Okay.  And when you two got together, what did you

13   discuss?

14   A    I told him we got indicted in New Jersey.

15        He said he wasn't going back to fucking jail.

16        At that point I told him, I'm going to see my

17   attorney and get legal counsel.  And that was that.

18        He said, fine.  I'm not going back to jail.  I

19   got my IDs.  I'm going to take off.

20        At that point I said, listen, give Chris a call.

21   Sitting on all that cocaine, we need money to fight this

22   case.  Give him a call.  Give it to him and, you know,

23   we'll be good to go.

24   Q    This is what you told Louie?

25   A    Yes.

OWEN WICKER, RPR

OFFICIAL COURT REPORTER

040411 TARANTINO

GA181

207

1208

1  Q    What was your concern about the cocaine?  Why did you

2  want that sold?

3  A    I was responsible for it, and I didn't want Louie

4  getting arrested or be grabbed with that amount of drugs

5  in the house.  We'd be out of everything.  So we wanted to

6  get rid of it and be out of the money that we might be

7  responsible for.

8  Q    What did you need the money for from the cocaine?

9  A    Give to my attorney and fight the charges.

10 Q    Okay.  And did you also owe money to Hugo, who supply

11 you with the cocaine?

12 A    Yes, ma'am.

13 Q    These charges you learned about that morning from

14 your sister and from reading the paper and the charges you

15 were talking to Louie about that came from New Jersey,

16 what was your understanding at that point?  What did they

17 relate to?  What criminal activity?

18 A    It related to the stuff going on in New Jersey, the

19 fur jackets, the heroin.

20 Q    Did this include your recording, to listen to it with

21 Richie Sabol, part of that case?

22 A    Yes, ma'am.

23 Q    And what was ultimately your plan?  You learned about

24 the indictment.  You are going to see an attorney.  And

25 did you have a plan formulated?

OWEN WICKER, RPR

OFFICIAL COURT REPORTER

040411 TARANTINO

1

1446

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,       :    CR 08 655

        v.                      :    U.S. Courthouse
                                     Central Islip, N.Y.
CHRISTIAN TARANTINO,            :
                                     TRANSCRIPT OF TRIAL
        Defendant.             :

-------------------------------X    April 6, 2011
                                    10:11 a.m.

BEFORE:

        HONORABLE JOANNA SEYBERT, U.S.D.J.
                and a jury

APPEARANCES:

For the Government:  LORETTA E. LYNCH
                     United States Attorney
                     100 Federal Plaza
                     Central Islip, New York 11722
                     By:  JAMES M. MISKIEWICZ, ESQ.
                          CARRIE N. CAPWELL, ESQ.
                          SEAN C. FLYNN, ESQ.
                          Assistants, U.S. Attorney

For the Defendant:   JAMES R. FROCCARO, JR., ESQ.
                     20 Vanderventer Avenue, Suite 103W
                     Port Washington, New York 11050
                          and
                     MICHAEL ROSEN, ESQ.
                     61 Broadway, Suite 2602
                     New York, New York 10006

Court Reporter:      HARRY RAPAPORT
                     STEPHANIE PICOZZI
                     United States District Court
                     100 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6105

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

31

Salmieri-Direct/Capwell

1476

1    Q    Okay.

2          I will ask you first, how many vehicles, if any,

3    pulled in?

4    A    There were three vehicles that showed up.

5    Q    Okay.

6          Can you take us through the three vehicles and

7    the occupants of them?

8    A    Yes.

9          The first vehicle that showed up was a tan

10   Mercury four-door.  The driver got out and introduced

11   himself as Big Bob.  The guy in the passenger seat was

12   named Tommy Glasses, and an individual in the back, he

13   introduced himself as John.

14   Q    Okay.

15   A    After that, the red van came up with white lettering

16   on the side, General, M-E-C-H-A-T-O-N-I-C-S, Corporation.

17   There was white lettering on the side of the red van.

18          An individual by the name of Chris got out and

19   introduced himself.

20          And a white Jeep showed up, and the driver got

21   out of the van and his name was Danny.  And another

22   drive -- guy got out by the name of Vinnie and introduced

23   himself.

24   Q    Okay.

25          Was it your understanding that all these

Salmieri-Direct/Capwell

1477

1   individuals were together?

2   A    They were together.

3   Q    Okay.

4        And going back to the red van, you mentioned

5   that somebody named Chris got out of the van.

6        Was there anybody else you met that came out of

7   the red van?

8   A    No.  It was only Chris that was in the van.

9   Q    Okay.

10       Had you ever met those men before that date?

11  A    No.  That was the first time.

12  Q    And what happened after those three vehicles pulled

13  in and you met the various individuals who came out of

14  those cars?

15  A    John and Vinnie, I said, I would like to take a look

16  at the merchandise, the furs.  And they said okay.

17       And Chris opened the door, and I went into the

18  van.  There was like plastic bags, a lot of them.  I

19  checked.  There were some furs in that, and I said okay.

20       As I got out, Vinnie said to me that he observed

21  the car.  It was one of our surveillance vehicles, with an

22  individual in it.  And Vinnie said, is that guy with you?

23       I said, no, nobody is with me but myself.

24  Q    And, sir, you mentioned you got into the van to check

25  the merchandise; is that right?

33

Salmieri-Direct/Capwell

1478

1    A    That's correct.

2    Q    Okay.

3         And is that the red van that you described

4    earlier?

5    A    Yes.

6    Q    And approximately how many bags containing furs did

7    you see inside that red van?

8    A    There were a lot of them.  I didn't count.  I just

9    wanted to make sure that they had the product that we were

10   going to buy.

11   Q    Okay.

12        After you checked the product and verified they

13   were furs, what happened at that point.

14   A    I said, okay, let's go.

15        We went to where the operation was, the

16   storefront.  And that was on 23rd on Bergenline Avenue in

17   Union City.

18   Q    And how far did you have to drive to get there?

19   A    About 15 minutes.  He left about -- we left about

20   1:30 from the Tip Top and got there about 1:45 p.m.

21   Q    And the storefront, that was the place you referred

22   to as Boutique?

23   A    Yes.

24   Q    And what happened once you got to the storefront?

25   A    Well, everybody wanted to get the goods, the furs out

GA186

34

Salmieri-Direct/Capwell

1479

1   of the van.

2       So we all, you know, took all the bags with the

3   furs inside, except for Vinnie.  He stayed outside, you

4   know, watching everything, and making sure there wasn't

5   going to be any problems.

6       We brought the furs in, and the guys were

7   negotiating inside.  I stayed outside with Vinnie.

8   Q   Okay.

9       And about how long would you say it took to get

10  all the bags into the storefront?

11  A   It took a while because they had to count them.

12  Q   Just before that happened, the process moving the

13  furs into the storefront, you said everybody was helping

14  with that?

15  A   Yes.  Everybody I met at the Tip Top, myself

16  included.  We were moving them in.  We wanted to get the

17  product off the street.

18  Q   Okay.

19      How long did that take, just the moving them in?

20  A   It didn't take that long, maybe 15 minutes.  And it

21  took longer because they counted them inside.  And I do

22  know, because I left.  Vinnie stayed outside and I was to

23  stay with Vinnie.

24  Q   Okay.

25      You stayed outside.  And your understanding of

GA187

Salmieri-Direct/Capwell

1480

1    what happened inside was the counting of the furs?

2    A    Yes.  That is what was going to happen.  They had to

3    verify the amount that was stole, the undercover agent, as

4    to how much they had, before they would actually turn over

5    the money.

6    Q    Okay.

7         You said that process took a while.  How long

8    did it take?

9    A    I don't know.  It took a while.

10   Q    At some point did the other undercover agent, what

11   was his name, Jeff, his undercover name?

12   A    Yes.

13   Q    And at some point did he leave?

14   A    Yes.  He left because he only had 25,000 in the

15   store, and the price was going to be 75.  Once we verified

16   the furs, it was kind of funny, rather than 143, there was

17   146.

18   Q    Of what?

19   A    Furs, the fur coats.

20        That was the price, 75,000.  So the undercover,

21   Jeff, gave 25,000.

22        Again, I don't know who he gave it to.  I was

23   outside.  But he had to leave to get the money.

24   Q    Okay.

25   A    And I was outside talking to everybody, you know,

GA188

36

Salmieri-Direct/Capwell

1481

1  Chris, and that, and didn't talk about anything, just to

2  pass the time .

3  Q    Okay.

4         At some point did the other undercover agent

5  come back?

6  A    Yes.

7  Q    Okay.

8         After that what happened?

9  A    Once he came back and the money was paid, we just

10  said good-bye and see you sometime, and then he left.

11  Q    Okay.

12        About how long from meeting everybody at the

13  Tip Top Diner to all of the men leaving, about how long

14  would you say they were there?

15  A    We got to the storefront about quarter of 2:00, and

16  they left about 4:45 p.m.

17        MS. CAPWELL:  Your Honor, may I approach the

18  witness?

19        THE COURT:  Yes.

20        (Counsel approaches the witness.)

21  Q    I will put before you a number of photographs labeled

22  SS-1 through SS-11, and ask you to take a look at that and

23  ask you if you recognizes these photographs?

24  A    Yes.

25        I recognize the individuals there.

Salmieri-Direct/Capwell

1482

1   Q    Okay.

2        What I will ask you for now is to quickly look

3   through all of them, and then I will move them into

4   evidence.

5   A    Yes, on Exhibit 2.

6        Yes, on Exhibit 3.

7        Yes, on Exhibit 4.

8        Yes, on Exhibit 6 -- sorry, that was Exhibit 5.

9        Yes, on Exhibit 6.

10       Yes, on Exhibit 7.

11       Yes, on Exhibit 8.

12       Yes, on Exhibit 9.

13       Yes, on Exhibit 10.

14       Yes, on Exhibit 11.

15  Q    Thank you, sir.

16       What do you recognize this group of photographs

17  to be from?

18  A    Individuals I met at the Tip Top that brought the

19  furs in.  We were standing outside the operation, the

20  office.

21  Q    Okay.

22       Those photographs, are they from November 9th,

23  1989?

24  A    Yes, they are.

25  Q    Do all of those photographs fairly and accurately

GA190

38

Salmieri-Direct/Capwell

1483

1    show the events that occurred on that date?

2    A    They basically show the people I met with who were in

3    there.

4    Q    Is it fair to say these are taken in front of the

5    storefront and not the tip Tip Top Diner?

6    A    That's correct.

7              MS. CAPWELL:  I move the admission of SS-1

8    through SS-11.

9              MR. ROSEN:  No objection.

10             THE COURT:  They are admitted in evidence.

11             (Whereupon, Government's Exhibits SS-1 through

12   SS-11 were received in evidence.)

13             MS. CAPWELL:  May I publish them, your Honor?

14             THE COURT:  Yes.

15   Q    Sir, I will put SS-1 on the overhead projector.

16             (At this time a document was exhibited on

17   courtroom screen.)

18   Q    Do you see yourself in this photograph, sir?

19   A    Yes, I do.

20   Q    I'm sorry.

21             There is a laser pointer in front of you that

22   might help us out.

23             Can you use the laser pointer on the large

24   screen to point where you are?

25   A    That is me.

GA191

39

Salmieri-Direct/Capwell

1484

1  Q    And do you know who the other individuals are that

2  you are speaking to?

3  A    Yes.

4         That was Danny who was in the Jeep (indicating).

5         That is Chris (indicating).  And that is Vinnie

6  (indicating).

7  Q    Okay.

8         Where are you standing in that photograph?

9  A    Standing by the Boutique, and there is a sign there.

10 Q    Okay.

11        Showing you SS-2.

12        Again, you see yourself in that photograph?

13 A    Yes.

14 Q    And who is it you are speaking to there?

15        (At this time a document was exhibited on

16 courtroom screen.)

17 A    There is Vinnie, myself.

18        That was John over here (indicating) .

19 Q    Okay.

20        Looking at SS-3, do you recognize any of those

21 individuals.

22        (At this time a document was exhibited on

23 courtroom screen.)

24 A    Yes.

25        That is Chris.  That is John, and that is Danny.

40

Salmieri-Direct/Capwell

1485

1    (At this time a document was exhibited on

2  courtroom screen.)

3  Q    And SS-4.

4    (At this time a document was exhibited on

5  courtroom screen.)

6  Q    You are looking at a group shot of several

7  individuals there at the storefront?

8  A    Yes.

9  Q    And are you able to make any of them out in this

10 photograph?

11 A    These two it is really hard to see.

12    This individual I didn't know (indicating).  He

13 came into the Boutique.

14    That is Chris (indicating).

15    That is Tommy Glasses (indicating).

16    And that was Bob (indicating).

17 Q    And the other individual, I will put my pen on him,

18 this man here (indicating)?

19 A    I don't know who he was.

20 Q    He was not at the Tip Top Diner?

21 A    No.  He was not part of the crew that came in.  Him I

22 don't know.

23 Q    All right.

24    Let me skip SS-6, and what do you see there?

25 A    That is Danny (indicating).

GA193

41

Salmieri-Direct/Capwell

1486

1    That is myself (indicating).

2    This person I can't see from the photo, he is

3  obscured.

4  Q    The vehicle right next to you there, what vehicle was

5  that?

6  A    That is the van that the furs were in.

7  Q    Okay.

8    That is in front of the Boutique?

9  A    Yes, it is.

10  Q    And looking now at SS-7, would you tell us what is

11  going on there, if you would?

12  A    That is where we were unloading the van with the

13  furs, taking them into the shop.

14  Q    Okay.

15    I will put SS-8 up.

16    (At this time a document was exhibited on

17  courtroom screen.)

18  Q    Is it fair to say that is part of the same process?

19  A    Yes, the same process.

20  Q    All right.

21    This is SS-9.

22    (At this time a document was exhibited on

23  courtroom screen.)

24  Q    Again, more of the unloading?

25  A    Yes.

GA194

42

Salmieri-Direct/Capwell

1487

1    Tommy Glasses here (indicating), myself

2   (indicating).  And this looks like John (indicating).

3   Q    Okay.  And SS-10.

4        (At this time a document was exhibited on

5   courtroom screen.)

6   Q    Do you recognize any of the individuals in this

7   photo?

8   A    Yes.  That is Danny, that is Chris, and that is John

9   (indicating).

10  Q    Okay.

11       On the overhead on the screen in front of you,

12  is this the sign here for the Boutique (indicating)?

13  A    Yes, it is.

14  Q    Finally, SS-11, what does this photograph show?

15       (At this time a document was exhibited on

16  courtroom screen.)

17  A    That is the van pulling away .

18  Q    Okay.

19       Sir, a couple of weeks or so, two or three weeks

20  after this undercover assignment that you had in

21  New Jersey, were you asked to look through a book of

22  photographs?

23  A    Yes.

24  Q    And do you see a photograph of the individual you met

25  who is named Vinnie?

GA195

43

Salmieri-Direct/Capwell

1488

1   A    Yes.

2   Q    Did you know what his full name was at that point?

3   A    Gargiulo.

4   Q    Okay.

5        Did you also see a photograph when you were

6   looking through books of photographs of the individual you

7   met whose name was Chris?

8   A    Yes.  Tarantino.

9   Q    All right.

10       Do you see Chris Tarantino in the courtroom

11  today?

12  A    Yes, I do.

13  Q    Okay.

14       Can you point him out by what he is wearing,

15  please.

16  A    The gentleman there with the sport coat and blue

17  shirt and dark hair.

18       THE COURT:  You acknowledge that?

19       MR. FROCCARO:  Yes.

20       THE COURT:  Ladies and gentlemen, it is

21  important that I instruct you as follows:

22       This evidence is not being admitted to show that

23  the defendant Christian Tarantino had any propensity to

24  steal clothes or possess stolen merchandise.  You are to

25  use this evidence, if you find it credible, to establish a

GA196

110

1555

1   nature of renewal of our original motion that was made

2   that this tape or this recording assuming that it should

3   be excluded in its entirety, Judge Seybert, because it is

4   now crystal clear from many sources that this recording

5   was made illegally for the purposes of extortion.

6           I read your Honor's opinion, obviously.  We

7   respect your Honor's ruling.  But now some time after you

8   made that ruling and it was a detailed ruling, it is clear

9   that I think in your ruling if I recall your Honor said

10  well, it's pretty clear what the purpose was but there is

11  no proof that he intended or Mr. Gargiulo intended to

12  execute on it.  Now it is crystal clear from the best

13  friend of Mr. Gargiulo that the whole point was to extort

14  the defendant and the law is just as crystal clear that

15  that tape is illegal.  So we renew it.  But I don't want

16  to obfuscate just the initial application on lack of

17  foundation.

18          THE COURT:  All right.  Your motion to exclude

19  is denied.  I will take it subject to connection

20  preliminarily under 104(b).

21          Let's take five minutes, then I will call the

22  jury back in.

23          (At this time, a recess was taken.)

24          THE COURT:  The government proffers this tape

25  was made at what point in time?

GA197

139

1584

```
 1        Mr. Miskiewicz, you want to be heard on the
 2   suppression motion?
 3        MR. MISKIEWICZ:  Very briefly.
 4        I would submit that because I never really got
 5   an opportunity to answer something that Mr. Rosen argued,
 6   there really is no change in the quantum of evidence
 7   before your Honor as to this motion.  They made their
 8   motion some months ago arguing this blackmail occurred in
 9   conjunction with the making of the tape.  They had Mr.
10   Gerrato's 3500 material and other 3500 material, that's
11   what they based their motion on.
12        Our argument, as I understood your Honor's
13   denial of the motion, was based on the fact that at the
14   time of the making of the tape, there was no evidence,
15   still no evidence, that there was no intention to
16   blackmail as opposed to which is evident from the tape
17   itself that perhaps the defendant was suspected of because
18   at the moment the DNA was being taken of perhaps seeking
19   to for lack of a better word throw other people under the
20   bus or accuse other people falsely of the two murders at
21   issue here and Mr. Gargiulo as best as we can tell from
22   the tape itself not secondhand but the tape itself says
23   I'm just so glad I had nothing to do with this, to which
24   the defendant silently seems to acknowledge that that is
25   true.
```

GA198

140

1585

1     So that's really the only evidence as to his

2  motivation for having done this.  And again, then there

3  was quite a long period of time and then other things

4  happened and so on and so forth.  But for purposes of that

5  exclusion under Title III they raised, nothing that Mr.

6  Gerrato said I submit today in fact their motion I think

7  was based in part on the anticipated testimony of Mr.

8  Gerrato but be that as it may nothing has changed.  So I

9  just wanted to be heard on that point.

10     MR. FROCCARO:  First of all, I didn't make the

11  motion, Mr. White did.  But my recollection of it, first

12  of all, is that we made it long before the 3500 material,

13  long before.  We got Mr. Gerrato's material a few weeks

14  ago, maybe a few months ago, but it was long before the

15  motion.

16     THE COURT:  You made it sometime in December.

17     MR. FROCCARO:  We didn't have Gerrato's stuff.

18  If I remember Mr. Miskiewicz represented to your Honor who

19  they would call.  They have no one who knows anything

20  about this tape.  Be that as it may, what I'm respectfully

21  asking your Honor, for the opportunity to do and go back

22  and review the submissions and speak to Mr. White and we

23  will get back to you.

24     THE COURT:  Sure.

25     All right.  Anything else?

1589

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
      ------------------------------X
3
      UNITED STATES OF AMERICA,     :   CR 08 655
4
             v.                     :   U.S. Courthouse
5                                       Central Islip, N.Y.
      CHRISTIAN TARANTINO,          :
6                                       TRANSCRIPT OF TRIAL
                     Defendant.     :
7                                       April 8, 2011
      ------------------------------X   10:00 a.m.
8
      BEFORE:
9
             HONORABLE JOANNA SEYBERT, U.S.D.J.
10


11    APPEARANCES:

12    For the Government:  LORETTA E. LYNCH
                           United States Attorney
13                         100 Federal Plaza
                           Central Islip, New York 11722
14                         By:  JAMES M. MISKIEWICZ, ESQ.
                                CARRIE N. CAPWELL, ESQ.
15                              SEAN C. FLYNN, ESQ.
                                Assistants, U.S. Attorney
16
      For the Defendant:   JAMES R. FROCCARO, JR., ESQ.
17                         20 Vandeventer Avenue, Suite 103W
                           Port Washington, New York 11050
18                              and
                           MICHAEL ROSEN, ESQ.
19                         61 Broadway, Suite 2602
                           New York, New York 10006
20
      Court Reporter:      HARRY RAPAPORT, C.S.R.
21                         United States District Court
                           100 Federal Plaza
22                         Central Islip, New York 11722
                           (631) 712-6105
23


24    Proceedings recorded by mechanical stenography.

25    Transcript produced by computer-assisted transcription.

GA200

1  important issue we need to be able to probe it.

