IN THE UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

# 13-1799-CR

_____

CHRISTIAN GEROLD TARANTINO,

Defendant/Appellant,

vs.

UNITED STATES OF AMERICA

Plaintiff/Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CENTRAL ISLIP)
_____

_____

APPELLANT'S  SUPPLEMENTAL APPENDIX
_____


TODD G. SCHER
FLORIDA BAR #0899641
LAW OFFICE OF TODD G. SCHER, P.L.
398 E. DANIA BEACH BLVD. #300
DANIA BEACH, FL 33004
TEL: 754-263-2349
FAX: 754-263-4147
COUNSEL FOR APPELLANT

# TABLE OF CONTENTS TO SUPPLEMENTAL APPENDIX

Jury Questionnaire                                           SA1

Criminal Information – Scott Mulligan                        SA43

Excerpt of *Curcio* Hearing                                 SA63

"Chucky" Letter                                             SA76

Letter from Gary Schoer re: Joseph Pistone                  SA77

Medical Records for Christian Tarantino                     SA80

5K.1 Letter re:  Peter Pistone                              SA99

Plea Hearing Transcript re: Joseph Pistone                  SA102

Criminal Information – Peter Pistone                        SA158

Plea Hearing Transcript re: Peter Pistone                   SA160

Excerpt of PSI for Christian Tarantino                      SA180

Excerpt of Grand Jury Testimony of Robert Schelhorn         SA182

SA1

Juror No. _____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**


     **– against –**                           **JURY QUESTIONNAIRE**
                                            **08-CR-655 (JS)**


**CHRISTIAN GEROLD TARANTINO,**

                **Defendant.**

-----------------------------------------------------------X

**Honorable Joanna Seybert**
**United States District Judge**
**United States District Court**
**Eastern District of New York**
**100 Federal Plaza**
**Central Islip, NY 11722**




<u>**THIS PAGE IS THE QUESTIONNAIRE COVER SHEET:**</u>
<u>**PLEASE TEAR OFF THIS PAGE**</u>
<u>**AND TAKE IT WITH YOU.**</u>

<u>**YOU WILL NEED THE NUMBER AT THE TOP OF THIS FORM**</u>
<u>**FOR THE JURY SELECTION.**</u>

SA2

Juror No. _____

## UNITED STATES v. CHRISTIAN GEROLD TARANTINO

## JUROR QUESTIONNAIRE

THE ANSWERS TO THE QUESTIONS ON THIS PAGE WILL BE DISCLOSED
ONLY TO THE APPROPRIATE COURT PERSONNEL
AS DIRECTED BY THE PRESIDING JUDGE

<u>Please print the following information:</u>

Name:

Home Address:

Home Phone:

Job & Department:

Business Address:

Business Phone (including extensions):

I hereby certify that the foregoing information, and all of the answers contained in this questionnaire, are true, correct, and complete to the best of my knowledge.

Date:   March __, 2011

SIGNATURE_____

SA3

Juror No. _____

## JUDGE'S PRELIMINARY INSTRUCTIONS

Upon your oath or affirmation, you must give true and complete answers to all questions. These questions are not meant to inquire unnecessarily about personal matters. Rather, these questions will help the court determine whether you can be fair and impartial in deciding this case, and will also provide information about you as a juror to help the parties select a jury. Part of the selection process depends on your ability and promise to follow the law as it is explained by the Judge. Thus, some of the questions include descriptions of legal principles and ask whether you can conscientiously follow them.

Please answer each question by placing a check next to the correct response or by providing the information requested. Please write your assigned juror number in the space provided at the top of <u>each</u> page, as indicated. Please answer all questions, and try to write as legibly as possible. If a question does not apply to you, fill in the space with an "N/A" for "not applicable." Do not leave any answer blank.

<u>The court instructs you not to discuss the questionnaire or your answers with your fellow jurors or anyone else</u>. It is very important that the answers be yours and yours alone. Remember, there are no "right" or "wrong" answers. Please answer as thoughtfully and candidly as possible.

Juror No. _____

## <u>SUMMARY OF THE CHARGES</u>

This case, <u>United States v. Christian Gerold Tarantino</u>, is a criminal case in which the defendant Christian Gerold Tarantino has been charged with federal crimes. Specifically, the indictment charges the defendant with participating in three murders in or affecting the Eastern District of New York in 1994 and 2003. Count One of the Indictment charges that on June 23, 1994, Tarantino, together with others, including a co-conspirator named Louis Dorval, handcuffed and disabled the driver and armed guard employed by Mid-Island Check Cashing Corporation, an armored car business engaged in interstate commerce, in violation of Title 18, United States Code, Section 33. It is alleged that in the course of attacking the armored car employees, Dorval shot and killed one of the guards, Julius Baumgardt.

Count Two of the Indictment charges Tarantino with the August 12, 1994 obstruction of justice murder of Dorval, in violation of Title 18, United States Code, Sections 1512 and 2. The Indictment alleges that Dorval was killed by Tarantino and others after the murder of Julius Baumgardt in order to prevent Dorval from cooperating with federal authorities who were, at the time, seeking to arrest Dorval on unrelated racketeering charges.

Counts Three and Four of the Indictment, respectively, charge Tarantino with conspiracy to commit, and with committing the obstruction of justice murder of Vincent Gargiulo, in violation of Title 18, United States Code, Sections 1512 and 2.

The indictment is not evidence. It merely contains formal accusations. The government has the burden of producing evidence sufficient to prove the defendant's guilt with

SA5

Juror No. _____

respect to each of the counts charged beyond a reasonable doubt.  The defendant has pleaded not guilty, and he is presumed innocent.

Juror No. \_\_\_\_\_

## QUESTIONNAIRE AND JURY SELECTION

As noted, the purpose of this questionnaire is to assist the court and the parties in selecting a jury of individuals that can be fair and impartial.  Experience has taught that in a case like this it is wise to take such steps as are deemed necessary to make certain that the jurors' right to privacy is respected.  The media and members of the public will be curious about the identity of the jurors, the witnesses, the lawyers and all other participants, and may seek to inquire into their personal affairs.  Anonymity will assure that the jury will not be exposed to such prying and to opinions, commentaries, and inquiries which might impair its ability to decide the case solely upon the evidence presented in court and upon the law as I instruct.  It is important to insure that the jury will in no way be influenced by the public, by the members of the media, and their articles and reports.  I wish to emphasize that I am taking these measures, which have been used in other cases in other federal courts, to protect your rights of privacy and to assist you in discharging your responsibility as jurors fairly and impartially.

To insure that your rights of privacy will be respected, only the first page of the attached questionnaire asks you to state your name and other identifying information.  That page will be detached from the questionnaire when you have completed it and will be locked securely in the office of the Clerk of the Court.  That page will not be available to anyone, including the presiding Judge.  Should special circumstances or other good cause require, and provided that the prior approval of the presiding Judge is obtained, that information may be made available to such person or persons as the presiding Judge deems necessary.  On the remaining pages of the questionnaire, you are instructed not to give names or addresses or any information that will permit anyone, even the presiding Judge, to identify you.

Juror No. _____

_____

**PART I:  QUESTIONS ABOUT YOUR BACKGROUND**
**(Questions 1 through 31)**

**Part I asks questions about you, your background**
**and very general questions about your family.**

1.      Do you have any difficulty reading or understanding English?

                    YES _____          NO _____

        If <u>yes</u>, please explain:_____

        _____


2.      Do you have any physical problem (for example, sight or hearing) or emotional problem
        that would interfere with your ability to serve?

                    YES _____          NO _____

        If <u>yes</u>, please describe:_____

        _____


3.      If you currently visit with a doctor or other medical professional on a regular basis, would
        those visits interfere with your ability to serve?

                    YES _____          NO _____


        If <u>yes</u>, please briefly describe, without identifying any doctor or location, how often these
        visits occur and why they would interfere with your ability to serve:

        _____

        _____

SA8

Juror No. _____

4.    Are you taking any medication that could affect your ability to serve as a juror?

YES _____          NO _____

If <u>yes</u>, please explain:_____

5.    What is your age: _____

6.    Are you:      Male _____          Female _____

7.    In what state were you born, or if outside the U.S., what country?

_____

8.    Where were you raised (state and county)?

_____

9.    Where were your parents born?

_____

SA9

Juror No. _____

10.     Are you: (Check all that apply)

               Married  _____

               Living with a partner/significant other _____

               Single  _____

               Divorced/separated  _____

               A widow/widower  _____

11.     How long have you lived at your present residence (do not identify the location)?

      _____

12.     What is your county of residence? _____

13.     Do you:

      ❑ Own your home?

      ❑ Rent your home?

      <u>Without mentioning names</u>, with whom do you live? (for example, "wife and children" or "parents" or "friends")

      _____

SA10

Juror No. _____

14.     Are you:  (Check any and all that apply; do not identify any place of employment)

                Employed full-time?                  _____

                Employed part-time?                  _____

                Working from home?                   _____

                A homemaker?                         _____

                Unemployed/laid off?                 _____

                Retired?                             _____

                Disabled and unable to work?         _____

                A student?                           _____

                If you are a student, list your level and area(s) of study (do not identify place of study):

                _____


15.     If you are employed by another person or entity, please answer the following:

        (a)     Without mentioning the name of your employer, what type of work do you do and what type of business is it?

                _____


        (b)     How long have you been employed in your present job?

                _____


        (c)     Do you supervise others in your job?

                        YES _____     NO _____

SA11

Juror No. _____

If <u>yes</u>, for how long have you been a supervisor?_____

If yes, how many people do you supervise in your position? _____

16.     If you are self-employed, answer the following:

(a)     Without mentioning the name of your business, what type of business is it?

_____

(b)     How long have you been self-employed? _____

17.     If retired or unemployed, what type of work had you been doing (do not mention any company name)?

_____

_____

18.     If you are married, live with someone, or have a life partner, please answer the following questions about that person's employment (without stating the name of their employer):

(a)     Is he/she employed?  _____

If so, in what type of work and for how long? _____

If your spouse or partner is retired or not employed, please so indicate and also describe the type of work he/she had been doing during his/her last period of employment.

_____

_____

SA12

Juror No. _____

19.     If you have children, please answer the following (do not list names of children):

(a)     Please fill out the following chart:

AGE          SEX          EDUCATION LEVEL

_____        ____        _____

_____        ____        _____

_____        ____        _____

(b)     Are any of your children employed?

YES _____      NO _____

(c)     List the occupation(s) of your children, without naming their employer(s).

_____

_____

20.     (a)     Have you or a family member ever had dealings other than routine activity (like paying taxes or receiving Social Security Benefits, Medicaid, Medicare, etc.) with a federal, state or city government or any of their agencies?

YES _____      NO _____

If yes, explain the type of non-routine dealings you have had with the government or a government agency.

_____

SA13

Juror No. _____

(b)    If yes, is there anything about these experiences of dealing with the government that would interfere with your ability to render a fair and impartial verdict in this case?

YES _____     NO _____

If yes, please explain:_____

_____

21.    (a)  How far did you go in school? (do not identify any school by name)

Elementary School    YES _____ NO _____
High School           YES _____ NO _____ LEVEL COMPLETED_____
College               YES _____ NO _____ LEVEL COMPLETED_____
Graduate              YES _____ NO _____
Post Graduate         YES _____ NO _____

(b)    If you are married or have a partner, state what level of education your spouse or significant other has completed and the area of study:

_____

22.    (a)    Were you ever in the military?

YES _____     NO _____

United States _____        Foreign country _____

(b)    What year did you enter the military?_____

(c)    In what branch did you serve?_____

(d)    What was the highest rank you achieved?_____

SA14

Juror No. _____

(e)     Any combat duty?

YES _____          NO _____

(f)     If you have had any military service, would anything about the above listed experience(s) prevent you from evaluating the evidence presented in this case in a fair and impartial manner?

YES _____          NO _____

If yes, please explain:_____

_____

23.     (a)     In the past ten years, have you or an immediate family member ever participated in any group that lobbies or takes public positions on social or legal issues (for example, the right to bear firearms/gun control, law enforcement, etc.)?

YES _____          NO _____

(b)     If yes, please describe the type of group (without specifically naming it) and the length of your involvement in the group.

_____

_____

(c)     If yes, would that experience prevent you from evaluating the evidence presented in this case in a fair and impartial manner?

YES _____          NO _____

If yes, please explain:_____

_____

Juror No. _____

24.  Have you, a family member, or close friend ever attended law school or been a lawyer?

YES _____     NO _____

(a)  If yes, have you, a family member or close friend ever practiced law in the area of criminal defense or prosecution?

YES _____     NO _____

(b)  If yes, was this person a criminal defense attorney or a prosecutor?

DEFENSE ATTORNEY_____     PROSECUTOR _____

25.  Do you have any opinions about lawyers that would make it difficult for you to render a fair and impartial verdict?

YES _____     NO _____

If yes, please explain:_____

_____

26.  Have you or any member of your family or close friends worked or applied for a position in the U.S. Attorney's Office, the District Attorney's Office, the New York City or Nassau or Suffolk County Police Departments, New York City Corrections Department or any other federal, state or city law enforcement agency?

YES _____     NO _____

If yes, was it you, a family member, or a close friend? _____

When and what agency? _____

_____

SA16

Juror No. _____

27.  Have you ever filed a complaint with the police against anyone?

YES _____      NO _____

If <u>yes</u>, please describe._____

_____

_____

If <u>yes</u>, were you satisfied with the way in which the police handled the complaint?

_____

_____

_____

28.  Do you, anyone in your household or any close friend or family member own any guns?

YES _____      NO _____

If <u>yes</u>, <u>without mentioning any names</u>, state your relationship to the gun owner(s), how many and what type, and reason for ownership:

_____

_____

29.  Do you or any member of your family belong to any associations or civic club such as the Rotary Club, Knights of Colombus, Veterans of Foreign Wars, National Rifle Association, American Legion, American Civil Liberties Union, or private country club?  If yes, please describe the type of group (without specifically naming it) and the length of your involvement in the group.

_____

_____

SA17

Juror No. _____

30.    List any newspapers and magazines that you subscribe to or read.  Indicate how frequently you read these periodicals (e.g., daily, often, occasionally, rarely).

_____

_____

31.    (a)    Have you ever been:

       (i)  a juror in a civil case?

              Yes _____              No _____

       (ii)  a grand juror?

              Yes _____              No _____

       (iii)  a juror in a criminal case?

              Yes _____              No _____

       (b)    Have you ever been a juror in a case which was dismissed because the jury was deadlocked (e.g., could not reach a verdict)?

              Yes _____              No _____

       (c)    If you have served on a jury, please provide the following information in the spaces provided below for each instance of your service.  If you have served more than four times, please continue this section on the next page.

              (1)    the approximate date(s) of your jury service;
              (2)    whether you served in state court or federal court;
              (3)    whether it was a grand jury or a trial jury;
              (4)    whether it was a criminal case or a civil case;
              (5)    what the general nature of the case was (for example, robbery, murder, contract, negligence, medical malpractice, etc.); and
              (6)    whether or not a verdict was reached.  **If so, do <u>not</u> state what the verdict was.**

SA18

Juror No. _____

First instance of jury service:

      (1)    Year _____
      (2)    State _____         Federal _____
      (3)    Grand jury _____    Trial Jury _____
      (4)    Criminal case _____   Civil case _____
      (5)    Nature of the case _____
      (6)    Verdict reached _____   Verdict not reached _____

Second instance of jury service:

      (1)    Year _____
      (2)    State _____         Federal _____
      (3)    Grand jury _____    Trial Jury _____
      (4)    Criminal case _____   Civil case _____
      (5)    Nature of the case _____
      (6)    Verdict reached _____   Verdict not reached _____

Third instance of jury service:

      (1)    Year _____
      (2)    State _____         Federal _____
      (3)    Grand jury _____    Trial Jury _____
      (4)    Criminal case _____   Civil case _____
      (5)    Nature of the case _____
      (6)    Verdict reached _____   Verdict not reached _____

Fourth instance of jury service:

      (1)    Year _____
      (2)    State _____         Federal _____
      (3)    Grand jury _____    Trial Jury _____
      (4)    Criminal case _____   Civil case _____
      (5)    Nature of the case _____
      (6)    Verdict reached _____   Verdict not reached _____

(d)    Is there anything about your prior jury service that: (1) would affect your ability to be a fair and impartial juror in this case; (2) would make you not want to serve again; or (3) affected your opinion of the jury system?

SA19

Juror No. _____

YES _____          NO _____

If <u>yes</u>, please explain. _____

_____

_____

Juror No. _____

### PART II: QUESTIONS ABOUT YOUR EXPERIENCES AND BELIEFS
**(Questions 32 through 52)**

**Part II asks questions about experiences you may have had and opinions you may have formed. Again, there are no "right" or "wrong" answers. Please be as thoughtful and candid as possible.**

32.   (a)   Have you, or has a family member or close friend, ever been a <u>witness to</u> or the <u>victim of</u> a crime?

YES (self) _____   YES (family/friend) _____   NO _____

If <u>yes</u>, please describe the circumstances surrounding the incident(s) and your relationship, if any, to the person(s) involved

_____

_____

_____

_____

_____

   (b)   Did you or your close friend or family member report that crime to the police or other law enforcement agency?

YES _____   NO _____

If <u>no</u>, please explain_____

_____

_____

Juror No. _____

(c)    Did law enforcement personnel respond to the report appropriately?

YES _____    NO _____

If <u>no</u>, please explain_____

_____

_____

(d)    Were you or your friend or family member called to testify in any legal proceedings arising out of the incident?

YES _____    NO _____

(e)    Is there anything about this experience which would affect your ability to evaluate the evidence in this case fairly and impartially?

YES _____    NO _____

If <u>yes</u>, please explain _____

_____

33.    (a)    Do you have any opinions or beliefs concerning law enforcement in general -- including, the New York City Police Department, the Nassau County Police Department, the Suffolk County Police Department, the Federal Bureau of Investigation ("FBI"), or the Department of Justice – that would affect your ability to evaluate the evidence in this case fairly and impartially?

YES _____    NO _____

If <u>yes</u>, please explain _____

_____

_____

Juror No. _____

(b)  Do you believe that any particular group does not receive fair treatment from law enforcement?

YES _____     NO _____

If <u>yes</u>, please explain _____

_____

_____

_____

_____

(c)  Can you put aside any such opinions or beliefs, as may have been described above, and evaluate, with an open mind and impartially, the evidence presented during the trial in this matter, in accordance with the Court's instructions?

YES _____     NO _____

If <u>no</u>, please explain _____

_____

_____

_____

34.  Have you, a family member or close friend ever had an experience with the police or other law enforcement officer that stands out in your mind as either very positive or very negative?

(a)  <u>Positive</u> Experiences:

YES (self) _____     YES (friend/family) _____     NO _____

If <u>yes</u>, please describe the circumstances surrounding the incident and your relationship to the individual(s) involved.

_____

Juror No. _____

(b)   <u>Negative</u> Experiences:

YES (self) _____    YES (friend/family) _____    NO _____

If <u>yes</u>, please describe the circumstances surrounding the incident and your relationship to the individual(s) involved.

_____

_____

(c)   Can you put aside any such experiences, as may have been described above, and evaluate the evidence presented during the trial in this matter, impartially and with and open mind, in accordance with the Court's instructions?

YES _____    NO _____

If <u>no</u>, please explain _____

_____

_____

35.   Have you, a close friend, or a member of your family ever filed a complaint against a member of a law enforcement agency?

YES (self) _____    YES (friend/family) _____    NO _____

If <u>yes</u>, please describe the circumstances surrounding the incident and your relationship to the individual(s) involved.

_____

_____

Can you put aside any such experiences, as may have been described above, and evaluate the evidence presented during the trial in this matter, impartially and with and open mind, in accordance with the Court's instructions?

YES _____    NO _____

SA24

Juror No. _____

If <u>no</u>, please explain _____

_____

_____

36.  Have you ever appeared or testified as a witness in any investigation or legal proceeding?

        YES _____      NO _____

If <u>yes</u>, what was the general nature of that investigation or proceeding, without naming it?

_____

_____

37.  (a)  If you have appeared as a witness and were cross-examined, is there anything about that experience which would affect your ability to serve as a juror in this case?

        YES _____      NO _____

    (b)  If <u>yes</u>, without listing the case by name, please explain:

_____

_____

38.  (a)  Are you or is anyone close to you, including family or friends, now under subpoena or likely to be under subpoena to testify in any criminal case?

        YES _____      NO _____

If <u>yes</u>, without listing any person or case by name, please explain: _____

_____

Juror No. _____

(b)    Have you ever been questioned or subpoenaed in any matter by the New York City Police, any state or local law enforcement agency, the Department of Justice or any United States investigative agency such as the Federal Bureau of Investigation?

YES _____         NO _____

If <u>yes</u>, do you feel that you were treated fairly in connection with this matter?

YES _____         NO _____

If <u>no</u>, please explain:_____

_____

(c)    Have you ever been involved or do you expect to become involved in any legal action or dispute with the United States or any agency, officer(s), or employee(s) of the United States, or have you had any financial interest in such a dispute?

YES _____         NO _____

If <u>yes</u>, without naming the dispute, please explain:_____

_____

_____

(d)    If you answered "yes" to (a), (b) or (c) above, is there anything about these facts that would make it difficult for you to sit as a fair and impartial juror in this case?

YES _____         NO _____

If <u>yes</u>, please explain:_____

_____

_____

39.    (a)    Have you or has a family member or close friend ever been involved in or been the target of a criminal investigation?

Juror No. \_\_\_\_\_

YES (self) \_\_\_\_     YES (family/friend) \_\_\_\_     NO \_\_\_\_

If <u>yes</u>, <u>without mentioning names</u>, please generally describe the circumstances surrounding the criminal investigation(s) and your relationship to the person(s) involved.

_____

_____

(b)     Have you or has a family member or close friend ever been arrested or charged with a crime?

YES (self) \_\_\_\_     YES (family/friend) \_\_\_\_     NO \_\_\_\_

If <u>yes</u>, <u>without mentioning names</u>, please describe the circumstances surrounding the arrest/charge, the result of the prosecution and your relationship to the person(s) involved.

_____

_____

_____

(c)     If you answered "yes" to (a) or (b) above, was the individual who was investigated or charged treated fairly by the criminal justice system?

YES _____          NO _____

If <u>no</u>, please explain: _____

_____

_____

SA27

Juror No. _____

(d)     Do you have, or have you ever had, a close friend or family member in prison?

YES _____          NO _____

If yes, without mentioning names, please explain:

_____

_____

(e)     Have you ever visited or toured a prison or jail facility?

YES _____          NO _____

If yes, without mentioning names, please explain the circumstances of your visit/tour:

_____

_____

(f)     If you answered "yes" to (a), (b), (d) or (e) above, is there anything about these facts that would affect your ability to sit as a fair and impartial juror in this case?

YES _____          NO _____

If yes, please explain _____

_____

40.     The Judge presiding over this case is the Honorable Joanna Seybert. Do you or does any relative or friend know or have any connection with Judge Seybert?

YES _____          NO _____

If yes, please explain:_____

_____

Juror No. _____

41.     This case is being prosecuted by the United States Attorney's Office for the Eastern
        District of New York.  The United States Attorney for this District is Loretta E. Lynch.
        Do you or does any relative or friend know or have any connection with Loretta E. Lynch
        or anyone associated with her office?

                        YES _____          NO _____

        If yes, please explain:_____

        _____


42.     (a)     Do you or does any relative or close friend know or have any connection with any
                of the following members of the prosecution, or their relatives or friends?

                        (i)     James M. Miskiewicz
                        (ii)    Carrie N. Capwell
                        (iii)   Sean C. Flynn

                        YES _____          NO _____

        If yes, please explain:_____

        _____


        (b)     Do you or does any relative or close friend know or have any connection to the
                following law enforcement officers or his relatives or friends?

                        Robert Schelhorn, Federal Bureau of Investigation
                        John Burns, Federal Bureau of Investigation


                        YES _____          NO _____

        If yes, please explain:_____

        _____

Juror No. _____

(c)     Do you or does any relative or close friend know or have any connection to the defendant Christian Gerold Tarantino, or any of his relatives or friends?

YES _____          NO _____

If <u>yes</u>, please explain:_____

_____

_____


(d)     Have you seen, heard or read anything about this defendant or about this case?

YES _____          NO _____


(e)     If <u>yes</u>, what have you seen, heard or read?

_____

_____


(f)     Have you formed an opinion as to the defendant, or about this case, based on anything that you have seen, heard or read?

YES _____          NO _____

If <u>yes</u>, what is that opinion?

_____

_____

Juror No. _____

(g)     Do you, or does any relative or close friend, know or have any connection with the following defense attorneys or any of their relatives or friends?

    (i)      James Froccaro
    (ii)     Michael Rosen
    (iii)    Diarmuid White

        YES _____        NO _____

If <u>yes</u>, please explain:_____

_____

_____

(h)     Is there anything in what you have seen, heard or read about the prosecutors, law enforcement personnel, the defendant or defense attorneys that would make it difficult for you to render a fair and impartial verdict in this case?

        YES _____        NO _____

If <u>yes</u>, please explain:_____

_____

_____

43.     (a)     Do you have any bias, sympathy, or prejudice toward law enforcement, prosecutors, or the United States Attorney's Office?

        YES _____        NO _____

If <u>yes</u>, please explain _____

_____

_____

Juror No. _____

(b)     Do you have any bias, sympathy, or prejudice toward the defendant Christian Gerold Tarantino?

YES _____     NO _____

If <u>yes</u>, please explain _____

_____

_____

44.     The defendant has been diagnosed with Parkinson's Disease.  Would the fact that the defendant has Parkinson's Disease cause you to have sympathy for him, or would his illness otherwise prevent you from rendering a fair and impartial verdict in this case?

YES _____     NO _____

If <u>yes</u>, please explain _____

_____

_____

45.     The defendant maintains an ownership interest in a number of fitness clubs on Long Island, which operate under the name "Synergy Fitness."  Do you or a member of your family maintain a membership at Synergy Fitness?