2          Number two, there were a lot of other people,

3  and we have gotten all the 3500, and we don't know all the

4  discussions they had with the government.  But the bottom

5  line is a lot of other people knew about the tape.  There

6  may be other people that knew.

7          Can the government represent that no one else

8  had any discussions with Mr. Gargiulo at the time the tape

9  was made?  We just don't know.

10         THE COURT:  If you have specific individuals you

11  want to subpoena, I will listen to what they have to say

12  and make a determination as to whether or not there is a

13  need for a suppression hearing.  I will do it outside the

14  presence of the jury.

15         But right now that's all we have, Mr. Gerrato's

16  testimony, both from the Mastrangello hearing, and at that

17  time there was no discussion as to these conversations.

18  And moreover, it is now how many days into the trial --

19         MR. MISKIEWICZ:  We are about three-quarters of

20  the way done.

21         MR. FROCCARO:  I will do it immediately, Judge.

22         THE COURT:  You are calling them as your

23  witnesses.

24         MR. FROCCARO:  I understand.

25         THE COURT:  This is not part of the trial.  This

GA201

1614

1   is part of what should have been done a while ago.

2        MR. FROCCARO:  We asked for it a while ago.  We

3   wanted to have a hearing.  And the government's

4   representation is that there was no one who knew anything

5   about the tape.  That was their representation.

6        THE COURT:  I don't think it was their

7   representation.  Their representation was, and it is still

8   the Court's opinion that you have not met your burden of

9   showing that at the time the tape was made, Mr. Gargiulo

10  had a specific intent to commit a tort or to commit a

11  crime.  That is still not there.

12       And the passage of almost three years makes it

13  speculative.

14       MR. FROCCARO:  But now we are in a better

15  position to come forward with that evidence, and we will

16  do it immediately.  We understand.

17       MR. MISKIEWICZ:  Your Honor, can we schedule the

18  hearing for tomorrow?  Monday the jury will be back.  And

19  we are at a point where we have no witnesses to call other

20  than Mr. Marr.

21       THE COURT:  Mr. Froccaro, who do you think has

22  this information?

23       MR. FROCCARO:  Larry Kyatt is one person who has

24  knowledge about the tape.  Suzette Snider, for example,

25  had knowledge about the tape.

040711  Tarrantino

GA202

1615

1     I can go through a list of the people, your

2  Honor.

3     THE COURT:  This is a hearing you may not be

4  entitled to.  That is what I'm trying to explore.

5     If you point to specific evidence, I will

6  consider whether or not these people should come in.

7     MR. FROCCARO:  I have a good faith basis to

8  argue to your Honor that these people have information

9  about the tape.  And it is clear in the 3500 they have

10  knowledge of it.  They discussed it with Mr. Gargiulo.

11  They may know what his specific intent was at the time.

12     MR. MISKIEWICZ:  May I, your Honor?

13     THE COURT:  Yes.

14     MR. MISKIEWICZ:  Mr. Froccaro has a good-faith

15  basis to say he has knowledge of the tape.  But that is

16  irrelevant.

17     What is relevant is:  Did anybody -- was anybody

18  there or does anybody have any knowledge for the reason

19  for making the tape?

20     The only thing that we know is the tape itself,

21  and the contents of the tape, which is clear as a bell as

22  to when the tape was made based on the defendant's own

23  admissions on the tape.  And it is clear as a bell that he

24  is eliciting the statements from the defendant about the

25  defendant's involvement in these murders, and also the

GA203

1618

1    is no evidence so far to warrant -- and I submit not just

2    so far, but at all, to even get into this issue for what

3    was going on in September of 2000 in Tarantino's apartment

4    hallway when they go out of the apartment.

5                THE COURT:  Give me the names of the people, and

6    I will take a look at the dates.  I don't want a

7    protracted hearing unless there is a specific indication

8    in the report that these individuals learned about the

9    tape when it was made sometime in 2000, which is the only

10   evidence that I have before me now, and that at that time,

11   other than Mr. Gerrato, who was in the late 90's.

12               MR. FROCCARO:  I can tell you and represent to

13   your Honor that Larry Kyatt was called by the government

14   and interviewed by my investigator.

15               What he indicated was Mr. Gargiulo told him he

16   made the tape to blackmail Mr. Tarantino.

17               THE COURT:  And when was that conversation had?

18               MR. FROCCARO:  Not in 2000, but he told him that

19   is why he made the tape.

20               THE COURT:  When did he have the conversation?

21               MR. FROCCARO:  Around 2001, 2002.  And that is

22   what he said to my investigator, which indicated he made

23   it for one purpose, and that is because he was exercising

24   his option to use that tape and his intent in 2003 --

25               THE COURT:  Is the government calling Mr. Kyatt?

GA204

1621

1    about the tape at all.

2         THE COURT:  Did she indicate what Mr. Gargiulo's

3    motivation was in making the tape?

4         MR. MISKIEWICZ:  I don't recall when she had

5    that conversation.  I don't think she has ever -- I have

6    to look at the 3500 again, but I don't recall right now if

7    she ever indicated when she had the conversation about the

8    use of this tape by her brother.

9         My impression from meeting with her and speaking

10   to her is that it was in the same time frame as the

11   Gerrato conversations, in the summer of -- you know, the

12   Twisted Sister concert, which would have been the summer

13   of 2003.  And I don't think there is anything in the 3500

14   that is specific as to that.

15        That is the best I can offer.

16        MR. FROCCARO:  There is another person named

17   Gitterman, and it is Mr. Rosen's witness, but I have

18   general familiarity.

19        He claims that the date the tape was made, he

20   had a discussion with Mr. Gargiulo about it.  But that is

21   my recollection from his grand jury testimony.

22        He certainly would have some information

23   relevant to the issue of whether it was made for an

24   extortionate purpose.  The day it was made he said he was

25   there.

GA205

1623

1    know -- or why we didn't offer it in evidence, but we know

2    the tape was made consistently with it being made in the

3    fall of 2000.

4        He didn't say, I made this, and I will use it

5    against them for blackmail.  There is no suggestion about

6    that.

7        If there was, I think at this point I would be

8    obligated to, you know, reveal that.  But there was

9    absolutely no suggestion other than pure speculation

10   perhaps.  But we didn't even go into what the motivation

11   was.

12       So, again, Gitterman doesn't support any

13   contention that this was made any time other than when we

14   always said it was made, in the fall of 2000.  In the fall

15   of 2000 everything is rosy.

16       Mel Roth's son, according to Vincent Gargiulo on

17   the tape, is a client of theirs, and happy, and making

18   money.

19       But the only other issue that one could infer is

20   the motivation for doing this is everybody out of the

21   Bellmore/Merrick area is having their DNA taken.  And this

22   thing, as the defendant says, is coming up six, seven

23   years old, meaning the murder of Mr. Gargiulo --

24       THE COURT:  And Dorval.

25       MR. MISKIEWICZ:  Yes, Dorval, the same, is six,

1    coming on seven years old.

2         It is clear to them that the feds are not going

3    to leave it alone.  There is a tremendous discussion as to

4    what they are doing, and Mr. Gargiulo even says, perhaps

5    what they are doing is they are trying to force

6    Mr. Mulligan, or other people who are perceived to be

7    weak, to cooperate.

8         Again, this is all on the tape.  They are going

9    about speculating that this is all just a bluff.  There is

10   no DNA or no forensic evidence to compare, and they are

11   trying to get -- we supposedly, my subpoena, is supposedly

12   there to shake the cherry tree, as Mr. Tarantino calls it,

13   and cause a bluff, and cause Mr. Mulligan to talk.

14        Everybody is worried.  Everybody is scared that

15   this investigation has now come into high gear.

16        Now, the Galasso prosecution that has begun with

17   Mr. Pistone and Mr. Misseri indicted on one of the three

18   issues here.

19        Now, if there was any evidence as to the

20   motivation, it is the tape.  The tape is clear.  He is

21   trying to get himself -- honestly and I think he is trying

22   to get himself exculpated from these crimes, he succeeds

23   in doing that.

24        If something changes later on and he finds a

25   reason to do it in 2003 and use it for extortion or

GA207

1632

1    the calculus here, which is the time that it was made,

2    there is no evidence that it was made for blackmail.

3              Finally, also, even if it was -- even if someone

4    were to come in and to say he made the statement for

5    blackmail purposes, we have not even gotten to the point

6    of -- then the government cannot use lawfully obtained

7    evidence to convict a murderer because of the intent of

8    the person who made the consensual recording?

9              That is my other argument and I will not go into

10   it now.

11             THE COURT:  I don't need anything additional on

12   that.

13             I think you argued as much as you can.

14             I will look at my prior decision.  If you have a

15   viable basis to bring someone in with respect to specific

16   references to lead me to believe that the person has

17   knowledge -- the witness has knowledge as to the

18   motivation of Mr. Gargiulo when he made the tape, I will

19   consider allowing that person to come in and testify.

20             But at this point, I do not believe you are

21   there.

22             MR. FROCCARO:  May I approach the sidebar on

23   something, please?

24             THE COURT:  Okay.

25

GA208

1639

1 arguments and so forth.

2          I haven't made any attempt, nor will I, to hide

3 from you any issues that are being decided by the Court if

4 it is appropriate.

5          I do ask you, because you all understand that

6 this trial is the result of a great deal of effort both by

7 the government and the defense, and you are not to engage

8 in statements regarding what the lawyers said currently as

9 to any potential witnesses and what representations back

10 and forth are.  Because if you do that, what happens is

11 there is always the potential that some of this might get

12 to the jury.

13          I understand that there is a reporter of the

14 media, who is exempt.  But I would ask and encourage

15 family members who may be speaking with, or friends who

16 may be dealing with either the government or the

17 defendant, not to specify in detail any of the issues that

18 were discussed today.

19          And I thank you in advance for doing that.

20 Because the last thing anyone wants is a mistrial.

21          Let me just look for one moment.

22          I will hear from you shortly.  If you have

23 anything more about these witnesses, you will get that

24 information to me by the close of business today?

25          MR. FROCCARO:  Yes, your Honor.

GA209

1641

1   for the following week?  We will have a full day on Monday

2   with Marr.  But if you want him here, I will tell him to

3   be here, but is there a time you would want him to be

4   here?

5           THE COURT:  I'm trying to contemplate when we

6   might get to it.

7           I might take it early Tuesday morning, or I

8   don't know if that will work.

9           MR. ROSEN:  Are we working on Tuesday?

10          THE COURT:  No.

11          Have him come in Monday at 4:30.

12          MR. MISKIEWICZ:  All right.

13          MR. ROSEN:  In order to expedite things, and I

14  know we are trying very hard.  But does the government

15  have a final transcript of the tape that they hope they

16  will ultimately play?

17          MR. MISKIEWICZ:  We will hand that over today.

18          MR. ROSEN:  Are we coming back?

19          THE COURT:  No.  You are not coming back today.

20  But do you have specific things, anything you wish to add,

21  let me know, and I will decide whether the motion to

22  suppress requires a hearing at this point.  But I will do

23  that.

24          MR. MISKIEWICZ:  Thank you, your Honor.

25          THE COURT:  The cases you were thinking about in

1910

1    1910

2                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
3
       ------------------------------X
4
       UNITED STATES OF AMERICA,      :    CR 08 655
5
              v.                      :    U.S. Courthouse
6                                          Central Islip, N.Y.
       CHRISTIAN TARANTINO,           :
7                                          TRANSCRIPT OF TRIAL
                    Defendant.        :
8                                          April 20, 2011
       ------------------------------X   10:00 a.m.
9
       BEFORE:
10
              HONORABLE JOANNA SEYBERT, U.S.D.J.
11                      and a jury

12     APPEARANCES:

13     For the Government:  LORETTA E. LYNCH
                            United States Attorney
14                          100 Federal Plaza
                            Central Islip, New York 11722
15                          By:  JAMES M. MISKIEWICZ, ESQ.
                                 CARRIE N. CAPWELL, ESQ.
16                               SEAN C. FLYNN, ESQ.
                                 Assistants, U.S. Attorney
17
       For the Defendant:   JAMES R. FROCCARO, JR., ESQ.
18                          20 Vanderventer Avenue, Suite 103W
                            Port Washington, New York 11050
19                               and
                            MICHAEL ROSEN, ESQ.
20                          61 Broadway, Suite 2602
                            New York, New York 10006
21
       Court Reporter:      HARRY RAPAPORT, C.S.R.
22                          United States District Court
                            100 Federal Plaza
23                          Central Islip, New York 11722
                            (631) 712-6105
24

25     Proceedings recorded by mechanical stenography.
       Transcript produced by computer-assisted transcription.

GA211

2081

Zacarese - Direct/Miskiewicz

2081

1    Q    Detective Zacarese, on or about July 20th, 2000, did

2    you collect DNA, or attempt to collect cells useful for

3    DNA comparison from the defendant for comparison purposes?

4    A    Yes, we did.

5    Q    And who were you with on that day when you did this?

6    A    The time consisted of myself, Agent Schelhorn,

7    Detective Bayzelewicz, and Detective Costello.

8    Q    And where did you go to collect the DNA from the

9    defendant?

10   A    Willard Correctional Institute in upstate, New York.

11   Q    And when you got there, were you there in a room for

12   some time with a defendant for a period of time?

13   A    Yes.

14        There was a facility provided to us by the staff

15   of the institution.

16   Q    And aside from collecting DNA of some kind, were you

17   there to collect any other exemplars from the defendant?

18   A    We were there to additionally collect palm prints for

19   comparison.

20   Q    Okay.

21        Did you have an opportunity to speak to the

22   defendant?

23   A    Yes.

24   Q    When you were there, did you mention to the defendant

25   the name Louis or Louis Dorval?

GA212

2082

Zacarese  -  Direct/Miskiewicz

2082

1  A    No, we did not.

2  Q    When you were there, did you overhear either

3  Detective Bayzelewicz, or Costello, or

4  Special Agent Schelhorn represent Louis, or Louis Dorval?

5  A    No, not at all.

6  Q    You said you had forensic evidence in the

7  investigation from the Chevy Blazer; is that correct?

8  A    Yes.

9  Q    When you went to collect DNA, what did you tell the

10  defendant about in terms of what you were seeking to

11  compare his DNA to?

12  A    We told him a subpoena had been issued by the grand

13  jury to collect hair samples, or clique cells and palm

14  prints.  That was on the subpoena.

15  Q    And did you tell him that you were there to compare

16  it to the hair from the Chevy Blazer?

17  A    No.

18  Q    You didn't mention the Chevy Blazer?

19  A    No, we wouldn't do that.

20  Q    Did you tell the defendant that you have it, have the

21  Chevy Blazer?

22  A    No.

23        That would be contrary to good investigative

24  techniques.

25  Q    What do you mean by that, that it would be contrary

042011 Tarantino

2320

1                                                              2320

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

3       ------------------------------X

4       UNITED STATES OF AMERICA,      :    CR 08 655

5            v.                        :    U.S. Courthouse
                                            Central Islip, N.Y.
6       CHRISTIAN TARANTINO,           :

7                                           TRANSCRIPT OF TRIAL
                     Defendant.        :
8       ------------------------------X    April 25, 2011
                                           10:00 a.m.
9

        BEFORE:
10
                HONORABLE JOANNA SEYBERT, U.S.D.J.
11                       and a jury

12      APPEARANCES:

13      For the Government:  LORETTA E. LYNCH
                             United States Attorney
14                           100 Federal Plaza
                             Central Islip, New York 11722
15                           By:  JAMES M. MISKIEWICZ, ESQ.
                                  CARRIE N. CAPWELL, ESQ.
16                                SEAN C. FLYNN, ESQ.
                                  Assistants, U.S. Attorney
17
        For the Defendant:  JAMES R. FROCCARO, JR., ESQ.
18                           20 Vanderventer Avenue, Suite 103W
                             Port Washington, New York 11050
19                                and
                             MICHAEL ROSEN, ESQ.
20                           61 Broadway, Suite 2602
                             New York, New York 10006
21
        Court Reporter:     HARRY RAPAPORT, C.S.R.
22                           United States District Court
                             100 Federal Plaza
23                           Central Islip, New York 11722
                             (631) 712-6105
24

25      Proceedings recorded by mechanical stenography.
        Transcript produced by computer-assisted transcription.

2354

Schelhorn  -  Direct/Miskiewicz

2354

1        (Whereupon, at this time the following takes

2    place in open court.)

3        THE COURT:  Ladies and gentlemen, a portion of

4    the exhibit will be admitted in evidence and you can refer

5    to those portions.

6        MR. MISKIEWICZ:  Thank you, your Honor.

7        (Whereupon, Government's Exhibit RS-29 was

8    received in evidence.)

9    Q    Special Agent Schelhorn, looking at RS-29, are those

10   newspaper accounts from three different newspapers from

11   the metropolitan area?

12   A    They are.

13   Q    Quickly, which newspapers are contained in this

14   exhibit?

15   A    The New York Times, Newsday and Daily News.

16   Q    Are they all from Friday, August 12th, 1994?

17   A    They are.

18   Q    Directing your attention to the last paragraph in

19   RS-29 in the New York Times article, are certain

20   individuals named in that paragraph?

21   A    Yes.

22   Q    Without going into each one, do they include the

23   names Guy Fatato?

24   A    Yes.

25   Q    And does it also include the name Louis Dorval?

GA215

                                                                2355

                Schelhorn  -  Direct/Miskiewicz

                                                        2355

1    A    Yes.

2    Q    In the story regarding the Giampa indictment?

3    A    That's correct.

4    Q    I would like to now show you what is received in

5    evidence as Government's Exhibit RAG-1, and I will show

6    you RS-27, which is in evidence by virtue of a stipulation

7    that Ms. Capwell read earlier in the day.

8              Do you have those before you?

9    A    I do.

10   Q    First of all, what is RS-27?

11   A    RS-27 is an American Express statement.

12   Q    And it is a statement for, among other people, who?

13   A    Lucille Pennise, P-E-N-N-I-S-E.

14   Q    And is there a particular account number that you are

15   referring to?

16   A    There is.

17   Q    And compared to RAG-1, is that the same account

18   number used to rent a room at the Four Seasons Hotel in

19   Ocean Beach?

20   A    Yes, it is.

21   Q    And when is -- when was that rental?

22   A    The rental was on -- August 13 was the check in and

23   August 13 was the check out.

24   Q    And would you turn to the third page of RS -- turn to

25   the first page of RS-27, and I will ask you to look, one,

GA216

2359

Schelhorn  -  Direct/Miskiewicz

2359

1          THE COURT:  This is just ordinary matters.

2    Before we get to that point, and you will know when it is,

3    don't lead the witness.

4          Tell us what you did in order to make the

5    transcript.

6          THE WITNESS:  I listened to the transcript while

7    using a program that allows you to start and stop on

8    specific wording while I typed in a word processing format

9    the transcript.

10   Q    You listened to the transcript or the tape?

11   A    Sorry.  I listened to the tape while preparing the

12   transcript.

13   Q    And there are abbreviations, UI, for unintelligible,

14   whenever you were not able to hear things, you put in UI?

15   A    That's correct.

16   Q    Drawing your attention to July 20th, 2000, do you

17   recall doing anything on that date in connection with your

18   investigation into the Dorval or Baumgardt murders?

19   A    Yes, I do.

20        Myself, Detective Zacarese, Detective Bazylewicz

21   and Detective Charles Costello went to the Willard

22   Correctional Center to take a DNA sample as well as major

23   case prints of the defendant.

24        MR. MISKIEWICZ:  I would like to ask the jury

25   and counsel to put on their headphones at this stage.

GA217

2364

Schelhorn  -  Direct/Miskiewicz

2364

1    Q    And do you recall whether on this recording there

2    ever has been a reference, or if there is a reference to

3    how long it has been since you took the DNA?

4    A    I do.

5    Q    And do you recall exactly at what point in time on

6    this recording that that occurs?

7    A    I would have to look at my edited transcript.

8            (Handed to the witness.)

9    Q    Are these your notes of the transcript?

10   A    They are.

11   Q    All right.

12           Without reading from it, would you take a look

13   at it, and if you can indicate at what time in the

14   transcript the reference to it being about two months

15   occurs?

16   A    It is at the time period three minutes and seven

17   seconds.

18   Q    Would that be at approximately page 4 of your notes?

19   A    That's correct.

20   Q    And that reference to it being two months and change

21   occurs starting at what, three minutes and seven seconds?

22   A    Three minutes and seven seconds.

23   Q    Of KM-5?

24   A    That's correct.

25   Q    Thank you.

                                                      2365

          Schelhorn  -  Direct/Miskiewicz

                                              2365

1          And --

2          THE COURT:  Perhaps now is a good time to take

3    our mid-morning break, and I will see you folks in ten

4    minutes.

5          Thank you.

6          (Whereupon, at this time the jury leaves the

7    courtroom.)

8

9          (Whereupon, a recess was taken.)

10

11         THE COURT:  Mr. Miskiewicz, you will be going up

12   through the luncheon break; is that right?