YES _____     NO _____

If <u>yes</u>, would that fact otherwise prevent you from rendering a fair and impartial verdict in this case?

YES _____     NO _____

If <u>yes</u>, please explain: _____

_____

_____

SA32

Juror No. _____

46.     The defendant is charged with three counts of murder and with conspiracy to commit murder.  Is there anything about the nature of these charges, in and of themselves, that would interfere with your ability to fairly decide this case?

YES _____     NO _____

If <u>yes</u>, please explain_____

_____

_____

47.     You may hear testimony that the defendant has previously spent time in prison.  Would that fact alone cause you to be biased against the defendant?

YES _____     NO _____

If <u>yes</u>, please explain _____

_____

_____

_____

48.     (a)     Do you have any religious, philosophical, moral or other belief(s) that might make you unable to render a "guilty" verdict for reasons unrelated to the law and the evidence or lack thereof?

YES _____     NO _____

If <u>yes</u>, please explain_____

_____

_____

_____

Juror No. _____

(b)     Do you have any religious, philosophical, moral or other belief(s) that might make you unable to render a "not guilty" verdict for reasons unrelated to the law and the evidence or lack thereof?

YES _____     NO _____

If yes, please explain_____

_____

_____

_____

(c)     Is there anything about your background, personal or religious beliefs that would prevent you from sitting in judgment of another person in a criminal trial?

YES _____     NO _____

If yes, please explain_____

_____

_____

49.     The oath you will take if you are selected as a juror is as follows: "I will fairly and impartially evaluate all the evidence in this case without fear or favor toward either the government or the defendant." Is there any reason why you will be unable to follow this oath?

YES _____     NO _____

If yes, please explain _____

_____

_____

Juror No. _____

50.  Is there any other matter which you should call to the court's attention which may have any bearing on your qualifications as a juror or which may affect your ability to render an impartial verdict based solely on the evidence, or lack thereof, and the court's instructions on the law?

YES _____     NO _____


If <u>yes</u>, please describe: _____

_____


51.  You may hear testimony from or about the people listed on <u>Attachment A</u> during the trial. Please turn to <u>Attachment A</u> at the end of this packet and circle the names of any person that you know or have any connection with.


52.  You may hear testimony about locations listed on <u>Attachment B</u> during the trial. Please turn to <u>Attachment B</u> at the end of this packet and circle the names of any locations that you know about, have any connection with, or have visited.

Juror No. \_\_\_\_\_

### PART III:  QUESTIONS  CONCERNING  IMPORTANT  LEGAL PRINCIPLES
**(Questions 53 through 65)**

**Part III explains some of the fundamental legal principles about which the court will give instructions during the trial.  If you believe you cannot follow these principles, you are duty bound to let the court know now.**

53.     (a)     The defendant is presumed innocent and cannot be convicted unless the jury, unanimously and based solely on the evidence in this case, decides his guilt has been proven beyond a reasonable doubt.  The burden of proving guilt rests entirely with the government.  The defendant has no burden of proof at all.

Do you agree with this rule of law?

YES _____          NO _____

Will you accept and apply this rule of law?

YES _____          NO _____

If <u>no</u>, please explain _____

_____

_____

(b)     Under the law, a defendant need not testify or offer any evidence on his behalf.  If a defendant does neither, the jury is not permitted to consider that fact in any way in deciding whether a defendant is guilty or not guilty.

Do you agree with this rule of law?

YES _____          NO _____

Will you accept and apply this rule of law?

YES _____          NO _____

Juror No. _____

If <u>no</u>, please explain _____

_____

_____

54.  You may hear that law enforcement officers secretly conducted visual, photographic and other surveillance during the investigation of this case.  These investigative techniques are lawful and you may properly consider the evidence obtained in this manner.  Do you have any feelings about the use of conducted secret visual surveillance that might affect your ability to consider such evidence fairly?

YES _____        NO _____

If <u>yes</u>, please explain _____

55.  You may hear that certain of the evidence offered against the defendant in this case consists of audio recordings allegedly of the defendant, which were made without the defendant's knowledge.  The use of these recordings in this case is lawful.  Do you have any feelings about the use of this evidence that might affect your ability to consider such evidence fairly?

YES _____        NO _____

If <u>yes</u>, please explain _____

56.  You may hear that law enforcement officers used a cooperating source to obtain some of the evidence at issue in this trial, including certain audio recordings.  The use of the cooperating source was lawful, and the use of the recordings in this case is lawful.  Do you have any feelings about the use of this evidence that might affect your ability to consider such evidence fairly?

YES _____        NO _____

If <u>yes</u>, please explain _____

Juror No. _____

57.     Some of the evidence in this trial may come from searches performed by law enforcement officers.  These searches were lawful, and you may consider any evidence obtained through these searches.  Do you have any feelings about searches conducted by law enforcement officers that would make it difficult for you to consider such evidence fairly?

            YES _____          NO _____


        If yes, please explain _____

        _____

58.     Several witnesses in this case will be law enforcement officers.

        (a)     Do you hold any beliefs or opinions that would affect your ability to evaluate the testimony of a law enforcement officer fairly and impartially.

                    YES _____          NO _____

        If yes, please explain _____

        _____

        _____


        (b)     A law enforcement witness's testimony is not to be given any more or less credence than any other witness's testimony simply because that witness is a law enforcement officer.

                Do you agree with this rule of law?

                    YES _____          NO _____

                Will you accept and apply this rule of law?

                    YES _____          NO _____

        If no, please explain _____

        _____

        _____

Juror No. _____

59.     Some government witnesses may testify that they have previously participated in serious
        crimes.   These witnesses, who may be referred to during trial as cooperating witnesses,
        may have lengthy criminal histories, may have pleaded guilty to crimes and may be
        testifying pursuant to agreements with the government in hopes that their own sentences
        will be reduced.  Use of these witnesses is lawful.

        (a)     Do you hold any beliefs or opinions that would affect your ability to evaluate such
                testimony from such witnesses fairly and impartially?

        _____

        _____

        _____

        _____

        (b)     Would you be able and willing to fairly and impartially assess the testimony of
                such a witness, in accordance with the Court's instructions?

                        YES _____        NO _____

        If no, please explain_____

        _____

        _____

        _____

        _____

Juror No. _____

(c)    It is the law that the testimony of a single witness, even a cooperating witness, can be sufficient to convict a defendant of a charged crime, if the jury finds that the testimony of that witness establishes proof beyond a reasonable doubt.

Do you have any opinion or belief about cooperating witnesses that would prevent you from applying that rule of law?

_____

_____

_____

_____

60.    Under the law, the facts are for the jury to determine and the law is for the judge to determine.  You are required to accept the law as the judge explains it to you even if you do not like the law or disagree with it, and you must determine the facts based solely upon the evidence, or lack thereof, presented at trial.

Would you have any difficulty following this rule of law?

YES _____        NO _____

If yes, please explain _____

_____

_____

_____

61.    I remind you that an indictment itself is not evidence.  It merely describes the charges made against the defendant.  It is an accusation.  It may not be considered by you as any evidence of the defendant's guilt.   Will you have any difficulty following this rule of law?

YES _____        NO _____

SA40

Juror No. _____

62.    This case may receive attention in the media.  I instruct you that you are not to read or listen to such media.  The media is not always accurate.  Under the law, you are to base your decision on the evidence presented at trial, not on what is reported in the media.  Will you have any difficulty accepting the proposition that the only evidence you should consider is the evidence received in this courtroom and that you are to avoid and ignore any statements made by the media?

YES _____     NO _____

63.    Under the law, the question of punishment (i.e., what will happen to the defendant if found guilty), if any, is for the Judge alone to decide.  The question of punishment, if any, must play no part in your decision as to whether the government has proven the defendant guilty beyond a reasonable doubt.

Will you have any difficulty following this rule?

YES _____     NO _____

If yes, please explain: _____

_____

_____

64.    Under the law, emotions such as sympathy, bias and prejudice must not enter into the deliberations of the jurors as to whether the guilt of the defendant has been proven beyond a reasonable doubt.

Will you have any difficulty following this rule?

YES _____     NO _____

If yes, please explain:_____

_____

65.    You, as jurors, must decide this case based solely on the evidence presented here within the four walls of the courtroom.  This means that during the trial you must not conduct any independent research about this case, the matters in the case, and the individuals

Juror No. _____

involved in the case.  In other words, you cannot consult dictionaries or reference materials, search the internet, websites, blogs, or use any other electronic tools to obtain information about this case or to help you decide the case.  You may not try to find out information from any source outside the confines of this courtroom.

Until you retire to deliberate, you may not discuss this case with anyone, not even your fellow jurors.  After you retire to deliberate, you may begin discussing the case with your fellow jurors, but only in the jury room and only when all of you are present.  You may not communicate with your fellow jurors about the case through any form of electronic technology.  You cannot discuss the case with anyone else until you have returned a verdict and the case is at an end.  Many of you use cell phones, BlackBerries, the internet or other tools of technology.  You also must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case.  This includes your family and friends.  You may not communicate with anyone about the case on your cell phone through e-mail, BlackBerry, iPhone, text messaging, or on Twitter, through any blog or website, through any internet chat room, or by way of any social networking websites, including Facebook, Myspace, LinkedIn, and YouTube.

 Will you have any difficulty following this instruction?

YES _____        NO _____

If yes, please explain:_____

_____

_____

Juror No. _____

## PART IV: YOUR SCHEDULE

66.     The court and the parties estimate that, after a jury is selected, this case will last approximately six to eight weeks.  The Court does not anticipate having trial on the following dates: March 31, April 1, April 12, April 13, April 14, April 15, May 25, May 26 and May 27.

Mere inconvenience or the usual financial hardships of jury service will be insufficient to excuse a prospective juror.  Is there anything about the length of the trial that would make it such a serious hardship that you would need to bring it to the attention of the court?

YES _____     NO _____

If <u>yes</u>, briefly explain the hardship.

_____

_____

_____

\*   \*   \*   \*

**NOTE**:     Before returning your questionnaire to the court personnel, please review your answers to be sure that you have addressed all of the questions including, those on <u>Attachment A</u> and <u>Attachment B</u>.  Be sure to take the cover page of this questionnaire with you when you leave today.  It contains your juror number and the instructions you will need to make your required phone call to the court on March __, 2011.  <u>Thank you</u>.

JMM:SCF/CNC
F.#2005R00138

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

SCOTT MULLIGAN,

        Defendant.

- - - - - - - - - - - - - - - - X

**MJ-11-1252**

**FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF ARREST
WARRANT

(18 U.S.C. §§ 33, 34
and 2)

EASTERN DISTRICT OF NEW YORK, SS:

        ROBERT F. SCHELHORN, Jr. being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

        Upon information and belief, there is probable cause to believe that, on or about June 23, 1994, within the Eastern District of New York, the defendant SCOTT MULLIGAN, together with others, willfully and with a reckless disregard for the safety of human life, disabled and incapacitated Julius Baumgardt and Walter Tully, who were drivers and persons employed in connection with the operation of a motor vehicle used, operated and employed in interstate commerce, to wit: a Mid-Island armored van, and lessened the ability of such persons to perform their duties, which offense resulted in the death of Julius Baumgardt.

        (Title 18, United States Code, Sections 33, 34 and 2).

The source of Your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with the FBI for approximately 16 years. Since late 1999, I have been the lead agent assigned to the investigation of the 1994 murder of Baumgardt, and two subsequent and related murders occurring in 1994 and 2003, as set forth more fully below. The information contained in this Complaint comes from first-hand knowledge, my discussions with witnesses involved in the investigation, my discussions with other law enforcement agents and officers, my review of reports prepared by other law enforcement officers, my review of other evidence, including documents, photographs and recordings related to this investigation, and my training and experience.

## A.    The Murder of Julius Baumgardt

2. Mid-Island Check-Cashing Corporation ("Mid-Island") was a check-cashing business located in Massapequa, New York. Mid-Island owned and operated armored vans that served as mobile check-cashing outlets for the employees of Mid-Island's

---

[1]    Because the purpose of this Complaint is to establish only probable cause to arrest, I have not set forth a description of all the facts and circumstances of which I am aware. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

customers, which included businesses located on Long Island, New York and in New Jersey. Mid-Island's armored vans were "motor vehicles" as defined in Title 18, United States Code, Section 31(a)(6). In June 1994, Volt Information Sciences, Inc. ("Volt") was a customer of Mid-Island, and was located in Syosset, New York.

3.    Julius Baumgardt ("Baumgardt") and Walter Tully ("Tully"), were persons employed by Mid-Island who jointly operated a Mid-Island armored van. On or about June 23, 1994, Baumgardt and Tully were assigned to deliver United States currency to Volt. As Baumgardt and Tully approached the Volt premises, the defendant SCOTT MULLIGAN ("MULLIGAN"), Christian Tarantino ("Tarantino") and Louis Dorval ("Dorval") approached Baumgardt and Tully, brandished firearms and ordered Baumgardt and Tully to lay on the ground. As Tully lay face-down and handcuffed, Dorval shot and killed Baumgardt. MULLIGAN and his accomplices then grabbed two satchels carried by Baumgardt, which contained the United States currency.

4.    Numerous individuals both inside and outside the Volt building witnessed the robbery and murder of Baumgardt. Two such eyewitnesses, John Does 1 and 2,[2] were standing outside the building - a few feet from Baumgardt and Tully - when the crime

---

[2]    I am aware of the identities of all the individuals referenced by aliases in this Affidavit.

3

occurred. John Does 1 and 2 have previously testified[3] that they saw two assailants on June 23, 1994. According to John Does 1 and 2, one of those individuals, subsequently identified during the course of the investigation as Dorval, was wearing a dark business suit, a mustache and sunglasses, and was carrying a handgun. The second individual was wearing a rubber mask that covered his entire head. John Doe 1 described this mask as resembling the face of a pig. John Does 1 and 2 testified that this second individual was carrying what both described as a black, pump action, pistol grip shotgun that, as set forth below, was purchased on behalf of Tarantino three days earlier. John Doe 2 further described one of the assailants as a large individual, approximately six-foot-one-inch in height, with a "heavy build".[4]

     5. Jane Does 1 and 2 were employees of Volt, who viewed the events from inside the building through ground-floor

_____

[3] On May 23, 2011, after a six-week jury trial conducted before the Honorable Joanna Seybert, Tarantino was convicted of participating in the June 23, 1994 murder of Julius Baumgardt, in violation of 18 U.S.C. §§ 33 and 34, and the August 1994 obstruction of justice murder of Dorval, in violation of 18 U.S.C. § 1512. See United States v. Christian Tarantino, 08 CR 655 (JS). John Does 1 and 2, as well as John Doe 5 and Jane Does 1, 2 and 3, referenced infra, testified during that trial.

[4] Your deponent has reviewed surveillance photographs taken of MULLIGAN in the summer of 1994. In those photographs, MULLIGAN looks as if he could have weighed between 210-240 pounds during that period. Additionally, biographical data contained in MULLIGAN's criminal history report indicates that he is six-foot-one-inch tall.

4

windows looking out onto the building's parking lot. According to Jane Does 1 and 2, there were three assailants who ambushed Baumgardt and Tully that morning. At least two of those individuals drove to the area in a red SUV, which was located shortly after the murder and identified as a Chevy Blazer (the "Blazer"). Both Jane Does 1 and 2 identified two of the assailants as wearing rubber "pig masks." According to Jane Does 1 and 2, one of these individuals was carrying a shotgun during the robbery.

6.     Moments after Dorval shot Baumgardt, the assailants fled in the Blazer, and then abandoned the SUV only a few hundred yards from where Baumgardt was killed. The assailants then sped away in a sedan, as described below. Police photographs of the Blazer taken soon after the murder show that its windows were left open and the vehicle was not properly aligned within the parking space. The Blazer bore a Florida license plate, with number PCX-42D. That number matched all but one digit of the six-digit identifier Jane Doe 1 relayed to law enforcement in a 911 call made moments after the robbery and murder of Baumgardt.[5]

7.     Subsequent investigation established that the Blazer had been stolen from a car dealership in Hicksville, New York, on or about January 28, 1994. The license plate belonged

---

[5]     In her 911 call to police, Jane Doe 1 identified the Blazer's license plate as a Florida plate, number PCX420.

5

to a different vehicle that was registered to an elderly Florida woman, who died 11 days prior to the Baumgardt murder. The Blazer was processed by Nassau County Police Department ("NCPD") detectives in the Scientific Investigations Bureau. The detectives noted that the Blazer appeared to have been thoroughly cleaned. Nevertheless, shortly after the murder, a crime scene examiner recovered both human and animal hairs from the seats and floor of the Blazer.

8. After abandoning the Blazer, Baumgardt's killers entered a cream/metallic colored sedan and fled out of the parking lot in front of the Volt building onto Jericho Turnpike. Two eyewitnesses reported almost being struck by this second getaway car as it fled the Volt office complex and abandoned Chevy Blazer. According to Jane Doe 3, the individual driving the cream/metallic sedan appeared to be a heavier-set individual with his hair pulled back into a pony tail. I have reviewed police surveillance photos taken of MULLIGAN and others in the weeks after the Baumgardt murder. In those photos, MULLIGAN's hair resembles the description given by Jane Doe 3. Specifically, MULLIGAN wore his hair pulled back in a pony tail.

## B. **The Storage Unit**

9. In the weeks before the Baumgardt murder, NCPD detectives investigating an auto-theft ring conducted surveillance at a self-storage business in Farmingdale, New York. Tarantino, MULLIGAN and others were subjects of that

6

investigation.  On June 20, 1994, Nassau County Police Department ("NCPD") detective Jack Kennedy, while at the self-storage business, observed an associate of MULLIGAN and Tarantino's, Carl Vahldieck, use a driver's license of another MULLIGAN and Tarantino acquaintance, John Doe 3, to rent storage unit B-54.

      10.  On the morning of June 24, 1994, the day after Baumgardt's murder, Detective Kennedy and his partner Detective Raymond Gene obtained a search warrant for storage unit B-54. After receiving a call from the manager of the storage facility advising that an individual was at the B-54 unit, Gene immediately drove to the storage facility as Kennedy waited for the warrant to be signed by a New York Supreme Court Justice.  As Gene arrived at the business, he saw MULLIGAN walk away from unit B-54, enter a white Lexus vehicle and drive away.  Kennedy arrived shortly after in time to see MULLIGAN driving out of the storage unit complex.  At the time, Detective Kennedy was very familiar with the MULLIGAN family through his work as a law enforcement officer in the Merrick/Bellmore area of Long Island. Detective Kennedy had served as a pall bearer at the funeral of MULLIGAN's brother, and was personally familiar with the defendant.  Further, Detective Kennedy noted the license plate of MULLIGAN's vehicle, which subsequently came back as being registered to MULLIGAN's mother.

      11.  Upon executing the search warrant for unit B-54 a few minutes later, detectives Gene and Kennedy found a stolen

7

automobile and a canvas bag containing a Model 19, 9 mm Glock
pistol (serial # APX041US), a Mossberg, Model 88 12-gauge shotgun
with a pistol grip (serial # MV51077D) (the "Mossberg Shotgun"),
police radio scanners and walkie talkies. Both John Does 1 and 2
have identified the Mossberg Shotgun found in the B-54 storage
unit as being similar to the one they observed during the June
23, 1994 robbery and murder of Baumgardt. A firearms trace
conducted by the Bureau of Alcohol, Tobacco and Firearms ("ATF")
revealed that the Mossberg Shotgun was purchased on June 20, 1994
at a sporting goods store in Merrick, New York, by John Doe 4.
ATF records further revealed that the Glock pistol (serial #
APX041US) seized from the storage unit was purchased by Dorval in
Florida on February 28, 1994 - along with two other handguns -
four months before Baumgardt's murder. John Doe 4 has testified
under oath that he purchased the Mossberg Shotgun at the request
of Vahldieck, with instructions that the weapon was needed by
Tarantino.

     12.  According to a Confidential Witness ("CW-1"), who
was a close partner and criminal associate of both MULLIGAN and
Tarantino, in the days following the Baumgardt murder, NCPD
detectives questioned several young male individuals, including
Vahldieck and John Does 3 and 4, about their connection to the B-
54 storage unit and the weapons found inside it. CW-1[6/] reported

---

[6/]    Following initial meetings with Your deponent and others in
2007, CW-1 stated that he received information that Tarantino

this information to MULLIGAN, who expressed concern that John Doe 4 was cooperating with authorities. According to CW-1, MULLIGAN then instructed CW-1 to take Vahldieck and John Does 3 and 4 to a Long Island-based attorney, whose identity is known, who was familiar with MULLIGAN and Tarantino. The purpose of taking these individuals to the attorney was to obtain written (and false) statements from them that would tend to exculpate MULLIGAN or Tarantino concerning their connection to storage unit B-54 and the purchase of the Mossberg Shotgun.

13. On or about July 4, 1994, one of the members of MULLIGAN and Tarantino's circle of associates, Gus Kritikos, was involved in a motorcycle accident on Long Island, which left Kritikos in vegetative state. According to CW-1, following that accident, MULLIGAN stated to CW-1 and others that, should they be questioned about the purchase of the Mossberg Shotgun found in the storage unit, they should indicate that the shotgun had been

---

and/or others knew that he had met with federal law enforcement agents. Subsequently, CW-1 stated that he was unwilling to testify out of fear of retaliation, and would, if subpoenaed, claim that his earlier statements were coerced. More recently, CW-1 has stated that he is prepared to testify in open court, and that the information he provided Your deponent beginning in 2007, as summarized herein, is true and accurate. The information provided by CW-1 as set forth herein has been corroborated by numerous sources and witnesses. Accordingly, I deem CW-1 to be reliable.

purchased at the direction of Kritikos - not Tarantino - since Kritikos was incapacitated.[2]

## C. MULLIGAN's Expressed Concern that His DNA Would Be Recovered from the Blazer, Which was Abandoned at the Scene of the Baumgardt Murder

14. On July 13, 2000, grand jury subpoenas directed MULLIGAN, Tarantino and others to provide buccal swabs, hair samples, palm prints and finger prints in an effort to link them to forensic evidence retrieved from the Blazer after the armored car robbery and murder of Baumgardt. MULLIGAN's hair and buccal swab were taken on July 26, 2000 at the NCPD Headquarters by NCPD Homicide Squad detectives working in conjunction with Your deponent on the Baumgardt and Dorval murder investigations. Sometime thereafter, during the summer of 2000, MULLIGAN called CW-1 and requested that CW-1 immediately come to his house in Bellmore, New York to speak with him. In a statement CW-1 provided to investigators in 2007, CW-1 indicated that during their 2000 conversation, MULLIGAN appeared visibly nervous about the taking of his DNA. According to CW-1, MULLIGAN stated that Tarantino speculated that the request for DNA was in connection with an unrelated federal narcotics and money laundering

---

[2]    Nothwithstanding evidence to the contrary, including the trial testimony of John Doe 4, who purchased the Mossberg Shotgun at Vahldieck's direction, that it was needed by Tarantino, Vahldieck has maintained as late as January 2010 that the Mossbery Shotgun was intended for Kritikos.

10

investigation of which MULLIGAN and Tarantino were aware.[8/]

However, according to CW-1, MULLIGAN was convinced that the DNA was related to another unspecified matter.

　　　　　15.　In or about September 2000, MULLIGAN attended a wedding in Great Neck, New York, which was also attended by a Cooperating Witness ("CW-2"). CW-2 is a cooperating defendant who pled guilty to Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371, and Conspiracy to Collect Unlawful Debts - Gambling, in violation of 18 U.S.C. § 1956(h). CW-2 entered his pleas pursuant to a cooperation agreement with the United States Attorney's Office for the Eastern District of New York. CW-2 has consistently been deemed reliable by other handling agents. At the wedding, MULLIGAN spoke to CW-2, who was known as an individual with a scientific background with experience in defending against DNA evidence in criminal matters. MULLIGAN indicated to CW-2, in sum and substance, that he was concerned because federal authorities had recently taken a DNA sample from him in an effort to link his DNA to hair found at the scene of a crime. According to CW-2, MULLIGAN mentioned that his hair might have been discovered in a "hat" or a "mask" that had been found near the scene of a robbery. According to CW-2,

_____

[8/]　　In or about April 2001, MULLIGAN was one of 25 defendants indicted on RICO narcotics and money laundering charges in the Eastern District of New York. He pled guilty to conspiracy to distribute marijuana and was sentenced to 37 months in prison, in November 2002. He surrendered to Bureau of Prisons authorities on January 10, 2003.

11

MULLIGAN described the robbery as an "armored something," and MULLIGAN wanted to know what his options were. When CW-2 specifically asked whether the hair found was MULLIGAN's, MULLIGAN responded that it was.

D. **MULLIGAN's Admission to CW-1**

16. CW-1 advised that MULLIGAN and Tarantino had learned, from unknown sources, that eyewitnesses at the Baumgardt murder site described to police that one of the assailants was heavy, and six-foot-one to six-foot-three in height. Although this was an approximation, rather than an exact description, CW-1 stated that within MULLIGAN and Tarantino's crew of criminal associates, only two individuals approximated that description: MULLIGAN and John Goetz (hereinafter "Goetz").[2]

17. Goetz was a friend and criminal associate of MULLIGAN and Tarantino, and an acquaintance of CW-1. In or about August 2000, Goetz was arrested by the U.S. Drug Enforcement Administration and charged with conspiring to distribute the "date-rape drug," known as GHB. In or about May 2001, after being released on bail, Goetz was found dead inside his New York City apartment as a result of natural causes. Sometime after Goetz's death, CW-1 and MULLIGAN had dinner together at a restaurant in Massapequa, New York. During the course of the

[2] Biographical data taken from a 2000 criminal history report for John Goetz indicates that Goetz was six-foot-two and 210 pounds in that year.

12

evening, CW-1 stated that he missed Goetz. MULLIGAN responded, in sum and substance, that "some good" had come from Goetz's death because Goetz had now become MULLIGAN's "cover story." Given MULLIGAN's prior direction to CW-1 and others to blame Kritikos for the purchase of the Mossberg Shotgun, CW-1 understood MULLIGAN to be stating that, in the event of an arrest for the Baumgardt murder, MULLIGAN would defend himself by using the deceased Goetz as fitting the description of the larger individual described by eyewitnesses at the Baumgardt murder scene.