13         MR. MISKIEWICZ:  Yes, your Honor.

14         Which is what time?  1:00?

15         THE COURT:  12:30.

16         MR. MISKIEWICZ:  12:30, yes.

17         THE COURT:  We are bringing the jury in.

18         MR. FROCCARO:  Is the air conditioning working?

19         THE COURT:  I don't know.  We will call down.

20         If the computer wasn't working, one wouldn't

21   think that the air conditioning is necessarily working

22   either.

23         It seems a little cooler here now.

24         Mr. Froccaro, and Mr. Rosen, are you going to be

25   ready with your witnesses tomorrow?

GA219

2366

Schelhorn - Direct/Miskiewicz

2366

1      MR. FROCCARO:  For the most part, I think, yes,

2  for the most part.

3      THE COURT:  Good.

4      MR. FROCCARO:  Assuming you don't have to send

5  any marshals out.

6      THE COURT:  The jury is entering.

7      (Whereupon, the jury at this time entered the

8  courtroom.)

9      THE COURT:  Please be seated.

10      Are we missing one person?  Everybody here?  All

11  right.

12      Ready to proceed.

13      MR. MISKIEWICZ:  Thank you, your Honor.

14  Q    Agent Schelhorn, during the break, did you have an

15  opportunity to review Government's Exhibit COB-1?

16  A    I did.

17  Q    And what was the date of birth -- I will try to put

18  it up here on the screen as well.

19      (At this time a document was exhibited on

20  courtroom screen.)

21  Q    What was the date of birth?

22  A    The date of birth is 12/1/2000.

23  Q    And that is the year you went up to take the DNA?

24  A    Yes.

25  Q    And did you participate in taking any DNA samples

GA220

2367

Schelhorn  -  Direct/Miskiewicz

2367

1    from any other individuals in relationship to this

2    investigation?

3    A    Yes, I did.

4    Q    Did they include, among others, Guy Fatato?

5    A    They did.

6    Q    Now, you testified earlier that you had listened to

7    KM-5 repeatedly.

8         Do you know, and can you assist us in locating

9    whether or not the defendant was ever identified as a

10   speaker on this recording?

11   A    I can.

12   Q    And where is that located?

13   A    Right about the -- it starts about 24 minutes and 37

14   seconds into the tape.

15        MR. MISKIEWICZ:  I will queue it up to that

16   point.

17        (Segment of tape recording is played.)

18   Q    Is that the location you were referring to?

19   A    Sorry?

20   Q    Is that the location that you were referring to?

21   A    That is.

22   Q    All right.

23        I would like to play another clip and we will

24   move on to a different area.

25        THE COURT:  Can you lower it a little bit.  It

GA221

2479

Schelhorn  -  Redirect/Miskiewicz

2479

1   along the lines of being -- that Mr. Tarantino was a

2   suspect in this investigation since day one.

3         Do you remember that --

4   A    I do.

5   Q    -- question that Mr. Rosen asked you?

6   A    I do.

7         MR. MISKIEWICZ:  Please put on your headphones.

8         (Segment of taped conversation is played.)

9   Q    Assuming -- well, you read the transcript -- you

10  created the transcript, I should say, and the

11  indication -- you heard the testimony here that there is

12  some indication that the DNA had been taken about two

13  months earlier; is that correct?

14  A    Yes.

15  Q    And you took the DNA when?

16  A    On July 20th.

17  Q    So assuming it is two months later, this is on or

18  about September 2000; is that correct?

19  A    Correct.

20  Q    When this recording is made?

21  A    Correct.

22  Q    And when did the mitochondrial DNA database for the

23  FBI get created?  What year, if you know?

24  A    1996.

25  Q    Four years -- assuming this is 2000, four years

042511 Tarantino

GA222

2684

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
        -------------------------------X
 3
        UNITED STATES OF AMERICA,      :   CR 08 655
 4
             v.                        :   U.S. Courthouse
 5                                         Central Islip, N.Y.
        CHRISTIAN TARANTINO,           :
 6                                         TRANSCRIPT OF TRIAL
                      Defendant.       :
 7                                         April 27, 2011
        -------------------------------X   10:00 a.m.
 8
        BEFORE:
 9
                HONORABLE JOANNA SEYBERT, U.S.D.J.
10                      and a jury

11      APPEARANCES:

12      For the Government:  LORETTA E. LYNCH
                             United States Attorney
13                           100 Federal Plaza
                             Central Islip, New York 11722
14                           By:  JAMES M. MISKIEWICZ, ESQ.
                                  CARRIE N. CAPWELL, ESQ.
15                                SEAN C. FLYNN, ESQ.
                                  Assistants, U.S. Attorney
16
        For the Defendant:   JAMES R. FROCCARO, JR., ESQ.
17                           20 Vanderventer Avenue, Suite 103W
                             Port Washington, New York 11050
18                                and
                             MICHAEL ROSEN, ESQ.
19                           61 Broadway, Suite 2602
                             New York, New York 10006
20
        Court Reporter:      HARRY RAPAPORT, C.S.R.
21                           United States District Court
                             100 Federal Plaza
22                           Central Islip, New York 11722
                             (631) 712-6105
23

24      Proceedings recorded by mechanical stenography.

25      Transcript produced by computer-assisted transcription.
```

042711 Tarantino

GA223

2691

Pistone  -  Cross/Miskiewicz

2691

1   murder of Louis Dorval; is that correct?

2   A    I would assume so, I don't remember.

3   Q    And, in fact, you were put into the grand jury -- you

4   sought to go into the grand jury, did you not, because --

5              MR. FROCCARO:  Objection, Judge.

6              THE COURT:  Excuse me?

7              MR. FROCCARO:  I will let him finish.  I

8   apologize.

9              THE COURT:  Yes.

10  Q    -- because you had already reversed yourself a number

11  of times in your account of the murder of Louis Dorval; is

12  that correct?

13  A    I don't know.

14             MR. FROCCARO:  Objection.

15             THE COURT:  Sustained.

16  Q    Well, you testified in the grand jury, did you not,

17  to explain why you gave, among other things, why you gave

18  a varying opinion -- varying accounts of who was involved

19  in the murder of Louis, didn't you testify along those

20  lines in the grand jury?

21             MR. FROCCARO:  Objection.  That is not what he

22  testified to.

23             THE COURT:  All right.

24             Come up.

25             If you bring the document, please, thank you.

GA224

2692

Pistone  -  Cross/Miskiewicz

2692

1           (Whereupon, at this time the following took

2     place at the sidebar.)

3           THE COURT:  You are attempting to elicit from

4     the witness that he testified in the grand jury to

5     basically clarify what he had earlier told law

6     enforcement?

7           MR. MISKIEWICZ:  To try to exculpate himself

8     from the varying stories.

9           Now, because of the various lies, the

10    government, in November of 2000, is forced, in essence, to

11    grant -- consent to bail on one of the witnesses -- one of

12    the defendants in that case, the Galasso case, Robert

13    Misseri, who had been charged with the murder.

14           And, subsequently, Misseri was allowed to plead

15    to something other than the murder.  That is in November

16    of 2000 when, oddly enough, on the very day that the Radio

17    Shack radio is determined to be built two years after

18    Louis Dorval was killed, and it was one of the factors

19    that led to the dismissal of essentially the murder.

20           Now, he testifies months later, mostly to try to

21    exculpate himself, and also to try to ascertain what

22    happened as to the various lies that he says, among other

23    things, that he was approached by his brother -- which was

24    elicited on direct examination; that he was approached by

25    some third party.

2693

Pistone  -  Cross/Miskiewicz

2693

1      At sentencing his lawyer, Mr. Wexler, says he

2  was approached by a private eye, Ron Dwyer.

3      MR. FROCCARO:  Not what he says.

4      MR. MISKIEWICZ:  He doesn't say Ron Dwyer, but

5  the record that he was approached by Ron Dwyer in the

6  jail, and those are the reasons he changed his mind.

7      And I just want to make it clear that he wasn't

8  at this point a cooperator in any further murder

9  investigation in the sense that we signed him up and then

10 we put him in there with all these phony conflicting

11 stories.

12     He was, at this point, apparently during the

13 grand jury investigation trying to ascertain whether there

14 was some sort of obstruction of justice that anybody could

15 believe that would somehow, A, exculpate him and maybe

16 save his 5K; and, B, lead to the prosecution of others.

17     Even that turned out to be a complete wash.

18     THE COURT:  The problem is, is he represented by

19 counsel when he goes into the grand jury?

20     MR. MISKIEWICZ:  Yes, he has Mr. Wexler.  It is

21 a year after his guilty plea.

22     THE COURT:  And he is advised, at that time, as

23 to what is going to happen in the grand jury?

24     I mean, right now, Mr. Miskiewicz, I'm thinking

25 of appointing counsel for him so he can confer, because we

1

1                                                                    1

2                          UNITED STATES DISTRICT COURT
                           EASTERN DISTRICT OF NEW YORK

3
         -------------------------------X
4
         UNITED STATES OF AMERICA,       :   CR 08 655
5
                 v.                       :   U.S. Courthouse
6                                             Central Islip, N.Y.
         CHRISTIAN TARANTINO,            :
7                                             TRANSCRIPT OF TRIAL
                      Defendant.          :
8                                             April 23, 2012
         -------------------------------X   10:05 a.m.
9

10       BEFORE:

              HONORABLE JOANNA SEYBERT, U.S.D.J.
11

12       APPEARANCES:

13       For the Government:   LORETTA E. LYNCH
                               United States Attorney
14                             100 Federal Plaza
                               Central Islip, New York 11722
15                             By:  JAMES M. MISKIEWICZ, ESQ.
                                    SEAN C. FLYNN, ESQ.
16                                  Assistants, U.S. Attorney

17       For the Defendant:   STEPHEN H. ROSEN, ESQ.
                              100 Almeria Avenue - Suite 205
18                            Coral Gables, Florida 33134

19                            FRANK A. DODDATO, ESQ.
                              666 Old Country Road
20                            Garden City, New York 11530

21
         Court Reporter:      HARRY RAPAPORT, C.S.R.
22                            United States District Court
                              100 Federal Plaza
23                            Central Islip, New York 11722
                              (631) 712-6105
24

25       Proceedings recorded by mechanical stenography.
         Transcript produced by computer-assisted transcription.

GA227

5

5

THE COURT:  All right.

The 404(b) evidence that has come in, there is a renewed motion to suppress the Gargiulo tapes and to have a hearing on that.

At this juncture, I don't see what the purpose of a hearing would be.  You have been given the opportunity, the defendant, to come forward and say our witnesses will testify to X, Y and Z.

The nature of the purpose for taping the defendant -- and it is conceded that it is the defendant's voice on the tape; is that correct?

MR. ROSEN:  That's correct.

THE COURT:  All right.

Is no longer anything different than what the Court ruled when it made its ruling last year with respect to admissibility, in that the defendant has not established by a preponderance of the evidence that Mr. Gargiulo made the tape for criminal or tortious -- and/or tortious act, to wit, to blackmail the defendant at the time the tape was made.  It is at least a 51 percent of preponderance, and there is question as to whether or not the defendant made the tape -- the person protected himself, made the tape to protect himself to preclude to be placing the blame on Mr. Gargiulo for any involvement. It is evidence of some other individuals taking the

GA228

6

6

1  responsibility for the murder of Mr. Dorval.

2          So that is my ruling on that and there is no

3  need for a hearing.

4          Also, a rather late time for the motion to be

5  made, and the Court also previously ruled on it.  I don't

6  see the application as warranting a hearing.

7          Now, there is the government's motion concerning

8  Mr. Gargiulo's letter, and that has to do with this letter

9  that purportedly was received by Manon Mulligan, the wife

10  of Scott Mulligan.  And then the issue as to whether it is

11  missing and calling to secondary evidence.

12          I need more explanation.  And particularly it is

13  my understanding of the papers that Mr. Mulligan's wife

14  received the letter, and at some point in time it went to

15  Mr. Froccaro who was representing Scott Mulligan.

16          Mr. Froccaro says he doesn't have the letter.

17          So is the government willing to make an offer

18  here?

19          It seems the government is saying it is lost due

20  to no fault of ours.  And I'm not saying that it is not

21  accurate.  But have you spoken to Mr. Froccaro?  Has

22  anyone spoken to him?

23          Obviously, Mr. Rosen, you have indicated that

24  Mr. Froccaro says he didn't get any letter.

25          MR. ROSEN:  Judge, I have not spoken directly

914

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

UNITED STATES OF AMERICA,        :    CR 08 655

        V.                       :    U.S. COURTHOUSE
                                      CENTRAL ISLIP, N.Y.
CHRISTIAN TARANTINO,             :

                                      TRANSCRIPT OF TRIAL
            DEFENDANT.      :

                                      MAY 1, 2012
-------------------------------X   9:15 A.M.


BEFORE:

            HONORABLE JOANNA SEYBERT, U.S.D.J.


APPEARANCES:

FOR THE GOVERNMENT:  LORETTA E. LYNCH
                     UNITED STATES ATTORNEY
                     100 FEDERAL PLAZA
                     CENTRAL ISLIP, NEW YORK 11722
                     BY:  JAMES M. MISKIEWICZ, ESQ.
                          SEAN C. FLYNN, ESQ.
                     ASSISTANTS, U.S. ATTORNEY
FOR THE DEFENDANT:   STEPHEN H. ROSEN, ESQ.
                     100 ALMERIA AVENUE - SUITE 205
                     CORAL GABLES, FLORIDA 33134
                     FRANK A. DODDATO, ESQ.
                     666 OLD COUNTRY ROAD
                     GARDEN CITY, NEW YORK 11530


COURT REPORTERS:     OWEN WICKER
                     HARRY RAPAPORT
                     UNITED STATES DISTRICT COURT
                     100 FEDERAL PLAZA
                     CENTRAL ISLIP, NEW YORK 11722
                     (631) 712-6105


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.
TRANSCRIPT PRODUCED BY COMPUTER-ASSISTED TRANSCRIPTION.

                     OWEN WICKER, RPR

GA230

915

                    PROCEEDINGS
                                    915


             M O R N I N G   S E S S I O N

            THE CLERK:  THERE IS ONE JUROR WHO IS RUNNING
LATE ABOUT TEN MINUTES.  THE JUDGE WILL BE OUT SHORTLY.
            THE COURT:  I UNDERSTAND WE ARE ONE JUROR SHORT.
            THERE IS AN OUTSTANDING APPLICATION ON A MOTION
WITH RESPECT TO TESTIMONY OF MRS. MULLIGAN -- HER FIRST
NAME IS MANON?
            MR. MISKIEWICZ:  MANON.
            THE COURT:  -- MS. MANON MULLIGAN'S TESTIMONY
WITH RESPECT TO A LETTER THAT SHE RECEIVED, PURPORTEDLY
FROM VINCENT GARGIULO.
            WHAT I'D LIKE TO DO IS, BECAUSE OF A COUPLE OF
ISSUES, I THINK, THAT STILL REMAIN IN TERMS OF HOW THE
GOVERNMENT ALLEGES HOW THIS CAME ABOUT, PERHAPS AN OFFER
OF PROOF WOULD BE APPROPRIATE.  AND PERHAPS WE CAN HAVE
MRS. MULLIGAN TESTIFY, NOT TODAY, AS THE WAY THINGS ARE
GOING, BUT TOMORROW.
            I HAVE A JUDGES' MEETING TODAY WHICH WILL RUN
FROM 1 O'CLOCK TO AT LEAST 2 O'CLOCK.  SO THAT WILL TAKE
UP A PRETTY GOOD CHUNK OF TIME.
            ADDITIONALLY, I HAVE TO LEAVE HERE AT 4:30
BECAUSE OF THE COMMITMENT I HAVE IN NASSAU COUNTY.
            MY RECOLLECTION OF MR. AMADOR'S TESTIMONY IS
THAT IT WILL BE AT LEAST --
                        OWEN WICKER, RPR

916

                          PROCEEDINGS
                                                916

1       MR. MISKIEWICZ:  -- ANOTHER HOUR, AT LEAST, ON

2  DIRECT.

3       THE COURT:  AND THEN ON CROSS-EXAMINATION, IF

4  IT'S ANYTHING LIKE THE LAST CROSS-EXAMINATION, PROBABLY BE

5  AN HOUR AND A HALF, I WOULD THINK.

6       BUT I DON'T KNOW WHAT YOUR APPROACH WILL BE,

7  MR. ROSEN OR MR. DODDATO.

8       AND AFTER THAT, YOU HAVE SEVERAL OTHER WITNESSES

9  WHO ARE ON BOARD?

10      MR. MISKIEWICZ:  YES, WE HAVE SEVERAL OTHERS.

11  AND GIVEN THE WAY THE SCHEDULE IS, WE PROBABLY WOULD NOT

12  GET TO MRS. MULLIGAN.

13      WHEN YOU MEAN AN OFFER OF TESTIMONY, DO YOU MEAN

14  OUTSIDE THE JURY?

15      THE COURT:  YES.

16      MR. MISKIEWICZ:  OKAY.

17      THE COURT:  THERE ARE CERTAIN THINGS I NEED TO

18  MAKE AN EVALUATION OF OUTSIDE THE PRESENCE OF THE JURY SO

19  THAT IT WILL NOT IN ANY WAY TAINT THE FAIRNESS OF THIS

20  TRIAL.  ALL RIGHT?

21      MR. MISKIEWICZ:  YES, YOUR HONOR.

22      MR. FLYNN IS HERE.  HE WENT DOWNSTAIRS TO GET

23  SOMETHING FROM THE OFFICE FOR COUNSEL, AND THIS IS REALLY

24  HIS MOTION.  BUT WE WERE TALKING ABOUT THIS RECENTLY, AND

25  WE THINK THE BETTER PRACTICE -- OBVIOUSLY WE, ARE STILL

26
27                      OWEN WICKER, RPR
28

GA232

917

1                          PROCEEDINGS

                                                   917

2     MOVING FOR PERMISSION FOR HER TO TESTIFY ABOUT THE

3     CONTENTS OF THIS LETTER.

4              THE COURT:  RIGHT.

5              MR. MISKIEWICZ:  IT CAME UP PRETRIAL, SOMETHING

6     ABOUT INTENTIONS, ABOUT AN ATTORNEY-CLIENT PRIVILEGE

7     POSSIBLY BEING BREACHED.

8              WE DON'T CONCEDE THAT, BUT WE WERE AMENDING WHAT

9     WE WOULD SEEK TO ELICIT FROM HER, BASICALLY, AFTER SHE

10    TESTIFIES ABOUT -- IF SHE IS PERMITTED TO TESTIFY, ABOUT

11    THE CONTENTS OF THE LETTER.  THAT IS SIMPLY SAYING SHE NO

12    LONGER HAS THE LETTER AS OPPOSED TO GETTING INTO THE WHOLE

13    BUSINESS --

14             THE COURT:  WITH RESPECT TO PELLEGRINO --

15             MR. MISKIEWICZ:  EXACTLY, WHERE IT WENT TO

16    MR. MULLIGAN'S ATTORNEY AT THE TIME, WHO WAS

17    MR. TARANTINO'S FORMER LAWYER.  SO WE'LL JUMP OVER THAT

18    AND MOVE INTO THE NEXT PHASE.

19             OBVIOUSLY, WITH THAT REPRESENTATION, WE WOULD

20    HOPE THAT THE COURT, IF COUNSEL WERE SO INCLINED, WOULD

21    PRECLUDE COUNSEL FROM GETTING INTO THE WHOLE KEITH

22    PELLEGRINO, JIMMY FROCCARO STORY, AGAIN, WHICH WOULD HAVE

23    BEEN FROM PELLEGRINO.  WHAT PELLEGRINO TOLD HER WOULD BE

24    HEARSAY.

25             SO I JUST WANT TO PUT THAT OUT THERE.  I DON'T

26    MEAN TO REQUEST A RULING IN ANY WAY.

27
28                       OWEN WICKER, RPR

918

PROCEEDINGS

918

I GUESS THE FIRST STEP IS WHETHER OR NOT ANY OF
THIS MATERIAL ABOUT THE CONTENTS SHOULD COME IN, AND WE'LL
HAVE HER TESTIFY, AND YOU MAY MAKE YOUR RULING.

THE COURT:  ANYTHING YOU WOULD LIKE TO ADD,
MR. ROSEN?

MR. ROSEN:  JUDGE, I APPRECIATE THE GOVERNMENT'S
CANDOR, BUT I THINK KEITH PELLEGRINO AND JAMES FROCCARO
MAY BE ESSENTIAL WITNESSES.  THEY HAVE MATERIAL AND
RELEVANT INFORMATION CONCERNING THAT LETTER.  AND IF THEY
HAVE READ IT, BOTH OF THEM OR EITHER HAVE READ IT, IT
BECOMES TESTIMONIAL IN NATURE AS TO WHAT IS CONTAINED IN
IT.

THE CASE LAW TALKS ABOUT BAD FAITH.  AND IT'S
OUR POSITION IF MR. PELLEGRINO TAKES THE FIFTH AMENDMENT,
THEN WE WOULD ASK THE GOVERNMENT TO GRANT IMMUNITY TO
MR. PELLEGRINO SO THAT WE CAN GO INTO WHAT HE HAS TO SAY.

AND THE SAME WOULD BE FOR MR. FROCCARO.  IF HE
INVOKES A FIFTH AMENDMENT PRIVILEGE, OR IF HE FAILS TO
WAIVE -- THE PRIVILEGE IS WITH MR. TARANTINO, NOT WITH
MR. FROCCARO.

I HAVE NOT SPOKEN TO MR. FROCCARO.  I HAVE
SPOKEN TWICE WITH HIM ON THE PHONE, MAYBE SIX OR SEVEN
MONTHS AGO, AND WE'VE HAD NO CONTACT SINCE.  I WAS NOT
AWARE THAT THE GOVERNMENT HAD CONTACTED HIM DIRECTLY AND
HE HAD TOLD THEM THAT HE HAD NEVER SEEN THAT LETTER.

OWEN WICKER, RPR

919

PROCEEDINGS
919

THIS ALSO BRINGS UP ISSUES FROM THE FIRST TRIAL
CONCERNING CONFLICTS OF INTEREST BETWEEN MR. FROCCARO AND
SCOTT MULLIGAN.

WE HAVE ALREADY RAISED WITH THE COURT ISSUES OF
HIS CONFLICT OF INTEREST WITH THE CUTIAS, AND WE'VE
FACTUALLY PLAYED OUT FOUNDATION WITH THAT.  WE MAY HAVE
SIMILAR ISSUES HERE CONCERNING DUAL LOYALTY BY
MR. FROCCARO.

THERE ARE ALSO ISSUES THAT MAY COME UP IN
REGARDS TO FEES AND OTHER THINGS WHICH WOULD CAUSE US TO
NECESSITATE TO BRING MR. FROCCARO FORWARD AND FIND OUT
WHAT THIS IS ALL ABOUT.

I THINK THE FIRST STEP IS EITHER THE COURT OR
THE GOVERNMENT TO GIVE MR. PELLEGRINO IMMUNITY.  ALL HE
WILL SAY IS WHETHER OR NOT HE GAVE THE LETTER TO
MR. FROCCARO, AND THEN WE CAN GO FROM THERE.  THAT IS THE
FIRST SPOT.

I DON'T SEE WHERE HE WOULD HAVE A BASIS FOR A
FIFTH AMENDMENT PRIVILEGE --

THE COURT:  WELL, HE'S NOT A WITNESS.  WE MAY
NOT GET THERE.  AND IF THERE IS NO TESTIMONY IMPLICATING
HIM OR INVOLVING HIM IN THIS SITUATION, WE WOULDN'T EVEN
GET TO THAT STEP.

MR. ROSEN:  I CAN'T AGREE WITH THAT.

THE COURT:  WELL, YOU CAN'T IGNORE IT.  BUT

OWEN WICKER, RPR

920

PROCEEDINGS
                                                        920

RIGHT NOW I'M TRYING THIS CASE, AND WHATEVER OTHER ISSUES

YOU HAVE IN TERMS OF A CONFLICT OF INTEREST -- AND

MR. FROCCARO CAN BE WELL VETTED ON APPEAL.

        FIRST, I MUST MAKE A DETERMINATION AS TO WHETHER

OR NOT MANON MULLIGAN WILL BE PERMITTED TO TESTIFY.  IF

THE GOVERNMENT IS SAYING THEY WILL NOT GET INTO WHAT

HAPPENED TO THE LETTER, THEN I MAY NOT EVEN REACH THAT

POINT.  I MAY FEEL THE EVIDENCE IS INSUFFICIENT.  BUT I

MUST MAKE THAT DETERMINATION FIRST, AS TO WHETHER OR NOT

SHE WILL BE PERMITTED TO TESTIFY.

        THE TESTIMONY OF MANON MULLIGAN, IN TERMS OF HER

SUBSEQUENT CONVERSATIONS WITH THE DEFENDANT -- THAT'S THE

PROFFER THAT HAS BEEN MADE.

        MR. FLYNN:  YES, YOUR HONOR.

        THE COURT:  THAT MAY BE ENOUGH TO PERMIT HER TO

TESTIFY.  I DON'T KNOW.  BUT AT THIS POINT I'M KEEPING AN

OPEN MIND.

        I DON'T SEE THE NEED AT THIS JUNCTURE TO GET

INTO ATTORNEY-CLIENT COLLATERAL ISSUES IF MR. PELLEGRINO

IS NOT TESTIFYING AND MANON MULLIGAN IS NOT GETTING INTO

WHO SHE GAVE THE LETTER TO.

        SO AT THIS JUNCTURE, THAT IS MY FIRST POINT THAT

I'M GOING TO BE DEALING WITH, PROBABLY TOMORROW, NOT

TODAY, BECAUSE WE'LL NOT HAVE TIME FOR THAT.

        MR. ROSEN:  MAYBE I'M CONFUSED, AND I JUST WANT

                        OWEN WICKER, RPR

1078

1078

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

    ------------------------------X

    UNITED STATES OF AMERICA,      :   CR 08 655

         V.                        :   U.S. COURTHOUSE
                                       CENTRAL ISLIP, N.Y.
    CHRISTIAN TARANTINO,           :
                                       TRANSCRIPT OF TRIAL
                DEFENDANT.     :
                                       MAY 2, 2012
    ------------------------------X   9:30 A.M.


    BEFORE:

                HONORABLE JOANNA SEYBERT, U.S.D.J.
                      AND A JURY
    APPEARANCES:
    FOR THE GOVERNMENT:  LORETTA E. LYNCH
                         UNITED STATES ATTORNEY
                         100 FEDERAL PLAZA
                         CENTRAL ISLIP, NEW YORK 11722
                         BY:  JAMES M. MISKIEWICZ, ESQ.
                              SEAN C. FLYNN, ESQ.
                              ASSISTANTS, U.S. ATTORNEY
    FOR THE DEFENDANT:   STEPHEN H. ROSEN, ESQ.
                         100 ALMERIA AVENUE - SUITE 205
                         CORAL GABLES, FLORIDA 33134
                         FRANK A. DODDATO, ESQ.
                         666 OLD COUNTRY ROAD
                         GARDEN CITY, NEW YORK 11530
    COURT REPORTER:      HARRY RAPAPORT
                         OWEN M. WICKER
                         STEPHANIE PICOZZI
                         UNITED STATES DISTRICT COURT
                         100 FEDERAL PLAZA
                         CENTRAL ISLIP, NEW YORK 11722
                         (631) 712-6105

    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.
    TRANSCRIPT PRODUCED BY COMPUTER-ASSISTED TRANSCRIPTION.

                         OWEN WICKER, RPR
```