**E.    Law Enforcement's Contact with MULLIGAN's friend and Criminal Associate Vincent Gargiulo**

18.    In May 2003, Your deponent received a letter, addressed to the Long Island Resident Agency of the FBI, which read in part:

> I'm writing you to see if there is a reward
> for information and audiotapes leading to the
> arrest and conviction of Scott Mulligan
> Christ [sic] Tarantino and others in the 1994
> armored car robbery where a guard was shot
> dead and the death of one of the robbers
> named Louie who was also shot dead and found
> floating off Long Island.

19.    The author of the letter used the pseudonym "Chucky" and claimed that he was not involved in the crimes and therefore did not "want a deal, I just want money." "Chucky" invited the FBI to contact him through the website craigslist.com.

13

20. On May 29, 2003, Your deponent, and another agent met "Chucky," who was in fact Vincent Gargiulo, a long time friend and former criminal associate of Tarantino and MULLIGAN's. Gargiulo reported that, several years earlier, he, Tarantino and MULLIGAN became partners in a Manhattan health club. Gargiulo had suffered from emotional and substance-abuse problems and was hospitalized for a time after the club, named Body Sculpt, opened. During his hospitalization, Gargiulo lost control of Body Sculpt's operation. When he returned from his hospitalization, Gargiulo discovered that Body Sculpt was in arrears regarding payments to its landlord and various creditors.

21. Gargiulo claimed that Tarantino and MULLIGAN sold Body Sculpt's equipment without consulting with him and that they kept the proceeds of those sales rather than pay the gym's creditors. Consequently, Gargiulo believed that Tarantino and MULLIGAN cheated him, and offered to provide the FBI, in exchange for money, with an audio tape that would tend to prove that MULLIGAN and Tarantino were, among other things, responsible for the 1994 murder of Baumgardt. Gargiulo further advised, in sum and substance, that Tarantino and MULLIGAN knew of the existence of the audio tape.

22. On the morning of August 18, 2003, Gargiulo was shot and killed near the corner of West 30th Street and Broadway in Manhattan by an individual named Justin Bressman. Bressman was an employee of Tarantino's at the time of the murder.

14

23.   On or about April 6, 2004, the New York City
Police Department received an anonymous mailing containing a
micro-cassette audiotape with the recorded voices of Tarantino
and Gargiulo.   Based on various references, including the extent
of Tarantino's wife's pregnancy with their first child and a
reference that it had been two months since the FBI took his DNA
exemplar, the tape was made in or about September 2000 inside
Tarantino's Manhattan apartment and a nearby hallway.   This would
also place the making of the tape at or about the same time that
MULLIGAN expressed to CW-1 and CW-2 concerns about the taking of
his DNA exemplars.

24.   On the audio tape, which has been subjected to
forensic analysis by the FBI, deemed to have been an original and
unaltered or edited recording, and admitted into evidence as
authentic pursuant to the Federal Rules of Evidence at the
Tarantino trial earlier this year, Tarantino admits his role in
the Baumgardt, as well as Dorval murders.   Specifically,
Tarantino recounts to Gargiulo how during the armored car robbery
that left Baumgardt dead, he and his accomplices drove to the
robbery in a "red stolen vehicle," and that they subsequently
"changed tails" after the robbery and murder and fled in a
different vehicle.

25.   Tarantino further stated to Gargiulo on the
recording that the government "had" the vehicle that he and his
accomplices abandoned at the scene, and that although he and

15

others had "cleaned the car for a couple of hours" before the robbery, Tarantino was concerned that law enforcement had recently taken his DNA sample for analysis - going so far as to state that he thought his sample would match, or "come back" to DNA found in the getaway vehicle. In discussing his concerns with Gargiulo, Tarantino also stated that he had discussed the matter with MULLIGAN and, in sum and substance, had assured MULLIGAN that prosecution for the Baumgardt murder would be impossible so long as both men refused to cooperate with law enforcement authorities. Tarantino reported that he and MULLIGAN were fairly confident that the taking of DNA was meant to scare one of them into doing something "stupid," such as cooperating with federal authorities. Tarantino reported that while, "I don't think SCOTT is as strong as, say, a lot of other guys," Tarantino believed MULLIGAN was "smart" and would calculate that even with cooperation in the Baumgardt murder investigation, he would inevitably face a lengthy prison sentence. Later in the conversation, Tarantino (designated "CT"), and Gargiulo (designated "VG"), are overheard stating the following:

> VG: That's a good thing. All you have to worry about is you and SCOTT.
>
> CT: Yeah.
>
> VG: SCOTT understands that, right?
>
> CT: Yeah, [unintelligible or "UI"].
>
> VG: I don't know about that.

16

CT: He is, yeah.

VG: Well, that's a fuckin' good thing. So you really -- you really should just drop it. Don't talk about it with anybody.

          \*     \*     \*     \*     \*

VG: You got to really beat that into SCOTT'S head.

CT: Yeah, no. He's listening . . . .

26.    Nevertheless, Tarantino and Gargiulo go on in the recording to discuss how the recent taking of MULLIGAN's DNA sample in connection with the Baumgardt murder had made MULLIGAN nervous, and had even prompted MULLIGAN to go "on the lam" for a period of time:

CT: [Tarantino's lawyer] said, well [UI]. Here's the deal. He said, if you don't give it to them [a DNA sample], the U.S. Attorney is going to call up your fucking parole officer, he's going to call DAN PERRONE. They're going to have you violated immediately. And just so you know, I've been checking it out. He goes, here's the deal. He goes, they can get a fuckin' court order, no fuckin' problem; and they will, okay, CHRIS? Before you get -- and they will. He goes, so if you don't like giving it to them, you're going to be automatically violated because if you give it to them, you're going to get out. Get out. How the fuck is that happening, you know what I mean. I'm like, it's coming back. I'm thinking, what does it take, ten days? Supposedly it takes two to three months.

VG: How long's it been?

CT: Two months and change.

VG: Oh, shit.

CT: Yeah.

VG: Now, it makes more sense that SCOTT'S doing everything. I was going to tell you how long ago SCOTT running [UI] . . . .

      *    *    *    *    *

VG: Umm, you know what there, I think – just so you know, it's all over Bellmore, that shit SCOTT'S doing.

CT: Yeah.

VG: It comes back to me. I get a call from BOB, who is in a dirt bag bar; and he found out. I go, what the fuck you talking about, SCOTT'S not, you know, on the – you know, basically he's on the lam. SCOTT'S not on the lam. It is the stupidest thing I ever [UI]. He was on [UI].

CT: Yeah.

VG: Turns out, he's right . . . .

    27. Later in the conversation, however, Tarantino assured Gargiulo that MULLIGAN was "alright now because we sat around and kicked it around." Tarantino and Gargiulo's statements in September 2000 about MULLIGAN's nervousness with respect to his DNA being taken by law enforcement are consistent with the information provided by CW-1 and CW-2 regarding their respective conversations with MULLIGAN during the summer of 2000, discussed more fully above, during which MULLIGAN expressed that same trepidation to them.

**F. MULLIGAN'S mtDNA Matches that of a Hair Extracted from the Blazer**

    28. In November 2011, FBI laboratory analysis reported that MULLIGAN's mitochondrial DNA ("mtDNA") was the same as mtDNA

18

extracted from a Caucasian hair found in the Blazer immediately following the Baumgardt murder. The FBI's analysis compared the frequency of the mtDNA sequence displayed by the Caucasian hair sample and MULLIGAN's known exemplar to the general population. The analysis concluded that the mtDNA sequence in the Caucasian hair sample and MULLIGAN's appeared in only 0.17% of the Caucasian population.[10/] Two other hairs found in the Blazer after the Baumgardt murder have also been matched to the same mtDNA found in blood and saliva samples obtained from Dorval and Tarantino, respectively.

WHEREFORE, Your deponent respectfully requests that an arrest warrant issue for the defendant SCOTT MULLIGAN so that he can be dealt with according to law.

---

[10/] The mtDNA analysis results do not provide a unique identifier because mtDNA is inherited from one's mother, usually with no change in mtDNA from mother to offspring. Therefore, MULLIGAN's mother, siblings and other extended family members on his mother's side will, absent mutations, have the same mtDNA match to the Caucasian hair sample obtained from the Blazer. More definitive nuclear DNA analysis would have required the recovery of blood or tissue, in addition to hairs, from the Blazer and, thus, is not available.

19

SA62

WHEREFORE, Your deponent further respectfully requests that this Complaint and Affidavit, as well as the arrest warrant, be filed under seal until such time as the defendant is arrested.

ROBERT F. SCHELHORN, Jr.
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of December, 2011

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

20

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                :
UNITED STATES OF AMERICA
                                        08-CR-00655

                                        TRANSCRIPT OF PROCEEDINGS

        -against-              :
                                        United States Courthouse
                                        Central Islip, New York

CHRISTIAN TARANTINO,
                                        March 15, 2011
        Defendant.           :  10:30 a.m.

- - - - - - - - - - - - - - - X

            BEFORE THE HONORABLE JOANNA SEYBERT
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          LORETTA E. LYNCH
                             United States Attorney
                             100 Federal Plaza
                             Central Islip, New York 11722
                             BY:  CARRIE CAPWELL
                                  JAMES MISKIEWICZ
                             Assistant United States Attorneys


For the Defendant:           JAMES FROCCARO, ESQ.
                             MICHAEL ROSEN, ESQ.


Also present as advisor:  EDWARD JENKS, ESQ.



Court Reporter:              Perry Auerbach
                             100 Federal Plaza
                             Central Islip, New York 11722
                             (631) 712-6103


        Proceedings recorded by mechanical stenography.
            Transcript produced by computer.

6

1    Mr. Tarantino understands what the potential conflict may

2    be if you continue with you simultaneously representing an

3    individual who, according to the confidential source at

4    one point back in 1994, '95 indicated that the

5    confidential source was the actual shooter --

6             MR. FROCCARO:  No, not the source was the

7    shooter.

8             THE COURT:  The confidential source that

9    Mr. Salvatore Katia was the shooter and that Dominico --

10            MR. FROCCARO:  The father.

11            THE COURT:  Of Salvatore Katia bragged about it

12   at one point, and the motivation for the killing is

13   another important consideration.

14            So I want Mr. Tarantino to be perfectly clear of

15   any mixed, if you will, loyalties with respect to

16   representation of the Katias.

17            MR. FROCCARO:  I understand.

18            THE COURT:  All right.  So Mr. Jenks, if you

19   would take the time and discuss this with Mr. Tarantino

20   and then you can go into any additional Curcio inquiries

21   that may be inquired.  You've met Mr. Tarantino.

22            MR. JENKS:  I've just been introduced to him

23   now.

24            THE COURT:  All right.  About a half our or so?

25            MR. ROSEN:  Judge, would it be a time saver to

7

1  take up some housekeeping rules with your Honor.

2          THE COURT:  I think that the phrase housekeeping

3  rules.

4          MR. ROSEN:  All right.  I won't use it again.

5          THE COURT:  The other phrase I don't like is

6  honestly.

7          MR. FROCCARO:  I never said that again, I don't

8  think, Judge, I learned that the first time.  And I'll

9  never say again I have one thing to say.

10          MR. ROSEN:  How about ground rules?

11          THE COURT:  Whatever.  You want to call it

12  housekeeping let's call it housekeeping.

13          MR. ROSEN:  They can go ahead, I don't want to

14  delay --

15          THE COURT:  All right.  Do you want to bring

16  Mr. Tarantino -- are you waiving Mr. Tarantino's

17  appearance for purposes of this additional what would you

18  call it?

19          MR. ROSEN:  I'm afraid to call it anything.

20  Whatever it is, I waive it.

21          THE COURT:  All right.

22          (Whereupon the defendant leaves the courtroom

23  with Mr. Jenks.)

24          MR. ROSEN:  Judge Seybert, you had asked a while

25  back about certain religious days or certain holidays

8

1    coming up next month in April, and I learned and have sort
2    of confirmed, yes, as my calendar indicates, that Passover
3    begins at sundown on Monday, April 18th, the first two
4    days of Passover which I believe are the most observed or
5    most sacred or some may say all days are, but
6    traditionally what I've been led to understand is that the
7    first two days, the 19th and 20th are the first two days
8    of Passover, which are the most observed. And of course
9    at the end of that week, it was told that we don't work on
10   that Friday the 22nd, but in any event, it's Good Friday,
11   and then at the very end of the week or you may want to
12   say it's the beginning of the next week, Sunday the 24th
13   is Easter.

14        Now, I've also been told and I did some
15   inquiries, that the schools in Nassau and Suffolk County I
16   believe are closed and again that's subject to I guess
17   case agent Schelhorn verifying. Schools are closed that
18   week.

19        THE COURT: I'm not going to pick any elementary
20   people to serve on the jury. No students. All right? So
21   they're closed.

22        MR. ROSEN: No, I understand that. No, I'm
23   saying parents who have children that normally would be in
24   school if the schools are closed down --

25        THE COURT: It may be a problem, we'll have to

9

1   see.

2           MR. ROSEN:  I just wanted to let your Honor know

3   what my religious research has turned up.  And that's what

4   I have to say.

5           THE COURT:  Okay.  Anything else?  The

6   questionnaires have been distributed?

7           MS. CAPWELL:  I believe so, your Honor.

8           MR. MISKIEWICZ:  Yes, your Honor.  They did go

9   down yesterday evening and they're down there with the

10  clerk's office, I think there's a session in the morning

11  and there's one coming in at 1:30.  We should have enough

12  questionnaires.

13          THE COURT:  You're beginning to start reviewing

14  them and giving me all the information so by Thursday I'll

15  have your selections, because I'm not going to be

16  available Friday morning.

17          MR. MISKIEWICZ:  Okay.  We hadn't gotten to that

18  pat of whether or not it's going to be feasible for both

19  sides to agree.

20          THE COURT:  I thought that you were going to

21  scan them and e-mail.

22          MR. MISKIEWICZ:  Yes, that we're going to do

23  starting this afternoon, I imagine by tomorrow Mr. Rosen

24  and Mr. Froccaro can pick up a CD with all the copied,

25  filled out questionnaires, there'll be hard copied for

1     your Honor, and we'll print out our own copy from whatever

2     we scan.

3                 So that will be done by tomorrow.  But in terms

4     of both parties agreeing upon a --

5                 THE COURT:  I want these people to know Friday

6     afternoon whether or not they're going to be coming in.

7                 MR. MISKIEWICZ:  You need to know from us first

8     thing --

9                 THE COURT:  I need to know from you Thursday

10    whatever the choices will be.  We have to resolve that.

11                MR. MISKIEWICZ:  You mean in terms of people who

12    we are agreeing for whatever reason shouldn't be serving.

13                THE COURT:  There's three piles.  Pile number

14    one, don't want, can't have them, totally unable to

15    consent.  Pile number 2, we agree those folks are good to

16    go, and then you sometimes have four or five that you

17    can't agree on.  That's what you need me for.

18                MR. MISKIEWICZ:  You need it by Thursday we'll

19    get it to you by Thursday.  We'll get it to counsel and

20    we'll be on the phone and try to work out an agreed

21    possible list of people that we both suggest should not be

22    on.

23                THE COURT:  You all have about 10 items that you

24    can go through pretty quickly, the questionnaires I'm

25    talking about.

11

1            MR. ROSEN:  Judge, as I understand it there's

2    usually three divisions as your Honor indicated.

3            THE COURT:  Right.

4            MR. ROSEN:  One is where we agree that there's

5    challenges for cause.

6            THE COURT:  Right.

7            MR. ROSEN:  Two, I always maintained was the

8    Court may want to do further inquiry, see that's my

9    understanding there may be X number.

10            THE COURT:  You want those people to come back

11    in.

12            MR. ROSEN:  Come back in for your Honor.

13            THE COURT:  And there's five or six knock down

14    drag out brawl you can't agree on, both sides are adamant

15    on it.  Unless you're telling me you're the type of

16    attorneys that can divide this up into two groups, you

17    have to --

18            MR. ROSEN:  No, Judge.

19            THE COURT:  You should come in with at least 75

20    to 100 people to show up.

21            MR. MISKIEWICZ:  We'll do that by Thursday.

22            MR. ROSEN:  And that would facilitate things in

23    the interest of justice if you're downloading all these

24    things that we'll come out and pick up a downloaded

25    version and get those disks that takes me three hours to

12

1    figure out how to put into the machine, downloaded for us,

2    a paper copy so we come out, we can start.

3            THE COURT:  No.  That's not what they're doing.

4    They're putting it out on a disk so you can take it back

5    and print it out, which is possibly more efficient.

6            MR. FROCCARO:  Judge, it's not more efficient if

7    we pick it up, if they have it done for us.

8            MR. MISKIEWICZ:  It will get to them faster than

9    if they have to wait around.

10           THE COURT:  You can e-mail them.

11           MR. MISKIEWICZ:  We could e-mail.  The problem

12   we've been advised it would be many, many e-mails and the

13   files are going to be so big it may jam up their e-mail

14   system and not get through.  Once we scan all the 250

15   completed questionnaires we load that on to a disk, they

16   can pick it up, I'm sure by tomorrow morning, that will be

17   the fastest thing, it's going to still take us, it took us

18   all day yesterday to print out these 250, because it's not

19   like making 250 copies, we had to print out 250 unique

20   sets of questionnaires, they're all unique numbers and

21   sequentially numbered.  It took us all day to do that.

22   It's going to take them a while, it will take us a while

23   to print out and them.  If we print out the disk.

24           THE COURT:  Will you have it today?

25           MR. MISKIEWICZ:  It depends upon how fast we get

13

1    it from the clerk's office.  We'll scan it and it will be

2    ready by the end of the day or tomorrow morning, if not, I

3    assume it will be ready by 9:00 tomorrow.

4         MR. FROCCARO:  That's going to take us all day.

5    Where are we going to find the time to read them.

6         THE COURT:  I can make myself available on

7    Friday afternoon.  But I'm not going to have the copies

8    with me.

9         MR. MISKIEWICZ:  We'll get chambers your hard

10   copies.

11        THE COURT:  I can't carry hard copies on a

12   plane.  I don't want 500 copies of questionnaires.  A lot

13   of things I don't mind traveling with, but 500 copies of

14   questionnaires I'm not doing.

15        MR. FROCCARO:  You have the Friday?

16        THE COURT:  I'm not going to physically have

17   them, that's my point, to discuss with you.  And usually

18   that's what I need.  You can do it, depending upon how

19   available Perry is, you can certainly do it after five

20   o'clock, within reason.  So let's get the schedule down,

21   the last group of jurors will be done today in the

22   afternoon.

23        MR. MISKIEWICZ:  They come in at 1:30, figure by

24   2:30 they'll be done.

25        THE COURT:  And then how many are you expecting

14

1  this afternoon?

2        MR. MISKIEWICZ:  I think what the clerk's office

3  said they were going to bring in 150 in the morning and

4  150 in the afternoon, and that's assuming everybody shows.

5        THE COURT:  Usually it's around 250, right?

6        MR. MISKIEWICZ:  So whenever we get the first

7  batch, for instance, if they're finished now, we can start

8  scanning them now.  We will start scanning them now.

9  Maybe we can get at least that first batch on the disk

10  before the end of the day to counsel.

11        THE COURT:  Then they're going to have to

12  photocopy them also.

13        MR. MISKIEWICZ:  Print them out.

14        THE COURT:  The other alternatives is I can ask

15  the magistrate judge to do it.

16        MR. ROSEN:  May we just have a photocopy

17  machine, nothing elaborate.

18        THE COURT:  You may have to take it to a

19  service.

20        MR. ROSEN:  Like Kinkos or something.

21        THE COURT:  Absolutely.  You're not going to be

22  able to do it.

23        MR. MISKIEWICZ:  We could print it all out as

24  well for counsel, it's just that it's going to take us a

25  while to print out our own set.  I'm trying to get them

1    something as soon as possible.

2              THE COURT:  You print them here.

3              MR. MISKIEWICZ:  Yes.  In case we have, we

4    ultimately decided rather than sending them to First

5    Choice, because of the possibility that the collating

6    would get messed up.  We're doing it all in-house.  And

7    also First Choice didn't think they can get back copies by

8    nine o'clock tomorrow morning.  They were telling us that

9    they could not guaranty that.  So this seemed to be the

10   faster way.

11             MR. FROCCARO:  We may have the same problems.

12   If you can do it, it honestly would be a big help.  If we

13   go to Kinkos they can tell us they can't get it tomorrow

14   morning.

15             MR. MISKIEWICZ:  Then --

16             THE COURT:  It's the clerk's office that's doing

17   the photocopying.

18             MR. MISKIEWICZ:  No, we're doing it, we're doing

19   everything.  We just handed them the material.  And

20   they're handing us the completed copies.  I just wanted to

21   say they have what we have as soon as possible.  If

22   counsel is okay with it, it will just take longer to print

23   out, print everything out.  I don't know how long it's

24   going to take to print out.

25             MR. FROCCARO:  It will take the same amount of

16

1   time but we're going to have the same amount of time

2   anyway.

3           MR. MISKIEWICZ:  We'll work it out.

4           THE COURT:  If it has to be, I'll have a

5   magistrate judge do it.  I would prefer doing it Thursday

6   afternoon.  Okay.

7           MR. ROSEN:  Thank you, Judge.

8           THE COURT:  I'll see you in about a half hour.

9           MR. ROSEN:  Judge, while you are here, I don't

10  mean to infringe on your time, there are a couple of

11  things that I would like to bring to the Court's attention

12  in the nature of reargument.

13          I know your Honor ruled about these computers,

14  but -- that were taken from Mr. Garguilo, from Mr. Kyatt,

15  and there's a third computer somewhere I saw in the 3500

16  material.  These computers were seized -- again if you

17  don't want to hear the comment, I respect that.

18          THE COURT:  Is there something new that's come

19  up in the last few days?

20          MR. ROSEN:  No.

21          THE COURT:  On this issue?

22          MR. ROSEN:  No.  Something new that I've gone

23  back over the 3500 material and the detectives who did

24  seize these computers made it pretty clear in their DD-5s,

25  I think, that Mr. Schelhorn's selected 302s, that they

40

1    question in the questionnaire related to Parkinson's and

2    the jury will be advised of that, and they'll also be

3    instructed that if they notice any tremor it has nothing

4    to do with your being nervous or uncomfortable in court.

5    It's simply a condition that you have.  All right.

6    Anything else?

7            MR. ROSEN:  No, Judge.

8            THE COURT:  I deem the conflict waived, unless

9    the government has any questions that you'd like the Court

10   to ask.

11           MS. CAPWELL:  No, your Honor.  Thank you very

12   much.

13           THE COURT:  I'll see you folks, I'll certainly

14   hear from you, you'll be able to visit with Mr. Tarantino

15   and go through the jury selection questionnaires.

16           MR. FROCCARO:  I don't know if we'll have time

17   to do that.

18           THE COURT:  So you're definitely going to do

19   that beforehand and see what his desires would be in terms

20   of the type of jury he'd like to be seated.

21           MR. FROCCARO:  Yes, your Honor.

22           THE COURT:  Have a good day.

23           MR. ROSEN:  Judge, we're due back here, just so

24   I make sure that I don't miss it, when does your Honor

25   expect us physically back here?

Untitled

Attention Homicide:

I'm writing you to see if there is a reward for information and audio tapes leading to the arrest and conviction of Scott Mulligan, Christ Tarintino and others in the 1994 armored car robbery where a guard was shot dead and  the death of one of the robbers named Louis who was also shot dead and found floating off Long Island. To tell me about if and how much the reward is, or just to get in contact with me please post info on www.craigslist.com under missed connections.

Chucky

P.S. I was not involved in these crimes and I don't want a deal, I just want money! Further, Chris T. told me someone was wrongly convicted of the armored car robbery.

cc: FBI
    Nassuu County Homicide

Page 1

000000278



# GARY SCHOER

**ATTORNEY AT LAW**

**NORTH SHORE ATRIUM**

**6800 JERICHO TURNPIKE, SUITE 108W**

**SYOSSET, NEW YORK 11791**

**(516)496-3500**

**FAX (516) 496-3530**

**EMAIL: GSchoer@aol.com**

February 17, 2009

<u>**FACSIMILE (631) 712-5626 & ECF**</u>

Honorable Arthur D. Spatt
United States District Judge
Eastern District of New York
1024 Federal Plaza
Central Islip, NY 11722

RE: <u>United States v. Joseph Pistone</u>
<u>Criminal Docket No. 00-122 (ADS)</u>

Dear Honorable Sir:

As your honor may remember, I was assigned to represent the Defendant Joseph Pistone, who entered a plea of guilty in the above captioned case and was sentenced on December 7, 2001 to 225 month's incarceration.

In January, 2006, the Defendant was brought to the MDC pursuant to a writ. He has remained at the MDC, although the writ was satisfied several months ago. It now appears that he is about to be transferred from the MDC and, despite your Honor's Order of December 1, 2008, that the BOP intends to return him to USP Beaumont.

Recently, the Government has indicted another individual for the murder of Louis Dorval, the crime for which the Defendant was sentenced by your Honor. This individual, Christian Tarantino (08 CR 655(JS)) was not an associate of the Defendant, nor was he mentioned as an accomplice in any of the documents provided

1

throughout the instant proceeding including statements made by Co-Defendants and informants. In addition, the motive alleged in the Government's most recent indictment concerning the Dorval homicide is inconsistent with the motive purported by the Government to be the reason for the Defendant's actions.

The inconsistent theories of the Government support the Defendants claim made for many years that he is innocent of the crime for which he pled guilty and that he did so only because of pressure from the Government to close out the Dorval homicide and in light of his guilt on other charges for which he faced additional incarceration.