1                                                      1284

2    WITNESSES ARE ON THE GOVERNMENT'S OWN WITNESS LIST.

3              THE COURT:  I GOT IT.

4              MR. ROSEN:  DO I STILL HAVE TO TELL THEM?

5              THE COURT:  YES, YOU STILL HAVE TO TELL THEM.

6              MR. ROSEN:  LESHAWN CAMPBELL, JOSEPH PISTONE,

7    ANTHONY DENEGRO AND RICHARD TRAMBLE.

8              MR. MISKIEWICZ:  IT IS REONEGRO.

9              THE COURT:  YES.

10             MR. ROSEN:  EVERY ONE OF THE WITNESSES WAS PUT

11   DOWN BY THE GOVERNMENT IN THE QUESTIONNAIRES.

12             THE COURT:  INCLUDING RICHARD TRAMBLE?

13             MR. ROSEN:  YES.

14             MR. MISKIEWICZ:  YOUR HONOR, WE MAY HAVE AN

15   APPLICATION AS TO THIS.  AGAIN, IT HAS TO DO WITH WHAT

16   YOUR HONOR RULED SEVERAL MONTHS AGO REGARDING THE PRIOR

17   CONVICTIONS.

18             OBVIOUSLY MR. PISTONE --

19             THE COURT:  I DIDN'T HAVE JOSEPH PISTONE IN A

20   PRIOR TRIAL.  I HAD HIS BROTHER, PETER PISTONE.  AND I

21   MADE CERTAIN RULINGS AS TO HIS PRIOR CONVICTIONS, YES.

22             MR. MISKIEWICZ:  ALL I'M SAYING IS INSOFAR AS WE

23   ARE GOING TO HEAR MR. PISTONE TESTIFY IN AN EFFORT TO

24   NEGATE THE PRIOR CONVICTION FOR THE LOUIS DORVAL MURDER,

25   WE MAY HAVE AN APPLICATION THAT GOES BACK TO YOUR HONOR'S

26   ORDER OF SOME MONTHS AGO ABOUT THE COLLATERAL ESTOPPEL AS

27

28             STEPHANIE PICOZZI, OCR, RPR

GA238

1285

1285

TO WHETHER OR NOT AS TO WHETHER THE GOVERNMENT CAN MOVE

INTO THE PRIOR CONVICTION.  AND I'M JUST RAISING THAT

SINCE I BELIEVE YOUR HONOR WANTS TO GIVE THE JURY A SENSE

OF TIMING, AND THAT IS AN ISSUE THAT WE ARE GOING TO HAVE

APPLICATIONS ABOUT IF AND WHEN MR. PISTONE IS IN FACT

CALLED BY THE DEFENSE.

        MR. ROSEN:  THE ONLY REASON HE IS BEING CALLED

IS BECAUSE SCOTT MULLIGAN IS GOING TO SAY THAT CHRIS TOLD

HIM HE KILLED HIM, AND HE DID IT INSIDE THE WAREHOUSE, IN

CRAIG MILLER'S WAREHOUSE, AND THAT THEY PAINTED THE

FLOORS.

        THE COURT:  WHO IS THE "THEY"?

        MR. ROSEN:  SORRY?

        THE COURT:  WHO IS THE "THEY" THAT PAINTED THE

FLOORS?

        MR. ROSEN:  ROB SMYTH, CHRIS TARANTINO.  AND I

DON'T KNOW IF SCOTT MULLIGAN ENGAGED IN THE PAINTING.  HE

DID ENGAGE IN THE DISPOSAL OF THE BODY, BECAUSE WE HEARD

CRAIG MILLER.

        BUT I'M NOT DOING IT FOR THOSE REASONS, TO

UNDERLINE THE ATTACK OF THE DORVAL CONVICTION.  I'M DOING

IT BECAUSE SCOTT MULLIGAN IS GOING TO SAY THAT CHRIS

CONFESSED TO THE MURDER, AND THAT IS WHY THEY DID THE

WAREHOUSE PAINTING.

        IT IS A CORRECT --

        STEPHANIE PICOZZI, OCR, RPR

1286

1286

2          THE COURT:  HE CONFESSED TO THE MURDER AND THAT

3    IS WHY THEY PAINTED THE WAREHOUSE?

4          MR. ROSEN:  YES, TO COVER THE BLOOD, BECAUSE IF

5    CHRIS KILLED HIM IN THE HOUSE ACCORDING TO MULLIGAN, AND

6    THEN TO CLEAN UP THE BLOOD THEY REPAINTED -- YOU MAY HAVE

7    REMEMBERED CRAIG MILLER WENT INTO THAT.

8          THE COURT:  THE SHEETROCK AND ALL THAT, YES.

9          MR. ROSEN:  YES.

10          HE SAYS I'M IMPEACHING MULLIGAN.  OBVIOUSLY THAT

11    IS WHY WE ARE BRINGING HIM.

12          THE COURT:  OKAY, YOU ARE IMPEACHING MULLIGAN.

13          MR. ROSEN:  YES.  WE ARE NOT CHALLENGING THE

14    UNDERLYING CONVICTION.

15          THE COURT:  YOU ARE GOING TO BRING JOSEPH

16    PISTONE IN, WHO IS GOING TO COME IN AND TESTIFY -- NOTHING

17    TO DO WITH THE FACT THAT HE IS SERVING JAIL TIME ON ANY

18    CHARGE, ANY MURDER OR ANYTHING ELSE, CONSPIRACY, ETCETERA.

19    AND YOU ARE GOING TO HAVE HIM COME IN AND ONLY TALK ABOUT

20    PAINTING THE FLOOR AND SHEETROCK?

21          MR. ROSEN:  NO, NO.  THAT IS SCOTT MULLIGAN WHO

22    IS GOING TO DO THAT.

23          THE COURT:  RIGHT.

24          MR. ROSEN:  AND BECAUSE HE IS GOING TO CLAIM

25    CHRIS TARANTINO, MY CLIENT, CONFESSED TO HIM FOR KILLING

26    LOUIS DORVAL.

27

28                STEPHANIE PICOZZI, OCR, RPR

GA240

1287

1287

2       THE COURT:  RIGHT.

3       MR. ROSEN:  MR. PISTONE ALREADY CONFESSED TO

4  THIS COURT THAT HE PUT A BULLET IN THE BACK OF THE HEAD

5  AND HE KILLED JOSEPH PISTONE (SIC).  AND THAT IS WHY --

6       THE COURT:  THAT JOSEPH PISTONE KILLED LOUIS

7  DORVAL, OBVIOUSLY YOU MEANT TO SAY?

8       MR. ROSEN:  YES.

9       MR. MISKIEWICZ:  THEN IT IS AN IMPEACHMENT OF

10  THE DEFENDANT TAKING CREDIT FOR THE MURDER.  IT IS NOT AN

11  IMPEACHMENT OF THE WITNESS.

12       I THINK THERE IS A 403 ARGUMENT HERE.  THIS GOES

13  BEYOND CONFUSION.

14       FRANKLY, I DON'T SEE -- I DON'T SEE WHY THEY

15  WANT TO PUT IT IN.

16       I ALSO AM FAMILIAR ENOUGH WITH MR. PISTONE, WHO

17  WILL SAY IN THE REST OF THE 3500 MATERIAL HE WAS

18  DISAPPOINTED THAT MR. TARANTINO TOOK CREDIT FOR THE

19  MURDER.

20       SO I'M JUST SAYING -- I HAVEN'T BEEN PRIVY TO

21  WHAT THEIR THINKING IS.  I THINK THERE IS GOING TO BE AN

22  APPLICATION PRIOR TO HIM TESTIFYING.  IT MIGHT CAUSE A

23  DELAY.

24       I'M JUST RAISING IT WITH YOUR HONOR.

25       THE COURT:  AS FAR AS YOU KNOW, MR. JOSEPH

26  PISTONE IS NOT RAISING THE FIFTH AMENDMENT PRIVILEGES OR

27

28       STEPHANIE PICOZZI, OCR, RPR

050212 Tarantino OW-SP-HR

1291

1291

1
2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
3
      ------------------------------X
4
   UNITED STATES OF AMERICA,        :   CR 08 655
5
           V.                       :   U.S. COURTHOUSE
6                                       CENTRAL ISLIP, N.Y.
   CHRISTIAN TARANTINO,             :
7                                       TRANSCRIPT OF TRIAL
                  DEFENDANT.    :
8                                       MAY 3, 2012
      ------------------------------X   9:30 A.M.
9
   BEFORE:
10
                HONORABLE JOANNA SEYBERT, U.S.D.J.
11                         AND A JURY
12 APPEARANCES:
13 FOR THE GOVERNMENT:  LORETTA E. LYNCH
                        UNITED STATES ATTORNEY
14                      100 FEDERAL PLAZA
                        CENTRAL ISLIP, NEW YORK 11722
15                      BY:  JAMES M. MISKIEWICZ, ESQ.
                             SEAN C. FLYNN, ESQ.
16                           ASSISTANTS, U.S. ATTORNEY
17 FOR THE DEFENDANT:   STEPHEN H. ROSEN, ESQ.
                        100 ALMERIA AVENUE - SUITE 205
18                      CORAL GABLES, FLORIDA 33134
19                      FRANK A. DODDATO, ESQ.
                        666 OLD COUNTRY ROAD
20                      GARDEN CITY, NEW YORK 11530
21 COURT REPORTER:      HARRY RAPAPORT
                        STEPHANIE PICOZZI
22                      OWEN M. WICKER
                        UNITED STATES DISTRICT COURT
23                      100 FEDERAL PLAZA
                        CENTRAL ISLIP, NEW YORK 11722
24                      (631) 712-6105
25
26
27 PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.
28 TRANSCRIPT PRODUCED BY COMPUTER-ASSISTED TRANSCRIPTION.

1                    M. MULLIGAN-DIRECT/FLYNN
                                            1332

2              (WHEREUPON, AT THIS TIME THE FOLLOWING TOOK

3    PLACE AT THE SIDEBAR.)

4              THE COURT:  OBVIOUSLY SHE WAS GOING TO SAY THAT

5    KEITH PELLEGRINO AND THE DEFENDANT TOLD HER NOT TO MENTION

6    IT TO HER HUSBAND.

7              TRYING TO KEEP AWAY FROM KEITH PELLEGRINO --

8              MR. ROSEN:  NO.

9              THE COURT:  YOU WANT KEITH PELLEGRINO IN HERE?

10             MR. ROSEN:  ABSOLUTELY.

11             THE COURT:  BUT THAT IS NOT HAPPENING, BECAUSE

12   FOR PURPOSES OF THIS TRIAL I'M NOT GOING TO GET INTO --

13             MR. ROSEN:  SHE GAVE THE LETTER --

14             THE COURT:  YOU BE QUIET FOR A MINUTE AND LET ME

15   FINISH.

16             MR. ROSEN:  I APOLOGIZE.

17             THE COURT:  I WILL NOT GET INTO GIVING THE

18   LETTER TO FROCCARO.  I DON'T SEE HOW THAT IS PROBATIVE ON

19   THE ISSUES BEFORE THIS COURT AT THIS TIME.

20             YOU WILL HAVE WHATEVER RIGHTS YOU HAVE ON APPEAL

21   IN TERMS OF CURCIO, AND THE GOVERNMENT'S FAILURE TO ADVISE

22   THE COURT IN THE FIRST TRIAL THAT MR. FROCCARO HAD

23   REPRESENTED SCOTT MULLIGAN, AND WHAT IF ANY IMPACT THERE

24   SHOULD HAVE BEEN AND WHETHER THERE SHOULD HAVE BEEN A

25   HEARING IS SOMETHING FOR LATER ON.

26             BUT AT THIS POINT IN TIME THE WITNESS OFFERED

27
28             HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

GA243

1333

M. MULLIGAN-DIRECT/FLYNN

1333

THE FOLLOWING TESTIMONY.

SHE RECEIVED THE LETTER.  IT IS AUTHENTICATED

OFFICIALLY, AS FAR AS I'M CONCERNED.  SHE NO LONGER HAS

THE LETTER.  THAT IS OBVIOUSLY AN EVIDENTIARY ISSUE AND I

HAVE ALLOWED THE FACT THAT SHE GOT A LETTER AND NO LONGER

HAS IT.

I DON'T SEE ANY REASON TO BRING KEITH PELLEGRINO

IN.  BUT I WILL HEAR YOUR ARGUMENT AS TO WHY THIS SHOULD

BE DONE.

YOU ARE SAYING THERE WAS A SCRIPT SOMEHOW AND

SOMEHOW THIS WITNESS DEVIATED FROM THE SCRIPT BECAUSE I'M

SURE YOU SAID DON'T MENTION PELLEGRINO.

MR. FLYNN:  SHE DIDN'T MENTION PELLEGRINO.

THE COURT:  THE OPERATIVE PRONOUN WAS "THEY."

MR. FLYNN:  LOOK, YOUR HONOR.  SHE IS VERY

NERVOUS.

THE COURT:  I'M NOT CRITICIZING ANYBODY HERE.

MR. FLYNN:  SHE IS TESTIFYING TRUTHFULLY.

MR. ROSEN:  OH, PLEASE.  DON'T CATEGORIZE HER

TESTIMONY.

THE COURT:  WHAT IS YOUR POINT?

STOP IT.

MR. MISKIEWICZ:  I'M SORRY.

MR. ROSEN:  YOUR HONOR --

THE COURT:  HE IS NOT DONE.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

GA244

1334

                    M. MULLIGAN-DIRECT/FLYNN
                                               1334

        THERE WAS AN OBJECTION TO A LEADING QUESTION IN

TERMS OF MR. FLYNN SAYING, DID THE DEFENDANT SAY ANYTHING

TO YOU WITH REGARDS TO THE LETTER AND TELLING YOUR

HUSBAND?  AND THAT WAS A LEADING QUESTION.

        MR. ROSEN:  NO, THE QUESTION IS "THEY."

    YOU SEE, KEITH PELLEGRINO --

        THE COURT:  IT WAS NOT.

        MR. ROSEN:  KEITH PELLEGRINO WAS THE FIRST --

        THE COURT:  SHE RESPONDED "THEY."