The Defendant has, thus, requested that I investigate on his behalf the filing of a Motion under 28 U.S.C. §2255 to vacate, set aside and correct his conviction in that he is actually innocent of the crime for which he is presently incarcerated. It is clear that the Due Process Clause's guarantee of fundamental fairness prohibits prosecutors from presenting mutually inconsistent theories of the same case against different Defendants. For example, due process may be violated if "an inconsistency exist[s] at the core of a prosecutor's cases against Defendants for the same crime, or where evidence used at the two trials is factually inconsistent and irreconcilable", See e.g. United States v. Higgs, 353 F.3d 281 (4th Cir.2003); Smith v. Groose, 205 F.3d 1045 (8th Cir.2000); Thomson v. Calderon, 120 F.3d 1045 (9th Cir. 1997); Drake v. Kemp, 762 F.2d 1449 (11th Cir.1985).

Herein, until more is learned about the pending case against Tarantino, I am unable to fully advise the Defendant as to the course he should pursue. However, in order to do so, it would be in Mr. Pistone's best interest that he remain at the MDC to facilitate communication between us.

In light of the above, respectfully, the Defendant would request that a writ issue immediately keeping the Defendant at the MDC until such writ is satisfied.

Thank you for your consideration of this matter.

SA79

Respectfully

*Gary Shoer*

GARY SCHOER

GS/tm
cc.: AUSA James Miskiewicz (Via ECF)
     Joseph Pistone



**Nassau University**
**Medical Center**
A. Holly Patterson Extended Care Facility
Family Health Center*

March 29, 2012

Re: **Tarantino, Christian**
MRN: **771466**
Date of Birth: **09/28/1968**
Date(s) of Service: **07/16/1986, 01/25/1988, 01/26/1988, 09/11/1989, 07/04/1993, 08/13/1994, 09/06/1994, 09/13/1994, 09/13/1994, 09/20/1994, 06/16/1995, 06/18/1995, 04/30/1996 & 04/27/2000.**

To Whom It May Concern:

The records/films that you have requested are no longer available. Please see the explanation below.

As per Department of Health of New York State:

Chapter V Medical Facilities.

Title 10 NYCRR §405.10(a)(4)
(4) Medical Records shall be retained in their original or legally reproduced from for a period of at least six years from the date of discharge of three years after the patient's age of majority (18 years), whichever is longer, or at least six years after death.

I have provided printouts of the x-ray(s) done on the above mentioned date(s) of service.

Very Truly Yours,

Jacqueline Philburn
Correspondence Supervisor and Radiology Imaging Tech.
Medical Records Department Room 76

2201 Hempstead Turnpike ✚ East Meadow, New York 11554 ✚ 516.486.NUMC ✚ www.nuhealth.net
*In partnership with the LI Federally Qualified Health Center, Inc.



2201 HEMPSTEAD TURNPIKE    EAST MEADOW, NY 11554    (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian  M 17      MR#: 771466  Loc.: Emergency Room
Dr.: Illegible                  Case#: 165731       Bus#: 86046775
                                                    Chrs: $      .000
DATE OF EXAM: Wednesday, July 16th, 1986
DATE TYPED:  Thursday, July 17th, 1986


RIGHT FOREARM:


Soft tissue swelling is present about the olecranon process.
There is no evidence of fracture or dislocation.


IMPRESSION: No evidence of fracture or dislocation.




                                        Stephen W. Lastig, M.D.


                                        Elizabeth Cancroft, M.D.




2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian  M 19     MR#: 771466   Loc.: Emergency Room
Dr.: Arason, Gudmundur          Case#: 259219      Bus#: 88005565
                                                   Chrg: $      .000

DATE OF EXAM: Monday, January 25th, 1988
DATE TYPED:  Tuesday, January 26th, 1988


CERVICAL SPINE: Lateral projections

SOFT TISSUES OF THE NECK

Subcutaneous emphysema is noted in the soft tissues of the
anterior neck. No other abnormalities are seen.

MO/js

                          .Michael O'Grady, M. D.


                          Eurton M. Gold, M.D.

SA83



NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE    EAST MEADOW, NY 11554    (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian  M 19      MR#: 771466   Loc.: Emergency Room
Dr.: Arason, Gudmundur          Case#: 259213   Bus#: 88005565
                                                Chrg: $      .000

**DATE OF EXAM:** Monday, January 25th, 1988
**DATE TYPED:** Tuesday, January 26th, 1988


**CHEST:** PA, left lateral, erect

Pneumomediastinum is noted.  The lungs and pleura are clear.
The bones are normal.


**IMPRESSION:**  Pneumomediastinum.

                                    .Michael O'Grady, M. D.


                                    Burton M. Gold, M.D.

Case 13-1799, Document 181, 04/02/2015, 1475917, Page86 of 202

SA84



# NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian  M 19     MR#: 771466  Loc.: 8e
Dr.: Leifsson, Bjorn Surg     Case#: 269558     Bus#: 769840
                                                 Chrg: $      .000

DATE OF EXAM: Tuesday, January 26th, 1988
DATE TYPED:  Wednesday, January 27th, 1988


CERVICAL SPINE: Routine, AP and lateral projections

SOFT TISSUES OF THE NECK

Radiographic examination of the soft tissues of the neck once
again demonstrates significant subcutaneous emphysema.  No
other abnormalities are seen.


IMPRESSION: Subcutaneous emphysema.
          MO/js



                                   Burton M. Gold, M.D.

                                   Michael O'Grady, M.D.

SA85



NASSAU COUNTY MEDICAL CENTER
2201 HEMPSTEAD TURNPIKE    EAST MEADOW, NY 11554    (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian  M 19    MR#: 771466  Loc.: 8e
Dr.: Leifsson, Bjorn Surg    Case#: 269558    Bus#: 769840
   Chrg: $     .000

DATE OF EXAM: Tuesday, January 26th, 1988
DATE TYPED: Wednesday, January 27th, 1988

CHEST: PA, erect

The heart is within normal limits.  Pneumomediastinum is once
again seen. No inflammatory disease was seen.

IMPRESSION: Pneumomediastinum.
       MO/js

Burton M. Gold, M.D.

Michael O'Grady, M.D.




# NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian  M 19     MR#: 771466  Loc.: Emergency Room
Dr.: Kabeer, Adil Surg     Case#: 269479     Bus#: 88005565
                                               Chrg: $      .000

DATE OF EXAM: Tuesday, January 26th, 1988
DATE TYPED:  Wednesday, January 27th, 1988

**ESOPHAGRAM:**

An esophgram study was performed using barium. The examination
was extraordinarily limited for technical reasons.  Air was
noted to be in the soft tissues of the neck. No definite
extravasation was seen.

IMPRESSION: Extraordinarily limited.
            Air in the soft tissues of the neck.
            No definite extravasation.
            A repeat esophagram is suggested.
            JU/js

                                    Burton M. Gold, M.D.

                                    Michael O'Grady, M.D.

Case 13-1799, Document 181, 04/02/2015, 1475917, Page89 of 202



DℓC SA87 88



## NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE    EAST MEADOW, NY 11554    (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian  M 19      MR#: 771466  Loc.: 8e
Dr.: Leifsson, Bjorn Surg      Case#: 269558      Bus#: 769840
                                                  Chrg: $      .000

DATE OF EXAM: Tuesday, January 26th, 1988
DATE TYPED:  Wednesday, January 27th, 1988

### ESOPHAGRAM:

An esophagram was performed utilizing fluoroscopy, overhead radiographs, spot radiographs and video tape. The scout radiograph once again demonstrates pneumomediastinum and subcutaneous emphysema of the neck. The visualized esophagus demonstrates normal calibre, peristaltic waves and mucosal folds.

The esophagus demonstrates no evidence of reflux.

        IMPRESSION: Normal esophagus.
        Subcutaneous emphysema and pneumomediastinum.
        Normal esophagus.
        MO/js

                        Burton M. Gold, M.D.

                        Michael O'Grady, M.D.

 

# NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian      m 20y MR #: 771406 Loc.: Emergency Room
Dr.: Diaz, Fernando  M.D.      Case #: 935797 Bus. #: 89060339


DATE OF EXAM: Monday, September 11th, 1989
DATE TYPED: Tuesday, September 12th, 1989
DATE DICTATED:     9|11


RIGHT ANKLE:  AP.

There is soft tissue disruption about the distal fibula.

Soft tissue swelling is present about the lateral malleolus.
There is no evidence of fracture or dislocation.


IMPRESSION: Soft tissue disruption about the distal fibula.

No evidence of fracture or dislocation.


William Mechanic, M.D.


Danuta Montorfano, M.D.




## NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554-5400     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian     m 24y MR #: 0771466 Loc.: Emergency Room
Dr.: Aronovici, Noemy   Md     Case #: 486100 Bus. #: 1242751

DATE OF EXAM: Sunday, July 4th, 1993
DATE TYPED: Tuesday, July 6th, 1993
DATE DICTATED: Sunday, July 4th, 1993

RIGHT HAND: AP and oblique.

Amputation through the tuft of the distal phalanx of the thumb
is seen. Soft tissue discontinuity is noted. Small fracture
fragments are seen at the level of the stump of the distal
phalanx. Surg.E.R. is aware of the above findings.
In addition, old fracture deformity of the 5th metacarpal is
noted.

nk/db

NIC
Nalini Kanth, M.D.

M
Paul Moh, M.D.

SA90




## NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554-5400     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian        m 25y MR #: 0771466 Loc.: Emergency Room
Dr.: Mondschein,                    Case #: 645679 Bus. #: 1382848

DATE OF EXAM: Saturday, August 13th, 1994
DATE TYPED: Monday, August 15th, 1994
DATE DICTATED:

RIGHT HAND AND LITTLE FINGER: AP, lateral and oblique.

There is an undisplaced oblique fracture of the terminal tuft of
the distal phalanx of the little finger with associated soft
tissue swelling.

Soft tissue swelling is present about the little finger.

IMPRESSION: Fracture of the terminal tuft of the distal phalanx
of the little finger.

Jonathan N. Levine, M.D.

Uresh Patel, M.D.





2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554-5400     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian        m 25y MR #: 0771466 Loc.: Emergency Room
Dr.: Lee, Steven  M.d.           Case #: 654856 Bus. #: 1390733


DATE OF EXAM: Tuesday, September 6th, 1994
DATE TYPED: Thursday, September 15th, 1994
DATE DICTATED: Wednesday, September 7th, 1994


RIGHT HAND: AP, lateral and oblique; in cast.

Radiographic examination of the right hand shows splint in
place.  Again seen is a fracture of the 1st metacarpal with good
bony alignment.

ML/mj


                                        Michael Lam, M.D.


                                        Elizabeth Cancroft, M.D.

SA92



2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554-5400     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian     m 25y MR #: 0771466 Loc.: Emergency Room
Dr.: Lee, Steven  M.d.          Case #: 654839 Bus. #: 1390733


DATE OF EXAM: Tuesday, September 6th, 1994
DATE TYPED: Thursday, September 15th, 1994
DATE DICTATED: Tuesday, September 6th, 1994


RIGHT HAND AND THUMB: AP, lateral and oblique.


Radiographic examination of the right hand shows a splint in
place.  Again seen is a fracture of the base of the 1st
metacarpal.  Bones appear in good alignment.

ML/mj


                                        Michael Lam, M.D.

                              Elizabeth Cancroft, M.D.

2201 HEMPSTEAD TURNPIKE — EAST MEADOW, NY 11554-5400 (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian          m 25y MR #: 0771466 Loc.: HandClinic
Dr.: Lin, Chalif                    Case #: 657711 Bus. #: 1246083


DATE OF EXAM: Tuesday, September 13th, 1994
DATE TYPED: Thursday, September 15th, 1994
DATE DICTATED:


RIGHT THUMB: AP and lateral; in cast.

Comparison Film:   Sept. 6, 1994.


Plaster obscures bony detail.
The oblique fracture of the base of the first metacarpal shows
no change in position.

IMPRESSION: Fracture of the base of the first metacarpal,
position unchanged.


                                        Kathryn A. Draves, M.D.



2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554-5400     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian      m 25y MR #: 0771466 Loc.: HandClinic
Dr.: Woloszyn, Thomas T. Md     Case #: 660580 Bus. #: 1246083
                    660581

DATE OF EXAM: Tuesday, September 20th, 1994
DATE TYPED: Friday, September 23rd, 1994
DATE DICTATED:

RIGHT HAND AND WRIST: AP, lateral and oblique; in cast.

Comparison Film:     Sept. 6, 1994.

Plaster obscures bony detail.
The oblique fracture of the base of the first metacarpal shows
minimal dorsal angulation of the distal fragment.  Compared to
the previous examination there has been no interval change in
angulation.

IMPRESSION: Fracture of the base of the first metacarpal.
Angulation unchanged.

                              Kathryn A. Draves, M.D.



NASSAU COUNTY MEDICAL CENTER

2201 HEMPSTEAD TURNPIKE    EAST MEADOW, NY 11554-5400    (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian          m 26y MR #: 0771466 Loc.: Emergency Room
Dr.: Vail,                          Case #: 772054 Bus. #: 1490491

DATE OF EXAM: Friday, June 16th, 1995
DATE TYPED: Monday, July 3rd, 1995
DATE DICTATED: Friday, June 16th, 1995

NOSE :

A deformity of the tip of the right nasal bone is seen. This
may represent an old injury. In addition, a lucency is noted
through the base of the right nasal bone and an acute
nondisplaced fracture cannot be excluded. Soft tissue density
is noted projecting over the left maxillary sinus, likely
representing a retention cyst of the left maxillary sinus.

IMPRESSION: Old fracture of the right nasal bone. Acute
superimposed fracture cannot be excluded.

NK/tm

Nalini Kanth, M.D.

Danuta Montorfano, M.D.

 

2201 HEMPSTEAD TURNPIKE     EAST MEADOW, NY 11554-3100     (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian     m 26y MR #: 0771466 Loc.: nassau county jail
Dr.: Clark, Robert           Case #: 772905 Bus. #: 999953

DATE OF EXAM: Sunday, June 18th, 1995
DATE TYPED: Tuesday, June 20th, 1995
DATE DICTATED: 6/19/95

CHEST: AP, erect

The heart and mediastinum are unremarkable.  The lungs and
pleura are clear.  The bones are normal.

IMPRESSION: Normal examination of the chest.

James L. Goldstein, M.D.

Dvorah Balsam, M.D.


SA97

2201 HEMPSTEAD TURNPIKE      EAST MEADOW, NY 11554-5400      (516) 542-2635

# DEPARTMENT OF RADIOLOGY

Tarantino, Christian        m 27y MR #: 0771466 Loc: nassau county jail
Dr.: Kashimano,                 c:301404        Bus. #: 999953
p: 12347151

DATE OF EXAM: Tuesday, April 30th, 1996
DATE TYPED: Thursday, May 2nd, 1996
DATE DICTATED:

CHEST : PA

The heart and mediastinum are unremarkable.  The lungs and pleura are
clear.  The bones are normal.

IMPRESSION:

Normal examination of the chest.

                              Dvorah Balsam, M.D.

Nassau Health Care Corporation
NASSAU UNIVERSITY MEDICAL CENTER
SA98
2201 Hempstead Turnpike    East Meadow, NY 11554-5400
(516) 572-6635
Department of Radiology

---

Patient:  TARANTINO,CHRISTIAN          Age/Sex:          MR#: 771466H
Loc:                                   DOB: 09/28/1968
Dr: HISTORICAL, PHYSICIAN
Order #:           UNDEFINED CODES CERNER/MISYS CONVERSION
Date of Exam: 04/27/2000

=================================================================

This exam was reviewed by the undersigned attending, who agreed with the
interpretation.

FINAL REPORT:

CHEST:  PA

There are no acute pulmonary infiltrates.  The heart is not enlarged.


IMPRESSION:  No active cardiopulmonary disease.


MD/tm


          RASHMIKANT BAXI, MD

Mark DeSantis, D.O.
RASHMIKANT BAXI, MD


          Approved by:   RASHMIKANT BAXI, MD



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRC:GRB

ppistone.ltr

*United States Attorney's Office*
*610 Federal Plaza*
*Central Islip, New York 11722-4454*

**TO BE FILED UNDER SEAL**

September 19, 2002

The Honorable Arthur D. Spatt
United States District Judge
1024 Federal Plaza
Central Islip, NY 11722

> Government
> Exhibit
> P-5
> 00 CR 1655 (JS)

Re: United States v. Peter Pistone,
    Docket No. 00 CR 076 (ADS)

Dear Judge Spatt:

This letter is respectfully submitted in anticipation of the sentencing of the defendant in the above-referenced prosecution, currently scheduled for Friday, September 20, 2002. For the reasons set forth below, the Government has decided not to write a 5K1.1 letter for the defendant and agrees that the defendant should be sentenced within the Sentencing Guidelines range of 100-125 months as calculated by the Probation Department.

Pursuant to a cooperation agreement, the defendant pled guilty to being an accessory after the fact to the Louis Dorval homicide before Judge Seybert. That plea was based on the fact that, at the time, Mr. Pistone had advised the Government that he had no prior knowledge of the plan to kill Dorval. The cooperation agreement provided for, among other things, truthful and complete cooperation by the defendant as well as the possibility of a 5K1.1 letter. As set forth in detail below, the defendant did not consistently provide complete and truthful cooperation, and the Government will not be moving for a 5K1.1 departure.

As noted in the Pre-Sentence Report, the defendant did provide significant information to the Government – Mr. Pistone helped the Government solve the Dorval homicide, an organized crime murder that had remained a mystery for six years. See PSR ¶109 (description of cooperation by former Detective Kennedy). His information ultimately resulted in a plea to the Dorval

---

2

homicide by Joseph Pistone, the defendant's brother.[1] However, the defendant changed his story so many times - repeatedly lying to agents and prosecutors - that he substantially undercut his own credibility.[2] He provided false leads, causing law enforcement agents waste time and resources investigating bogus claims. On several occasion, Mr. Pistone radically changed his account of the Dorval killing, altering critical details of the crime. Indeed, Mr. Pistone even shifted his account of his own role in the homicide, eventually admitting that he was a principal in the homicide, rather than an accessory after the fact. As the Court may recall, because of variations in Mr. Pistone's account, the Government initially charged Mr. Misseri in the homicide, but was later compelled to agree to Mr. Misseri's release on bail and a plea for Misseri that did not include the murder charge.[3]

In sum, while the defendant's information was remarkable, his fabrications substantially undermined his efforts. Obviously, he is ineligible for a 5K1.1 departure. In fact, although the Government does not make such an application, the defendant's misleading statements could support an obstruction of justice enhancement, ineligibility for acceptance and/or an upward departure. See U.S.S.G. §§ 3C1.1(obstruction), 3E1.1 (App.n.4)(obstruction "ordinary indicates" that acceptance reduction not warranted), and 5K2.1(upward departure for death of a victim). Of course, the defendant has already received a significant benefit, having pled to an accessory count rather than a murder count which would require a life sentence. However, in light of the fact that the defendant helped unravel the Dorval homicide, the Government does not seek an upward departure and has decided to not charge the defendant further.

---

[1] By the time of Joseph Pistone's plea, the Government had developed independent evidence implicating Joseph Pistone in the Dorval homicide.

[2] It appears that even the defendant's family members cannot get a consistent account from the defendant. See PSR ¶¶103-4.

[3] The defendant claimed that his vacillation regarding Mr. Misseri's role in the homicide was due to intimidation by Mr. Misseri. While certain corroborating information supports the allegation of witness tampering, this neither explains nor excuses Mr. Pistone's sharp variations with respect to other aspects of the homicide.

---

3

As such, the Government adopts the Probation Department's estimate of 100-125 months, and takes no position as to where within the range the defendant should be sentenced.

Thank you for your consideration of this matter.

Very truly yours,

ROSLYNN R. MAUSKOPF
United States Attorney

By: _____
    Gary R. Brown
    Assistant U.S. Attorney
    (631) 715-7843

cc: William Wexler, Esq.
    (by fax)

**Pattison-Cross/Froccaro**

788

4   Q    And while you were standing to the front entrance of

5   the building having a cigarette, you came within a few

6   feet of two of the perpetrators; is that correct?

7   A    Yes.

8   Q    Including the one carrying the shotgun; is that

9   correct?

10  A    Yes.

11  Q    All right.

12       And the individual with the shotgun you noticed

13  had gray hair; is that right?

14  A    Yes.

15  Q    And he was tall; is that correct?

16  A    Yes.

17  Q    With a heavy build; is that correct?

18  A    Yes.

19  Q    And the person carrying the shotgun was heavy,

20  weighed about 280, 280 pounds; is that correct, in your

21  estimate?

22  A    Probably.

23  Q    In fact, that is what you told the police at the

24  time; is that correct?

25  A    I believe so.

**Fatato-Cross/Froccaro**

1257

2   Q    First of all, would you describe yourself as tall?

3   You are about six foot one, six foot two, sir?

4   A    Yes.

5   Q    And at about the time of the armored car robbery in

6   1994, you were heavier, you weighed 270 pounds?

7   A    270, 280, yes.

8   Q    You also had two dogs at the time; is that correct?

**Pattison-Redirect/Flynn**

789

1   Q    In fact, that is what you have been telling the

2   police from day one, right?  That the fellow with the

3   shotgun was about 270, 280 pounds; is that right?

4   A    Sounds about right.

Case 13-1799, Document 181, 04/02/2015, 1475917, Page103 of 202
SA101

803

13  Q    And you were traveling eastbound on Jericho Turnpike

14  when you first saw a cream colored car pull across

15  Jericho; is that right?

16  A    Yes.

17  Q    And when you first saw this cream colored car, it was

18  only a few feet away from you; is that correct?

19  A    When I first -- no.  When I first saw the car, I saw

20  it go over the curb first before it was in front of me.

21  Q    And then it came actually within a few feet of the

22  car you were in with Lauren; is that correct?

23  A    Yes.

24  Q    And you noticed there were three people in the cream

25  colored car; is that correct?

804

1   A    Yes.

2   Q    Including the driver?

3   A    Yes.

19       MR. FROCCARO:  I guess I already did approach.

20  Q    3500-DD-1 provided by the government, I will ask you

21  to review it and see if it refreshes your recollection

22  that you provided to the police, that the male driver was

23  a male white, 50 years old, bald on top with gray hair on

24  the top, and had a round face and was wearing sunglasses?

25  A    Yes.

805

1   Q    And that is what you told the police, which was the

2   truth that day; is that right?

3   A    Yes.

2552

4   Q    Mr. Pistone, you have a brother named Joseph whom we

5   mentioned already; is that correct?

6   A    Yes.

7   Q    He is also known by a nickname, isn't he, Joe Baldy?

8   A    Yes.

2572

3   Q    Mr. Pistone, at the time of the armored car robbery,

4   and you saw it in the news, did your brother have a black

5   pistol grip black Mossberg shotgun?

6   A    Yes.

7   Q    That resembled this (indicating)?

8   A    Yes.

9   Q    All right.

10       Mr. Pistone, at the time of the armored car

11  robbery, did your brother Joe -- at the time of the

12  armored car robbery you saw on the news, did your brother

13  Joe Baldy also have any hair wigs?

14  A    Yes.

23  Q    Did he have a black wig?

24  A    Yes.

25  Q    What did he use the wigs for, sir?

2573

1   A    Usually to do robberies.

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

                Plaintiff,

   - against -

JOSEPH PISTONE,

             Defendant.

CR-00-0122

U.S. Courthouse
Central Islip, New York

July 19, 2001
11:55 o'clock a.m.

- - - - - - - - - - - - - - - -X

TRANSCRIPT OF GUILTY PLEA
BEFORE THE HONORABLE ARTHUR D. SPATT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      LORETTA E. LYNCH
                     United States Attorney
                     271 Cadman Plaza East
                     Brooklyn, New York 11201
                     BY:  JAMES MISKIEWICZ, ESQ.

For the Defendant:       GARY SCHOER, ESQ.

Also Present:           HON. DENIS DILLON,
                     Nassau County District Attorney
                     BY:  MARY B. RUDDY, ESQ.,
                        Assistant District Attorney

Court Reporter:          Ellen S. Combs, CSR
                     1180 Federal Plaza
                     Central Islip, New York 11722
                     (631) 712-6107

Proceedings recorded by mechanical stenography
Transcript produced by CAT

2

1          (Call to order of the Court.)

2          THE CLERK:  Criminal cause for guilty plea,

3   Criminal 00-0122, United States of America vs Joseph

4   Pistone.

5          THE COURT:  Do you want to come up, please?

6          Appearances, please.

7          MR. MISKIEWICZ:  James Miskiewicz for the United

8   States.

9          Good afternoon, your Honor.

10         THE COURT:  Good afternoon.  Is it afternoon?

11  Not yet.

12         MR. MISKIEWICZ:  Not yet.

13         MR. SCHOER:  Good morning, your Honor.

14         For the defendant, Gary Schoer.

15         THE COURT:  What is happening in this case?

16         MR. MISKIEWICZ:  Your Honor, I understand that

17  that the defendant is prepared to plead guilty to count

18  one of the indictment as it has been superseded, and

19  specifically to committing two predicate acts in

20  furtherance of a racketeering enterprise; namely,

21  conspiracy to commit murder and arson.

22         I feel I am obligated to also -- I have to tell

23  the Court that in just a brief few seconds before the

24  Court took the bench just now, there were certain

25  statements made by the defendant in my presence and

ELLEN S. COMBS, CSR
Official Court Reporter

3

1    counsel's presence, that lead me to believe that perhaps

2    the defendant is not prepared to make that kind of

3    allocution, or that the defendant has some reservations.

4         So I would need to put that on the record.  And

5    I don't know if counsel for Mr. Pistone needs additional

6    time or not, but I'll leave that to him.

7         THE COURT:  Mr. Schoer, does your client want to

8    plead guilty?  Is he not sure, or what?

9         MR. SCHOER:  My client wants to plead guilty.

10        THE COURT:  Okay, you heard what the prosecutor

11   just said.  So there is no hesitancy?

12        MR. SCHOER:  There is no hesitancy on

13   Mr. Pistone's part at all, Judge.

14        THE COURT:  All right.

15        You are Joseph Pistone?

16        THE DEFENDANT:  Yes, sir, pis-tony.

17        THE COURT:  Pis-tony?

18        THE DEFENDANT:  Yes, sir, spelled the same way,

19   just pronounced different.