        MR. ROSEN:  THE FIRST PERSON WHO TOLD HER NOT TO

LET SCOTT KNOW ABOUT THE LETTER IS KEITH PELLEGRINO.

        MR. FLYNN:  YOUR HONOR PRECLUDED THAT.

        MR. ROSEN:  HOW CAN I NOT ASK THAT QUESTION?

THEY ARE SAYING HE TOLD HER.

        BEFORE THAT, PELLEGRINO TOLD HER, I'M TAKING THE

LETTER FROM YOU.  DON'T TELL SCOTT.  THE FIRST PERSON IN

HER DEBRIEFING, SHE NEVER MENTIONED TARANTINO.  SHE

MENTIONS PELLEGRINO WARNED HER, DO NOT TELL YOUR HUSBAND.

        THAT HAS TO BE PART OF CROSS-EXAMINATION BECAUSE

HE WAS THE FIRST.  TARANTINO WAS THE SECOND.  THEY DIDN'T

TELL YOU THAT.  IN HER DEBRIEFING, THAT IS WHAT SHE SAID,

THAT HE WARNED HER, THEY WERE GOOD FRIENDS, SCOTT, HIM AND

HER.  DON'T TELL YOUR HUSBAND.  HE IS IN JAIL.  HE

SHOULDN'T KNOW THESE THINGS.  WE CAN HANDLE IT OURSELVES.

        THE COURT:  OKAY, ALL RIGHT.

        HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

1335

                    M. MULLIGAN-DIRECT/FLYNN
                                              1335

1      WHAT IS YOUR RESPONSE?

2      MR. FLYNN:  LOOK, AGAIN, YOUR HONOR, THE REASON

3  WE ARE HERE IS BECAUSE MR. ROSEN OBJECTED TO A LEADING

4  QUESTION.

5      THE REASON I ASKED THE QUESTION IN THAT MANNER,

6  IT WAS TO AVOID MENTION OF MR. PELLEGRINO.

7      HE CAN BRING UP MR. PELLEGRINO IF HE WANTS.  I

8  WOULD JUST -- ANY MENTION OF MR. PELLEGRINO SHOULD BE

9  LIMITED NOT TO THE FACT THAT SHE GAVE THE LETTER TO HIM,

10 BUT ALSO PELLEGRINO AND TARANTINO, WHICH SHE ALWAYS

11 MAINTAINED, BOTH TOLD HER NOT TO MENTION THE LETTER TO

12 SCOTT MULLIGAN IN PRISON.

13     THE COURT:  I WILL ALLOW HIM TO BRING OUT

14 MR. PELLEGRINO.

15     YOU ARE CALLING HIM AS A WITNESS?

16     MR. ROSEN:  I MAY, I MAY.

17     THE COURT:  I WILL ALLOW YOU TO BRING OUT THAT

18 THERE WAS A CONVERSATION WITH PELLEGRINO NOT TO MENTION

19 THE LETTER ALSO AND THAT CONVERSATION OCCURRED FIRST.

20     I REALLY DON'T FEEL IT IS NECESSARY TO GET INTO

21 HER GIVING THE LETTER TO SCOTT PELLEGRINO -- KEITH

22 PELLEGRINO, RATHER, TO GIVE TO JAMES FROCCARO.

23     MR. ROSEN:  OKAY.

24     I WILL JUST ASK THE ONE QUESTION:  DID YOU GIVE

25 THE LETTER TO PELLEGRINO?

26
27
28     HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

GA246

1336

1          M. MULLIGAN-DIRECT/FLYNN
                                          1336
2          YES.

3          I WILL STOP RIGHT THERE.

4          THE COURT:  WHAT IS THE POINT OF THAT?

5          MR. FLYNN:  WHAT IS THE POINT OF THAT?

6          MR. ROSEN:  IT SHOWS THE TRUST THAT SHE HAD IN

7   PELLEGRINO.  THAT WHEN HE SAID TO HER ORIGINALLY, DON'T DO

8   ANYTHING, DON'T LET SCOTT KNOW, I'LL HANDLE IT.

9          THE COURT:  I DON'T THINK THAT WAS HER

10  TESTIMONY.

11         MR. ROSEN:  IT WILL BE.

12         MR. FLYNN:  NO.  YOUR HONOR PRECLUDED HIM FROM

13  GETTING INTO THAT SPECIFICALLY.

14         THE COURT:  I WANT TO STAY AWAY FROM THE

15  ATTORNEY ISSUE.

16         MR. ROSEN:  I WILL, I WILL.  I WILL NOT ASK A

17  QUESTION ABOUT FROCCARO.  I JUST WANT TO PUT THE LETTER IN

18  KEITH PELLEGRINO'S HAND.  THAT IS IT.  THAT IS WHERE I'LL

19  STOP.

20         MR. FLYNN:  YOUR HONOR PRECLUDED THIS.  I DIDN'T

21  OPEN ANY DOOR AS TO THIS.

22         MR. ROSEN:  SURE YOU DID.

23         MR. FLYNN:  I DID NOT.

24         THE COURT:  PLEASE DON'T BICKER BACK AND FORTH,

25  GENTLEMEN.  THIS IS A COURTROOM.

26         MR. FLYNN:  YOUR HONOR, IN FACT, SHE HAS NOT

27
28         HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

GA247

1515

1    1515

2              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK

3    ------------------------------X

4
     UNITED STATES OF AMERICA,       :    CR 08 655

5
          V.                         :    U.S. COURTHOUSE

6                                         CENTRAL ISLIP, N.Y.
     CHRISTIAN TARANTINO,            :

7                                         TRANSCRIPT OF TRIAL
                   DEFENDANT.        :

8                                         MAY 7, 2012
     ------------------------------X  9:55 A.M.

9

10   BEFORE:

              HONORABLE JOANNA SEYBERT, U.S.D.J.
11                      AND A JURY

12   APPEARANCES:

13   FOR THE GOVERNMENT:  LORETTA E. LYNCH
                          UNITED STATES ATTORNEY
14                        100 FEDERAL PLAZA
                          CENTRAL ISLIP, NEW YORK 11722
15                        BY:  JAMES M. MISKIEWICZ, ESQ.
                               SEAN C. FLYNN, ESQ.
16                        ASSISTANTS, U.S. ATTORNEY

17   FOR THE DEFENDANT:   STEPHEN H. ROSEN, ESQ.
                          100 ALMERIA AVENUE - SUITE 205
18                        CORAL GABLES, FLORIDA 33134

19                        FRANK A. DODDATO, ESQ.
                          666 OLD COUNTRY ROAD
20                        GARDEN CITY, NEW YORK 11530

21
     COURT REPORTER:      HARRY RAPAPORT
22                        OWEN M. WICKER
                          UNITED STATES DISTRICT COURT
23                        100 FEDERAL PLAZA
                          CENTRAL ISLIP, NEW YORK 11722
24                        (631) 712-6105

25

26

27   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.

28   TRANSCRIPT PRODUCED BY COMPUTER-ASSISTED TRANSCRIPTION.

GA248

1531

                    S. MULLIGAN-DIRECT/FLYNN
                                              1531

A    ROUGHLY 1:30, A QUARTER TO 2:00, SOMETHING LIKE THAT.

Q    AND WHAT HAPPENED WHEN HE GOT BACK TO HIS HOME?

A    WE GOT BACK AND I OFFERED TO HELP HIM OUT WITH HIS

BOAT.  AND HE REJECTED IT AND SAID, NO, NO, NO.  I GOT IT.

        AND THEN THE DEFENDANT AND I LEFT IN SEPARATE

CARS.

Q    DID YOU SPEAK WITH THE DEFENDANT BEFORE HE LEFT?

A    YES.  IN FACT, HE WAS GOING TO GO HOME AND TRY TO

WRAP HIS HANDS AND -- HAND AND MEET UP LATER.

Q    ARE YOU AWARE AS TO WHETHER THE DEFENDANT SOUGHT ANY

MEDICAL TREATMENT LATER THAT DAY FOR THE WOUND TO HIS HAND

THAT YOU CAUSED BY DROPPING CONSTRUCTION DEBRIS ON IT

INSIDE THE BOX ON THE BOAT?

A    YES.

Q    WHERE DID HE GO FOR THAT MEDICAL TREATMENT?

A    NASSAU COUNTY MEDICAL CENTER.

Q    WHERE IS THAT?

A    IN EAST MEADOW ON HEMPSTEAD TURNPIKE.

Q    WHERE IS THE NASSAU UNIVERSITY MEDICAL CENTER IN EAST

MEADOW IN RELATION TO WHERE THE DEFENDANT WAS LIVING AT

THE TIME IN 1994?

A    ABOUT TWO MILES FROM HIS HOME.

        MR. FLYNN:  YOUR HONOR, AT THIS POINT THE

GOVERNMENT MOVES INTO EVIDENCE OR ASKS TO MOVE INTO

EVIDENCE GOVERNMENT EXHIBIT MED-1 THROUGH MED-13, WHICH

        HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

1532

S. MULLIGAN-DIRECT/FLYNN

1532

ARE DOCUMENTS WE DISCUSSED OFF THE RECORD THIS MORNING,

THE DEFENDANT'S MEDICAL RECORDS.

THE COURT:  YES.

OVER OBJECTION, THEY ARE ADMITTED.

(WHEREUPON, GOVERNMENT'S EXHIBITS MED-1 THROUGH

MED-13 WERE RECEIVED IN EVIDENCE.)

Q   MR. MULLIGAN, ON THE SCREEN IN FRONT OF YOU, AND ON

THE COURTROOM SCREEN, IS NOW WHAT IS ADMITTED IN EVIDENCE

IN THIS CASE AS GOVERNMENT'S EXHIBIT MED-3.

(AT THIS TIME A DOCUMENT WAS EXHIBITED ON

COURTROOM SCREEN.)

Q   THEY ARE -- IT IS A COPY OF THE DEFENDANT'S MEDICAL

RECORDS FROM THE NASSAU UNIVERSITY MEDICAL CENTER.

I HAVE HIGHLIGHTED THE TOP PORTION OF THE

DOCUMENT WHICH IS NOW BLOWN UP ON THE SCREEN IN FRONT OF

YOU.

I WILL DIRECT YOUR ATTENTION, MR. MULLIGAN, TO

THE UPPER -- UPPER LEFT-HAND PORTION OF THE DOCUMENT WHICH

APPEARS TO INDICATE A NAME AND AN ADDRESS.

DO YOU RECOGNIZE THAT NAME?

A   YES.

Q   MORE SPECIFICALLY, DO YOU RECOGNIZE 29 MONTAUK

AVENUE?

A   YES, I DO.

Q   WHAT SIGNIFICANCE DOES THAT ADDRESS HAVE FOR YOU?

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

050712 Tarantino HR-OW

1592

S. MULLIGAN-DIRECT/FLYNN

1592

Q    MR. MULLIGAN, DID YOU ENGAGE IN CONVERSATIONS WITH

THE DEFENDANT REGARDING THE NEED FOR YOU TO REMAIN QUIET

ABOUT THE BAUMGARDT/DORVAL MURDERS?

A    YES.

Q    AND APPROXIMATELY WHEN DID THESE CONVERSATIONS OCCUR?

A    ALL DURING THE TIMEFRAME AFTERWARDS, AFTER THE WHOLE

THING HAPPENED.

Q    DO YOU HAVE AN APPROXIMATE YEAR?

A    YES, '94.

Q    AND WHAT WAS SAID BETWEEN YOU AND THE DEFENDANT?

A    BASICALLY TO KEEP MY MOUTH SHUT AND NOT TO TALK ABOUT

IT WHEN I'M OUT OR AT A BAR OR DRINKING OR ANYTHING, THAT

NOTHING SLIPS OUT.

Q    APPROXIMATELY HOW MANY TIMES DID YOU HAVE THIS SORT

OF CONVERSATION REGARDING THE NEED TO REMAIN QUIET ABOUT

THE ARMORED CAR ROBBERY AND LOUIS DORVAL'S MURDER?

A    I'M GUESSING, MAYBE THREE OR FOUR TIMES.

        (TAPE RECORDED CONVERSATION CONTINUES AND IS

INTERRUPTED.)

Q    MR. MULLIGAN, WERE YOU PHYSICALLY SERVED WITH A

SUBPOENA WHICH REQUIRED YOU TO PROVIDE A DNA SAMPLE WITH

RESPECT TO THE BAUMGARDT AND DORVAL MURDERS?

A    NO.

        MR. ROSEN:  OBJECTION.  THIRD TIME ASKED AND

ANSWERED.

        HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

1593

S. MULLIGAN-DIRECT/FLYNN

1593

THE COURT:  OVERRULED.

Q    YES OR NO?

A    NO.

Q    WAS ANYONE IN YOUR FAMILY SERVED WITH A SUBPOENA?

A    YES.

Q    WHO?

A    MY WIFE.

Q    OKAY.

AND TO YOUR KNOWLEDGE, WHO SERVED YOUR WIFE

MANON MULLIGAN WITH THAT SUBPOENA FOR DNA?

A    DETECTIVE JACK KENNEDY.

Q    HOW DID YOU KNOW JACK KENNEDY IN 2000?

A    I HAVE KNOWN HIM FROM PRIOR, ALL THE YEARS I WAS

GROWING UP IN MY NEIGHBORHOOD.  HE USED TO COME AROUND

WITH RESPECT TO MY BROTHER AND CRIMES.

(TAPE RECORDED CONVERSATION CONTINUES.)

Q    MR. MULLIGAN, YOU PREVIOUSLY TESTIFIED THAT THE

INDIVIDUAL THAT YOU AND THE DEFENDANT WERE WITH WHEN YOU

DUMPED MR. DORVAL'S BODY IN THE OCEAN WAS CRAIG MILLER; IS

THAT CORRECT?

A    YES.

Q    DID YOU KNOW CRAIG MILLER PRIOR TO THAT DATE?

A    YES.

Q    HOW DID YOU KNOW HIM?

A    SELLING WEED, MARIJUANA.

HARRY RAPAPORT, CERTIFIED REALTIME REPORTER

1837

1                                                    1837

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

3
      -------------------------------X
4
      UNITED STATES OF AMERICA,        :    CR 08 655
5
            V.                         :    U.S. COURTHOUSE
6                                           CENTRAL ISLIP, N.Y.
      CHRISTIAN TARANTINO,             :
7                                           TRANSCRIPT OF TRIAL
                     DEFENDANT.        :
8                                           MAY 9, 2012
      -------------------------------X    9:50 A.M.
9

      BEFORE:
10
            HONORABLE JOANNA SEYBERT, U.S.D.J.
11                  AND A JURY
12    APPEARANCES:
13    FOR THE GOVERNMENT:  LORETTA E. LYNCH
                           UNITED STATES ATTORNEY
14                         100 FEDERAL PLAZA
                           CENTRAL ISLIP, NEW YORK 11722
15                         BY:  JAMES M. MISKIEWICZ, ESQ.
                                 SEAN C. FLYNN, ESQ.
16                              ASSISTANTS, U.S. ATTORNEY
17    FOR THE DEFENDANT:   STEPHEN H. ROSEN, ESQ.
                           100 ALMERIA AVENUE - SUITE 205
18                         CORAL GABLES, FLORIDA 33134
19                         FRANK A. DODDATO, ESQ.
                           666 OLD COUNTRY ROAD
20                         GARDEN CITY, NEW YORK 11530
21
      COURT REPORTER:      HARRY RAPAPORT, C.S.R.
22                         UNITED STATES DISTRICT COURT
                           100 FEDERAL PLAZA
23                         CENTRAL ISLIP, NEW YORK 11722
                           (631) 712-6105
24
25    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.
26    TRANSCRIPT PRODUCED BY COMPUTER-ASSISTED TRANSCRIPTION.

1934

REBUTTAL SUMMATION/MISKIEWICZ

1934

NONE OF WHICH, OR VERY LITTLE OF WHICH WAS BASED IN

EVIDENCE.

ONE THING I WANT TO REMIND YOU OF, SINCE

MR. ROSEN MADE MENTION OF HOW LONG HE HAS BEEN A

PRACTICING ATTORNEY -- AND I'M SURE HE HEARD THIS

EXPRESSION, AND THAT IS THAT THERE IS AN OLD EXPRESSION

AMONG LAWYERS, AND THAT IS, IF THE FACTS ARE AGAINST YOU,

YOU ARGUE THE LAW.

IF THE LAW IS AGAINST YOU, YOU ARGUE THE FACTS.

AND IF, AS IN THE CASE OF THAT MURDERER, THE FACTS AND THE

LAW ARE AGAINST YOU, YOU BLAME THE GOVERNMENT.

THAT IS ESSENTIALLY WHAT HIS PLEA TO YOU TO FIND

REASONABLE DOUBT IS ALL ABOUT.  BLAME THE GOVERNMENT.

THEY TOOK SCOTT MULLIGAN'S WORD FOR IT AND THEY DIDN'T

EVEN CHECK THE MEDICAL RECORDS.  DO YOU REMEMBER?  THAT

WAS ONE OF THE FIRST THINGS HE SAID TO YOU IN CLOSING.

WELL, ALTHOUGH HE SAID THERE IS A REFERENCE TO A

PINKY, YOU ARE GOING TO HAVE THIS BACK THERE WITH YOU.

READ IT.  THERE IS NO REFERENCE TO A PINKY INJURY.

WHAT WAS THAT BUSINESS YOU HEARD MR. ROSEN

TESTIFYING ABOUT, OR ATTEMPTING TO TESTIFY ABOUT JUST A

LITTLE WHILE AGO?  AND THEN THERE WERE TWO INCIDENTS.

THERE WAS THE FIRST INCIDENT OF A FINGER, AND THEN, IT WAS

NOT A BIG DEAL.  IT WAS JUST A COUPLE OF STITCHES.  AND

THEN THERE WAS A SECOND INCIDENT, BECAUSE THE DEFENDANT

REBUTTAL SUMMATION/MISKIEWICZ

1935

WAS INVOLVED IN A FIGHT OR SOMETHING?  DID I HEAR THAT

CORRECTLY?

        FRANKLY, I DON'T CARE AS TO WHAT HE SAID.  BUT

WHAT I DO CARE ABOUT AND I KNOW WHAT YOU CARE ABOUT IS

WHAT THE RECORD SHOWS.

        YOU KNOW, RECORDS, BUSINESS RECORDS, THEY ARE A

GOLD MINE.  AND IN THIS CASE THEY ARE A DISASTER FOR THIS

CLAIM THAT SCOTT MULLIGAN IS A LIAR.  BECAUSE THERE IS NO

RECORD HERE OF TWO INCIDENTS.  ONE OF THE THINGS YOU CAN

SEE IN THIS RECORD HERE, GOVERNMENT'S EXHIBIT NED, AND IT

IS 1, 2, 3, AND THERE ARE SEVERAL, IS THAT THIS WHOLE

BUSINESS ABOUT THE DEFENDANT'S FIFTH FINGER -- NOT HIS

PINKY, HIS FIFTH FINGER BEING CRUSHED, LIKE SCOTT MULLIGAN

SAID, HAVING NERVE DAMAGE, NECESSITATING A CAST.

        IT ALL COMES BACK TO A REFERENCE OF A PARTICULAR

MEDICAL RECORD NUMBER.  YOU KNOW, NUMBERS DON'T LIE.

        AND WHEN THE DEFENDANT CRUSHED HIS FINGER

DUMPING LOUIS DORVAL'S BODY INTO THE ATLANTIC OCEAN AND

SPLIT IT OPEN, HE NEEDED MEDICAL ATTENTION.  AND HE GOT A

NUMBER.

        THE COURT:  MR. MISKIEWICZ, BACK TO THE PODIUM.

        MR. MISKIEWICZ:  AND HE GOT A NUMBER, 771466.

THAT'S THE NUMBER.  AND THIS REFERENCE TO A SECOND EVENT,

IT IS NOT A SECOND EVENT.  IT IS A FOLLOW-UP TO THE SAME

INJURY, 771466.

GA255

1936

REBUTTAL SUMMATION/MISKIEWICZ

1936

SO AS SCOTT MULLIGAN TOLD YOU, HE WAS INJURED SEVERELY ON HIS FIFTH FINGER, NOT HIS PINKY. NOTHING HERE ABOUT HIS PINKY. AND HE RECEIVED MEDICAL ATTENTION ON THE DAY THEY CAME BACK FROM DUMPING THE BODY.

AND THEN IN SUBSEQUENT WEEKS, AFTER GETTING A CAST, HE HAD FOLLOW-UP ATTENTION. AND IT ALL COMES BACK TO ONE FILING. IT IS THERE. READ IT.

I IMPLORE YOU TO READ THE EVIDENCE, NOT NECESSARILY BECAUSE I SAY SO OR COUNSEL SAYS SO. READ THE EVIDENCE. STICK TO THE RECORD HERE. THAT WILL GUIDE YOU TO THE TRUTH.