20        THE COURT:  Pis-tony.

21        Mr. Pistone, your attorney advises me that you

22   wish to plead guilty to count one of the superseding

23   indictment?

24        THE DEFENDANT:  Yes, sir.

25        THE COURT:  Which charges you with knowingly and

Dec 02 08 04:39p

p.4

4

1    intentionally participating in the conduct of an

2    enterprise through a pattern of racketeering activity with

3    regard to Predicate Act B, murder conspiracy; conspiring

4    to murder one Louis Dorval.

5            And with respect to Racketeering Act Two B,

6    knowingly and intentionally conspiring to damage and

7    destroy by means of fire, a building, to wit:  The

8    Hav-a-Home Kennel in Brookville.

9            Do you understand the nature of the crimes that

10   you are going to plead guilty to?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  Do you wish me to read these counts

13   at this time?

14           MR. SCHOER:  No, your Honor.

15           THE DEFENDANT:  No, sir.

16           THE COURT:  Mr. Pistone, this plea is a serious

17   decision, and I must be certain that you make it

18   understanding your rights and the consequences of your

19   plea.

20           I'm going to explain certain rights to you, and

21   then ask you some questions.  I want your answers to be

22   under oath.

23           Please swear in the defendant.

24   JOSEPH PISTONE, the defendant, having been first duly

25           sworn, was examined and testified as follows:

ELLEN S. COMBS, CSR
Official Court Reporter

Dec 02 08 04:40p                                                                                        p.5

5

BY THE COURT (to the defendant):

Q.    Mr. Pistone, do you understand that having been sworn
to tell the truth, you must tell the truth?

        Do you understand that?

A.    Yes, sir.

Q.    If you were to deliberately lie in response to any
question I ask you, you could face further criminal
charges for perjury.

        Do you understand that?

A.    Yes, sir.

Q.    If I say anything that you do not understand, or if
you need me to repeat anything, you have only to ask.  It
is important that you understand everything that goes on
in this proceeding.

        Is that clear?

A.    Yes.

Q.    How old are you, Mr. Pistone?

A.    Thirty-four.

Q.    How far did you get with your education?

A.    Twelfth grade.

Q.    That is high school?

A.    Yes, sir.

Q.    Mr. Pistone, I must be certain that whatever
decisions you make today, and they certainly are
important, you make with a clear head.  So I'm going to

Dec 02 08 04:40p

6

```
1    ask you some questions about your health.
2              Are you presently, or have you recently been
3    under the care of a doctor for any reason?
4    A.   No, sir.
5    Q.   Are you presently, or have you recently been under
6    the care of a psychiatrist or a psychologist for any
7    reason?
8    A.   No, sir.
9    Q.   In the past 24 hours, have you taken any pills or
10   drugs, or medicine, or alcoholic beverages of any kind?
11   A.   No, sir.
12   Q.   Have you ever been hospitalized or treated for any
13   drug-related problem?
14   A.   No, sir.
15   Q.   So you're not taking any medication at the present
16   time?
17   A.   Not at this time, sir.
18   Q.   Is your mind clear as you stand here today?
19   A.   Yes.
20             THE COURT:  Mr. Schoer, have you discussed the
21   question of this guilty plea with your client?
22             MR. SCHOER:  Yes, your Honor.
23             THE COURT:  In your view, does he understand the
24   rights he would be waiving by pleading guilty?
25             MR. SCHOER:  Yes, your Honor.
```

ELLEN S. COMBS, CSR
Official Court Reporter

```
 1              THE COURT:  Do you have any question as to his
 2    competency to proceed?
 3              MR. SCHOER:  No question as to his competency.
 4              THE COURT:  You're appointed, counsel?
 5              MR. SCHOER:  Yes, your Honor.
 6    BY THE COURT:  (Continuing)
 7    Q.    Mr. Pistone, your attorney, Gary Schoer, was
 8    appointed by the Court to represent you in this case.  He
 9    is an experienced criminal defense lawyer.
10              Are you satisfied with the assistance your
11    lawyer, Gary Schoer, has given you thus far in this
12    matter?
13    A.    Very much so, yes.
14    Q.    What?
15    A.    Very much so, yes.
16    Q.    Do you feel you need any more time to discuss with
17    him the question of this guilty plea?
18    A.    No, sir.
19    Q.    Because if you do, I will certainly give it to you.
20              Do you need any more time?
21    A.    No, sir.
22    Q.    Now Mr. Pistone, you have a right to continue to
23    plead not guilty to these charges and go to trial.
24              Do you understand that?
25    A.    Yes, I do.
```

Dec 02 08 04:41p                                                           p.8

8

1    Q.    If you plead guilty to these charges, you will give

2    up some very valuable rights.  Please listen to the rights

3    you will give up if you plead guilty.

4              You have a right under the constitution and laws

5    of the United States to a speedy and public trial before a

6    jury with the assistant of your attorney.

7              Do you understand that?

8    A.    Yes, I do.

9    Q.    At the trial you would be presumed to be innocent.

10   You would not have to prove that you were innocent.  This

11   is because under our system of law it is the government

12   that must come forward with proof that establishes, beyond

13   a reasonable doubt, that you are guilty of these crimes.

14   If the government fails to meet this burden of proof, the

15   jury would have the duty to find you not guilty.

16             Do you understand that?

17   A.    Yes, I do.

18   Q.    At the trial witnesses for the government would have

19   to come here to this courtroom and testify in your

20   presence.  Your lawyer would have the right to

21   cross-examine those witnesses.

22   A.    Yes.

23   Q.    He could raise legal objections to the evidence the

24   government sought to offer against you.  He could offer

25   evidence in your behalf, if you thought there was evidence

ELLEN S. COMBS, CSR
Official Court Reporter

9

1   that might help you in this case.

2          Do you understand that?

3   A.   Yes, I do.

4   Q.   Further, at the trial you would have the right to

5   testify in your own behalf if you wish to do so. On the

6   other hand, you could not be forced to be a witness at a

7   trial. This is because under the Constitution of the

8   United States, no person can be compelled to be a witness

9   against himself.

10         So, if you wish to go to trial but chose not to

11  testify, I would instruct the jury that they could not

12  hold that against you.

13         Do you understand that fundamental right?

14  A.   Yes, I do.

15  Q.   If, instead of going to trial you plead guilty to

16  these crimes, and if I accept your guilty plea, you will

17  be giving up your right to a trial and all the other

18  rights I have just discussed. There will be no trial in

19  this case. There will be no appeal on the question of

20  whether you did or did not commit these crimes. The only

21  thing you could appeal would be if you thought I did not

22  properly follow the law in sentencing you.

23         Do you understand that?

24  A.   Yes, I do.

25         THE COURT:   Is there a waiver of appeal in the

10

1  plea agreement?

2         MR. MISKIEWICZ:  There is, your Honor.

3         THE COURT:  Where is it?

4         MR. MISKIEWICZ:  Paragraph 4 on page 3 indicates

5  that the defendant will not file an appeal or otherwise

6  challenge this conviction or sentence in the event that

7  the Court imposes a term of imprisonment of 240 months, or

8  below, which is our estimate, our statement as to what we

9  believe the statutory maximum would be under what the

10  defendant is pleading guilty to.

11  BY THE COURT:  (Continuing)

12  Q.  Mr. Pistone, did you hear what the prosecutor just

13  said?

14  A.  Yes, I did.

15  Q.  In paragraph 4 there is a waiver of appeal under

16  certain circumstances.

17         Do you understand that?

18  A.  Yes.

19  Q.  Normally without this waiver of appeal you would have

20  the right to appeal from any part of any sentence that is

21  imposed on you.

22         Do you understand?

23  A.  Yes.

24  Q.  You can't appeal from the crime if you plead guilty,

25  but you can appeal from the sentence.

```
                                                              11
1    A.    Okay.

2    Q.    But you have a right to give up that right to appeal.

3    And you have given it up, according to this paper, this

4    agreement.  If the Court imposes a term of imprisonment of

5    240 months or less, you have given up the right to appeal.

6            Do you understand that?

7    A.    Yes, I do.

8    Q.    Do you wish to give up your right to appeal if the

9    Court imposes a sentence of 240 months or less?

10   A.    Yes.

11   Q.    Now Mr. Pistone, are you willing to give up your

12   right to a trial?

13   A.    Yes, sir.

14   Q.    And the other rights I have just discussed with you?

15   A.    Yes.

16           THE COURT:  Is there an agreement pursuant to

17   which this plea is being offered, Mr. Miskiewicz?

18           MR. MISKIEWICZ:  Yes, your Honor.

19           There is a written plea agreement, a copy of

20   which was provided to the Court's chambers earlier today.

21   I believe the defendant has signed the original copy.

22   Mr. Schoer has a copy of it.

23           I would also like to indicate that the agreement

24   is signed both by representatives of the United States

25   Attorney's office, including myself on page 6, and is also
```

```
                                                          12
 1   countersigned by Frank Lanzo.

 2              THE COURT:  L-A-N-Z-O?

 3         MR. MISKIEWICZ:  Yes, your Honor.

 4              THE COURT:  We may not know Mr. Lanzo.  In fact,

 5   I don't know him.

 6         MR. MISKIEWICZ:  Mr. Lanzo is Chief of the

 7   Rackets Bureau for the Nassau County District Attorney's

 8   office, and in accordance with this agreement -- this

 9   agreement is in satisfaction of all of the charges in the

10   current indictment here federally, and is also in

11   satisfaction of a parallel state arson prosecution which

12   is set to go to trial on Monday, I believe in Supreme

13   Court in Nassau County.

14              THE COURT:  Is that in this plea agreement?

15         MR. MISKIEWICZ:  Your Honor, it is in the plea

16   agreement insofar as it states in paragraph 5(a), that the

17   office, and the Nassau County District Attorney's office,

18   agree that no further criminal charges will be brought

19   against this defendant for the offenses described in this

20   indictment.

21              THE COURT:  So there is a state charge of arson,

22   you say?

23         MR. MISKIEWICZ:  There is a state charge of

24   arson, which is also charged here as a predicate act; that

25   is the predicate arson act in the indictment.
```

1          THE COURT:  So that is the one that --

2          MR. SCHOER:  The kennel, Judge, is the same.

3          THE COURT:  The kennel is the same as count one,

4    Racketeering Act Two?

5          MR. MISKIEWICZ:  That's correct.

6          THE COURT:  Arson conspiracy?

7          MR. MISKIEWICZ:  And Two B.

8          THE COURT:  Having to do with Hav-a-Home Kennel,

9    Old Brookville, New York?

10          MR. MISKIEWICZ:  Yes, your Honor.

11          THE COURT:  There is a charge against him in the

12   state court as well?

13          MR. MISKIEWICZ:  Yes.

14          THE COURT:  And that case is scheduled to go to

15   trial, you say?

16          MR. MISKIEWICZ:  On Monday.

17          THE COURT:  On Monday.  Monday is what, July?

18          THE CLERK:  23rd.

19          THE COURT:  July 23rd.  And this plea includes

20   what is going to happen to that charge on Monday?

21          MR. MISKIEWICZ:  My understanding is, that upon

22   sentencing here the District Attorney's Office -- actually

23   the Court will dismiss the pending state count of arson.

24          THE COURT:  How am I going to do that?

25          MR. SCHOER:  Not you, your Honor, the State

14

1  Court will dismiss it.  It is my understanding that that

2  has already been worked out.  And that could be done in

3  absentia, and the defendant wouldn't have to be produced.

4          THE COURT:  So we'll make it very clear.  If

5  this defendant pleads guilty to the charge now before me,

6  there will be a dismissal of the state charge for arson

7  that is presently pending in the County Court, Nassau

8  County?

9          MR. MISKIEWICZ:  Correct.

10          THE COURT:  What is the number of that?  Does

11  anybody know?

12          MR. MISKIEWICZ:  Your Honor, the assistant DA

13  who is handling that matter is in the courtroom.  If I can

14  get that --

15          THE COURT:  Where is he?

16          MR. MISKIEWICZ:  She, Mary Ruddy, who is an

17  assistant district attorney in the Rackets Bureau.

18          THE COURT:  What is her name?

19          MR. MISKIEWICZ:  Mary Ruddy.

20          THE COURT:  Come up, Ms. Ruddy.

21          Welcome to the Federal Court, Ms. Ruddy.

22          MS. RUDDY:  Thank you, your Honor.  Good

23  afternoon.

24          THE COURT:  Is it afternoon?  Yes, it is

25  afternoon.

1      Do you understand that that is what is going to

2  happen?

3      MS. RUDDY:  Yes, your Honor.

4      THE COURT:  That if the defendant pleads guilty

5  and is sentenced by me to whatever the sentence is here,

6  that the indictment in the County Court, Nassau County,

7  for arson involving the premises in Old Brookville will be

8  dismissed?

9      MS. RUDDY:  That's correct, your Honor.

10     THE COURT:  That is part of the deal.  Right?

11     MS. RUDDY:  Yes, Judge.

12     THE COURT:  That is what you have agreed, to do

13  that, to induce him to plead guilty.  Correct?

14     MS. RUDDY:  Well, Judge, my understanding is,

15  partly.

16     THE COURT:  Partly?

17     MS. RUDDY:  Well, once he pleads here, Judge, I

18  believe that we would be jeopardied out, in any event.

19     THE COURT:  Whether you would be or not, you're

20  going to dismiss the indictment?

21     MS. RUDDY:  That's correct, Judge.  We are.

22     THE COURT:  You're not relying on this, you're

23  making an agreement to do that.  Right?

24     MS. RUDDY:  Yes, your Honor.

25     THE COURT:  And that is partly to induce him to

16

1   plead guilty.

2        Tell Mr. Dillon I have you here. Don't worry

3   about it.

4        MS. RUDDY: Sorry, Judge.

5        THE COURT: He is a good friend of mine. We

6   campaigned together. Did you know that?

7        MS. RUDDY: No, I didn't.

8        MR. SCHOER: Mr. Pistone also is under the

9   impression -- and I don't represent him in the State Court

10   -- but he is under the impression there will be no other

11   charges pending against him in the State Court.

12        THE COURT: Who represents you in the State

13   Court?

14        MR. SCHOER: He is assigned. Mr. Scott.

15        THE COURT: Scott, S-C-O-T-T?

16        MR. SCHOER: Yes, James Scott, I believe.

17        THE COURT: Is he here?

18        MR. SCHOER: No, he is not here. But I have

19   spoken to Mr. Scott, and based on my conversations with

20   Mr. Scott there are no other charges other than the arson

21   charges, or at least that indictment.

22        THE COURT: And he has already pled guilty to

23   bail jumping, attempted bail jumping?

24        MS. RUDDY: Right.

25        MR. SCHOER: And it is my understanding and

17

1    Mr. Pistone's understanding that that sentence will run

2    concurrent with your Honor's sentence, and he would be

3    sentenced in absentia with respect to that.

4            I believe that was all put on the record this

5    week when they appeared before the State Court Judge.

6            THE COURT:  Well, what Judge is this before?

7            MS. RUDDY:  It is before the Honorable Jeffrey

8    S. Brown, Nassau County Court Judge.

9            And your Honor, so the record is clear.  This

10   defendant was present in Nassau County Court on July 17th,

11   2001, where all of this was placed on the record.  This

12   defendant does have two other indictment numbers pending

13   against him in Nassau County Court in addition to the

14   arson.

15           THE COURT:  What about those two indictments?

16           MS. RUDDY:  The defendant has already pled

17   guilty, I don't recall the indictment number, to attempted

18   bail jumping, a Class C felony.  He is awaiting sentence

19   on that.

20           In addition, another indictment charging him

21   with criminal possession of a forged instrument, I believe

22   second degree, is going to be dismissed in satisfaction

23   once he is sentenced on the attempted bail jumping.

24           THE COURT:  Now, this attempted bail jumping, is

25   that involved in this plea here?  Is that going to be

18

1  concurrent with the time that I am going to sentence him?

2         MS. RUDDY:  Judge, I don't know what the

3  understanding is with respect to the attempted bail

4  jumping.  I can tell you that --

5         THE COURT:  That is what Mr. Schoer said just

6  now.

7         MS. RUDDY:  Well, Judge Brown's commitment is an

8  indeterminate term of imprisonment of two to four years.

9  And the defendant will be sentenced in absentia after he

10 is sentenced on the matter pending before your Honor.

11        THE COURT:  So in the State Court, Judges are

12 permitted to make promises?  Are they?

13        MS. RUDDY:  Yes, Judge.

14        THE COURT:  In the Federal Court we're not

15 permitted to do that.  Do you know that?

16        MS. RUDDY:  I'm not familiar with your practice.

17 I'm sorry, your Honor.

18        THE COURT:  Well, we're not.  Rule 11 says we're

19 not.  But I want to make sure that the defendant and his

20 lawyer here understand that.

21        This two to four you say is not going to be

22 concurrent with my sentence, or it is going to be

23 concurrent?

24        MS. RUDDY:  Judge, I honestly, I can't answer

25 that question.

19

1  THE COURT:  Who would know that?  This is

2  important to know.  Isn't it?

3  MS. RUDDY:  Judge, I don't know the legal

4  operation of, and the position of a state sentence after

5  the defendant has been sentenced federally.

6  THE COURT:  Well, an agreement is an agreement,

7  whether it's state, federal, or both.  What is the

8  agreement?  What was the agreement when he pled guilty to

9  the attempted bail jumping?  Were you there at the time?

10  MS. RUDDY:  Yes, I was, Judge.

11  THE COURT:  What was the agreement?  Was the

12  agreement that he was to be sentenced concurrently with

13  this sentence?  It is going to be far in excess of two to

14  four years.

15  MS. RUDDY:  Your Honor, if my recollection is

16  correct --

17  THE COURT:  Is it going to be consecutive to the

18  sentence that I -- this is important for the defendant and

19  his lawyer to know.

20  MS. RUDDY:  Well, your Honor, at the time the

21  plea was entered on the attempted bail jumping, I don't

22  believe that the defendant had been indicted in Federal

23  Court for the arson.  So I don't think that that was ever

24  addressed, because that was not an issue at the time of

25  the plea.

```
                                                                            20
 1           THE COURT:  How long ago was this indictment for
 2   attempted bail jumping?
 3           MS. RUDDY:  The date of the plea, it was 2000,
 4   probably March of 2000.
 5           THE COURT:  He was indicted in March of 2000?
 6           MS. RUDDY:  No, he took a plea of guilty.
 7           THE COURT:  Was he indicted for attempted bail
 8   jumping prior to the federal indictment?
 9           MS. RUDDY:  Yes, your Honor, he was.
10           THE COURT:  Well, what is the agreement?  Who
11   would know what the agreement is?
12           Were you there at the time, Mr. Schoer?
13           MR. SCHOER:  No, Judge.  But I think Ms. Ruddy
14   is correct, in the sense that when he actually took the
15   plea, at the time the agreement was made there was no
16   discussion of concurrent time, consecutive time.
17           THE COURT:  So then it could be consecutive
18   time?
19           MR. SCHOER:  Yes.  But it was my understanding
20   that -- this is from Mr. Pistone -- that this was
21   mentioned this week when they appeared before Judge Brown.
22           THE COURT:  Well, who was there when they
23   appeared before Judge Brown?  Were you there?
24           MS. RUDDY:  Yes, I was, Judge.
25           THE COURT:  Was anything mentioned about whether
```

c 02 08 05:08p

21

1    the two to four on the attempted bail jumping was going to

2    be consecutive or concurrent?

3              MS. RUDDY:  I don't recall Judge Brown

4    addressing the issue of concurrent versus consecutive

5    time.  He indicated on the record that based on

6    everything, that he would keep his promise of imposing a

7    two to four sentence after the imposition of sentence on

8    this federal matter.

9              THE COURT:  Well, this is now, as an infamous

10   Broadway show called, "a puzzlement."

11             Do you know that show, Mr. Schoer?

12             MR. SCHOER:  Yes, Judge, *Fiddler on the Roof*, I

13   think I heard it referred to.

14             THE COURT:  No, it is not.  It is not.  It is

15   *The King and I*.

16             MR. SCHOER:  *The King and I*.

17             THE COURT:  Never mind *Fiddler on the Roof*.

18   Where did you get that from?

19             MR. SCHOER:  Because you referred to *Fiddler on

20   the Roof* before.

21             THE COURT:  Did you ever hear of Yul Brenner?

22   You wouldn't know, you're too young to know about that.

23   Only the marshals would know about that.

24             THE DEFENDANT:  What is it about Yul Brenner?

25   You don't like Yul Brenner?

22

1      THE COURT:  I like Yul Brenner.  He looks like
2  you somewhat.
3      But now I got to figure this out, though.  How
4  am I going to do that?
5      If I call Judge Brown, would he know?
6      MS. RUDDY:  I don't know, Judge.
7      THE COURT:  You don't know?  Let's get Judge
8  Brown on the phone.  Let's talk to him.  I mean I want to
9  know.  Don't you?
10      THE DEFENDANT:  Sure.  Give me the number, I'll
11  dial it.
12      THE COURT:  You stay right there, we'll dial.
13      What is the number for Judge Brown?
14      MS. RUDDY:  Judge, I believe his chambers is
15  area code 516-571-1488.
16      THE COURT:  Good.
17      MS. RUDDY:  I have dialed it a few times.
18      THE COURT:  Madam deputy, do you want to get him
19  for me, please?
20      (There was a pause in the proceedings.)
21      Hello, this is Judge Spatt calling from the
22  Federal Court in Central Islip.
23      VOICE ON PHONE:  How are you?
24      THE COURT:  Good.  How are you?
25      Is Judge Brown around?

Dec 02 08 05:09p                                                              p.3

```
                                                                         23
  1              VOICE ON PHONE:  He is actually on the bench.

  2         Would you hold on one second, please?

  3              THE COURT:  Would you get him?

  4              VOICE ON PHONE:  Sure.  Would you hold on?

  5              THE COURT:  Thank you.

  6              (There was a pause in the proceedings.)

  7              JUDGE BROWN:  Hello.

  8              THE COURT:  Jeff?

  9              JUDGE BROWN:  Hi, Judge.  How are you?

 10              THE COURT:  How are you?

 11              I have a question for you.  I am in the middle

 12         of a guilty plea with Joseph Pistone.  It is a federal

 13         case.  You're on the speaker phone and everybody is

 14         hearing what we're saying.

 15              JUDGE BROWN:  Yes.

 16              THE COURT:  Mr. Pistone is about to take a plea

 17         in a superseding indictment; count one, conspiracy,

 18         racketeering conspiracy, including a murder conspiracy and

 19         an arson conspiracy involving this Have-a-Home Kennel in

 20         Old Brookville.

 21              JUDGE BROWN:  Right.  I have before me an arson

 22         in the second degree which involves that same count.

 23              THE COURT:  I understand that if he pleads

 24         guilty to the count before me, that the people are going

 25         to dismiss this indictment?
```

ELLEN S. COMBS, CSR
Official Court Reporter

24

1          JUDGE BROWN:  Yes.  That is what they told me.

2          THE COURT:  Now also, he pled guilty to another

3    charge, attempted bail jumping?

4          JUDGE BROWN:  That's right.

5          THE COURT:  That sentence is going to be an

6    indeterminate term of not less than two, nor more than

7    four years?

8          JUDGE BROWN:  Okay.  I have a commitment on

9    that.

10         THE COURT:  The point I'm trying to find out so

11   that he would know and understand before he pleads guilty

12   here; is that two to four consecutive to my sentence, or

13   concurrent to my sentence?

14         JUDGE BROWN:  Well, I didn't say anything,

15   because I didn't expect that to happen.  Because if I

16   tried the case -- because he was out on bail at the time

17   he allegedly committed the arson, I would have had to give

18   him consecutive time.  However, now that my case is

19   dismissed, I was not going to say anything because it is

20   just a two to four commitment, which I was going to

21   sentence him.

22         THE COURT:  Well, we have to know.  I mean

23   somebody has to know.

24         I don't want to put you on the spot or anything,

25   but he is going to have to know; either you can't tell him

25

1   whether it is two to four consecutive, or concurrent, or

2   it is consecutive, or it is concurrent, one or the other,

3   I mean, so he knows.  I want him to know all these facts

4   before he pleads guilty.

5           JUDGE BROWN:  Well, I don't know if I'm

6   statutorily prohibited at this point.  I have to look at

7   the statute.

8           THE COURT:  So you really don't know if it is

9   going to be consecutive or concurrent?

10          JUDGE BROWN:  I was just going to say, I was

11  under the understanding that perhaps -- that this sentence

12  would have merged with the federal.

13          THE COURT:  But you don't know that?

14          JUDGE BROWN:  I don't know that.  Somebody

15  mentioned that, and I thought perhaps, you know --

16          THE COURT:  Well, is it possible to find out

17  about that, or is it not?  How do we find out, if we ever

18  find out?

19          JUDGE BROWN:  Well, the only thing I can do at

20  this point, I can look at the statute and see exactly what

21  it says.

22          THE COURT:  I don't want to make you make a

23  decision that you have to exercise your discretion on.

24  That is not what I'm calling about.

25          JUDGE BROWN:  Right.

26

THE COURT: If you have discretion, then I'm
going to have to tell Mr. Pistone, who is listening to
this, that you have the discretion to do this. It is only
if you're, if you either by agreement or by statute are
compelled to give him consecutive, or you're going to give
him consecutive.

JUDGE BROWN: I don't think I would, you know,
give consecutive, be compelled to give consecutive. I
don't think so, because if my case is dismissed I don't
think I would be compelled.

And what is the commitment that you're going to
give him?

THE COURT: Well, I don't make any commitment.

JUDGE BROWN: I didn't realize that.

THE COURT: I can't make any commitment. But
under this plea agreement that has been signed, and that
we're working on, he has waived his right to appeal any
sentence of 240 months or less, 20 years.

JUDGE BROWN: I would think that because he has
good time in already, I mean at least pretty close to it,
because he has been -- bail was set, and through my
commitment -- and my inclination would have been not to
require, be required to give him consecutive. It would
have been concurrent.