AND WHAT ABOUT, THERE IS ONLY A MOTIVE TO KILL VINCENT GARGIULO, MR. ROSEN'S ARGUMENT, IF MR. TARANTINO KNEW ABOUT THIS LETTER OR THE THREAT TO GO TO THE FBI WITH THE GARGIULO TAPE.

AGAIN, IT IS ALL THE GOVERNMENT'S FAULT. WE JUST RELIED ON MANON MULLIGAN.

FIRST OF ALL, THE TAPE YOU HEARD FROM HER, TALKING TO HER, THAT COUNSEL PLAYED A LITTLE WHILE AGO, YOU CAN LISTEN TO IT ALL YOU WANT. AND YOU GOT TO ASK YOURSELF, DOES THAT REALLY SOUND LIKE SCOTT MULLIGAN IS COACHING HIS WIFE TO LIE?

HE SAYS ON THE TAPE -- HE SAYS ON THE TAPE, WELL, WHAT YOUR MEMORY IS IS YOUR MEMORY. I'M JUST GOING BY WHAT YOU TOLD ME YEARS AGO. YOU ARE JUST TELLING THE

# TRANSCRIPT

CASE:          **U.S. v. CHRISTIAN TARANTINO**
               08 CR 655 (JS)

CD NO.:        CD - Part II

RUNNING TIME:          0:39:23

PARTICIPANTS:          CT -- Christian Tarantino
                       VG -- Vincent Gargiulo
                       UF -- Unidentified Female

ABBREVIATIONS:         [UI] = Unintelligible
                       [PH] = Phonetic Spelling

```
                                  Government
                                   Exhibit
                                    RS-39
                                  08 CR 655 (JS)
```

(Elapsed time starting 00:00:26)

CT:     So the cops come upstate, you know.

VG:     Right.   They go all the way upstate?

CT:     Yeah, 'bout four of them, right?

        So I get a phone call from --

VG:     Feds or state?

CT:     Both.

VG:     Together?

CT:     Yeah.   So listen, so I go, ah -- I get a call from MEL, you know.   Fuckin',

        ah, KENNY comes to get me.   I'm like, what the fuck, you know.   So MEL

        goes, CHRIS, listen, fuckin' U.S. Attorney wants to take DNA from you.

        You fuckin' botched the armored car up, blah, blah, blah, blah, blah.

VG:     They didn't take it, did they?

CT:     Listen.   So I go, holy fuck; and I ain't giving it to them, you know?   He says

        this.   I ain't giving to them.   I go, it's gonna come back, you know?   So,

        ah --

GA257

VG: From the car [UI]?

CT: Yeah. Listen, I'll tell you about it. Okay. Listen [UI] --

VG: What --

CT: The car we drove up there with Louie.

VG: Yeah, I know. I know. I had the car.

CT: I had the car, remember the other half of the car. The car we drove up in, the car that we pulled up in. We changed tails over here, and we went to a different car and took off, so the [UI] we put on -- the car we pulled up in --

VG: Right.

CT: -- they have it.

   VG: And -- and, then what, you didn't have a hat on? What kind of DNA is it, hair?

CT: They go, if the DNA works out different, they did this now -- [UI] be happy to have -- I'm like -- like a [UI].

VG: Maroon, right.

CT: Not anymore, anything they get.

VG: Any hair?

CT: They get.

VG: So you think they have hair?

CT: So listen. So we used the car all winter. And for the most part, I did --

VG: Oh, shit. There's no way ya fucked up.

CT: Definitely, I know. That's what I said. I go, and I went to the city with Mike.

VG: Holy shit.

GA258

3

CT:    So listen.   I'm like, fuck, you know.   I'm shitting bullets.   We took a vacuum to the car, you know what I mean, right?

VG:    Hey, JENN.

UF:    Hey.

CT:    Ah, I didn't vacuum the car 'till -- you know what I mean, like we, we, we cleaned it for a couple of hours, you know what I mean?

VG:    Right.

CT:    The night before (UI) vacuumed it out (UI), but you know big (UI) . like any other (UI), but then you know, I know they had the little (UI), so listen, so (UI) I am not giving it to them.   He calls me back, he says you gotta give it to them.

VG:    All right.   Well, I'll be your [UI].

CT:    He said, well [UI].   Here's the deal.   He said, if you don't give it to them, the U.S. Attorney is going to call up your fucking parole officer, he's going to call DAN PERRONE.   They're going to have you violated immediately.   And just so you know, I've been checking it out.   He goes, here's the deal.   He goes, they can get a fuckin' court order, no fuckin' problem; and they will, okay, CHRIS?   Before you get -- and they will.   He goes, so if you don't like giving it to them, you're going to be automatically violated because if you give it to them, you're going to get out.   Get out.   How the fuck is that happening, you know what I mean.   I'm like, it's coming back. I'm thinking, what does it take, ten days?   Supposedly it takes two to three months.

VG:    How long's it been?

CT:    Two months and change.

4

VG:     Oh, shit.

CT:     Yeah.

VG:     Now, it makes more sense that SCOTT'S doing everything.　I was going to tell you how long ago SCOTT running [UI].

CT:     Nah, nah, don't.　But the thing is, I can't imagine it takes fuckin' six weeks. Like it ain't six weeks from then 'till now.　You going to let me out?

VG:     What?

CT:     I think they had to, like, [UI] money or something.　So listen, as soon as --

VG:     But even with just the car, [UI] it doesn't explain everything.　[UI] fucking [UI] fibers [UI] --

CT:     I know because who's to say -- listen, the others -- I was thinking about the other thing, but who's to say, the car we pulled up in, did someone take our license plate down?　How do they know that was the car that was found down there?　Just 'cause it's a red stolen vehicle, it could of been there for a month, you know, but -- you know.　You know what I'm saying, like --

VG:     Right.

CT:     I go, you know [UI] how do you know that wasn't the one we pulled up in? Did somebody take the plate?　Did someone give a description of the plate? Like were you there at the time I was saying I was there? You know what I'm saying?

VG:     Right.

CT:     So, but nevertheless, here's how -- so the story gets even trickier, all right.

VG:     Uh-huh.

CT:     So now, they think this -- by the time they come up there, right?

5

VG:     [UI], one other question, CHRIS.

CT:     They're up here.

VG:     Why are they waiting this long ?   What's it, four or five years?

CT:     Huh-uh.   Six -- six, coming up on seven.   Let me -- let me -- let me just tell
        you 'cause, Vince -- and you know what, I won't lead you, and I'll let you tell
        me what you think, all right?   Now when these guys come up here, right,
        now a bunch of other dudes get arrested. [UI] --

VG:     Yeah.

CT:     Okay, some guy's cousin rats on his cousin, okay?   Somebody rats on you
        and says you killed LOUIE which you totally [UI].

VG:     Holy shit.

CT:     Yeah, they got him out of jail.

VG:     I got to talk.   Something strange [UI].

CT:     Just listen to this.   It gets twisted, right?   They got him out of jail.   This guy
        named PISTONE, okay -- remember that PETER PISTONE, okay, running
        around telling everybody he bumped LOUIE.     He got arrested in Brooklyn.

VG:     Unbelievable.

CT:     He -- him and this guy PISTONE and like five other fuckin', like half fuckin'
        mozzarellas, all right, got arrested for like some kind of RICO or something,
        you know what I mean, out on Long Island, all right?   So now they had all of
        their DNA taken too and supposedly dozens of witnesses.   CHRIS told me.
        I go -- and dropped him off in his car, you know.   He used his fuckin'
        cousin's pickup, or whatever, and dropped them off.   And there's -- there
        were blood stains in there.   So they took all these guys' DNA also [UI] in

this person's pickup truck. Maybe they find hairs so [UI], and they took seven guys' names. I don't know one of their names, not one. It's like, yeah, JOE MOTARATS, TONY COROLIE; and I'm like, you know. And I'm like, I don't know them [UI]. So these guys are also arrested at the same time, all right? So now – and admit that [UI] -- (Laughter).

VG:     Go ahead.

CT:     [UI] imagine. So now MEL tells me they wanted hair but doesn't want me to take it, right? He's like [UI]. I can't think for about a day, two days. Finally, I'm sketching shit out. For one, eighteen people were in that car. Eighteen. Thinking like JOE CAPATENIE, [UI] like. Like a million – like really never – so I'm like, holy fuck, you know? So, they know that. And I go – [UI] fuckin' DNA's been around forever. That got us fuckin' like –

VG:     That's it. I think they're trying to scare you guys into making some type of move and – and get this stupid case with a dead end. So what they're doing now is putting pressure on everyone. See if you get everyone involved into saying that SCOTT'S on the lam. He shouldn't be doing what he's doing.

CT:     He's changed, SCOTT, because listen, you're thinking like this, for one. You're not a saint in all of this. You're taking X amount of time, and I'm taking X. So for one, I need a guy on the street in order to fuckin' take care of my shit, you know what I mean, as far as arranging money, as far as handling our business.

VG:     But he is going to be so hot if this comes down.

CT:     Doesn't matter. Listen, his whole thing is if he can prove to the wife, he

7

could arrange it.   He'll -- he'll turn himself in.   He just wants to arrange bail, you know what I mean, and that's it.   And he will turn himself in, because --

VG:     They're not going to give him bail.

CT:     They can arrange it from a long distance.   I mean RYAN ROSECO [PH] did it.

VG:     Yeah, but RYAN --

CT:     They gave -- they gave fuckin' MIKEE CARTER gave him bail.   He had six fuckin' murders on his case.

VG:     Because they kept control of him.

CT:     He's got a fuckin' murder out at Staten Island.   He's all gangstered up.

VG:     The security guard is an innocent guy.   They -- that's why they will never stop with this.   This shit is going to go on for ten years.

CT:     So listen -- so -- so, ah --

VG:     [UI] their interest, in Louie --

CT:     Yeah.

VG:     Him, they don't give a fuck about.   That's what I mean. They don't care about him.

CT:     Not anymore.

VG:     No.

CT:     Fuck them.

VG:     It's more the security guard.   That's really bad, BUDDY.

CT:     I know.

VG:     That's really bad.

CT:     I know.

8

VG:      Umm, you know what there, I think – just so you know, it's all over Bellmore, that shit SCOTT'S doing.

CT:      Yeah.

VG:      It comes back to me.    I get a call from BOB, who is in a dirt bag bar; and he found out.    I go, what the fuck you talking about, SCOTT'S not, you know, on the – you know, basically he's on the lam.

SCOTT'S not on the lam.    It is the stupidest thing I ever [UI].    He was on [UI].

CT:      Yeah.

VG:      Turns out, he's right.    He said that.    I couldn't believe fuckin' – you know what he's saying, RALPH.    He's saying it's some type of a drug bust, though.    I thought maybe that thing with LADAGANA was talking about.

CT:      We were working from the inside [UI].    Cops were there, asking about Liquid Lab.    They were laundering money out of there.

VG:      Oh, really.

CT:      The fucking place only does breakfast and lunch.    How can they make any money?    Meanwhile, I would send [UI] thirty thousand [UI] the place [UI].

VG:      Fucking CLAUDIA and REM.    REM --

CT:      Nonetheless, so listen, let me tell you.    There is more to the story, right?  So the cops come up.    By the time they get me, I'm cool.    I've -- I've pretty much accepted the fact that [UI] months ago, 40 years', I'm going to do it.  I'll go see Dave.    I'll go see Al.    [UI] fuckin' day.    I ain't breaking no matter what, you know, no matter what.    Nobody's fuckin' ever turning me out.

VG:      Nobody.

9

CT:     Never.

VG:     It's fucking rough shoes to be in.

CT:     Yeah, no.   But [UI] get -- it gets to the point, you know, you ran it.   And all of a sudden, it's like, well, I hope it goes to the feds.   That's an understanding to myself, ya know.   It's my fuckin' time.   I'm going to go wherever the fuck.

VG:     One thing I'm glad about, if the feds are involved, they won't bring you down to torture a confession out of you.

CT:     Right.

VG:     Suffolk County will do that to you.

CT:     Nassau [UI]?

VG:     It's Nassau County?

CT:     Yeah.

VG:     I thought it was found in [UI].   Nassau's even worse.

CT:     Yeah.

VG:     They are worse.   I told you about them.

CT:     Now, the guys come up.   So by the time I get there, I'm pretty cool.   I know I've got to give my shit up, right?   So they're doing my palms so -- so what's funny is the guy from Nassau, he's a nice looking Italian guy.   He's older, probably fifty.   They've got one guy from Nassau, like, ah, who deals with forensic.   And they got the other guy who looks like the guy that gets on TV a lot 'cause, you know, we got this guy, like a spokesman you know, head detective.   And you got the guy from the feds and another guy from the feds, right?

So, the other guy from the feds was heavy investigation, trying to make a name for himself like from the *Unsolved Mystery*, you know?   He, uhm -- he seems to be like this other guy, like -- like the Nassau guy is sharp as a fuck -- sharp as hell, ya know.   He knows what he's doing, you know what I mean?   [UI] I felt this motherfucker's presence.   The other guy is like New Jack, kind of grey.   What, are you talking to me, like I [UI] -- feel like I should show him a fucking letter –

VG:     Say no, you're going at it --

        (Laughter)

CT:     – you know what I mean?   I felt like I should school him a little bit.   So he's like, ahh, CHRIS, you guys switched over the gyms to Synergy.   I'm like, ahh –

VG:     And right up your ass, huh?

CT:     Yeah.   So, ahh, the thing is, they go, ah, CHRIS, listen [UI].   Yeah, yeah –

VG:     What did he say? [UI]?

CT:     In general, he says, you know, [UI], boot camp?

VG:     Oh.

CT:     Very military?   I'm like, yeah, yeah.   We're like niggers, you know?   They took my whole hand print, you know?   Yeah, pretty good at this, huh, you know.   They go and take my [UI].   I give it to them.   I give them my shit [UI].   [UI] talk to, you know.   They [UI] who you are, right?   So they go, so you know what we're up here about, right?   I go, yeah, I know what you're up here about.

VG:     Why did you say that?

11

CT:     Listen.   'Cause -- did your lawyer -- told us what you're up here about,

        right?

VG:     Oh, okay.

CT:     I go, yeah, I know.   He goes, your [UI] told us.   He goes, ah, you want to

        tell us what we're up here about?     I go, why don't you tell me.

        (Laughs)

        [UI] why don't you tell me.   Then they're like, I think [UI] can see we're not

        going to get anywhere.   He's like, you know?   And he didn't mention, I

        didn't mention, you know.   So -- so they start kicking it around.   He goes,

        CHRIS, this is fucking serious.   You know, we don't take DNA everyday.

VG:     Everyday?

CT:     Yeah, they go, we don't take DNA everyday unless it's very serious.   And

        yeah, I don't give it everyday, you know?   So I sit down [UI].   I go – and I

        they start making their pitch, you know.   And I ain't [UI] tell right now who

        [UI] you know.   [UI] up here.   [UI] seventeen, there is a dead cop involved

        now.   We know you're making legal money now.   You're married, blah,

        blah, blah.

VG:     So they don't know JENN was pregnant, right?

CT:     They might, you know?

VG:     How the fuck do they get all this information?

CT:     They know I'm married, and they didn't say JENN was pregnant.   And I was

        almost tempted to say, yeah, my wife's pregnant, you know, like --

VG:     Just to see how close [UI] --

12

CT:     Yeah, but they didn't mention it, but they would of.   [UI] making legal

money now.   [UI] I didn't feel like going to them [UI].   See I can't tell on my

friends, right.   Now when I get out, fuckin' you going to get me like

$500,000 a year to cover my fuckin' living.   What, am I going to go start

stealing again?

(Laughter)

Where the fuck do I go, you know what I'm saying, like [UI].   I'm saying --

like I'm telling SCOTT, who's ever going to talk to me again, like there's no

fuckin' -- there's no possibility, you know.   It's not like I love my friends.   I

don't like them.   So the other guy, the other guy's like, ah, you know how it

ends and ahh – so he says, CHRIS [UI] I really got to tell you -- well, when

you think about it, [UI] I go, I don't get it.   I go, you know what, I know what

I do and I know what I don't do?   This fuckin' shit don't add up to me.   I go,

now the big conspiracies, I go, I don't fuckin' get it.   I go – and I know you

guys like -- like you know what, I go, I kind of believe in your justice system.

I go, I know you guys are fucked up out in Nassau.   I go, like, when I got

pinched for robbing a car, they locked SCOTT up with it.   I go, I did it.   You

guys got me.   And I would have been guilty.   I go, SCOTT really didn't.

But we were doing other things.   I go, but you know what I mean, so -- so --

but this shit right here, I go -- I go, I don't -- I don't get it, you know.   So I go

[UI].   I got -- you know, I got [UI] what am I going to do, tell my friends.   He

goes, ahh, you know, CHRIS, you don't want to be in a place when you

wake up and there is no mirror.   [UI] CHRIS, just so you know, he goes,

you don't want to be on the back of this train 'cause we're going to be

13

arresting a lot of people.    He goes, you don't want to be in the caboose on this one.

VG:    You know what I'm saying, [UI] one thing for sure buddy?

CT:    What?

VG:    I don't mean to sound fucked up, but I'm so glad I'm not involved in this one.

CT:    Listen, he goes, you could be in the big caboose, better than that, right? I'm like [smack sound].    I get up.    Uh, uh, I leave, right.    So I'm adamant. I'm pretty shook, you know.    Fuck, you know.    I guess this is it, right? Now, I get a letter from MANON saying they arrested JOHN GOETZ, ah right.    Okay, and the U.S. Attorney tells MEL and RICK LIBRETT, don't take this case.    You're going to have a conflict of interest, meaning they are going to tie me and SCOTT in with JOHN, which I think is implicating that there is a train which is great.

VG:    They don't know if JOHN had nothing to do with it, right?

CT:    Listen, no, man.    They knew JOHN had nothing to do with it.    They locked JOHN up for the GHB.

VG:    Right, JOHN [UI] more of a train?

CT:    [UI] and end this train.    You don't want to be in the caboose, like everyone is going to tell on me again, like --

VG:    All right.

CT:    -- [UI] for RICHIE, you know.

VG:    Right.

CT:    So they're like, you don't want to get in the caboose on this one.    So they tell MEL and RICK LIBRETT, you know, conflict of interest here, don't do it.

14

So ahh –

VG:  MEL does it, I hope.

CT:  Well, of course, MEL does it.   He goes, what the fuck you talking about, you know.     To make a long story short, I had a – I had a falling out with JOHN.   I get to the point where I was going to [UI] Black Jack my shit, he was hiding from [UI].   GHB and it was legal, and I was supposed to make X amount of dollars and then -- and then I thought JOHN was fuckin' – wasn't making any money.   I didn't want to believe him.

VG:  I knew you weren't happy with him back then.

CT:  Yeah, but I didn't want to bleed the kid, you know what I mean?     And then I go to the fuckin' wholesalers club where he moves three hundred cases.   And I'm supposed to make X amount on a fuckin' bottle.   And it's like, twenty, thirty thousand out of my fucking pocket.     I'm fuckin' angry, you know.   I'm like -- I call him up.   I go, yeah, JOHN I got great deal, you know.   I need fifty grand, or I'm going to get bubble Buzz.     I'm just going to take the fuckin' money.   I'm going to Black tack Jack his fuckin' ass, and that was going to be it.   You know SCOTT, more of a business man, right?

VG:  Well, it's not only that.   You just don't want the kid on the -- not on your good side though.

CT:  This was then though.   This is going back two years ago, okay?   So SCOTT goes because he is a business man, he goes, let me handle this, gets JOHN to pay the money.     I don't talk to JOHN.   I don't invite him to my wedding.   I don't talk to him for a fuckin' year.   We go to the courthouse.   He was there with a lawyer, you know?   We finally make up

15

just before our case gets resolved.   I've been hanging in the [UI] gym for

fuckin' for two years, okay?   They're convinced though that JOHN put a

million and half dollars in Jamaica.   That's a lot of fuckin' money.

VG:        Yeah, well, I read in the papers that he had like $270,000 in the bank.

CT:        They fuckin' seized it.   They seized another 200,000 in fucking cash.

VG:        Holy shit.

CT:        Three thousand out of his fuckin' apartment and who knows what else.

VG:        I can't believe CLAUDIA got caught up in that.

CT:        Yeah.

VG:        That's fucked up when your girl's with you.

CT:        Yeah.

VG:        You know they questioned her as well too.

CT:        Huh --

VG:        You know they questioned her about that.

CT:        Right.   It gets better.   It gets better.   The whole story gets better, right?
            So
            now -- and what [UI] I said JOHN did?   You know, so I get a visit from
            fuckin' JENN and my fuckin' brother, who is such a pussy.   It makes me
            fuckin' sick.

VG:        Your brother?

CT:        Oh yeah, he's such a pussy.