THE COURT: Yes, but the question is; are you

27

1  required or not?  That you have to look into?

2          JUDGE BROWN:  If you want to hold on, I'll see

3  if I can get hold of my law secretary to look at the

4  statute.

5          THE COURT:  That would be very nice, if you do

6  that.

7          JUDGE BROWN:  Will you hold on a second?

8          MR. SCHOER:  Judge, I believe that Judge Brown

9  is under a misconception.

10         JUDGE BROWN:  Hold on a minute.

11         MR. SCHOER:  As far as I understand -- I'm Gary

12  Schoer, I'm Mr. Pistone's counsel here in the Federal

13  Court.

14         As far as I understood, the bail jumping was not

15  -- the arson was not committed while he was on bail for

16  that.  That caused the bail jumping, the bail jumping

17  occurred during the course of the arson case.

18         JUDGE BROWN:  He was in the middle of hearings.

19  It was before Judge Kowtna in the middle of hearings.

20         MR. SCHOER:  Right, so he was not, I don't

21  believe, and if I understand the law correctly -- I don't

22  believe that it would be, it would be required to be

23  consecutive, because he was not on bail when the arson

24  occurred.

25         THE COURT:  Well, is it possible for you to

```
                                                    28
1    check on this?
2              JUDGE BROWN:  I'll do it right now, if you want
3    to hold on a second.
4              THE COURT:  Sure, we'll hold.
5              JUDGE BROWN:  Okay.
6              (There was a pause in the proceedings.)
7              THE COURT:  Where are you supposed to be, in
8    Brooklyn, Mr. Schoer?
9              MR. SCHOER:  I believe.
10             THE COURT:  You're not going to be there.  We're
11   going to break for lunch.
12             MR. SCHOER:  Judge Gold at two o'clock.
13             THE COURT:  At two o'clock?
14             MR. SCHOER:  And it's a civil trial where the
15   government has an expert witness that they're calling at
16   two o'clock.
17             THE COURT:  Do you have Judge Gold's telephone
18   number?
19             MR. SCHOER:  No, I don't, Judge.
20             THE COURT:  What is the name of the case?
21             MR. SCHOER:  It's Alberti against the United
22   States.
23             THE COURT:  You represent Alberti?
24             MR. SCHOER:  The plaintiff, yes.  It's a civil
25   case.
```

ELLEN S. COMBS, CSR
Official Court Reporter



c 03 08 09:15a

```
                                                        29
1          THE COURT:  And you say the government is
2   bringing an expert in?
3          MR. SCHOER:  Yes, a doctor.  We had testimony
4   yesterday, and we were continuing today.
5          THE COURT:  That is a bench trial?
6          MR. SCHOER:  It's a bench trial.  I also have at
7   1:30, and I still haven't gotten confirmation, a plea in
8   front of Magistrate Borelski.
9          THE COURT:  You better call Judge Borelski.
10         MR. SCHOER:  I don't know if that was set for
11  1:30 or after five.
12         THE COURT:  How do you do all of these things,
13  Mr. Schoer?
14         MR. SCHOER:  We were supposed to be here at
15  nine, so I thought I was going to be able to do these
16  things.  And I don't know how I do it.
17         THE COURT:  But right now this takes priority.
18         MR. SCHOER:  I'm sure.
19         THE COURT:  So you worry about everything else
20  later.
21         MR. SCHOER:  And I appreciate your Honor making
22  the call.
23         (There was a pause in the proceedings.)
24         JUDGE BROWN:  Judge Spatt?
25         THE COURT:  Yes.
```

c 02 08 05:14p

30

1    JUDGE BROWN:  Okay, I have the section in front

2    of me, and I'm going to read it to you.  And from my

3    reading it indicates to me that I do not have to give

4    consecutive time.

5         I'm reading from Penal Law Section 70.25, 2-C.

6         When a person is convicted of bail jumping in

7    the second degree as defined in Section 215.56 --

8         THE COURT:  You have to slow down a little bit.

9    I want you to do that again, please.

10        JUDGE BROWN:  Certainly.

11        When a person is convicted of bail jumping in

12   the second degree, as defined in Section 215.56, and

13   called bail jumping in the first degree as defined in

14   Section 215.57 -- the defendant pled guilty to bail

15   jumping in the second degree committed after arraignment,

16   and while released on bond or bail in connection with a

17   pending indictment or information charging one or more

18   felonies, at least one of which he is subsequently

19   convicted, and if an indeterminate sentence of

20   imprisonment is imposed in each case, such sentences shall

21   run consecutively.

22        It goes on to say -- provided, however, that the

23   Court may in the interests of justice order a sentence to

24   run concurrently in a situation where consecutive

25   sentences are required by this subdivision, if it finds

31

1    mitigating circumstances that bear directly upon the

2    matter on which the crime was committed.

3         Section two goes on further, but I can stop at

4    that point.

5         THE COURT:  Good thing.

6         JUDGE BROWN:  What happened here is that:  A, I

7    no longer have a pending indictment in front of me.  Plus

8    he will not have been convicted of the arson in the second

9    degree, which brings me --

10        THE COURT:  And also there are mitigating

11   circumstances involved.

12        JUDGE BROWN:  That may be too.  I don't know

13   what the mitigating circumstances provision means in that

14   section, but if the People dismiss the indictments before

15   me, then obviously there would not be convictions from

16   that, and I am not required to give a consecutive

17   sentence.

18        THE COURT:  You mean dismiss the indictment for

19   arson?

20        JUDGE BROWN:  Yes, well they will dismiss the

21   indictment before me.

22        THE COURT:  That was the underlying crime.

23        JUDGE BROWN:  Right.  He was out on bail at the

24   time.

25        THE COURT:  Now I want to make it clear, Judge



c 02 08 05:31p

32

1   Brown. I'm not asking you to make a decision on a

2   discretionary matter like this. I mean it is just not

3   fair for me to do that. But I just want to know, I want

4   Mr. Pistone and his lawyer to know what the possibility,

5   probabilities or certainties are.

6          JUDGE BROWN: Well, that was the section that I

7   would be guided by at the time. And of course if the case

8   is tried before me, and if there was a conviction, this

9   statute tells me I must give consecutive time, unless

10  there are mitigating circumstances.

11         However, at this point if the people dismiss the

12  indictment for arson in the second degree which is

13  presently pending before me, there will be no underlying

14  charge before me.

15         THE COURT: So therefore, with reasonable

16  certainty, based on that you would sentence to concurrent

17  time?

18         JUDGE BROWN: That's correct.

19         THE COURT: Okay.

20         Any other questions, Mr. Schoer?

21         MR. SCHOER: No, Judge.

22         THE COURT: Mr. Miskiewicz?

23         MR. MISKIEWICZ: No, your Honor.

24         THE COURT: Judge Brown, thank you very much.

25         JUDGE BROWN: You're welcome.

Dec 02 08 05:31p

33

1    THE COURT:  You have been responsive and

2  helpful.  I really appreciate it.

3    JUDGE BROWN:  No problem at all.

4    THE COURT:  Thanks a lot.

5    JUDGE BROWN:  You're welcome.  Bye now.

6    THE COURT:  Bye.

7    (There was a pause in the proceedings.)

8    THE COURT:  Excuse me, I have to talk to --

9  Judge Gold is very unhappy.

10    THE DEFENDANT:  Take your time.

11    (A recess was taken.)

12    THE COURT:  Okay, I have to get you out as soon

13  as possible, which means we're going to work through

14  lunch.  You can have lunch later.

15    THE DEFENDANT:  I have all of the time in world.

16    THE COURT:  Is that all right with you,

17  Mr. Marshal?

18    A VOICE:  Yes.

19    THE COURT:  All right now, it appears then that

20  the indictment for arson in the state court is going to be

21  -- where is the assistant district attorney, where did she

22  go?  Come on up here.

23    We're going to swear you in as a special

24  assistant United States attorney very shortly.

25    MS. RUDDY:  Thank you, Judge.  That's great.

ELLEN S. COMBS, CSR
Official Court Reporter

34

1       THE COURT:  Now it appears, Mr. Schoer, that the

2  indictment in the state court, in the County Court, Nassau

3  County, before Judge Jeffrey Brown is going to be

4  dismissed on Monday, or will be dismissed when I sentence

5  him.

6       MS. RUDDY:  That's correct, your Honor.

7       THE COURT:  That is the agreement.  It also

8  appears that probably the sentence for the attempted bail

9  jumping will be concurrent.  I say, probably, because you

10  heard the conversation I had with Judge Brown.

11       MR. SCHOER:  Yes.

12       THE DEFENDANT:  Yes, sir.

13  BY THE COURT:  (Continuing)

14  Q.   Now Mr. Pistone, did you hear everything that we

15  discussed?

16  A.   Everything.

17  Q.   Are you satisfied with that?

18  A.   A hundred percent, sir.

19  Q.   Are you ready to go ahead based on that?

20  A.   Yes, sir.

21  Q.   Now I can't guarantee it is going to be concurrent,

22  but it sounds that way.

23       Do you understand that?

24  A.   Okay.  Who makes that final decision, you?

25       MR. SCHOER:  Judge Brown.

Dec 02 08 05:32p

35

1   Q.   Judge Brown.

2   A.   Judge Brown, after my sentencing here makes the final

3   decision?

4   Q.   Yes.

5   A.   Okay.

6   Q.   You heard what he said?

7   A.   Yes.

8   Q.   So in other words, now next week when you decide --

9   Well, it is not for sure, I shouldn't have taken the

10  plea -- I'm not going to let you withdraw the plea.

11       Do you understand me?

12  A.   Yes.

13  Q.   You know that he is probably going to sentence you to

14  concurrent, but not absolute at this point.

15       Do you understand?

16  A.   Yes.

17  Q.   Do you want to go ahead with the guilty plea?

18  A.   Yes.

19  Q.   Now you're not going to withdraw the plea if it is

20  not concurrent.

21       Do you understand?

22  A.   Yes.

23  Q.   Okay.

24       THE COURT:   Now what is this agreement?   What

25  does it provide?   Can you tell me, briefly?

ELLEN S. COMBS, CSR
Official Court Reporter

Dec 02 08 05:32p                                                                    p.5

```
                                                                    36
1        MR. MISKIEWICZ:  Briefly, your Honor; the

2    agreement is that if the defendant will plead guilty to

3    count one, racketeering --

4        THE COURT:  Mr. Pistone, listen to this, because

5    I know that you have gone over it, and I know you're an

6    intelligent man.  And I know you got a very good lawyer.

7    And I know he has explained everything to you.  But I want

8    you to listen to it anyway.

9        Go ahead.

10       MR. MISKIEWICZ:  If the defendant pleads guilty

11   to count one of the superseding indictment, Predicate Act

12   One B, and Predicate Act Two; namely the murder conspiracy

13   and arson, that plea will be taken in satisfaction for all

14   other counts in the superseding indictment.

15       The government, as I indicated earlier today,

16   will not bring any further charges or prosecution for the

17   defendant.

18       It is our estimate under the statute --

19       THE COURT:  Before you get to the estimate, is

20   there a statutory maximum penalty term of imprisonment for

21   what he is pleading guilty to now?

22       MR. MISKIEWICZ:  Yes, your Honor.

23       THE COURT:  What is the maximum term of

24   imprisonment for the crimes he is pleading guilty to now?

25       MR. MISKIEWICZ:  Under Title 18, United States
```

1    Code Section 1963, the maximum term of imprisonment would

2    be 20 years.

3              THE COURT:  We call it 240 months.

4              MR. MISKIEWICZ:  Or 240 months, yes, your Honor.

5              THE COURT:  So that is the max.  Right?

6              MR. MISKIEWICZ:  Correct.

7              THE COURT:  Minimum is zero?

8              MR. MISKIEWICZ:  Correct.

9              THE COURT:  Okay.  And I interrupted you when

10   you said something about estimated something.

11             MR. MISKIEWICZ:  Under the guidelines, under the

12   US sentencing guidelines, your Honor, it is our

13   calculation, our estimated calculation that the base

14   offense level here would be driven by Section 2(a)(1).1,

15   minus a 3 level adjustment for acceptance of

16   responsibility, would bring this to an adjusted offense

17   level.

18             THE COURT:  Would it be a three level reduction?

19             MR. MISKIEWICZ:  Our estimate is that a timely

20   acceptance of responsibility downward adjustment would

21   still be viable at this juncture.  Yes, your Honor.

22             THE COURT:  The government would agree that it

23   is timely, so that it would be a three, rather than a two

24   level reduction?

25             MR. MISKIEWICZ:  Yes, your Honor.

38

1          THE COURT:  I'm saying all of this for your

2     benefit.

3          THE DEFENDANT:  Thank you.  Say more, please.

4          THE COURT:  No, no.  I want you to listen.

5          THE DEFENDANT:  I need all the help at this

6     time.

7          THE COURT:  I want you to listen to it, because

8     you're going to plead guilty based upon all of these

9     things that we're talking about now.

10          MR. MISKIEWICZ:  Your Honor, given that, and

11     given the defendant's prior criminal history, we estimate

12     --

13          THE COURT:  Hold on one minute, please.

14          (There was a pause in the proceedings.)

15          THE COURT:  Let me interrupt to tell you, Mr.

16     Schoer; I spoke to Judge Gold, and he is going to wait for

17     you.  And he understands the delay.

18          And I spoke -- I didn't speak, but my courtroom

19     deputy spoke to Judge Borelski who will take the plea

20     after five.

21          MR. SCHOER:  That's great, Judge.  Thank you.

22          THE COURT:  This afternoon.

23          MR. SCHOER:  Thank you, Judge.

24          THE COURT:  Go ahead.  I'm sorry for

25     interrupting you.

39

1        MR. MISKIEWICZ:  No problem, your Honor.

2        It is our estimate that under the guidelines,

3 and given the defendant's criminal history which we place

4 at A criminal history category of V, the guideline --

5        THE COURT:  Roman Numeral 5?

6        MR. MISKIEWICZ:  Roman Numeral 5.  The guideline

7 exposure in this case would be a range of 360 months to

8 life.

9        However, because there is a statutory maximum of

10 20 years under Title 18, we believe that the maximum

11 sentence that may be imposed under this plea would be 20

12 years or 240 months.

13        THE COURT:  Did you hear what the prosecutor

14 said?  Is that your view of what this plea agreement is

15 about, Mr. Schoer?

16        MR. SCHOER:  Yes, Judge.

17 BY THE COURT:  (Continuing)

18 Q.   Did you hear what the prosecutor and your attorney

19 just said?

20 A.   Yes, sir.

21 Q.   Now you have a written plea agreement?

22 A.   Yes.  That is what I'm reading from.

23 Q.   Did you read it before?

24 A.   Yes, I did.

25 Q.   And there are things in there you might not have

40

1    understood.  Correct?

2    A.    Yes.

3    Q.    Did Mr. Schoer explain everything?

4    A.    Yes, this morning.

5    Q.    In his usual careful manner?

6    A.    Sure did.

7    Q.    And now do you understand everything that is in this

8    plea agreement?

9    A.    Yes, I do.

10   Q.    If there is anything you don't understand, I'll be

11   glad to try to explain it to you.

12   A.    Not at all, sir.

13   Q.    All right.  And did you indicate your understanding

14   of the plea agreement, and consenting to be bound by the

15   terms of the plea agreement by signing it?

16   A.    Yes, I did.

17   Q.    And when you signed it, did you read about what --

18   the words above your signature?

19   A.    Did I read the words above my signature?

20   Q.    Yes.  Read it again just to make sure.

21   A.    I have read the entire agreement and discussed it

22   with my attorney --

23   Q.    Wait, slow.

24   A.    I have read the entire agreement and discussed it

25   with my attorney.  I understand all of the terms and am

Dec 03 08 09:22a                                                                    p.3

41

1   entering into it knowingly and voluntarily.

2   Q.   And are you entering into this agreement knowingly?

3   A.   Yes, sir.

4   Q.   Knowing all of the terms?

5   A.   Yes.

6   Q.   And voluntarily?

7   A.   Yes, sir.

8   Q.   No one ever coerced you to do this?

9   A.   No, sir.

10  Q.   Certainly Mr. Schoer wouldn't do that.  Right?

11  A.   No.

12  Q.   That's for sure?

13  A.   No.

14  Q.   Okay, and were there any other promises made to you

15  that are not in this agreement?

16  A.   No, sir, there was not.

17  Q.   By the government?

18  A.   No, there was not.

19  Q.   And that includes the waiver of appeal you discussed

20  before?

21  A.   Okay.

22  Q.   Now Mr. Pistone, I must be certain that you

23  understand the consequences of pleading guilty to these

24  charges.

25          The maximum term of imprisonment by statute is

Dec 03 08 09:22a

```
                                                              42
 1   20 years or 240 months.

 2            Do you understand that?

 3   A.   Yes.

 4   Q.   The minimum term of imprisonment is zero, so that you

 5   will be sentenced to between zero and 240 months.

 6            Do you understand that?

 7   A.   Yes, I do.

 8   Q.   And further, if you are sentenced to 240 months or

 9   less, you can not appeal to the United States Court of

10   Appeals.

11            Do you understand that?

12   A.   Yes.

13   Q.   Further, there is a maximum term of supervised

14   release of five years.

15            Do you know what supervised release is?

16   A.   Like parole, sir.

17   Q.   Yes.  And this term of supervised release is a

18   maximum of five years.

19            If you violate any term of supervised release,

20   which means if you commit another crime while you're out

21   on supervised release; if you don't report to the

22   Probation Department; if you move without telling them

23   about it; if you take drugs; or carry a weapon; or

24   anything like that -- if you violate any condition of

25   supervised release, you can be sentenced to an additional
```

o 03 08 09:27a

43

```
 1    term of three years or 36 months, without credit for

 2    previous imprisonment or time previously served on

 3    post-release supervision.

 4            Do you understand that?

 5    A.   Yes.

 6    Q.   There is also a maximum fine of $250,000, or twice

 7    the gross profits of the racketeering enterprise.  And I

 8    don't know what that is.

 9    A.   Right.

10    Q.   That of course depends upon your financial ability to

11    pay.

12            Do you understand that?

13    A.   Yes.

14    Q.   Further, there is restitution.  If victims have been

15    hurt and lose money as a result of these crimes, you got

16    to pay restitution.

17            Do you understand that?

18    A.   Yes.

19    Q.   Now that is also determined by your ability to pay,

20    but it's much more often imposed, even if you do not have

21    a present ability to pay, and have a future ability to

22    pay.

23            Do you understand that?

24    A.   Yes, I do.

25    Q.   And there is further a $100 mandatory special
```

Dec 03 08 09:28a

44

1   assessment.

2            Do you understand that?

3   A.   Yes.

4   Q.   Now Mr. Pistone, in sentencing you I will have to

5   consider the federal sentencing guidelines that control

6   the Court.

7            THE COURT:   Have you discussed the federal

8   sentencing guidelines with Mr. Pistone, Mr. Schoer?

9            MR. SCHOER:   Yes, your honor.

10  BY THE COURT:   (Continuing)

11  Q.   Do you know what the federal sentencing guidelines

12  are?

13  A.   Yes, sir, I do.

14  Q.   What are they?

15  A.   It determines the amount of time you're going to get,

16  your sentence.  And your criminal history is categorized

17  -- to use a big word there.

18  Q.   All right.  Now, the best explanation for the federal

19  sentencing guidelines is by a reporter from the New York

20  Times at the time the guidelines were enacted, and this is

21  what he said:

22            "The federal guidelines create a point system

23  that add and subtract mitigating and aggravating

24  circumstances depending on the individual's conduct and

25  the circumstances surrounding the case."

45

1          Now, what I would call the *good factors*, would

2     reduce the point level.  What is a good factor?  Accepting

3     responsibility, pleading guilty.

4          You heard the government say they thought it was

5     a timely acceptance, so you're going to get a three level

6     reduction.

7     A.   Yes.

8     Q.   That reduces the points.

9     A.   Okay.

10    Q.   The less points, the less time.

11    A.   Yes.

12    Q.   And the factors that are bad -- I use that word

13    generally -- you understand?

14    A.   I understand what you mean.

15    Q.   Firearm involvement, victim hurt, and all of that

16    increases the points.  So when it gets to a certain point

17    level, then we go to the chart and we see the number of

18    points factoring in your criminal history, which is V,

19    which is a heavy criminal history.

20    A.   Yes.

21    Q.   You would get the time that I would sentence you to.

22         Now if we do that here, according to the

23    government it is going to end up with an adjusted offense

24    level of 40.  An adjusted offense level of 40 would carry

25    a term of 360 months to life.

46

1          Do you understand that?

2     A.    Yes, sir.

3     Q.    But I have already told you, there is a statutory

4     maximum beyond which I can not go, and they will not go,

5     which is 240 months.

6     A.    Okay.

7     Q.    So it looks like that will probably be the sentence.

8          Do you understand that?

9     A.    Yes, sir.

10    Q.    I want to be sure you knew that, and you understand

11    that.

12    A.    Okay.

13    Q.    Now in connection with the federal sentencing

14    guidelines, you're going to have to report to the

15    probation officer, who will ask you questions about your

16    entire life.  You're going to have to answer these

17    questions.  They are going to ask you about any criminal

18    history, your employment, marriages, divorces, children,

19    sickness, military service, boy scout service, religious

20    activities, and everything else in your life.  And you're

21    going to have to answer those questions.

22          Do you understand that?

23    A.    Yes, I do.

24    Q.    And they are going to draw a report, presentence

25    report.  And they will review all of the sentencing

ELLEN S. COMBS, CSR
Official Court Reporter

47

1    guidelines, and all of the factors to come to this offense

2    level and point level and sentencing range.

3            In your case, we know it is going to be more

4    than 240 months, but there is a statutory maximum.

5            Follow me?

6    A.   Yes.

7    Q.   Now within a couple of months you and your attorney

8    will get copies of this presentence report, and you can

9    object to it say that there are mistakes made.  And

10   Mr. Schoer will bring that to my attention.

11           And generally I will have to sentence within the

12   guideline range, except where there is a statutory maximum

13   of 240 months.

14   A.   Yes.

15   Q.   So it looks like that is what is going to happen.  I

16   can't assure you of that, but that is what is going to

17   happen.

18           Do you understand that?

19   A.   Yes.

20   Q.   Now at the time of your sentencing, your fine

21   attorney will make a recommendation to me, and perhaps the

22   prosecutor may make a recommendation in accordance with

23   this plea agreement.  He is bound by the terms of this

24   plea agreement.

25           I will listen carefully to whatever they say,



oc 03 08 09:42a

48

1    but you must clearly understand that the final

2    responsibility for sentencing you is mine alone.

3    A.    Okay.

4    Q.    And while I may be persuaded by your attorney, I may

5    also view the case differently, and not impose the

6    sentence he recommends.  I may impose a higher one.  No

7    one can promise you what sentence the Court will impose.

8    Is that clear?

9    A.    Yes.

10    Q.    If, after I impose sentence, you or your attorneys

11    think I have not properly followed the law in sentencing

12    you, where normally you could appeal, but now under this

13    plea agreement you have waived your right to appeal if I

14    sentence you to 240 months or less.

15            Do you understand that?

16    A.    Yes.

17    Q.    Do you have any questions you would like to ask me

18    about the charge, your rights, the possible sentence, or

19    anything else related to this matter that may not be

20    clear?

21    A.    No, sir.

22    Q.    Any questions at all?

23    A.    Nothing that I can think of right now, sir.

24            THE COURT:  Mr. Schoer, is there anything you

25    would like me to discuss with your client in further

```
                                                        49
 1   detail?
 2              MR. SCHOER:  No, your Honor.
 3              THE COURT:  Mr. Schoer, do you know of any
 4   reason why your client should not enter a plea of guilty
 5   to this charge?
 6              MR. SCHOER:  No, your Honor.
 7              THE COURT:  Are you aware of any viable legal
 8   defense to the charge?
 9              MR. SCHOER:  No, Judge.
10   BY THE COURT:  (Continuing)
11   Q.   Joseph Pistone, are you ready to plead to count one
12   of the superseding indictment:  Racketeering Act One B,
13   murder conspiracy; Racketeering Act Two B, arson
14   conspiracy?  Are you ready to plead to those charges?
15   A.   Yes, sir.
16   Q.   How do you plead to the charges contained in count
17   one with the predicate acts?
18   A.   Guilty.
19   Q.   Are you making this plea of guilty voluntarily and of
20   your own free will and accord?
21   A.   Yes, I am.
22   Q.   Has anyone threatened or forced you to plead guilty?
23   A.   No, sir.
24   Q.   Other than the agreement with the government which we
25   went over in detail, has anyone made you any promise that
```

50

1    caused you to plead guilty?

2    A.    No.

3    Q.    Has anyone made you any promise about the sentence

4    you will receive?

5    A.    No, sir.

6    Q.    No one can make you such a promise, because as I

7    advised you several times, I alone will have to decide on

8    the proper sentence in this case.

9              Do you understand that?

10   A.    Yes, I do.

11   Q.    All right, Mr. Pistone, would you describe briefly in

12   your own words what you did in connection with the crime

13   charged in count one, Racketeering and Racketeering Act

14   One B, murder conspiracy.

15             Tell us in your own words what you did.

16   A.    From about 1994 to 1998 I was associated with a group

17   of individuals and their companies that engaged in

18   racketeering activity.  The enterprise consisted of a

19   group of associated --

20   Q.    You have to slow down.  What did you say?

21   A.    I said the enterprise consisted of a group of

22   associated people and companies that worked for and under

23   the protection of members of the Columbo crime family of

24   La Cosa Nostra.  This is the same group identified in the

25   indictment as the "Galasso-Misseri Crew"



p.1

51

1    Q.    And what did you do in connection with this

2    enterprise, and this group, and this conspiracy?

3    A.    As members of that enterprise, and as a part of a

4    pattern of racketeering activity, I committed the

5    following:

6            In August of '94 together with others, including

7    other members of the enterprise, I conspired to murder

8    Louis Dorval.

9    Q.    And was he murdered?

10   A.    Yes.

11   Q.    How was he murdered?

12   A.    He was shot and killed.

13           THE COURT:  Is that satisfactory for that

14   particular act?