VG:        Why?

CT:        He is so fuckin' [UI], you know, for somebody who wanting to be like -- you
            know, for the part, he's like, you know, he'll sock 'em up.   But he ain't -- he

16

ain't going any further than that, you know what I mean?   Like for a kid like, well, I got to calm down and talk, not fuckin' people, when I'm thinking like, oh, no, maybe he's -- maybe he's, you know, like when I got to talk him out of doing something, like figuring maybe he would be half serious once in a while, he ain't, you know.   The kid is fucking straight soft like baby shit, you know what I'm saying?

VG:     Yeah, I know.

CT:     Which is good.   Yeah, which is good, you know.   We shouldn't put that off on him [UI] stuff.   But the truth of it, my brother is straight up shorts.   He gets all his stories fucked up.   You come up there, buddy, and then you shit on yourself, you know what I'm saying.   You know with JOHN.   Did you ever tell on him?   Yeah, [UI] JOHN and I [UI] 24-hour drug dealer.   You know what I'm saying?

VG:     You didn't do anything with JOHN, did you?

CT:     Oh, yeah, I did.

VG:     JOHN wasn't involved in this, was he?

CT:     No.

        Woo, woo, woo, bam.   He goes right out of the picture.   [UI].   We -- with JOHN and like the thing didn't go down, you know what I'm saying?

VG:     But why?

CT:     For more than one reason, JOHN wasn't innocent.

VG:     You – you didn't get any money?   You didn't get any money, did you?

CT:     No, I guess the bottom line is he ain't around.

VG:     Oh, yeah?

17

CT:        Yeah.

VG:        Okay.   Give me five minutes to [UI] up.

CT:        Five minutes.

VG:        But, ah, it's better than nothing, which is nonsense.

CT:        [UI].   Do you think the case is about me and SCOTTY?   No.
           And they couldn't charge [UI] this way.   Tell us about CHRIS, and we'll let
           you go home.   They told CLAUDINE the same thing.   Tell us who [UI].
           We know you fuckin' guys –

VG:        Involved in the GHB?

CT:        Yeah.   We knew you fuckin' guys did it.   Blah, blah, blah.   She's like,
           listen, her lawyer is KEVIN KEATING, right out of MEL's office.

VG:        KEVIN KEATING?

CT:        Yeah, lucked out.   Right.   By accident purely, okay.   Tells the cops, listen,
           we wouldn't let them get involved.   They tried to get involved.   We wouldn't
           let them get involved.   You're wrong, you know, and as far as LIQUID LAB
           goes da, da, da; and this is a fuckin' a girl pleading, so they knew they can
           turn her, you know?   So that's good.   So I'm like -- when they first got
           arrested, I'm like [UI] it ain't that bad, you know; but the -- the DNA shit. They
           took fuckin' seven guys' shit.

VG:        What about, ahh – the problem with that is they don't know whose that is.
           They don't care about that.    They just look for your match.

CT:        Yeah, I know, but what about the [UI] okay, KEVIN KEATING, DNA [UI]
           show up 'cause they did all of [UI].   Dude, they would of taken [UI].   I think
           -- I think that Nassau fucked up that car.

VG:     What do you mean, fucked it up?   Didn't take anything out of it?

CT:     The car that I left there, I think it was dead.

VG:     Oh, really.

CT:     Yeah, they just fucked it up because, VIN, 'cause we've been a suspect in

        that since day one – day one, okay.   The fuckin' DNA has been around for

        how many years now?   A lot.

VG:     Yeah.

CT:     It's been around for four.

VG:     Yeah.

CT:     Right?

VG:     I'm convinced that they are trying to get stirred up, trying to make you

        make some stupid mistake, get SCOTT scared, SCOTT goes on the run,

        stirring this thing up.   It just happens they don't have no leads and now --

        yeah, exactly, this was [UI] DNA even happened.

CT:     The exact fuckin' place [UI].   They can do it all they want.

VG:     But you know what the bad thing is SCOTT going on the run.   He makes

        you guys look so bad though.   It – it so much – it so much [UI] if you guys

        go --

CT:     The one thing you got to do, listen, that doesn't matter anymore, trust me.

VG:     As soon as you guys get busted, they're going to find SCOTT in no time.

CT:     Yeah.

VG:     No time at all.   Because you know how much media they'll put on him.

        He'll be number one's most wanted. He won't be able to move.

CT:     Right, right.

VG:     So it's all a waste of time.

CT:     Right.

VG:     But, uhm, I'm not saying you shouldn't have did it because you shouldn't have fed into it.   You should have just shrugged it off.   But, ah --

CT:     Nothing we can do now --

VG:     No, [UI] the fuckin' losers in Bellmore start knowing that SCOTT'S on the lam, that means everyone knows.

CT:     Oh, yeah.

VG:     Cops know he's on the lam now.

CT:     Oh, yeah.

VG:     They know he's running scared.   What do you think – now this is between me and you.   What do you think?   You don't think he's going to tell on you?

CT:     Nah.

VG:     Really.

CT:     You know what it is?   He keeps saying things that I'm like, ah -- I don't think -- I don't think SCOTT is as strong as, say, a lot of other guys, whatever, but – two things, one is that SCOTT is smart.

VG:     He is smart, right?

CT:     He is smart.

VG:     Because he was [UI] but what would happen is he was – he'd get a shit load of time, but you'd get more.

CT:     He does.   Two things, one is that he is smarter now.   Two is like, you know what, everyone's got a reason for not doing it.   Like if someone tells on me, I ain't tellin' on them anyway.   I just ain't doing it.   I ain't doing it.   And I

20

ain't fuckin' doing it, you know.   And if I like – and -- and I – and I would play

it to the max.   Like if someone says VINNY's been talking, SCOTT's been

talking, I want to see you at trial and I want to see you doing it.   And I might

be the fuckin' moose brother that killed your mother, but I ain't doing it, you

know what I mean?   And [UI].

(Grunting sound)

I mean, I'd like to see him do it.   I really – I think he could.   I think he'll go to

hell for doing that.

VG:     (Laughs)

CT:     I really do, you know what I mean.

VG:     I don't think ROB would do it.

CT:     Never.   Never ROB.

VG:     Do you think they were on to him?

CT:     Nope.

VG:     That puppy was good.

CT:     Besides, listen to me.   They are so fuckin' wrong with this, that's good, you

know?   I think, ahh, they're shaking the cherry tree.   They're shaking an

apple tree.

VG:     Now that they know that, now they see what SCOTT did, they must feel

pretty confident they're on the right track.   I think you're planning on them

fucking it up.   Maybe they did a long time ago.

CT:     Long time ago, yeah.   [UI] three [UI].

VG:     What about, remember the trunk and your finger?   You told me something,

you squished your finger?

GA276

21

CT:       Yeah [UI].

VG:       There was no skin on that, right?

CT:       Buddy, no way [UI]. I was in the middle of the fuckin' Atlantic Ocean and the

          body was found floating two days later or better. There was one piece of

          skin on a fuckin' rock, can't believe it's been floating in the ocean.

VG:       Yeah, no way.

CT:       No fucking way.

VG:       Fish would eat it and stuff.

CT:       The bottom line, it would just float away, you know what I mean?   It

          wouldn't stay jammed on a rock?   If it was here, yeah; but in the water --

          saltwater, for fuckin' two days, no fuckin' way.

VG:       How bad is SCOTT taking this?

CT:       He's all right now because we sat around and kicked it around, you know?

          This is like the [UI] -- listen.     It's -- for one they are not gonna get it. You

          know what I am saying?   Two, is that like they [UI] confession.   I get it.

VG:       What now?

CT:       Someone knows.   You know what I mean?   You can't --

VG:       They came up and beat the shit out of him, but I'm --

CT:       All I'm saying, barring that -- listen, barring, ah, like a pique event to do a

          fuckin' crime, okay, barring that --

VG:       Which is pretty unlikely here.   They would beat him up.

CT:       Yeah, they would beat him up to admit because, look, listen, one of them

          would have been involved.   Like I was so fuckin' concerned with this thing,

          you know being announced and everything, I wrote a letter to MEL.   I,

22

CHRIS TARANTINO, don't know a goddamn thing – (laughing) – make a confession.   I am fuckin' innocent of any and all crimes.   Please notarize this, you know.   I sent it out to MEL, and MEL fuckin' sent it back.   And he said, CHRIS, I can't do that, but I will make note of it, you know?   You know, I was fuckin'– you know, I was up there.   And I'm like they're gonna make a fuckin' confession.   Fuck that shit, you know.   They fuckin' did it then [UI] now, right now.   He's like, I ain't telling them shit.

VG:     But while you're in jail, you're still covered from your lawyer.

CT:     Yeah.

VG:     They can't ask for anything.   Now that you're out though, I don't know. The same may be being on probation.

CT:     They fuckin' did do it while I was in jail.   They did fuckin' talk to me.

VG:     About – that's only if you want to talk, anything you said can't be used against you.

CT:     Yeah, well, I didn't say nothing anyway, you know.   I mean I would of [UI], but, uhm –

VG:     They [UI] – MEL would have to be involved to get – to release, ah -- ah --

CT:     What?

VG:     Uhm –

CT:     Some kind of statement or whatever.

VG:     A statement.   I'm pretty sure it might – once you're sentenced, it might stop running there.   But I think the whole time you're in jail --

CT:     So that's the other thing SAL adds on.   It goes like this also – we're all pack animals, okay, and for whatever the reason is someone ain't telling them a

GA278

bit about -- like SCOTT doesn't know who the fuck is -- he's out of the gyms, you know what I'm saying?   Like he, you know -- he – he just – just there's no fuckin' way, you know what I mean?   It's just – it's – it's one of those things that, like, you know, maybe at the last minute it's a possibility, you know.   I don't -- I don't think so, you know, no matter what, you know what I'm saying?   At the last minute, maybe if like fuckin', you know –- it's all big guys [UI] down so that other [UI] do it. If that were the fuckin' case, you know, but for the most part [UI] fuckin' it's nothing, taking the weight, at all. None.

VG:   That's a good thing.   All you have to worry about is you and SCOTT.

CT:   Yeah.

VG:   SCOTT understands that, right?

CT:   Yeah, [UI].

VG:   I don't know about that.

CT:   He is, yeah.

VG:   Well, that's a fuckin' good thing.   So you really -- you really should just drop it.   Don't talk about it with anybody.

CT:   I know [UI].   Listen.   [UI] talking [UI] nothing, and that's it.   I believe that the only thing I said to him [UI].   Let me ask or whatever.   And you know, [UI].   Have you ever watched *Unsolved Mysteries*?   I go, I'm the unsolved mystery.

(Laughter.)

Wah-woo!   Whatever you got, I am.

VG:   You got to really beat that into SCOTT'S head.

24

CT:     Yeah, no.   He's listening.   We went over here, you know, and ahh, like, I
        said, SCOTT'S smart, and he's fuckin' – we're sitting around – at first, but
        you know what happens when you -- when you get that first bid [UI] tell me
        you didn't take the DNA test.

VG:     SCOTT?

CT:     Yeah, SCOTT'S over there in Farmingdale.

VG:     They didn't take SCOTT'S?

CT:     Yeah, they did.   They go right to his house first.   They called me up.

VG:     And SCOTT'S on the street?

CT:     Yeah, KENNEDY came by and dropped a subpoena off.

VG:     Who came by, KENNY?

CT:     KENNEDY.

VG:     KENNEDY.

CT:     And he came by my fuckin' gym a couple of months before because they
        figure they can get to SCOTT, da, da, da, da, da.

VG:     Yeah.

CT:     Said he was going to drop a fuckin' subpoena off on fuckin' SCOTT, give it
        to his wife, knowing that SCOTT didn't answer the door, so I call home.
        JENN says, hey, we bought a dog, you know.   I'm like, great, you know?
        But right before that I'm in a meeting, you know?   I'm talking to these scum
        bags, you know, dropped by, you know, fucking want DNA whatever.   I'm
        like --

VG:     On your shit, right?

CT:     [UI] (laughter).

Fuck, you know.   Then I get pulled out by the Lieutenant; and up there, it's like the secret squirrel society anyway.   And the counselors all know your business.   Everybody wants to know what's going on.   I got the Lieutenant comes to me.   I got MEL calling up there four times, and these fuckin' niggers make like four hundred a week after taxes.   I got my attorney calling up, looking, who wants to know your attorney, you know?   Like feds coming up here.   They're going to [UI] DNA from you, you know what I'm saying?   Like, I'm thinking, they're never letting me out of here, and the fact that they're [UI].

VG:     And when you're in there, you definitely panicked.

CT:     I – you know, like I'm like, they're never letting me out of here.   I got to the point where I'm like -- two weeks I would -- I would sleep.   I'd sleep like this for four hours.   I wake up sweating my balls off.

        (Laughter.)

        That was it.   I was up, you know, four hours a day, maybe, you know.   Like, you know, I would get to bed right away, but I'd be up from two o'clock on, you know.   Since two I was gone, but I get up, I'm like -- you know? Motherfucker, man.   And then, ahh – so when you hear the first shift – [UI], I'm like [UI] finally got DNA. [UI] sleep – sleep.   I'm like --

VG:     Holy shit, oh.

CT:     I go, that's if you got me.   [UI], Mel [UI] listening some color hair, there's nothing.

VG:     Is that what they said?

CT:     Yeah, there's nothing.   Now they're going [UI] from me.   They're taking

26

[UI] from me.  You come to my fuckin' house, my dog hair was in that fuckin' car, you know what I am saying?  It -- it – there's a lot of like [UI] reasons to go down with that shit, you know what I'm saying?  But we might of been in the car.  We're good friends. You know they picked me up. How many other people were in the car the – there might be fuckin' twenty different people in there.  Did they fuckin' hit them all?  Fuckin' KENNY was in the car, stole an armored truck. Not that I would ever tell them – tell anybody, but I mean like, he was.  He might have been in jail at the time. ALFONSE is done.  We didn't kill him, though.  So I get fuckin' two open reverse tests.  And hopefully they had hair on them.

VG:     Right.

CT:     [UI] it's -- it's not like anything [UI]

VG:     [UI] – hey, you really don't think that they got LOUIE by now?

CT:     I think, like, GARRETT knows him.  Those guys were all in jail.  And GARRETT doesn't know him.  And so he tells me, yeah, SCOTT did this, you know.  But he's telling me, like, what the other team thinks, you know what I'm saying?  And, ahh, the DNA [UI] another two buckets.  The DNA comes back and supposedly they say they have a picture at night, and these guys are rolling him right off the bridge – LOUIE off the bridge.

VG:     Oh, really.   Oh, so you know they are way off --

CT:     Yeah, they took ten other guy's DNA, probably because he's there in the car or if his brother's in there or if LOUIE's fuckin' blood was actually in the car. Supposedly it's pig's blood from the barbeques.

VG:     When – when – when LOUIE had problems --

CT:      What?

VG:      How did he get where he got him?   It wasn't in the car, was it?

CT:      By boat.

VG:      No.   How did he get to the boat though?

CT:      We got back from the [UI] –

VG:      No, not [UI] --

CT:      And I was thinking about this, if it proves out, I'm thinking, boom.   [UI]
         meanwhile it was in nighttime?   Boink.   In the daytime.

VG:      (Laughter.)

CT:      You know, so, ah, [UI], the kid that gave em the score with SCOTT, you
         know. So SCOTT told ROB, you know what I mean [UI]?

VG:      I know him.   He's a funny man.
         (Laughter.)

CT:      You know, like a year or whatever, you know, because of something – da,
         da, da – and, ah, [UI] LOUIE [UI] so we even checked out like [UI] worry
         about, I'm like, you know, thinking you know --

VG:      He doesn't know any of this stuff happened, does he?

CT:      Huh?

VG:      Does he know any of this is about?   Like. he's a good kid, right?

CT:      Really good kid.

VG:      [UI] not [UI] in trouble -- in trouble, right?

CT:      Nah, nah.   I don't think he's a thief [UI] he was on probation for like year or
         two.   We used to sell pot with GREG REIDER, back like on Death Warrant
         Road, you know?   And I mean, like, I was so nervous with [UI] a kid that I

know was right there when this whole fucking thing went down, you know?
Like right there. And, ahh, to make a long story short, I said, you know, like
JENN, go get Jimmy's fuckin phone number, 'cause I know that JENN [UI] –
JIMMY'S phone number cause I was gonna get in touch with him to get a
fuckin' statement.

I was ready to go give up everybody's DNA, you know what I'm saying?
Like, they probably put like a million people in the car. It would be like, you
know -- not that I wouldn't put him there, then and there; but like if this came
to trial, I'd be like what about this one, what about this one, like just to fuck
up evidence 'cause I didn't think I was getting out, and I've been work the
fuckin' – like get a PI involved and start working. I said --

VG:      Right.

CT:      I said, I work -- I start working in here, you know what I mean. So, ah --

VG:      I would slow down though, KILLER.

CT:      I'm not doing nothing.

VG:      Good.

CT:      I ain't doing shit. MEL said, listen, we -- because I went to MEL. I go, we
should do this. I want statements from this one. I want statements from
this one, blah, blah. He goes, CHRIS – (smack sound) – you know, chill.
He goes the feds are fucked up, and they can use everything as evidence.
When I say everything, that means everything, CHRIS.

VG:      I mean they can even use hearsay, I think.

CT:      Buddy, they can use the fact like SCOTT disappeared for a while.

VG:      Really?

GA284

29

CT:     Yeah, they can use like the most fucked up shit in the goddamn planet, you know what I'm saying?   Like they can use fuckin' anything, you know, to make their case.   So he's like they get -- they can go around saying that you were nervous, you know, and put it like that to the jury and you would get your case [UI] --   (laughter)   --   you know what I'm saying?   So --

VG:     And they can too without [UI].

CT:     Yeah --

VG:     Yeah, they're bad.

CT:     Yeah, they really fucked up.   So ahh -- so -- so -- you know.

VG:     MEL ROTH's son is a member of my gym.   I gave him a membership.

CT:     Oh, really.

VG:     Yeah, he lives in the neighborhood.

CT:     Oh, that's cool.

VG:     Yeah.   He comes in and starts asking questions.   I'm like, who are you?   MEL ROTH's my father (laughter).   I don't know.   He looks like an attorney.

CT:     Oh, yeah.

VG:     I don't know.   I didn't even ask him.

CT:     I love MEL.

VG:     Me too.

CT:     That's what they say -- they go, do you like your attorney?   I go, I love my attorney.   (Laughs), you know.   I do, you know?   The only [UI] about Mel, like if I wouldn't go to trial on something like this, I would get a smoking gun, you know.   I would have MEL co-counsel it 'cause he cares about me.

30

VG:         Yeah.

CT:         But I would get --

VG:         A real strong mouthpiece.

CT:         Yeah.   Well, I would get someone maybe if not a BRUCE CUTLER or

            someone like that who is like upper peer or --

VG:         I can't believe it's in Nassau County.   I thought it was really a Suffolk -- in

            fuckin' Suffolk.

CT:         No, the body was found between Suffolk and Jersey.

VG:         So what does that make it?

CT:         [UI] that doesn't matter.

VG:         So what does it make it, though?   Who would have the jurisdiction?

CT:         The feds.   It's a joint investigation between the feds, you know.   That's it.

VG:         It's got its pros and cons.   I think you're better off with the feds.

CT:         It's good and bad, you know.

VG:         Yeah.

CT:         The problem is -- the problem is with the feds --

VG:         [UI]

CT:         Probably not, because the feds, anything goes.   You get a trial, anything

            goes, you know.   And I don't have to do shit like I would act down, you

            know, try and get a   mistrial, fuckin' you know, whatever I would act out and

            take a shot 'cause I watch everybody else going to trial sitting there quietly

            fuckin' not gettin anywhere, you know what I mean?

VG:         Right.   Did you see the one kid that represented himself?   The cops

            chasing him, shooting at him [UI] --

31

CT:        No.

VG:        He's a cocky little kid.   He acted like his own lawyer.   I don't [UI] --

CT:        Yeah, he got convicted of everything?

VG:        Yeah, but it was – looked like he was really going to walk on it.

CT:        Yeah.

VG:        But yeah.   He actually – he reminded me of you.   He was hysterical, this
           kid.

CT:        Yeah?

VG:        Yeah.

CT:        [UI] could.   I tell you, after that, I would have to have an attorney [UI], like a
           CUTLER, like a MURPHY, someone who would, you know, go [UI] – 'cause
           the problem I've had with MEL, like if MEL beats the case for me out at
           Nassau County, they'd fuck him for the rest of his life.

VG:        Yeah, he made his reputation out there to be [UI] really – the good boy
           system would be tough.

CT:        He'd never get a fuckin' another plea again, you know?

VG:        Right.