15           MR. MISKIEWICZ:  The predicate act set forth,

16   overt act in furtherance of that conspiracy, your Honor --

17   they are in paragraphs 23(a) through 23(d) of the

18   superseding indictment on pages 10 and 11.  And I don't

19   know that there has been any allocution thus far to

20   Mr. Pistone's involvement in any of those overt acts.

21   BY THE COURT:  (Continuing)

22   Q.    All right, do you see the overt acts set forth on

23   page 11, top of the page?  What about those overt acts,

24   Mr. Pistone?

25   A.    Yes, sir.  Would you like me to tell you, sir?

52

1    Q.   Yes.

2    A.   I then attempted to dispose of the body by loading it

3    into a large plastic Tuff Bin toolbox.

4    Q.   T-u-f-f B-i-n toolbox?

5    A.   Yes, sir.

6    Q.   What happened with the toolbox?

7    A.   It was then dumped into the Atlantic Ocean.

8    Q.   That was in August of 1994?

9    A.   Yes, sir.

10    Q.   Where was that?

11    A.   Pardon?

12    Q.   Where did this happen?

13    A.   Long Island, sir.

14    Q.   In Long Island?

15    A.   Yes.

16    Q.   What part of Long Island?

17    A.   Fire Island, sir.

18    Q.   Fire Island.

19          THE COURT:  Okay, anything else on that?

20          MR. MISKIEWICZ:  Your Honor, I still think that

21    the allocution isn't sufficient insofar as the defendant

22    has basically said he disposed of the body, or that it was

23    disposed of.

24          I'm not even sure if it was in the passive,

25    which theoretically he could be an accessory.

```
                                                              53
 1    BY THE COURT:   (Continuing)
 2    Q.    Well, how was he killed then?
 3    A.    He was shot and killed.
 4    Q.    Who did that?
 5    A.    I did.
 6          MR. MISKIEWICZ:   Nothing further.
 7    Q.    Now what about the Racketeering Act Two, arson
 8    conspiracy?  That is in paragraph 24 and 25, Mr. Pistone.
 9    A.    On February 15th of 1998, together with others,
10    including other members of the enterprise, I knowingly,
11    intentionally, and maliciously attempted to burn down and
12    destroy, and conspired to burn down and destroy the
13    Have-a-Home Kennel.
14    Q.    Have-a-Home?
15    A.    Yes, sir.
16    Q.    That is in Old Brookville, New York?
17    A.    Yes, sir.
18    Q.    And that was about, on or about February 15th, 1998?
19    A.    Yes, it was.
20          THE COURT:   Anything else on that?
21          MR. MISKIEWICZ:   No, your Honor.
22          THE COURT:   Based on the information given to
23    me, I find that the defendant, Joseph Pistone, is acting
24    voluntarily.  That he fully understands the charges, his
25    rights, and the consequences of his plea.
```

54

1       There is, moreover, a factual basis for the plea

2   and all parts of the plea.  I therefore accept the plea of

3   guilty to count one, Racketeering Act One B, murder

4   conspiracy; Racketeering Act Two B, arson conspiracy.

5       As I told you, Mr. Pistone, you will be

6   interviewed by the probation officer who is signed to this

7   case.  You are directed to cooperate fully with the

8   probation officer to help insure the speedy production of

9   the presentence report.

10      This sentence will take place on October 26th,

11  2001, at 10:30 a.m.

12      MR. SCHOER:  Is that the earliest possible date?

13      THE COURT:  Do you want an earlier date than

14  that?

15      MR. SCHOER:  Mr. Pistone would like the earliest

16  possible date.

17      THE COURT:  Well, I'm thinking about when the

18  presentence report -- if he sees the probation officer as

19  soon as possible --

20      THE DEFENDANT:  Yes, sir.

21      MR. SCHOER:  Well, he is incarcerated.

22      THE COURT:  The Probation Department said they

23  need a minimum of eight weeks.  Maybe we'll ask them to

24  make it faster in this case, make it a couple of weeks

25  faster.

ELLEN S. COMBS, CSR
Official Court Reporter

55

1          MR. SCHOER:  Eight weeks would put us into

2    September.

3          THE COURT:  They have to go through the NYSIIS

4    report, and the whole criminal history.  It is going take

5    awhile.

6          MR. SCHOER:  What was the date your Honor

7    suggested?

8          THE COURT:  October 26th.  I think that is about

9    as soon as we can get it.

10          MR. MISKIEWICZ:  Your Honor, again what was the

11    time?

12          THE COURT:  10:30 am, October 26, 2001.

13          The problem is going to be the criminal history,

14    the verification, that they're going to have to verify

15    everything.

16          THE DEFENDANT:  Yes.

17          THE COURT:  But if we can get it done sooner,

18    we'll try.

19          THE DEFENDANT:  Okay.

20          THE COURT:  We'll try.  We can't assure you of

21    that.  Right now it's October 26th, 2001.

22          Anything else at this time, Mr. Miskiewicz?

23          MR. MISKIEWICZ:  Nothing from the government,

24    your Honor.

25          THE COURT:  Mr. Schoer?

56

1          MR. SCHOER:  Mr. Pistone has asked me to request

2  the minutes of this plea.

3          THE COURT:  Yes, I request that the minutes be

4  transcribed, and be done under the auspices of the

5  Criminal Justice Act.

6          MR. SCHOER:  Thank you.

7          THE DEFENDANT:  Thank you.

8          THE COURT:  Anything else?

9          MR. SCHOER:  No, sir.

10         THE COURT:  This plea allocution is terminated.

11  Thank you very much.

12         MR. SCHOER:  Thanks.

13         THE COURT:  Thank you very much for coming.

14  Give my best to Denis Dillon, will you?

15         MS. RUDDY:  I will, your Honor.  Thank you.

16         It has been a pleasure.

17         (Whereupon the proceedings were concluded.)

18              —       —       —

19

20

21

22

23

24

25

GAS:GRB
F. #2000R00017
ppistone.inf

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

PETER PISTONE,

               Defendant.

- - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. _____
(T. 18, U.S.C., §§
3 and 3551 <u>et seq</u>.)

THE UNITED STATES ATTORNEY CHARGES:

        In or about August 1994, within the Eastern District of New York, the defendant PETER PISTONE, knowing that an offense against the United States had been committed, to wit: the murder of Louis Dorval for the purpose of maintaining and increasing position within the Colombo Organized Crime Family of La Cosa Nostra, an enterprise engaged in racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(1), did knowingly and intentionally assist the offenders in order to hinder and prevent their apprehension, trial and punishment.

        (Title 18, United States Code, Sections 3 and 3551 <u>et seq</u>.)

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

 Criminal  Action  No.

## SA159

**UNITED STATES DISTRICT COURT**
**Eastern District of New York**

UNITED STATES OF AMERICA

v.

PETER PISTONE,

Defendant(s).

## INFORMATION

#### PLEASE TAKE NOTICE that the within will be presented for settlement and signature to the Clerk of the United States District Court in his office at the U.S. Courthouse, 225 Cadman Plaza East Brooklyn, New York, on the ___ day of _____, ___, at 10:30 o'clock in the forenoon.

Dated: Brooklyn, New York

_____, 19_____

_____

United States Attorney,
Attorney for _____

_____
_____
_____

Attorney for _____


PLEASE TAKE NOTICE that the within is a true copy of _____ duly entered herein on the ___ day of _____
_____, in the office of the Clerk of the Eastern District of New York,

Dated: Brooklyn, New York

_____, 19_____

_____

United States Attorney,
Attorney for _____

_____
_____
_____

Attorney for _____


_____ZACHARY W. CARTER_____
United States Attorney
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, New York 11201

Due Service of a copy of the within_____
_____ is hereby admitted.
Dated: _____, 19 _____.

Attorney for _____

GARY R. BROWN
Assistant U.S. Attorney    (516) 228-3177/8630

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------X

CR 00-76
UNITED STATES OF AMERICA,            S E A L E D


                    v.               United States Courthouse
                                     Uniondale, New York
JOHN DOE,
                                     February 4, 2000
                    Defendant.       2:30 p.m.

---------------------------X


            TRANSCRIPT OF PLEADING
     BEFORE THE HONORABLE JOANNA SEYBERT
          UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          LORETTA E. LYNCH
                             United States Attorney
                             One Pierrepont Plaza
                             Brooklyn, N.Y. 11201
                             By:  GARY BROWN, ESQ.
                                  JOSEPH CONWAY, ESQ.
                                  Assistant U.S. Attorneys

For the Defendant:           WILLIAM WEXLER, ESQ.
                             816 Deer Park Avenue
                             N. Babylon, N.Y.


Court Reporter:              Owen M. Wicker, RPR
                             100 Federal Plaza
                             Central Islip, N.Y. 11722
                               (631) 712-6102

GOVERNMENT
EXHIBIT
3500-PPIST-10
00CR0122(ADS)

Proceedings recorded by mechanical stenography; transcript
produced by computer transcription.

2

1

2          (Case called.)

3          THE CLERK:  Appearances, please.

4          MR. BROWN:  Gary Brown and Joseph Conway, for the

5  government.

6          MR. WEXLER:  And William Wexler on behalf of

7  Mr. Pistone.

8          THE COURT:  And I understand Mr. Pistone will be

9  disposing of the case today.

10          MR. WEXLER:  That's correct.

11          THE COURT:  And the courtroom will be cleared

12  with respect to anyone that should not be here.

13          MR. BROWN:  Your Honor, we're asking that the

14  courtroom be sealed today.  Mr. Pistone is pleading out to

15  an organized crime-related murder, or at least a role in

16  that, and will be cooperating.  The fact that he was

17  pleading for the public would endanger him and the public,

18  and accordingly we'd ask that the Court seal the

19  proceedings.

20          MR. WEXLER:  And I would concur with the

21  Government's request.

22  P E T E R   P I S T O N E , having been first duly sworn

23  by the Clerk of the Court, was examined and testified as

24  follows:

25          THE COURT:  Mr. Pistone, I will be asking you a

OWEN M. WICKER, RPR      OFFICIAL COURT REPORTER

3

1  series of questions with respect to this disposition, and

2  I want to make sure that you understand what is going on.

3          First of all, do you understand that since you've

4  been sworn you subject yourself to a charge of perjury if

5  you do not tell the truth.

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Are you willing to subject yourself

8  to the consequences of not telling the truth, or

9  committing perjury?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  If at any time you don't understand

12  something or you need time to discuss it with your

13  attorney or whatever questions you may have, you will be

14  given that opportunity.  Do you understand that.

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Are you currently serving another

17  term?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  And what is that sentence for?

20          THE DEFENDANT:  Time?

21          THE COURT:  Crime and the conviction.

22          THE DEFENDANT:  Arson, and the sentence is six

23  years.

24          THE COURT:  And you are represented on this

25  charge by Mr. Wexler?

000000522

OWEN M. WICKER, RPR       OFFICIAL COURT REPORTER

4

1        THE DEFENDANT:  Yes, ma'am.

2        THE COURT:  Are you satisfied with his services.

3        THE DEFENDANT:  Yes, ma'am.

4        THE COURT:  Prior to coming to court today, have

5   you had any drugs, alcohol, medication of any kind?

6        THE DEFENDANT:  No, ma'am.

7        THE COURT:  Have you ever been treated for

8   substance abuse or any mental illness?

9        THE DEFENDANT:  No, ma'am.

10       THE COURT:  Are you currently under the care of

11  any physician?

12       THE DEFENDANT:  No, ma'am.

13       THE COURT:  Is there any reason you believe you

14  will not understand these proceedings?

15       THE DEFENDANT:  No, ma'am.

16       THE COURT:  Do you understand that you have an

17  absolute right to have this case presented to a grand

18  jury?

19       THE DEFENDANT:  Yes, ma'am.

20       THE COURT:  And that I have before me an

21  information which is simply an accusation made by the

22  United States Attorney?

23       This case has not been sent to a grand jury and

24  considered by some 23 people to see if there is sufficient

25  evidence to charge you.  Do you understand that?

OWEN M. WICKER, RPR     OFFICIAL COURT REPORTER

1           THE DEFENDANT:  Yes, ma'am.

2           THE COURT:  Are you willing to give up your right

3  to have the case presented to a grand jury and accept this

4  information?

5           THE DEFENDANT:  Yes, ma'am.

6           MR. BROWN:  Judge, I have a signed copy of a

7  waiver of indictment form which I'll hand up to your

8  Honor's clerk.

9           THE COURT:  And you signed that, Mr. Pistone?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  Do you have any questions regarding

12  the waiver?

13          THE DEFENDANT:  No, ma'am.

14          THE COURT:  The Court will approve the waiver.

15          Now, with respect to this information, you've had

16  an opportunity to review it with your attorney, right?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Do you understand you have an

19  absolute right to take this case to trial?  At that trial

20  you will be represented by counsel.  If you can't afford

21  counsel, counsel will be provided for you.

22          It is the Government's duty to prove your guilt

23  beyond a reasonable doubt before there can be any

24  conviction.  Do you understand that?

25          THE DEFENDANT:  Yes, ma'am.

6

1          THE COURT:  You would be able to present

2    witnesses, if you desire to do so, at the trial.  You

3    would be able to present any evidence.  You could testify

4    if you wanted to, you could not testify, and the jury

5    would be instructed that they couldn't find any adverse

6    inference against you if you chose not to testify.

7          Do you understand that?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  Do you understand when you plead

10   guilty you give up any issue with respect to whether or

11   not you committed this crime?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  In fact, you are saying that "I

14   committed this crime" and that "I want to plead guilty."

15         THE DEFENDANT:  Yes, ma'am.

16         THE COURT:  I have before me a cooperation

17   agreement, and that indicates, and I advise you now -- you

18   reviewed this cooperation agreement with counsel, right?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  And do you have any questions

21   regarding the cooperation agreement?

22         THE DEFENDANT:  No, ma'am.

23         THE COURT:  Do you understand that the maximum

24   term for which you can be sentenced for in this particular

25   case is 15 years?  The maximum supervised release term is

1    ten years.

2            If you are violated on your supervised release,

3    you can be sent back to jail and be sentenced for up to

4    three years without any time being credited to you that

5    you've previously served.

6            Do you understand that?

7            THE DEFENDANT:  Yes, ma'am.

8            THE COURT:  Do you also understand that the

9    maximum fine is $125,000 and you must pay a special

10   assessment fee of $100 at the time of sentence?

11           THE DEFENDANT:  Yes, ma'am.

12           THE COURT:  And in addition, you know that when

13   you are sentenced, I will be sentencing you pursuant to

14   the sentencing guidelines, and I will have all the

15   information presented to me by the probation department.

16   They'll do an investigation here, and they will set a

17   guideline range.  And I may or may not accept that, but

18   you will be given an opportunity to present anything you

19   want to with respect to sentence.

20           All right?

21           THE DEFENDANT:  Yes, ma'am.

22           THE COURT:  Do you also understand that by the

23   terms of this agreement, the Government is saying, the

24   Government being the U.S. Attorney for the Eastern

25   District, that they agree to not oppose any acceptance of

1    responsibility and allow you to have a downward adjustment

2    of three levels for your plea of guilty here, for

3    accepting your responsibility?

4            Do you understand that?

5            THE DEFENDANT:  Yes, ma'am.

6            THE COURT:  You are also agreeing that you will

7    provide truthful, complete and accurate information to the

8    U.S. Attorney's Office and that you will attend all

9    debriefing sessions, meetings concerning your criminal

10   activities, and you will give the office any documents --

11   if you have any materials -- that you have with respect to

12   these criminal activities; that you will give or do

13   undercover work if you are requested to do so by the

14   Government.

15           Do you understand that?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  You also are agreeing not to give up

18   your cooperation to any third party unless the Government

19   agrees to do so, and you will testify at any time, either

20   in the Eastern District or anyplace else that the

21   Government requests you to testify, and you will consent

22   to adjournments of your sentence.

23           Do you understand that?

24           THE DEFENDANT:  Yes, ma'am.

25           THE COURT:  Also, do you understand that the

9

1   Government is agreeing, based on what they know now, they

2   will not prosecute you for any other criminal charges with

3   respect to your participation in the criminal activity

4   involving your role as an accessory after the fact with

5   respect to the murder of Louis Dorval in August of 1994?

6           Do you understand that?

7           THE DEFENDANT:  Yes, ma'am.

8           THE COURT:  Also, that any statements that you

9   make with respect to this case will not be used against

10  you except as provided in the agreement, in other words,

11  your plea of guilty, and if you violate any of the terms

12  of the agreement, they can prosecute you on anything

13  you've given with respect to this cooperation agreement?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  All right.  You agree to meet with

16  the office of the U.S. Attorney and to allow him to

17  debrief you if your counsel cannot make it, although

18  counsel will be given notice when these meetings will

19  occur, and absent any time restraints should be available

20  to be with you during the meetings to debrief you.

21          Do you understand that?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  You also understand that matters at

24  any meeting or debriefing may be considered by the United

25  States Attorney's Office in determining whether they will

000000528

10

1   send a 5K1 letter and as to whether or not you have

2   achieved substantial assistance to law enforcement.

3            That will be done by the government.  Do you

4   realize that?

5            THE DEFENDANT:  Yes. Ma'am.

6            THE COURT:  If they find that you've cooperated

7   fully and you've met all the conditions of this agreement,

8   then they will send a substantial assistance motion to me

9   and I'll make the determination as to whether or not I

10  believe that a downward departure is appropriate.

11           Do you realize that?

12           THE DEFENDANT:  Yes, ma'am.

13           THE COURT:  You know you are not a prevailing

14  party, and you can't sue the Government under the Hyde

15  Amendment.

16           Do you understand that, in case you have any

17  intentions of filing a suit?

18           THE DEFENDANT:  Yes, ma'am.

19           THE COURT:  And you also know if you don't give

20  complete, truthful and accurate information and testimony,

21  the Government will not be bound by the terms of this

22  agreement.

23           Similarly, if you commit or attempt to commit any

24  further crimes, the Government will find and they will

25  advise this Court that you have failed to cooperate fully,

1    or in case of giving false and misleading information,

2    that you've done that, or committed any crimes, and they

3    will be released from their side of the bargain.

4            Do you understand that?

5            THE DEFENDANT:  Yes, ma'am.

6            THE COURT:  And they will go ahead and oppose any

7    downward departure.

8            They will, of course, not make a motion for

9    substantial assistance, and they will also prosecute you

10   for any crimes that you've admitted to during the course

11   of your attempt to cooperate.

12           Do you understand that?

13           THE DEFENDANT:  Yes. Ma'am.

14           THE COURT:  You will not have the benefit of any

15   constitutional rights with respect to those statements

16   that you made, nor will you be entitled to any statute of

17   limitations benefit with respect to those charges.

18           Do you understand that?

19           THE DEFENDANT:  Yes. Ma'am.

20           THE COURT:  If this plea is set aside for any

21   reason or the conviction is set aside for any reason, the

22   Government will be able to use all the information they've

23   obtained from you on any other case.

24           Do you understand that?

25           THE DEFENDANT:  Yes.

1          THE COURT:  Do you understand that this agreement

2     doesn't bind any other federal, state or local authority

3     from prosecuting you?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  And initiating any administrative

6     hearings against you also?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  There is a paragraph in here with

9     respect to the witness security program, and the

10    Government has indicated that if you request, they will --

11    and if they deem that request to be reasonable, they will

12    make an application and recommend that you be placed in

13    the witness security program.

14          Do you understand that?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  However, that determination is made

17    by the Department of Justice and will be made in

18    accordance with their regulations, so the Government can't

19    promise you at this point to place you in the witness

20    security program.

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  Have any other promises or agreements

23    been made to you with respect to your plea of guilty on

24    this case?

25          THE DEFENDANT:  No, ma'am.

1          THE COURT:  Is anyone forcing you or threatening

2    you to plead guilty?

3          THE DEFENDANT:  No, ma'am.

4          THE COURT:  Are you pleading guilty because you

5    are guilty and for no other reason?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Can you tell me what you did back in

8    August of 1994 with respect to the murder of Louis

9    Dorval -- you have to spell it.

10          Is it Dorval, D-O-R-V-A-L?

11          MR. BROWN:  That's the correct spelling, Judge.

12          THE COURT:  That's the correct spelling?

13          MR. BROWN:  Yes.

14          THE COURT:  So the cooperation agreement should

15    be changed, because there it is D-U-V-A-L.

16          MR. BROWN:  I will take care of that, Judge.

17          THE COURT:  Tell me what you did back then.

18          Essentially this is a charge in which you are

19    being accused of knowing that an offense against the

20    United States had been committed and that -- by someone

21    other than you, knowing that, and that you had actual

22    knowledge of the crime and the person's participation in

23    it, and with that knowledge you in some way assisted the

24    person with a specific purpose or plan to hinder or

25    prevent the person's apprehension, trial or punishment.

1    So tell me what you know about the murder of

2 Mr. Dorval, when you knew it, and what, if anything, you

3 did with respect to assisting any person.

4    THE DEFENDANT:  In the summer of '94 I was with

5 my brother Joseph Pistone, myself, and Robert Misseri,

6 M-I-S-S-E-R-I, where we were in my brother's truck, where

7 Louis Dorval was shot in the truck and I helped dispose of

8 the body.

9    THE COURT:  And how did you do that?

10    THE DEFENDANT:  We placed it -- my brother and

11 Robert Misseri placed it in a black tool box, the body in

12 a black tool box, put it back in the truck, and we dumped

13 it in the water.

14    THE COURT:  And what, if anything, did you know

15 about someone committing this murder?

16    MR. BROWN:  Judge, I believe the defendant

17 indicated he was present when the shooting happened.

18    THE COURT:  I'm not certain I heard that, so I

19 want that again.  He said where the person was shot.  I

20 don't know if he just happened on the scene later or what.

21    MR. BROWN:  I understand.

22    (Counsel confers with defendant.)

23    THE DEFENDANT:  I was in the truck at the time

24 when I was driving.  I didn't know what was going on, and

25 Louis Dorval was shot in the back seat.

1       THE COURT:  And he was murdered.

2       THE DEFENDANT:  Yes, ma'am.

3       THE COURT:  And you knew that the person who

4   murdered him was doing it so that person could advance or

5   increase his standing in an organized crime family.

6       THE DEFENDANT:  No.  No, ma'am.

7       THE COURT:  All right.

8       MR. BROWN:  Judge, could we inquire as to whether

9   or not he learned that later on?

10      THE COURT:  Did you learn that later on?

11      THE DEFENDANT:  Yes, ma'am.

12      THE COURT:  And what, if anything, did you learn

13  later on?

14      THE DEFENDANT:  The reason that he was killed for

15  is a part of an organized crime thing where he was selling

16  drugs and not kicking back to certain people.

17      THE COURT:  All right.  But you didn't obtain

18  knowledge of why the person was killed.  You just knew

19  they were killed.

20      THE DEFENDANT:  Yes, ma'am.

21      THE COURT:  Is that sufficient for the

22  Government?

23      MR. BROWN:  May I have a moment, Judge?

24      THE COURT:  Yes.

25      (Counsel confer).

1     MR. BROWN:  Judge, if we can just inquire that

2  the defendant learned Mr. Dorval was killed at the

3  direction of an organized crime family.  I think he

4  learned that afterwards, but I think we should have that

5  cleared up in other words.

6     MR. WEXLER:  May I have a moment?

7     THE COURT:  Yes.

8     (Counsel confer.)

9     MR. WEXLER:  Judge --

10     THE DEFENDANT:  I learned from my brother Joseph

11  that that's the reason he was killed for.

12     THE COURT:  All right.  And with that knowledge,

13  you then disposed of the body?

14     THE DEFENDANT:  Yes.

15     THE COURT:  All right.  And can you tell me, sir,

16  where did these events occur?

17     MR. WEXLER:  I'm sorry, which?  Which events?

18     THE COURT:  The physical location, the events of

19  disposing of the body.

20     You said you were driving with your brother and

21  another individual in the truck.

22     THE DEFENDANT:  Yeah, we disposed of the body in

23  the water of --

24     THE COURT:  I don't need an exact location,

25  generally.

SA176

17

1           THE DEFENDANT:  Drove down to the beach, got on

2      the boat, took the body on the boat and dumped the body.

3           THE COURT:  What town?  What borough?

4           THE DEFENDANT:  Nassau County.

5           THE COURT:  Nassau County.

6           MR. WEXLER:  Nassau County borough.

7           THE COURT:  In any event, you know that is in the

8      Eastern District, right, Mr. Pistone?

9           THE DEFENDANT:  Yes.

10          MR. CONWAY:  Just so the record is clear, the

11     Government's evidence would show as Mr. Pistone stated, he

12     was in the car at the time that the murder occurred,

13     although he had no knowledge that it was going to happen.

14     Once it did happened, he helped dispose of the body and

15     then subsequently learned as to the reasons why Mr. Dorval

16     was actually killed.

17          THE COURT:  So he's not an aider and abetter.

18          MR. CONWAY:  Exactly.

19          THE COURT:  How do you plead to this charge,

20     sir?

21          You have two choices: not guilty or guilty.

22          THE DEFENDANT:  Guilty.

23          THE COURT:  The Court accepts your plea, finding

24     that you've made a knowing, voluntary waiver of your

25     rights, that you understand the consequences of pleading

OWEN M. WICKER, RPR      OFFICIAL COURT REPORTER

1    guilty, and there is a factual basis for me to accept the

2    plea.

3              You are going to need a substantial adjournment,

4    I gather?

5              MR. CONWAY:  I would ask if your Honor's practice

6    is to fix a date, we do so maybe four or five months in

7    advance or without a date later.

8              THE COURT:  Is there any indication that you will

9    be in need of a probation report?

10             MR. WEXLER:  Not for a long time, Judge.

11             THE COURT:  The defendant, he is currently

12   serving a sentence of three to nine, did you say?