CT:        And I can't get fuckin' sold out.   I need a guy like you and I would talk to AL
           GRECO and I would say, you know, I told my attorney that this guy is like
           half a psychopath, you know, testifying against me.   He was telling [UI] – I
           was telling my attorney, get up there and [UI] shit and then stir him up so the
           fuckin' jury doesn't see this big guy telling a very sweet story and his
           attorney thought, are you crazy, they're fuckin' [UI] two murders, here –
           (laughter).   I go, I'll fuckin' kill ya.   But my point is that if you get a guy like

DAN MORRISSEY or whatever because it's very like – it's not really technical here. It's fuckin' – it's like a cat fight, you know.

VG:    Yeah, right.

CT:    It's all – he said, she said, da, da, da, da, you know. You know, there's nothing there [UI]. It's a game. It's a game to him.

VG:    [UI], when all this stuff happened between me and you and the gyms --

CT:    Yeah.

VG:    And I was telling SCOTT to, uhh, or maybe I was telling ERIC that I owe you an apology.

CT:    Yeah.

* * *

[End of conversation purposely removed]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                S T I P U L A T I O N

     - against -                        Cr. No. 08-655 (JS)

CHRISTIAN GEROLD TARANTINO,

           Defendant.

- - - - - - - - - - - - - - - - - -X

       IT IS HEREBY STIPULATED by and between Assistant United

States Attorneys James M. Miskiewicz, Carrie N. Capwell and Sean C.

Flynn on behalf of the United States, and James R. Froccaro, Esq.

and Michael Rosen, Esq., on behalf of the defendant Christian

Gerold Tarantino, that:

       1.  If called to testify, Lawrence Hardie would testify

that:

            a.  Between March 1993 and September 1994, he was
               a Group Supervisor in Newark, New Jersey for
               the United States Customs Service, now known
               as the Department of Homeland Security,
               Immigration and Customs Enforcement.

            b.  During that time period, his group was
               conducting an investigation of members and
               associates of the Lucchese crime family.  As
               part of that investigation, the U.S. Customs
               Service used a confidential informant, named
               Richard Sabol ("Sabol").

            c.  During the investigation, Sabol recorded
               telephone conversations and face-to-face
               meetings with several individuals, under the
               supervision and direction of Special Agents of
               the U.S. Customs Service.

Government
Exhibit

STP- 5
OB CR 655(JS)

2

    d.    The recorded conversations made by Sabol include the audio recordings contained on the compact disks marked as Government Exhibits GF 9, GF 11, GF 12, GF 13, GF 14, GF 15, GF 16 and GF 17. The above-listed Government Exhibits contain true and accurate recordings of seven telephone conversations that took place between January 5, 1994 and January 12, 1994, and one face-to-face meeting that took place on January 13, 1994.

    e.    On August 10, 1994, a federal grand jury sitting in the District of New Jersey returned an indictment entitled <u>United States v. Joseph Giampa, et al.</u>, 94 CR 403 (AJL), charging nine individuals, including Gaetano Fatato and Louis Dorval, with federal crimes, including crimes related to the interstate sale of fur and leather coats stolen from a Filene's Basement store in Manhasset, New York.

    2.    This Stipulation and Government Exhibits GF 9, GF 11, GF 12, GF 13, GF 14, GF 15, GF 16 and GF 17 are admissible in evidence.

Dated:    Central Islip, New York
           April 4, 2011

                          LORETTA E. LYNCH
                          United States Attorney
                          Eastern District of New York

        By:                    
                          James M. Miskiewicz
                          Carrie N. Capwell
                          Sean C. Flynn
                          Assistant United States Attorneys

                    
James R. Froccaro, Esq.
Michael Rosen, Esq.
Counsel for CHRISTIAN TARANTINO

Case 13-1799, Document 140, 02/09/2015, 1434253, Page293 of 299

CITY

## ...rive on Mob ...abotaged In New Jersey

### Officer Is Suspected Of Warning Suspect

By CLIFFORD J. LEVY

NEWARK, Aug. 11 — An extensive Federal undercover operation that was planned to snare the Lucchese crime family from gaining a new foothold in New Jersey was blown apart when a New York City crime...



John J. Doherty, right, with Mayor Rudolph W. Giuliani and Councilwoman Priscilla Wooten, at left wearing hat, in East New York, Brooklyn, Wednesday. Yesterday Mr. Doherty was named Sanitation Commissioner.

### Sanitation Dept. Gets Up-From-Ranks Chief

By STEVEN LEE MYERS

John J. Doherty, who joined New York City's Department of Sanitation as a garbage collector in 1960 and rose through its uniformed and administrative ranks, will be the department's next Commissioner, Mayor Rudolph W. Giuliani announced yesterday.

## Cor... ...es Plan To ... Grow

Propo... ...ool Budget

Government Exhibit RS-29

### A union says a cost-cutting plan is insensitive to pupils' needs.

## Bosnian Story Ends Happily With Boy Back at Farm

Continued From Page B1



### A Part of Growing Up: Locked in the Car

For many toddlers, it seems, being locked in a car is a wrenching a rite of passage. For Tommy Keels 2, his sister Lita, was quickly at the scene on 112th Street off Riverside Drive to correct the situation. With the help of police officers, the door was opened.

NEWSC09000009

A32

# Muslim Leader Slams Nation of Islam Beliefs

**By Elaine Rivera**
STAFF WRITER

Calling the Nation of Islam a "crippling force" for African-Americans, a spokesman for Muslim leader W. Deen Mohammed yesterday challenged Louis Farrakhan and his followers to abandon its teachings.

Mohammed, seen as a spiritual leader by thousands of orthodox Muslims, is scheduled to speak at rally in Harlem tomorrow afternoon, when he is expected to repeat the challenge. Mohammed is a son of Elijah Mohammad, a founder of the Nation of Islam.

"The Nation of Islam's beliefs serve as nothing but a crippling force for blacks in this country," the spokesman, Abdul Malik Mohammed, said at a news conference in Manhattan yesterday. "They have no legitimacy as far as Islam is concerned."

The spokesman, who is not related to the spiritual leader, said Mohammed is issuing this appeal now because of events during the past year in which both Farrakhan and a former top Nation of Islam aide,

Khallid Muhammad, have been accused of anti-Semitic and inflammatory rhetoric.

Conrad Mohammed, New York spokesman for the Nation of Islam, said, "If it were not for the Nation, you would not have black people with a universal perspective of Islam. More and more people are beginning to see the value of us — from blacks to whites and other people of color."

W. Deen Mohammed's spokesman said Mohammed and his supporters are concerned that the visibility given to the Nation of Islam will misrepresent orthodox Islam, of which there are more than 6 million followers in the United States, 40 percent of them African-Americans. Mohammed's supporters say that the Islamic teachings presented by the Nation of Islam have been distorted.

"The Nation of Islam discredits Islam, cheats African-Americans and it has no purpose except as . . . a time bomb that is destructive to the expectations of progress," Mohammed said.

# *Courting Hasidic Vote*

**By Nicholas Goldberg and John Riley**
STAFF WRITERS

Looking like a visitor from another country, Republican gubernatorial candidate George Pataki took a campaign stroll through Hasidic Crown Heights in Brooklyn earlier this week, grabbing long-bearded, black-coated men and harranguing them on the subject of crime.

In a series of meetings and sidewalk encounters with Orthodox Jewish residents, Pataki suggested that his opponent, three-term Gov. Mario Cuomo, had responded too weakly to the Crown Heights disturbances three summers ago and had made a drastic error by repeatedly vetoing the death penalty.

"Elect me and I'll sign it," Pataki told one group.

"From your mouth to God's ears," a listener responded.

Not to be outdone, Cuomo yesterday made his first-ever visit to the Satmar Hasidic community of Kiryas Joel in Orange County north of New York City, where he was met by virtually the entire village and hailed as a hero.

Cuomo, after all, signed the bill five years ago setting up a special school district for the handicapped children of the all-Hasidic village — despite his own Education Department's concern that the bill violated the

separation of church and state. When the U.S. Supreme Court ruled the district unconstitutional, Cuomo hesitated only a matter of days before coming up with a new law to keep the district in business. "It was the right thing to do," he said yesterday.

As he made his way through the sea of black coats and hats and the waving banners yesterday, the governor scoffed at the notion that his visit had anything to do with the upcoming election.

"You see everything in terms of politics," Cuomo chided reporters. "This is about government."

Nonetheless, the 150,000 Orthodox and Hasidic Jews in New York State wield power in New York politics far out of proportion to their numbers and cannot be ignored. As a result, the candidates have been focusing significant attention on the Jewish community.

For one thing, Hasidic Jews turn out at the polls in much higher proportions than the population at large. For another, they tend to vote as a bloc — generally for the candidate selected by the rebbe and community leaders.

Perhaps even more important, Hasidic Jews tend to be a key swing vote because, by and large, they don't vote ideologically, but cross party lines to support whomever they feel will best serve their community.

"We don't vote Democrat or Republican," explained Abraham Wieder, a top community leader in Kiryas Joel. "We vote on the issues that affect us and we vote for the people who help us."

Pataki spent Monday evening in Crown Heights arguing, according to some sources, that he would have been more ready than Cuomo to call in the National Guard during the riots there in 1991. On Wednesday he traveled to Brooklyn again, seeking the support of the Council of Jewish Organizations of Flatbush.

Cuomo, meanwhile, took time out in Kiryas Joel to meet with Moses Teitelbaum, the Grand Rabbi of the Satmar Hasidim, who is expected to give his blessing to one of the candidates in the weeks ahead.

In the current battle, Pataki believes his best weapon is the death penalty, which is widely supported in the essentially conservative community of Hasidic Jews. The crime issue is what helped both Mayor Rudolph Giuliani and Sen. Alfonse D'Amato, both Republicans, win support there. This week, Pataki's death penalty position was endorsed by Devorah Halberstam, whose son was shot while riding a Yeshiva bus over the Brooklyn Bridge in March.

Cuomo, meanwhile, signed laws last year allowing the Hasidic community's private ambulance corps to continue operating. He also has signed laws enabling religious Jews to object to autopsies of family members and has fought for stronger enforcement of Kosher food laws.

"The backing that Pataki has are people who were not in politics for the last 20 years," said Lubavitcher Rabbi Shea Hecht, a Cuomo supporter. "You get a lot of new kids on the block saying . . . on issues they agree with Pataki. . . . But most people will end up backing Cuomo. They will say, 'He was good to us, we owe him one.'"

*Bob Liff contributed to this story.*

# Crime Bill Bust

**DEFEAT** from Page A7

over the bill itself. "Anyone who thinks we can produce a new crime bill in the month remaining is smoking something," said Rep. Charles Schumer (D-Brooklyn).

Voting against the rule were 187 Republicans and 58 Democrats: Voting for it were 198 Democrats, 11 Republicans and 1 independent. Among the New York City delegation, only Reps. Susan Molinari (R-Staten Island) and Charles Rangel (D-Manhattan) voted no.

If the rule had passed, the bill itself was expected to be approved. On the procedural vote, however, the Republican leadership was able to pick up the votes of some Republicans who supported the bill. Some said it was a way to protect votes they saw as Democrats' high-handed tactics in the conference committee.

Republicans also denounced the bill as an example of unnecessary congressional largesse, including financing for such programs as midnight basketball leagues.

The bill would have banned assault weapons, helped put 100,000 new police officers on the streets, demanded life terms for some three-time felons and financed both their prisons and prevention programs.

*William Douglas contributed to this story.*

## Top Trashman Named

John Doherty, who started out with the Sanitation Department 34 years ago by loading trash cans and sweeping snow off the streets of Manhattan, yesterday rose to the top of the heap when Mayor Rudolph Giuliani named him as the $110,000-a-year head of the agency.

Doherty, 66, had been serving as acting commissioner of the 6,800-employee agency since Emily Lloyd left for a top administrative post at Columbia University last month. Yesterday's City Hall announcement makes Doherty the first sanitation commissioner to come from the department's ranks in more than three decades.

"I'm still on a bit of a high," Doherty said yesterday.

Unlike his most recent predecessors, Doherty comes to the job well-versed in the language of trash collection, landfills and incinerators. As deputy commissioner for operations since the waning days of the Koch administration, the Staten Island native has been responsible for collecting the city's 14,000 tons of household garbage each day.

His appointment comes at a critical time. The city is trying to negotiate a contract with uniformed sanitation workers to lengthen routes and ultimately reduce the workforce, while the courts have ordered the department to sharply increase the amount of garbage it recycles. At the same time, Giuliani is weighing whether to open two incinerators or ship trash out-of-state.

— William Bunch

## Trade Tower Smokeout

The observation deck at Two World Trade Center was closed yesterday for a short time as firefighters searched for the source of smoke that was detectable from the 94th floor to the top of the 110-story tower.

It took about 25 minutes before firefighters located a smoldering rubbish fire in a shaft on the 94th floor, the Fire Department said. The blaze was not considered suspicious, but is being investigated by fire marshals. No one was injured.

— Tom Collins

## Cop Hit by Sex Charge

A veteran Bronx highway patrol officer was arrested and suspended on charges he sexually abused his neighbor, police said yesterday.

Officer Daniel Quinlan, 29, was charged with second-degree aggravated sexual abuse for the assault Tuesday about 10:50 p.m. in his neighbor's home in Bellerose, Queens, police said. He was off-duty at the time. Quinlan, who is married, allegedly knocked the woman to the ground and tried to sodomize her.

The 26-year-old woman reported the attack Wednesday at the 105th Precinct, police said yesterday.

Quinlan, a cop for seven years, was suspended without pay and turned in his gun and badge, police said. He has been assigned to the Highway 1 unit in the Bronx since February, 1993.

— William K. Rashbaum

## Feds Bag 9 Mobsters

New Jersey federal agents arrested nine alleged members or associates of the Luchese crime family yesterday on drug trafficking and extortion charges, one day after two ranking New Jersey members were sentenced to long prison terms.

Among those arrested yesterday was Joseph Giampa, a reputed "capo" or captain in the Luchese mob who authorities said was the family's enforcer at the Hunts Point Market in the Bronx.

On Wednesday, a New Jersey judge sentenced Michael Taccetta, 46, to 40 years in prison, and Michael Perna, 52, to 25½ years. Taccetta headed the Luchese family's New Jersey wing, while Perna was the faction's caretaker while Taccetta was in prison, authorities have said. Authorities believe their convictions, along with the pleas and convictions of others, leave the Luchese operations in New Jersey in shambles.

— The Associated Press

NEWS000000001





**GRAVESTONE** is lowered into place on plot in which Baby Hope was buried.

# Marker for slain girl

## Feds hint cop tipped mobster

By TOM ROBBINS and ROBERT GEARTY
Daily News Staff Writers

A federal indictment of nine reputed mobsters yesterday hinted that one of them, warming fed confidences, that information by a New York City cop.

According to the indictment, Gennaro Vittorio tried, without success, to get back a usurious $10,000 loan after being told by a New York City police officer that someone was working for the federal government.

The loan had been extended to start an import-export company that was to be a front for a drug distribution network, according to the indictment.

New Jersey U.S. Attorney Faith Hochberg would say only that the investigation was continuing. She did not indicate if investigators knew the name of the officer.

The head of the Police Department's Internal Affairs Bureau, Deputy Commissioner Walter Mack, said, "We're very interested in the nature and veracity of that allegation."

Since 1992, three cops assigned to sensitive posts have been charged with passing information to the mob.

Vittorio and eight others were indicted by a grand jury in Newark on sweeping federal charges of trying to expand the Luchese family's turf into New Jersey.

"This indictment thwarts the attempts of two Luchese crime family factions to extend the tentacles of their crime family into New Jersey," Hochberg said.

One faction was allegedly headed by reputed Luchese capo Joseph (Big Joe) Giampa, 28, Vittorio's stepbrother. Last month the Daily News revealed mob rule at the Hunts Point Terminal Produce Market in the Bronx, according to testimony by a mob turncoat.

## Cops pledge: We'll get 'im

By CHRIS OLIVER
Daily News Staff Writer

A dusty bunny doll and a Little Bo Peep statue had been the only items marking the tiny grave of Baby Hope, the girl found ruthlessly stuffed in a plastic cooler in the Bronx three years ago.

But thanks to kind hearts in Washington Heights and a squad of unrelenting detectives, Baby Hope is finally at peace at St. Raymond's Cemetery in the Bronx.

"Baby Hope — Because We Care," reads the inscription on the tombstone placed at her grave yesterday.

The stone is also emblazoned with a large New York City detective's shield, to symbolize the promise that police will not give up the search for the killer who snuffed out little Baby Hope's 4-year-old life.

The girl was discovered inside the cooler in July 1991. It had been placed in front of a tree near an embankment on the Henry Hudson Parkway near Dyckman St.

"We'll hope and pray we can solve this case," said Detective Jerry Giorgio. "We'll never let go of this. I can't believe there isn't a playmate, a relative or someone out there who hasn't missed this child."

Out of the hundreds of tips and leads Giorgio and his colleagues in the 34th Precinct detective squad have pored over, one still haunts him.

A woman called him three days into the investigation and said she had seen a well-dressed Hispanic couple walking along the parkway with a cooler on a Sunday morning.

There was one followup call from the witness, who called herself Judy Brown, before she became scared of the cops.

"I know there are other details she has that can help this case," Giorgio said.

Giorgio, who recently solved a 13-year-old murder case, still holds out hope that he will find the killer of the little girl, who has become like family to him.

"We adopted this baby so she would not go to potter's field," Giorgio said. "She has a family."

Anyone with information should call detectives confidentially at (212) 927-0822 or (800) 577-TIPS.



**LIVES ON:** Masked clown of the Bronx prays for Baby Hope at St. Raymond's cemetery.

## Sanit commish up from ranks

John Doherty was named sanitation commissioner yesterday by Mayor Giuliani, ending a 34-year climb up the trash heap.

Doherty, who joined the Sanitation Department in 1960, began working as a street sweeper and hoisting heavy waste baskets into garbage trucks. He was first deputy commissioner in his promotion.

He is the first sanitation worker in decades to rise to be the department's $110,000-a-year commissioner.

Doherty, 56, replaces Emily Lloyd, who resigned last month to take a top spot at Columbia University. — Tim Ireland

GA293

X-RATED

Case 13-1799, Document 140, 02/09/2015, 1434253, Page296 of 299

FBI
Att: Homicide
135 Pinelawn Rd
Melville, NY. 11747

Pamco Printers NYC #489

Government
Exhibit

RS-6

08-CR-L55



CÉSAR E. CHÁVEZ

Untitled

Attention Homicide:

     I'm writing you to see if there is a reward for information and audio tapes leading to the arrest and conviction of Scott Mulligan, Christ Tarintino and others in the 1994 armored car robbery where a guard was shot dead and the death of one of the robbers named Louie who was also shot dead and found floating off Long Island. To tell me about if and how much the reward is, or just to get in contact with me please post info on www.craigsllst.com under missed connections.

Chucky

P.S. I was not involved in these crimes and I don't want a deal, I just want money! Further, Chris T. told me someone was wrongly convicted of the armored car robbery.

cc: FBI
    Nassuu County Homicide



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CNC/JMM

*610 Federal Plaza*
*Central Islip, New York 11722*

**March 24, 2014**

<u>By ECF & Federal Express</u>

Todd G. Scher, Esq.
Law Offices of Todd G. Scher, P.L
398 E. Dania Beach Boulevard #300
Dania Beach, FL  33004

> Re:   United States v. Christian Tarantino
> <u>Criminal Docket No. 08-655(JS)</u>

Dear Mr. Scher:

As we discussed by telephone last Friday, March 21, 2014, after a telephonic conference call with the Court, enclosed please find a Protective Order, signed by Judge Seybert on May 10, 2009, which was filed under seal, as well as documents bates-numbered 425 – 575, which the government provided to the defendant's prior counsel, David Ruhnke, Esq., on May 19, 2009.  Please bear in mind that the Protective Order remains in effect.

In addition, enclosed please find the following letters and orders that were filed under seal in the above-captioned case regarding materials that the defendant claimed were <u>Brady</u> materials:

(1) A November 29, 2010 letter from James R. Froccaro, Jr., Esq. to Judge Seybert, filed under seal;
(2) A December 7, 2010 letter from the government to Judge Seybert, filed under seal;
(3) A January 3, 2011 Sealed Order issued by Judge Seybert (Docket Entry No. 133);
(4) A January 19, 2011 Sealed Memorandum & Order issued by Judge Seybert (Docket Entry No. 143); and
(5) A February 14, 2011 letter from the government to James R. Froccaro, Jr., attaching two documents (although the letter was filed on ECF, the attachments were not).

If you have any other requests, please do not hesitate to contact me or AUSA James Miskiewicz.

Very truly yours,

LORETTA E. LYNCH
United States Attorney

By:   /s/ Carrie N. Capwell
Carrie N. Capwell
James M. Miskiewicz
Assistant U.S. Attorneys
(631)715-7836/7841

cc:    Clerk of the Court (JS) (via ECF)(without enclosures)