13             THE DEFENDANT:  Three to six.

14             THE COURT:  How much time do you have on that,

15   Mr. Pistone?

16             THE DEFENDANT:  About nine and a half months.

17             THE COURT:  So you have a ways to go on that.

18             So we'll put over four to five months.

19             MR. CONWAY:  If it's your Honor's practice to

20   assign a date, I would ask to put it over until June.

21             THE COURT:  How about the end of June, June 30 as

22   a control date, unless you want him brought down to court.

23             MR. WEXLER:  No, Judge.

24             MR. BROWN:  Judge, one quick matter.

25             Mr. Wexler and I have had some discussions, so

                OWEN M. WICKER, RPR    OFFICIAL COURT REPORTER

SA178

1   the record is clear.  I think this is obvious and a

2   defense that need not be raised, but so there is no

3   question, it's clear Mr. Pistone, while pleading to an

4   accessory after the fact, which has a five-year statute of

5   limitations, he's waiving that statute of defense in

6   connection to the plea.

7          MR. WEXLER:  Yes, Judge -- if I may just have a

8   second.

9          THE COURT:  Yes.

10         (Counsel confers with defendant.)

11         MR. WEXLER:  Judge, I've explained that to

12  Mr. Pistone, and I believe he understands the

13  ramifications of waiving the five-year statute of

14  limitations.

15         THE COURT:  In other words, you understand that

16  you could possibly not face trial on any charges if you

17  were successful under the statute of limitations defense?

18         THE DEFENDANT:  Yes, ma'am.

19         MR. WEXLER:  On the charges --

20         THE COURT:  -- that he's now looking at.

21         MR. WEXLER:  Yes.

22         MR. BROWN:  One last application.

23         For the same reasons we requested the courtroom

24  be sealed, we ask that the documents be sealed and that

25  this remain as United States v. John Doe with respect to

SA179

20

1    the public records filed in the clerk's office.

2              THE COURT:  And you join in that application?

3         MR. WEXLER:  Yes, your Honor.

4         THE COURT:  That application is granted.

5         MR. BROWN:  Thank you, your Honor.

6         MR. CONWAY:  Thank you, your Honor.

7         MR. WEXLER:  Thank you, your Honor.

8         (Proceedings concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA   )
  )
      vs.           ) PRESENTENCE INVESTIGATION REPORT
  )
CHRISTIAN GEROLD TARANTINO) DOCKET NO. 08-CR-655-01

| | |
|---|---|
| **Prepared for:** | The Honorable Joanna Seybert<br>United States District Judge |
| **Prepared by:** | Sindee J. Haasnoot<br>Senior United States Probation Officer<br>(631) 712-6359 |

| **Assistant U.S. Attorney** | **Defense Counsel** (Retained) |
|---|---|
| James Miskiewiez, Esq. | Frank A. Doddato, Esq. |
| Carrie N. Capwell, Esq. | 666 Old Country Road - Suite 501 |
| Sean C. Flynn, Esq. | Garden City, New York 11530 |
| | (516) 794-3737 |
| | |
| | Stephen H. Rosen, P.A. |
| | 100 Almeria Avenue - Suite 205 |
| | Coral Gables, Florida 33134 |
| | (305) 448-9900 |

| | |
|---|---|
| **Sentence Date:** | October 26, 2012 *a* 10:00 a.m. |
| **Offense:** | See Page Three. |
| **Arrest Date:** | September 24, 2008 |
| **Release Status:** | In custody since arrest |
| **Detainers:** | None. |
| **Other Defendants:** | James Contacessa (Dkt. #11-CR-246) - Pending Sentencing<br>Gregory Morgan (Dkt. # 12-CR-220) - Pending Sentencing<br>Scott Mulligan (Dkt. # 12-CR-02) - Pending Sentencing |
| **Date Report Prepared:** | October 5, 2012 |

31

| 102. | 9 4 94<br>(Age 26) | Assault<br>Court Unknown<br>Suffolk County<br>NY | 11 9 94<br>Conditional<br>Discharge;<br>$145 fine | 4A1.1(c)<br>4A1.2(c)(2)<br><br>**1** |

103. Although not noted on the NCIC printout, this arrest was noted in parole records as well as in documents contained in the defendant's federal supervision file. Although specific information was not included in parole records, the following information was obtained from a criminal complaint as well as a letter, dated October 11, 1994, written by the U.S. Probation Department for the District of New Jersey.

> According to police reports, on September 4, 1994, in Sag Harbor, New York, the releasee became involved in a fight outside a club at 3:35 a.m. According to his supervising U.S. Probation Officer David Williams, of the Eastern District of New York, what was most disturbing is the fact that the releasee once again attempted to flee from police but was recaptured after a foot chase. Consequently, he is now charged with both Disorderly Conduct and Escape in the Third Degree. Tarantino was released from custody on September 5, 1994. . .

> Details of the offense reflect that the releasee became embroiled in a dispute in the bar and was physically removed by several of the bouncers. The dispute continued outside the bar at which time the police arrived. While they were interviewing witnesses, someone opened the door of the police vehicle and the releasee attempted to escape. As mentioned previously, he was captured a short time later after a foot chase by police.

104. Another letter contained in the defendant's federal supervision file, dated January 9, 1995, informs that at the time of this arrest, the defendant was in the company of Michael Lagadana, who was on federal supervision after being convicted of Theft From Interstate Shipment in the Southern District of New York. It was noted "Ladagana along with the releasee was involved with the notorious Tellier brothers who committed multiple armed robberies and several homicides."

| 105. | 6 15 95<br>(Age 27) | Ct. 1: Attempted<br>Forgery - 2nd Degree;<br>Ct. 2: Resisting Arrest | 8 21 96<br><br>Ct. 1: 3 years<br>custody; | 4A1.1(a)<br>4A1.2(c)(1) |

SA182

1

1    UNITED STATES OF AMERICA
     EASTERN DISTRICT GRAND JURY

2                                                    ORIGINAL

3    ----------------------------------------X

     UNITED STATES OF AMERICA,
4
               -against-
5
     SAVERIO GALASSO III,
6          also known as "Sammy,"
     JOSEPH PISTONE,
7          also known as "Joe Baldy,"
     MICHAEL DELUCIA,
8          also known as "Michael Fazio,"
     ROBERT MISSERI,
9          also known as "Robert Mangano," and
     GARY HENDRICKSON,
10
                         Defendants.
11
     ----------------------------------------X
12
                         United States Courthouse
13                       Uniondale, New York

14                       April 6, 2000

15
     APPEARANCES:
16
                         GARY BROWN, ESQ.
                         JAMES MISKIEWICZ, ESQ.
17
                         Assistant U.S. Attorneys
18

19   WITNESS:

20                       SPECIAL AGENT ROBERT F. SCHELHORN

21
                         Grand Jury Reporter:
22                       Lisa H. Edelstein, RPR

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by (CAT) Computer Aided Transcription.

25

1          A      Louis Dorval was an associate that ran with both

2     the Gambino Family and the Colombo Family.  He did a little

3     freelance work.

4              When I say freelance, he worked both crews at the

5     same time.

6          Q      Going back to approximately 1994, did Louis

7     Dorval have some problems?

8          A      Yes.  Louis was indicted on federal Rico charges

9     for various crimes, which included counterfeiting, robbery,

10    et cetera.

11         Q      Based on information you received from at least

12    one confidential source of information, did those problems

13    include the fact that he was seen as a weak link?

14         A      Correct.

15         Q      What does that mean?

16         A      Louis was -- being that he was indicted on

17    federal charges, he was -- he was -- he had a lot of

18    exposure that could hurt the organized crime world.

19              We were advised by witnesses that he had a big

20    mouth.  He used to shoot off his mouth.  He was known have a

21    big mouth.

22         Q      So that would cause some concern for a crime

23    family like the Colombo Family?

24         A      Most definitely.

25         Q      In addition to that, you learned of later

1    problems, but we'll come back to that.

2          A     Correct.

3          Q     What happened to Louis Dorval in or about August

4    of 1994?

5          A     Louis's body wound up floating in the Atlantic

6    Ocean about 30 miles offshore of Long Island.  He was killed

7    and placed in a Tufpin (phonetic) toolbox.  If you've seen

8    them at Home Depot, it's about two by three by two.

9          Q     How was that box recovered or discovered?

10         A     The box was found floating offshore of Long

11   Island.  I believe it was a police officer on his day off on

12   a fishing trip.

13         Q     The Coast Guard recovered the box?

14         A     Correct.

15         Q     Inside, they found Mr. Dorval's body?

16         A     Correct.

17         Q     Has there been a determination as to what caused

18   Mr. Dorval's untimely demise?

19         A     Yes.

20         Q     What was that?

21         A     He was shot in the head.

22         Q     Was the bullet recovered?

23         A     Partial pieces of the bullet were found to be in

24   Louis's head.

25         Q     Was a ballistics analysis conducted on the

1   portions of the bullet that were collected?

2        A    Yes.

3        Q    What determinations were made about the kind of

4   weapon used to kill Louis Dorval?

5        A    That bullet came from a revolver.

6        Q    I'm going to show you what's been marked as Grand

7   Jury's Exhibits 1 through 4 of today's date.  Can you tell

8   us what these are?

9        A    Yes.  These are photos of Louis's body packed in

10  a Tufpin toolbox located, at this point, I think at one of

11  the Fire Island -- it's where the -- I'm sorry -- Suffolk

12  County Police Department brought Louis's body back to the

13  coast and his body was left on the trailer prior to going to

14  the Medical Examiner's Office.

15       Q    Is it fair to say, based on your investigation,

16  that these photos accurately depict the way Louis Dorval

17  looked when he was found in the box; correct?

18       A    Definitely.

19       Q    That goes down to including the kind of clothing

20  he's wearing and the position he's in and whatnot?

21       A    Correct.

22            MR. BROWN:  I'm going to hand this to the

23       foreperson.  I'd ask you to look at them and have them

24       circulated, if you would.

25            As I'm passing it around, I will continue the

VERITEXT, LLC
(516)608-2411            (212)267-6868

April 6, 2000          20

SA188

```
 1        questioning, if it's okay.

 2        Q      Did there come a point in time, actually fairly

 3   recently, when you developed a lead or a break in the case

 4   of the murder of Louis Dorval?

 5        A      Yes.

 6        Q      What was that break?

 7        A      An individual by the name of Peter Pistone, who I

 8   had mentioned earlier, had contacted the Nassau County

 9   Police Department that he had some information regarding an

10   individual that was killed and his body was placed out to

11   sea.

12        Q      At the time that Peter Pistone called in, where

13   was he and why was he there?

14        A      He was Upstate, New York, close to the Canadian

15   border.  He had been charged on a state arson charge by

16   Nassau County.

17        Q      He had been convicted of that charge at that

18   time?

19        A      Correct.

20        Q      Do you know how much time he was facing as a

21   result of that?

22        A      I believe it was three to six years.

23        Q      Is it fair to say that he came in and started

24   providing information to law enforcement?

25        A      Correct.
```

VERITEXT, LLC

(516)608-2411                    (212)267-6868

```
 1        Q      It included some information about Louis Dorval?

 2        A      Correct.

 3      · Q      Have you debriefed Mr. Pistone about Louis

 4    Dorval's death?

 5        A      Yes.

 6        Q      Has he told you what he knows about it or has he

 7    told you about that incident?

 8        A      Yes, he has.

 9        Q      Before we continue with that, I would ask you

10    what has he done with regard to accepting responsibility for

11    any role he might have had in the death of Louis Dorval?

12        A      Peter Pistone has taken a plea on the federal

13    level as an accessory after the fact.

14        Q      To?

15        A      To the murder of Louis Dorval.

16        Q      Is it fair to say that as a result of that, he

17    faces far more time than he did on the state arson charges;

18    correct?

19        A      Yes.

20        Q      Let's start at the beginning.  What did Peter

21    Pistone tell you about Louis Dorval, what he knew about him

22    and how he died, Louis?

23        A      Peter had explained to us that Louis had had some

24    problems with the -- with the people he ran with, in that he

25    had a big mouth and was shooting off his mouth and that he
```

VERITEXT, LLC
(516) 608-2411          (212) 267-6868

April 6, 2000    22

SA188

1    was doing drug deals which he wasn't kicking up for.

2            And ultimately he wound up paying the price where

3    his body was -- the end result was his body was found

4    floating out in the Atlantic Ocean.

5        Q    Where did Peter Pistone begin the night when

6    Louis Dorval died?

7        A    He stated that he was in his residency in

8    Farmingdale when his brother, Joseph, and Joseph's friend,

9    Robert, had come over to their house, over to Peter's house,

10   picked him up in a Blazer and then proceeded to go to

11   Westbury to Sam Galasso's office, where they were, at that

12   time, to meet up with Louis Dorval, the deceased.

13           At that time --

14       Q    Let me stop you for a second, Agent.  You

15   mentioned Joseph Pistone.  In the proposed indictment,

16   that's Joe Baldy; correct?

17       A    Yes.

18       Q    You mentioned Robert.  That's Robert Misseri

19   mentioned in the proposed indictment?

20       A    Yes.

21       Q    They traveled together with Peter to Sam

22   Galasso's office?

23       A    Correct.

24       Q    They met Louis Dorval there?

25       A    Correct.

1    Q    Now, at that time, according to what Peter told

2    you, what was he under the impression was going to happen

3    that night?

4    A    Well, Peter knew that generally when they

5    worked -- when they went out with Louis and the four of them

6    were together, that there was going to be trouble at one

7    point, that somebody was likely going to get beat up.

8    Q    What kind of -- what do you mean?  Why would

9    somebody get beat up?

10    A    Generally, these are the type of guys that would

11    travel with gloves in their pocket when they went out at

12    night, solely used to put a beating on people.

13    Q    That was generally in connection with some scheme

14    or extortion or something like that?

15    A    Yes.

16    Q    Peter did not know that something was going to

17    happen to Louis?  He thought Louis was going to help with

18    the job that they were doing; correct?

19    A    Correct.

20    Q    According to Peter, what happened next?  After

21    they picked up Peter, what happened next?

22    A    His brother, Joe Baldy, advised Peter, who was

23    now driving, to drive to the Cafe Royale, an adult

24    entertainment strip club in Farmingdale on Route 109,

25    because he needed to look for someone.

```
1                  Peter proceeded to drive to the club, at which
2   time Joe then told him, "The person I'm looking for is not
3   here.  Drive up to Allen Boulevard in Farmingdale," which is
4   at that point about a mile away.
5         Q      What kind of vehicle were they driving that
6   night?
7         A      They were driving a 1990 Chevy Suburban.
8         Q      Who owned that vehicle?
9         A      Joe Baldy's girlfriend at that time, Michelle
10  Fortus.
11        Q      Michelle F-O-R-T-I-S?
12        A      T-U-S.
13        Q      Have you interviewed Michelle Fortus about that
14  car?
15        A      Yes.
16        Q      Has she owned it since it was new?
17        A      Yes.
18        Q      Is it fair to say, she indicated Joe Baldy
19  borrowed it from time to time when they were dating;
20  correct?
21        A      Correct.
22        Q      When they are driving and get near Allen
23  Boulevard --
24        A      In Farmingdale.
25        Q      -- what's the seating arrangement?
```

SA191

```
 1       A    Peter Pistone is driving.

 2       Q    Who else is in the car and where are they

 3  sitting?

 4       A    Peter Pistone is driving the car.  At this time

 5  Robert Misseri is in the driver passenger seat, Joe Baldy's

 6  in the rear, as well as Louis Dorval.

 7       Q    We got Louis and Joe in the back, Robert in the

 8  passenger seat?

 9       A    Correct.

10       Q    According to Peter Pistone, what happened?

11       A    They drive around Allen Boulevard, within the

12  area right there, for a few minutes and then at one point,

13  as Peter's driving, he hears a gun go off, a loud shot.

14       Q    Before the gun, did he hear someone say something

15  to Louis Dorval?

16       A    Yes, he did.  He recalls someone asking Louis to

17  get something out of the compartment spot in the back of the

18  Blazer.

19       Q    So the cargo area in the back of the Blazer?

20       A    Correct.

21       Q    Which you reach by turning around over the back

22  seat?

23       A    Correct.

24       Q    After Louis Dorval turns around to get something

25  in the back seat, what does Peter Pistone hear next?
```

1          A          Peter hears a loud shot echoed throughout the

2     car.

3          · Q          He turned around to see what?

4          A          He turns around to see Joseph, his brother, Joe

5     Baldy, now with a revolver in his hand.

6          Q          Where is Louis?

7          A          Louis is now slumped over the back seat of the --

8     of the Blazer, with his head into the cargo area.

9          Q          After he sees Louis Dorval presumably shot dead,

10     laying over the back seat, what is Peter Pistone, who's

11     behind the wheel, told to do?

12          A          Peter Pistone at this time is told to look

13     straight ahead and keep his mouth shut.

14          Q          Who tells him this?

15          A          Both Joseph, his brother, and Robert Misseri,

16     who's in the front seat.

17          Q          Is it fair to say that Peter Pistone was close

18     with Louis Dorval?

19          A          Peter -- Peter's family, they had lived next to

20     one another when they were growing up as kids.

21          Q          So he was understandably upset at this point?

22          A          Oh, definitely.

23          Q          But it's fair to say that both Robert and Joe

24     Baldy tell him, "Calm down.  Keep driving"?

25          A          Correct.

1    Q    Where is he directed to go?

2    A    At this point he's directed to drive on the same

3    block up to -- there's a motorcycle shop on Allen Boulevard

4    in that area and he is told to pull the car into the

5    motorcycle shop, at which point before the car even stops,

6    Robert Misseri jumps out of the car. Joe Baldy jumps out of

7    the car and they go into the bushes where they have a Tufpin

8    toolbox placed at this time.

9    Q    What happens next?

10   A    Then Joseph, Joe Baldy, opens up the trunk of the

11   vehicle and now proceeds to pull Louis's body from the

12   truck, out of the back of the truck, and him and Robert

13   proceed to place the body into the toolbox.

14   Q    Placing the body into the toolbox involves what?

15   A    Louis was about a 200-pound man and a weight

16   lifter. Getting him in this two by three by two box was a

17   task itself.

18        Peter describes it, he hears cracking noises

19   coming from the back of the truck.

20   Q    Who is it that's stuffing Louis's body into the

21   box?

22   A    Both Robert and Joe Baldy are crunching Louis up

23   to put him in the box.

24   Q    After they get him into the box, what is done

25   with the body in the box?

VERITEXT, LLC
(516) 608-2411                    (212) 267-6868

1      A     The box is then reloaded into the Blazer and

2  Peter is advised then to drive straight down Allen Boulevard

3  to County Line Bowling Alley in Farmingdale.

4      Q     What happens then?

5      A     At that point Robert Misseri makes an attempt to

6  talk to Joseph Baldy and Joe tells him, "Not right now."

7  When the car stops, Robert jumps out of the car and proceeds

8  to go to his personal vehicle, which is now parked at the

9  County Line Bowling Alley.

10       Peter is distraught at this point and pleads with

11  Joseph that he wants to go home.  He wants to get out of

12  here, but Joe threatens him that he's going to stay with

13  him.

14      Q     What do they do from there?

15      A     At that point Joe tells Peter to drive the car to

16  Massapequa, down by the shore, by Dick & Dora's Restaurant.

17      Q     What's waiting for them when they get there?

18      A     When they get to Dick & Dora's Restaurant,

19  there's a personal family boat, personally owned family

20  boat.  Joe goes to the slip where the boat is parked and

21  drives the boat around onto the beach and Peter's told by

22  Joe to help him load the body, load the body off the truck

23  onto the boat.

24      Q     Have you independently verified that, in fact,

25  the Pistones owned a boat at that time?

1        A      Yes, we have SA195

2        Q      Once they get on the boat, what do they do?

3        A      Prior to getting on the boat, as they unload the

4   body, Peter recalls that as they went to take the body out

5   of the truck, the tailgate straps from the truck, due to the

6   weight of Louis's body, the tailgate straps break and the

7   rear tailgate door smashes off the bumper.

8            After this happens and the cooler is now on the

9   ground, Joe advises Pete, "Load the body on the boat."  Pete

10  loads the body on the boat with Joe.

11       Q      Okay.

12       A      And they proceed out to -- off of the Massapequa

13  shoreline.

14       Q      How long do they go out in the boat?

15       A      They -- Peter recalls they were out for hours,

16  endless hours.

17       Q      All this happens during the day or night?

18       A      Night.

19       Q      So it's after dark?

20       A      Yes.

21       Q      Once they get out to a certain spot in the water,

22  what happens?

23       A      Once they're out for a good distance, Peter

24  recalls seeing buoys floating, but they're out for hours.

25  Joe says, "This is the spot we are going to dump the body

April 6, 2000          30

SA196

1     over."

2          Q     They dump the body over the side in the box;

3     correct?

4          A     Yes.  They load the body up onto the boat.  They

5     load it up onto the back of the boat and -- and proceed to

6     place the body -- the box into the water.

7          Q     According to Peter, what do they do to the box at

8     that time?

9          A     To ensure -- Peter describes to ensure the fact

10    that Joe will not have any problems with Peter ratting on

11    him, he forces Peter to shoot holes in the box and he does

12    that by placing his hand over Peter's hand and they shoot

13    extra rounds into the box, at which time now Joe tells

14    Peter, "Now there's no chance that you're going back to say

15    anything to anyone."  That he's in it for shooting the gun

16    into the box.

17         Q     What was the purpose of shooting holes into the

18    box?

19         A     That was just nothing more than insurance on

20    Joe's part to make sure that in case Peter decided to rat on

21    him, that Joe would have some leverage over Peter by saying,

22    "You were in it as well as I was."

23         Q     I'm sorry.  I asked the wrong question.

24               What was the purpose of the holes?

25         A     The holes will make it sink.

                        VERITEXT, LLC
        (516) 608-2411              (212) 267-6868

1    Q    Make the box sink?

2    A    Yes.

3    Q    Did the box sink?

4    A    No.  The box never sank.

5    Q    Why?

6    A    The way the box is built, the box retains air on

7    the sides.  The box never filled up with water and stayed

8    afloat.

9    Q    Essentially, this is made of hollow plastic

10   panels.  Therefore, one hole in the box or two holes didn't

11   make it sink?

12   A    Yes.  Just a giant cooler.

13   Q    Have you or other agents examined that box?

14   A    Yes.

15   Q    Were there bullet holes in the box --

16   A    Yes.

17   Q    -- as Peter described?

18   A    Consistent with what Peter's statements were.

19   Q    According to Peter, after they dumped the box,

20   shot the holes, what did they do?

21   A    At that point then they make their way back to

22   the shoreline.  After getting back to the shoreline, Joe

23   drives Peter back to his home in Farmingdale.

24   Q    Subsequent to dumping the body and this incident

25   ending, did Peter get paid any money for his role in it?

April 6, 2000                    32
SA198

```
 1        A     Yes.  Peter got a few hundred dollars by both
 2   Robert Misseri and Joseph.
 3    · Q     According to Peter Pistone's account, were Joseph
 4   and Robert suddenly flushed with cash after Louis's death?
 5        A     Yes, they were.
 6        Q     Why?
 7        A     After Louis's death, Peter describes that he was
 8   told by his brother, Joseph, that they went back to Louis's
 9   house in Queens and robbed his apartment, which at that time
10   was full of a substantial amount of cocaine.
11        Q     So they sold off the coke and made some money;
12   correct?
13        A     Correct.
14        Q     Have there been interviews conducted of a woman,
15   who was the girlfriend of Louis Dorval at that time?
16        A     Yes, there have.
17        Q     What is her name?
18        A     Janice Triesta (phonetic).
19        Q     According to Ms. Triesta, what happened to Louis
20   Dorval's apartment after his death?
21        A     Louis's apartment was robbed.  She knew of a
22   substantial amount of drugs that were held in Louis's
23   refrigerator.
24        Q     She said what happened to those?
25        A     The drugs were gone.
```

VERITEXT, LLC
(516) 608-2411                    (212) 267-6868

April 6, 2000                    33

SA199

```
 1      Q      In fact, she went back to get them; correct?

 2      A      Yes.

 3    · Q      They were gone?

 4      A      Yes.

 5      Q      Again, it's consistent with what Peter tells you

 6   about how they get the money?

 7      A      Correct.

 8      Q      After the death of Louis Dorval, did Peter

 9   Pistone learn why Louis was killed?

10      A      Yes, he had.

11      Q      What did Joe Baldy tell him about what?

12      A      Joe Baldy told him that -- that Louis was a

13   problem, in the sense that he had a big mouth, that he had

14   recently got indicted by the feds and that he wasn't kicking

15   up to the right people that he was supposed to be kicking up

16   to.  He wasn't kicking up, at all.

17      Q      Are you certain that Joe Baldy said he had been

18   indicted?

19      A      No.  Excuse me.

20      Q      You learned that independently; yes?

21      A      Yes.

22      Q      According to what Peter learned from Joe Baldy,

23   who ordered Louis Dorval killed?

24      A      That would be who Peter referenced as the old

25   man.
```

```
 1        Q     Who is the old man?

 2        A     Which was Sony Frances.

 3      · Q     Why is it that Joe Baldy would carry this murder

 4   out?  Why was he responsible?

 5        A     Joe Baldy was the person who stood up or vouched

 6   for Louis initially when he became part of the -- part of

 7   the underworld, the organized crime world.

 8        Q     Based on your understanding of how that world

 9   works, is it fair to say that Joe had to clean up a problem

10   he caused?

11        A     Yes, it was.  Louis's problems now became Joe's

12   problems.

13        Q     So either he kills Louis or what happens then?

14        A     Or then it was either Joe kills Louis or Joe

15   would have had problems himself.

16        Q     All right.  Let's move ahead a little bit.

17              Calling your attention to February 15th of 1998,

18   can you tell me what, if anything, happened to any members

19   of this crew that night?

20        A     Yes.  Joseph Baldy, Peter Pistone and Gary

21   Hendrickson were arrested by -- were arrested by the

22   Brookville Police Department for an arson that had taken

23   place off of Old Brookville Road in Brookville.

24        Q     How was it they came to be arrested?  ·

25        A     They had -- they were stopped by the local police
```